THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

LIVEVIDEO.AI CORP
    *Plaintiff,*

vs.

                              CIVIL ACTION

SHARI REDSTONE,
NATIONAL AMUSEMENTS, INC.,
CHRISTINE VARNEY,
MONICA SELIGMAN,

    *Defendant's.*
_____/

**SECOND AMENDED**
**COMPLAINT AND**
**JURY DEMAND**

Plaintiff, LiveVideo.AI Corp., (hereinafter "Plaintiff" or "Live") hereby alleges, for its First Amended Complaint against Defendants, SHARI REDSTONE, NATIONAL AMUSEMENTS, INC., CHRISTINE VARNEY, and MONICA SELIGMAN, and DOES 1-10 (hereinafter collectively the "Defendants"), as follows:

1.  Plaintiff, LiveVideo.AI Corp, is a New York based Artificial Intelligence technology company that sought to participate in what it had believed was a bidding process to acquire Paramount Global, Inc. ("Paramount") owner of CBS, Comedy Central, Nickelodeon and MTV. However the opportunity to buy Paramount ended on July 7, 2024 when it entered into a binding merger agreement with Skydance, a private Los Angeles based film company.

2.  The Plaintiff did not get a chance to have its July 5th 2004 buyout offer considered because of a series of unlawful actions taken by the defendants who were in control of the Paramount sales process and had significant conflicts of interest with the Plaintiff's CEO.

3.  Federal questions include whether the Plaintiff and its CEO were victims of harassment and discrimination after the defendants decided to retaliate for protected actions under §78u–6(h)(1). In addition, the Plaintiff was the victim of several types of tortious interference

1

instigated by the defendants to harm its relations with Paramount including the unauthorized accessing of Paramount's computer system which violated 8 U.S.C. § 1030 – The Computer Fraud and Abuse Act.

## NATURE OF THE CLAIMS

4. This action seeks relief under §78u–6(h)(1), declaratory and monetary damages for U.S.C. §1030 violations, while also redressing tortious interference and unfair competition torts.

## JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (Federal question). 28 U.S.C. § 1367 provides supplemental jurisdiction over the state law tort claims that arose from the same common nuclei of facts. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful practices and actions alleged herein, occurred in or around the City of Manhattan, New York. Upon information and belief, Defendants respectively have ongoing and systematic contacts with this District, maintain offices in, reside in, and/or have committed wrongful acts which occurred within this District, and which impacted this District.

## PARTIES

6. Plaintiff, LiveVideo.AI Corp., incorporated in the State of Delaware, with its main offices in New York.

7. Defendant, Shari Redstone (hereinafter "Redstone"), President of Defendant National Amusements, Inc., Chairperson non-party Paramount Global Inc., and a citizen of Massachusetts.

8.    Defendant Monica Seligman (hereinafter "Seligman"), a New York resident, serves as a Paramount Special Committee Member and joined Plaintiff's competitor OpenAI as a Director in March 2024.

9.    Does 1-10 and Non-Party Christine D'Alimonte (hereinafter "D'Alimonte"), a New York resident was General Counsel of Non-party Paramount Global d/b/a Paramount, f/k/a Viacom CBS, Inc., registered in Delaware and operating its principal place of business in New York.

## **FACTUAL ALLEGATIONS AND RELEVANT BACKGROUND**

**Viacom Acquires MTV and Nickelodeon Crown Jewels**

10.    In 1970s Great Uncle and mentor of Plaintiff's CEO the late Gus Hauser, a former Harvard Law School professor, Chairman and CEO of Warner Communications created cable channels MTV and Nickelodeon.[1]

11. Gus left and "Warner sold the Warner Amex cable programming business, including MTV, Nickelodeon and The Movie Channel to Viacom" started by Harvard Law educated, Sumner Redstone as movie theater chain and diversified entertainment company, Paramount Global ("Paramount").

12.    Plaintiff's CEO starts eUniverse, Inc., 1999 by reverse merging e

---

[1]

commerce site CDUniverse.com, with one million users, into a public shell, expanding into a network of entertainment quickly surpassing even Google with nearly 50 million monthly average unique users (MAU) by August 2001.

13. After launching 100% owned Myspace.com in August 2003 which would quickly become eUniverse's crown jewel asset, things took a turn for the worse when a venture capital fund gained control of eUniverse aided by unscrupulous members of the Board of Directors. The CEO resigned at end of October 2003. exposing part of wrongdoing in 8k disclosure. In July 2005, due to the progress made by the Plaintiff CEO's complaint against the outside venture capital firm and Directors for their wrongdoing, they signed a deal with News Corp for broad indemnification as part of a sale offering shareholders $12.00 per share cash. The Plaintiff's CEO still owning 12% of eUniverse believed the price to be unfair based on the continued growth of Myspace.com the #1 social network.

14. The Plaintiff's CEO learns Viacom was misled and had no chance to make a bid, contacts International division head, Robert Bakish, Paramount Global's future CEO, on august 2, 2005 Subject: "Myspace – shareholder"

> "Bob-I am currently a 10% holder of Intermix, the company that owns Myspace.com I was the founder and CEO of Intermix until October 2003, and actually initiated the creation of Myspace (I bought the company of the execs that run Myspace today-Chris Dewolfe) I think management & the VCs that control a big block of stock are selling too cheaply to News Corp. " "My idea …
> MYSPACE- THE PUBLIC COMPANY BACKED BY VIACOM/MTV-
> "Viacom comes in as a strategic investor offering to buy 33% of Intermix shares at $12.10 a share (roughly a $200mln investment). "

4

> "shareholders can sell some of their stock and keep a portion to go 'long' on the MYSPACE story- "
>
> "BOTTOM LINE- The marketplace gets a pure play Myspace that is publicly traded.""Viacom has a great new strategic Relationship with the Myspace"

15. Confirming interest in joining the $13.50 counter offer ahead of eUniverse's September 30, 2005 Shareholder vote, the Plaintiff's CEO begins strategizing with Viacom's top lawyer Michael Fricklas in August 25, 2005 email:

> Subject: FW: Complaint
>
> "Good speaking with you today! I will try to arrange a call with my lead lawyer (from Quinn Emanuel) who is riding herd with Crayton Condon ASAP. In addition, I could also arrange a casual conf call Tomorrow or Monday-with the principal at firms Trafeletter & Gardener Lewis.to give you a good sense of institutional support. Between these 2 and myself, we are at about 10mln shares or 23% roughly."

16. Paramount top executives receive more compelling reasons to join the $13.50 counter offer from Plaintiff CEO's August 28, 2005  6:02:28 PM email.

> To: "Bakish,Robert"<bb@viacom.com>,michael.fricklas@viacom.com
>
> Subject: Myspace Metrics/Value
>
> "Gentlemen-I am sure you saw the NY-TIMES MYSPACE article today. A little metrics and back of the envelope valuation piece I put together for some private equity funds I just started talking to. I believe I have one fund focused in the online space that would Be willing to form a partnership to bring a voting block together to do the 35-45% buyout of Intermix and creation of a Myspace Public company. Perhaps they could be the 'front-guy' on such an attempt to keep Viacom out of the limelight. They could drop in $50 - 100 million By themselves. MYSPACE- TRAFFIC GROWTH & VALUATION The Deal with News Corp was announced on July 18th.Since then, in roughly 30 days, Myspace has increased its weekly unique visitors by 17% and # of ad impressions by over 30%. (according to online traffic measurement company Nielsen Netratings for period covering July 3-August 14, 2005).THIS IS STAGGERING "

5

17.    The Plaintiff's CEO, and the senior executives agreed to form a joint

venture that included a Paramount promise to finance the $13.50 counter offer.

18.    As part of their agreement, Paramount also assures the Plaintiff's CEO,

a valuable counter-bid partner worth $13.50 and a potential future strategic

collaborator, that they will be treated "fairly" if Paramount were ever to go up for

sale in accordance with Delaware law. Including allowing LiveVideo.AI's CEO to

participate in making an offer or submitting a bid alongside other interested

parties.[2]

19.    LiveVideo.AI's CEO could have reasonably assumed based on the

prior affirmations of top leadership executives met with in 2005 that in the future

because it cost Paramount no cash expenditure, the understanding would be

honored and the Plaintiff's CEO no later then July 5th, 2024 would also get equal

access to any confidential information shared with other potential buyers upon

expressing interest to make an offer to purchase Viacom (including its predecessor)

should it go up for sale.

---

[2] This promise was made based on the mistreatment that Paramount suffered under
the control of Myspace's parent company in 2005. The management colluded with
News Corp and quickly signed a merger agreement, resulting in Viacom's bid
being disregarded and ultimately harming both eUniverse and Paramount
shareholders.

20. The Plaintiff's CEO in turn agrees to Paramount's condition: Paramount's role providing the financing will not be disclosed publicly until after shareholders reject or eUniverse' Board terminates the News Corp deal.

21. The $13.50 counter offer is announced September 23, 2005 then filed with SEC September 27, 2005, done only days before the September 30, 2005 News Corporation Intermix/eUniverse shareholder meeting to approve the below fair market $12.00 buyout. (Exhibit #3)

22. The $13.50 counter-offer is already challenged by the severe time constraints allowing for the marshaling of sufficient shareholders to vote against News Corp's offer before the shareholder meeting.

23. However harming the $13.50 counter-offer even more was a diabolical scheme approved by News Corp's outside counsel to pay undisclosed cash bribes to eUniverse and Myspace's management teams to induce them to omit disclosure of Myspace's financial results ahead of the September 2005 shareholder meeting.

24. Despite the $13.50 counter-offer failing to stop the News Corp $12.00 buy out, the Plaintiff's CEO continued to maintain a friendly relationship with Bakish, while continuing to advance and expand the business relationship with Paramount and its predecessor thru the present.

**The Genesis of Paramount's 2024 Merger with Skydance**

7

25. Defendant NAI controlled CBS Corporation ("CBS") and Viacom Inc. ("Viacom") after they were split into separate companies in December 2005.[3] As NAI founder Sumner Redstone's health began to decline in 2014, Defendant Shari Redstone seized control of NAI, reshaped both CBS and Viacom board, all done while strictly seeking to find the best exit strategy for NAI.[4]

26. In January 2018 Evercore[5] advised Redstone of the risk of no buyers for Viacom if sold separately from CBS, suggesting CBS and Viacom be combined followed by a sale of NAI would be best for Redstone but not necessarily fair or good for shareholders of CBS, Viacom, or successor Paramount.

27. Defendant Redstone's uses NAI status and power with outsize voting power, ousted and packed both boards with Directors willing to give her what she wants and succeeds in forcing a CBS-Viacom merger at the end of 2019.

**Redstone Controls Conflicted Paramount Board**

28. After the CBS-Viacom merger closed Redstone packed Paramount Global ("Paramount") Board with insiders over whom she exercises control and Bob Bakish became CEO of the combined entities renamed Paramount Global.

---

[3] *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at *6, *15 (Del. Ch. Jan. 27, 2021).

[4] *See id.* at *6, *9.

[5]

8

**The AI Technology Partnership**

29.    In early 2023 Plaintiff  had developed and acquired multiple AI technology products and services for use across Paramount.  Plaintiff contacted Paramount publishing arm, Simon & Schuster July 17, 2023 thru their Senior Vice President Jennifer Bergstrom and made a "proposal for a strategic digital media AI partnership", stating "I am writing you to schedule meeting to present a proposal for a strategic digital media AI partnership benefitting S&S. " Noting how the Plaintiff was recently CEO was "featured as top AI expert by Fox Business in their future of AI forecasting report March 28, 2003:" (Exhibit #2)

**2023 IP Deals**

30.    On August 8, 2023, LiveVideo.AI emailed Paramount's CEO with a new idea as part of a planned stratagem to begin development of joint IP LiveVideo.AI had acquired from its CEO into valuable film and television assets.

31. The Plaintiff had high expectations for the IP partnership because LiveVideo.AI had determined Paramount to be the perfect business partners for exploiting the aforementioned IP it owned and LiveVideo.AI presented directly to Paramount CEO in 2023 proprietary IP plan to create and market films, TV, books based on (i) the true story of Myspace.com, titled "Myspace: End of eUniverse," (ii) a true story about first USPTO trademark for Metaverse issued July 4, 2000, and (iii) the true story of the y2k credit card hacking incident involving Russian hacker Maxus.  Plaintiff used a strategy to entice the Paramount CEO with a

9

movie deal that would showcase their successful production arm and feature the

CEO in a positive light as August 8th 5:30PM email points out, Paramount is

significantly involved in shared historical events involved in the true story of

Myspace.com in 2005 during a critical juncture in the historical story.

"Subject: Congrats! Your edgy inspiring 2005 media fighter role made cut!

"The kid stays in the movie.".."Whats better then "The Social
Network2"? "Myspace: End of EUniverse".(working title) "
"premieres Xmas 2025.

"Scene Title (you will be forced to select actor to play your role)"

"September 2005, BG announces $13.50 per share counter-bid (which
Viacom is secretly financing)…to keep Myspace Public"
"Despite failing to "create the Utopia deal Viacom the White Knight
owning 20-33% of Public Independent Myspace"

32. The strategy proved successful, as evidenced by Paramount's CEO not

rejecting or criticizing the offer and plan outlined by email.[6] The Plaintiff had a

clear path to complete an IP Partnership with Paramount - all they needed to do

---

[6] Back in the year 2000, the Plaintiff was in a race against time. The ruthless
Russian hacker, Maxus, had already infiltrated their systems and was holding the
entire company hostage with his demands. In a desperate attempt to protect the
privacy of hundreds of thousands of customers, the CEO made the difficult
decision to pause production on their partnership with Paramount's 60 Minutes.
But there was no time to waste as the CEO worked alongside the FBI to secure
their e-commerce website and fend off Maxus' relentless attacks. Every second
counted as they raced to prevent the hacker from releasing sensitive information
and credit card numbers belonging to innocent customers. It was a high-stakes
battle for national security and employee safety, and Plaintiff's CEO was
determined to come out victorious. (see https://www.zdnet.com/article/biggest-
hacking-fraud-ever/ )

was provide a completed book so that Paramount could begin production, including adapting it into a screenplay. The Plaintiff had already completed most of the important work involved in this story about the Founder of Myspace.com during its launch in 2003. They also invested significant time and resources into finding outside parties, including an author and screenwriter, who would enhance the value of the IP Partnership for both Paramount and themselves.

33. For comparison, the biopic in 2010 by Sony Pictures "The Social Network" according to Nash generated $224,922,135 in global box office revenue and an est $34,697,366 Domestic Video Sales.[7] not include streaming receipts or cable/broadcast rights.

34. In September 2023, the CEO of LiveVideo.AI Corp exercised their "first look" provision from the 2005 Paramount $13.50 Counter-bid agreement and sent a proposal to Paramount's CEO. The proposal offered the opportunity for Paramount to discuss taking a strategic stake in LiveVideo.AI Corp. A few days later, after reviewing the proposal, Paramount's CEO responded directly via email to thank the Plaintiff's CEO for the offer but declining to invest cash in purchasing a minority equity stake in a private company at that time. It was later revealed that Paramount was focusing on cash preservation and sale of assets to pay off debt.

**Financial difficulties Pushes Redstone Frantic Fire Sale of Paramount**

---

[7] https://www.the-numbers.com/movie/Social-Network-The-(2010)#tab=more Page 4 of 4

11

35. After the CBS-Viacom merger, Paramount had been consistently paying out a quarterly dividend of $0.24 per share. However, in 2023 this amount was drastically reduced to only $0.05 per share.[8] This dividend was crucial for NAI and Redstone to cover their operational costs without having to resort to selling or using shares as collateral.

36. To make up for the shortfall, Defendants Redstone and NAI secured a $125 million loan from BDT Capital[9], who became their financial advisor. According to NY Post story titled "Shari Redstone banker tied to Warren Buffett amid Paramount sale talks",

> "BDT" stands for Byron David Trott — a former Goldman Sachs executive who has long been most famous for being Warren Buffett's banker. "
>
> " One major elephant in the room: Warren Buffett — a longtime client of Trott, although it's not clear he's currently a client — also happens to be Paramount's biggest shareholder. Buffett's 15% stake is down about 60% since he began amassing it in early 2022. According to a well-placed source, Buffett began amassing his stake shortly after Redstone hired Trott as her banker."[10]

---

[8] Paramount Global, Inc., Dividend Information, https://ir.paramount.com/dividend-history#menu. Paramount has been forced to maintain the $0.05 dividend since May 2023.

[9] Jessica Toonkel, *Paramount Global Controlling Shareholder Gets $125 Million Investment*, THE WALL STREET JOURNAL (May 25, 2023),
https://www.wsj.com/articles/paramount-global-controlling-shareholder-gets-125-million- cash-infusion-9e155340.

[10] A key backer of Skydance is Gerry Cardinale, the dealmaker behind RedBird Capital — who also happens to be a former Goldman banker who worked with Trott and spent a short time at BDT.

37. According to the New York Post, a looming deadline to repay a separate

$175 million loan was the driving force behind Redstone's rushed decision to sell off

assets. Failure to meet the deadline could result in her losing control of Paramount

by being forced to sell shares according to the New York Post losing control of

Paramount[11].[12]

38. According to other reports, Shari Redstone held meetings with Skydance

CEO David Ellison in the summer of 2023 to explore the possibility of acquiring

NAI, rather than Paramount.[13] Despite obvious conflicts of interest, Paramount

Board delays until January 2, 2024 forming a Special Committee of independent

directors to "evaluate strategic alternatives, including third party proposals."

Paramount Form 8-K,  January 10, 2024, the *New York Post* reported  Shari

Redstone  put NAI up for auction.[14] January 24, 2024, various reports suggested

---

[11] *Id.*

[12] *Id.*; Cynthia Littleton, *Shari Redstone's National Amusements Receives $125 Million Investment From BDT & MSD Partners*, VARIETY (May 25, 2023), https://variety.com/2023/biz/news/shari-redstone-paramount-bdt-capital-investment-1235625758/.

[13] Josh Kosman, *Shari Redstone banker's ties to Warren Buffett raise scrutiny amid Paramount sale talks*, NEW YORK POST (Jan. 18, 2024), https://nypost.com/2024/01/18/media/shari-redstone-banker-tied-to-warren-buffett-amid-paramount-sale-talks/.

[14] J. Kosman, L. Moynhian & A. Steigrad, *Shari Redstone launches auction of Paramount Global's holding company: sources*, NEW YORK POST (Jan. 10, 2024),https://nypost.com/2024/01/10/business/shari-redstone-launches-auction-of-paramount-global-holder-source/.

13

that Skydance made a bid to acquire NAI, which was contingent on a second stepdeal with Skydance acquiring Paramount.[15]

39. April 3, 2024, Skydance and Paramount entered into a 30-day exclusive period blessed by Paramount Special Committee advisor Centerview Partners, conflicted from financial advisor role for CBS special committee in previous Viacom merger. The Delaware Court noted the conflict and speculated Centerview was hired by Paramount but controlled by Redstone's instructions – to focus on the Skydance offer and ensure its success.[16]

**Redstone Recklessly Removes Plaintiff's CEO Contact**

40. April 26, 2024, Paramount announced resignation of CEO Bob Bakish and the formation of an "Office of the CEO" committee. It is believed that Bakish was forced out by Redstone due to opposing Skydance. Unexpected loss of a CEO when selling diminishes its value, forcing potential buyers to bring emergency plan for transitioning it.

41. Redstone proceeded as if this event would not be seen as a surprise by bidders and shareholders while also not lowering in the short term the value of Paramount on the auction block requiring a repair or replacement CEO before continuing the sales process . On April 29th, it was reported Skydance had

---

[15] Alex Sherman, *David Ellison's Skydance Media explores acquiring all of Paramount Global, sources say*, CNBC (Jan 25, 2024), https://www.cnbc.com/2024/01/24/david-ellisons-skydance-media-explores-buying-paramount-global.html.

[16] This goes against their role to independently advise the Special Committee on strategic alternatives for Paramount's shareholders. The exclusivity agreement was not received well by Paramount's investors.

provided a "best and final" offer but was refusing to require shareholder approval which the deal had earlier been conditioned on. In late May, the special committee accepted Skydance revised offer, with no shareholder vote provision.[17]

**Plaintiff Five June 2024 Phone Calls/Voicemails To Defendant Redstone**

42. LiveVideo.AI after having lost its CEO contact decided to contact the sole party news articles consistently pointed to as the individual responding to offers from potential bidders, Defendant Shari Redstone after reading June 3rd news that Paramount Special Committee accepted Skydance's buy out terms.[18]

43. LiveVideo.AI's CEO engaged in extensive efforts to contact the defendants and press forward with completing a transaction. Contacting National Amusement HQ in Norwood Massachusetts during working business hours on five separate days between June 3rd thru 11th, leaving five very detailed voice messages at Shari Redstone's office while also providing Redstone's executive assistant Michelle with a myriad of options NAI could use to communicate with

---

[17] Shareholders expressed dissent. The advisors for NAI, Paramount, and Skydance were aware of potential lawsuits and discussed how to handle them, but negotiations continued. Redstone and NAI insisted on legal protection from Skydance in case of lawsuits as a crucial term in the deal.

[18] "Paramount Global has agreed on terms of an \$8 billion merger with Skydance", "under the proposed deal with a Paramount special committee to pay \$2 billion for Paramount's parent company, National Amusements," "An announcement could come as soon as Tuesday at Paramount's annual shareholder meeting, according to reports.", "We received the financial terms of the proposed Paramount/Skydance transaction over the weekend and we are reviewing them," a National Amusements spokesperson said. https://nypost.com/2024/06/03/business/paramount-skydance-agree-to-terms-on-8b-merger-deal-report/

15

and contact back LiveVideo.[19]

Calls to National Amusement's Shari Redstone and Paramount General Counsel Christine D.

1.  June 3- 3:50PM 1 minute 9 second voicemail left with Shari's assistant Michelle* (781-461-
    1600)

2.  June 4-5:47pm est, 1 minute 22 second voice mail left with Shari's assistant(781-461-1600)

3.  June 6- 4:20PM 1 minute 10 second voice mail left with Shari's assistant

4.  June 6- 4:50pm est  2 minute 15 second voice mail left with PARA GC (212-846-5933)

5.  June 7- 3:16PM est 1 minute 28 second voice mail left with Shari's assistant(781-461-1600)

6.  June 11- 6:03PM est 1 minute 21 second voice mail let with Shari assistant(781-461-1600)

7.  July 5-5:02PM est 1 minute 10 second voice mail left with Shari assistant(781-461-1600)

\*the National Amusements switchboard requests caller key in last name of person they are
trying to reach. Keying in Redstone is recognized and forwards to voicemail of executive
assistant Michelle

44.  June 4th, Redstone tells public she is "Unhappy" with Skydance

deal and "Considering Rival Bids and Options", these false statements mislead the

Plaintiff and its CEO inducing them to continue efforts, including work to prepare

offer, soliciting financing sources to pay for making buy out of Paramount and

---

[19] On June 3rd at 3:50pm Est. A company directory was the only option
because there was no live operator that picked up after the Plaintiff dialed: 781-
461-1600. The CEO of LiveVideo.AI contacted the headquarters of National
Amusement in Massachusetts five times over the course of a week, leaving
messages for Shari Redstone through her executive assistant Michelle. They
invited Redstone to view a CNBC interview and informed her that their company
was interested in making a better offer for Paramount's shares than what had been
reported in the media, highlighted how their company could strategically benefit
Paramount with advanced AI technology and their CEO's experience running a
publicly traded compan, and assured Redstone that their purchase would not
involve breaking up and selling off the company, left contact info, signed nda.

NAI offer and consulting with various tax and finance advisors.[20]

> "The new Skydance offer included "reducing Skydance's valuation of
> the merger to \$4.75 billion from \$5 billion, to the dismay of Redstone,
> Reuters reported."
> "Redstone is unhappy with the updated merger deal from Skydance
> and is considering rival bids and options."
> "Redstone is now reportedly considering an offer from Hollywood."
> "Sources said Redstone is obliged to consider all offers for National
> Amusements."

45. Redstone had even allowed Paramount a full fair chance to prominent

other potential acquirors including on or about January 31, 2024, Byron Allen's

Allen Media Group to submit a bid for Paramount Global.

46. On June 6th, the plaintiff had no choice but to leave a voicemail for

Redstone at 4:20PM EST for 1 minute 10 seconds, reiterating points from a

previous message left on June 4th. Since Redstone expressed unhappiness with the

Skydance terms and was open to other offers, the plaintiff could confidently state

that Plaintiff's offer would be better for Redstone and Paramount shareholders.

47. As result that Plaintiff's contact is removed as Paramount CEO in April

on June 6th the Plaintiff pivots to try to connect with Paramount's General Counsel,

D'Alimonte through a phone number listed with the New York Bar Association.

Despite multiple call attempts, Plaintiff was unable to reach her and left a 2

[20] "Paramount Global shares drop after annual meeting as hopes of merger with Skydance fade"
https://nypost.com/2024/06/04/media/paramount-global-shares-drop-after-annual-meeting-as-hopes-of-merger-with-skydance-fade/

minute 15 second voicemail at 4:50pm EST.[21]voicemail left the previous day,

48.Plaintiff attempted to reach NAI and Redstone by telephone during

working hours on June 7th only to get the same voicemail sole option, and the

Plaintiff finally with no other choice and limited to making a communication by

leaving a fourth voicemail did so at 3:16PM est for 1 minute 28 seconds which

largely re-iterated the same points stated in first voicemails left June 3rd, 4th, 6th.

49.Redstone continued to manipulate the public spin and messaging she

sought to be broadcast out to interested parties like LiveVideo.AI to manipulate

them as a June 7th headline: "Redstone was unhappy with the reduced offer, paving

a way for rival bidders to make their case."[22] Redstone used manufactured media

stories to give the illusion that she was working for shareholders and keeping

Paramount's sales process unbiased. However, shareholders increasingly vocal

about dislike for Skydance proposal and wanted other suitors.

50. Caving to Shari Redstone's demands, key Paramount officers were

spontaneously given improved management severance packages in 2024 to

disregard their fiduciary duties to shareholders, mitigating resistance by Paramount

---

[21] informing her of their superior offer for a Skydance merger that included
purchasing Redstone's shares in Paramount and NAI. The Plaintiff also mentioned
that their offer was willing to be subjected to approval by a majority vote and
would pay higher prices per share for both Class A and Class B stockholders
compared to Skydance's proposal. Further Plaintiff made clear that messages by
Plaintiff regarding interest were also being left with Chairperson Shari Redstone.
Also to speak with D'Alimonte about a conflict of interest with "one member of
the special committee". With Paramount's GC refusing to respond to the Plaintiff's
[22] https://nypost.com/2024/06/07/media/shari-redstone-receives-fewest-votes-in-paramount-board-election/

18

Officers or Directors as Shari usurped third parties' interest in acquiring Paramount

to usurp its corporate opportunities, pushing buying NAI as an alternative means to

acquire control of Paramount

### Defendants Conceal July 5, 2024 Fax and email Offer

51. Despite defendant's multiple delay tactics, Paramount Chairperson

Redstone received Plaintiff July 5th offer by corporate fax, and emailed to NAI

top lawyer on July 5. 2024.[23] Defendants ignore both Plaintiff's July 5, 2024 offers

sent by fax and to Mr. Jankowski by email. (Exhibit #1)

52. Meanwhile evasive Defendants rushed to complete and sign a merger

with Skydance on July 7th adding a new material $400 million dollar termination

fee to help scuttle any other interested bidders. (Exhibit #2)

53. Another element of the bid ridding scheme was to avoid a Livevideo

rival bid to emerge in the media and press like the 2007 Dow Jones Counter bid

which became featured by CNBC in interview by host Maria Bartiromo. The

particular need to conceal the Plaintiff's bid was to keep Plaintiff from getting

---

[23] "purchase...interests..NAI holds..on superior terms to..Skydance"
"higher of $17.50 per share or.. 111% of ..price offered by SkyDance"
"CEO with significant public operating experience "
"under the structure you prefer..or..subject to…shareholder approval."
"binding" agreement "within 3 business days from…return.. NDA "
left a voice mail ..indicating our intent to make an offer…2 weeks ago ""PARA
GC".blocked..progress to move offer process forward."
"some conflict of interest concerns.. certain members special committee… impact
ability consider.. what was best for..fiduciaries"

the Paramount largest independent shareholder Gabelli's support.[24]

The defendants concealed the Plaintiff's bid because they knew Gabelli's fund

would support LiveVideo.AI over Skydance, as evidenced by his previous

successful investments in eUniverse and Viacom. The Defendants were aware that

Skydance's management team had a history of sexual harassment including a top

executive terminated by NBC for violations corroborated as well as a top executive

terminated from Pixar, as reported by Chicago Tribune[25]

and other news sources like NY Post[26], while LiveVideo.AI had a clean track

record, making them the more favorable option for investors.

54. Between July 5th and July 7th defendants interfered with the plaintiff's

potential business relations by erasing records, refusing to contact Plaintiff about

the July 5 offer letter faxed and emailed or the voicemail left later in the date for

NAI President and Paramount Chairperson Shari Redstone voicemail expressing

interest in acquiring Paramount and NAI.

55. Defendants used false statements broadcast on television, radio, and

---

[24] Mario Gabelli, Paramount's largest non-Redstone voting-stock shareholder, threatened legal action if Shari sells voting stock.

[25] https://www.chicagotribune.com/2024/07/08/column-paramounts-new-president-was-fired-last-year-as-ceo-of-nbcuniversal-after-allegations-of-sexual-harassment/

[26] https://www.msn.com/en-us/money/companies/feminist-group-blasts-skydance-for-naming-jeff-shell-president-after-hadley-gamble-sexual-harassment-scandal/ar-BB1pLdY2

print, while also waiving away adviser initiated inquiries requesting contact

approval with Plaintiff and refusing to follow up through outside advisors and law

firms, making defamatory statements, they influenced others to turn a blind eye to

their reckless actions.

## **COUNT I -Unfair Competition (Brought Directly Against All Defendants )**

56.     Plaintiff repeats and re-alleges every allegation set forth in previous

paragraphs as if fully set forth herein.

57.     Redstone and NAI with BDT transferred control of Paramount's sale

process from one run in the best interests of shareholders to one tilted in favor of

Defendants Redstone, NAI, and creditor advisor BDT whose former employee was

partners with the winning Skydance July 7 merger agreement Paramount entered

into and in the process the Plaintiff was harmed including the concealment and

blocking of its July 5, 2024 offer sent to the defendants.

58.     One method was unfairly using a conflicted BDT role as financial

advisor to assign or recommend Redstone insert as Special Committee outside

counsel a conflicted person that was previously adverse to Paramount in another

transaction and responsible for harming Paramount shareholders   while that lawyer

was engaged by rival News Corp.

21

59. Shari orchestrates strategy to force Paramount to rubber stamp transactions NAI, Redstone, and Lender BDT wanted done quickly without the usual checks and balances restraining Boards of public companies.

60. The BDT Plan Lend Cash To Shari Redstone Collateralized By Paramount Stock. First Shari agrees NAI hires BDT as its advisor on all Paramount financial transactions including change of control. Assigning the NAI lender to be advisor on future sale of core asset securing lender's loan instantly created conflicts of interest the sort of transaction that would never have been approved by a public board of directors. BDT places Christine Varney from its long time law firm Cravath Law, in key Paramount with the help of NAI and Shari Redstone. As outside counsel for the Special Committee, Varney controlled information, making influential recommendations, having ability to communicate with BDT, NAI, and Redstone about committee decisions and reactions.

**Paramount and Plaintiff CEO Both Victims Of Varney 2005 Bid Rigging**

61. Varney's strategy to help her client News Corp snatch up Myspace's public parent company damaged and humiliated Viacom when the company failed to deliver a bid. Years later Federal Judge George King will conclude the target company's management," evaded Viacom's advances, even though it's representatives were communicating a competing bid was imminent." (Exhibit #4)

62. NY Times' Gretchen Morgenson described Judge King 2010 ruling:

> "a shareholder's worst nightmare. A company is in play, with two potential acquirers circling it, but the boards of directors and others running the enterprise who are supposed to snare top dollar for shareholders favor bidders who are dangling the biggest rewards for directors and senior executives.

63. Defendant Varney managed the "dangling" that NY Times cites the Judge concluded occurred harming Paramount shareholders and the Plaintiff's CEO.[27]

64. The lawyers blueprint in 2005 for News Corp allowing them to acquire publicly held Myspace at a below fair market price, outfoxing an equally determined key rival, Paramount's predecessor Viacom, Inc.

65. Another problem with Varney however beyond the first conflict of interest issue cited previously. Varney was saddled with an unusual legal liability created during a crusade she had undertaken in 2005 while serving as top lawyer for News Corp in its completed acquisition of eUniverse (later renamed Intermix) and its Myspace asset (collectively the "Myspace buyout"). She manipulates Paramount into quickly approving a future transaction that NAI, Redstone, and lender BDT have been eagerly awaiting.

---

[27] "Testimony and documents in the case indicate that Viacom was excluded from the bidding process and did not have the opportunity to top the News Corporation offer before Intermix accepted it."

"evidence and testimony...points to Mr. Rosenblatt favoring the News Corporation bid because he anticipated receiving a big job there if the deal went through. "
"Judge King wrote that evidence "raises the inference
that Rosenblatt"..was dodging Viacom's advances,".."On July 15, 2005, a female executive from MTV, a Viacom unit, alerted Mr. Rosenblatt that Viacom would produce a bid early the following week. The judge said, "Rosenblatt replied evasively, failing to correct her mistaken impression that the auction would still be ongoing after Monday."

"there are at least triable issues of fact" about whether Mr. Rosenblatt acted in good faith or tilted the auction in favor of the NewsCorporation "for a purpose other than maximizing shareholder value."

66.    Varney's "strategy" for acquiring the company was a plan to pay off

key individuals with under-the-table cash bribes. Evidence in the class action case

revealed that Varney had orchestrated secret cash payments without disclosing

them publicly before the crucial shareholder meeting (page 172, 174, 176, 178, dkt

18-1 Federal FRCO Rule 23 Case No. 5:1606268 see Exhibit #5).[28]

"Summary of key deal terms [TBD]"

"Approximately $709 million"

"Expect to enter into arrangements with a pre-tax cost of $70mm post transaction signing to ensure continuity of key personnel"[29]. "Deal Update" report from "Fox Entertainment Group"

"Total deal cost: $750M vs. previous $680M", iii.

"Myspace Retention Plan"…"$90M gross ($50M net) critical to maintain positive relationship with management and reduce their tax exposure as much

---

[28] The sheer amount of money involved - a whopping $70 million dollars - was enough to raise suspicions but News Corp's attorneys ensured client got what wanted and these proof of manipulating and deceiving omissions even after the merger agreement was signed and publicly announced, Varney gave her approval for another $70 million dollars to be paid off to management, advising both companies not to disclose them. It was clear that the attorneys for Paramount rival main concern was securing the deal at any cost, even if it meant disregarding ethical and legal boundaries. Federal Class Action by public acquisition target shareholders of which largest qualifying FRCP Rule 23 certified class member is GAMCO Gabello Case 5:16-cv-06286, which finally concluded in 2013 with Varney's client settling for a hefty sum of $45 million dollars. The Federal Judge presiding over the case had already deemed it highly likely that bid rigging had occurred.

[29] and that as a premeditated scheme which Varney advised to not be disclosed at all to the public target's shareholders before they voted on approving the transaction

as possible."…"Additionally, trigger option pool for rank-and-file employees as goodwill move ($5m). [30]

67. Varney used this strategy to induce the target's management not to consider the CEO of LiveVideo.AI's $13.50 counter offer which Viacom had agreed to provide the financing for back in 2005. (Exhibit #3). This was Case 5:16-cv-06286 which her client settled in 2013 for $45 million dollars after Federal Judge ruled a Jury would likely find bid rigging had occurred in the deal Varney oversaw.[31]

_____

[30] page 178 (Exhibit #5 page 179 dkt 18-1 Federal FRCO Rule 23 Case No. 5:1606268 ). "Revised Investment" that reveals Christine Varney's involvement in directing her client, Fox Entertainment Group. Despite publicly announcing their merger agreement worth $582 million dollars, Varney directed Fox to secretly agree to pay the target company's management a whopping $69 million as part of their "MySpace Retention Plan" - a scheme deemed successful by a Federal Judge in preventing Viacom from bidding on the acquisition And that's not all; after the merger agreement was signed, Varney approved another $70 million in cash payments to management and advised both companies to keep it off their SEC filings before the shareholder vote to approve the sale of Myspace.com's parent company.

[31] 18. Varney was able to accomplish this difficult task thru inducing the behavior of the target acquired corporations thru rigging support by key management like the "Richard Rosenblatt" ceo position cited by the Federal Judge in the King 2010 judgment about Varney's lucrative 2005 completed M&A advisory payday Varney received from News Corp., Intermix, later Myspace.com further paid Varney and her law firm millions of dollars in legal fees thru at least 2013.

five years later and only after a determined push by well resourced and experienced class action lawyers had pursued discovery deep in the process of the securities fraud class action case initiated in 2005 after the News Corp $12.00 Myspace Buyout had been announced.

20. Plaintiff's CEO who at that time owned about 10% of the Myspace public parent, eUniverse (renamed Intermix), had only detected several other problems about the transaction thru reading the SEC filings Varney directed News Corp and

## A. Misleading Press Leaks And Statements

68. On June 11th, Defendant Redstone publicly announced negotiations with SkyDance had ended. This statement was misleading and false because Redstone was aware of LiveVideo.AI's interest in making a competing buyout offer, further wanted to give the appearance that other bidders were welcome while secretly blocking out Plaintiff by instructing Paramount advisors not to engage with them and preventing the Special Committee considering LiveVideo.AI.

69. Redstone's public statements about ending negotiations with SkyDance were misleading and false, leading Paramount's General Counsel certainly by then to make D'Alimonte question the integrity of her leadership. On one hand, Redstone claimed to be open to other bidders while secretly freezing out LiveVideo.AI and preventing the Special Committee from engaging with them. D'Alimonte surely knew that by remaining silent, she would be breaching her duty of candor even further.

## B. Termination of Paramount GC Without Cause Golden Parachute

70. Another masterful chess move in a high-stakes game of corporate manipulation and greed played out resulting in the June 21· 2024 8k disclosure Paramount will terminate her without cause on June 28th.

---

the acquisition target to disclose in required S-4 or 8k filings in the months leading up to the required September 2005 shareholder vote meeting needed to close the Myspace buyout.

26

71. Even more shocking then the GC D'Alimonte  disappearing days after

she learns about LiveVideo.AI offer as if that wasn't suspicious enough, it quickly

becomes clear that the GC was given a lucrative golden parachute worth well over

$5 million cash, to silence any knowledge of Plaintiff's offer and not disclose its

receipt to shareholders an unfathomable deception designed by defendants and

directed by Varney.

72. The true motive behind D Alimonte's sudden acceptance of the  separation

revealed in the 8k is that she, as Paramount's General Counsel, must have made the

difficult decision of the need to publicly disclose to shareholders the existence of a

new potential offer from LiveVideo.AI for a change of control.

C. Ensuring Defective Systems and Internal Controls

73.  Defendants NAI, over ten years later, Defendant Shari Redstone who

lacked operating experience and still continues to lack public company operating

experience and has never signed a Sarbanes Oxley SOX Officer Certificate ,

willfully damaged LiveVideo.AI's business opportunities with Paramount. They

destroyed all records of communication, refused to reach out or allow others to do

so on their behalf, and disregarded attempts at contact from LiveVideo.AI and the

Special Committee. This caused significant harm to Plaintiff's integrity and resulting

in economic damages that will be proven in court.

74. A voicemail left by LiveVideo.AI on June 6, 2024 has informed

D'Alimonte that they have also contacted Defendants NAI and Shari Redstone with their intention to make a competing offer on better terms than Skydance's proposal. Despite this, Defendants Shari Redstone, NAI, Varey, and Seligman instructed D Alimonte to keep quiet about the LiveVideo.AI contacts and not respond to their proposition, while publicly feigning negotiations with Skydance. D Alimonte has discovered that Defendant Shari Redstone's statement on June 11 claiming an end to negotiations with Skydance is deceitful.

75. Despite LiveVideo.AI expressing interest in a buyout offer, Redstone announces that Paramount is open to other offers while secretly working to complete the deal over the July 4th weekend. On July 2, news sources report that NAI and Skydance have reached a revised agreement, falsely making it seem like a recent development. Redstone and affiliated media partners continue to spread false narratives about the situation. These actions misled Plaintiff LiveVideo.AI, which was actively seeking financing for a potential merger with Paramount. D Alimonte has discovered that Shari Redstone falsely claimed she wasn't pursuing the transaction, using media partners like NYPost and WSJ to propagate the false narrative. This is misleading by omission of Defendants Varney, Seligman, NAI, and now Paramount's General Counsel thru an 8k.

## C. $400 Million Dollar Paramount Termination Fee

76. On June 11, 2024, it was publicly reported that Paramount, NAI and

Redstone had rejected the Skydance offer terms.[32]

> "National Amusements confirmed the deal was dead, saying the company has "not been able to reach mutually acceptable terms, regarding the potential transaction with Skydance Media."

NAI said the company "supports the recently announced strategic plan being executed by Paramount's Office of the CEO."

> "Redstone will now likely pursue a sale of just National Amusements, without merging Paramount with another company, according to The Wall Street Journal, ."

"NAI has received interest from two other suitors, an investor consortium led by Hollywood producer Steven Paul, and media exec Edgar Bronfman"

"a committee of Paramount directors, who had recently approved the economic terms of the merger but continued to negotiate with Skydance about other deal points, The Journal said."

"some of those points included pushing for a deal to be subject to a vote of all other shareholders."…"National Amusement was supportive of a vote. Skydance said such a vote is "a nonstarter," according to The Journal."

"The committee was scheduled to vote on the Paramount merger with Skydance on Tuesday afternoon, but it is not clear if the vote happened.

"A spokesperson for Paramount Global declined to comment. Skydance did not immediately respond to a Reuters request for comment."

77.     Plaintiff attempted to reach NAI and Redstone by telephone during

working hours on June 11th after seeing the news reports that Redstone and

---

[32] **"Shari Redstone kills Skydance bid to buy her controlling stake in Paramount Global"**

https://nypost.com/2024/06/11/media/shari-redstone-kills-skydance-bid-for-paramount-global/

NAI had "confirmed the deal was dead" only to get the same voicemail sole

option, and the Plaintiff finally with no other choice and limited to making a

communication by leaving a fifth voicemail did so at 6:03PM est for 1 minute 21

seconds which largely re-iterated the same points stated in the first voice mails left

on June 3rd, 4th, and 6t for reasons completely unconnected with the unfairness of

the deal to shareholders and possible threat of litigation, the delay was in part

caused by Plaintiff June 6th voicemail left with Paramount's General Counsel.

78.   Despite Redstone refusing to respond to LiveVideo.AI she had no

problem engaging other new interested parties.   Reportedly, Diller's company,

IAC, had signed a nondisclosure agreement with NAI and was looking at its data

room to determine the specifics of the bid;

79. On Sunday, July 7, 2024, Paramount and Skydance issued a press

8-K) announcing  a merger agreement "approved by (i) the Paramount Board of

Directors based on the unanimous recommendation of the Special Committee and

(ii) by Redstone's NAI,  (Exhibit #3)  Barclays on July 8, 2024 estimated the price

of Redstone's class A shares from the deal at $66.16 per share,  Skydance will

purchase Redstone's NAI for $2.4 billion, gaining voting control of Paramount and

providing indemnifications to Redstone. Paramount will merge with Skydance,

resulting in 317 million new Class B shares for Skydance, valuing the company at

$4.75 billion.

80. Criticism of the Merger among analysts and within the investing

community has been quick and widespread. July 8, 2024, analysts covering

Paramount downgraded their stock ratings. The $400 million Termination Fee is

exceptionally high, representing 4.8% of the total value of the Merger.

## An Adverse Special Committee Member Seligman

81. Sony invested $5 million dollars in eUniverse for a 15% stake plus a Board

seat in 2001 but writes off investment in 2003, its Sony employee resigning from

Board. Defendant Seligman, is  GC Sony America (SCA) from 2001 until she's

terminated in 2016. After Plaintiff's CEO resigns as eUniverse CEO,   Seligman

breaches 2001 agreements and obligations owed to Plaintiff's CEO by  wrongfully

adding a non Sony employee into eUniverse's Series B right for a Sony employee

only. Seligman's further failed to review the background of their nominee, failing to

disclose  Edell's bankruptcy as required under Federal Law and SEC regulations nor

to make corrective disclosure under Rule S-K 404.

82. Seligman was adverse to Plaintiff and suffered a legal blow when
January 9, 2024, DC District Court granted Plaintiff CEO's request for judicial
notice of ten facts. The first fact judicial notice was granted included ten cases with
a negative judgement Seligman's employer was the party defendant but carried
Seligman's liability as CEO or CLO or both during those period for U.S. company
Antitrust liability. (Exhibit #6)

31

"iv. August 20, 2015 "FRCP Rule 23 5:14-cv-04062 " Denial of Defendants
Twenty-First Century Fox, Inc., Sony Corporation of America, Orrick
Herrington Law LLC, claims for violation of Sherman Act 1, Clayton Act,
Rule 17200 5:14-cv-04062"

83. This Court can determine if Seligman's actions as head Sony attorney
and later CEO failure to not take SEC corrective action is of a material nature.
By way of substituting Seligman's name in as another member of the 1502
Enterprise in place of largest number of companies "Sony Corporation, Sony
Music Entertainment, Sony Corporation America, 550 DMV, Sony Broadband
Entertainment" and fully incorporating by reference the #9567 Delaware complaint
starting on page 4, its attached 70b motion and declaration including the evidence
attached as fact based evidence as to why Seligman would have been incented and
desirous to use her Special Committee Membership to act capricious, arbitrary and
discriminate, make defamatory false claims casting Plaintiff's CEO in a negative
light to the other Special Committee Members, advisors, and Directors Officers of
Paramount. (Exhibit #7, Page 4)

**WHEREFORE,** Plaintiff demands judgment against Defendants for compensatory
and actual damages in an amount to be determined at trial plus punitive damages,
interest, counsel fees, costs and the expenses of this action, and for such other and
further relief as the court seems equitable. As a direct, legal and proximate result of
Defendants' aforementioned actions, Plaintiff has sustained economic damages to
be proven at trial. Plaintiff seeks judgment for actual damages, interest and costs.

**COUNT II Tortious Interference With Business Relations (Brought Directly Against All Defendants )**

84.    Plaintiff repeats and re-alleges every allegation set forth in previous paragraphs as if fully set forth herein. The Plaintiff had a pre-existing business relationship with Paramount prior to the January 2, 2024 formation by the Board of Directors of a Special Committee.

85.  The Special Committee and Board of Directors of Paramount chose to ignore the superior offer presented by LiveVideo.AI on July 5th, dismissing it without proper consideration. Despite offering a higher share price of $17.50 compared to Skydance's $15.00 for Class A and B shareholders, LiveVideo.AI's proposal would have resulted in 50% less dilution for Paramount stockholders. This significant cost savings was made clear in multiple voice messages to Chairperson Shari Redstone, yet she chose to overlook it and continue with the Skydance deal that required a whopping $4.8 billion worth of stock issuance.

86. Plaintiff had every reason to believe that their competitive offer would be given due diligence by Paramount. Not only was it a superior offer in terms of financial benefits for shareholders, but also promised a more experienced management team and $2.4 billion less in stock issuance. Yet, despite these clear advantages, Paramount chose to disregard the Plaintiff's offer and instead went

33

ahead with the costly and dilutive Skydance deal.The Special Committee and

Board of Directors of Paramount chose to ignore the superior offer presented by

LiveVideo.AI on July 5th, dismissing it without proper consideration. Despite

offering a higher share price of $17.50 compared to Skydance's $15.00, and a result

of 50% less dilution for Paramount stockholders. This significant cost savings was

made clear in multiple voice messages to Redstone, yet she chose to overlook it and

continue with the Skydance deal that required a whopping $4.8 billion worth of stock

issuance. Later damaging these LiveVideo.AI technology and IP deals as a result of

the Plaintiff seeking to attempt to make a superior buy-out offer that would have

benefitted stockholders and employees of Paramount.

87. With malicious intent, Defendants NAI and Shari Redstone took

deliberate actions to sabotage LiveVideo.AI's chances of securing a partnership with

Paramount on June 7th. Despite receiving multiple phone calls and a clear request

to participate in Paramount's sales process, they destroyed all physical and

electronic evidence of the communication and refused to personally reach out or

direct their outside advisors and legal counsel to do so.

88. They even went as far as refusing to involve the Special Committee and

Board of Directors in any follow-up with LiveVideo.AI, revealing a calculated plot

to harm the plaintiff's business prospects. These ruthless actions demonstrate a

blatant disregard for fair competition and unethical behavior at the highest levels of leadership within NAI and Redstone's inner circle.

89. On the crucial day of June 11th, Defendants NAI and Shari Redstone knowingly and deliberately sabotaged LiveVideo.AI's potential business opportunities with Paramount. As soon as they received LiveVideo.AI's desperate phone calls and voicemail at 6:03pm est,begging to be included in the ongoing sales process, they immediately set out to destroy all physical and electronic evidence of these communications.

90. They refused to personally reach out or direct any outside advisors or law firms working with Paramount to contact LiveVideo.AI. Despite being fully aware of LiveVideo.AI's interest in acquiring Paramount and NAI, they callously disregarded any attempts at communication from LiveVideo.AI, the Special Committee, and even the Board of Directors.

91.With calculated malice, Defendants NAI and Redstone effectively cut off all avenues for LiveVideo.AI to pursue a potential partnership with Paramount, causing immeasurable damage to the plaintiff's business prospects.

92. Plaintiff had every reason to believe that their competitive offer would be given due diligence by Paramount. Not only was it a superior offer in terms of financial benefits for shareholders, but also promised a more experienced

management team and $2.4 billion less in stock issuance. As a result, the Plaintiff is seeking damages of no less than 50% of the value in stock $2.42 billion for the unjustified rejection of their proposal and those legal and professional fees found to have been paid in cash.

93. Another reason that NAI, Varney, and Redstone seek to fraudulently conceal the July 5th offer is because it would force them to explain the malicious tortious interference scheme they have used to block, frustrate, and harass the LiveVideo.AI because they Varney and Seligman are conflicted with Plaintiff because of its CEO from ongoing and recent adverse legal matters causing significant conflicts of interest and it is because of the defendants subsequent actions the Plaintiff has now suffered the inability to advance strategic partnerships directly with Paramount begun in good faith during 2023.

**WHEREFORE,** Plaintiff demands judgment against Defendants for compensatory and actual damages in an amount to be determined at trial plus punitive damages, interest, counsel fees, costs and the expenses of this action, and for such other and further relief as the court seems equitable. As a direct, legal and proximate result of Defendants' aforementioned actions, Plaintiff has sustained economic damages to be proven at trial. Plaintiff seeks judgment for actual damages, interest and costs.

## COUNT III Aiding And Abetting Breach Of Fiduciary Duty, Candor, or Breach of Duty Loyalty (Brought Directly Against All Defendants )

94.    Plaintiff repeats and re-alleges every allegation set forth in previous paragraphs as if fully set forth herein.

95. The corporate opportunity doctrine is a fiduciary duty of corporate directors and officers. They cannot take an opportunity for their own benefit if: (1) the corporation can take advantage of it; (2) it falls within the corporation's line of business; (3) the corporation has an interest in it; and (4) taking it would conflict with their duties to the corporation.

96.    Controlling stockholders are also prohibited from using their power to benefit themselves at the expense of the corporation. Directors, special committee outside counsel, M&A transaction special committee members, and Chairpersons have a responsibility to prioritize the interests of the shareholders above their own personal interests or those of other parties involved.

97. In this case, the Defendants breached their fiduciary duty by prioritizing the interests of the Controlling Stockholder to approve an unfair Merger, which benefited Skydance and Redstone personally through a buyout at a premium price.

98. D'Alimonte had a fiduciary obligation to disclose the existence of LiveVideo.AI, but was instructed by Redstone, Varney, and Seligman to keep quiet about it and not respond to their offer. However, on June 11, when Shari Redstone announced the end of negotiations with SkyDance, she was aware of

LiveVideo.AI's interest in a competing offer but did not allow the Special Committee to consider it.

99. This put D'Alimonte in a difficult position of having to betray her duty of candor even further. The sudden termination of Paramount's General Counsel on June 21 was a result of Redstone's misleading public statements about negotiations with Skydance while withholding information about LiveVideo.AI's interest. These actions forced D'Alimonte to make false statements in Paramount's June 8k which ultimately hurt Paramount shareholders and the Plaintiff by blocking any chance for an alternative offer to be considered.

**WHEREFORE,** Plaintiff demands judgment against Defendants for compensatory and actual damages in an amount to be determined at trial plus punitive damages, interest, counsel fees, costs and the expenses of this action, and for such other and further relief as the court seems equitable. As a direct, legal and proximate result of Defendants' aforementioned actions, Plaintiff has sustained economic damages to be proven at trial. Plaintiff seeks judgment for actual damages, interest and costs.

**Count IV- Unjust Enichment (All Defendants)**

100. Plaintiff repeats and re-alleges every allegation set forth in previous paragraphs as if fully set forth herein.

101. Defendant NAI shared LiveVideo.AI communications with Skydance including all details contained in Plaintiff's indications of interest voice mail

communications. The defendants maliciously handed over Plaintiff's confidential

strategies and plans to SkyDance as part of a misdirection and false broadcasting

scheme Redstone launched on June 11th when the defendants leaked to media

cohorts that Redstone "killed" or ended the negotiations with SkyDance.[33] for

reasons completely unconnected with the unfairness of the deal to shareholders and

moreso to put in place newly crafted legal protections amidst threats of litigation

and the $400 million dollar termination, and to mislead the Plaintiff into delaying

coming forth with an actual offer like the July 5, 2024 one Plaintiff transmitted.

**Redstone had rejected the Skydance offer terms.[34]**

> "National Amusements confirmed the deal was dead, saying the company
> has "not been able to reach mutually acceptable terms, regarding the
> potential transaction with Skydance Media."

> NAI said the company "supports the recently announced strategic plan being
> executed by Paramount's Office of the CEO."

>> "Redstone will now likely pursue a sale of just National Amusements, without
>> merging Paramount with another company, according to The Wall Street Journal,
>> "

---

[33] Meg James, So the Paramount and Skydance Deal is Back on Track. What
Happened and What's Next?, (July 3, 2024),
https://www.latimes.com/entertainment-arts/business/story/2024-07-03/paramount-
and-skydance-deal-is-back-on-track-what-happened-and-whats-next.

**[34] "Shari Redstone kills Skydance bid to buy her controlling stake in
Paramount Global"**

https://nypost.com/2024/06/11/media/shari-redstone-kills-skydance-bid-for-
paramount-global/

"NAI has received interest from two other suitors, an investor consortium led by Hollywood producer Steven Paul, and media exec Edgar Bronfman Jr., " "The second part of the deal would have entailed Skydance merging with Paramount, .. in a stock deal."

"a committee of Paramount directors, who had recently approved the economic terms of the merger but continued to negotiate with Skydance about other deal points, The Journal said."

"some of those points included pushing for a deal to be subject to a vote of all other shareholders."..."National Amusement was supportive of a vote. Skydance said such a vote is "a nonstarter," according to The Journal."

"The committee was scheduled to vote on the Paramount merger with Skydance on Tuesday afternoon, but it is not clear if the vote happened."

"A spokesperson for Paramount Global declined to comment. Skydance did not immediately respond to a Reuters request for comment."

102.  Plaintiff attempted to reach NAI and Redstone by telephone during

working hours on June 11th after seeing the news reports that Redstone and

NAI had "confirmed the deal was dead" only to get the same voicemail sole

option, and the Plaintiff finally with no other choice and limited to making a

communication by leaving a fifth voicemail did so at 6:03PM est for 1 minute 21

seconds which largely re-iterated the same points stated in the first voice mails left

on June 3rd, 4th, and 6th.

103.  Despite Redstone and NAI refusing to respond to Plaintiff they had no

problem engaging other new interested parties.  Reportedly, Diller's company,

IAC, had signed a nondisclosure agreement with NAI and was looking at its data

room to determine the specifics of the bid;

**WHEREFORE,** Plaintiff demands judgment against Defendants for

compensatory and actual damages in an amount to be determined at trial plus

punitive damages, interest, counsel fees, costs and the expenses of this action, and

for such other and further relief as the court seems equitable. As a direct, legal and

proximate result of Defendants' aforementioned actions, Plaintiff has sustained

economic damages to be proven at trial. Plaintiff seeks judgment for actual

damages, interest and costs, as well as judgment temporarily and permanently

enjoining Defendants from continuing described actions.

## COUNT V – VIOLATION OF DODD-FRANK WHISTLEBLOWER STATUTE – SECTION 922 & 18 U.S.C. §1513(e))(Against Varney and Seligman)

104. Plaintiff repeats and realleges the foregoing paragraphs as set forth

herein.

105. Petitioner is entitled to a private cause of action for damages suffered

Pursuant to the Dodd Frank Whistleblower Statute. Plaintiff[35] entitled to a

private cause of action for whistleblowers alleging retaliatory discharge or other

discrimination. Id. § 78u-6(h)(1)(B)(i). and Proxy Battle against Petitioner.

106. Defendant Seligman controlled a critical Board Seat Nomination

legal right (Series B Preferred) nominating Jeff Edell in 2004 even after evidence

---

[35] Plaintiff's CEO has agreed to transfer rights and privileges due or held by the CEO personally to the Plaintiff.

in Delaware Court showed Edell and Defendants had mislead shareholders by
filing multiple defective and false proxy statements to Issuer's shareholders in
2003 and 2004.Relief includes Right to Jury Trial, reinstatement, double the back
pay owed, and costs and fees. Id. § 78u-6(h)(1)(C).

107. Defendants have discriminated against the Plaintif because of the
Plaintiff 's lawful acts done including investigating the conflicts of intrest behind
the Skydance offer and Redstone's financial advisor BDT who is also her lender.

108. Plaintiff has been discriminated against by not getting treated similar
to the manner other 3rd parties have been welcomed and invited to sign a mutual
non disclosure agreement with Paramount as part of receiving the opportunity to
participate in making a Paramount buy out offer.

109. Despite the Plaintiff contacting Redstone, NAI and Paramount,
and drafting., signing, then sending by fax and email an executed non disclosure
agreement the Plaintiff had executed. The defendants discriminated against the
Plaintiff and its CEO by refusing to respond, call back, answer, or have an advisor
reach out to the Plaintiff after the June 6 phone calls and voice mails left with
Paramount's Chairperson and General Counsel.

110. Defendants further discriminated and harassed the Plaintiff and its CEO
on July 5th when refusing to treat the Plaintiff like other interested buyers that
have contacted Paramount or Redstone. For instance, there are many articles about
the Paramount sales process and each article includes references to the fact that

Paramouint and Redstone are open to other bidders and offers.

111. Yet despite these claims being made by Defendants, Varney and Seligman are using their control of the special committee and outside counsel to manipulate the information the other Special Committee members possess and are aware of in regards to alternative offers or bidders.

112. Varney, Seligman, and Redstone have instructed Paramount employees and other executives that work on Paramount's behalf not to return the Plaintiff's phone calls, not to reply by email, and not to send any letter communications. To give the Plaintiff no chance to review the information about Paramount being shared with other interested buyers.

113. The defendants have further discriminated against the Plaintiff and have harassed the Plaintiff by refusing to fix defective SEC Filings, ignoring their fiduciary duties and duties of disclosure after the Plaintiff delivered a bona fide 7 page offer agreement fully detailing why the economics would be superior and even offering to travel to Massachussets to meet with NAI, Redstone, and her lawyers in person.

114. It was discrimination after July 5, 2024 at approximately 2pm, when Plaintiff CEO was refused without explanation after Plaintiff requested to speak with someone at NAI or Paramount or their advisors in order to be able to participate in the opportunity with basically the same chances as the other interested parties.

115. Seligman with malicious intent to harm Plaintiff CEO for informing regulators of misdeeds News Corp and Sony, and aidongoing litigation husband's company has with Plaintiff CEO in his position as a shareholder member of Class Action that RGRD Law was pursuing in Judge King's Federal Court in Los Angeles that News Corp was the insured for, Sony Corp executives, Defendants in this Complaint, abused theirfiduciary duty to Issuer by misleading the Public and shareholders as part of assisting Defendant's scheme to take control of eUniverse, Inc. in 2003 and get approval and entrench Defendants as a result of the January 2004 Annual Meeting.

116. As a Result of the applicable Defendant's involvement in the above-described conspiracy and conspiratorial scheme, the Plaintiff has suffered severe emotional, financial, mental, and physical harm and other deleterious effects; been unfairly disadvantaged in multiple civil lawsuits initiated against him by several of the Defendants and other parties; had his freedom of speech severely impinged; been forced to spend hundreds of thousands of dollars on legal fees; been forced to; And had his personal and professional reputation severely and permanently damaged.

117. Based upon information and belief, some of the Defendants are continuing to engage in the above-described conspiracy and conspiratorial scheme even though they are well aware of the devastating toll that their prior conspiratorial actions have already taken on Petitioner and Petitioner's business

effort

se 1:24-cv-06290-DEH-BCM    Document 32    Filed 09/13/24    Page 45 of

assets.

118. A Jury will determine if Seligman lied to Court regarding Defendant's

Proxy disclosure related to Edell. Defendant's failure to "make this right" as

claimed by Seligman's Delaware counsel is worthy of corrective disclosure by

Sony or Seligman including Declaratory Relief. That is if Seligman's actions and

non actions were actually a:

> "thumbing their nose at the Chancery Court ruling in January 2004 (and
> fraudulently concealing from the "Chancery Court in July 2004 at which
> time the Court entertained an award of legal fees but only granted in part
> because defendants were fraudulently concealing the aforementioned matters
> which are detailed fully in the underlying Motions). "

(page #41 of Exhibit #9)

**WHEREFORE,** Plaintiff on behalf of its CEO demands jury trial and judgment

against Defendants for Special, Compensatory and actual damages in an amount to

be determined at trial plus punitive damages, interest, counsel fees, costs and the

expenses of this action, and for such other and further relief as the court seems

equitable. As a direct, legal and proximate result of Defendants' aforementioned

actions, Plaintiff's CEO has sustained economic damages to be proven at trial.

Plaintiff seeks judgment for actual damages, interest and costs.

## COUNT VI- VIOLATION OF 18 U.S.C. § 1030 –

## The Computer Fraud and Abuse Act

119. Plaintiff repeats and realleges the foregoing paragraphs as set forth

herein.

120. Defendants became aware of LiveVideo.AI's potential interest in making an offer for Paramount no later then May 6, 2024 after the Plaintiff sent out a test email to find out if the former Paramount CEO might still have access to his corporate email even as he had transitioned to a consulting arrangement with Paramount. [36]

121. The Plaintiff send out an email May 6th at 11:35 am EST with the subject line "Perfect move opportunity!". The email was used as a test to determine if the Plaintiff's previous top level contact, CEO Bakish,

122. The Plaintiff assumed it was possible a Paramount employee might now be reviewing the former CEO's email inbox to share potential leads or help the new Paramount CEO more rapidly transition key corporate contacts Bakish email account messages.

123. However the Plaintiff was not prepared for what happened next.[37]

_____

[36] had been merely sidelined from leading exploration of the sale of Paramount or totally frozen out without access to be in the Paramount office and no longer able to send or review any email communications sent to the CEO's longtime email address BB@ParamountGlobal (Paramount.com, Viacom.com).

[37] At time of May "test" email sent, the Plaintiff was still evaluating the desirability and practicality in regards to if it would be prudent of the Plaintiff to make an offer to acquire Paramount.

124.   The Plaintiff's May email was sent with an online marketing software

pixel that provides basic information about if and to what degree the email

communication was received and read by the intended recipient as well as

further detail consisting of providing information if the email is passed on from the

email account of the intended recipient to other users using different computers.

125.   A couple of weeks after the Plaintiff sent the test email in May, the

log summary information provided by the email marketing software was reviewed.

The Plaintiff was stunned by the unlawful behavior long suspected after so many

news articles and legal settlements pounded home the same simple story: That

Shari Redstone did not believe in corporate governance and never took seriously

the conflict of interest legal requirements requiring her to keep separate both her

personal and NAI interests from those of Paramount. Further, that Redstone just

because she owns 9.9% of the stock of Paramount and is Chairperson, does not

mean Redstone can operate inside Paramount as if she was the CEO and direct

Paramount resources in self-serving manners while only focusing on purposing

Paramount to benefit Redstone and NAI.

126.   Defendant Redstone violated 1030 by directly or indirectly accessing

the Paramount CEO's email communications residing or stored in Paramount's

mail server. Redstone as Chairperson was not an executive working for Paramount

and therefore Redstone's unauthorized taking or transfer or removal of Paramount

owned emails including Plaintiff's May 6, 2024 email residing in the former

CEO's Paramount email server or inbox, contravened 1030 The Computer Crime

Prevention Act.

127. Indeed, Redstone and other unauthorized non-executives appear to

have without authorization, transferred to upwards of three unauthorized

computers a copy of Plaintiff's confidential May 6 email Plaintiff expected would

be confidentially received and read by the Paramount CEO or his successor.[38]

128. On May 6th, and then again on May 11th, and later on July 22, 2024

Defendants Varney, Redstone, Korfman, Seligman "intentionally accessed a

computer " owned by Paramount and maintained solely for the use of its

employees.

---

[38] Sent for purposes also to try to cheer up the embattled Paramount but
evidence  points to abuse by different access points showing the email was usurped
from Paramount corporation email account and siphoned out to NAI and most
likely Redstone, and Varney, who should not have had access, it was read by at
least three individuals during the month of May and re-opened in late July after the
July 5th offer had been concealed as Varney  or her staff were looking to cover
their tracks.

48

129. The defendants without authorization accessed the Bakish email inbox and without first receiving authorization or accessed the inbox of the former CEO which was Paramount owned property and exceeded authorized access. This is because non-executives have no reason or need to be able to access computer servers which are strictly maintained for Paramount employees not for Paramount Directors, outside counsel, or members of the special committee.

130. "Further, the defendants violated 1030 because they did also obtain "information from any protected computer"

The defendants conspired to usurp opportunities they knew they would likely find by invading the Paramount CEO's confidential inbox that it strictly owned by Paramount and to be used only for the benefit of solely Paramount.

131. Further, Defendants Varney, her lieutenant that took over access to computer records deputy general counsel Ms. Groce after D'Alimonte resigned, forwarded without authorization to access or gave an unauthorized access pass to Defendant Redstone's lawyer son Mr. Korff who passed or shared access with SkyDance in Los Angeles and later San Jose, CA exposing it to other unauthorized to access private corporate emails sent from the public company's personal business contacts its CEO maintained and pass them to at least six other unauthorized persons in at least four states, DC, California, New York, Massachusetts, and to show in meetings to countless other adverse conflicted

parties. This activity could not have been a benefit to Paramount Global the corporation or its shareholders as violations of the CCFA being generated and other privacy violations are not what Paramount will earn more revenue or profits from. (See Exhibit #11)

132. The Plaintiff has suffered damage and loss by reason of Defendants violations of CCFA.

**WHEREFORE,** Plaintiff demands judgment against Defendants for compensatory and actual damages in an amount to be determined at trial plus punitive damages, interest, counsel fees, costs and the expenses of this action, and for such other and further relief as the court seems equitable. As a direct, legal and proximate result of Defendants' aforementioned actions, Plaintiff has sustained economic damages to be proven at trial. Plaintiff seeks judgment for actual damages, interest and costs, as well as judgment temporarily and permanently enjoining Defendants from continuing described actions.

Dated: September 3, 2024

Respectfully submitted Constants Law Offices, LLC.

By _/s/ Alfred C. Constants III_

Alfred C. Constants III, Esq.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable in accordance with

Federal Rule of Civil Procedure 38(b).

By _/s/ Alfred C. Constants III_

Alfred C. Constants III, Esq.

Attorneys for Plaintiff
Constants Law Offices, LLC.