EXHIBITS

EXHIBIT #1



## New Purchase Offer $17.50 Per Share

| | |
|---|---|
| From | Brad Greenspan <bgreenspan@mypalisadescapital.com> |
| To | tjankowski@national-amusements.com |
| Date | Fri 14:12 |

☑ Summary  ⏻ Headers

📄 july5.2024.Palisade.PARA.Letter.pdf (~970 KB) ▾

Good morning, Mr. Jankowski.

Please find a letter offer to be delivered to Ms. Shari Redstone
which is concurrently being delivered via fax with a cover letter that states

"Please find New Purchase Offer $17.50 Per Share + 11% Auto Topper Guarantee"

Please confirm receipt at your earliest convenience. Thank you and we look forward to
engaging directly with you upon approval from Ms. Redstone and return of the mutual
NDA we have provided for expediency sake although we are willing to sign a version
your legal counsel prefers and is more comfortable with.

Best Regards

Brad Greenspan

Managing Director, Palisades Capital, Inc.
CEO, eLiveTime, Inc.
244 Fifth Avenue
Suite #G290
New York, NY

Successful transmission of 17813266699.Re: AT Ht. Ms. Shari Redstone cc: Mr.
Tad Jankowski 

From   MetroFax <NoReply@mail.metrofax.com>
To     bgreenspan@mypalisadescapital.com
Date   Fri 14:06

☑ Summary  ⓘ Headers  ☰ Plain text

⚠ To protect your privacy remote resources have been blocked.  [ Allow ]



Your fax was successfully sent to 17813266699 by MetroFax.

**Fax Details**

**Date:** 2024-07-05 14:06:32 (GMT)
**Number of Pages:** 6
**Length of Transmission:** 350 seconds
**Receiving Machine Fax ID:** 7814610107

If you have any questions, please visit our online help center.

Thank you for choosing MetroFax.

Sincerely,
The MetroFax Team

EH-BCM        Document 32-1        Filed 09

## FAX COVER SHEET

| | |
|---|---|
| TO | Shari Redstone |
| COMPANY | National Amusements Inc |
| FAX NUMBER | 17813266899 |
| FROM | Brad Green |
| DATE | 2024-07-05 14:00:11 GMT |
| RE | ATTN: Ms. Shari Redstone cc: Mr. Tad Jankowski |

COVER MESSAGE

Please find New Purchase Offer $17.50 Per Share + 11% Auto Topper Guarantee

Palisades Capital, LLC
www.MyPalisadesCapital.com

July 5, 2024

Shari Redstone
Chair Paramount Global

Cc      Tad Jankowski
        Vice President
        SPV-NAIEH LLC ("SPV")
        National Amusements, Inc. ("NAI")
        NAI Entertainment Holdings LLC ("NAI EH")
        Sumner M. Redstone National Amusements Part B General Trust ("General Trust")
        846 UNIVERSITY AVENUE
        NORWOOD        MA        02062

Dear Shari,

As a follow up to the voicemail communications I have left for yourself and NAI beginning in June 2024. Please find an executed mutual NDA (EXHIBIT A) which upon counter execution and return LiveVideo.AI Corp and Palisades Capital, Inc. its long time boutique merchant banking affiliate plans to work in good faith and on an expeditious basis to complete the transaction disclosed in more detail below but which generally calls for the purchase of 100% or at least the majority of the controlling equity ownership interests you personally hold in the above entities and to do so on superior terms to what has been reported in the recent press articles regarding a Skydance transaction and any other suitor that is engaged with yourself in discussions or that may arise in coming days.

Our offer comes after our efforts but inability to advance strategic partnerships directly with Paramount Global and certain of its subsidiaries in late 2023 including thru its subsidiary Simon & Schuster and directly with the PARA CEO Mr. Robert Bakish. Therefore we have viewed for many years the existence of an excellent strategic fit between our company and the assets it owns and operates with the core asset PARA owned and controlled by the General Trust. Further, we have a CEO with significant public operating experience and a track record of success in the internet and online space which will allow for a smooth transition to oversee the General Trust's stewardship while giving confidence to all related parties that post-transaction the PARA asset will be in good hands.

We only learned of the departure of the PARA GC today which is good news because as you will learn further below, she had blocked our progress to move our offer process forward.

We have used the time since leaving you an initial voice mail by way of your assistant to secure commitments from reliable third parties that will provide to us and our involved entities listed below with all necessary cash needed to purchase the shares you beneficially control as listed under the most recent SEC filing made by Mr. Jankowski (see EXHIBIT B). These well known public institutional investors can be easily verified to have available and on hand more then sufficient cash which will allow for an expeditious closing of the purchase transaction.

Palisades Capital, Inc.
www.MyPalisadesCapital.com

KEY TERMS OF OFFER:

The purchase price we will pay per share shall be the higher of $17.50 per share or an amount
per share equal to 111% of the per share price offered by SkyDance as of its last bona fide
offer in writing to yourself as of the close of business on July 5, 2024.

Further, we are willing to proceed under the structure you prefer that has been arranged or
contemplated with SkyDance or any other potential suitor, or by way of a two step transaction
that includes and is subject to PARA shareholder approval.

We seek upon the execution of the mutual NDA (Please email, mail or fax back to us at 212-
898-0176) that we be given the right to begin open discussions with Mr. Jankowski including
that he might share confidential information so we can:

1.  Expeditiously prepare a provide a more detailed executable binding offer letter that can
    be fully considered and entered into by the above entities subject to meeting our goal of
    providing a superior purchase offer for the endeavored transaction its been reported
    you are in discussions with SkyDance to enter into in the coming days. We commit to
    provide this within 3 business days from the return of the executed NDA and getting to
    speak at least once to Mr. Jankowski or your designated representative to insure we
    understand the structural needs or provisions that must be captured in the document
    and that we correctly identify all the entities involved.

2.  Share information regarding the identities of the sources of financing we have secured
    to complete this transaction.

3.  Receive any due diligence materials you have already prepared and provided to
    SkyDance so that we might be in no less favorable position and can not be
    disadvantaged in performing on our offer and pledge to provide a superior economic
    arrangement for the benefit of yourself in this sale transaction.

4.  Be in a position to travel to MA in coming days to meet in person with Mr. Jankowski
    and/or yourself to present our post-purchase plans in more detail to yourself and Mr.
    Jankowski, answer any questions you might have or provide any information you might
    seek to gather or learn about my background, the background of the post-transaction
    involved funding sources, and our plans on how we hope to steward our post-
    ownership positions in the above entities.

    Please note that we also have further confidential information regarding significant
unrealized NAV controlled intellectual property and related assets we wish to share in person
that we believe you deserve to know and consider before consummating the endeavored sale.
Please further note that our progress to date has been delayed by the refusal of the PARA
General Counsel to begin open communications with us. We had contacted Christia A.
D'Almonte and left a voice mail introducing our company and indicating our intent to make an
offer approximately 2 weeks ago and further indicating we wished to speak with her to relay
some conflict of interest concerns we had relating to certain members of the special committee
which we believed were adverse to ourselves. Further we wished to relay some information
regarding why we believed the same or other members may be conflicted based on other

EH-BCM          Document 32-1          Filed 09

Palisades Capital, Inc.
www.MyPalisadesCapital.com

relationships which might impact their ability to consider our offer on the basis of what was best for their fiduciaries in their role on the special committee.

Please find further background information of 2 video interviews to verify our principal's identity at www.LiveVideo.AI/Investors

Please see Exhibit C for further detail and evidence of why we believe we will be the best stewards of any suitor for overseeing and protecting the crown jewel PARA business, including why we believe your late father would also be in favor of your choosing to work with and proceed with our offer, and why we consider our proposed transaction to be a quasi re-purchase of assets sold under financial duress by our predecessor operated by my late Great Uncle and mentor Gustave Hauser who explained in an interview:

> "Warner sold the Warner Amex cable programming business, including MTV, Nickelodeon and The Movie Channel to Viacom. In effect, it had been forced to sell some of its crown jewels. Today, the value of MTV and Nickelodeon networks probably exceeds $30 billion. It is interesting to recall that when I launched Nickelodeon as a national, satellite delivered cable network, my first annual budget for it was about $1 million."

https://syndeoinstitute.org/the-hauser-oral-history-project/h-listings/gustave-hauser/

You can reach me at any time by calling 846-664-1229.

We are excited to build a long erm direct trust relationship with you Shari which includes a win/win share purchase transaction completed on most favorable terms with least headache for you in the short term.

Please feel free to view the following one minute video providing highlights of facts supported by SEC Filings that prove I was one of the best performing public CEO operators during the most difficult challenging environment which included significant restructuring, M&A, and fending off many unexpected black swan events that left most of my better funded larger public internet peers melted down by the end of the .com Nasdaq downturn beginning in 2001:

https://docsend.com/view/7x7pn7r45mfmyhsp

Best Regards

Brad Greenspan
Managing Director
President, Palisades Capital, Inc.
LiveVideo.AI Corp
LiveVideo.com Inc.
Livelesk Global Internet, Inc.
Omni GSS Inc.
244 5ᵗʰ Avenue
Suite #0290
New York, NY 10001
Email: bgreenspan@mypalisadescapital.com
Tel: 846-664-1220



Palisades Capital, Inc.
www.MyPalisadesCapital.com

EXHIBIT A

# EH-BCM     Document 32-1     Filed 09/

## MUTUAL NON-DISCLOSURE AGREEMENT

This Agreement is entered into as of the 2nd of July, 2024 (the "Effective Date", by and between Palisades Capital, Inc. and its clients LiveVideo.AI Corp, LiveVideo.com Inc., Livelook Global Internet, Inc. hereinafter known as "Party A", and

hereinafter known as "Party B".

WHEREAS Party A and the Party B, hereinafter known as the "Parties", have an interest in participating in discussions wherein either Party may share information with the other that the disclosing Party considers to be proprietary and confidential to itself ("Confidential Information"); and WHEREAS the Parties agree that Confidential Information of a Party may include, but not be limited to, that Party's: (1) business plans, methods, and practices, (2) personnel, customers, and suppliers; (3) inventions, processes, methods, products, patent applications, and other proprietary rights; or (4) specifications, drawings, sketches, models, samples, costs, computer programs, technical information, or other related information;   NOW, THEREFORE, the Parties agree as follows:

1. Either Party may disclose Confidential Information to the other Party in confidence provided that the disclosing Party identifies such information as proprietary and confidential either by marking it, in the case of written materials, or, in the case of information that is disclosed orally or written materials that are not marked, by notifying the other Party of the proprietary and confidential nature of the information, such notification to be done orally, by e-mail or written correspondence, or via other means of communication as might be appropriate.

2. When informed of the proprietary and confidential nature of Confidential Information that has been disclosed by the other Party, the receiving Party ("Recipient") shall, for a period of 18 months from the date of disclosure, refrain from disclosing such Confidential Information to any contractor or other third party without prior, written approval from the disclosing Party and shall protect such Confidential Information from inadvertent disclosure to a third party using the same care and diligence that the Recipient uses to protect its own proprietary and confidential information, but in no case less than reasonable care. The Recipient shall ensure that each of its employees, officers, directors, or agents who has access to Confidential Information disclosed under this Agreement is informed of the proprietary and confidential nature and is required to abide by the terms of this Agreement. The Recipient of Confidential Information disclosed under this Agreement shall promptly notify the disclosing Party of any disclosure of such Confidential Information in violation of this Agreement or of any subpoena or other legal process requiring production or disclosure of said Confidential Information.

3. All Confidential Information disclosed under this Agreement shall be and remain the property of the disclosing Party and nothing contained in this Agreement shall be construed as granting or conferring any rights to such Confidential Information on the other Party. The Recipient shall honor any request from the disclosing Party to promptly return or destroy all copies of Confidential Information disclosed under this Agreement and all notes related to such Confidential Information. The Parties agree that the disclosing Party will suffer irreparable injury if its Confidential Information is made public, released to a third party or otherwise disclosed in breach of this Agreement and that the disclosing Party shall be entitled to obtain injunctive relief against a threatened breach or continuation of any such breach and, in the event of such breach, an award of actual and exemplary damages from any court of competent jurisdiction.

4. The terms of this Agreement shall not be construed to limit either Party's right to develop independently or acquire products without use of the other Party's Confidential Information. The disclosing party acknowledges that the Recipient may currently or in the future be developing information internally, or receiving information from other parties, similar to the Confidential Information. Nothing in this Agreement will prohibit the Recipient from developing or having developed for it products, concepts, or techniques that are similar to or compete with the products, concepts, systems, or techniques contemplated by or embodied in the Confidential Information provided that the Recipient does not violate any of its obligations under this Agreement in connection with such development.

5. Notwithstanding the above, the Parties agree that information shall not be deemed Confidential Information and the Recipient shall have no obligation to hold in confidence such information, where such information:

(a) is already known to the Recipient, having been disclosed to the Recipient by a third party without such third party having an obligation of confidentiality to the disclosing Party; (b) is or becomes publicly known through no wrongful act of the Recipient, its employees, officers, directors, or agents; (c) is independently developed by the Recipient without reference to any Confidential Information disclosed hereunder; (d) is approved for release (and only to the extent so approved) by the disclosing Party; or (e) is disclosed pursuant to the lawful requirement of a court or governmental agency or where required by operation of law.

6. Nothing in this Agreement shall be construed to constitute an agency, partnership, joint venture or other similar relationship between the Parties.

7. Neither Party will, without prior approval of the other Party, make any public announcement of or otherwise disclose the existence or terms of Agreement.

8. This Agreement contains the entire agreement between the Parties and is not only creates an obligation for either Party to disclose information to the other Party or to enter into any other agreement.

9. This Agreement shall remain in effect for a period of 36 months from the Effective Date unless otherwise terminated by either Party giving notice to the other of its desire to terminate this Agreement. The requirement to protect Confidential Information disclosed under this Agreement shall survive its termination.

Party A's Signature /s/ _____                                Party B's Signature /s/ _____

Print Name: __Brad Greenspan__                                         Print Name _____

Title: Managing Director Palisades Capital, Inc.                       Title: _____
President LiveVideo.Ai Corp
President LiveVideo.com Inc.
President Livelook Global Interactive, Inc.

CONFIDENTIAL

EXHIBIT #2

Exhibit 99.2

## PARAMOUNT GLOBAL'S SPECIAL COMMITTEE UNANIMOUSLY APPROVES
## MERGER WITH SKYDANCE MEDIA

NEW YORK, July 7, 2024 – The Special Committee of the Board of Directors (the "Special Committee") of Paramount Global (NASDAQ: PARA, PARAA) ("Paramount" or the "Company") today confirmed that it has unanimously approved a merger agreement between Paramount and Skydance Media, LLC ("Skydance").

The Special Committee was formed on January 2, 2024, at the request of Paramount's controlling stockholder, National Amusements, Inc. ("NAI"), to evaluate potential transactions involving both NAI and Paramount as NAI considered its options relating to its investment in Paramount. The Special Committee retained independent financial and legal advisors, Centerview Partners LLC and Cravath, Swaine & Moore LLP respectively. Over a period of more than six months, the Special Committee considered multiple approaches and constructs from various counterparties and solicited interest from potential counterparties for an acquisition of Paramount.

The merger agreement includes a 45-day "go-shop" period, which permits the Special Committee and its representatives to actively solicit and consider alternative acquisition proposals. There can be no assurance that this process will result in a superior proposal, and the Company does not intend to disclose developments with respect to the go-shop process unless and until it determines such disclosure is appropriate or is otherwise required.

On behalf of the Special Committee, Charles E. Phillips, Jr. said: "We are pleased to have reached an agreement that we believe delivers to Paramount stockholders both immediate value and future upside opportunity. The Special Committee, with the assistance of independent financial and legal advisors, conducted a thorough review of actionable potential transactions to drive value for our stockholders. In addition to economic value, the Special Committee took into account the certainty of closing and regulatory approvals. Following extensive negotiations with Skydance, we believe this proposed transaction will position Paramount for success in a rapidly evolving industry landscape. Upon closing, it will deliver immediate cash consideration at a premium to both the minority Class A and Class B stockholders, who will also benefit from what we believe to be considerable upside through continued equity participation in New Paramount."

Mr. Phillips continued, "The Special Committee would like to thank our Co-CEOs George Cheeks, Chris McCarthy and Brian Robbins for making significant progress on optimizing company operations in a short period of time, positioning Paramount for a sustainable transformation and a path to profitable growth going forward."

Further information regarding terms and conditions contained in the merger agreement will be available on the investor relations section of Paramount's website at https://ir.paramount.com/ and in a joint press release issued earlier today by Paramount and Skydance.

**Important Information About the Transactions and Where To Find It**
In connection with the proposed transactions involving Paramount, Skydance and NAI (the "Transactions"), Paramount will file with the Securities and Exchange Commission (the "SEC") a registration statement on Form S-4 that will include an information statement on Schedule 14C and that

will also constitute a prospectus of Paramount. Paramount may also file other documents with the SEC regarding the Transactions.

EH-BCM      Document 32-1      Filed 09/

This document is not a substitute for the information statement/prospectus or registration statement or any other document that Paramount may file with the SEC. INVESTORS AND SECURITY HOLDERS OF PARAMOUNT ARE URGED TO READ THE REGISTRATION STATEMENT, WHICH WILL INCLUDE THE INFORMATION STATEMENT/PROSPECTUS, AND ANY OTHER RELEVANT DOCUMENTS THAT ARE FILED OR WILL BE FILED WITH THE SEC, AS WELL AS ANY AMENDMENTS OR SUPPLEMENTS TO THESE DOCUMENTS, CAREFULLY AND IN THEIR ENTIRETY BECAUSE THEY CONTAIN OR WILL CONTAIN IMPORTANT INFORMATION ABOUT THE TRANSACTIONS AND RELATED MATTERS. Investors and security holders may obtain free copies of the registration statement on Form S-4 (when available), which will include the information statement/prospectus, and other documents filed with the SEC by Paramount through the website maintained by the SEC at www.sec.gov or by contacting the investor relations department of Paramount (+1-646-824-5450; jaime.morris@paramount.com).

**No Offer or Solicitation**
This communication is for informational purposes only and is not intended to and does not constitute an offer to subscribe for, buy or sell, or the solicitation of an offer to subscribe for, buy or sell, or an invitation to subscribe for, buy or sell, any securities or a solicitation of any vote or approval in any jurisdiction, nor shall there be any sale, issuance or transfer of securities in any jurisdiction in which such offer, invitation, sale or solicitation would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. No offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act of 1933, as amended, and otherwise in accordance with applicable law.

**Cautionary Notes on Forward-Looking Statements**
This communication contains both historical and forward-looking statements, including statements related to our future results, performance and achievements. All statements that are not statements of historical fact are, or may be deemed to be, forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Similarly, statements that describe our objectives, plans or goals are or may be forward-looking statements. These forward-looking statements reflect our current expectations concerning future results and events; generally can be identified by the use of statements that include phrases such as "believe," "expect," "anticipate," "intend," "plan," "foresee," "likely," "will," "may," "could," "estimate" or other similar words or phrases; and involve known and unknown risks, uncertainties and other factors that are difficult to predict and which may cause our actual results, performance or achievements to be different from any future results, performance or achievements expressed or implied by these statements.

Important risk factors that may cause such a difference include, but are not limited to: (i) that the Transactions may not be completed on anticipated terms and timing (or at all), (ii) that a condition to closing of the Transactions may not be satisfied, including the failure to receive any required regulatory approvals from any applicable governmental entities (or any conditions, limitations or restrictions placed on such approvals), (iii) that the anticipated tax treatment of the Transactions may not be obtained, (iv) the potential impact of unforeseen liabilities, future capital expenditures, revenues, costs, expenses, earnings, synergies, economic performance, indebtedness, financial condition and losses on the future prospects, business and management strategies for the management, expansion and growth of the combined business after the consummation of the Transactions, (v) potential litigation relating to the Transactions that could

be instituted against Paramount or its directors, (vi) potential adverse reactions or changes to business relationships resulting from the announcement or completion of the Transactions, (vii) any negative effects of the announcement, pendency or consummation of the Transactions on the market price of Paramount's common stock and on Paramount's or Skydance's operating results, (viii) risks associated with third party contracts containing consent and/or other provisions that may be triggered by the Transactions, (ix) the risks and costs associated with the integration of, and the ability of Paramount and Skydance to integrate, the businesses successfully and to achieve anticipated synergies, (x) the risk that disruptions from the Transactions will harm Paramount's business, including current plans and operations or by diverting management's attention Paramount's ongoing business operations, (xi) the ability of Paramount to retain and hire key personnel and uncertainties arising from leadership changes, (xii) legislative, regulatory and economic developments, (xiii) the other risks described in Paramount's most recent annual report on Form 10-K and quarterly report on Form 10-Q, and (xiv) management's response to any of the aforementioned factors. There may be additional risks, uncertainties and factors that we do not currently view as material or that are not necessarily known.

These risks, as well as other risks associated with the Transactions, will be more fully discussed in the information statement/prospectus that will be included in the registration statement on Form S-4 that will be filed with the SEC in connection with the Transactions. While the list of factors presented here is, and the list of factors to be presented in the registration statement on Form S-4 is, considered representative, no such list should be considered to be a complete statement of all potential risks and uncertainties. Unlisted factors may present significant additional obstacles to the realization of forward-looking statements. Consequences of material differences in results as compared with those anticipated in the forward-looking statements could include, among other things, business disruption, operational problems, financial loss, legal liability to third parties and similar risks, any of which could have a material adverse effect on Paramount's consolidated financial condition, results of operations, credit rating or liquidity. The forward-looking statements included in this communication are made only as of the date of this communication, and we do not undertake any obligation to publicly update any forward-looking statements to reflect subsequent events or circumstances, except as otherwise required by applicable law.

**Contact:**
Brunswick Group
ParamountSpecialCommittee@brunswickgroup.com
(212) 333 – 3810

Exhibit #3

## Press

**Published: 9/23/05**

### Outside investor offers $13.50 a share for Intermix

Friday September 23, 3:44 pm ET
By Carla Mozee

SAN FRANCISCO (MarketWatch) -- Intermix Media Inc.'s largest non-insider shareholder Brad Greenspan said in a statement Friday that he has submitted a proposal to Intermix's board to acquire a significant interest in the company for $13.50 a share. Greenspan, the founder of FreeMySpace LLC, plans to file a proxy statement with the Securities and Exchange Commission to solicit Intermix shareholders to vote against the proposed acquisition of the company by News Corp., which has offered $12 a share, at the upcoming shareholders meeting. Greenspan said under the proposal, shareholders would be able to sell up to 50% of their shares at their option for $13.50 a share, as well as retain equity participation in Intermix, which would increase Intermix ownership of the MySpace.com business. Greenspan said with that divestiture of non-MySpace assets, Intermix could "successfully focus on the growth and development of MySpace.com."

← Back

EXHIBIT #4



UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | | Date | June 17, 2010 |
|---|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | | |

| Presiding: The Honorable | | **GEORGE H. KING, U. S. DISTRICT JUDGE** | |
|---|---|---|---|
| Beatrice Herrera | | N/A | N/A |
| Deputy Clerk | | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:** **(In Chambers)  Order re: Cross-Motions for Summary Judgment**; [213, 218, 244, 251, and 261]

        This shareholder class action arises out of News Corporation's ("News Corp.") 2005 acquisition of Intermix Media, Inc. ("Intermix"), formerly known as eUniverse Inc. (Brewer Decl. ¶ 3), a company which owned, among other internet businesses, the social networking website MySpace. Plaintiff Jim Brown ("Plaintiff"), individually and on behalf of all members of the certified class of former Intermix shareholders,[1] claims that Defendants Brett Brewer ("Brewer"), Daniel Mosher ("Mosher"), Lawrence Moreau ("Moreau"), David Carlick ("Carlick"), Andrew Sheehan ("Sheehan"), Richard Rosenblatt ("Rosenblatt"), James Quandt ("Quandt"), and William Woodward ("Woodward") (collectively, "Defendants"), the eight Intermix directors at the time of the company's sale, breached their fiduciary duties under state law and violated Section 14(a) of the Securities and Exchange Act of 1934 and SEC Rule 14a-9 (Counts IV and II, respectively).[2]  (Consolidated Second Amended Complaint ["CSAC"] ¶¶

---

[1] In our June 22, 2009 Order, we certified the following class: "All holders of Intermix Media, Inc. ('Intermix' or the 'Company') common stock, from July 18, 2005 through the consummation of the sale of Intermix to News Corporation ('News Corp') at the price of $12.00 per share on September 30, 2005 (the 'Acquisition'), who were harmed by defendants' improper conduct at issue in the litigation. Excluded from the Class are defendants and any person, firm, trust, corporation or other entity related to or affiliated with any defendant." (Dkt. No. 197).

[2] In our July 14, 2008 Order on the Motion to Dismiss, we dismissed with prejudice Defendants Montgomery & Co. LLC ("Montgomery"), and Thomas Weisel Partners Group, Inc. and Thomas Weisel Partners LLC ("TWP"), the investment banks which advised the Intermix board during the 2005 transaction and completed fairness analyses on the $12 per share price offered by News Corp. In the consummated merger transaction.  (Dkt. No. 110, at 4-5).  In that same Order, we also dismissed with prejudice Count I for violation of Section 14(a) of the 1934 Act and SEC Rule 14a-9, which was stated against the 2003 Individual Defendants, which included Brewer, Mosher, Carlick, Sheehan, and Lipp, and VantagePoint.  (*Id.* at 1-3).  Accordingly, Count III for

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | | Date | June 17, 2010 |
|---|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | | |

168-74, 179-87; Brewer Decl. ¶ 5). The only other remaining claim is Count III for "control person" liability under Section 20(a) of the 1934 Act against Defendants involved in the 2005 acquisition of Intermix. (CSAC ¶¶ 175-78). This matter is before us on the Parties' Cross-Motions for Summary Judgment. We have considered the papers filed and all of the admissible evidence, and deem this matter appropriate for resolution without oral argument. L.R. 7-15. As the Parties are familiar with the facts in this case, we will repeat them only as necessary. Accordingly, we rule as follows.

I.       **Motion for Summary Judgment Standard**

        Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On a motion for summary judgment, our "function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

        The moving party bears the initial responsibility to point to the absence of evidence of any genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006) (citation and quotation marks omitted). By contrast, where the non-moving party "bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case.'" *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting *Celotex Corp.*, 477 U.S. at 322) (alteration in original). "[T]he moving party can meet its burden by pointing out the absence of evidence from the non-moving party," and it "need not disprove the other party's case." *Miller*, 454 F.3d at 987 (citation omitted). Accordingly, "[t]he nonmoving party must come forward with specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citations

"control person" liability was dismissed as to Edell and Ward, as it was premised on the only other claim against them, the dismissed Count I. (*Id.* at 7-8). The Parties stipulated to dismiss certain Defendants. (Dkt. Nos. 190, 204). On June 10, 2009, pursuant to the Parties' stipulation, we dismissed without prejudice Defendants Morgenthaler Partners VII, VP Alpha Holdings IV L.L.C., VantagePoint Venture Partners IV (Q) L.P., VantagePoint Venture Partners IV L.P., and VantagePoint Venture Partners IV Principals Fund L.P. (Dkt. No. 194). On August 28, 2009, pursuant to the Parties' stipulation, we dismissed without prejudice Defendant Christopher Lipp, Intermix's General Counsel. (Dkt. No. 205).



**CIVIL MINUTES - GENERAL**

| | | | | |
|---|---|---|---|---|
| Case No. | CV 06-3731-GHK (SHx) | | Date | June 17, 2010 |
| Title | Jim Brown v. Brett Brewer, et al. | | | |

omitted). However, "[i]f the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." FED. R. CIV. P. 56(e)(2); *see also Celotex Corp.*, 477 U.S. at 322 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). The "opposing party may not rely merely on allegations or denials in its own pleading[,]" FED. R. CIV. P. 56(e)(2). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *see also In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) ("The court must view all the evidence in the light most favorable to the nonmoving party.") (citations omitted).

"Only admissible evidence may be considered in deciding a motion for summary judgment." *Miller*, 454 F.3d at 988. Under Federal Rule of Civil Procedure 56(e)(1), "[a] supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." *See also Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001). Conclusory and speculative affidavits that fail to set forth specific facts are insufficient to raise a genuine issue of material fact. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Absent a proper foundation, hearsay statements are inadmissible. *See Japan Telecom, Inc. v. Japan Telecom Am., Inc.*, 287 F.3d 866, 875 n.1 (9th Cir. 2002). Furthermore, another unverified complaint nor unsworn statements made in the parties' briefs can be considered as evidence at this stage. *See Moran v. Selig*, 447 F.3d 748, 759 & n.16 (9th Cir. 2006) (noting that unverified complaint cannot be considered as evidence on motion for summary judgment); *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978) ("[L]egal memoranda . . . are not evidence[.]").

## II.     Count IV: Breach of Fiduciary Duty Claim

### A.     Delaware Law on Corporate Fiduciary Duties Generally

Delaware law governs Plaintiff's state law claim of breach of fiduciary duty. Under Delaware law, all directors and officers of a corporation owe their shareholders fiduciary duties of loyalty and care. *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009).[5]

---

[5] Under Delaware law, the business judgment rule creates "a presumption that in making a business decision, the directors of a corporation act on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). "A plaintiff challenging a board decision bears the burden to rebut the rule's presumption by providing evidence that the directors breached their fiduciary duties." *Goodwin v. Live Entm't, Inc.*, No. Civ. A. 15765, 1999 WL 64265, at *24 (Del. Ch. Jan. 25, 1999) (citing *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993), *modified by*, 636 A.2d 956 (Del. 1994) ("*Cede II*"); *Citron v. Fairchild Camera and Instrument Corp.*, 569 A.2d 53, 64 (Del. 1989)). "In order to overcome that presumption, a plaintiff must prove an act of bad faith by a preponderance of the evidence." *In re*

EH-BCM    Document 32-1    Filed 09/

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | *Jim Brown v. Brett Brewer, et al.* |
|---|---|

### 1. Duty of Care

"Director liability for breaching the duty of care 'is predicated upon concepts of gross negligence.'" *Binks v. DSL.net, Inc.*, C.A. No. 2823-VCN, 2010 WL 1713629, at *8 (Del. Ch. Apr. 29, 2010) (quoting *McMullin v. Beran*, 705 A.2d 910, 921 (Del. 2000)). The Delaware General Corporation Law permits a corporation to include a provision in its charter "eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director." DEL. CODE ANN. tit. 8, § 102(b)(7). While such an exculpatory provision may eliminate any liability for breaches of the duty of care, it "shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; . . . or (iv) for any transaction from which the director derived an improper personal benefit." *Id.* Intermix's charter exculpates Defendants from any duty of care claims. (J.A., Ex. 38, Certificate of Incorporation). Accordingly, Defendants assert this provision as their fifth affirmative defense: "The breach of fiduciary duty claim is barred, in whole or in part, by the exculpatory provision contained in Intermix's Certificate of Incorporation." (Dkt. No. 111, Aug. 4, 2008). In light of this provision, we conclude that the director Defendants cannot be liable for any purported breach of fiduciary duty based solely on their duty of care. Plaintiff does not argue otherwise.

Defendants also move for summary judgment on the question of whether Brewer and Rosenblatt, who doubled as officers for Intermix, may be held liable for any breaches of the duty of care, since Section 102(b)(7) only permits exculpation of duty of care claims for directors. It is undisputed that both Brewer and Rosenblatt were directors and officers of Intermix, Brewer as President and Rosenblatt as CEO. (Brewer Decl. ¶ 1; Rosenblatt Decl. ¶ 1). The law is clear that where it is impossible to separate actions taken in fulfillment of a defendant's directorial duties from actions taken in fulfillment of that defendant's duties as a corporate officer, then any duty of care claim stated against that individual is exculpated. In *Arnold v. Society for Savings Bancorp, Inc.*, 650 A.2d 1270 (Del. 1994), the Delaware Supreme Court held that since the plaintiff "failed to highlight any specific actions [the defendant] undertook as an officer (as distinct from actions as a director) that fall within the two pertinent exceptions to Section 102(b)(7)[,]" any duty of care claim was precluded under the exculpatory clause. *Id.* at 1288 (citing R. Franklin Balotti & Jesse A. Finkelstein, Delaware Law of Corp. & Business Org. § 4.19, at 4-335 (Supp. 1992) (where a defendant is a director and officer, only those actions taken solely in the defendant's capacity as an officer are outside the purview of Section

---

*Walt Disney Co. Derivative Litig.*, 907 A.2d 693 (Del. Ch. 2005). "If the plaintiff fails to rebut the presumption, the business judgment rule protects the decision made." *Goodwin*, 1999 WL 64265, at *4 (citation omitted). "If the rule is rebutted, the burden shifts to the defendants . . . to prove that the transaction was entirely fair to the plaintiff shareholder." *Id.* (citation omitted).



| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | Jim Brown v. Brett Brewer, et al. | | |

102(b)(7))). Plaintiffs have not identified any actions taken by Rosenblatt or Brewer solely in their capacity as officers. Accordingly, to the extent any claim for breach of the duty of care is embodied in Count IV, we **GRANT** summary judgment on that specific basis as to all director defendants, including Brewer and Rosenblatt who also served as officers.

### 2. Duty of Loyalty

To hold a director liable for breach of the duty of loyalty, the plaintiff must establish that "a majority of the Director Defendants either [1] stood on both sides of the merger or were dominated and controlled by someone who did; or [2] failed to act in good faith, i.e., where a fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *In re NYMEX S'holder Litig.*, C.A. Nos. 3621-VCN, 3835-VCN, 2009 WL 3206051, at *6 (Del. Ch. Sept. 30, 2009) (internal citations and quotation marks omitted); *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 239-40 (Del. 2009) ("*Lyondell*") ("Because the trial court determined that the board was independent and was not motivated by self-interest or ill will, the sole issue is whether the directors are entitled to summary judgment on the claim that they breached their duty of loyalty by failing to act in good faith.").

With respect to the first basis for demonstrating breach of the duty of loyalty, Delaware law provides that "[w]hen directors . . . are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983). "Classic examples [of this type of breach] are when a director appears on both sides of a transaction or receives a personal benefit not received by the shareholders, generally." *Oliver v. Boston Univ.*, No. Civ. A. 16570-NC, 2006 WL 1064169, at *18 (Del. Ch. Apr. 14, 2006) (citing *Cede II*, 634 A.2d at 362 (citing *Nixon v. Blackwell*, 626 A.2d 1366, 1375 (Del. 1993))) (internal quotation marks and alterations omitted). "If corporate fiduciaries stand on both sides of a challenged transaction, an instance where the directors' loyalty has been called into question, the burden shifts to the fiduciaries to demonstrate the 'entire fairness' of the transaction." *Id.* (citations omitted). A showing of "entire fairness" requires proof that the transaction is "the product of both fair dealing *and* fair price." *Cede II*, 634 A.2d at 361 (emphasis in original and citations omitted).

With respect to the second basis for demonstrating breach of the duty of loyalty, Delaware courts have noted that "the requirement to act in good faith is a subsidiary element, i.e., a condition, of the fundamental duty of loyalty." *Stone v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006) (citation, alteration, and internal quotation marks omitted) ("[T]he fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest. It also encompasses cases where the fiduciary fails to act in good faith."). In *Stone*, the Delaware Supreme Court explained that "although good faith may be described colloquially as part of a 'triad' of fiduciary duties that includes the duties of care and loyalty, the obligation to act in good faith does not establish an independent fiduciary duty that stands on the same footing as the duties of care and loyalty." *Id.* at 370.

EH-BCM       Document 32-1       Filed 09/

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

The Delaware Supreme Court has explained what constitutes bad faith by way of a spectrum of directorial conduct. "At one end of the spectrum, [there is] a category of acts involving non-exculpable, so-called 'subjective bad faith,' that is, fiduciary conduct motivated by an actual intent to do harm." *Ryan v. Lyondell Chem. Co.*, C.A. No. 3176-VCN, 2008 WL 4174038, at *3 (Del. Ch. Aug. 29, 2008) ("*Ryan*") (quoting *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 64 (Del. 2006) ("*Disney*")) (internal quotation marks omitted). "The second category of conduct, which is at the opposite end of the spectrum, involves lack of due care—that is, fiduciary action taken solely by reason of gross negligence and without any malevolent intent." *Disney*, 906 A.2d at 64. The court observed that "grossly negligent conduct, without more, does not and cannot constitute a breach of the fiduciary duty to act in good faith." *Id.* at 65. The third category identified by the Delaware Supreme Court is the one at issue in this case: "intentional dereliction of duty or a conscious disregard for one's responsibilities." *Id.* at 66. "Such misconduct, according to the Court, is 'properly treated as a non-exculpable, non-indemnifiable violation of the fiduciary duty to act in good faith.'" *Ryan*, 2008 WL 4174038, at *3 (quoting *Disney*, 906 A.2d at 66).

Accordingly, "the distinction between gross negligence and non-exculpable 'bad faith' (i.e., that elusive something 'more') has important consequences in Delaware's jurisprudence and corporate statutory scheme because, for example, director conduct amounting *only* to a violation of the duty of care, but otherwise taken in good faith, is exculpable under 8 Del. C. § 102(b)(7) or indemnifiable under 8 Del. C. § 145." *Id.* (citing *Disney*, 906 A.2d at 64-65).

**B.     *Scope of Plaintiff's Claim of Breach of the Duty of Loyalty***

Inasmuch as the director defendants are exculpated from potential breaches of their duty of care, the success of Count IV necessarily depends on "whether any arguable shortcomings on the part of the . . . directors also implicate their duty of loyalty, a breach of which is not exculpated." *Lyondell*, 970 A.2d at 239. To that end, in order to rule on Defendants' motion for summary judgment, we must ascertain whether there are any genuine issues of material fact with respect to whether the directors breached their duty of loyalty, not merely their duty of care. In keeping with the Parties' Joint Brief, we address the two bases for breach of the duty of loyalty in the reverse order: first, Plaintiff's assertion of bad faith conduct by Defendants, and second, Plaintiff's allegation of a self-interested transaction not shown to be entirely fair.

**1.     Bad Faith in *Revlon* Auction Context**

The obligation to act in good faith, which is a necessary component of satisfying the duty of loyalty, requires directors to act for the purpose of advancing corporate well-being. Therefore, any "intentional dereliction of duty, a conscious disregard for one's responsibilities[,]" constitutes bad faith, or the failure to act in good faith. *Disney*, 906 A.2d at 66; *Stone*, 911 A.2d at 370 ("Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith."). In this case, Plaintiff and the shareholder class which he represents argue Defendants



**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | *Jim Brown v. Brett Brewer, et al.* | | |

consciously disregarded their responsibilities in selling Intermix to News Corp. for $12 per share, when, so they contend, a likely topping bid from Viacom was imminent.

The seminal case of *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986), regulates directorial conduct during a sale or change of control of a publicly held corporation. *Revlon* holds that directors satisfy their fiduciary duties when their conduct is geared towards "the maximization of the company's value at a sale for the stockholders' benefit." *Id.* at 182. *Revlon* is triggered in the following three scenarios: "(1) when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company; (2) where, in response to a bidder's offer, a target abandons its long-term strategy and seeks an alternative transaction involving the break-up of the company; or (3) when approval of a transaction results in a sale or change of control." *Arnold v. Soc'y for Sav. Bancorp., Inc.*, 650 A.2d 1270, 1289-90 (Del. 1994) (internal citations and quotation marks omitted). More recently, the Delaware Supreme Court has stated that *Revlon* duties attach "when a company embarks on a transaction–on its own initiative or in response to an unsolicited offer–that will result in a change of control." *Lyondell*, 970 A.2d at 242. When the company's "break-up" became "inevitable," in *Revlon*, "[t]he directors' role changed from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company." 506 A.2d at 182. In addition to its principal holding that shareholder wealth maximization must be the directors' foremost objective, the court also noted that "favoritism for a white knight to the total exclusion of a hostile bidder" was impermissible if divorced from the objective of shareholder value maximization. *Id.* at 184. "[W]hen bidders make relatively similar offers, or dissolution of the company becomes inevitable, the directors cannot fulfill their [fiduciary] duties by playing favorites with the contending factions. Market forces must be allowed to operate freely to bring the target's shareholders the best price available for their equity." *Id.*

The Delaware Supreme Court has clarified that "*Revlon* did not create any new fiduciary duties[,]" but rather "simply held that the 'board must perform its fiduciary duties in the service of a specific objective: maximizing the sale price of the enterprise.'" *Lyondell*, 970 A.2d at 239 (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)). Additionally, Delaware case law has time and again reaffirmed the anti-favoritism principle, *i.e.* that directors may not tilt the playing field in favor of one bidder or otherwise skew the auction unless this conduct is designed to maximize shareholder wealth. In *Barkan v. Amsted Industries*, 567 A.2d 1279 (Del. 1989), the court warned that "the board must act in a neutral manner to encourage the highest possible price for shareholders." *Id.* at 1286. To be sure, "there is no single blueprint that a board must follow to fulfill its duties," and "there are no legally prescribed steps that directors must follow to satisfy their *Revlon* duties." *Id.*; *Lyondell*, 970 A.2d at 243. Nevertheless, "[w]hen multiple bidders are competing for control, this concern for fairness forbids directors from using defensive mechanisms to thwart an auction or to favor one bidder over another." *Id.* at 1286-87 (citation omitted). More recently, *In re Toys "R" Us, Inc., Shareholder Litigation*, 877 A.2d 975 (Del. Ch. 2005), the Delaware Chancery Court stated that "a selfish or idiosyncratic desire by the board to tilt the playing field towards a particular bidder for reasons unrelated to the stockholders' ability to get top dollar" is a violation of a director's fiduciary obligations. *Id.* at 1000-01.

EH-BCM    Document 32-1    Filed 09/

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 06-3731-GHK (SHx) | | Date | June 17, 2010 |
|---|---|---|---|---|

| Title | Jim Brown v. Brett Brewer, et al. |
|---|---|

        To support his claim that Defendants acted in bad faith, Plaintiff cites *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261 (Del. 1988). In that case, Macmillan, Inc.'s Chairman and Chief Executive Officer ("CEO") and its President and Chief Operating Officer ("COO") orchestrated a leveraged buyout of their own company, resulting in a lock-up agreement "between Macmillan and Kohlberg Kravis Roberts & Co. ('KKR'), an investment firm specializing in leveraged buyouts." *Id.* at 1264-65. These directors, "as participants in the leveraged buyout, had a significant self-interest in ensuring the success of a KKR bid." *Id.* at 1279. Indeed, "Macmillan senior management would receive up to 20% ownership in the newly formed company." *Id.* at 1273. So strong was the pull of that promised 20 percent ownership stake that even before KKR had communicated a bid price, these self-interested actors indicated that they would "endorse" the acquisition to the full board of directors. *Id.* To steer the process in the desired direction, they "clandestinely and impermissibly skewed" the auction in KKR's favor by, among other things, tipping KKR off as to the amount of a competing bid and then concealing this tip from the board of directors. *Id.* at 1279-81. On appeal, the Delaware Supreme Court held that "discriminatory treatment of a bidder, *without any rational benefit to the shareholders*, was unwarranted." *Id.* at 1282 (emphasis added).[4] The Court found that "KKR repeatedly received significant material advantages to the exclusion and detriment of [the competing bidder] to stymie, rather than enhance, the bidding process." *Id.* at 1281. Moreover, the court concluded that "[t]he board was torpid, if not supine, in its efforts to establish a truly independent auction . . . ." *Id.* at 1280. The court added: "By placing the entire process in the hands of [the chairman], through his own chosen financial advisors, with little or no board oversight, the board materially contributed to the unprincipled conduct of those upon whom it looked with a blind eye." *Id.*

        Defendants contend that *Macmillan* is distinguishable because the directors in that case were on both sides of the transaction and therefore engaged in self-dealing. However, Defendants have pointed us to no authority for the proposition that *Macmillan* is only applicable when a court reviews self-interested transactions for fairness and may not support a finding of bad faith conduct in the *Revlon* auction context.

---

[4] Favoritism and deal protection devices, such as a termination fee, are permissible so long as they are strategically designed to maximize the price paid to shareholders. *Macmillan*, 559 A.2d at 1287 ("[T]he board's primary objective, and essential purpose, must remain the enhancement of the bidding process for the benefit of the stockholders."). *Macmillan* set forth a test which tolerates only *value-enhancing* preferential treatment:

> In the face of disparate treatment, the trial court must first examine whether the directors properly perceived that shareholder interests were enhanced. In any event, the board's action must be reasonable in relation to the advantage sought to be achieved, or conversely, to the threat which a particular bid allegedly poses to stockholder interests.

559 A.2d at 1288; see *In re J.P. Stevens & Co., Inc. S'holders Litig.*, 542 A.2d 770, 782 (Del. Ch. 1988) ("The board may tilt the playing field if, but only if, it is in the shareholders' interest to do so.").

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | | Date | June 17, 2010 |
|---|---|---|---|---|

| Title | Jim Brown v. Brett Brewer, et al. |
|---|---|

We recognize that *Wayne County Employees' Retirement System v. Corti*, Civil Action No. 3534-CC, 2009 WL 2219260 (Del. Ch. July 24, 2009), distinguishes *Macmillan* from the single-bidder merger reviewed in that case on the absence of any conflicted insiders seeking to transfer control of a company to themselves. *Id.* at *12-13 ("There is much less cause for concern where managers will continue their employment with the combined post-transaction entity, than when the conflicted managers are bidders in an auction for control of the company, and are thereby seeking to transfer control of the company to themselves personally."). But that discussion has no bearing on the prohibition on favoring a particular bidder in a *multiple*-bidder context, which this case arguably presents.[5]  Defendants suggest that the directors may tilt the playing field in favor of a particular bidder, without regard to shareholder wealth maximization, so long as they are not on both sides of a transaction.  We reject this argument.  Simply because *Macmillan* examined "disparate treatment" through the lens of disloyalty premised on a self-interested transaction does not mean field-tilting is permissible in other contexts. *See Emerson Radio Corp. v. Int'l Jensen Inc.*, Civ. A. Nos. 15130, 14992, 1996 WL 483086, at *11-12 (Del. Ch. Aug. 20, 1996) (describing *Macmillan* as requiring fiduciaries to "treat all bidders equally and fairly in carrying out their *Revlon* duties" and identifying self-interested nature of merger transaction as an "addition[al]" or "alternative" theory for breach of duty of loyalty); *Roberts v. Gen. Instrument Corp.*, CIV. A. No. 11639, 1990 WL 118356, at *8 (Del. Ch. Aug. 13, 1990) (citing *Macmillan*, 559 A.2d at 1287-88) ("In each instance where the board is not predominantly self-interested or under the control or dominating influence of a person with a conflicting interest, the principal judicial inquiries relate to whether the board was adequately informed and acting in good faith.  That can be said, but this case has been positively instructive, however, that 'where issues of corporate control are at stake' action of even a disinterested board must meet an enhanced test before they will qualify for the deference that courts ordinarily accord to good faith business judgments.").

Whatever a director's particular motivation, evidence that he skewed an auction in favor of a particular bidder can support a finding of an "intentional dereliction of duty," *Disney*, 906 A.2d at 66, *i.e.* a violation of the obligation to act in good faith.  *See Nagy v. Bistricer*, 770 A.2d 43, 48, n.2 (Del. Ch. 2000) (observing that the duty of good faith may serve as a "constant reminder . . . that, regardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes," even if for a reason "other than personal pecuniary interest").[6]

---

[5] Although Viacom did not actually submit a bid, we conclude that there are triable issues of fact as to whether Viacom was at least a serious potential bidder which was discouraged from actually submitting a bid by Defendants' alleged bad faith conduct.

[6] The Delaware courts have explained that favoritism, untethered to any strategy to drive up bid prices, is a breach of the fiduciary duties which *Revlon* focused through the lens of shareholder wealth maximization:

Critically, in the wake of *Revlon*, Delaware courts have made clear that the enhanced judicial review *Revlon* requires is not a license for law-trained courts to second-guess reasonable, but

EH-BCM      Document 32-1      Filed 09/

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | *Jim Brown v. Brett Brewer, et al.* |
|---|---|

Defendants' principal argument is that recent Delaware Supreme Court case law creates a much more stringent standard for claims of breaches of the obligation to act in good faith. To this end, they cite language in the Delaware Supreme Court's decision in *Lyondell*. In that case, Lyondell's board of directors approved the sale of their company to Basell AF, a privately held Luxembourg company, after negotiating several increases in the per share bid price up from $40 to $48, and a set of less stringent deal protection devices, including a "fiduciary out" clause in the standard no-shop provision and a reduced termination fee. 970 A.2d at 237-39. The court found no bad faith and therefore no breach of the duty of loyalty. *Id.* at 242-44. The Supreme Court rested its decision on the following facts:

> The Lyondell directors met several times to consider Basell's premium offer. They were generally aware of the value of their company and they knew the chemical company market. The directors solicited and followed the advice of their financial and legal advisors. They attempted to negotiate a higher offer even though all the evidence indicates that Basell had offered a "blowout" price. Finally, they approved the merger agreement, because "it was simply too good not to pass along [to the stockholders] for their consideration." We assume, as we must on summary judgment, that the Lyondell directors did absolutely nothing to prepare for Basell's offer, and that they did not even consider conducting a market check before agreeing to the merger. Even so, this record clearly establishes that the Lyondell directors did not breach their duty of loyalty by failing to act in good faith.

*Id.* at 244.

Contrary to Defendants' argument, *Lyondell* did not work any transformation in Delaware law on the duty of loyalty. Nothing in this case alters or altered the standard definition of bad faith; indeed, the court reaffirmed that "bad faith will be found if a 'fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.'" *Id.* at 243 (quoting *Disney*, 906 A.2d at 67). The court continued: "there is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties." *Id.* Despite all the references to the

———————————————————

debatable, tactical choices that directors have made in good faith. For example, the Supreme Court has held that the duty to take reasonable steps to secure the highest immediately available price does not invariably require a board to conduct an auction process or even a targeted market canvass in the first instance, emphasizing that there is "no single blue-print" for fulfilling the duty to maximize value. Nor does a board's decision to sell a company prevent it from offering bidders deal protections, so long as its decision to do so was reasonably directed to the objective of getting the highest price, *and not by a selfish or idiosyncratic desire by the board to tilt the playing field towards a particular bidder for reasons unrelated to the stockholders' ability to get top dollar.*

*Toys "R" Us*, 877 A.2d at 1000-01 (emphasis added; citations omitted).



CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
| Title | Jim Brown v. Brett Brewer, et al. | | |

"conscious disregard" standard. Defendants nevertheless cherry-pick certain language to argue that a more stringent standard applies, including the following lines: (1) "Only if they knowingly and completely failed to undertake their responsibilities *would* they breach their duty of loyalty"; and (2) "[T]he inquiry should have been whether those directors *utterly failed* to obtain the best sale price." *Id.* at 243-44 (emphasis added). (Joint Br. 5-7, 16). Defendants' citation of this language is out of context and misleading. A comprehensive review of the *Lyondell* opinion reveals that the court intended that language to be synonymous and coterminous with the "conscious disregard" standard. The court did not suggest that the "utter failure" standard would supplant the definition of bad faith set forth in *Disney*. Nor did it suggest any unprecedented diminishment of *Revlon* duties, as suggested by the minimalist standard Defendants advance. If such a radical departure were intended, we think the court would have taken the pains to say as much. Divorced from the surrounding text, the "utter failure" language could be said to require that directors simply do anything in the auction process, no matter how feckless, ineffectual, or at odds with the goal of maximizing shareholder wealth.

The "utter failure" language derives from the *Stone* and *In re Caremark* decisions, which the court cited. 911 A.2d 362 (Del. 2006); 698 A.2d 959, 971 (Del. Ch. 1996). Both of those decisions concerned claims that directors failed to engage in the necessary oversight to ensure compliance with laws such as the federal Bank Secrecy Act in *Stone*. That vital factual context helps explain why *In re Caremark* defined bad faith as follows: "Generally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation, . . . only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability." 698 A.2d at 971 ("Such a test of liability—lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight—is quite high."). Nevertheless, the Delaware Supreme Court explained in *Stone* and reaffirmed in *Lyondell* that: "the *Caremark* standard is fully consistent with the *Disney* definition of bad faith." *Lyondell*, 970 A.2d at 240 (citing *Stone*, 911 A.2d at 370). We cannot second-guess that determination as Defendants wish.

Instead of placing "utter failure" between "subjective bad faith" (*i.e.* "actual intent to do harm") and "conscious disregard" on the *Disney* "bad faith" spectrum, *Lyondell* equated the "utter failure" and "conscious disregard" standards. 970 A.2d 240. This reasoning was fully in keeping with the Supreme Court's prior decision in *Stone*, where it noted that the duty of loyalty could be breached by two typically kinds of conduct rising to the level of bad faith: "(a) the directors *utterly failed* to implement any reporting or information system or controls; or (b) having implemented such a system or controls, *consciously failed to monitor or oversee* its operations thus disabling themselves from being informed of risks or problems requiring their attention." 911 A.2d at 370. Crucially, though bad faith could be demonstrated with either of these alternatives, the court emphasized, citing *Disney*, 906 A.2d at 67, that these were coterminous legal standards:

In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations. *Where directors fail to act in the face of a known*

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | *Jim Brown v. Brett Brewer, et al.* |
|---|---|

duty to act, thereby demonstrating a conscious disregard for their responsibilities*, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

911 A.2d at 370 (emphasis added).  Delaware courts generally seem to read *Lyondell* this way.  *See, e.g.*, *Robotti & Co., LLC v. Liddell*, C.A. No. 3128-VCN, 2010 WL 157474, at *11 (Del. Ch. Jan. 14, 2010) (characterizing *Lyondell* as holding that "[b]ad faith, and thus a breach of the duty of loyalty, can arise only when a fiduciary consciously disregards his or her responsibilities").[7]

    In addition, we do not read *Lyondell* as diminishing the prohibition on tilting the playing field in favor of a particular bidder for any reason other than maximizing shareholder wealth.  The lack of an actual or even potential second bidder was a key undisputed fact on which that court relied, because: "[The directors] had reason to believe that no other bidders would emerge, given the price Basell had offered and the limited universe of companies that might be interested in acquiring Lyondell's unique assets. . . . Finally, no other acquiror [*sic*] expressed interest during the four months between the merger announcement and the stockholder vote."  970 A.2d at 241.  Other cases have distinguished between single-bidder and multiple-bidder contexts as well.  *See, e.g.*, *Barkan*, 567 A.2d at 1286-87; *Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 466 n.14 (D. Del. 2004) ("In [*Macmillan*], the claim was that the directors approved the use of a lock-up that stopped rival bidders from winning the auction for the company so that fellow directors could purchase the company through a leveraged buy-out.  Here, however, *there were no other bidders for Star*, the Company was on the verge of bankruptcy, and the Gotel financing was, by the Plaintiff's own admission, the only financing option presented to the Board.") (emphasis added and citations omitted).  Since *Lyondell* only reviewed a merger with a lone bidder, even if we were to read its "utter failure" language as more lenient on Defendants, it is of severely diminished relevance in the multiple-bidder scenario we arguably confront here.

    In short, *Revlon* and *Macmillan* are not displaced in any way by *Stone* or *Lyondell*.  Accordingly, we must ask whether there is a genuine issue of material fact as to whether Defendants consciously disregarded their duties, *i.e.* "fail[ed] to act in the face of a known duty to act."  *Stone*, 911 A.2d at 370.  There is nothing in the case law to warrant granting judgment as a matter of law for Defendants, simply because they engaged in some bargaining.

    Having considered all of the admissible evidence before us and viewing it in the light most favorable to Plaintiff as we must under Rule 56, we conclude that there are genuine, triable issues of material fact sufficient to defeat Defendants' Motion for Summary Judgment on this *Revlon* claim.

---

[7] "A failure to act in good faith may be shown . . . where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d at 755.



**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
| Title | Jim Brown v. Brett Brewer, et al. | | |

These issues fall into three categories: (1) whether Intermix CEO Rosenblatt impermissibly tilted the playing field in favor of News Corp.; (2) whether the remaining board members consciously disregarded their duties; and (3) whether the purported risk of a direct bid for MySpace, which would have frozen the MySpace Option, precludes a finding that Defendants consciously disregard their duties.

a.  **Rosenblatt**

Plaintiff proffers evidence tending to show that during the crucial week leading up to the July 18, 2005 merger, Rosenblatt evaded Viacom's advances, even though Viacom's representatives were communicating that a competing bid was imminent.  Plaintiff raises at least two interrelated triable issues: (1) whether Rosenblatt was self-interested in the merger transaction;[8] and (2) whether he impermissibly steered the auction in News Corp.'s favor.

As to Rosenblatt's purported self-interest, there is evidence of Rosenblatt's motivation for the alleged bidder favoritism, namely his anticipation of future employment with News Corp.  In one particularly revealing email sent on July 15, Rosenblatt excitedly endorses News Corp.'s Ross Levinsohn's vision: "So, we create the Fox Internet group, all our units (myspace, alena, grab) fall under it, plus all new acquisitions, and you are CEO Fox Internet and I am Fox Internet grand Puba!!!!" (J.A., Ex. 184).  Rosenblatt continues: "I would like to discuss my specific role and structure whenever you are ready.  It is no rush unless Peter and Rupert want me to sign an employment agreement by Sunday [July 17, 2005] . . . ." (*Id.*).  In an earlier email in that same chain, Rosenblatt wrote: "[I] am burning some real equity with every major media company by getting [the deal] done. . . . u [sic] have no idea the pain I will suffer on Monday.  U [sic] better have a good job for me cause I ain't [sic] gonna work in this town again. . . ." (*Id.*).  On July 13, Rosenblatt wrote: "tell Thom Murdoch and I cut the deal in 30 mins [sic] and I got 100% of what we wanted.  Deal closing by Monday." (*Id.*, Ex. 154).  This evidence at least raises the inference that Rosenblatt had a strong interest in seeing a merger transaction with News Corp. completed and that had that Intermix would be sold to News Corp. as of July 13.

Moreover, Plaintiff points to several key pieces of documentary evidence and witness testimony which tend to support his contention that (1) Rosenblatt, in representing the Intermix board through the Transaction Committee ("TC"), (2) Sheehan, who also sat on the TC, and (3) their agents, deliberately dodged, if not frustrated, an arguably imminent bid from Viacom:

---

[8]  Although analytically we are reviewing the evidence on the bad faith prong of the duty of loyalty component of the breach of fiduciary duty claim at this juncture, we consider Rosenblatt's alleged self-interest to the extent that it bears on whether Plaintiff has raised a triable issue of material fact as to whether Rosenblatt acted in conscious disregard of his duties by impermissibly tilting the field in favor of News Corp.

EH-BCM      Document 32-1      Filed 09,

CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
| Title | Jim Brown v. Brett Brewer, et al. | | |

*First*, on July 6, Montgomery responded to an email announcing "Viacom coming in hard" by telling Rosenblatt: "You need to dance with [Viacom] . . . slow them down. I know you can do it." (*Id.*, Ex. 117).

*Second*, TWP, specifically Robert Kitts ("Kitts"), was aware that Epstein was trying to reach them to talk about a potential Viacom bid. (Kitts Tr. at 125:4-7, 126:4-13). Epstein noted on July 16 that Kitts never called him back. (J.A., Ex. 191 ("We exchanged subsequent emails and he indicated he would call me, but he never did.")).

*Third*, on July 15, Mosher wrote Rosenblatt following one of Rosenblatt's updates to the full board, saying "Viacom sounds like a pipedream." (*Id.*, Ex. 182).

*Fourth*, on July 15, Judy McGrath of MTV[9] wrote Rosenblatt to inform him that Viacom was "coming with a bid early next week." (*Id.*, Ex. 183). She added: "We really want to be with you on this, and hope to get in the ring for it . . . ." (*Id.*). Rosenblatt replied evasively, failing to correct her mistaken impression that the auction would still be ongoing after Monday: "I am on a call but thanks so much for the email . . . I will call you back soon . . . ." (*Id.*). Rosenblatt could not recall precisely whether he had returned her call: "I may have tried. I think, actually, I do think I tried and I couldn't get a hold of her." (Rosenblatt Tr. at 108:21-24).

*Fifth*, Viacom's CEO Thomas Freston ("Freston"), who reiterated Viacom's interest in purchasing Intermix to Rosenblatt, has testified that he was only told that the process with the competing bidder was "moving quickly." (Freston Tr. at 17:12-20, 19:8-11, 22:4-14).[10] He testified that he could not "recall" if [Rosenblatt] said that they were going to do a deal by Sunday." (*Id.* at 22:21-24). When asked whether Rosenblatt had communicated that a deal would be completed by Sunday, he stated that he did not believe so. (Freston Tr. at 19:8-11).

---

[9] Viacom owns MTV Networks.

[10] The Parties initially sought to file Freston's deposition transcript under seal because it contained information subject to the governing protective order. On November 13, 2009, the Parties filed a joint stipulation to withdraw their application to file under seal unredacted versions of the Joint Brief, the Joint Statement of Uncontroverted Facts, and Volumes 2-3 and 5-9 of the Joint Evidentiary Appendix, as well as several full deposition transcripts, including Freston's testimony. (Dkt. No. 234). In that document, the Parties stated that: "WHEREAS the Parties have contacted all non-parties that produced documents and/or gave deposition testimony which was the subject of the application to file under seal, and obtained their permission for the documents to be publicly filed, and therefore withdraw the Application to File Under Seal[.]" (*Id.* at 3). Our November 17, 2009 Order regarding the joint stipulation was not clear as to whether the deposition transcripts were also being filed in the public record. (Dkt. No. 236). We now clarify that all of the deposition transcripts labeled "Confidential Pursuant to Protective Order" and submitted to the Court along with the Cross-Motions for Summary Judgment SHALL also be filed in the public record pursuant to the Parties' joint stipulation.

EH-BCM        Document 32-1        Filed 09/

E-Filed

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |

| | |
|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* |

Kitts of TWP also confirmed that he failed to give Viacom any hard deadline by which to submit a bid. (Kitts Tr. at 88:21-89:16, 90:11-22, 136:11-14).[11]

*Sixth*, on July 17, Jason Hirschhorn emailed Chris DeWolfe, MySpace's CEO, to document his difficulties in staying in the auction process: "chris, quick concerns . . . Intermix management did not show up on Friday as promised during our time there . . . Intermix legal cancels their time with our legal today at the last minute . . . Heard you guys got called off the ad sales call abruptly . . . In short, I have had a team of 20+ people here working for 72 hours straight on a significant bid, is there anything I need to know?" (J.A., Ex. 200).

*Seventh*, on July 17, Van Toffler of MTV also emailed Rosenblatt directly to complain politely about the perceived run-around: "They are in the office working round [sic] the clock so we can put forth a number to you this week. They mentioned a couple of calls were cancelled at the end of the day Friday, and seemed a bit concerned. Is there anything I can do to help the process for both of us as this is clearly on the fast track?" (*Id.*, Ex. 202). Again, Rosenblatt replied in such a way that a reasonable jury could infer an intent to evade an arguably imminent competing bid: "We like you and your guys a ton also. Chris called back or will your GC today. Have a great weekend[.]" (*Id.*).[12]

*Eighth*, on July 17, Kitts of TWP, pursuant to the Intermix board's instructions, informed Viacom that it would be in "its best interest" to make a bid that evening. (Kitts Tr. at 69:13-70:14, 88:21-89:16). Kitts admitted that he did not give Viacom a hard and fast deadline (*see id.* at 88:21-89:16, 90:11-22; Epstein Tr. at 53:21-55:5), but that he "relied upon the message [he]

---

[11] Rosenblatt, on the other hand, has testified that he actually told Freston that a deal would "likely be over by Sunday," or (stated with more certainty) that the deal was "going to be done by Sunday." (Rosenblatt Tr. at 64:5-22, 65:22-25, 92:5-8). For purposes of summary judgment, this conflicting evidence further supports the existence of a triable issue of fact as to Viacom's relative awareness of the impending consummation of the merger with News Corp. Moreover, Jason Hirschhorn ("Hirschhorn"), Viacom's top manager for Internet business, wrote in an internal email on Saturday July 16 that News Corp. "will deliver [its bid] anywhere from today-monday." (J.A., Ex. 192). Freston also states that Rosenblatt told him "a specific deal was imminent." (Freston Tr. at 29:11-16). Though the actual meaning of that statement is obscure as to whether a deal or a bid would have been imminent (particularly given Freston's other testimony), this ambiguity likewise buttresses our conclusion that there are genuine issues for trial.

[12] A reasonable jury could infer from this email that Rosenblatt intended to evade an arguably imminent competing bid, and that the "[h]ave a great weekend" line at the end of the email was dismissive, given the fact that the email was sent at nearly 6 p.m. on a Sunday night.

[13] We do not read the deposition to suggest that these were his actual words; Kitts was merely paraphrasing what he recalls saying to Viacom.

EH-BCM        Document 32-1        Filed 09/

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | *Jim Brown v. Brett Brewer, et al.* | | |

delivered as code that [Epstein] should get a bid in this evening." (Kitts Tr. at 90:20-22).
Furthermore, Kitts admitted in the deposition that he had been instructed to ask for a bid on a
timetable that he knew was infeasible. (*Id.* at 144:1-145:1). Kitts testified that he was aware of
an upcoming Viacom board meeting, "at which [a potential bid] was going to be discussed." (*Id.*
at 69:13-70:14). The Viacom board was not scheduled to meet until the evening of Tuesday
July 19, 2005. (Rosenblatt Decl. ¶ 42; Brewer Decl. ¶ 29).

On the other hand, Defendants present the following evidence of events leading up to the July
18th merger, which they argue demonstrates the board members' good faith. News Corp. initially
signaled that it would be willing to purchase Intermix in the $8-10 per share price range. (Rosenblatt
Decl. ¶ 18). During the Tuesday July 12, 2005 meeting between Rosenblatt, Rupert Murdoch, and Peter
Chernin,[14] News Corp. indicated that it would pay $12 per share, as long as the MySpace Option was
exercised and a merger agreement was executed by no later than Sunday, July 17, 2005. (*Id.* ¶ 24
(describing the "handshake deal")). At the 2 p.m. meeting on July 15, the Intermix board of directors
rejected News Corp.'s proposal to enter exclusive negotiations as premature. (*Id.* ¶¶ 29-30). At the 8
p.m. meeting on July 15, the Intermix board rejected the non-binding term sheet including a variety of
deal protection provisions as "too strong a deterrent to other potential bidders." (*Id.* ¶ 33; J.A., Ex. 14).
At the 8 p.m. meeting on July 16, TWP advised the board that it would be reasonable to approve a
merger with News Corp. rather than waiting for Viacom to present an offer. (Brewer Decl. ¶ 27;
Rosenblatt Decl. ¶ 37). At the 7:30 p.m. TC meeting on July 17, the committee directed TWP to contact
Viacom and/or its representative, Morgan Stanley, to ascertain whether Viacom would be making an
offer before the opening of the market the next morning. (Rosenblatt Decl. ¶ 41; Sheehan Decl. ¶ 36;
J.A., Ex. 18). At the 10 p.m. Intermix board meeting on July 17, TWP advised that Viacom was not
prepared to make any offer until its board met on Tuesday July 19 and approved a bid. (Rosenblatt
Decl. ¶ 42; J.A., Ex. 19). At the 3:45 a.m. board meeting on July 18, both Montgomery and TWP
presented their valuation analyses, explaining that $12 per share was a fair price for Intermix, and the
Board voted to approve the merger. (Rosenblatt Decl. ¶ 44). On July 18, Intermix entered into a merger
agreement with News Corp.'s Fox Interactive Media. (Rosenblatt Decl. ¶ 45; J.A., Ex. 4 at 319).
Defendants contend, and the record reflects, that throughout this process the board met repeatedly,
authorized ongoing discussions with both competing bidders, and consulted legal and financial advisers.
(J.A., Exs. 8-12, 14-19).

Viewing the evidence as a whole and in the light most favorable to Plaintiff, we conclude that
there are at least triable issues of fact as to whether Rosenblatt acted in good faith, whether he
impermissibly skewed the auction in favor of News Corp. for a larger personal gain, whether that
maximizing shareholder value, knowing that a Viacom bid was likely and imminent, and whether this
arguably disparate treatment of Viacom and News Corp. had any effect on Viacom's appreciation of the
arguable need to make an offer by the evening of July 17, 2005.

---

[14] Rupert Murdoch is the Chairman and CEO of News Corp. Peter Chernin was the then-
President and COO of News Corp.


EH-BCM      Document 32-1      Filed 09/

CIVIL MINUTES - GENERAL

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | Jim Brown v. Brett Brewer, et al. |

### b.   The Other Directors

#### i.   Sheehan

In addition to Rosenblatt, there are also triable issues of fact as to whether Sheehan consciously disregarded his director duties. On Friday July 15, Stuart Epstein ("Epstein"), the Morgan Stanley investment banker representing Viacom, tried to reach Sheehan but was unsuccessful. (Sheehan Tr. at 83:12-18; J.A. Ex. 175). Sheehan instructed his secretary as follows: "Do not tell [Epstein] anything about what I am doing or where I am[.]" (J.A., Ex. 175). In reply to his email, Sheehan's secretary informed him that she told Epstein that he was "unavailable." (Id.). A reasonable jury could conclude that this email chain evinces Sheehan's intent to avoid Viacom's representatives.

#### ii.   The Other Six Directors

In *Gesoff v. IIC Industries, Inc.*, 902 A.2d 1130 (Del. Ch. 2006), the court stated that bad faith may be found where directors have "acted with conscious disregard *or made decisions with knowledge that they lacked material information*." *Id.* at 1165 (emphasis added). Few Delaware cases attempt to define precisely what conduct reaches the level of actionable bad faith, but there is at least agreement that "adopting a 'we don't care about the risks' attitude concerning a material corporate decision" constitutes bad faith. *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 289 (Del. Ch. 2003) (finding bad faith claim properly alleged where factual allegations, if true, implied that "the defendant directors *knew* that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss") (emphasis in original).

Having reviewed the record in full, we conclude that there is sufficient admissible evidence to create a triable question of fact as to whether the rest of the board, as in *Macmillan*, "plac[ed] the entire process in the hands of" Rosenblatt and to a lesser extent Sheehan and thereby "materially contributed to the [allegedly] unprincipled conduct of those upon which it looked with a blind eye." 559 A.2d at 1281.

On February 9, 2005, the Intermix board of directors formed a Transaction Committee comprised of Rosenblatt, Sheehan and Quandt. (Rosenblatt Decl. ¶ 6). From that point until July 18, 2005 when the merger was announced, it is undisputed that the Board received most of its information about the negotiations from its self-interested CEO, Rosenblatt. Indeed, it is undisputed that Rosenblatt was the only board member who had some first-hand information as to the circumstances of Viacom's efforts to put in a bid. (*See, e.g.*, Joint Statement of Uncontroverted Facts P347 ("Rosenblatt was the only person from the Intermix Board who negotiated with Viacom.")). Crucially, one of the board members testified that Rosenblatt had led him to believe "[t]hat Viacom was less urgent about the deal and hadn't taken the time or done the same level of work as Fox Network" and that Viacom was a "pipedream." (J.A., Ex. 182; Mosher Tr. at 25:24-26:1). This phrase is admittedly not indicative of *conscious* wrongdoing. However, there is a triable question as to whether the other board members

Case 2:06-cv-03731-GHK-SH Document 278 Filed 06/17/10 Page 18 of 39

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
| --- | --- | --- | --- |

| Title | Jim Brown v. Brett Brewer, et al. |
| --- | --- |

consciously abdicated their responsibilities as corporate fiduciaries in allegedly swallowing Rosenblatt's version of events and utterly failing to assess the situation for themselves.

More generally, a reasonable fact-finder could conclude that the other board members acted in bad faith by making "decisions with knowledge that they lacked material information." *Gesoff*, 902 A.2d at 1165. With respect to their knowledge of the relative likelihood of a Viacom bid, Mosher stated that he could not recall if he or any other board member had "asked any questions regarding Viacom or its status." (Mosher Tr. at 26:14-21). Additionally, he could not recall whether he had "any knowledge of whether anyone from management was providing equal information to Viacom and Fox News Corp about the time line" for submitting a bid for Intermix. (*Id.* at 43:17-21).

With respect to their knowledge of bidder favoritism, though Mosher testified that he could not recall the board ever instructing Rosenblatt to favor one bidder over another, he also could not definitively represent that the board had *not* so instructed Rosenblatt. (*Id.* at 41:10-21). Other board members besides Rosenblatt have also testified that they were unaware that any due diligence meetings with Viacom had been cancelled. (Brewer Tr. at 119:11-15; Sheehan Tr. at 98:1-20). Furthermore, Brewer testified that he was simply unaware that Viacom was conducting due diligence over the July 16-17, 2005 weekend. (Brewer Tr. at 26:5-24).

With respect to their knowledge of the fairness of the merger price, Rosenblatt did not inform Brewer that he was requesting $12 per share from News Corp. until the day of the "handshake deal" with Rupert Murdoch; it is unclear when the rest of the board learned this information. (*Id.* at 122:2-9). He also did not explain how that requested price was derived. (*Id.* at 122:10-14). Brewer testified that the board did not ask, and Mosher could not recall whether any board member sought an explanation. (*Id.*; Mosher Tr. at 53:6-9). Moreover, Brewer testified that the board as a whole never conducted any independent analysis to determine what "an appropriate price per share" would be. (Brewer Tr. at 122:15-18; *see also* Mosher Tr. at 49:24-50:4 (testifying that he himself did not perform any independent analysis)). Additionally, Mosher confirmed that the board had not "directed the management team to get the specific valuation work done prior to the acquisition" (Mosher Tr. at 52:4-18). Finally, Brewer has testified that he could not even recall whether any of the directors had asked "any questions about [Montgomery and TWP's] fairness presentations." (Brewer Tr. at 104:2-10). Though Brewer's failure to recall what everyone had specifically asked back in 2005 would be understandable, a reasonable jury might draw a negative inference from his representation that he could not recall any discussion as to the investment banks' analysis.

Construing all of the above testimony in the light most favorable to Plaintiff as we must on Defendants' motion for summary judgment, we conclude that it is at least triable as to whether the remaining six board members consciously disregarded their duties and acted in bad faith. There is evidence in the record suggesting that no one on the board asked any questions about the requested per share price, the treatment of the competing bidders, the fairness valuations, or the relative likelihood of a Viacom bid. A reasonable jury could infer that this evidence demonstrates the other six directors consciously abdicated their roles as corporate fiduciaries required by law to do their utmost to maximize



| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | Jim Brown v. Brett Brewer, et al. |
|---|---|

shareholder wealth. Of course, we remain mindful that even gross negligence, premised on "simple inattention or failure to be informed of all facts material to the decision[,]" violates only the duty of care and is not actionable as bad faith. *Disney*, 906 A.2d at 66. Nevertheless, we think a reasonable jury could find that the other six directors exceeded the bounds of negligent conduct, willfully proceeded to their decisions knowing they lacked material information, *Gesoff*, 902 A.2d at 1165, and thereby consciously disregarded their fiduciary duties. *Disney*, 906 A.2d at 66 ("Cases have arisen where corporate directors have no conflicting self-interest in a decision, yet engage in misconduct that is more culpable than simple inattention or failure to be informed of all facts material to the decision. To protect the interests of the corporation and its shareholders, fiduciary conduct of this kind, which does not involve disloyalty (as traditionally defined) but is qualitatively more culpable than gross negligence, should be proscribed.").

   **c.**  **The MySpace Option**

  The MySpace, Inc. Stockholders Agreement ("MSA") (J.A., Ex. 2), executed on February 11, 2005, was the culmination of negotiations between MySpace, Inc., MySpace Ventures, LLC, Redpoint Ventures I, L.P., Redpoint Associates I, LLC, Redpoint Ventures II, L.P., Redpoint Associates II, LLC, Redpoint Technology Partners Q-1, L.P., and/or Redpoint Technology Partners A-1, L.P. (collectively, "the Redpoint Entities"). (Brewer Decl. ¶ 6; Rosenblatt Decl. ¶ 7). Under the agreement, the Redpoint Entities purchased a 47 percent minority interest in Intermix, and at the same time, the 53 percent majority stockholders acquired an option ("the MySpace Option") to buy back that minority interest if a third party made a "bona fide . . . offer" for 50 percent or more of Intermix's shares:

> So long as Intermix (together with its Affiliates) directly or indirectly holds at least 1,000,000 shares of Common Stock . . . , in the event Intermix receives a bona fide third-party offer with respect to a Change of Control of Intermix . . . within the twelve (12) month-period commencing on the date hereof . . . , then, following receipt of such offer (and provided discussions relating to such offer are then-ongoing), Intermix shall have the right to purchase . . . up to 100% of Common Stock and Common Stock Equivalents of the Corporation held by the other Stockholders, whether now owned or hereafter acquired . . . .

(J.A., Ex. 2 § 7.1.1; Brewer Decl. ¶¶ 6-7; Rosenblatt ¶¶ 7-8). Section 7.1.5 of the MSA precluded the majority from exercising the MySpace Option if a third party made a direct bid for MySpace of over $125 million: "Intermix may not exercise the Purchase Option if a) the Corporation [MySpace, Inc.] has previously received a bona fide third party offer to purchase the Corporation's capital stock or assets for a purchase price greater than $125.0 million and discussions regarding such acquisition between the Corporation and such third party are ongoing . . . ." (J.A., Ex. 2 § 7.1.5). These two provisions are mutually exclusive: (1) a bid for 50 percent or more of Intermix's shares precludes any subsequent direct bid for MySpace (while discussions for the Intermix control share are ongoing); and (2) any direct bid for MySpace precludes any subsequent bid for 50 percent or more of Intermix's shares (while discussions for the acquisition of MySpace are ongoing).

EH-BCM     Document 32-1     Filed 09/

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | *Jim Brown v. Brett Brewer, et al.* |
|---|---|

Defendants contend their conduct was not in bad faith in light of the risk of a direct third-party bid for MySpace, which would have precluded the 53 percent Intermix majority interest from exercising the MySpace Option under the MSA to purchase the minority 47 percent interest. Accordingly, we must consider whether the purported risk of a direct bid for MySpace, which would have frozen the MySpace Option, dictates a conclusion that Defendants did not consciously disregard their duties as a matter of law.

Defendants claim that the risk of such a freezing bid was real and that any delay in consummating the merger with News Corp. threatened the loss of an opportunity to capture the value of Intermix's crown jewel, MySpace, for their shareholders. (Joint Br. 11-15). At the July 15th board meeting at 2 p.m., the directors discussed the status of conversations with News Corp. and Viacom and considered the possibility that if either company "viewed itself as unlikely to prevail in acquiring [Intermix], it might submit an offer to acquire only MySpace in order to potentially suspend, at least temporarily, [Intermix's] ability to exercise the MySpace option, thereby potentially jeopardizing economically attractive transactions involving the Company including the potential News Corp. transaction then under consideration." (Rosenblatt Decl. ¶ 31; J.A., Ex. 12). Rosenblatt and the other directors have declared that they "believed that the deadline provided by News Corp. by which to execute the Merger Agreement was firm and that News Corp. was prepared to walk away if the deal was not consummated by the opening of the stock market on July 18, 2005." (Rosenblatt Decl. ¶ 46).

To substantiate their purported concern over a potential freeze-out bid, Defendants suggest that a "bona fide third-party offer" can only mean a fully executed agreement, as in the written merger agreement executed on July 18, 2005. (Joint Br. 93-97). We reject Defendants' assertion that this proposed construction of "bona fide third-party offer" is compelled as a matter of law. Under Sections 7.1.1 and 7.1.5 of the MSA, a subsequent bid for MySpace or the Intermix control share, respectively, will only be precluded if discussions regarding the "bona fide third-party offer" are "ongoing." This language in the agreement suggests that the term "bona fide offer" does not contemplate the final execution of an agreement, at which point discussions would no longer be "ongoing."

Even though we reject Defendants' construction of the phrase "bona fide third-party offer" in the MSA, we also reject Plaintiff's request that we rule as a matter of law on the purely legal question of what constitutes a "bona fide third-party offer" under Sections 7.1.1 and 7.1.5 of the MSA. In our view, Plaintiff's request misses the point. We are not here to construe the terms of the MSA, as such. Rather, the question is whether there is a triable issue that Defendants, reasonably fearing being frozen out of the MySpace Option, or whether Defendants had no such reasonable fear, but merely used the MySpace Option as a rationalization for a selfish or idiosyncratic desire to favor News Corp. unrelated to securing top dollar for the shareholders. We think the evidence fairly presents such triable issues as to Defendants' purported conscious disregard of their duties. In any event, our *post hoc* legal determination cannot dictate the result of the question of the propriety of Defendants' conduct that indisputably occurred without the benefit of our construction of the MSA.



**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
| Title | Jim Brown v. Brett Brewer, et al. | | |

Accordingly, we hereby DENY Plaintiff's Motion for Summary Judgment on this question of contractual interpretation.

In light of all the reasons set forth above, we hereby DENY Defendants' Motion for Summary Judgment on the fiduciary duty claim with respect to Plaintiff's bad faith theory in the *Revlon* auction context.

    2.    **Self-Interested Transaction**

In the alternative, Defendants move for summary judgment on the second theory supporting the breach of fiduciary duty claim, arguing that five of the eight Defendants (a majority) were not self-interested or controlled by someone who was. The Delaware Supreme Court summarized the governing law in *Cinerama, Inc. v. Technicolor, Inc.*:

> A board of which a majority of directors is interested is not a "neutral decision-making body." *See, e.g., Paramount Communications, Inc. v. QVC Network, Inc.*, Del.Supr., 637 A.2d 34, 42 n. 9 (1994) ("[w]here actual self-interest is present and affects a majority of the directors approving a transaction, a court will apply [the entire fairness test]"); *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 812 (1984). A majority of disinterested directors is not "independent" if that majority was dominated by an interested director. *See Heineman v. Datapoint Corp.*, Del.Supr., 611 A.2d 950, 955 (1992). Similarly, the manipulation of the disinterested majority by an interested director vitiates the majority's ability to act as a neutral decision-making body. *See Mills Acquisition Co. v. Macmillan, Inc.*, Del.Supr., 559 A.2d 1261, 1279 (1989).

663 A.2d 1156, 1170 n.25 (Del. 1995). Accordingly, Plaintiff must make two showings. "First, the plaintiff must proffer evidence showing that those members of the board had a material self-interest in the challenged transaction[,]" and this must be "evidence of a substantial self-interest suggesting disloyalty, such as evidence of entrenchment motives, vote selling, or fraud." *Goodwin*, 1999 WL 64265, at *25 (citing *Cede II*, 634 A.2d at 362-63; *Cinerama*, 663 A.2d at 1169). "Second, the plaintiff must show that those materially self-interested members either: a) constituted a majority of the board; b) controlled and dominated the board as a whole; or c) i) failed to disclose their interests in the transaction to the board; ii) and a reasonable board member would have regarded the existence of their material interests as a significant fact in the evaluation of the proposed transaction." *Id.* (citing *Cinerama*, 663 A.2d at 1168).

There were eight directors on the Intermix board at the time of the merger: Rosenblatt, Sheehan, Mosher, Quandt, Brewer, Carlick, Moreau, and Woodward. Rosenblatt was conflicted due to his interest in becoming the head of Fox Interactive Media. He aimed to "receiv[e] a personal benefit from a transaction not received by the shareholders generally." *Cede II*, 634 A.2d at 362; *McGowan*, 2002 WL 77712, at *2 (deeming contracts for post-merger employment in acquiring entity a "disabling conflict of interest"); *Goodwin*, 1999 WL 64265, at *25 (finding "a triable issue of fact regarding whether [directors'] expectations constituted a material interest in the merger not shared by the

CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | Jim Brown v. Brett Brewer, et al. |
|---|---|

stockholders" but granting summary judgment on lack of evidence that any material interest infected
deliberative process); *Oliver*, 2006 WL 1064169, at *19 ("[A]s a consequence of their personal interest in
the negotiation of the Accord Agreement, in light of its potential impact on their rights under their
employment agreements, they also were self-interested."). Rosenblatt did not simply seek to retain his
current position, but sought to secure a coveted position at the top of a division at News Corp.
Accordingly, read in conjunction with other admissible evidence we have cited previously, this self-
interested motivation is suggestive of disloyalty.

Defendants argue that Rosenblatt's interests were coterminous with the shareholders' interests
because every additional dollar increase in the price paid per share would roughly an additional $2
million for Rosenblatt, a significant shareholder in Intermix. (Rosenblatt ¶ 51; Joint Statement of
Uncontroverted Facts D89). This argument, however, misses the point that Rosenblatt arguably stood
to gain more money and prestige by becoming the "grand Puba" of Fox Interactive Media. If Chris
DeWolfe, the former CEO of MySpace, stood to make a $30 million salary over two years if retained by
the merged entity (the Parties appear to agree on this point) (*see* Joint Br. 37 n.42, 41-42), a reasonable
jury could infer that Rosenblatt, as head of Fox Interactive Media, would have been offered an even
higher salary. As such, a per share price of well above $20 would be needed to offset Rosenblatt's
conflicting interest in a $30 million (or higher) salary. (*Id.* at 41-42). Defendants only reiterate that
Rosenblatt stood to gain a greater benefit from each incremental increase in the per share price.

It is undisputed that no director instructed any other director on how to vote or was influenced
by how other board members voted. (Joint Statement of Uncontroverted Facts D95-96; Brewer Decl. ¶
36; Carlick Decl. ¶ 38; Mosher Decl. ¶ 34; Moreau Decl. ¶ 36; Quandt Decl. ¶ 42; Rosenblatt Decl. ¶
49; Sheehan Decl. ¶ 44; Woodward Decl. ¶ 34). The real question is whether each board member acted
independently and free of any manipulation by the interested members, principally Rosenblatt, *i.e.*
whether "[e]ach Board Member exercised his independent judgment and consideration in deciding how
to vote." (Joint Statement of Uncontroverted Facts D97). In virtually identical declarations, the
directors claim they were not so manipulated. (Brewer Decl. ¶ 36; Carlick Decl. ¶ 38; Mosher Decl. ¶
34; Moreau Decl. ¶ 36; Quandt Decl. ¶ 42; Rosenblatt Decl. ¶ 49; Sheehan Decl. ¶ 44; Woodward Decl.
¶ 34). On the other hand, Plaintiff argues that Rosenblatt deliberately misled the other board members
regarding the viability of the Viacom bid, steering them into approving the merger without waiting even
a couple more days to see if Viacom would top News Corp.'s offer. (Joint Br. 26-27). Plaintiff cites an
email Mosher sent to Rosenblatt after one of the July 15th meetings, stating: "We need to honor our
commitment to Fox and get this done. Viacom sounds like a pipedream. Fox sounds dead serious and
not screwing around." (J.A., Exs. 182). When asked about this email during his deposition, Mosher
testified that Rosenblatt's periodic updates to the board had led him to believe "[t]hat Viacom was less
urgent about the deal and hadn't taken the time or done the same level of work as Fox Network."
(Mosher Tr. at 25:24-26:1, 26:5-13). He also noted that: "The discussion around Viacom that the
management team had led indicated that Viacom did not seem as willing to come to the table with an
offer for the company." (*Id.* at 25:1-4). This evidence is sufficient to raise an inference that
Rosenblatt's presentation to the board may have been misleading as to Viacom's seriousness.
According to Mosher's description of the board meetings, "from the management team estimation



| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | Jim Brown v. Brett Brewer, et al. |
|---|---|

standpoint [sic], they were not inclined to make an offer for the company on the time line that we were looking at." (*Id.* at 25:18-21). Viewing the evidence as a whole in the light most favorable to Plaintiff, including the contrary evidence that Viacom was indeed very seriously interested in bidding on Intermix,[15] there are at least triable issues of fact as to whether Mosher was manipulated by a self-interested director, Rosenblatt.

Moreover, based on Mosher's description of the content of Rosenblatt's presentations to the board, the issue of manipulation is triable with respect to all of the other board members. Accordingly, as a reasonable jury could potentially conclude that a majority of the directors were interested or manipulated by someone who was, we hereby **DENY** Defendants' Motion for Summary Judgment on this second basis for Plaintiff's claim of breach of the duty of loyalty.

**III.    Count II: Violation of Section 14(a) of the Securities and Exchange Act of 1934 and SEC Rule 14a-9**

On August 25, 2005, Intermix issued a proxy statement ("Proxy") concerning the News Corp. merger. (Rosenblatt Decl. ¶ 53). On September 30, 2005, a majority of Intermix shareholders voted to adopt the Merger Agreement. (*Id.* ¶ 55). Plaintiff alleges that there were five material omissions in the Proxy. (J.A., Ex. 4). To succeed on "a claim under § 14(a) and Rule 14a-9, a plaintiff must establish that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *New York City Employees' Ret. Sys. v. Jobs,* 593 F.3d 1018, 1022 (9th Cir. 2010) (citation and internal quotation marks omitted); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.14a-9(a) ("No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.").

---

[15] Van Toffler of MTV emailed Rosenblatt on July 17 to note that his people were "in the office working around the clock so [Viacom] could] put forth a number to [him that] week." (J.A., Ex. 202). On the same day, Jason Hirschhorn of Viacom informed Chris DeWolfe that he has "had a team of 20+ people . . . working for 72 hours straight on a significant bid[.]" (*Id.*, Ex. 200).

EH-BCM      Document 32-1      Filed 09/

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

### A.    *Alleged Material Omissions*

#### 1.    MySpace's Then-Current Revenue and Profits

Defendants first argue that Plaintiff failed to identify the alleged material omission of MySpace's then-current revenue and profits as a basis for this Section 14(a) claim in its responses to their interrogatories, thereby waiving this ground for his Section 14(a) claim. (Joint Br. 45 n.49). We disagree. First, the CSAC clearly alleges that Defendants omitted "the current revenues and profits being generated by MySpace." (CSAC ¶¶ 130-33). Second, our July 14, 2008 Order clearly identified this purported material omission as one of the five surviving bases for this Section 14(a) claim. (Dkt. No. 110, at 5). Third, whether Plaintiff actually identified this alleged material omission in his Revised Objections and Responses to Defendant VP Alpha Holdings IV, L.L.C.'s First Set of Interrogatories is unclear. (J.A., Ex. 28). Most of the response to Interrogatory No. 1 focused on the conspicuous absence of internal projections for MySpace's prospective growth, not the company's then-current revenue and profits. (*Id.* at 513-15). Plaintiff did not use the phrase "current revenue and profits," but rather, stated the following:

> [S]hareholders . . . *were never made aware of MySpace's true value* or its true growth potential, and had no way of comparing the information that was publicly available to management's projections and growth assumptions. *Thus, even though certain metrics that were used to track MySpace's growth were available from some hard to find public sources (and were not made available by the Company directly to its shareholders), shareholders and other members of the investing public could not compare this data to the Company's internal data* to determine if the Investment Banks' fairness opinions accurately reflected the explosive growth of MySpace.

(*Id.* at 515 (emphasis added)). Although somewhat opaque, we think the highlighted text above can fairly be read to embrace internal data on MySpace's then-current financial position. Fourth, during the Parties' Local Rule 7-3 meet and confer, according to Defendants, Plaintiff did not identify this alleged omission. (Joint Br. 45 n.49). Sheehan and Carlick's counsel has also declared that Plaintiff was asked at the meeting whether they were pursuing "any other misstatements or omissions," but he does not declare that Plaintiff's counsel answered the question in the negative, thereby waiving his basis. (J.A., Ex. 30, Knaster Decl. ¶¶ 8-9). Fifth, Plaintiff's counsel also circulated a letter outlining the issues discussed at the meet and confer, which did not list this purported material omission. (J.A., Ex. 35). However, since this document purports to be an outline of the summary judgment arguments Defendants identified, we decline to conclude that this document contemplated a waiver of the "current revenue and profits" omission, which was so clearly identified in the CSAC (if not so clearly in the interrogatory responses). Accordingly, as this argument was not waived, and Defendants have not made any threshold showing entitling them to summary judgment on this basis, we **DENY** the Motion for Summary Judgment as to this alleged material omission under Count II.

#### 2.    Intermix Management's 2005-2009 Financial Projections

EH-BCM     Document 32-1     Filed 09/

**CIVIL MINUTES - GENERAL**

| | |
|---|---|
| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

Plaintiff also alleges that Defendants failed to disclose Intermix management's internal financial projections, and that this information was material. The Supreme Court set forth the materiality standard for 14(a) claims in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976): "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Id.* at 449. The Court added that "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.*

While federal courts generally agree that financial projections, "forward-looking statements," "puffing," or other soft financial information need not be disclosed, this case is distinguishable. *See, e.g., Walker v. Action Indus., Inc.*, 802 F.2d 703, 707-08 (4th Cir. 1986); *Flynn v. Bass Bros. Enters., Inc.*, 744 F.2d 978, 985 (3d Cir. 1984) (noting SEC policy favoring nondisclosure of financial projections due to their unreliability and potential to mislead voting stockholders). In this case, the Proxy disclosed Montgomery and TWP's fairness analyses but did not disclose the underlying 2005-2009 Intermix management projections used in formulating those opinions. In *Zemel Family Trust v. Philips International Realty Corp.*, No. 00 CIV. 7438 MGC, 2000 WL 1772608 (S.D.N.Y. Nov. 30, 2000), the court honed in on this distinction:

> A company has no duty to include "speculative financial predictions" in a proxy. However, if a Proxy discloses valuation information, it must be complete and accurate. And the proxy and the [financial valuation] opinion address the value of the Third Avenue property and so [the defendant] has a duty to fully and accurately disclose information related to the valuation.

*Id.* at *6.

Here, the "total mix" of information before the shareholders did not include any of the projected growth rates. *See SEC v. Mozilo*, No. CV 09-3994-JFW, 2009 WL 3807124, at *10 (C.D. Cal. Nov. 3, 2009) ("[T]he 'total mix' of information only includes information that is 'readily' or 'reasonably' available to an investor."); *Koppel v. 4987 Corp.*, 167 F.3d 125, 132 (2d Cir. 1999) (same). A reasonable shareholder would have wanted to independently evaluate management's internal financial projections to see if the company was being fairly valued. "[T]here is a substantial likelihood that a reasonable shareholder would consider it important" in making his decision. *TSC Indus., Inc.*, 426 U.S. at 449. As we previously noted in our July 14, 2008 Order, the Ninth Circuit has observed that: "investors are concerned, perhaps above all else, with the future cash flows of the companies in which they invest. Surely, the average investor's interest would be piqued by a company's internal projections . . . ." *United States v. Smith*, 155 F.3d 1051, 1064 n.20 (9th Cir. 1998). Delaware courts concur. In a case that also considered a discounted cash flow ("DCF") analysis in a proxy statement, the same technique utilized by Montgomery and TWP, the court held that the underlying projections informing a DCF analysis completed for a proxy were clearly material. *See In re Netsmart Techs. S'holders Litig.*, 924 A.2d 171, 203 (Del. Ch. 2007) ("[P]rojections of this sort are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or . . . market multiples. What they cannot hope to do is replicate management's inside

EH-BCM       Document 32-1       Filed 09/

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | CV 06-3731-GHK (SHx) | | Date | June 17, 2010 |
|---|---|---|---|---|

| Title | Jim Brown v. Brett Brewer, et al. | |

view of the company's prospects.").")." Here, we conclude that there is at least a triable issue as to the materiality of the omission of Intermix's internal financial projections.

Accordingly, Defendants' Motion for Summary Judgment is **DENIED** as to this alleged material omission.

**3.    Outstanding Derivative Lawsuits**

Plaintiff also argues that Defendants failed to disclose one pending derivative lawsuit, *LeBoyer v. Greenspan, et al.*, No. CV 03-5693-GHK (JTLx), and the fact that shareholder derivative standing would be extinguished as to both *LeBoyer* and *Greenspan v. Salzman*, the two derivative lawsuits pending at the time the Proxy was issued. The Proxy merely stated: "Following the effective time of the merger, Fox Interactive Media will use commercially reasonable efforts to take such actions as are within its control so as to obtain the dismissal of Greenspan v. Salzman, et al., LASC No. BC328558; provided that it will not be required to make any payments to any of the plaintiffs (or their counsel) in such litigation to do so." (J.A., Ex. 4, at 332).

Defendants concede that they did not disclose the existence of the pending *LeBoyer* action. (Joint Br. 56 n.67). However, Defendants maintain that this lawsuit had been disclosed in Intermix's prior public filings (*see* J.A., Exs. 47 (Form 10-Q), 3 (Form 10-K)), which they argue were incorporated by reference in the Proxy. A document "may be incorporated into proxy materials by reference, at the least, in circumstances where 'no reasonable shareholder can be misled.'" *Federated Bond Fund v. Shopko Stores, Inc.*, No. 05 CV 9923(RO), 2006 WL 3378696, at *2 (S.D.N.Y. Nov. 17, 2006) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 777 (2d Cir. 1991)). We do not think this is a case where "no reasonable shareholder can be misled." *Id.* Moreover, "[c]orporate documents that have not been distributed to the shareholders entitled to vote on the proposal should rarely be considered part of the total mix of information reasonably available to those shareholders." *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199-1200 (2d Cir. 1993) (rejecting notion that public reports and 10-K Report submitted to SEC were part of "total mix"). Accordingly, whether the undisclosed derivative lawsuit constituted material information which was not part of the "total mix" of information is at the very least a triable question.

With respect to the disclosed *Greenspan v. Salzman* action, Defendants argue they had no obligation to further announce the extinguishment of derivative standing. In Delaware, with only two exceptions not applicable here, a cash-out merger extinguishes the standing of shareholder plaintiffs to maintain a derivative suit. *Feldman v. Cutaia*, 951 A.2d 727, 731 (Del. 2008) (citing *Lewis v. Anderson*, 477 A.2d 1040, 1049 (Del. 1984)). This is because a plaintiff must be a stockholder at the time of the alleged wrongdoing and throughout the litigation. *Lewis*, 477 A.2d at 1046. The failure to

---

[16] Even though this decision concerned a state law duty of disclosure claim, the materiality standard is the same as set forth in *TSC Industries, Inc. In re Netsmart Techs.*, 924 A.2d at 199-200.

CIVIL MINUTES - GENERAL

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | Jim Brown v. Brett Brewer, et al. |
|---|---|

disclose the potential extinguishment of a derivative lawsuit is material. *See Lichtenberg v. Besicorp Group Inc.*, 43 F. Supp. 2d 376, 387 (S.D.N.Y. 1999). In *Lichtenberg*, the court noted that the proxy stated that the shareholder plaintiffs "may" not be able to maintain their derivative suits following the merger. *Id.* The court found the word "may" to be "affirmatively misleading," because it "implie[d] a possibility that the plaintiffs will be able to continue the actions as shareholder derivative suits," when that was in fact foreclosed as a matter of New York law. *Id.* Here too, the disclosure above is arguably misleading as well, as it did not affirmatively disclose that the *Greenspan v. Salzman* plaintiff's derivative standing would be extinguished under Delaware law. (J.A., Ex. 4, at 332.) Instead, it only stated that Fox Interactive Media would seek the dismissal of the action and would do so only if it was not required to pay the plaintiffs or their counsel. (*Id.*). Accordingly, it is at least triable whether the above language was misleading as to the extinguishment of derivative standing, which was material information.

Accordingly, we also hereby **DENY** Defendants' Motion for Summary Judgment as to this alleged material omission.

### 4.     Alleged Material Omissions Concerning Viacom and the MySpace Option

Plaintiff has also argued that the directors made two other material omissions concerning: (1) Viacom's ability to make an offer for Intermix or its ability to conduct due diligence; and (2) the likelihood of a direct bid for MySpace, which would freeze the MySpace Option. This subpart of the Section 14(a) claim essentially seeks to penalize Defendants for their failure to disclose that Viacom was allegedly stonewalled or otherwise prevented from making a bid during the auction. It also seeks to hold Defendants liable for purportedly exaggerating the threat of a direct bid for Intermix's crown jewel, MySpace.

However, these purported material omissions are nothing more than the building blocks of Plaintiff's fiduciary duty claim. Mandating the disclosure of the above allegations would compel Defendants to essentially accuse themselves of breaching their fiduciary duties. In *Koppel v. 4987 Corp.*, the court dismissed Rule 14a-9 claims based on its conclusion that "these allegations constitute no more than state law breach of fiduciary duty claims under a thin coat of federal paint." 167 F.3d at 133. The court explained:

We have long recognized that no general cause of action lies under § 14(a) to remedy a simple breach of fiduciary duty. *See Field v. Trump*, 850 F.2d 938, 947 (2d Cir. 1988) (quoting *Maldonado v. Flynn*, 597 F.2d 789, 796 (2d Cir. 1979), *cert. denied*, 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989); *cf. Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (refusing to construe § 10(b) to prohibit "instances of corporate mismanagement . . . in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary"). Although the Supreme Court has explained that explicit, conclusory statements concerning the wisdom of a proposed action are actionable, *see generally Virginia Bankshares*, 501 U.S. 1083, 111 S.Ct. 2749, there is no § 14(a) violation for merely failing to

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | | Date | June 17, 2010 |
|---|---|---|---|---|

| Title | Jim Brown v. Brett Brewer, et al. |
|---|---|

inform shareholders that a proposed action is not subjectively the most beneficial to an entity's shareholders: "Subjection to liability for misleading others does not raise a duty of self-accusation; [rather] it enforces a duty to refrain from misleading." *Id.* at 1098 n. 7, 111 S.Ct. 2749. The securities laws do not "effectively require [an issuer] to accuse [it]sel[f] of breach of fiduciary duty." *Id.*

*Id.* at 133-34. The D.C. Circuit has arrived at the same conclusion: "Though *Santa Fe* does not bar a claim related to a breach of fiduciary duty if there has been a material misrepresentation or omission, a plaintiff may not 'bootstrap' a claim of breach of fiduciary duty into a federal securities claim by alleging that directors failed to disclose that breach of fiduciary duty." *Kas v. Fin. Gen. Bankshares, Inc.*, 796 F.2d 508, 513 (D.C. Cir. 1986) (citations omitted).

In this case, the Proxy unambiguously disclosed Rosenblatt's self-interested motivations, anticipated future employment with News Corp., and the immediate vesting of all his unvested options. (J.A., Ex. 4, at 272, 310, 312). The Proxy also disclosed that Viacom ("Company D") conducted due diligence and remained interested in making a bid for Intermix, but was "not then in a position to make a proposal [prior to] a [Viacom] board meeting later that week . . . ." (*Id.* at 287, 289). Plaintiff claims this disclosure was misleadingly incomplete, because it did not mention Rosenblatt's alleged evasion of Viacom executives and the alleged deliberate hampering of Viacom's due diligence efforts. (CSAC ¶¶ 147-48). Plaintiff claims that these omissions "left shareholders with the false impression that Viacom was given a full and fair opportunity to bid for the Company." (*Id.* ¶ 148). Plaintiff also claims that Defendants misrepresented Viacom and News Corp.'s ability to block a competing bid by freezing the MySpace Option. (CSAC ¶¶ 149-51 (citing J.A., Ex. 4, at 284, 288)). As there is no duty of self-accusation, these proffered material omissions cannot support a Section 14(a) claim. Indeed, the allegedly omitted details are not necessarily *facts*, but rather factual *allegations*, and unless and until judgment is granted in Plaintiff's favor, their omission from the Proxy simply could not have been material. In *Brown v. Perrette*, No. CIV.A 13531, 1999 WL 342340 (Del. Ch. May 14, 1999), the court explained this distinction:

> Although a flawed bidding process would be a material fact, [the plaintiff] must prevail on the substantive claim, that the process was flawed, before the alleged flaw becomes material. Once [the plaintiff] prevails on her *Revlon* claim, the alleged disclosure claim becomes superfluous because the defendants' breach of duty becomes the wrong for which an appropriate remedy must be crafted.



**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

*Id.* at \*10-11[17]; *see also Stroud v. Grace*, 606 A.2d 75, 84 n.1 (Del. 1992) ("We recognize the long-standing principle that to comport with its fiduciary duty to disclose all relevant material facts, a board is not required to engage in 'self-flagellation' and draw legal conclusions implicating itself in a breach of fiduciary duty from surrounding facts and circumstances prior to a formal adjudication of the matter.") (citation omitted).

Accordingly, since "self-flagellation" omissions are not material, we hereby **GRANT** Defendants' Motion for Summary Judgment as to the purported material omissions concerning Viacom and the MySpace Option.[18]

**B. Negligence**

In *Desaigoudar v. Meyercord*, 223 F.3d 1020 (9th Cir. 2000), the Ninth Circuit stated that a "Rule 14a-9 plaintiff must demonstrate that the misstatement or omission was made with the requisite level of culpability . . . ." *Id.* at 1022 (citation omitted). To succeed on a Section 14(a)/Rule 14a-9 claim, a plaintiff need only establish that the defendant was negligent in drafting and reviewing the proxy statement. *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1300-01 (2d Cir. 1973) (holding that negligence suffices for claim based on misleading proxy statement and that plaintiffs "are not required to establish any evil motive or even reckless disregard of the facts"). This holding was reaffirmed in the oft-cited case of *Wilson v. Great American Industries, Inc.*, 855 F.2d 987 (2d Cir. 1988): "Liability can be imposed for negligently drafting a proxy statement." *Id.* at 995 (citing *Gerstle*, 478 F.2d at 1301 n.20). "As a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the *Gerstle* negligence standard." *Id.* Accordingly, a director may be found negligent under Section 14(a) for a failure to notice material omissions upon reading a proxy statement. *See, e.g.*, *Parsons v. Jefferson-Pilot Corp.*, 789 F. Supp. 697, 702 (M.D.N.C. 1992) ("Mr. Eagle [a senior in-house lawyer] is not the only negligent party in this action. Each of the directors who reviewed the proxy statement is equally as negligent for failing to notice the use of the word 'restricted' ten times in the document.").

Here, each of the Defendants has declared that he was "involved in the process of preparing, reviewing, and disseminating the Proxy Statement to Intermix shareholders." (Sheehan Decl. ¶ 53 (internal citation omitted); Carlick Decl. ¶ 46; Brewer Decl. ¶ 39; Mosher Decl. ¶ 37; Moreau Decl. ¶ 39; Quandt Decl. ¶ 45; Rosenblatt Decl. ¶ 53; Woodward Decl. ¶ 37). Construing this sworn statement in the light most favorable to Plaintiff, we read it to mean each director personally reviewed the Proxy

---

[17] Even though Brown analyzes the relationship between a state law fiduciary duty claim and a state law duty of disclosure claim, brought on the same grounds, the principles articulated are equally applicable to a Section 14(a) claim premised on the same allegations supporting a breach of fiduciary duty claim.

[18] Notwithstanding our ruling, nothing in the above discussion precludes Plaintiff from introducing evidence of these omissions in the course of his breach of fiduciary duty claim.

EH-BCM      Document 32-1      Filed 09/

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | Jim Brown v. Brett Brewer, et al. | | |

before it was disseminated to the Intermix shareholders. Since we have denied summary judgment with respect to three of the proffered material omissions in the Proxy, and Defendants have admitted to participating in "the process of preparing, reviewing, and disseminating" that Proxy, we must also **DENY** summary judgment with respect to the element of negligence. If Plaintiff can persuade a jury as to both materiality and Defendants' participation in the preparation and/or review of the Proxy at trial, then a finding of negligence will flow from those findings.

    *C.*    **Damages**

        **1.**    **Benefit-of-the-Bargain Damages**

        This theory of damages is wholly inapposite to this case. A request for "benefit-of-the-bargain damages" seeks the "value that was represented as coming to" the shareholder under a particular transaction, such as a merger. *In re Real Estate Assocs. Ltd. P'ship Litig.*, 223 F. Supp. 2d 1142, 1152 (C.D. Cal. 2002). "[B]enefit-of-the-bargain damages are available in the limited instance where a misrepresentation is made in the proxy solicitations as to the consideration to be forthcoming upon an intended merger." *Id.* (citation omitted). As the Ninth Circuit has stated, "[t]he benefit-of-the-bargain measure of damages allows a Plaintiff to recover 'the difference between what the plaintiff *expected* he would receive . . . and the amount [the plaintiff] *actually received* . . . .'" *DCD Programs, Ltd. v. Leighton*, 90 F.3d 1442, 1449 (9th Cir. 1996) (quoting *Cunha v. Ward Foods, Inc.*, 804 F.2d 1418, 1426 (9th Cir. 1986) (emphasis in original)). Here, the Proxy made no misrepresentation as to the per share price offered to and ultimately received by the class members. The Proxy stated the class members would receive $12 cash for each common share, and it is undisputed that they received $12 cash for each common share. (J.A., Ex. 4, at 319; Joint Statement of Uncontroverted Facts D128.) Accordingly, this damages theory is not viable. We **GRANT** summary judgment with respect to this damages theory.

        **2.**    **Out-of-Pocket Losses**

            *a.*    **Legal Framework**

        "'Out-of-pocket' losses are the standard measure of damages for Rule 10b-5 and Section 14(a) claims." *In re DaimlerChrysler AG Secs. Litig.*, 294 F. Supp. 2d 616, 626 (D. Del. 2003) (citing *Tse v. Ventana Med. Sys., Inc.*, 123 F. Supp. 2d 213, 222 (D. Del. 2000) ("*Tse II*")). Out-of-pocket losses constitute "the difference between the fair value of all that the seller received and the fair value of what he would have received had there been no fraudulent conduct." *Tse II*, 123 F. Supp. 2d at 222 (quoting *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 155 (1972)) (quotation marks omitted). The Ninth Circuit concurs: "The out-of-pocket rule fixes recoverable damages as 'the difference between the purchase price and the value of the stock at the date of purchase.'" *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1437 (9th Cir. 1987), *implicitly overruled in part on other grounds by Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1577-78 (9th Cir. 1990) (*en banc*) (citation omitted). "The guiding philosophy of the out-of-pocket theory of damages . . . is to award not what the plaintiff might have



**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | *Jim Brown v. Brett Brewer, et al.* |
|---|---|

gained, but what he has lost by being deceived into the purchase." *Id.* at 1437 n.2 (citation and internal quotation marks omitted). Since this theory of damages is premised on an intrinsic valuation of the company as it existed at the time of the merger, Plaintiff has produced expert witness testimony consisting of two different financial valuations of Intermix/MySpace. Defendants have moved to exclude that testimony as inadmissible.

### b.  *Defendants' Motion to Exclude; Plaintiff's Motions to Strike*

Defendants move to exclude Plaintiff's proffered expert testimony by Dr. G. William Kennedy as inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Plaintiff has moved to strike both this Motion to Exclude and Defendants' Motion for Summary Judgment, arguing that this *Daubert* challenge was not included on the Cross-Motions for Summary Judgment and therefore violates our Order Re: Summary Judgment Motions. (Dkt. No. 123, Oct. 30, 2008.) As an initial argument. First, Defendants included virtually the same arguments attacking Dr. Kennedy's testimony in the Joint Brief. (Mot. 77-80). Second, the Motion to Exclude is a challenge to the admissibility of evidence crucial to one of Plaintiffs' damages theories. As we may only consider *admissible* evidence in ruling on the Parties' Cross-Motions, nothing in the Order Re: Summary Judgment Motions precludes a party from filing a separate motion to exclude certain evidence from the Court's consideration. Third, it is common for litigants to move for exclusion of certain evidence at the summary judgment stage. *See, e.g.*, In re Hanford Nuclear Reservation Litig., 292 F.3d 1124, 1131 (9th Cir. 2002) ("Defendants linked their summary judgment motion to dozens of in limine motions challenging the admissibility of plaintiffs' expert witnesses, commonly known as *Daubert* motions.'") (citation omitted); *O'Hanlon v. Matrixx Initiatives*, No. CV 04-10391-AHM (JTLx), 2007 WL 2446496, at *1, 4 (C.D. Cal. Jan. 3, 2007) (considering motions *in limine* concurrently with motion for summary judgment). Accordingly, we hereby **DENY** Plaintiff's Motions to Strike the Motion to Exclude and the Motion for Summary Judgment.

We now consider the merits of the Motion to Exclude. Defendants attack the reliability of Dr. Kennedy's application of his chosen methodologies for estimating the value of MySpace: (1) discounted cash flow ("DCF") analysis; and (2) comparable public company analysis. Federal Rule of Evidence 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert*, the Supreme Court construed Rule 702 to require district courts to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. The Court noted that "[p]ertinent evidence based on scientifically valid principles will satisfy the

EH-BCM      Document 32-1      Filed 09/

**CIVIL MINUTES - GENERAL**

| | | |
|---|---|---|
| Case No. | CV 06-3731-GHK (SHx) | Date   June 17, 2010 |
| Title | Jim Brown v. Brett Brewer, et al. | |

demands" but cautioned that "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that generate." *Id.*; at 595. To assist courts in assessing whether the proffered testimony is scientifically valid, the Supreme Court set forth a non-exhaustive list of factors, including: "whether the theory or technique employed by the expert is generally accepted in the scientific community; whether it's been subjected to peer review and publication; whether it can be and has been tested; and whether the known or potential rate of error is acceptable. *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) ("*Daubert II*") (citing *Daubert*, 509 U.S. at 593-94).

The "gatekeeping obligation" *Daubert* requires us to fulfill "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting Fed. R. Evid. 702). "Because there are areas of expertise, such as the social sciences in which the research, theories and opinions cannot have the exactness of hard science methodologies, trial judges are given broad discretion to determine whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case." *United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006) (citing *Kumho*, 526 U.S. at 153) (internal citations and quotation marks omitted). Courts have stated that "[i]n such instances, other indicia of reliability are considered under *Daubert*, including professional experience, education, training, and observations." *Id.* Though perhaps not to the same degree as psychology or social psychology, financial valuation is not an exact scientific methodology. Estimations, predictions, and inferences based on professional judgment and experience are key ingredients in any valuation. In a variety of contexts, the circuit courts have noted that economic valuation is less than an "exact science." *See, e.g.*, *In re Arnold & Baker Farms*, 85 F.3d 1415, 1421 (9th Cir. 1996) ("Experience has taught us that determining the value of real property at any given time is not an exact science. Because each parcel of real property is unique, the precise value of land is difficult, if not impossible, to determine until it is actually sold."); *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 830, 835 (7th Cir. 1985) (noting that "[t]he process of valuation is inexact" and that DCF analyses "are highly sensitive to assumptions about the firm's costs and rate of growth, and about the discount rate").

With respect to the DCF analysis, the principal difference from Montgomery and TWP's DCF fairness analyses is Dr. Kennedy's MySpace growth rate projections for 2007-2008 and 2008-2009. (Baron Decl., Ex. 3, Expert Report of Dr. G. William Kennedy ["Kennedy Report"], May 20, 2009.) Intermix management projected the following revenue growth rates for the company: 107 percent for 2005-2006; 67 percent for 2006-2007; 20 percent for 2007-2008; and 15 percent for 2008-2009. (J.A., Ex. 242.) Montgomery used these projections for its analysis without any modification. (Baron Decl., Ex. 3, at 39.) TWP's projections differed slightly from management's projections: 107 percent for 2005-2006; 67 percent for 2006-2007; 21 percent for 2007-2008; and 10 percent for 2008-2009. (*Id.*). Kennedy adopted management's growth rate projections for 2005-2006 and 2006-2007, derived a deceleration rate of 62.06 percent from those figures, and then used that same deceleration rate to calculate different revenue growth rates for 2007-2008 and 2008-2009, 41.36 percent and 25.67 percent, respectively. (*Id.* at 39-40). Based on these new figures, Kennedy calculated new Earnings Before

CIVIL MINUTES - GENERAL

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

Interest, Taxes, Depreciation and Amortization ("EBITDA") figures for 2008 and 2009 for MySpace. (*Id.* at 40). Finally, "[u]sing a discount rate of 19% and a terminal EBITDA multiple of 18[,]" Dr. Kennedy calculated "a value of $962.4 million after subtracting the $69 million option exercise price from the present value of MySpace's Cash Flows." (*Id.*). The 19 percent discount rate was chosen based on the discount rates used in the Montgomery and TWP fairness opinions, which ranged from 17 percent up to 25 percent. (*Id.* at 41).

Defendants make several arguments against the reliability of this procedure. They argue first that Dr. Kennedy has insufficiently justified his use of a uniform deceleration rate from 2005 to 2009 and the 18x terminal multiple. (Mot. 9-13). Defendants claim that Dr. Kennedy has offered no coherent reason for his rejection of management's projections for 2007-2008 and 2008-2009. (*Id.* at 11). They note that he has merely declared that Montgomery and TWP's projections "were unreasonably low and not consistent with the very rapid rates of growth currently observed at the time of the Proxy and expected in the social networking sector at the time." (*Id.* at 11 (quoting Moriarty Decl., Ex. 7, Kennedy Supplemental Decl. ¶ 6) (emphasis omitted)). Yet, Defendants neglect to mention that Dr. Kennedy explained his use of higher growth rates for 2007-2008 and 2008-2009 by noting that "MySpace revenues consistently outperformed Internix management's own projections in each of the first four months of 2005." (Baron Decl., Ex. 3, Kennedy Report, at 35). This is at least one reasoned basis for his adjustments to what he viewed as demonstrably "conservative" forecasts. (*Id.*). After all, the entire endeavor is forecasting, not hard science. Projections themselves cannot be tested for accuracy; they "represent hopes rather than the results of scientific analysis." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 420 (7th Cir. 2005); *see also In re Orchards Village Invs., LLC*, No. 09-30893-rldll, 2010 WL 143706, at *11 (Bankr. D. Or. Jan. 8, 2010) ("[P]rojecting future financial results from the operations of a business is not an exact science.").

Additionally, Defendants argue that: "Kennedy provides no theoretical or empirical justification for applying this incredibly aggressive 18x terminal multiple, except his statement that it is based on forward EBITDA multiples observed in comparable publicly traded guideline companies' referenced in the comparable public company analysis below. (Mot. 12-13 (quoting Moriarty Decl., Ex. 1, Kennedy Report, at 15) (quotation marks omitted)). They assert that Dr. Kennedy only relied on "the most profitable of the 14 comparable companies relied upon by" Montgomery and TWP, including Google and Yahoo!, and could not summon a single company that had grown at the rate projected with his revenue growth rates and terminal value. (*Id.* at 13 (citing Moriarty Decl., Ex. 1, Kennedy Report, at 25; *id.*, Ex. 6, Kennedy Report, at 123:4-24)).

While these two challenges may be objections to Kennedy's *conclusions* on his DCF analysis, they do not render his methodology unreliable. Rather, the deviation from management's projections, the use of an arguably aggressive terminal multiple, and the alleged selection of the most profitable guideline companies are proper subjects for cross-examination. Defendants do not take issue with the

EH-BCM        Document 32-1        Filed 09/

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 06-3731-GHK (SHx) | | Date | June 17, 2010 |
|---|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | | |

widely accepted DCF methodology;[19] nor do they attack any input that is identical to those used in the Montgomery and TWP projections (for instance, the 2005-2006 and 2006-2007 projections or the discount rate which fell within the same range in the investment banks' fairness analyses). Even in light of Dr. Kennedy's less than fully reasoned explanations for his choices, given the inherent element of judgment in these financial valuation analyses, we cannot say that he failed to identify any "reliable principles and methods" or to apply those "principles and methods reliably to the facts of [this] case." FED. R. EVID. 702. "A court may admit somewhat questionable testimony if it falls within 'the range where experts might reasonably differ, and where the jury must decide among the conflicting views.'" *S.M. v. J.K.*, 262 F.3d 914, 921 (9th Cir. 2001) (quoting *Kumho*, 526 U.S. at 153).

Defendants also argue that there is a fundamental flaw in Dr. Kennedy's DCF analysis, since it allegedly yields an average growth rate into perpetuity above that of the U.S. economy as a whole (12.74 percent versus a historical average of 6.5 percent). (Mot. 13-16; Cornell Decl. in Supp. of Mot. to Exclude ¶ 5). Arguing that this outcome violates a key tenet of financial valuation, Defendants cite to Professor Aswath Damodaran's treatise, which states: "The fact that a stable growth rate is sustained forever, however, puts strong constraints on how high it can be. Since no firm can grow forever at a rate higher than the growth rate of the economy in which it operates, the constant growth rate cannot be greater than the overall growth rate of the economy." (Defs.' Request for Judicial Notice ["RJN"], Ex. B, ASWATH DAMODARAN, DAMODARAN ON VALUATION: SECURITY ANALYSIS FOR INVESTMENT AND CORPORATE FINANCE 145 (John Wiley & Sons, Inc. 2d ed. 2006)). We have reviewed Defendants' expert Dr. Bradford Cornell's declaration in support of this Motion to Exclude, in which he argues that "Dr. Kennedy's use of an 18x EBITDA forward multiple is unreasonable . . . ." (Cornell Decl. in Supp. of Mot. to Exclude ¶ 5). To cross-check the outcome of Dr. Kennedy's DCF analysis, Dr. Cornell used three hypothetical scenarios, in which MySpace's revenue growth rate declines by 2 percent, 1 percent, and 0.5 percent, respectively, each year until it reaches 6.5 percent, the average annual growth rate in nominal Gross Domestic Product between 1928 and 2008. (*Id.* ¶¶ 8-10 (citing Defs.' RJN, Ex. F, Bureau of Economic Analysis News Release, July 31, 2009)). Using Dr. Kennedy's assumptions and the Gordon Growth Model (*id.* ¶¶ 11-13), Dr. Cornell calculated the following total present values as of January 1, 2010 and implied EBITDA multiples for each scenario: (1) for the 2 percent annual reduction, $549.13 million and a 4.7x multiple; (2) for the 1 percent annual reduction, $606.18 million and a 5.2x multiple; and (3) for the 0.5 percent annual reduction (what he calls the "most aggressive scenario"), $695.34 million and a 6.0x multiple. (*Id.* ¶¶ 14-19; *see also id.*, Exs. 5, 6). Applying the 19 percent discount rate used by Dr. Kennedy, Dr. Cornell calculates discounted values as of mid-2005 for each scenario, including: (1) $251.02 million; (2) $277.10 million; and (3) $317.8 million. (Cornell Decl. in Supp. of Mot. to Exclude ¶ 20). Finally, Dr. Cornell concludes that "even assuming an instance where MySpace's revenues grow at a rate exceeding that of the economy as a whole for fifteen years

---

[19] *Lippe v. Bairnco Corp.*, 288 F.R. 678, 689 (S.D.N.Y. 2003) ("Many authorities recognize that the most reliable method for determining the value of a business is the discounted cash flow ('DCF') method.") (citations omitted); *see also Children's Broad. Corp. v. The Walt Disney Co.*, 245 F.3d 1008, 1018 (8th Cir. 2001) (describing DCF analysis as "an uncontroversial accounting method").



**CIVIL MINUTES - GENERAL**

| | | |
|---|---|---|
| Case No. | CV 06-3731-GHK (SHx) | Date   June 17, 2010 |
| Title | *Jim Brown v. Brett Brewer, et al.* | |

after 2010, *i.e.*, until 2025, Dr. Kennedy's implied EBITDA multiple of 18x is *three times too high* when compared with even [Dr. Cornell's] most aggressive implied EBITDA multiple of 6.0x to give a reasonable estimate of MySpace's value as of mid-2005." (*Id.* ¶ 21 (emphasis original)).

Though a jury might conclude at trial that Dr. Kennedy's selection of an 18x EBITDA multiple was overzealous, Dr. Cornell's calculations do not demonstrate that Dr. Kennedy's *methodology* is fundamentally unreliable. At base, Dr. Cornell's challenge to this DCF analysis constitutes an attack on Dr. Kennedy's projections as to MySpace's annual growth rates and as to how long those growth rates can be sustained. Since Dr. Cornell is in essence attacking the reasonableness of Dr. Kennedy's projections, the generation of which we have already noted is not an exact science, we conclude that his arguments do not render Dr. Kennedy's methodology fundamentally unreliable and therefore inadmissible. Dr. Cornell himself has testified that an adjustment in the terminal multiple based on the expert's assessment of the company's growth potential is appropriate. (Baron Decl., Ex. 2 (Cornell Tr. 1 at 167:19-168:3)). Additionally, Dr. Cornell rejected the proposition that "any time that the implied perpetual growth rate exceeds the growth of the economy, that the terminal value multiple used would be unreliable[.]" (*Id.*, Ex. 1 (Cornell Tr. II at 21:21-22:1)). He further explained that "it's just a question of how much [the implied perpetual growth rate] exceeds [the economy rate,]" and there is no standardized method to determine whether the difference between the two rates is "unreasonable." (*Id.* at 22:3-24:6; *id.* at 23:12-25 ("Q[.] And then do they use judgment to see whether it's reasonable to them or not reasonable to them? . . . . Is there some written scale as to how much variation there can be before, in your view, it becomes unreasonable or unreasonable; or is that a judgment of the analyst? A[:] Well, there's not a written scale . . . . And these calculations Dr. Kennedy used struck me as [unreasonable]")). These statements suggest that Defendants' Motion turns on a difference of professional opinion, not some fatal methodological flaw.

Based on our review of the papers and evidence submitted, if anything is clear, it is that DCF analysis is, in not insubstantial measure, an inherently subjective and predictive methodology, which relies in part on the expert's judgment and experience. Indeed, neither Party has presented the Court with any accepted, standardized methodology for deriving the required inputs for DCF analysis. Accordingly, we are forced to conclude that DCF analysis is sufficiently pliable so that it may reasonably lead to a wide breadth of plausible conclusions. Dr. Kennedy's conclusions and the bases therefor may ultimately be subject to legitimate attacks on cross-examination, but we perceive no fundamental unreliability in his analysis that would counsel in favor of outright exclusion. We agree that our "gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury." *DSU Med. Corp. v. JMS Co., Ltd.*, 296 F. Supp. 2d 1140, 1147 (N.D. Cal. 2003) (citation, quotation marks, and alteration omitted). It is readily apparent that Defendants have thoroughly researched the case law on DCF methodology, and in all but one of the several cases they cite, the expert witness's DCF analysis was considered *at trial* and *then* rejected by the court. *Compare In re Iridium Operating, LLC*, 373 B.R. 283, 350-52 (Bankr. S.D.N.Y. 2007) (rejecting DCF analyses following trial); *In re Emerging Commc'ns, Inc. S'holders Litig.*, No. Civ.A. 16415, 2004 WL 1305745, at *14-15 (Del. Ch. June 4, 2004) (same); *Gray v. Cytokine Pharmasciences, Inc.*, No. Civ.A. 17451, 2002 WL 853549, at *8 (Del. Ch. Apr. 25, 2002) (same), with *Kipperman v. Onex Corp.*, 411 B.R. 805,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | *Jim Brown v. Brett Brewer, et al.* |

844-49 (Bankr. N.D. Ga. 2009) (simultaneously deciding summary judgment and granting motion to exclude an expert's testimony as unreliable under Rule 702, where the expert rejected management's projections and generated his own DCF analysis).

With respect to Dr. Kennedy's comparable public company analysis, Defendants argue that he only used the projected MySpace revenue and EBITDA figures for 2006, ignoring the 2005 numbers without explanation. (Mot. 17-18 (citing Moriarty Decl., Ex. 1, Kennedy Report, at 24)). They argue Dr. Kennedy's explanation for choosing to disregard the 2005 figures was inadequate *ipse dixit*. When asked if 2005 was "an aberrant year for MySpace," he replied: "No, but it wasn't who the company was expected to be." (Kennedy Tr. at 129:19-22). Furthermore, Defendants argue that Kennedy cherry-picked only the most profitable guideline companies referenced in Montgomery and TWP's fairness analyses, instead of applying an average of the multiples applicable to several companies. (Mot. 18). In support of this latter contention, they cite another treatise, which states: "In employing the guideline publicly traded company method, every effort should be made to select as broad a base of comparative companies as is reasonably possible, as well as to give full consideration to every possible factor in order to make the comparison more meaningful." (Defs.' RJN, Ex. E, PRATT, REILLY AND SCHWEIHS, THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 233 (2000) ("PRATT, et al.") (citation and internal quotation marks omitted)). Defendants contend that Dr. Kennedy erred in whittling down the broader base of comparable public companies identified by Montgomery and TWP to only Google and Yahoo!, "seasoned" companies with "proven revenue model[s]" that experienced explosive growth. (Mot. 19-20). Though this appears to strike Defendants as litigation-driven, we are instructed to evaluate the *methodology*, not the ultimate determination reached by the expert. Our "sole purpose is to determine the reliability of a particular expert opinion through a preliminary assessment of the methodologies underlying the opinion." *DSU Med. Corp.*, 296 F. Supp. 2d at 1147 (citing *Daubert*, 509 U.S. at 592-93). Of course, we must consider "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert II*, 43 F.3d at 1317. However, there is no evidence in the record that Dr. Kennedy deviated from his standard methodology for the purposes of testifying in this case.

Dr. Kennedy explained his method as follows. First, he analyzed the companies selected by Montgomery and TWP and restricted his selection to those comparable companies. (Moriarty Decl., Ex. 1, Kennedy Report, at 18-20). Montgomery had chosen twelve companies (Google, Yahoo!, CNET Networks, iVillage, Monster Worldwide, Aptimus, ValueClick, Vertrue, Church & Dwight Co., Herbalife Ltd., Jarden Corp., and Nature's Sunshine Products) based on the following sectors: online advertising, online content and networking, online direct marketing, and offline direct marketing. (*Id.* at 19). TWP had chosen fourteen guideline companies (Bankrate, CNET, iVillage, 1-800-FLOWERS.COM, Blue Nile, Celebrate Express, Netflix, NutriSystem, Overstock.com, Provide Commerce, Aptimus, Marchex, ValueClick, and Vertrue) based on three sector categories: content, eCommerce, and direct marketing. (*Id.*). In identifying a narrower set of comparable companies, Dr. Kennedy explained that he considered these to be "the most similar operational, financial, and growth

EH-BCM      Document 32-1      Filed 09/
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |

| | |
|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* |

guideline publicly traded companies." (*Id.* at 20). He justified his deviation from the investment banks, beginning with TWP, as follows:

> In implementing the public guideline company method, TWP selected guideline Companies based on all of the businesses of Internix on a combined basis. . . . Montgomery selected guideline companies based on each business within Intermix because "the three businesses have different economics and peer groups." As a result, Montgomery selected only "Online Advertising" and "Online Content and Networking" to apply to MySpace. We agree that Montgomery's approach that each Intermix business segment, and specifically MySpace, has different growth and profit potential and therefore, different multiples would be appropriate to apply to MySpace and the other Intermix business segments. Within TWP's comparables, only the "Content" group is applicable.

(*Id.* at 20-21). Accordingly, Dr. Kennedy selected the following six comparable companies: Bankrate, CNET, iVillage, Google, Yahoo!, and Monster. (*Id.* at 21). Then, based on "separate MySpace financial performance information," Dr. Kennedy narrowed the field down to Google and Yahoo!, contending those were the only two companies with comparable revenue and EBITDA growth metrics. (*Id.* at 21-25). Dr. Kennedy concluded that MySpace "[fell] into the higher profitability tier" of the six guideline companies, and therefore, he could discount the 2005 figures for MySpace and utilize an "average of the multiples indicated by Google and Yahoo." (*Id.* at 24-25).

There is nothing in the record to support the proposition that selecting comparable companies based on (1) services provided, (2) revenue metrics, and (3) EBITDA metrics renders a comparable public company analysis fundamentally unreliable. We will not exclude this evidence simply because Defendants dislike Dr. Kennedy's conclusion that the only guideline companies left standing in the final analysis were Google and Yahoo!. Even Defendants' cited treatise urges the selection of "as broad a base of comparative companies *as is reasonably possible*." (Defs.' RJN, Ex. E, PRATT, et al., *supra*, at 233 (emphasis added).) Dr. Kennedy concludes, in effect, that the remaining comparable companies are as broad a base of comparable companies as is reasonably possible. Defendants' disagreement with this conclusion is properly explored on cross-examination.

Accordingly, we hereby DENY Defendants' Motion to Exclude Dr. Kennedy's testimony. As Dr. Kennedy's testimony is sufficient to at least raise triable issues on damages from out-of-pocket losses, we also DENY Defendants' Motion for Summary Judgment on this issue.

### 3.    "Lost Opportunity" Damages

As a final alternative, Plaintiff seeks "lost opportunity" damages based on the allegedly impending Viacom bid. "Where actual losses cannot be demonstrated," some circuit courts have recognized "an alternate theory of establishing damages," the "lost opportunity" theory. *DaimlerChrysler*, 294 F. Supp. 2d at 627 (internal quotation marks omitted). Lost opportunity damages represent "loss of a possible profit or benefit, [defined as] an addition to the value of one's investment,

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | *Jim Brown v. Brett Brewer, et al.* | | |

unless the loss is wholly speculative." *Tse II*, 123 F. Supp. 2d at 223 (internal citations omitted; alteration in original). "Lost opportunity damages are not 'wholly speculative' if they are based on 'certain, fixed and demonstrable profits thwarted by a defendant's alleged fraud.'" *DaimlerChrysler*, 294 F. Supp. 2d at 627 (quoting *Rudinger v. Ins. Company of America, Inc.*, 778 F. Supp. 1334, 1341 (E.D. Pa. 1991)). "Further, lost opportunities damages 'are not available where the fact of the loss, i.e. whether there was any lost opportunity at all, is wholly speculative.'" *Id.* (quoting *Tse v. Ventana Med. Sys., Inc.*, 297 F.3d 210, 220 (3d Cir. 2002) ("*Tse III*")). Finally, "'[t]he risk of uncertainty as to [the] amount of damages is cast on the wrongdoer and it is the duty of the fact finder to determine the amount of the damages as best he can from all the evidence in the case.'" *Tse III*, 297 F.3d at 220 (quoting *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 781-82 (3d Cir. 1976)).

In support of this theory of damages, Plaintiff argues that Viacom was contemplating a bid above $750 million, citing a single internal Viacom email, in which Jason Hirschhorn states: "My guess is that News [Corp.] is going to take the $12/share ask from Richard Rosenblatt and add a premium of 10-20%. $700-$750 million . . . . Don't know if offer will be binding from NEWS [Corp.]. But I believe [*sic*] they will deliver it anywhere from today-monday." (J.A., Ex. 192). Viacom never in fact put in a bid for Intermix. Therefore, the relevant question on this motion for summary judgment is whether there is a triable issue of material fact as to whether Viacom would have submitted a bid. This question must be answered in the negative, since it is undisputed that Viacom's board simply refused to engage in a public bidding war with its competitor News Corp. Freston, Viacom's CEO, testified that the Viacom board members were adamant on this point: "There already had been an offer and it wasn't ours and it didn't look like there was an opportunity to counter bid or if there was, we would have to do so in a public way and the board had said on the spot, no, let's not get involved in that." (Freston Tr. at 35:11-15; *see also* West Tr. at 33:22-24 ("We had some discussion and we ended up saying that it wasn't worth pursuing a counterbid strategy.")). Therefore, given this unwavering refusal to engage in a public bidding war following the July 18th merger announcement, the Proxy, including whatever alleged material omissions, issued in late August had no effect whatsoever on Viacom's willingness to place a bid for Intermix. Accordingly, the allegedly defective Proxy cannot support the notion that Intermix shareholders missed out on an opportunity with Viacom.

While it may be theoretically possible that Viacom would have entered a subsequent bid had the Intermix shareholders not been allegedly deceived by the defective Proxy and they rejected the merger with News Corp., we conclude that under the totality of the evidence, Plaintiff's showing is no more than speculative. Moreover, mere rejection of the News Corp. bid by the shareholders would not necessarily have eliminated the specter of a public bidding war that Viacom abhorred. Nothing prevented News Corp. from countering any Viacom bid with a counterbid. This is precisely the type of speculation and indeterminacy that is insufficient to create a triable issue on the existence of any lost opportunity.

EH-BCM      Document 32-1      Filed 09/

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | CV 06-3731-GHK (SHx) | Date | June 17, 2010 |
|---|---|---|---|

| Title | *Jim Brown v. Brett Brewer, et al.* |
|---|---|

Accordingly, we **GRANT** Defendants' Motion for Summary Judgment as to this theory of damages.[20] On his Section 14(a) claim, Plaintiff may **ONLY** proceed at trial on his theory of out-of-pocket losses based on an intrinsic valuation of Intermix at the time of the merger.

**IV.    Count III: Violation of Section 20(a) of the Securities and Exchange Act of 1934**

Section 20(a) of the 1934 Act provides that: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). The Parties agree that if there is no primary liability under Section 14(a), there can be no control person liability. (Joint Br. 87). However, since we have denied summary judgment with respect to three of the bases for Count II, we likewise **DENY** the Motion for Summary Judgment with respect to Count III.

**V.    Conclusion**

Plaintiff's Motion for Summary Judgment is **DENIED**. Defendants' Motion for Summary Judgment is hereby **GRANTED in part** and **DENIED in part** as set forth in this Order. **Within thirty (30) days hereof,** counsel **SHALL** file a joint status report setting forth their views regarding further mediation in light of these rulings.

**IT IS SO ORDERED.**

|  |  | -- | -- |
|---|---|---|---|
| | Initials of Deputy Clerk | Bea | |

---

[20] We have no occasion to consider and therefore express no opinion on whether the "lost opportunity" theory of damages premised on a potential Viacom bid would be viable with respect to the breach of fiduciary duty claim which is based on evidence beyond the alleged material omissions from the Proxy. The Parties have not addressed this issue in their Cross-Motions.

EXHIBIT #5

## Summary of key deal terms [TBD]

| | |
|---|---|
| Price/share | $12 /share |
| Consideration | Cash |
| Total equity value | $581 million (including Preferred Stock and vested Options) |
| Total transaction cost | Approximately $725 million (including retention costs, NewCo buyout and Liquidations Preference on Preferred Stock) |
| McGate buyout | Option triggered to purchase Regroint and management holdings for approx. $75mm |
| Employee retention | Expect to enter into arrangements with a pre-tax cost of $70mm post transaction signing to ensure continuity of key personnel |
| Existing employee options | All vested options cashed out. Unvested options at closing cancelled |
| VantagePoint Agreement | • NewCorp to acquire VantagePoint's shares (5.9mm shares, approx 10% of total diluted shares outstanding) for $12/share (approx. cost $110 million)<br>• NewCorp to pay VantagePoint an additional amount if a transaction with Ivory is completed at a higher price than $12/share |
| Transaction structure | Newly created NewCo sub subsidiary and Ivory to merge, with Ivory remaining as the surviving |
| Expected closing | October, 2005 |
| Key points to close | • Ivory Shareholder Vote<br>• No Material Adverse Change<br>• All representations, warranties and business conduct provisions satisfied<br>• Receipt of necessary government approvals |
| Breakup fee | ($25 million) |
| Other deal protection provisions | • "No shop" with fiduciary out<br>• Matching provisions in event of Superior Proposal<br>• Liability for NewCo to go "fiduciary fee" in the event that [a] a Superior Proposal is received and the Ivory board changes its recommendation] |

ACQUISITION OF IVORY - PRESENTATION TO BOARD OF DIRECTORS

NEWS CORPORATION

Exhibit 193

Case 5:16-cv-06268-EJD   Document 18-1   Filed 12/14/16   Page 174 of 316

# Revised Investment

| | previous | Gross | Net Present Cost (current) |
|---|---|---|---|
| Equity Value ($12/share) | $561 | $582 | $582 |
| Net Debt + Cash Option Value | (20) | (26) | ($26) |
| **Enterprise Value** | **$541M** | **$556M** | **$556M** |
| Vantage Liquidation | - | 13 | 13 |
| MySpace Option Cost | 69 | 69 | 69 |
| Intermix Transaction Costs | - | 7 | 7 |
| **W/ Transaction Costs** | **$610M** | **$645M** | **$645M** |
| Intermix Unvested Options | - | 12 | 9 |
| MySpace Retention Plan | 69 | 90 | 50 |
| MySpace Options | - | 4 | 4 |
| **Total Deal Cost** | **$680M** | **$750M** | **$708M** |

CONFIDENTIAL

**FOX** Entertainment Group

Exhibit 199

NC

$680M buyout
price increases to
$750M

# Deal Update

## Economics

- □ Enterprise value cost of $556M vs. previous estimate of $541M
- □ Total deal cost: $750M vs. previous $680M -- Net present cost of $708M
- □ Fox adjusted DCF Valuation $518M-$646M
- □ Using market comps from JPM, valuation of $590M-$730M (current yr.) and $1.0-$1.4B (forward year)
  - ➢ MySpace alone is being valued at $550M-700M using Management projections (forward year EBITDA of $35M)

## MySpace Retention Plan

- □ $90M gross ($50M net) critical to maintain positive relationship with management and reduce tax exposure as much as possible
  - ➢ Additionally, trigger option pool for rank-and-file employees as goodwill move ($4M)

## Legal

- □ Still working between voting rights agreement vs. stock purchase agreement
  - ➢ Break-up fee of $25M
  - ➢ Financing of $59M option on a secured basis

**FOX** Entertainment Group

CONFIDENTIAL

Exhibit 199

NC91227



# Potential Acquisition Comparison

**Intermix**

REDACTED

### Top Sites

MySpace
Grab
Flowgo
Quizyourfriends

### Target Market

M/F16-34 & F18-49

### Current Traffic

| | |
|---|---|
| - Uniques | 28M |
| - Page Views | 7.9B |

### 2005 Financials[1]

| | w/ Alena | w/out Alena |
|---|---|---|
| - Revenue | $113M | $50M |
| - EBITDA | 28 | 17 |
| - Margin % | 25% | 34% |

### Est. Transaction Price[2]

- $520M - $670M
- EBITDA Multiple   20-24x

1) All financials are annual calendar year-end figures as projected by company
2) Includes $40-70m in potential earn-out



CONFIDENTIAL

Exhibit 30

Page 573

NC01004

EXHIBIT #6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, STATE OF
ARKANSAS, STATE OF CALIFORNIA,
STATE OF FLORIDA, STATE OF GEORGIA,
STATE OF INDIANA, COMMONWEALTH
OF KENTUCKY, STATE OF LOUISIANA,
STATE OF MICHIGAN, STATE OF
MISSISSIPPI, STATE OF MISSOURI, STATE
OF MONTANA, STATE OF SOUTH
CAROLINA, STATE OF TEXAS, AND
STATE OF WISCONSIN

       Plaintiffs,

v.

GOOGLE LLC,

       Defendant.

Case No. 1:20-cv-03010-APM

HON. AMIT P. MEHTA

STATE OF COLORADO, STATE OF
NEBRASKA, STATE OF ARIZONA, STATE
OF IOWA, STATE OF NEW YORK, STATE
OF NORTH CAROLINA, STATE OF
TENNESSEE, STATE OF UTAH, STATE OF
ALASKA, STATE OF CONNECTICUT,
STATE OF DELAWARE, DISTRICT OF
COLUMBIA, TERRITORY OF GUAM,
STATE OF HAWAII, STATE OF ILLINOIS,
STATE OF KANSAS, STATE OF MAINE,
STATE OF MARYLAND,
COMMONWEALTH OF MASSACHUSETTS,
STATE OF MINNESOTA, STATE OF
NEVADA, STATE OF NEW HAMPSHIRE,
STATE OF NEW JERSEY, STATE OF NEW
MEXICO, STATE OF NORTH DAKOTA,
STATE OF OHIO, STATE OF OKLAHOMA,
STATE OF OREGON, COMMONWEALTH
OF PENNSYLVANIA, COMMONWEALTH
OF PUERTO RICO, STATE OF RHODE
ISLAND, STATE OF SOUTH DAKOTA,
STATE OF VERMONT, COMMONWEALTH
OF VIRGINIA, STATE OF WASHINGTON,

Case No. 1:20-cv-03715-APM

HON. AMIT P. MEHTA

RECEIVED
~~Mailroom~~

JAN - 3 2024

~~Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia~~

**REQUEST FOR JUDICIAL NOTICE**

EH-BCM     Document 32-1     Filed 09/

REQUEST FOR JUDICIAL NOTICE

Plaintiff hereby requests, pursuant to Rule 201 of the Federal Rules of Evidence, that the

Court take judicial notice of the following items in connection with Plaintiff Motion 60(b)(3):

Exhibit #1

1. Record Supplemental September 27, 2015 in Delaware Supreme Court -1 Page

Exhibit #2

2. April 13, 2015 IN THE SUPREME COURT OF THE STATE OF DELAWARE

   No. 102, 2015
   A WRIT OF MANDAMUS
   Before STRINE, Chief Justice; HOLLAND, and VAUGHN, Justices.
   0RDER -3 pages

3. September 17, 2015 Delaware Supreme Court Order on No 347, 2015

   PETITION OF BRAD D. GREENSPAN FOR A WRIT OF CERTIORARI -4 pages

4. April 2, 2015 Delaware Court Chancery grants Plaintiff's Motion Recusal of Judge.-6 pages

5. 9/1815 Order San Jose District Court Order-1 page

Exhibit #3 documents

6. Plaintiff filed Notice of Appeal in San Jose Federal District case vs. Google IAC in May

2016 and the Circuit Court's Order issued AUG 17 2017:U.S. COURT OF APPEALS 2 16-15908

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

BRAD GREENSPAN, Plaintiff-Appellant, v. IAC/INTERACTIVECORP, a Delaware

No. 16-15908 D.C. No. 5:14-cv-04187-RMW MEMORANDUM*

   Appeal from the United States District Court for the Northern District of California

   Ronald M. Whyte, District Judge, Presiding Submitted August 9, 2017**

**Before: SCHROEDER, TASHIMA, and M. SMITH, Circuit Judges.**

   **FILED AUG 17 2017**

     MOLLY C. DWYER, CLERK

EH-BCM   Document 32-1   Filed 09/

"Greenspan's notice of appeal challenging the Securities and Exchange

Commission's ("SEC") May 2, 2016 Order Determining Whistleblower Award

Claim, which was filed in the district court, should have been filed in this court.

See 15 U.S.C. § 78u-6(f) (providing that certain determinations of whistleblower

awards "may be appealed to the appropriate court of appeals of the United States

not more than 30 days after the determination is issued by the Commission"). We

construe Greenspan's notice of appeal as a petition for review. See Fed. R. App. P.

15(a)(4). In the interests of justice, we transfer Greenspan's petition for review to

this court. See 28 U.S.C. § 1631; Kolek v. Engen, 869 F.2d 1281, 1284 (9th Cir.

1989) (setting forth conditions for transfer under 28 U.S.C. § 1631); see also Baeta

v. Sonchik, 273 F.3d 1261, 1264 (9th Cir. 2001) ("[B]ecause the purpose of the

transfer statute is to aid litigants who were confused about the proper forum for

review, a petition that would be time-barred without a transfer satisfies the

interest of justice test." (citation and internal quotation marks omitted)).

The Clerk shall file Greenspan's notice of appeal (District Court Docket

Entry No. 104) as a petition for review of the SEC's May 2, 2016 order and open a

new case in this court."

-1 page

7.  DEFENDANT GOOGLE INC.'S REPLY IN SUPPORT OF MOTION FOR AN

    ORDER DECLARING PLAINTIFF A VEXATIOUS LITIGANT AND FOR

    ATTORNEYS' FEES PURSUANT TO 28 U.S.C. § 1927 filed 09/13/16

    Docket in 14-cv-04187-RMW involving Defendant Document 155 -3 pages:

8.  Filed by defendant Plaintiff is entitled to bring or defend claims against by way of motion

EH-BCM     Document 32-1     Filed 09/

RMW:

"**DEFENDANT GOOGLE INC.'S**

**FED R. CIV. P. 7.1 AND LOCAL RULE 3-15**

**CERTIFICATE OF INTERESTED ENTITIES"**

**DATE FILED: OCTOBER 8, 2015**

substantially affected by the outcome of this proceeding:

1. Alphabet Inc., Holding Company of Defendant 2. Google Inc., Defendant"

Dated: October 8, 2015"

9.  Filed by Defendant 10/20/2017 example of how in a case with a more friendly counter
    party counsel, Google negotiates but requires permission from counter party. Google
    never got permission for the substitution in case Plaintiff filed in Federal Court
    San Jose. , showing how no stipulation means Alphabet never could have become
    released from being adverse counter party to Plaintiff.

"Pursuant to Civil Local Rule 7-12, Plaintiff Google Inc., now known as Google LLC, and
Defendant Creative Labs, Inc. and Creative Technology Ltd. ("Creative"), (collectively,
the "Parties"), by and through their respective counsel of record, hereby stipulate as
follows:

WHEREAS Plaintiff represents that Google Inc. filed a Certificate of Conversion with the
Delaware Secretary of State, in which Google Inc. converted from a corporation to a limited
liability company and changed its name to Google LLC on September 30, 2017;

WHEREAS Plaintiff represents that Google LLC filed a Certificate of Formation with the
Delaware Secretary of State, effective on September 30, 2017;

WHEREAS the Parties agree that this Stipulation merely reflects the above-noted change
of corporate name, and does not affect any substantive issue in this case;

NOW, THEREFORE, IT IS HEREBY STIPULATED by and between the Parties, through
their respective counsel and subject to the Court's approval, that: Google Inc. shall now be
known as Google LLC in this action and the caption of the case shall be:

4

NOW, THEREFORE, IT IS HEREBY STIPULATED by and between the parties, through their respective counsel and subject to the Court's approval, that:  Google Inc. shall now be known as Google LLC in this action and the caption of the case shall be:

GOOGLE LLC,

      Plaintiff,

    v.

CREATIVE LABS, INC. and
CREATIVE TECHNOLOGY LTD.,

      Defendants.

Dated:   October 20, 2017          Respectfully submitted,

                           By:   _/s/ Bijal V. Vakil_____
                               Bijal V. Vakil

                           Attorneys for Plaintiff
                           Google LLC

                           By:   _/s/ Johnathan D. Baker__
                               Johnathan D. Baker

                           Attorneys for Defendants
                           Creative Labs, Inc. and
                           Creative Technology Ltd.

- 1 -

America #1073565                      JOINT STIPULATION AND PROPOSED ORDER TO REFLECT NAME CHANGE
                               CASE NO: 3:16-cv-02628-JST

---

10. 10.20.17 Case No. 3:16-cv-02628-JST

JOINT STIPULATION AND [PROPOSED] ORDER TO REFLECT NAME CHANGE
FROM GOOGLE INC. TO GOOGLE LLC

11. Certificate FRCP 7.1 filed in this case by Defendant Google LLC stated " Alphabet, Inc.,

Google, Inc. MapleTechnologies Inc., XXVI Holdings Inc., Holding Company of Google

LLC, Youtube LLC, "

IV.   CONCLUSION

EH-BCM   Document 32-1   Filed 09,

is sum the above items m 201 2 the Federal Rule of

Evidence, and therefore, the Court must take judicial notice of them pursuant to Rule 201(c)(2)

of the Federal Rules of Evidence.

Respectfully Submitted,

*/s/  Brad Greenspan*                              **Dated**: January 2, 2024

Brad Greenspan, pro se

244 5th ave, #G290

New York, NY 10001
Email: legalsupport1@nym.hush.com

EXHIBITS

EH-BCM       Document 32-1       Filed 09/

**EXHIBIT #1**



IN THE SUPREME COURT OF THE STATE OF DELAWARE

Brad D. Greenspan

    Plaintiff Below,
    Appellant

FOR AN EXTRAORDINARY
WRIT OF CERTIORARI
In C.A. No. 9567

v.

Twenty-First Century Fox, Inc, et al

    Defendants Below,
    Appelles

---

**RECORD (SUPPLEMENTAL)**

i.    September 23, 2015 FRCP Rule 23 Case No. 5:14-cv-04187 co-Defendant IAC/Interactive  "Declaration of Kurt A. Kappes in Support of Defendant IAC/Interactive Corp's Bill of Fees And Costs"

ii.    September 18, 2015 FRCP Rule 23 Federal District Judge Ruling Case No. 5:14-cv-04187 in favor of Plaintiff and against Defendants Twenty-First Century Fox, Inc., IAC/Interactive, et al.

iii.    August 14, 2015, FRCP Rule 23 No. 5:14-cv-04187 co-Defendant Google, Inc. Motion To Consolidate & "DEFENDANT IAC/INTERACTIVE CORP'S NOTICE OF JOINDER TO GOOGLE, INC.'S ADMINISTRATIVE MOTION TO CONSOLIDATE HEARING DATES"

iv.    August 20, 2015 FRCP Rule 23  5:14-cv-04062 "All Actions" ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS" Denial of Defendants Twenty-First Century Fox, Inc., Sony Corporation of America, Orrick Herrington Law LLC, claims for violation of Sherman Act 1, Clayton Act, Rule 17200 5:14-cv-04062

v.    February 19, 2015 2nd Amended Class Action Case No. 5:14-cv-04187 vs Defendants Twenty-First Century Fox, Inc., IAC/Interactive, et al, and Google, Inc.

vi.    July 7, 2014 FRCP Rule 23 Case No. 5:11-cv-02509 Motion To Consolidate Plaintiff's claims under FRCP 2521 against Defendants Twenty-First Century Fox, Inc. IAC/Interactive, Orrick Herrington Law LLC, and Google, Inc.

vii.    March 28, 2014 FRCP Rule 23 Case No. 5:11-cv-02509- "ALL ACTIONS" "ORDER DENYING DEFENDANTS' INDIVIDUAL MOTIONS FOR SUMMARY JUDGMENT" for co-Defendants Google, Inc., Twenty-Century Fox, Inc., IAC/Interactive Inc., Apple Corporation, Intel Corporation, Adobe Corporation, violation of Sherman Act 1, Clayton Act, Rule 17200

DATED: September 27, 2015

Respectfully submitted,

/s/ Brad D. Greenspan
Brad D. Greenspan
2995 Woodside Rd.
Suite 400 Woodside, CA 94062
Ph: 408-827-9656 ext: 454

EH-BCM     Document 32-1     Filed 09/

this summary above items may be relevant under Rule 201(b)(2) of the Federal Rules of

Evidence, and therefore, the Court must take judicial notice of them pursuant to Rule 201(c)(2)

of the Federal Rules of Evidence.

Respectfully Submitted,

/s/  Brad Greenspan                                        Dated: January 2, 2024

Brad Greenspan, pro se

244 5th ave, #G290

New York, NY 10001
Email: legalsupport1@nym.hush.com

6

EH-BCM    Document 32-1    Filed 09/

<u>**EXHIBIT #2**</u>

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN THE MATTER OF THE | § | |
| PETITION OF BRAD D. | § | No. 102, 2015 |
| GREENSPAN FOR A WRIT OF | § | |
| MANDAMUS | § | |

Submitted:  March 23, 2015
Decided:   April 13, 2015

Before **STRINE**, Chief Justice; **HOLLAND**, and **VAUGHN**, Justices.

## O R D E R

This 13th day of April 2015, upon consideration of the petition of Brad Greenspan for a writ of mandamus, it appears to the Court that:

(1)   The petitioner, Brad Greenspan, seeks to invoke the original jurisdiction of this Court under Supreme Court Rule 43. He requests that this Court issue a writ of mandamus directing a Master of the Court of Chancery to: (i) grant his "Motion to Expedite Summary Judgment;" (ii) declare that he is immediately entitled to advancement of his legal fees; (iii) grant his "Motion Rule 54(b) or Rule 55(b);" (iv) grant his "Motion for Partial Summary Judgment;" (v) order a hearing on his "Motion 70b;" (vi) order an independent accounting of legal fees paid by defendants to the Master's former employer; (vii) transfer his case to Vice Chancellor Laster; (viii) disqualify the law firm of Richards Layton & Finger from appearing

his case; (ix) join certain people as codefendants; and (x) set a new hearing

date on his "Motion to Expedite Summary Judgment."

(2)    Defendants below, News Corporation and Intermix Media LLC,

as well as defendants, Sony Entertainment, Inc., Sony Music Holdings, Inc.,

and 550 Digital Media Ventures, Inc., have filed motions seeking to dismiss

Greenspan's writ of mandamus.  After careful consideration of the parties'

respective positions, we find that Greenspan's petition manifestly fails to

invoke this Court's original jurisdiction to issue an extraordinary writ.

Accordingly, his petition must be dismissed.

(3)    A writ of mandamus is designed to compel a lower court to

perform a duty if it is shown that:  the complainant has a clear right to the

performance of the duty; that no other adequate remedy is available; and that

the trial court has arbitrarily failed or refused to perform its duty.[1]  A writ of

mandamus will not be issued "to compel a trial court to perform a particular

judicial function, to decide a matter in a particular way, or to dictate the

control of its docket."[2]  A writ of mandamus is not warranted under the

present circumstances because the pending motions below are within the

discretion of the Master in Chancery.[3]  This Court will not compel the Court

---

[1] *In re Bordley*, 545 A.2d 619, 620 (Del. 1988).

[2] *Id.*

[3] *Id.*

EH-BCM   Document 32-1   Filed 09/

of Chancery to rule in Greenspan's favor on the substantive issues below.

These are matters Greenspan may raise in any appeal from a final order

issued by the Court of Chancery in the proceedings below.

NOW, THEREFORE, IT IS ORDERED that the petition for the

issuance of an extraordinary writ of mandamus is DISMISSED.

BY THE COURT:

/s/ Leo E. Strine, Jr.

Chief Justice

3

EXHIBIT #7

The information contained herein ... shall be ... by the ... Fox ...
... is deemed ... and ... internal stat...
... (Chap...)
BRAD D. GREENSPAN; Plaintiff ▪ NEWS CORPORATION; 21ST CENTURY FOX CORPORATION; NEWS AMERICA CORPORATION; WASHINGTON POST CORPORATION; SONY CORPORATION; SONY
CORPORATION AMERICA; SONY MUSIC ENTERTAINMENT, INC.; 350 DIGITAL MEDIA VENTURES, INC.; SONY BROADBAND ENTERTAINMENT, INC.; EINVERSE, INC., NEWS CORPORATION;
21ST CENTURY FOX, EUNIVERSE, INC., AGRE LAW LLC, VANTAGEPOINT VENTURE PARTNERS, ORRICK HERRINGTON LAW LLC, EPHIMUSIC, WARNER MUSIC GROUP INC CORPORATION, MYSPACE,
INC., ASKJEEVES, INC., JP MORGAN CHASE CORPORATION, REDPOINT PARTNERS CORPORATION, ARENT FOX LAW LLC INC.

... Filed ...

4/18/2014

... ...
1. Name and address of counsel for plaintiff:

Brad Greenspan
264 South La Cienega, Suite 1236
Beverly Hills, CA 90211

4. Short statement and nature of claim asserted:

1503 & Indemnification and Advancement claim,

5. Substantive field of law involved (check one):
_____ Administrative law                    _____ Trade secrets/trade mark/
_____ Commercial law                              or other intellectual
_____ Constitutional law                          property
_____ Corporation law                       _____ Trusts*
_____ Guardianship                          _____ Wills and estates*
_____ Labor law                             _____ Zoning
_____ Real Property                         _____ Other

*6. Related cases, including any Register of Wills matters (which
require copies of all documents in this matter to be filed with the
Register of Wills):

10&-VCS & 140-VCS & SSCC
Technology & Labor
7. Basis of Court's jurisdiction (including the citation of any statute(s)
conferring jurisdiction):

Plaintiff is Idminter of Delaware corporation acquired by News Corporation.

8. If the complaint seeks preliminary equitable relief, state the specific
preliminary relief sought.

9. If the complaint seeks a TRO, summary proceedings, a Preliminary
Injunction, or Expedited Proceedings, check here _____
(If #9 is checked, a Motion to Expedite must accompany the transaction.)

*10. If the complaint is one that in the opinion of counsel should not be
assigned to a Master in the first instance, check here and attach a
statement of good cause. _____

Signature of Attorney of Record & Bar ID

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

BRAD D. GREENSPAN                                    )
                                                     )
Suite 1216                                           )
Beverly Hills, CA 90211                              )
                                                     )
Plaintiff,                                           )
                                                     )
v.                                                   )
                                                     )
NEWS CORPORATION, 21ST CENTURY FOX CORPORATION, NEWS AMERICA CORPORATION,    )
WASHINGTON POST CORPORATION,                         )
SONY CORPORATION, SONY CORPORATION AMERICA, SONY MUSIC ENTERTAINMENT INC.,   )
550 DIGITAL MEDIA VENTURES, INC. SONY BROADBAND ENTERTAINMENT, INC., EUNIVERSE, INC
NEWS CORPORATION, 21ST CENTURY FOX, EUNIVERSE, INC. , RGRD LAW LLC,
NTAGEPOINT VENTURE PARTNERS, ORRICK HERRINGTON LAW LLC, EMI MUSIC, WARNER MUSIC GROUP,
IAC CORPORATION, MYSPACE, INC.,
ASKJEEVES, INC.,
JP MORGAN CHASE CORPORATION, REDPOINT PARTNERS CORPORATION,
ARENT FOX LAW LLC INC.


1503 & INDEMNIFICATION COMPLAINT

Plaintiff, in his Complaint against the Defendants, alleges as follows:

## I-    PRELIMINARY STATEMENT & SYNOPSIS

1.  Plaintiff Brad D. Greenspan ("Plaintiff"), a former Director an Officer of eUniverse, Inc. a Delaware Corporation hereby files this complaint. Petitioner is entitled to a private cause of action for damages suffered as a result of Defendant acts , omissions, damages, violations, and other losses caused by the long running 1503(d) conspiracy among Defendants. Petitioner also has contractual rights for Indemnification and Advancement.

## II -  PARTIES

PLAINTIFF

2.  Brad Greenspan, former Director, Officer, Shareholder of eUniverse, Inc

DEFENDANTS

3.  News Corporation, a Delaware Corporation

4.  21st Century Fox Corporation, a Delaware Corporation

5.  News America Corporation,  Delaware corporations

6.  Sony Corporation,   incorporated in Japan (herein Sony Corporation and its subsidiaries listed below will be referred to as "Sony")

7.  Sony Corporation America, a Delaware corporation

8.  Sony Music Entertainment Inc., a Delaware  Corporation

9.  550 Digital Media Ventures, Inc. ("550 DMV"), a Delaware Corporation

10.  Sony Broadband Entertainment, Inc., a Delaware corporation

eUniverse, Inc.  (name later changed to eUniverse) a Delaware Corporation (News Corp acquired in 2005)

12. Myspace, Inc., a Delaware Corporation (News Corp acquired in 2005)

13. RGRD Law LLC, a California LLC

14. VantagePoint Venture Partners, a California LLC

15. Orrick Herrington Law LLC, a California LLC

16. EMI Music, a Delaware Corporation

17. Warner Music Group, a Delaware Corporation

18. AskJeeves Inc., a Delaware corporation (IAC Corp acquired in 2005)

19. IAC Corporation, a Delaware corporation

20. JP Morgan Chase, a Delaware corporation

21. RedPoint Partners, a California LLC

22. Washington Post Corporation, a Delaware Corporation

23. Arent Fox Law, a Delaware LLC

## III - JURISDICTION AND VENUE

24. The jurisdiction of this Court is conferred and invoked pursuant to eUniverse, Inc., and its buyer, News Corporation being Delaware incorporated

## IV- FACT HISTORY

### The 1503 & 1505 Claims

25. 1503 & 1505 according to Delaware statute §1501 have a purpose:

" to guard against and prevent the infiltration and illegal acquisition of legitimate economic enterprises by racketeering practices, and the use and exploitation of both legal and illegal enterprises to further criminal activity."

"to apply to conduct beyond what is traditionally regarded as "organized crime" or "racketeering."

26. **Enterprise under § 1502 is defined:**

"(3) "Enterprise" shall include any individual, sole proprietorship, partnership, corporation, trust or other legal entity; and any union, association or group of persons associated in fact, although not a legal entity. The word "enterprise" shall include illicit as well as licit enterprises, and governmental as well as other entities."

27.    Members of the "SearchBriberyHacking" ('SBH') Enterprise are an

association-in-fact "enterprise that are known as of the date of filing this

complaint to include: IAC, AskJeeves, News Corporation, Orrick Herrington,

VantagePoint Partners, RedPoint Partners, JPMorgan, Washington Post Corporation,

RGRD Law LLC,  Sony Corporation, Sony Music Entertainment, Arent Fox, EMI,

Warner Brothers Music, MySpace Inc., Intermix Inc., Sony Corporation America, 550

DMV, Sony Broadband Entertainment Inc.,  as well as certain of their Officers,

Directors, and employees ("Enterprise").

28.    This Enterprise possessed and continues to possess a  common

purpose and goal, a membership, organizational structure, and ongoing

relationships with sufficient longevity to permit and enable pursuit of the

Enterprise's purpose and long-term objective through a continuous course of

conduct that  affected and continues to affect interstate and foreign commerce.

Most or all of the members of the Enterprise are also Principals, defined under

Delaware statue,

4

"(8) "Principal" shall mean a person who engages in conduct constituting a violation, or one who is personally accountable for the unlawful conduct of another person or another.

29.    The SBH Enterprise, members, and/or Principals engaged, attempted to

engage in, or conspired to engage in or to solicit, coerce or intimidate other person

to engage in Racketeering violations which under Delaware state law is defined as:

"(9) "Racketeering" shall mean to engage in, to attempt to engage in, to conspire to engage in or to solicit, coerce or intimidate another person to engage in:

a. Any activity defined as "racketeering activity" under 18 U.S.C. § 1961(1)(A), (1)(B), (1)(C) or (1)(D); or

b. Any activity constituting any felony which is chargeable under the Delaware Code or any activity constituting a misdemeanor under the following provisions of the Delaware Code:

Chapter 73 of Title 6 relating to the sale of securities; Chapter 5 of Title 11 & Title 6 relating to forgery and counterfeiting; Chapter 5 of Title 11 relating to perjury; Chapter 5 of Title 11 and Title 28 relating to bribery and misuse of public office and improper influence; Chapter 5 of Title 11 relating to tampering with jurors, evidence and witnesses;"

30.    SBH Enterprise, members, and Principals that make up the SBH

Enterprise initiated a Pattern of racketeering activity between 2003 thru 2013,

defined as:

"(5) "Pattern of racketeering activity" shall mean 2 or more incidents of conduct that:

a. That:

1. Constitute racketeering activity;

2. Are related to the affairs of the enterprise;

3. Are not so closely related to each other and connected in point of time and place that they constitute a single event; and

b. Where:

1. At least 1 of the incidents of conduct occurred after July 9,    1986;

2. The last incident of conduct occurred within 10 years after a prior occasion of conduct; and

3. As to criminal charges, but not as to civil proceedings, at least 1 of the incidents of conduct constituted a felony under the Delaware Criminal Code, or if committed subject to the jurisdiction of the United States or any state of the United States, would constitute a felony under the Delaware Criminal Code if committed in the State."

31.   SBH Enterprise "racketeering activity" included: 18 U.S.C. § 1341 (relating to mail fraud), 18 U.S.C. § 1512 (relating to tampering with a witness, victim, or an informant) 18 U.S.C. § 1513 (relating to retaliating against a witness, victim, or an informant) and 18 U.S.C. § 1519 (relating to destruction, alteration, or falsification of records in Federal investigation and bankruptcy).

32.   The pattern of racketeering activity is based on the following facts:

33.   Principals and members of the SBH enterprise desired and wanted to fraudulently take control of a publicly traded company that was the #1 fastest growing Top 10 Property in the world as of October 2003.

34.   Defendants launch series of schemes and frauds to take control of publicly traded MySpace and its parent corporation eUniverse (later renamed Intermix) and oust founder/CEO Brad Greenspan.

35.   Defendants also initiate schemes to defame and harass Petitioner, and additionally obstruct justice.

36.   Not satisfied with their existing economic gains, defendants embarked on an ever growing series of schemes and misdeeds to loot the public company.

37.   Petitioner on January 23, 2004 published press release titled:

"Substantial Conflicts of Interest with Respect to Verisign Nasdaq:VRSN And Ask Jeeves NASDAQ: ASKJ"

stating:

i. "eUniverse's Future Success in Lucrative Paid Search Space Is
   Threatened by Several Factors Including"

ii. "certain of eUniverse's incumbent Directors have substantial conflicts of interest
    that could threaten the Company's success in the paid search industry."

iii. "Daniel Mosher has conflicts of interest arising from his middle management role
     at Verisign, Inc. (NASDAQ: VRSN) which introduced the "sitefinder" redirect
     service in direct competition with eUniverse's PerfectNav application. "

iv. "David Carlick has a conflict of interest arising from his membership on the Board
    of Ask Jeeves (Nasdaq: ASK), which is a pure play in the paid search space.

v. "Carlick has the ability to influence management decisions which may adversely
   affect eUniverse's Paid Search division."

## DEFENDANTS ENTRENCHMENT SCHEME SHIFTS CONTROL

38.   Petitioner incorporates by reference Exhibit #1 which includes:

i.    January 2, 2014 letter to Chancellor Strine

ii.   NOTICE MOTION IN CONTEMPT

iii.  MOTION FOR CONTEMPT 70(B) 42(B) AND/OR 60(B)(3)

iii.  DECLARATION IN SUPPORT OF MOTION 70(b) 42(b) CONTEMPT

iv.   JUDGMENT ENTRY SETTING HEARING

(Note: All above unsigned documents were signed and submitted by courier
January 2, 2014 to Brenda at intake with copy of December 2013 proof of
service to Defendants )

## DEFENDANTS PASS ON FRAUDULENTLY CONCEALED EDELL DISCLOSURE VIOLATION TO ACQUIROR NEWS CORPORATION

39.  July 17, 2005 News Corporation Corporate counsel Lang emailed at 4:13AM
to Defendant eUniverse Director Sheehan and states, by interstate wire or interstate
carrier an email furthering the fraudulent concealment scheme to fabricate and

fraudulently conceal unlawful acts including contempt of Court to acquiror News

Corporation, clearly contained in email disclosed by 3ES Counsel in 2011 related security fraud class action. "Subject: 'Purchase Agreement", stating,

"On the issues, let's close on the remaining ones in a fair and reasonable way-- so we can build out relationship." And

"**3. We feel like we have given indemnification on the shares and the purchase agreement itself to do so on any issue we have had no involvement in whatsoever (i.e. Greenspan) - that seems like too much. Andy, I know we are very eager to get this done. Let do it so both sides can feel good and move forward on our longer-term relationship."**

Lang's communication is in violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and 18 U.S.C. § 1519 (relating to destruction, alteration, or falsification of records in Federal investigation and bankruptcy).

## 2013 HITECH FEDERAL CLASS ACTION EVIDENCE

40.   Evidence disclosed for the first time May 2013 in the Hitech Class Action Case 5:1102509, specifically document 198-3, page 37 and 38, proves Google had undisclosed illegal agreements in place with AskJeeves, AOL, Intel, Intuit, IAC Corp. and Apple  as of March 6, 2005 or earlier violating Federal antitrust statues. The companies fraudulently concealed the agreements and failed to disclose them in their annual 10K SEC or Proxy filings, violating security law and Director fiduciary duties.

41.   The evidence confirms Petitioner and shareholders were victims in 2005 of an  bid rigging conspiracy led by Google and enacted in coordination with AskJeeves's Directors who used their positions on the  Boards of both MySpace, Inc. and Parent eUniverse to mislead the other Directors  and shareholders while

42.   This conspiracy included: (i) fabricating prior sale of MySpace stock with backdated agreement in November 2004 (ii) agreements allowing AskJeeves Director Jeff Yang to purchase 30% of MySpace, Inc. in February 2005 at below fair market value using his RedPoint fund where he is managing Director;

a.   September 27, 2004 Vantagepoint internal report proves SBH Enterprise, Carlick, and AskJeeves manipulated Intermix Directors to forgo using less dilutive debt financing available, instead facilitating sweetheart equity sale to Yang and RedPoint Partners.

> "Myspace will require approximately $1.5 -2 million in the next 2 months for storage arrays, database servers, switches and routers."

And

> "The company is in discussions with Silicon Valley Bank regarding a $4m line of credit, which is likely to be approved."

b.   October 1, 2004, 3:05PM Rosenblatt contacts Sheehan using interstate wire or interstate carrier to send and deliver the email:

> "Just had a tough talk with Chris DeWolf. His lawyer is definitely giving him concerns about our offer. Heart ache about us taking the tech, value if we sell, etc.  He really thinks he is worth more independently...I am told him that is not going to happen."

the disclosed order of events described in the November 2004 10Q is fabricated and this email is in violation of both 18 U.S.C. § 1341 & 18 U.S.C. § 1343, and is a Key component and predicate act in fraudulently concealing the false facts in the November eUniverse 2004 10Q filing related to hiding backdated MySpace stock purchase agreement by defendants.

c.   October 7, 2004 3:45PM Sheehan contacts Rosenblatt & Carlick by interstate wire or interstate carrier using an email in violation of 18 U.S.C. § 1341 &/or § 1343

furthering the fraudulent concealment scheme to fabricate and fraudulently conceal the MySpace Stock purchase documents published in the November 2004 10Q were fabricated and backdated with Subject: "MS thoughts of the day",

"My current thoughts on the MS situation:

* We need to get in place the revised agreement before any meaningful negotiations with any other third party.

* I believe I understand Chris' concerns about being locked into an illiquid subsidiary, but that its their choice – they could have MIX stock if they want liquidity.

* They are minority shareholders and need to accept this fact.

* We, InterMix, need the right to be able to sell all of MS. Including founders shares.

* We, InterMix, need the right to buy out the founders at a price or a formula

On Redpoint:
* Why not continue talking to them, it is too hard to figure out if they could present the most attractive deal or not at this time"

d.    November 4, 2004 11:43PM Carlick emails Sheehan, by interstate wire or interstate carrier an email in violation 18 U.S.C. § 1341 &/or § 1343 furthering the fraudulent concealment scheme to fabricate and fraudulently conceal the MySpace Stock purchase documents published in the November 2004 10Q were fabricated and backdated Subject: "My talk with Yang" stating,

"Andrew, Spoke with Geoff, who holds you in the highest regard. I am not in the loop on their offer, which he described as 23% Redpoint, 25% Founders and pool and 52% Intermix.

His case for the offer was interesting and compelling, as Intermix could still "fold in" the earnings, traffic, etc. I want to discuss with you my thoughts on the subject tomorrow, God know when, as we

10

have no breaks I can count on. In any case, I suggested that Geoff speak with you directly."

e.  November 5, 2004 11:58AM Sheehan contacts Carlick and states, by interstate wire or interstate carrier an email in violation 18 U.S.C. § 1341 &/or § 1343 furthering the fraudulent concealment scheme to fabricate and fraudulently conceal the MySpace Stock purchase documents published in the November 2004 10Q were fabricated and backdated

> "what it comes down to is do we sell ms now or keep it. Doing a deal where mix keeps 52% doesn't make any sense for anyone except Yang. All the banks and investors think we would be foolish to sell some or all of ms now. We will get much less benefit to mix if we own 52% and have give all sorts of rights to an investor. Richard wants to keep it in mix."

f.  November 18, 2004, 3:56PM Orrick's Richard Harroch contacted Sheehan, Redpoint & AskJeeves' Director Yang and RedPoint's Beasly, by interstate wire or interstate carrier an email in violation 18 U.S.C. § 1341 &/or § 1343 furthering the fraudulent concealment scheme to fabricate and fraudulently conceal the MySpace Stock purchase documents published in the November 2004 10Q were fabricated and backdated

> Subject: 'MySpace Term Sheet 'and states,
>
> "Gentleman: As a follow up to our conversation today, attached ia a clean and redlined markup of the last version of the term sheet that was give to us in connection with the Myspace transaction. Let us discuss the issues at your convenience. Richard Harroch <<MySpace Sale of Series A Preferred Stock.doc>>"

g.  Rosenblatt by interstate wire or interstate carrier uses email in violation 18 U.S.C. § 1341 &/or § 1343 to further the fraudulent concealment scheme forwards an incoming Orrick email to Chris Lipp and Tom Flahie at 4:28PM to fabricate and fraudulently conceal the MySpace Stock purchase documents published in the November 2004 10Q, to hide the fact the documents were fabricated and backdated.

The email states: "I have not seen yet"

Rosenblatt professes to not know the terms that the company has already agreed to sell a
MySpace.com ....... on ....... Alba bought number on Ask Jeeves [s.?]
Yang and his fund company he is a principal in, Redpoint.

EH-BCM   Document 32-1   Filed 09/

h.   November 18, 2004 CFO Flahie emails Rosenblatt, Subject: 'RE: MySpace
Term Sheet' and states,

> "this situation really goes beyond anything I want to be a part
> of. I communicated my feelings in writing twice now about the
> lawyer for a large preferred stockholder and one director
> negotiating a major business transaction on behalf of the company
> without authorization of our board and all I received was an
> admonishment from Harroch about my email and told to shut up in
> a conference call."

> Since you have not seen this yet and I have certainly not, this
> makes a broader statement about our Senior Management." "As an
> officer I would be derelict in my duties to our company to allow
> this to continue outside of the view of the Board without doing
> something about it"

Flahie uses interstate wire or interstate carrier in violation 18 U.S.C. § 1341 &/or § 1343
to deliver email to further the fraudulent concealment scheme to fabricate and
fraudulently conceal the MySpace Stock purchase documents published in the November
2004 10Q, to hide the fact the documents were fabricated and backdated.

i.   November 18, 7:20PM Rosenblatt emails Flahie Subject: 'Re:Myspace Term
Sheet', stating:

> "Tom, I know how this could look but it is NOT at-all how it may
> appear."

and

> "Andy NEVER looked at it as a vantage shareholder, but as a
> Board member looking out for Intermix as a whole."

and

> "I believed (and was right) that he was better positioned than I
> was to extract terms that would be acceptable to the Board at
> large. Over the past week he was, to my surprise, able to get the

terms we all think are BETTER for the company and make the
Redpoint deal a great deal."

"In hindsight, I should have asked him to give those new terms to
Chris and we should have sent the term sheet to Redpoint. I plan
on clarifying with Redpoint tomorrow that Andy was simply helping us
get a deal done and the Company will take it from here."[i]

Rosenblatt uses interstate wire or interstate carrier in violation 18 U.S.C. § 1341 &/or §
1343 to deliver email to further the fraudulent concealment scheme to fabricate and
fraudulently conceal the MySpace Stock purchase documents published in the November
2004 10Q, to hide the fact the documents were fabricated and backdated.

j.      November 18, 2004 at 7:51PM, Sheehan forwards the email thread and
CFO's effective 'whistleblower notification' to Orrick's Harroch who is directly
involved in the incident. Sheehan uses interstate wire or interstate carrier to deliver
email to further the fraudulent concealment scheme to fabricate and fraudulently conceal
the MySpace Stock purchase documents published in the November 2004 10Q, to hide
the fact the documents were fabricated and backdated, to conceal scheme to sell 25% of
Myspace.com to conflicted Interlocking Director violating Clayton Act fellow
AskJeeves Director, Geoff Yang in violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343,
and violation of 18 U.S.C. § 1519 (relating to destruction, alteration, or falsification
of records in Federal investigation and bankruptcy).

(iii)    agreements allowing Google, TimeWarner/AOL, News Corporation, AskJeeves,
IAC, and other defendants to collude to gain economic benefits by delaying
closing of a competitive EUNI MySpace search engine auction for a new
commercial search engine agreement in the months leading up to News Corporation
acquiring 100% of eUniverse in September 2005. This arrangement ensured
Google's $4.4 Billion dollar August 2005 secondary by tying up the fast growing

online audience of MySpace, significantly growing its share of online

search advertising with the current competition chain – Yahoo; (iv)

An arrangement allowing News Corporation to purchase MySpace.com at below

fair market value, growing its market valuation and generating billions in

incremental profits and a massive online audience to seed new online assets for

years to come, while preventing a competitive auction with main rival Viacom.

    k.  MySpace and eUniverse's failure to elect 5th MySpace Director was key

part of scheme to rig bidding in Search Auction and sale of eUniverse. Failure to

disclose Intermix's majority owned MySpace, Inc. was in breach of this covenant in the

August 2005 Proxy was a 14A violation. Defendants breach and non disclosure of such

breach are used to effect the Antitrust bid rigging scheme. Defendants violated 18 U.S.C.

§§ 1341 thru publishing,distributing and mailing the August 2005 Proxy omitting the

disclosure of such breach.

    l.  euniverse's failure to cure breach **of** Merger Agreement Sections

6.3 & 6.4 & 6.5. was a key part of scheme to rig bidding in Search Auction and

sale of eUniverse. Failure to disclose the breach in the August 2005 Proxy was a

14A violation. Defendants breach and non disclosure of such breach are used to

effect the Antitrust bid rigging scheme. Defendants violated 18 U.S.C. §§ 1341

thru publishing, distributing and mailing the August 2005 Proxy omitting the

disclosure of such breach

    m.  eUniverse and CEO Rosenblatt by end of June has earmarked $25-30

million in monies the executives are not owed or entitled to which helps float his own

14

requests for consideration higher. *June 23, 2005* Email from Rosenblatt to <del>Brown on with subject matter attached "Acquisition meeting.ppt"</del> states:

*"This deal would need to be a win-win for everybody. I think we could motivate and energize the Myspace team if we took $25-30mm and put in escrow for 12-24 months. They would receive that money if they continued to build Myspace and remained at the Company. Right now, they own 20% and would receive about $20MM (due to the preference from Redpoint) if we exercised our option. If they could sell for $250mm they would receive $50mm. While they think Myspace is worth far more than $250mm, the escrow would clearly be enough incentive to keep them very motivated and want to stay on board."*

eUniverse and Rosenblatt thru use of such email violate 18 U.S.C. § 1341 &/or § 1343, and 18 U.S.C. § 1519 (relating to destruction, alteration, or falsification of records in Federal investigation and bankruptcy). Scheme is designed to bribe certain members of management to support the below fair market sale of MySpace to News Corporation while not disclosing such additional payments in the Proxy as required by Federal law.

    n.    On July 18, 2005 at 8:19PM, eUniverse's Rosenblatt uses interstate wire to email News Corporation executive, Levinsohn in violation 18 U.S.C. § 1341 &/or § 1343 to further the fraudulent scheme to sell eUniverse and Myspace below fair market value. The email indicates Rosenblatt is aware the $12.00 per share price he negotiated with News Corporation days earlier is below fair market value and is aware of the correct valuation level for internet assets including the future value Google will use to value AOL in the months ahead,

          *"Snippet of the press playa. You will be famous…now 20B"*

**BROWN v. BREWER FEDERAL SECURITY FRAUD CLASS ACTION**

    42.    Petitioner was originally part of a Federal Class Action filed in

15

Federal Court as a securities class action, titled Brown v. Brewer. However, the defendants led by New Corp management Inc. engaged in a series of coverups and struck a deal with Class Counsel to remove key evidence and claims including initiating a scheme to blatently obstruct justice by eliminating petitioner before he could submit evidence into the Federal court in 2009 which would have led to adding   claims

43.    June 17, 2010 Federal Judge King Summary Judgement states:

" Though Brewer's failure to recall what everyone had specifically asked back in 2005 would be understandable, a reasonable jury might draw a negative inference from his representation that he could not recall any discussion as to the investment banks' analyses.

Construing all of the above testimony in the light most favorable to Plaintiff as we must on Defendants' motion for summary judgment, we conclude that it is at least triable as to whether the remaining six board members consciously disregarded their duties and acted in bad faith. There is evidence in the record suggesting that no one on the board asked any questions about the requested per share price, the treatment of the competing bidders, the fairness valuations, or the relative likelihood of a Viacom bid.

A reasonable jury could infer that this evidence demonstrates the other six directors consciously abdicated their roles as corporate fiduciaries required by law to do their utmost to maximize shareholder wealth. "

"Nevertheless, we think a reasonable jury could find that the other six directors exceeded the bounds of negligent conduct, willfully proceeded to their decisions knowing they lacked material information, Gesoff, 902 A.2d at 1165, and thereby consciously disregarded their fiduciary duties. Disney, 906 A.2d at 66"

"2. Self-Interested Transaction

In the alternative, Defendants move for summary judgment on the second theory supporting the breach of fiduciary duty claim, arguing that five of the eight Defendants (a majority) were not self interested or controlled by someone who was. "

"Plaintiff argues that Rosenblatt deliberately misled the other board members regarding the viability of the Viacom bid, steering them into approving the News Corp. bid, but waited several weeks to see if Viacom would top News Corp.'s offer. (Joint Br. 26-27).

"This evidence is sufficient to raise an inference that Rosenblatt's presentation to the board may have been misleading as to Viacom's seriousness.

According to Mosher's description of the board meetings, "from the management team estimation standpoint [sic], they were not inclined to make an offer for the company on the time line that we were looking at." (Id. at 25:18-21).

" there are at least triable issues of fact as to whether Mosher was manipulated by a self interested director, Rosenblatt. Moreover, based on Mosher's description of the content of Rosenblatt's presentations to the board, the issue of manipulation is triable with respect to all of the other board members.

Accordingly, as a reasonable jury could potentially conclude that a majority of the directors was interested or manipulated by someone who was, we hereby DENY Defendants' Motion for Summary Judgment on this second basis for Plaintiff's claim of breach of the duty of loyalty.

A. Alleged Material Omissions

"current revenue and profits" omission, which was so clearly identified in the CSAC (if not so clearly in the interrogatory responses). Accordingly, as this argument was not waived, and Defendants have not made any threshold showing entitling them to summary judgment on this basis, we DENY the Motion for Summary Judgment as to this alleged material omission under Count I

Here, we conclude that there is at least a triable issue as to the materiality of the omission of Intermix's internal financial projections. Accordingly, Defendants' Motion for Summary Judgment is DENIED as to this alleged material omission.

Outstanding Derivative Lawsuits

Plaintiff also argues that Defendants failed to disclose one pending

derivative lawsuit, LeBoyer v. Greenspan, et al., No. CV 03-5603-GHK (JTL), and the fact that shareholder derivative standing would be extinguished through the action in the Greenspan v. Salzman, two derivative lawsuits pending at the time the Proxy was issued.

Defendants concede that they did not disclose the existence of the pending LeBoyer action. (Joint Br. 56 n.67).

With respect to the disclosed Greenspan v. Salzman action, Defendants argue they had no obligation to further announce the extinguishment of derivative standing.

Here too, the disclosure above is arguably misleading as well, as it did not affirmatively disclose that the Greenspan v. Salzman plaintiffs' derivative standing would be extinguished under Delaware law. (J.A., Ex. 4, at 332). Instead, it only stated that Fox Interactive Media would seek the dismissal of the action and would do so only if it was not required to pay the plaintiffs or their counsel. (Id.). Accordingly, it is at least triable whether the above language was misleading as to the extinguishment of derivative standing, which was material information.

Accordingly, we also hereby DENY Defendants' Motion for Summary Judgment as to this alleged material omission."

44. Edell & Defendants in mid-2009 launch another prong of fraudulent concealment. includes i) publication of a book by employee loyal to News Corp to fabricate the background of Jeff Edell a former Director ii) Using fabricated Edell character to conceal truth that MySpace asset sale documents were not executed until 2004. These schemes create a fraud upon the court and keep petitioner and Class members from getting benefit of fair judicial process.

45.     Defendant's leverage their relationship with acquiror to create defamatory and fabricated lies thru acquiror News Corporation employee Angwin's published in late 2009 book, 'Stealing MySpace' which fraudulently conceals the true background of former Director and Chairman Jeff Edell and his scheme with

46.    This creates further ongoing defamatory damages to Plaintiff and

Shareholders because Class Counsel accepts and uses false Edell facts in book

instead of Plaintiff's facts offered to Class Counsel in 2012 Federal Class Action in

Los Angeles Central District. Edell's false facts allow the fraudulent conveyance

Of approximately 50% of Myspace.com, the crown jewel of eUniverse, Inc. in 2004.

Further, Edell's false facts which become Acquiror News Corporation false facts,

obstruct Plaintiff's true facts from entering the record for the benefit of the Federal

Court learning the true damages and claims rightfully owed to shareholders. Plaintiff

and shareholders will continue to suffer until the defective disclosure is cured by

Defendants.  (70B Declaration, pg. 24-27, paragraphs 114-131)

47.  Additional act of fraudulent concealment is part of scheme by defendants tied

to 2009  Angwin published book that uses fabricated documents to support critical

contentions. altering, destroying, mutilating, or concealing a document with the intent to

obstruct justice in violation of 18 U.S.C. § 1512(c)(1);

48.    Petitioner a fact witness with testimony that was adverse to Defendants  was

excluded and obstructed from entering evidence into the Brown Brewer case,

immediately before Defendants plugged in Angwin's  false facts and testimony while

using "Stealing MySpace" as an uncontested source of facts  to corrupt the

Class's case And damage/expert reports.

49.  News Corporation destroyed  Petitioner testimony  from "appearing"  which

damages Petitioner and violates Section 1512(d) which  criminalizes the  actions of