"[w]hoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from" appearing before an official proceeding, law enforcement officer or United States judge

50.   Angwin fraudulently conceals evidence of Edell's true work experience and back ground and his violation of SEC rules in 2003 and 2004.   Defendants conceal their knowledge of this scheme thru the March 19, 2012 Approval of the Federal Brown Brewer settlement that Petitioner and 4 other Class members attempted to object to or intervene to remove RGRD and Jim Brown from representing the Federal Class and agreeing to An Inadequate consideration for the settlement and failure to assert more valuable claims and evidence into the Court prior to approving settlement.

51.   Angwin, Hinton, News Corporation, Hogan Lovell, RGRD, and eUniverse Defendants violate 18 U.S.C. § 1512(c)(1) and 18 U.S.C. § 1519 by hiding evidence of Edells two resignations on his bio that were really his last two jobs instead of submitting an accurate bio, defendants stretched the job of Edell that was actually 3  jobs prior, and increased this 3rd job by another 2 years, to the year 2002 (from 2000).  Edell both omits to   accomplish his end goal of making detection and disclosure of his true track record and financial history as difficult as possible.

   i.   Angwin, News Corporation, Hinton, Murdoch, RGRD, eUniverse and Orrick Conceal the false revised BIO of Edell filed in July 2004 SEC filings:

> "Mr. Edell was the Chief Executive Officer of Showorks Entertainment Group. Inc., a Delaware corporation that later changed its name to Media Technology Source of Delaware, Inc. Within two years of the time that Mr. Edell resigned from that company, it filed a petition for relief under the United States Bankruptcy Code."

52.   Defendant's scheme entailed Creating a fictitious Glowing work experience

for Edell using a fabricated Resume in 2003 that News Corporation, Hinton, Angwin,

and Murdoch determined would be used to create a portion that a book that was published called "Stealing MySpace" and was sent in US Mail to bookstores Across the United States beginning in March 2009, and overseas with the fabricated false facts related to Edell's true work Experience and his SEC violations in 2003, 2004, 2005 in violation of Rule 401, this violated section 18 U.S.C. § 1341.

53. After the Class won summary judgement in June 2010, petitioner in 2011 tried to bring new evidence to the attention of Class Counsel indicating the true damages were related to the value of MySpace's search value, the claims and facts which had never been put before the Federal Court. Petitioner's Rule 701 damage report providing for damages of over $96 billion dollars was ignored by Class Counsel who instead joined with defendants in a brazen scheme to: i) mislead and initiate a fraud upon the Court by changing the definition of the certified class to eliminate upwards of 60% of the eligible shares and shareholders and ii) enter into a sham settlement for pennies on the dollar which was accepted by the Federal Court in March 2012.

54. In September 2010, by RGRD, Baron, Hogan Lovell, Stone, News Corporation, Orrick and other Defendants filea Joint Motion to ban fact witness and Petitioner from the Federal Class to delay and harass Petitioner from appearing before Federal Judge. Defendants knew the motion to ban the petitioner could not be true unless Orrick could continue to suppress new evidence and discovery from entering the Federal Brown V. Brewer ongoing case.

55. Other Evidence destroyed by Orrick included their ties and business with MySpace Parent Company executive Chris DeWolfe. Orrick and DeWolfe work together in 2004 and 2005 to document a fabricated sale of equity of MySpace at rock bottom prices for DeWolfe.

56. In 2010, Baron and News Corporation and Hogan & Lovell, and Stone, and RGRD and Orrick violated 18 U.S.C. § 1341 (relating to mail fraud) by sending notice of the Joint Motion to Brief the "Motion to Ban Brad Greenspan" for purported "res judicata" they intended to file in Federal Court via email to Petitioner's then lawyer Mr. Lawrence.

 i. Above Defendants violated further 18 U.S.C. § 1512 (relating to tampering with a witness, victim, or an informant) 18 U.S.C. § 1513 (relating to retaliating against a witness, victim, or an informant) and 18 U.S.C. § 1519 (relating to destruction, alteration, or falsification of records in Federal investigation and bankruptcy) by omitting and destroying the evidence they possessed at the time the above actions were taken that would have provided new facts and information and claims not raised or in State proceeding and that would have the effect of voiding the defendant's motion.

 ii. RGRD, Baron, Wissbroecker violated their fiduciary duty to Petitioner as well as aiding and abetting above violations of other Defendants.

 iii. Baron & RGRD lied and fabricated briefings, pleadings, and affidavits in 2011 and 2012 to fraudulently conceal the prior criminal acts in Federal Court.

 57. In December 2010, RGRD was again disloyal by changing the Class

i.      6/8/09 – Judge King approved "Certified Class" with definition:

Most clear is position of RGRD Law at the time:

> "Plaintiff responds herein to both questions raised by the Court in its Order re: Plaintiff's Motion for Class Certification: (1) **should the class definition be modified to include only holders of Intermix Media, Inc. common stock who held continuously from July 18, 2005** (the date the merger with News Corporation was announced) through the consummation of the merger on September 30, 2005; and (2) **should the plaintiffs in the state court actions be carved out of the class definition?** As set forth below, <u>the answer to both questions is no.</u>"

ii.     12/23/10 – Certified Class is victim of definitional change by RGRD Law, inserting ulawfully, word "continuously". This cuts approximately 60% of total shares that were eligible under "Certified Class" definition.

iii.    December 2011 – RGRD challenged by Shareholders objecting[1] to Settlement denied the Class Certificate had been switched.

58.     Sony Music Corp and Seligmann using its control position on the Board of the RIAA and its relationship with EMI and Warner Music Group, induced Arent Fox to falsify his affidavit and the fact contained which were used to conceal the fact that EMI and Petitioner's startup LiveUniverse, Inc. had entered into a music text lyric license prior to Warner Music, EMI, RIAA, Sony Music, and PeerMusic filing a federal

---

[1] *Included:
-Largest shareholder of original Certified Class defined in 2009, Trafelet & Co., a multi billion dollar NY Hedge Fund which retains law firm referred by Brad Greenspan, another injured shareholder and fact witness. Brad was one of named plaintiffs in State Class action which was dismissed in 2006.
-Similar to Cut/lost shares, RGRD switched its position unlawfully, allowing Defendants to file uncontested Motion to Ban state court plaintiffs, un defended, default judgment carved out Brad's 2,900,000 shares. (Brad was the largest single shareholder, owning about 10% commons stock at time of sale.

copyright infringement complaint that claimed LiveUniverse had never entered into such an agreement in 2009.

59.  It was part of the Defendants' scheme to conspire to interfere with Plaintiff's livelihood by filing a lawsuit against Plaintiff in 2009 in retaliation for providing truthful information to the SEC, DOJ, and FTC relating to the Defendants' scheme, in violation of 18 U.S.C. § 1513(e) and (f).

60.  It was part of the Defendants' scheme to interfere with Plaintiff's livelihood by disseminating defamatory statements about Plaintiff to the public through various media outlets in retaliation for providing truthful information to the SEC, DOJ, FTC, and Federal and State court relating to the RICO Defendants' scheme, in violation of 18 U.S.C. § 1513(e) and 1513(f),

NEWS CORPORATION: CRIMINAL HACKING & BRIBERY

61.  In 2012, News Corporation, who indemnified director defendants in Brown v. Brewer and was operating the case's U.S. legal strategy, was exposed as a criminal enterprise that had hacked the phones of over 1000 UK citizens and employed a massive campaign of bribing police and public officials.

62.  News Corporation's general counsel resigned in 2011 and its CEO appearing under oath at the Leveson Inquiry admitted he was the victim of a "coverup" and all criminal acts exposed had gone on without his knowledge.

63.  News Corporation conceded its internal controls were defective as a result of the exposure of years of bribes its UK subsidiaries had paid out and hidden by falsifying its financials.

64.  At the current time, the CEO's most trusted lieutenants and top

employees are on criminal trial for obstruction of justice, bribery of government

officials, and other crimes as herein alleged.

65.    Four employees of News Corporation have already pled guilty.

66.    News Corporation, has already conceded it has no defense for the illegal acts charged and admits its internal controls were defective and the CEO didn't know what was going on and the same "coverup" News Corp claims to be a victim of was operating and responsible for the acts petitioner claims herein.

### V - CONCLUSION:

67.    Chancery Court's failure to force Defendants to honor their promise to fix the defective Disclosure in 2003 is directly responsible for allowing Defendants to steal upwards of $32 Billion in damages (Rule 701 Damage Report) from thousands of shareholders in 2005 including Petitioner.

68.    Defendants have failed to respond to a Motion 70(b) filed with Judge Strine January 2, 2014 seeking relief from the contempt of then Vice Chancellor Strine's order and ruling January 14, 2004 and the included agreed relief for any "technical violation".

## VI. CLAIM COUNTS

## COUNT # 1 –   § 1503 (A) VIOLATION

69.    Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

70.    All Defendants have violated Count #1

## COUNT # 2 - § 1503, (B) VIOLATION

71.    Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

72.    All Defendants have violated Count #2

## COUNT #3  - § 1503 (C) VIOLATION

73.   Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

74.   All Defendants have violated **§ 1503 (c)**

## COUNT # 4 –   § 1503(D) VIOLATIONS.

75.   Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

76.   All Defendants have violated Count #4

## COUNT # 5 –§ 1504 TRIGGERED PETITIONER RIGHT TO CIVIL REMEDY UNDER § 1505(F)

77.   Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

78.   News Corporation 2013 UK CRIMINAL GUILTY PLEAS "UNLAWFUL

UNDER" 1504 and 1505(f)

## COUNT # 6  - (BREACH OF AGREEMENT)

79.   Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

80.   Sony has breached The July 2003 Option agreement which stated,

>     iv.    "Pursuant to the debt financing agreements, eUniverse and VPVP agreed that in the event that VPVP does not exercise the Option within 120 days of its grant, that VPVP may, within 10 days after the expiration of such 120-day period, transfer the Option to eUniverse in exchange for a warrant (the "Warrant") to purchase 200,000 shares of the Company's Series C Convertible Preferred Stock."

81.   Sony and VantagePoint Venture Partners have further breached

>     "OPTION AGREEMENT, dated as of July 15, 2003, among 550 Digital Media Ventures, Inc. ("Seller"), an affiliate of Sony Broadband Entertainment, Inc., eUniverse, Inc., a Delaware corporation (the "Company"), and VP Alpha Holdings IV, L.L.C. ("Buyer")."

Sections 6 & 7 & 10 & 14 which state:

>     "6. Representations and Warranties of Seller. Seller represents, warrants and covenants to Buyer, as of the date hereof and as of the Closing Date, that:

(e) No Price Stabilization or Manipulation. Seller has not taken and will not take, directly or indirectly, any action designed cause or result in stabilization or manipulation of the price of any of the Shares.

7. Representations and Warranties of Buyer. Buyer represents, warrants and covenants to Seller, as of the date hereof and as of the Closing Date, that:

(c) No Price Stabilization or Manipulation. Buyer has not taken and will not take, directly or indirectly, any action designed to cause or result in stabilization or manipulation of the price of any of the Shares.

"14. Buyer May Exercise Option For Less Than All Shares. Notwithstanding any other provision herein to the contrary, Buyer may exercise the Option with respect to less than all of the Shares, but in no event less than 50% of the Shares."

10. Certain Transactions. Seller shall vote as a stockholder in favor of an investment and loan transaction between the Company and Buyer resulting in an additional investment in the Company by Buyer of no less than $5 million at a price of at least $1 per share (if an equity transaction), as approved by the Board of Directors of the Company (the "Transaction"). "

"16. Miscellaneous.
This Agreement may not be modified or amended, except by an instrument in writing signed by duly authorized officers of both of the parties hereto."

82.    Proxy notes on page 17. that on "October 31, 2003, the option term was extended to April 16, 2004 and VantagePoint partially exercised the option and purchased 454,545 shares of our Series B preferred stock from 550 Digital Media Ventures." The note an exhibit had an original term of 120 days or November 16, 2003 for VantagePoint to purchase the Sony Corp shares under the option.

83.    In Intermix 3/31/04 - 10K section 'Certain Relationships'

"On October 31, 2003, the option term was extended to April 16, 2004 and VantagePoint partially exercised the option and purchased 454,545 shares of our Series B preferred stock from 550 Digital Media Ventures. On April 16, 2004, VantagePoint exercised the remainder of the option."

84.    However, The October 31, 2003 'extended option' agreement between

Sony and VantagePoint was improper and what was not disclosed to shareholders

i) that the Orrick and defendant plan to take shareholders by losing the value

of the deal which called for Issuer to have the right to purchase 100% of the Sony

'Option Shares' after January 16, 2004 as part of an agreement that would transfer

200,000 Series B Warrants of Issuer to VantagePoint and ii) The October 31, 2003

'extended option' actually acted as a way that Orrick and defendants sought to avail

themselves of the 19.9% nasdaq and other exchange limits that required Issuer to

have a shareholder vote prior to approving any issuance of stock of Issuer including

an issuance of stock as part of an integrated deal that shifted more then 19.9% of

Issuer's stock to new party.

## COUNT # 7 - ("INSEPARABLE FRAUD") VIOLATION

85.    Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

86.    All Defendants have violated Count #7

## COUNT #8 —PAREXEL TYPE FRAUD VIOLATION THRU FAILURE TO DISCLOSE "COMPLIANCE FAILURES"

87.    Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

88.    All Defendants have violated Count #8

## COUNT #9 – RULING BASED ON DELAWARE STATUE AND CODE 1304 THAT 2004 MYSPACE TRANSFER AND 2005 TRANSACTIONS "FRAUDULENT"

89.    Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

**90.    § 1304. Transfers fraudulent as to present and future creditors.**

## COUNT #10 – VIOLATION OF DODD-FRANK WHISTLEBLOWER STATUTE – SECTION 922) &18 U.S.C. §1513(E))

91.    Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

the Dodd Frank Whistleblower Statute. Mr. Greenspan is entitled to a private cause of

action for whistleblowers alleging retaliatory discharge or other discrimination. Id. §

78u-6(h)(1)(B)(i). Relief includes Right to Jury Trial, reinstatement, double the back

pay owed, and costs and fees. Id. § 78u-6(h)(1)(C).

      i. Damages including loss of employment and Chairman Director

position from Myspace Parent company in 2003 under 15 U.S.C. § 78u-6 ("Section

922") and loss of Director employment under the same statues. Petitioner reported

information concerning Defendant's breach of fiduciary duty, disloyalty, and violation

of Section 10(b) of the Exchange Act when he resigned as CEO on October 30, 2003.

Petitioner reported information concerning Defendant's breach of fiduciary duty,

disloyalty, and violation of Section 10(b) of the Exchange Act when he resigned as

Director in December 2003.

      Mr. Greenspan was terminated for two reasons: (i) in retaliation for reporting

misconduct of Brewer, Edell, Lipp, and other Defendants; and (ii) to stop the CEO from

terminating, demoting or decreasing the compensation of Brewer, Edell, Lipp, Moreau.

iii) The CEO's refusal to sign a Board created settlement agreement during the week of

October 30, 2003 which would have prevented Greenspan from contacting other

shareholders or regulators and disclosing the breach of fiduciary duty or other security

violations the Board and certain executives had committed in the process of

consummating the VantagePoint Series C

Financing in October 2003. The acts had been committed by Defendants

PETITIONER ALSO HAS CLAIMS AGAINST SONY

ix.     Sony Corp executives, Defendants in this Complaint, abused their

fiduciary duty to Issuer by misleading the Public and shareholders as part of

assisting Defendant's scheme to take control of eUniverse, Inc. in 2003 and get

approval and entrench Defendants as a result of the January 2004 Annual Meeting

and Proxy Battle against Petitioner.

x.     Sony Corp Defendant's possessed a critical Board Seat Nomination

legal right the Series B Stock possessed. Sony Corp nominated Edell as the Series B

Stockholder in 2004 even after evidence in Delaware Court showed Edell and

Defendants had mislead shareholders by Filing multiple defective and false proxy

statements to Issuer's shareholders in 2003 and 2004.

xi.     As a Result of the applicable Defendant's involvement in the above-

described  conspiracy and conspiratorial scheme, the Plaintiff has suffered severe

emotional, financial, mental, and physical harm and other deleterious effects; been

unfairly disadvantaged in multiple civil lawsuits initiated against him by several of

the Defendants and other parties; had his freedom of speech severely impinged;

been forced to spend hundreds of thousands of dollars on legal fees; been forced to;

And had his personal and professional reputation severely and permanently

damaged. Based upon information and belief, some of the Defendants are

continuing to engage in the above-described conspiracy and conspiratorial scheme

even though they are well aware of the devastating toll that their prior conspiratorial actions have already taken to Issuer and Issuer's remaining classified assets.

## COUNT # 11 - BLASIUS VIOLATION

93. Plaintiff incorporates by reference and realleges each allegation set forth above.

94.    All Defendants are charged with Count #11

## COUNT # 12 - CONTEMPT VIOLATION

95.    Plaintiff incorporates by reference and realleges each allegation set forth above.

96.    Defendants lied to Court regarding Defendant's Proxy disclosure related to

Edell. Defendant's Failure to "make this right" as claimed by Defendant

Delaware counsel is worthy of Contempt violation.

## COUNT # 13 - RULING CERTAIN TRANSACTIONS AFTER OCTOBER 17, 2003 ARE VOID.

97. Plaintiff incorporates by reference and realleges each allegation set forth above.

98.    Plaintiff effects 3-1-1 approval of properly noticed Director slate on October

17,2003. Defendants fraudulently concealed such properly noticed slate.

Defendant's have also not legally effected a valid closing or vote on the Series C stock

sale or transfer from Sony of their Series B shares, blocking public issuer's option

received in three way agreement between Sony, VantagePoint, and public issuer in 2003.

The crooked dealings expand when Orrick uses its insider knowledge to produce a

commercial benefit for VantagePoint while having Issuer pay 100% of the cost by

paying off Sony debt earlier than due.

## COUNT # 14 – VOID Defendants right to EXCULPATION UNDER 102(B)(7)

99.   Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

100.   Defendant Directors right to Exculpation because of Judge King ruling finding "bad faith" and disloyalty must be void.

## COUNT #15 – RULING CERTAIN TRANSACTIONS AFTER October 17, 2003 are Void.

101.   Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

102.   Plaintiff effects  3-1-1 approval of properly noticed Director slate on October 17, Defendants fraudulently concealed such properly noticed slate. Therefore, Defendant's have also not legally effected a valid closing or vote on the Series C stock sale or transfer from Sony of their Series B shares, blocking public issuer's option right to rebuy the shares for benefit of common stock shareholders received

in three way agreement between Sony, VantagePoint, and public issuer in 2003.

103.   voids Blasius Directors compensation post Blasius event

104.voids VantagePoint financing tranche I on October 31, 2003

105.voids VantagePoint financing tranche 2 on January 24, 2003 which was subject to shareholder vote of items in Blasius Proxy created by Blasius Directors.

106.Plaintiff awarded damages to stock owned equal to the dilution caused by Blasius Directors and Blasius Proxy.

107. Plaintiff awarded Expectency damages as Proxy Slate backer damaged by Blasius Directors and Blasius Proxy.

108. Award to competing Proxy slate compensation as if Slate Directors had not been

COUNT #14 - VOID DEFENDANTS RIGHT TO

ction of Brasius violation by defendants

## COUNT #16  INDEMNIFICATION AND ADVANCEMENT CLAIMS

109.  Plaintiff repeats and realleges the foregoing paragraphs as set forth herein

110.  PLAINTIFF RIGHT TO INDEMNIFICATION  AND ALSO RIGHT TO IDEMNIFICATION FOR ADVANCEMENT LEGAL FEES. INCLUDING ALL MATTERS OR EVENTS OR FACTS CITED☐

111.  Plaintiff was Director and Officer at Issuer that owes Plaintiff benefit of  "contract

rights" defined in Section 7 of Issuer Bylaws for  Indemnification and Advancement:

"The rights conferred upon indemnitees in this ARTICLE VIII shall be contract rights
and such rights shall continue as to an indemnitee who has ceased to be a director,
officer or trustee and shall inure to the benefit of the indemnitee's heirs, executors and
administrators." (Exhibit 1,Article VIII  Section 7.  Nature of Rights )

112.  Plaintiff 's "Right to Indemnification" is entitled to: i)  "indemnification" to

"fullest extent  authorized  by the Delaware General Corporation Law" or "broader

indemnification rights"[2]:

113.  Plaintiff is also beneficiary broader protection compared to Del 145 statue limits[3]

114.Indemnitee in addition to being an Officer, was Director and due benefit of Issuer's

Eighth Bylaw broadening scope of Indemnification and Advancement rights:

"*EIGHTH:* Directors of the Corporation shall not be personally liable to the Corporation
or its stockholders for monetary damages for breach of fiduciary duty as a director,
except for liability (i) for any breach of the director's duty of loyalty to the Corporation
or its stockholders, (ii) for acts or omissions not in good faith or which involve

---

[2] "shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the
Delaware General Corporation Law, as the same exists or may hereafter be amended (but, in the case of
any such amendment, only to the extent that such amendment permits the Corporation to provide broader
indemnification rights than such before amendment, to provide prior to such amendment)," (Article VIII Section 1;Exhibit 1)

[3] "any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a
"proceeding")" (Exhibit 1 eUniverse Article VIII Section 1. "Right to Indemnification")

intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit (emphasis).

**INDEMNIFIED FOR "ALL EXPENSE, LIABILITY, AND LOSS" "SUFFERED"**

115. Indemnitee "contract" right is Mandatory advancement. Plaintiff is not

limited by standard Delaware 145 Permissive advancement limitations such as allowing

"terms and conditions" to be set that a "corporation deems appropriate".

116.  Petitioner seeks to be indemnified for following:

   (a1)  Damages and impact on Indemnitee from fabricated dividend or fraudulent conveyance of 33% of Myspace.com to insiders initiated in November 2004.

   (a2)   Damages and impact on Indemnitee from void October 31, 2003 Certificate of Designation of Series C Preferred Stock, void Series C Preferred Stock sale, void Series C Directors, void January 2004 Annual Shareholder meeting, void sale of Skilljam.com,

   (a3)   Damages and impact on Indemnitee from void  February 2005 sale to RedPoint Capital of 25% of Myspace, Inc. stock.

   (a4)   Damages and impact on Indemnitee from void name change by eUniverse, Inc. to Intermix, Inc.,  and sale of eUniverse, Inc. aka Intermix, Inc.  to Defendant in September 2005.

   (a5)   Damages and impact on Indemnitee from void issuances of stock and options to certain Officers and Directors after October 30, 2003.

   (a6)   Damages and impact on Indemnitee from fraudulent concealment by Defendants of valid October 17, 2003 Annual Slate of Directors being validly nominated for Annual Shareholder meeting with a shareholder record date of October 23, 2003.

   (a7)   Damages and impact on Indemnitee from void News Corporation 2005 purchase of eUniverse, Inc. since indemnite owned 30% of eUniverse, Inc.

   (a8)   Damages and impact on Indemnitee from lost $900 million Google Search Commerciial  agreement.

   (b1)  Damages and impact on Indemnitee's January 2004 conflicted "search

Intermix, Inc. and Intermix's june 2005 reply and actions.

(b3)    Damages and impact to Indemnitee thru Carlick June 2005 fraudulent concealment while Carlick controlled Manatt Law firm misled & manipulated NYAG to investigate Indemnitee

(b4)    Damages and impact to Indemnitee and Expectancy Damages from Indemnitee's $13.50 Counter Offer to Purchase Intermix, Inc. and Myspace Inc

(b5)    Damages and impact to indemnitee and Expectancy Damages from Indemnitee's failed online music lyric text community website venture after and as part of Sony facilitated November 30, 2012 Warner Music Group "PeerMusic" lawsuit against Indemnitee.

(b6)    Damages and impact to indemnitee and Expectancy Damages from Indemnitee's failed buyout of publicly traded Delaware Incorporated Answers.com in 2011.

(b7)    Damages and impact to Indemnitee and Expectancy Damages from Indemnitee's failed buyout of subsidiary of publicly traded Delaware Corporation, Washington Post Corporation in 2013.

(c1)    Damages and impact to Indemitee and Expectancy Damages from preventing Indemnitee from entering Rule 701 Damage Report into Federal Court in Los Angeles in 2011 and 2012.

(c2)    Plaintiff did not receive $2.75 per share despite having qualifying stock Held of over 2,900,000 shares.

Plaintiff as shareholder was damaged by reason that Plaintiff was Director and Officer of eUniverse, Inc. Plaintiff was obstructed from puttingRule 701 Damage Report into Federal Court before the December 31, 2012 final Disposition.

COMPLAINT FOR DAMAGES

Requiring disgorgement and/or imposing a constructive trust upon Defendants' ill-gotten gains, freezing Defendants' assets, and/or requiring Defendants to pay restitution

to Plaintiff and to all members of the class of all funds acquired by means of any act or

practice declared by this Court to be an unlawful, unfair, or fraudulent.

## VIII - RELIEF REQUESTED

A.  WHERFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in its favor and in favor of the Class and against the Defendants as follows:

B.  Awarding Plaintiff appropriate damages including compensatory damages, together with pre- and post-judgment interest;

C.  Awarding Plaintiff the costs, expenses and disbursements of this action, including any attorneys' and experts' fees and, if applicable, pre-judgment and post-judgment interest; and

D.  Awarding Plaintiff such other relief as this Court deems just, equitable and proper.

Dated: April 16, 2014

_____

Brad D. Greenspan (SEAL)


_____

EXHIBIT #1



Brad D. Greenspan
264 South La Cienega Blvd.
Suite 1236
Beverly Hills, CA 90211

Case C.A. No. 106-VCS
Greenspan v. Brewer, et. Al.

Dear Honorable Chief Chancellor Strine

Attached for your consideration under Exhibit A herein is a Motion 60(B)(6) requesting the case be re-opened to allow for the merits of a Motion for Contempt 70(B) to be considered, along with the other relief your ruling explicitly allowed for under the ruling and statements you made during the hearing in January 2004 (A transcript of the hearing is attached as Exhibit #9 of Declaration in support of Motion 70(B) , specifically a Motion to Conform the Evidence, and a Motion for Judgment on the Pleadings.

While several years have gone by since the case was closed in 2004, I believe it is meritious for The Chancery Court to accept the Motion 60(B)(6) that attaches as exhibit Motion (70)(B) for filing along with the other documents.

First, procedurally, I followed the precedent and sequence for such an action from your decision in C.A. No. 4780-VCS (WIMBLEDON FUND LP – ABSOLUTE ) RETURN FUND SERIES v. SV SPECIAL SITUATIONS FUND, February 2011), in which you stated in the ruling,

"the way for a party to obtain relief from a final judgment is for it to file a motion in this court under Court of Chancery Rule 60(b)."

Second, because the underlying facts of the Motion for Contempt 70(B) involve fraudulent concealment by the defendants of the scheme that the motion seeks relief from, the amount of time that has passed should not bar this Motion from being accepted by the Court to consider.

Specifically, the evidence discovered to pierce the fraudulent concealment scheme only became available after: i) the defendants as part of the scheme published a book in 2009 calling "Stealing MySpace" with false facts in an attempt to further the fraudulent concealment which began in Chancery Court after your ruling and findings in 2004.

The defendants then induced the Plaintiff Class Counsel RGRD Law to substitute the false facts from the defendant's published book in place of my evidence I was seeking to submit into the Los Angeles Central District Federal Class Action Security Fraud case (Brown v. Brewer, which consolidated 2005 events and claims surrounding the September 30, 2005 Cash sale of eUniverse, Inc which had changed its name to Intermix to acquiror News Corporation, and certain 2003 claims related to the restatement eUniverse had experienced ). Therefore, I was a member of the Class of Plaintiff shareholders in regards to the 2005 claims, but a potential defendant Director in regards to the 2003 claims from the restatement.

A fight broke out as I sought to alert other shareholders of the Class to the fact that Plaintiff Class Counsel had turned into a "renegade" suddenly sprinting to settle the claims for .07 cents on the dollar

the Federal Judge King's March 2012 Summary Judgment finding in favor of the Plaintiff Class of which I am a member of the certified class, and disregarding the underlying public claim, Judge King's Summary Judgment focuses only on the 2005 matters.

Both myself and the second largest member of the certified class, an institutional stockholder Trafelet & Co, a NY hedge fund, then attempted to object to the inequitable Settlement fashioned by RGRD Law. Further, I tried to intervene to stop the settlement and get the Federal Court in Los Angeles to review the new evidence covered up by defendant's fraudulent concealment and fraud on the Chancery Court evidence and matters that I had discovered by March 2012.

While I was forced because of monetary constraints (and the breach of a 2007 Common Interests Agreement I signed with RGRD Law) to file pro se, I was not allowed to intervene to inject the newly discovered facts, and the Federal Class Action Security Fraud class action had its final disposition with the December 31, 2012 distribution of $45,000,000 in settlement proceeds to the Class

However, my alerting the other Class members led to  Trafelet & Co's retained lawyer being allowed to intervene at which time we discovered that RGRD Law had initiated a scheme to change the definition of the certified class in the settlement documents which effectively removed 60% of the eligible shares for participation in the settlement (RGRDLAW changed the legal definition of the Class in the 2012 settlement documents from the previous May 2009 definition which the federal court certified allowing anyone holding shares as of July 18, 2005 thru September 30, 2005 (date of consummation of the merger) to receive a share of settlement proceeds, to instead a new different legal definition which RGRD Law printed in the 2012 settlement documents which injected the word "Continuously" as a qualifier. RGRD Law had a copy of the 13-F SEC list of institutional holders which they had sent me in 2007, and realized by simply adding this one qualifying word, 60%+ of the eligible shares would be cut out because 80%+ of the institutional shareholders holding shares on July 18, 2005 when the merger was announced, sold their shares before September 30, 2005 when the company announced they would not entertain the competing $13.50 bid I had publicly announced (and in which I was fronting for Viacom, Inc. a rival bidder, who was not given a chance to bid and such scheme discussed by Judge King in his 2010 summary Judgement ruling.  Thus the Federal Judge could not consider the facts and evidence including my emails with Viacom, their desire for me to keep their involvement in my bid anonymous unless the Company agreed to delay the September 30, 2005 shareholder meeting to approve the sale to News Corporation.

My alerting the other class members resulted in Trafelet & Co. first discovering that they were in fact not eligible to receive any of the award because they had sold all 3 million of their shares before consummation of the merger September 30, 2005, and  working with a boutique law firm in Los Angeles such effort caused the Federal Judge to reject the first Settlement terms. While Judge King noted in his ruling rejecting the first Settlement terms, that it was "odd" that RGRD Law in 2009 had fought to create a certified class that included the type of shares held by Trafelet & Co and that in 2012 RGRD Law was now fighting jointly with the Defendants to claim "continuous" holding of the shares thru the date of the September 30, 2005 consumation was necessary to be a member of the newly defined certified class that RGRD printed in the settlement documents.

Judge King appeared exhausted by the proceedings and not desirous to take action on RGRD's breach of its duty of loyalty, fiduciary duty to the Class members, fraudulent concealment of new evidence, and fraud upon the Court (all of which I sought to be reviewed and considered by the Court in my intervention filings and 60b3 motions which the Court rejected to be heard because more than 12 months since the default judgement banning me as a member of the Class that  I sought to vacate had passed) and approved a March 2012 2nd Settlement structure in which RGRD admitted Trafelet & Co.

was a member of the certified class but had shares which were not as valuable as the Continuous ........ held a smaller ........ ........ 35? ? ......... Continuous were also members of the 70 certified class

During this time, I became aware of one of the underlying reasons for RGRD Law's misdeeds. RGRD was sanctioned in 2008 in Chancery Court as part of the findings and rulings of (SS&C TECHNOLOGIES, INC. C.A. No. 1525-VCL). However, RGRD fraudulently concealed this sanction from me and never disclosed it to the Federal Court in Los Angeles. This was because the defendant in the Brown v. Brewer case was represented by Latham Watkins (although Latham directly represented the defendants in the California State Class Action which was dismissed at demurrer stage in 2006 before discovery was reviewed by myself and new findings and claims were created from such discovery that I subsequently shared with RGRD in 2006 which was then filed as part of the Federal Class Action Security fraud claims, Latham wisely allowed Hogan Hartson to sub in for Latham during the Federal Class action), the law firm that was opposite RGRD In SS&C.

Thus, RGRD was induced to turn 'renegade' against the interests of myself and the other Federal Class members because Latham was willing to pass on launching a new set of claims against RGRD and significant new liability for RGRD (using the findings the Vice Chancellor hints at in the SS&C Sanction ruling) that may have terminated RGRD's ability to practice law. RGRD also wanted a piece of the $45 million dollar settlement and Latham's silence on informing the Federal Court that RGRD was fraudulently concealing notice and disclosure of its Sanction from Chancery Court, allowed RGRD to remain as Class Counsel. Noting that I was unaware initially of the SS&C Sanction matter when I began in 2009, sending emails to RGRD indicating I was seeking to have them removed as Class Counsel after they did a joint motion to ban me as a Witness and so my new evidence (May 2009) after I informed them I would submit new evidence into the record I had discovered and had agreed to be subpoened by Defendant's counsel Hogan Lovell and submit such new evidence imminently

ii) The additional critical evidence that caused me to purchase and review the 2009 "Stealing Myspace" book that RGRD used as the false facts injected into the Federal Court Summary Judgment, as well as the impetus for a below fair market settlement of the case in 2012, was the ongoing Federal Class action HiTech Employees v. Google, Apple, et. Al I discovered existed in 2012 (the class action had been filed in San Jose Federal Court in late 2011). After purchase of the "Stealing Myspace" book I discovered references to interviews with Jeff Edell at the back of the 300 page book (after seeing reference to use of "Stealing Myspace" by RGRD Law in the post 2010 Summary Judgement underlying summary of facts documents I reviewed after being forced to stop my internet business (my full time job at the time) and become "Active" as a class member that became aware RGRD had gone 'renegade' and the entire Shareholder Class's rights and claims were exposed and likely to be lost or severly diminished unless I personally became "active".

Only after launching a new investigation of "Jeff Edell" because the "Stealing Myspace" book underpinned its facts from the interviews with Edell, did I get access to an original D&O Questionaire that Edell had filled out in 2003 and submitted to the Nominating Committee of the eUniverse Board (of which I was not a member).

It was this evidence of fraud that is at the heart of the 70(B) motion and is part of the Exhibits that proves clearly a new crime of Fraud Upon the Chancery Court (along with other equitable claims).

Additionally new evidence disclosed in discovery in Hitech Employees v. Google only became available in May 2013 (when disclosed in that case's attempt to Certify its Class), and such new evidence connects Director Carlick with being a party to secret bilateral agreements that Defendants in

were formed in 2004 and 2005. As Carlick was a Director of AskJeeves Ltd which
had a co-bilateral that Google should be penalized for its unlawful and illegal agreement
With Google (and Google had signed a Settlement admitting as such with the Department of Justice in
late 2011). Carlick was simultaneously a Director of eUniverse and his firm was control shareholder
after using Edell to help take control and win the 2004 Proxy vs. my competing Proxy bid.). Thus
Edell's continuation of the fraud started in Chancery Court, discovered by Chancery Court, and then
doubled up on by defendants, was the key scheme of the fraudulent concealment that the 2009
"Stealing Myspace" book accelerated, and underpinned RGRD Law's claims to the Federal Court in
Their 2012 joint bid telling the Federal Court that my claims I sought to inject into the Court were
lacking in credibility.

Therefore, unless the Chancery Court provides the relief I am seeking, I can never recover my
credibility versus the fabricated Director Edell scheme that the Motion 70(B) seeks to lance.

Further, unless the Chancery Court re-opens the matter under its right to do so via 60(B)(6), then
The Chancery Court will be allowing Defendants including Delaware defense counsel to lie to the
Court and completely disregard the Court's rulings when they are made.

Therefore, I urge your consideration of the facts included in the attached Motions and appeal to your
sense of equitableness in allowing these Motions to be filed in the Chancery Court despite the time
since the matter was closed. I also note that because my Slate of Directors was nominated rightfully
October 17, 2003 before I resigned as Chairman and CEO, and the Defendants fraudulently concealed
this fact from the Chancery Court and the public, doesn't provide a cure for the VOID actions
defendants took after such date, nor does it provide a cure for the VOID actions the defendants took
after thumbing their nose at the Chancery Court ruling in January 2004 (and fraudulently concealing
from the Chancery Court in July 2004 at which time the Court entertained an award of legal fees but
only granted in part because defendants were fraudulently concealing the aforementioned matters which
are detailed fully in the underlying Motions).

Sincerely,

Brad D. Greenspan

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

BRAD D. GREENSPAN,

      Plaintiff,

      v.

BREWER, et al.

      Defendants.

C.A. No. 106-VCS

---

**NOTICE MOTION IN CONTEMPT**

Now comes the Plaintiff's Motion for contempt under 70B and moves the Court for an Order requiring

Defendant(s) to appear before Chancery Court and answer as to why Defendant(s) have failed to comply with

the prior Orders of this Court and to show cause why should not be punished for Contempt.

TO: Brett Brewer, Jeffrey Edell, Bradley Ward, Larry Moreau, Dan Mosher, David Carlick, Andrew Sheehan,
VantagePoint Partners, eUniverse, Inc., successor: News Corporation & 21st Century Fox, Inc.
Registered Agent
The Corporation Trust Company
Corporation Trust Center
1209 Orange St.
Wilmington, Delaware, 19801

PLEASE TAKE NOTICE that the attached Motion will be presented to the Court by **Brad Greenspan Plaintiff** at

the convenience of the Court.

_____

**Brad Greenspan**
264 South La Cienega
#1236
Beverly Hills, CA 90211
Ph: 310-345-1983

Dated: 12/24/2013

NOTICE OF MOTION OF CONTEMPT 70(B)

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

BRAD D. GREENSPAN,               )
                                 )
        Plaintiff,               )
                                 )
        v.                       )    C.A. No. 106-VCS
                                 )
BRETT BREWER, et al.             )
                                 )
        Defendants               )
                                 )
                                 )

**MOTION FOR CONTEMPT 70(B) 42(B) AND/OR  60(B)(3)**

I    INTRODUCTION...................................................................................................pg.3

II    SUMMARY OF ALLEGATIONS.........................................................................pg. 4

III    ARGUMENT.........................................................................................................pg. 5

A.    DEFENDANTS WILLFULLY IGNORED
WARNINGS  AND MULTIPLE NOTICES..................................................................pg. 6

B.    COURT PROVIDES RECOMMENDATION
THAT DEFENDANTS OPTED TO IGNORE............................................................pg. 6

C.    BOTH DELAWARE COUNSEL AND
DEFENDANT BROKE PROMISE TO COURT........................................................pg. 7

D.    DEFENDANTS IGNORED FIDUCIARY DUTY
TO HONOR OCTOBER 17, 2003 DULY ELECTED PROXY SLATE...................pg. 8

E.    DEFENDANTS PASS ON FRAUDULENTLY CONCEALED
EDELL DISCLOSURE VIOLATION TO ACQUIROR NEWS CORPORATION.......................pg. 8

F.    SONY IS CONFLICTED AND HAS INFLICTED
MULTIPLE PREDICATE ACTS...................................................................................pg. 9

G.    FRAUDULENT CONCEALMENT USED TO DISCREDIT PLAINTIFF IN 2009
NATIONALLY PUBLISHED NOVEL AND TO FURTHER UNLAWFUL SCHEME.................pg. 9

H.    DEFENDANT'S "BAD FAITH" & "DISLOYAL" FINDINGS AND ACTS DAMAGING
SHAREHOLDERS IN FEDERAL  2010 SUMMARY JUDGMENT RULING WERE CAUSED
BY FAILURE OF CHANCERY COURT TO FORCE DEFENDANTS TO FIX 2004
DEFECTIVE DISCLOSURE.............................................................................pg. 10

IV    CONCLUSION........................................................................................pg. 10

I.  DEFENDANTS FAIL TO CURE RULE S-K ITEM 401 (F) VIOLATION........................pg.  10


**COMES NOW** the **Plaintiff** acting on **his** own behalf, hereby moves this Honorable Court to enter Judgment on

the Pleadings in **Plaintiff's** favor and offers in support the following:

## I - INTRODUCTION

1.     The Plaintiff moves the Court to find Defendants in contempt under 70(B),

42(B) and/or 60(B)(3). Additionally, Plaintiff requests Court to sanction Defendants $25,000 per day

since Chancery Court January 2004 hearing that "corrective disclosure" ordered by then Vice Chancellor

Strine was not undertaken by Defendants and such per day sanction to continue until Defendants provide

proof to the Chancery Court that "corrective disclosure" has been made to the public.[1]

2.     During January 2004 trial, then Vice Chancellor finds Defendants guilty of Proxy

Disclosure Violations.

    i.     "clearly, Mr. Edell was not validly elected to a Series B slot on October 6th.  He just wasn't
He could not have been appointed to the Board to a Series B slot."(70B Declaration,
Exhibit# 9, pg.63)

    ii.     "It's even odder when it's supposed to be retroactive to October 6th, especially when as of
October 6th, as I understand it, Mr. Edell hasn't even agreed to be on the board."( 70B
Declaration, Exhibit# 9, pg.63)

    iii.     "As of October 6th, I have got to say, I really -- I think Mr. Lipp basically said the board had
no idea that is was slotting him in a Series B. I think there is a great deal of record evidence--
it's not a big record, but what record evidence there is suggests that the board wasn't really
thinking about putting him in as a Series B director but thought Sony was simply waiving its
right."( 70B Declaration, Exhibit# 9, pg.63)

    iv.     "It's a very strange -- I mean, I have got to say--I will say this on the record.  I'm very
dubious about the validity of this election, and there is a certainly that has to be
done around electing people.  And I mean, is this a proxy?" ( 70B Declaration, Exhibit# 9, pg.63)

    v.     "It's not really, I guess, my job to be Director of Hygiene for eUniverse, but now that very
competent Delaware counsel has been engaged to assist the company, I mean, it's pretty
common knowledge that the board of directors has to approve the actual certificate of

---

[1] In Gallagher v. Long, the Delaware Supreme Court stated, "[a] trial judge has broad discretion to impose sanctions for failure
to abide by its orders," so long as the sanctions are "just and reasonable."

designation amendment that's being proposed. And you know-- and this isn't the first dot com kind of company that's tried to be a bit innovative." (70B Declaration, Exhibit# 9, pg.63)

    v.     "There is a certain elegant order in things. You have to -- the board has to approve it. And they have to approve it in the form they are proposing. Then the stockholders have to do it."
<div align="right">(70B Declaration, Exhibit# 9, pg.63)</div>

    vi.    "The Court: "I have a disclosure violation here," (70B Declaration, Exhibit# 9, pg.63)

## II – SUMMARY OF ALLEGATIONS

3.     Defendants, VantagePoint, and Orrick are guilty of Fraud upon the Chancery Court thru first

trying to mislead then Vice Chancellor Strine that Proxy disclosure is factual. Next caught in multiple lies

before the court, defendants agree to fix defective disclosure and fail to do so.

4.     Vice Chancellor Strine further discovered the certificate of designation amendment was

never approved by Board:

> "THE COURT: Has the board actually voted upon, Mr. Teklits, a final copy of the certificate of designation amendment?
>
> MR. TEKLITS: There was some confusion. We had done it with Mr. Lipp, Your Honor. Sony would not consent to an amendment that didn't require Vantage to exercise over 50 percent. They didn't want Vantage to exercise one share and they would lose their right to the seats. I'm not sure what was attached to what.
>
> THE COURT: It's not really, I guess, my job to be Director of Hygiene for eUniverse, but now that very competent Delaware counsel has been engaged to assist the company, I mean, it's pretty common knowledge that the board of directors has to approve the actual certificate of designation amendment that's being proposed. And you know-- and this isn't the first dot com kind of company that's tried to be a bit innovative." (70B Declaration, Exhibit# 9, pg.63)

5.     Omission of Edell's bankruptcy in Proxy statements is violation of: Rule S-K Item 401 and

Rule S-K Item 401 (f). (70B Declaration, pg.19-21, paragraph #s 94-103)

6.     Defendants aware the January 2004 Proxy was defective, fraudulently concealing

Edell's work experience, ignore then Vice Chancellor Strine ruling, don't cure the defects and make more

<div align="center">4</div>

disclose violations in order...............control of a...and shall control and publicly traded or Univers...and

7.    Sony Corp is guilty of aiding & abetting Edell  and defendants to violate SK Item 401 and defame Plaintiff and Plaintiff's competing slate of Directors in January 2004 Proxy contest.

8.    Defendants & their Counsel are guilty of Fraudulently concealing Edell's background in 2003, 2004, 2005, 2009, 2010, and 2012, resulting in damages to Plaintiff and shareholders, as well as fraud upon the Chancery Court in Delaware and the Federal Court in Los Angeles Central District because Defendants induce Shareholder Class Counsel to substitute fabricated facts from fabricated Director Edell instead of Plaintiff's true facts.

## III – ARGUMENT

9.    Under Court of Chancery Rule 70(b), this Court may find a party in contempt when it fails to obey a Court order of which it had knowledge. [2]

10.    The moving party is not required to show that the violation was willful or intentional, but the intentional or willful nature of a contemnor's acts may be considered in determining the appropriate sanction.[3]

   i.   Scienter of Defendants is supported by (70B Declaration, pg.4-22, paragraph #s 20-103)

11.    A party moving for a finding of contempt bears the burden of establishing by clear and convincing evidence that a court order was violated. If the movant makes that showing, the burden then shifts to the contemnor to show why it was impossible to comply with the order or why.[4]  ...........

---

[2] Court of Chancery Rule 70(b) supplies this court with the power — and broad latitude — to remedy violations of its orders.
[3] 27 Mother African Union First Colored Methodist Protestant Church v. The Conference of African Union First Colored Methodist Protestant Church, 1998 WL 892642, at *6 (Dec. 11, 1998).

[4] State ex rel. Oberly v. Atlas Sanitation Co. Inc., 1988 WL 88494, at *2 (Del. Ch. Aug. 17, 1988) ("[O]nce the party with the burden of proof has introduced evidence from which a fact finder could conclude that he has established a prima facie case, then the burden of going forward with the evidence shifts to the alleged contemnor to . . . [show] it was impossible to comply with the court order."); see Rolex Watch U.S.A., Inc. v. Crowley, 74 F.3d 716, 720 (6th Cir. 1996); F.T.C. v. Affordable Media, 179 F.3d 1228, 1239 (9th Cir. 1999); see also AM. JUR. 2D Injunctions § 321.

12.    Defendants based on precedential Delaware rulings, should be sanctioned and fined.

13. January, July 2004, & August 2005 Proxies omit key facts rendering them defective and void.

**A.    DEFENDANTS WILLFULLY IGNORED WARNINGS AND MULTIPLE NOTICES**

14.    Warnings by then Vice Chancellor Strine included:

i.    "But you can get this stuff fixed out or you put me in a position where I have got some sort of -- this is low hanging fruit". (70B Declaration, Exhibit# 9, pg.63)

ii.    "I don't have to say these words and you don't have to go fix them or call your client." (70B Declaration, Exhibit# 9, pg.63)

iii.    "the way the board purported to fill it was invalid."(70B Declaration, Exhibit# 9, pg.63)

iv.    "You may need to do corrective disclosure to begin with, because of this"( 70B Declaration, Exhibit# 9, pg.63)

v.    "Then I have a disclosure violation here," (70B Declaration, Exhibit# 9, pg.63)

vi.    "real problem that I may have to take some notice of".(70B Declaration, Exhibit# 9, pg.64)

vii.    "could I plead with the Delaware lawyers for the company that if we are going to get -- if you are going to get a consent from Sony, craft it.  I mean, it's one thing Mr. Shannon and Mr. Walsh -- it's one thing if you want to do a Blasius thing. You know, you don't want to walk in here again with some sort of technical problem," (70B Declaration, Exhibit# 9, pg.64)

viii.    "You know you probably have to amend your proxy statement, then." (70B Declaration, Exhibit# 9, pg.64)

ix.    "make sure you get it done right" (70B Declaration, Exhibit# 9, pg.64)

x.    "the company amends its proxy statement" (70B Declaration, Exhibit# 9, pg.64)

xi.    "You clean that up" (70B Declaration, Exhibit# 9, pg.64)

**B.    COURT PROVIDES RECOMMENDATION THAT DEFENDANTS OPTED TO IGNORE**

15.    Then Vice Chancellor Strine tips to avoid Blasius and Disclosure violations ignored:

i.    "I can't help but observe the other thing, which is if this -- if the company --if the

---

5 (GEORGE LITTERST v. ZENPH SOUND INNOVATIONS, INC., C.A. No. 7700-ML,2013) Because First State and CAMI failed to comply with paragraphs 3 and 5 of the PI Order, IDB is entitled to an order holding First State and CAMI in contempt and imposing an appropriate sanction. This Court has broad discretion in formulating a remedy for violations of its orders.6 As part of its broad remedial powers, the Court may impose a fine, for example, to coerce a non-complying party to cease improper conduct.

incumbent board. He probably — then if you all had the commitment and you preferred voting together to elect a majority even now, which I don't know to be the case – but if it were and you said, "Let's have a showdown. We have a large stockholder. We have a disagreement. Vantage is in here. Let's have the showdown in the OK Corral. We want Mr. Edell to be on the board." Well, there is an obvious way to do that. Right? And if you don't want to have a legal fight, then you know, you figure out who your four are. You know who the Vantage two are If Edell is one of the fighting four, you make sure the certificate of designation has been approved. You clean that up. You know you probably have to amend your proxy statement, then. Then maybe you change your sale and put Edell on it. And the four that is currently in there, make a decision as to being on the board or not.. You have a fight about the majority. That is the judge trying to be practical in a situation where I have seen both sides," "I'm saying if it's fair fight time and you are ultimately going to have a majority up, that is a real clean way to do it. I don't know how Blasius comes into that at all. (70B Declaration, Exhibit# 9, pg.64)

    ii.    "I'm saying if it's fair fight time and you are ultimately going to have a majority up, that is a real clean way to do it. I don't know how Blasius comes into that at all." (70B Declaration, Exhibit# 9, pg.64)

    iii.    "So to the extent that Sony -- for example, if Mr. Edell were to resign today, to say, "I am not longer on the board," one of his other colleagues would resign -- and you do it in however elegant fashion to make sure you get it done right. Mr. Edell is immediately reelected to the vacancy a common vacancy, and the company amends its proxy statement and puts him as one of the four." (70B Declaration, Exhibit# 9, pg.64)

## C.    BOTH DELAWARE COUNSEL AND DEFENDANTS BROKE PROMISE TO COURT

16.    Delaware Counsel Teklits and Defendants plus Sony break promise to Court:

    "MR. TEKLITS: We will make sure this is right, Your Honor. I think everybody wants this amendment approved." (70B Declaration, Exhibit# 9, pg.63)

17.    Defendants fail to make Court ordered "corrective disclosure" of:

    i.    False December 30, 2003 Proxy: (70B Declaration, pg.19-21, paragraph #s 94-103)

    ii.    False October 31, 2003 Press release (70B Declaration, pg. 38-39)

    iii.    False Defamatory December 11, 2003 8k: (70B Declaration, Exhibit #6, pg. 44)

18.    Defendants opt instead to initiate multiple new "Edell" disclosure violations thumbing nose at Chancery Court and promise made to then Vice Chancellor Strine:

    i.    Thru "ISS Report" Defamatory attack on Petitioner: (70B Declaration, pg.22, paragraph #s 104-108)



ii.     Los Angeles Times "Defamatory attack on Petitioner" (70B Declaration, pg. 23, paragraph # 109)

iii.    Thru false and defective July 2004 Proxy (70B Declaration, pg. 24, paragraph #s 110-113 & Exhibit #7, pg.48-49)

iv.     False and defamatory January 26, 2004 Proxy Disclosure (70B Declaration, Exhibit #6, pages 45-46)

iv.     Misleading investment bankers in 2005 Bidding Contest by failing to correct previous Proxy statements and disclosures, ensuring Plaintiff status would be "Does not have significant credibility" so that Plaintiff would not have equitable opportunity to participate with $13.50 counter bid announced in September 2005 before Defendants consummated $12.00 per share sale to News Corporation. (70B Declaration, Exhibit #8, page 51)

**D.     DEFENDANTS IGNORED FIDUCIARY DUTY TO HONOR OCTOBER 17, 2003 DULY ELECTED PROXY SLATE**

19.     After January 2004 Chancery Court hearing, it was unlawful for Defendants to fraudulently

conceal and to not honor Plaintiff's October 17, 2003 approved Director slate nominated at validly called

Board Meeting. (70B Declaration, pg.13, paragraph #48)

20.     Voided Edell Director, voids Edell vote during Plaintiff and eUniverse's October 16, 2003

Vote to Nominate Director slate proposed by Plaintiff before Plaintiff resigned as Chairman and CEO.

This effects 3-1-1 win by Plaintiff vs. previous "No pass" Defendants purport existed from 3-1-2 vote

before Chancery Court ruled Edell was never validly elected as Director in October 2003.

**E.     DEFENDANTS PASS ON FRAUDULENTLY CONCEALED EDELL DISCLOSURE VIOLATION TO ACQUIROR NEWS CORPORATION**

21. Defendants pass on fraudulently concealed unlawful acts including contempt of Court to

acquiror News Corporation as clearly exhibited in email disclosed by Class Counsel in 2011 Federal

security fraud class action. Such email on July 17, 2005 from Corporate counsel Lang emailed at 4:13AM

to Defendant Director Sheehan, "Subject: 'Purchase Agreement", stating,

> "On the issues, let's close on the remaining ones in a fair and reasonable way-- so we can build out relationship." And

feel like we ... sides ... file purchase agreement do so on any **issue we have had no involvement in whatsoever (i.e. Greenspan) - that seems like too much**. Andy, I know we are very eager to get this done. Let do it so both sides can feel good and move forward on our longer-term relationship."

### F.    SONY IS CONFLICTED AND HAS INFLICTED MULTIPLE PREDICATE ACTS:

22.    Sony was an insider shareholder in eUniverse (Intermix, and Myspace by ownership level prior to Sale of VantagePoint VC firm in July 2003;October30, 2003;April 2004 (SEC disclosure) and had a Director and Series B Nominee Edell in January 2004 Proxy.

23.    Sony Corp's general counsel Seligman is married to Joel Klein who began working for News Corp in 2009. Sony has fraudulently concealed the defective Edell background & both violations of Rule SK Item 401 in January and July 2004 Proxy and Annual meetings respectively. Sony and/or Seligman are aiding and abetting News Corp for the benefit of Joel Klein who is an executive and Director earning $1m+ per year from News Corp.

### G.    FRAUDULENT CONCEALMENT USED TO DISCREDIT PLAINTIFF IN 2009 NATIONALLY PUBLISHED NOVEL AND TO FURTHER UNLAWFUL SCHEME

24.    Defendant's leverage their relationship with acquiror to create defamatory and fabricated lies thru acquiror News Corporation employee Angwin's published in late 2009 book, 'Stealing MySpace' which fraudulently conceals the true background of former Director and Chairman Jeff Edell and his scheme with Brewer to forward a fabricated false resume, misleading CEO to get Edell onto the Board. This creates further ongoing defamatory damages to Plaintiff and Shareholders because Class Counsel accepts and uses false Edell facts in book instead of Plaintiff's facts offered to Class Counsel in 2012 Federal Class Action in Los Angeles Central District. Edell's false facts allow the fraudulent conveyance Of approximately 50% of Myspace.com, the crown jewel of eUniverse, Inc. in 2004. Further, Edell's false facts which become Acquiror News Corporation false facts, obstruct Plaintiff's true facts from entering the record for the benefit of the Federal Court learning the true damages and claims rightfully owed to shareholders. Plaintiff and shareholders will continue to suffer until the defective disclosure is cured by

Defendants. (70B Declaration, pg. 24-27, paragraphs 114-131)

25. Defendants use ongoing Edell defective disclosure scheme to defame Plaintiff and impugn

reputation in book Falsely claiming, "violent mood swings were part of Greenspan's character".
(70B Declaration, pg. 26, paragraphs 127)

**H. DEFENDANT'S "BAD FAITH" & "DISLOYAL" FINDINGS AND ACTS DAMAGING
SHAREHOLDERS IN FEDERAL 2010 SUMMARY JUDGMENT RULING WERE CAUSED BY
FAILURE OF CHANCERY COURT TO FORCE DEFENDANTS TO FIX 2004 DEFECTIVE
DISCLOSURE**

26. Chancery Court's failure to force Defendants to honor their promise to fix the defective

Disclosure in 2003 is directly responsible for allowing Defendants to steal a minimum of $670 million in

damages (Federal Judge King 2010 approved damage report) and upwards of $32 Billion in damages (Rule

701 Damage Report not used by Class Counsel because of ongoing Edell fraud) from thousands of

shareholders in 2005.

(Exhibit #1, page 12, June 2010 Federal Central District, Judge King, Summary Judgment Ruling)

**IV-   CONCLUSION**

**I. DEFENDANTS FAIL TO CURE RULE S-K ITEM 401 (F) VIOLATION**

27.   Rule S-K Item 401 (f) states the requirement for information disclosed in Intermix's

January 2004 & July 2004 Proxy filings for Director's "Involvement in certain legal proceedings" stating,

> "Describe any of the following events that occurred during the past ten years and that are
> material an evaluation of the ability or integrity of any director, person nominated to become a
> director or executive officer of the registrant:

> "A petition under the Federal bankruptcy laws or any state insolvency law was filed by or
> against, or a receiver, fiscal agent or similar officer was appointed by a court for the business or
> property of such person, or any partnership in which he was a general partner or at within two
> years before the time of such filing, or any corporation or business association of which he was
> an executive officer at or within two years before the time of such filing;"

28.   To make Proxy not defective under 14a or Delaware security laws, issuer would have to

disclose that,

former Chairman of the Board. Edell's board seat was replaced by Jeffrey Scott.
Edell was most recently President and CEO of Showorks Entertainment Group, Inc. from January
2001 thru April 2002. Sometime in 2002, Showorks Entertainment Group, Inc. underwent a name
change to MTS, Inc. Sometime in September of 2002 Edell learned that MTS, Inc. had filed for
bankruptcy under Chapter 7. Edell was not there at the time of filing. Edell has informed the
company Edell was never personally named or contacted as part of the bankruptcy under Chapter 7
or subsequent proceedings. Edell was from 1995 thru December 31, 2000, President and CEO of
Soundelux Entertainment Group., Inc."

29.     Defendants also fail to fix disclosure related to fraudulent "Amended" October 31, 2003

Note. Defendants cannot lawfully or validly backdate the October 31, 2003 $2.5 million dollar

note by simply creating a new Note disclosed in December 2003 with a date of October 31, 2003.
 (70B Declaration, pg.19, paragraph #91)

30.     Plaintiff requests Court to sanction Defendants $25,000 per day since Chancery Court

January 2004 hearing that "corrective disclosure" ordered by then Vice Chancellor Strine was not

undertaken by Defendants and such per day sanction to continue until Defendants provide proof to the

Chancery Court that "corrective disclosure" has been made to the public.

31.     The interests of justice are properly served by the grant of this Motion.

Respectfully submitted

_____
Brad Greenspan, Pro Se

EXHIBIT #1

June 2010 Federal Central District, Judge King, Summary Judgment Ruling

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

BRAD D. GREENSPAN,

Plaintiff,

v.

BRETT BREWER et al.

Defendants.

) C.A. No. 106-VCS

DECLARATION IN SUPPORT OF MOTION 70(b) 42(b) CONTEMPT

1.      I submit this declaration in order to provide the Court and the parties to the above captioned Litigation, information regarding this matter as.

2.      I am over 21 years of age and I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

3.      I was founder of Issuer eUniverse, Inc. ('eUniverse') which later changed its named to Intermix, Inc. and was the largest common stock holder from Issuer's creation and public listing in April 1999, thru the September 30, 2005 merger consummation at issue in this case.

4.      On April 14, 1999, eUniverse began publicly trading under the symbol EUNI. The initial Directors and executive officers of eUniverse were Brad D. Greenspan, age 26, Chairman of the Board, Leland W. Silvas, age 44, President Chief Executive Officer and Director, Charles Beilman, Age 39, Chief Operating Officer and Director, and William R. Wagner, age 52, Vice President, Chief Financial Officer.

5.      According to the SEC filing in 1999, Chairman and Director BG owned 57.2%.of the company and was a control shareholder of the public corporation as it began public trading.

6.      eUniverse closed its first day of trading at $12.50 per share on April 14. 1999, at this time, eUniverse had less then 1 million unique users coming to its network of owned websites. None of the defendants were officers or senior executives of eUniverse at the time of the public listing or by the end of 1999.

7.      In December of 1999, eUniverse launched its first social network platform, LivePlace.com, with proprietary technology acquired thru the Big Network Acquisition. Unfortunately, a year later, eUniverse exited the LivePlace business when it determined the technology at the time was not sufficient to prevent websites from slowing down for users after installing the LivePlace technology. However, LivePlace's launch by eUniverse cements the fact that eUniverse was a pioneer in the social network space. LivePlace was described as:

"a proprietary technology that turns a website into a public place where users can meet and interact through chat, instant messaging, and co-browsing."

8.      On July 31, 2001, eUniverse announces that for its March 31, 2001 quarter, it has generated its first net profit and third consecutive ebitda positive quarter becoming profitable is critical for eUniverse because as of its 7/31/2001 SEC filing the company only had $218,000 in cash vs. $2.3 million in cash as of the year before.

9.      By October 2001, eUniverse had 31.3 million unique U.S. users and had the 8th largest online audience in United States for the period. By comparison, Ebay was ranked #9 with 31.29 million users and Google was ranked #14 with 26.9 million users.

10.     On December 17, 2001, the NY Times features a story on eUniverse titled, "For Some Dot-Coms there Are Real Profits", stating

    "Meet Brad D. Greenspan and at first it seems like he's a visitor from another era-- the Internet bubble of 1999. He's a 28-year-old chief executive of a public Internet company, eUniverse, with tens of millions of users and big backers like Sony."

11.     eUniverse had $33.19 million revenue for 12 months ended March 2002 & $6.64 million EBITDA.

12.     eUniverse by the end of 2002 had over 250 employees working in Los Angeles amongst this group, the company had developed highly skilled technology and internet Strategy executives. eUniverse also developed significant technology resources and assets gathered over its many years of operations.

13.     Mr. Greenspan resigned as CEO on October 30, 2003 and on November 21, 2003, Morgan Stanley issued its annual internet report ranking eUniverse as the #1 fastest growing Portal based on data from the prior 90 days, ahead of AOL and Yahoo and 'Excite Network' which AskJeeves acquired in 2003.

14.     The eUniverse board during week ending October 31, 2003 reneged on a common stock financing arranged by ThinkEquity and Greenspan which the same board had approved on October 16, 2003.

15.     Instead the Board manipulated by defendants, changed course and determined to sell effective control of eUniverse, Inc. to San Francisco based private equity fund VantagePoint Ventures LLC, issuing below market price preferred stock and simultaneously breaching the 19.9% shareholder vote threshold which the company had also specifically promised it would not do in any financing weeks earlier to the Nasdaq listing panel.

16.     VantagePoint had been told the week before by the Chairman and CEO of eUniverse that the

company had determined not to proceed with their highly dilutive $8 million preferred stock proposal

~~which~~ ~~~~ shares as ~~~~ $1.15 and offer a shame ~~~~ ~~~~ the $20 million m~~~~ capitalized eUniverse without a shareholder vote, which violated the Nasdaq 19.9% threshold rule.

17.     VantagePoint was informed that their proposed financing was economically inferior and that because Vantagepoint was still negotiating both terms and documentation and had not finished their diligence, the company had opted to close a $1.85 common stock financing from existing and new institutional investors. However, Chairman and CEO Greenspan invited VantagePoint's David Carlick and their counsel, Orrick's Richard Harroch to participate on the same terms as the institutional investors which was a significant discount already to the then approximate $2.25 - $2.40 per share public trading price range of eUniverse.

18.     VantagePoint determined to not only reject the offer from eUniverse's chairman and CEO to invest at $1.85, but embarked on and facilitated a brazen scheme to manipulate and defraud eUniverse's Board and shareholders that put defendants Carlick, Sheehan, and Harroch in control of eUniverse's board by October 31, 2003 and allowed defendants to recognize an almost sure windfall on their below market Series C preferred stock financing.

19.     Not satisfied with their existing economic gains, defendants then Embarked between late 2003 thru September 30, 2005 on ever growing series of schemes and misdeeds to loot the public company and effect transactions that benefitted themselves and related parties at the expense of the common stock shareholders who had held the majority of eUniverse.

**DEFENDANTS SCHEME TO ENTRENCH THEMSELVES AND SHIFT CONTROL**

20.     Mr. Greenspan was on the verge of terminating the general counsel and Chris Lipp, and the President of eUniverse, Inc. Brett Brewer, for their roles or poor performance in the restatement the company had suffered between October 2002 and May 2003, and ultimately a new controller and CFO were hired and eUniverse refiled via its 10k in August of 2003. Defendants General Counsel Chris Lipp was told the company would transition to a new general counsel after closing the next round of financing and President Brett Brewer was informed in the summer of 2003 he would be demoted.

21. Mr. Greenspan instead was faced with a scheme by Brewer to take control of the Board and shift control of company over to VantagePoint and Defendants. The scheme is admitted in a letter from Edell to certain of the Defendants of Octo... ...murder Brad Gre...

"Brett is always on the side of Brad's removal when not around Brad, but has no backbone when in front of him. He is looking for us to do the dirty work but will not stand tall himself."

i.      The first fraud was Brewer recommending and endorsing a friend of his Jeffrey Edell to come onto the Board of Directors in mid-October 2003. Edell, Brewer, and the Chief Financial Officer Flahie who had worked for Edell at a previous company all misled Mr. Greenspan and the other Directors as to the qualifications of Mr. Edell. Brewer distributed a 3 page resume/background prior to Mr. Greenspan determining to support Edell as a new board member, but such 3 pages did not disclose the truth that Jeffrey Edell had just bankrupted the last company he worked for. Nor did Edell's public filings or Proxy background or press release made by Edell disclose this pertinent and critical information. Instead, Edell, Brewer, and Flahie knowingly omitted this information in order to get Edell onto the Board where Edell quickly damaged the franchise value of eUniverse, Inc. by several disloyal acts and breaches of fiduciary duty. (EXHIBIT #1, pg. 29. & EXHIBIT #2, pg. 31)

ii.     Defendants key strategy that enabled them to take control of the board of eUniverse was by fabricating or aiding and abetting the fabrication of information to mislead independent directors and CEO about background of Jeffrey Edell. Instead, defendants artificially branded Edell with false credentials and set him loose to engage recklessly with the corporate assets and the important financing the CEO had closed with common stockholders clearly on better terms the lower priced preferred stock peddled by venture capital firm. Defendants cover up a recent bankruptcy under his stewardship. Brewer, Flahie, Edell, Lipp, Moreau, Carlick, Harroch, and Sheehan do not correct the defective proxy that they all approve multiple times between November 2003 and September 2005. The defect is caused by the omission of Edell's recent bankruptcy a violation Item 401 Rule-SK related to Director & Officer work experience background.

iii.    Defendants recognized the already locked in profits and upside that existed for them if they could force eUniverse to accept VantagePoint's inferior more costly financing.

iv.     Defendants use the fabricated Edell resume in a series of Shareholder letters and press releases in an attempt to cover the unexpected news that the CEO has been forced to resign as part of defendant's scheme to cause eUniverse shareholders to be diluted and pay for more expensive financing so that the Directors

led by Brewer could keep their jobs and receive significant upside from the incoming directors from

in the MTS 2002 Chapter 7 bankruptcy and also another turnaround company he ran in 2003 more recently that

also failed according to Edell's accurate D&O submitted to the Nominating Committee. However, Edell

continues his sleight of hand and now promotes only the Soundelux CEO role without disclosing end of tenure

in 2000 when it was sold and creates Impression he was most recently serving as CEO of eLabor, Inc., stating

"Additionally, Edell served as Founder, Director and CEO of eLabor, Inc., which was sold to ADP in February

of 2003." In fact, Edell was only a director of eLabor since at least 1995.

## HIDING ONE BANKRUPTCY AND ONE FAILED TURNAROUND IN PUBLIC DISCLOSURES

22.     Edells two resignations on his bio that were really his last two jobs instead of submitting an accurate bio,

defendants stretched the job of Edell that was actually 3 jobs prior, and increased this 3rd job by another 2

years, to the year 2002 (from 2000). Edell both omits to accomplish his end goal of making detection and

disclosure of his true track record. (EXHIBIT #1, pg. 29, EXHIBIT #2, pg. 31, EXHIBIT #3 pg. 33-36, EXHIBIT #5,

pg.41-42)

## FLAHIE THE NEW CFO

23.     Brewer, also a Director, took advantage of his position leading the interviews and recruitment of the

company's new CFO during the summer of 2003 to recommend final candidate, Tom Flahie,

i.      Flahie had previously worked as CFO at eLabor, America, Inc. under Brewer's close friend and

fellow YPO member Jeffrey Edell 's brother. Edell was Director of eLabor where Edell's brother served as

CEO Based on Brewer's recommendation, the CEO met with the candidate, and in August 2003, Tom Flahie

was approved and offered a position as the new Chief Financial Officer of eUniverse.

## EDELL THE NEW DIRECTOR CANDIDATE

24.     After current board member Thomas Gewecke, a senior business development executive of Sony

Music, informed the board in the summer of 2003 of his desire not to serve as director for another annual term,

Chairman/CEO Brad Greenspan agrees to review resume of candidate Jeffrey Edell.

25.     In or around August 2003, eUniverse had need to recruit a new independent Board Member who was

also qualified to sit on the audit committee. Brewer and Flahie initiated a scheme to promote their associate

DECLARATION IN SUPPORT OF MOTION 70(b) 42(b) CONTEMPT                    6

Jeffrey Edell as a candidate for the board slot so that they could be assured job security and benefit in the clear understanding existing be a senior officer and employee of eUniverse as of October 2003.

    i.    Based on information and belief, Brewer had been in a Southern California Chapter of the Young Presidents Organization (YPO) with Edell and they would meet regularly to discuss each other's business challenges and prospects for three years prior to Edell joining the eUniverse board.

    ii.    New CFO Flahie had pre existing business relationship with Edell, working for a company where Jeff Edell served as Director and Edell's brother served as CEO managing Flahie immediately prior to coming to work for eUniverse in August 2003.

    ii.    Brewer and Flahie were challenged to get the Chairman/CEO to nominate Edell to the board based on Edell's actual work experience which would call into question his fitness to serve on the board of a publicly traded company.

    iii.    The plan to nominate Edell to the eUniverse board based on his real work experience became more challenging when the most recently nominated Director, Lawrence Moreau, who had joined eUniverse's board in May of 2003, admitted to being less then candid About his track record after a Los Angeles Business Journal article in August of 2003 brought such facts to the attention of the other eUniverse directors.

    iv.    Based on information and belief, Brewer, Flahie, and Edell realized that to get the support of the Chairman/CEO to back nomination of Edell to the Board, they would have to inflate and falsify Edell's track record to make it appear flawless.

26.    Defendants thru this fraudulent scheme and omissions of Edell's true work experience, created a fake Director candidate misleading shareholders and Petitioner with what appeared to be a perfect track record with no negative recent work experience disclosed.

    i.    Defendants determine to accomplish the deed by omitting Edell's two most recent work experiences which were both failures and falsifying the time frame he worked as CEO of an, earlier successful venture, 'Soundelux'.

    ii.    Defendants accomplished thru falsifying the Soundelux timeframe Edell worked as CEO by two years while omitting the actual prior two jobs, both negative tenures where Edell had failed to improve the

Companys where he was principal executive officer.

Defendants fraudulently conceal the true background and was experience allowed Edell to get onto eUniverse Board in 2003 and become supported by fellow Board Member, founder, and largest shareholder, CEO Brad Greenspan.

27.    Defendants fraudulently conceal the true background of former Director and Chairman Jeff Edell and forward a fabricated false resume, misleading CEO to get Edell onto the Board.

   i.    Edell benefitted from fraud of fabricating his work experience by gaining access to the public issuer's board.

28.    Edell had not come off a successful business endeavor as his fabricated resume stated but really had failed in his last two ventures including one of two failures resulting in a Chapter 7 Bankruptcy filing.

29.    Brewer moved scheme forward with aid of new CFO Flahie whose disloyalty in not reporting to the CEO or public that Edell resume was fabricated demonstrates Scienter intent to defraud & mislead shareholders.

30.    Jeff Edell's omission to trick CEO of Issuer via omission of his immediate two prior employment jobs. A Director's last two jobs and such director candidate's performance or the company's performance being the most critical bit of information for Issuer or CEO to parse or review to do his duty.

31.    Edell scheme results in eUniverse shareholders being diluted via more expensive VantagePoint financing.

32.    On August 26, 2003 at 5:39PM Brewer forwards via email a fabricated three page (EXHIBIT #1. Pg. 29) resume for 'Jeffrey S. Edell' to the CEO with CFO Flahie cc'd and states,

> **"looks strong… again jeff will be here tomorrow to have lunch with tom and i. brad, I'll set something up for you later this week or next depending on your schedule."**

   i.    Brewer lies, misleading the CEO further, asserting Edell's resume **"looks strong"**, even as Brewer and Flahie are aware that Edell's prior two actual jobs are being intentionally omitted from the document sent to Greenspan. Edell, Brewer, and Flahie have destroyed the actual true work experience information prior to sending the fabricated Edell resume, this is a violation of 18 U.S.C. § 1512(c)(1), which prohibits the destruction of records.

   ii.    Defendants omitted a portion of the true documents and information in the Resume sent to Petitioner, with the intent to obstruct justice in violation of 18 U.S.C. § 1512(c)(1) and also since the false

document was sent via email, Edell, Brewer, Flahie, and Lipp violate 18 U.S.C. § 1341 (relating to mail fraud).

23, 2003, the CEO is deceived by the fabricated resume of Edell and responds to Brewer and Flahie after being misled and reviewing the fabricated resume of Edell, **"Great resume!".** Since the CEO is misled via email, this is a violation of 18 U.S.C. § 1341 (relating to mail fraud).

34.     On the first page of the fabricated Edell resume Brewer forwards, in the section labeled 'Professional Experience'. Edell lists first: **'Soundelux Entertainment Group, Inc. Hollywood, CA, from 1995-2002'** and the next line purports that during this period, Edell was **"President/CEO/Director"**. Edell & Defendants violate 18 U.S.C. § 1519 (relating to destruction, alteration, or falsification of records in Federal investigation and bankruptcy) and defendants are destroying Edell's true work experience and put in its place the fake Fabricated work experience purporting that 2000-2002 Edell worked still for Soundelux.

    i.     Edell's resume forwarded by Brewer, falsely creates the appearance and assumption that **'Soundelux Entertainment Group'** has been the sole Professional Experience of Edell's as a full time Executive since '2002'.

    ii.     Edell's fabricated 'Professional Experience' section creates the appearance that Edell, **"Successfully initiated, negotiated and closed sale of the Hollywood postproduction division of SEG (Soundelux) to the Liberty Media Group"** and Edell lists he was President/CEO/Director of Soundelux Entertainment Group from 1995-2002, then the reader of the fabricated document would assume Edell departed as CEO after Soundelux was sold in 2002. Brewer, Edell, Orrick, VantagePoint, Harroch, Carlick, Rosenblatt, Sheehan, DeWolfe, Latham, and Sony Corp violate 18 U.S.C. § 1519 because they have altered records of a Board candidate during the SEC restatement inquiry that ended October 2004.

    iii.     Defendants specifically violated Section 1512© and U.S.C. § 1519 by destroying and altering Edell's true background and work experience which should have truthfully disclosed:

and

    **"i)     ShoWorks,** where Edell was CEO starting April 2001 thru 2002 (name changed immediately prior to bankruptcy in September 2002)"

    **"ii)     Enterprise Entertainment Group LLP** at which Edell was President/CEO/Director for less then a year before he resigned from company citing his resignation came after "working on server turnaround situation" in May of 2003. " (EXHIBIT #3,, Pg. 33-36)

35.     Director Lawrence Moreau on September 30, 2003 at 10:15AM emails Brewer, Mosher, and Lipp,

Subject: 'RE: Potential EUNI Board Member', stating ,

"**Also we** [~~~~~~~~~~~~~~~~~~] **so we can review it for any problems prior to the Board vote."**

**The false and defective October 3, 2003 Nominating Committee Recommendation**

36.    Larry Moreau, Director and Nominating Committee member tasked with review of Edell, Sends email

stating, '**Jeff Edell – Completed D&O Questionnaire'** to Director Brewer, Director Greenspan, Director

Mosher, General Counsel Lipp, and Sony's sole series B Director Gewecke and states,

    i.    Moreau and Defendants lie in his email about what is contained in the D&O questionnaire,

failing to disclose Edell's disclosed recent bankruptcy and declaring:

> "**Based on my review, there are no negatives for the Nominating Committee to report to the Board.**

    ii.    This false statement is distributed thru email to Petitioner and other Directors misleading them

and causing them to be unaware that Edell's Proxy disclosure is false. This is a violation of 18 U.S.C. § 1341

(relating to mail fraud). Moreau, heading the nominating committee, concealed his knowledge that Edell does

have "negatives" that should be brought to the Board's attention like fact that Edell has a mandatory disclosable

SEC event under Rule S-K Item 401 (f), requiring specific disclosure on Edell's recent federal bankruptcy.

    iii.    Furthermore the destruction or altering of the true information by omission which Edell, Brewer,

and Moreau are guilty of in violation of 18 U.S.C. §1512(c)(1) and violation of 18 U.S.C. § 1519.

    iv.    Moreau and Defendants further misleads the board by stating:

> "**the Nominating Committee's previous legal and financial background checks did not disclose any negatives.**
>
> "**Based on the results of the Nominating Committee's due diligence procedures including meeting and various discussions with Jeff, I think he is an outstanding candidate and hereby recommend that the Board approval his appointment. "**

37.    An attached D&O questionnaire is distributed in October 3, 2003 email with false claims used to

coverup underlying facts, in violation of of 18 U.S.C. § 1341 (relating to mail fraud).

38.    In late 2011, Petitioner discovered a D&O questionnaire Edell submitted to eUniverse's Nominating

Committee headed by Director Larry Moreau. Edell's true work experiences consists of:

i.    On the first page, in the first paragraph, there is information to read for the

questionnaire submission. The third line from the bottom states

"Accordingly, great care should be exercised in completing this questionnaire. You should be aware that if the Proxy Statement contains any false or misleading statements, the Company and those in control of the Company could be subject to liability under federal securities laws."

ii.   The factual D&O Questionnaire of Edell from Exhibit XX reveals:

a.   On the second page of the document titled,

"EUNIVERSE, INC. QUESTIONNAIRE FOR DIRECTORS AND OFFICERS",

the first section is labeled: "I. Employment, Occupation, and Business Experience."

And it lists information submitted by "Jeffrey S. Edell, 11/10/57".

b.   Under section ©, document states,

"Please Indicate all positions and offices which you hold or have held during the past five(5)years"

c.   Edell's 'Questionnaire For Directors And Officers' lists 3 submissions  under 'Positions/Office':

"President/CEO & Director Showorks Entertainment Group, Inc."

from "January 2001- April 2002" and notes he "resigned April 2002".

"President/CEO/Director, Soundelux Entertainment Grp., Inc."

from "November 1995- 12/31/2000".

"President/CEO/Director, Enterprise Entertainment Grp, LLC".

From "November 2002-May2003"

and the next line in parenthesis immediately below states,

"resigned May 2003, after working on severe turnaround situation."

d.   On page 14 of Edell's 'Questionnaire For Directors And Officers', Edell checks 'YES' for

section (a) when asked if "any of the following events has occurred since April 1, 1998, please

provide a brief description of the event".

e.   Section (a) states:

"A petition under the Federal bankruptcy laws or any states insolvency law was filed by or against you, or any corporation or business association of which you were an executive officer at or within two years before the time of such filing."

f.  Edell discloses under "Description:":

> "Soundelux Entertainment Group Inc. employment from Sept. 1999 in 2002 to MTI. I resigned as President and CEO of Soundelux Entertainment Technologies Group. After leaving, sometime in September of 2002, I learned that they had filed bankruptcy under Chapter 7."

39.  Therefore, Edell's scheme to defraud the eUniverse Directors is effected by changing the time frame and term of his Soundelux employment from the factual end of 12/31/2000, to the fabricated and false claim that Edell's end of his work tenure being thru 2002. This allows Edell to effectively cover up or disguise his true historical work performance and mislead Petitioner & shareholders that need accurate and true professional experience to determine if someone is qualified to be a Director of a public  company.

i.  As part of scheme, Edell omits his January 2001-April 2002 true employment where he was

"**President/CEO & Director Showorks Entertainment Group, Inc.**" that he had disclosed in a prior D&O Questionaire.

ii.  Edell also omits his November 2002-May 2003 professional experience as

"**President/CEO/Director, Enterprise Entertainment Grp, LLC**",

resigning after just five months, blaming a "**severe turnaround**". (EXHIBIT #3, pg. 33-36)

**Predicate Acts related to 2003 press release announcing  Edell**

40.  On October 9, 2003, Brewer furthers the fraudulent concealment scheme by forwarding eUniverse's PR firm the fabricated resume which incorrectly shows Edell worked at Soundelux until 2002  and omits both the Showorks/MTS bankruptcy and working most recently at troubled Enterprise Entertainment Grp, LLC. Brewer also misleads PR firm by sending fabricated work experience and bankruptcy omission from their PR firm.Laurie Eisner,

> "laurie-we need a very basic- Thomas Gewecke has resigned from the euniverse board.  And jeff edell (bio attached) has been appointed-"

41.  October 10, 2003 at 2:05PM, PR firm emails Brewer and Greenspan draft of Edell press release stating,

> "Prior to his Board appointment at eUniverse, Edell served as President and CEO of Soundelux Entertainment Group, Inc., a provider of entertainment content technologies, with revenues exceeding $110 million"



42. October 11, 2003 at 2:43PM, Edell emails Greenspan requesting puffery to be added to the draft press release about the background stating,

> "Brad, Comments on Release- It says nothing of the record sale to Liberty Media and John Malone for apprx. $100m, the sale of the software company called, Inc. that I served as CEO and founder for 10 years, and sold to ADP, the sitting on the Public board of IVC industries and sale of it to Inverness Medical. Also the winner of Entertainment Entrepreneur of the YEAR by NASDAQ and Ernst and Young in 2000, and member of both TV and Film Academies..member of Young Presidents Organization... Get some bang out of it!! That should all be somewhere in it..please have them take another shot"

43. October 11, 2003 at 4:43PM Edell emails Greenspan and Brewer:

Subject: 'RE: Press Release: Jeffrey Edell' and states,

> "Your PR dept can do a better job extracting what I have on my bio related to the subjects that are pertinent to eUNI.... but please do not ease this until we finalize our deal..."

44. October 11, 2003, at 6:15PM Greenspan emails Lipp and Brewer forwarding above Edell Email and states, "call me to discuss So we can finalize.'"

45. The October 11, 2003 draft PR submission Defendants Edell and Brewer are hiding and have destroyed the evidence of Edell's True work experience in the press release draft being distributed as well as the final release in violation of of 18 U.S.C. §1512(c)(1) and violation of 18 U.S.C. § 1519.

46. Also Defendants violate Section 1341 by using email to send false fact draft press release to PR firm

47. Brewer enlists Highland Partners and Jim Quandt to provide background checks for the eUniverse nominating committee for Director candidate Edell and Ward. As evidence of this scheme, Brewer emails Mosher on October 16, at 3:56PM and states,

*"dan- have you received the background check from highland partners for bradley ward?'"

48. BOARD MEETING- October 17, 2003 there is Board meeting where Brad Greenspan attempt to elect the annual board slate and his slate leaves off Lawrence Moreau and Dan Mosher. General counsel Chris Lipp deems Greenspan's slate did not pass even though 3 Directors approved the new slate, 1 disapproved, and 2 Directors Abstained. Lipps Board minutes indicate, "The motion failed with a vote of 3 for, 1 against and 2 abstentions, constituting less then the requisite majority of directors present."

49. On October 30, 2003 at 4:57PM, Flahies emails Lipp, Subject: 'Bio for New Directors For proxy Draft'

and provides a bio for Edell which states

"*Jeffrey Edell has served as President since 2002 and 2003. Mr. Edell worked
ident and Chief Executive Officer of Soundelux Entertainment Group*
*(previously known as Soundelux Entertainment Group, Inc.) a provider or entertainment content and*
*technologies, from 1995 until 2002.*"

50. On Friday, October 31, 2003 Defendants cause the company to put out a press release with false information:

"eUniverse announces eUniverse Announce CEO Departure and Board of Director Changes Brad Greenspan
Steps Down as Chief Executive Officer  Jeffrey Edell eLabor Founder and Former CEO/President of
Soundelux Entertainment Group, and Bradley Ward, CEO of The Game Tree, Join eUniverse Board."

51. Significant puffery created by Edell and put into press release but omits mention of his true work experience
such as his recent fraudulently concealed MTS Bankruptcy and other employment information provided in the original
D&O Questionnaire Edell provided to eUniverse. Defendants also violate Section 1343 as the defendants cause the
false information to be distributed via news wire to the public. (EXHIBIT #4, pg. 38-39)

52. Sony in fact specifically made it known that it would not allow VantagePoint to take over or transfer the
rights to vote Series B until VantagePoint  bought all the stock held  by Sony Corp of public issuer.

53. November 7, 2003 at 3:59M- Intermix CFO Tom Flahie sends a draft Proxy to Chris Lipp, Subject: 'Proxy'
which states,

54. On November 17, 2003, Chris Lipp sends Consents to Sony Corp to sign.

**LIPP KNEW SONY DID NOT SIGN THE CONSENT ON NOVEMBER 17th**

55. Sony's Mark Eisenberg only signs the consent to change the Certificate of Designation of the Series B
provided by Lipp.

56. Sony's Eisenberg executes the consent on November 18, 2003 according to his testimony read in court. [i]

57. On November 18, 2003 at 12:50PM, Lipp emails Vantagepoint's Carlick and Sheehan a new draft Series C
consent that appears to have some backdated element of optimizing the prior Notes to the detriment of the
shareholders.

58. Orrick's Harroch  active in the planning of the Proxy and Edell frauds emails Lipp stating,

"I don't understand the background of this, and it will take some time to review.  Chris
are you working on the proxy statement language to implement the things required by
the Option Agreement?"

59. On November 18, 2003, at 4:09PM, Lipp asks PR company run by Jonathan Heit to put out 'Annual Meeting
Release'. The release falsely states Issuer's

"annual meeting of stockholders has been rescheduled for January 21, 2004 so that certain
aspects of the Company's recently announced financing transaction with VantagePoint Venture

Partners, among other items, has updated the Company's stockholders for approval. A new record date for the meeting of December 1, 2003 has also been set."

60. On November ... 2003- Fla[...] David [...] Andy [...], Subject 'Director Bios' [...] Bradley, states,

"In preparation for filing of the proxy, I have updated the director bio information from the Form 10-K. David, Andy, Jeff and Bradley, I took a first pass to put a bio together for you. Since this information is personal, please make edits to your bio and return the word doc to me. I will make your edits in the actual proxy. Thanks, Tom"

**DEFENDANTS FALSIFY PROXY HOPING SONY WILL SIGN OFF ON NOMINATING EDELL AS SERIES B DIRECTOR**

61. November 21, 2003- Intermix CFO Tom Flahie sends an email, Subject: 'Proxy', stating,

   i. *"I completed the first draft of the 2003 proxy."*

   ii. *"Given the major changes to the Board."*

   iii. *"the proxy needs a close look this year".*

   iv. *"We intend to file with the SEC on Wednesday.".*

62. Flahie attaches a draft of proxy which falsely states, ***"550 DMV notified the Company that Lawrence Moreau and Jeffrey Edell have been nominated by the Series B preferred stockholders."***

63. Issuer announces on November 21, 2003 that it has raised $2.5 million in Common stock financing selling 1,643,000 shares at $1.50 instead of the $1.85 previously agreed price with the same investors, or a loss of $575,050 for shareholders in the bargain made by management to mitigate one of the agrieved parties from defendant's actions around the 2004 proxy.

64. At 5:46PM on Saturday November 22, 2003, eUniverse Sr. VP Legal, Chris Lipp emails Orrick's Harroch and VantagePoint's Harroch and internal general counsel Guidero with Subject: Series C Consent re Bylaw Amendment and attached, 'Series C Written Consent to Amend Bylaws' and states,

   *"Rich, Please find attached the Series C consent with the changes we discussed. Thanks, -Chris"*

65. On November 24, 2003 at 12:05PM, Flahie emails outside general counsel Cartmell, Subject 'RE: Proxy' and states, *"I need to file on Wednesday. I hope that your comments do not impact the schedule"*

66. Defendants in November 2003 press release omit Edell's CEO role in the MTS 2002 Chapter 7 bankruptcy and failure of another turnaround company he ran in 2003. Edell continues his sleight of hand and promotes only the Soundelux CEO role without disclosing end of tenure in 2000 when it was sold, creating impression he was most recently working as CEO of eLabor, Inc., stating, *"Additionally, Edell served as Founder, Director and CEO of*

*eLabor, Inc., which was sold to ADP in February of 2003."* In fact, Edell was only a director of eLabor since at least [1095]

EH-BCM     Document 32-2     Filed 09/

### NOVEMBER 2003- SONY SERIES B SHAM CONSENT SCHEME

67.    November 25, 2003 at 5:33AM, Moreau emails Flahie, Carlick, Mosher, Subject: 'RE: Nomating Committee-Dropped nominations', and states, *"Tom, Did you mean to drop David Carlick, Andy Sheehan, Jeff Edell and I from the Board? Also, when is the proxy deadline?"*[1090]

68.    Flahie responds at 8:27AM on November 25th, falsely stating:

>    *"Only three directors are up from election at the January 24 stockholders' meeting. The Series B stockholders (Sony) have elected Larry Moreau and Jeff Edell. The Series C stockholders have selected Andry Sheehan and David Carlick. The only directors that up for election are Dan Mosher, Brett Brewer and Bradley Ward."* And

>    *"The proxy deadline is driven by the timing of Chris Lipp's vacation. Chris has put off a European vacation several times due to the issues we are working through. He will be out all next week. I will prepare the proxy in his absence."*

69.    On November 25, 2003, at 10:11PM, Lipp emails Flahie, Subject 'Proxy Excerpt' with attached files including one called 'By-Laws', and states,

>    *"Attached is the language I would suggest for Proposal 2 and the Other Business sections. Also attached is the newly added Section 10 of the Article 1 of the Bylaws."*

70.    On November 25, 2003, Chris Lipp emails Sony's Melissa Cole and Mark Eisenberg, Subject: 'One More Series B Consent' and attaches a draft of Series B consent form re: election of directors, and states, *"Melissa- Please find attached what should be the final Series B consent we will need in connection with getting the director issues sorted out"*

71.    Director Ward is puzzled at the Flahie claim that a new Board slate has been elected which includes Edell and Moreau as Series B Directors Ward who had just voted with the rest of the Directors to elect the slate on November 20, 2003, states in a November 26, 2003 9:28AM

>    *"Quick question...."The role of the Nominating and Corporate Governance Committee ("NCGC") shall be to determine the slate of director nominees for election to the Company's Board of Directors (the "Board") to be included in the Company's annual proxy statement,..."* And

>    *"Will this committee solely determine the nominees on the slate and no longer require a full Board vote like we just had last week? In the absence of any specification for a full Board vote, that's how I read that."*

72.    November 26, 2003 at 11:26AM, Outside iUniverse counsel Nate Cartmell emails Chris Lipp, Subject: 'Series B Written Consent re Election of Directors 11-26-03.DOC' and states,

attaching a document titled:

'ACTION BY WRITTEN CONSENT OF MAJORITY SERIES B STOCKHOLDER OF EUNIVERSE, INC.'

### NOVEMBER 26, 2003 - CFO FLAHIE INSTRUCTS STAFF TO FILE PROXY

73.     November 26, 2003, 1:41PM, Flahie emails Samina Merchant, Subject: *'Proxy'*, and states,

*"Please send the proxy over to Donnelley for Edgar formatting".*

74.     As of November 26, Sony had not given its consent to nominate Moreau or Edell as Series B nominees.

### DECEMBER 1, 2003 PROXY IS FILED

75.     The December 1, 2003 Proxy lists Edell & Moreau as Series B Preferred Nominated Directors stating:

*"the majority holder of our Series B preferred stock, has the exclusive right, voting separately as a single class, to elect two directors"* and **"550 DMV has notified the Company that it intends to elect Lawrence Moreau and Jeffrey Edell to the Board."**

### PROXY CONTEST DECEMBER 2003- JANUARY 2004

76.     According to former Director Greenspan, his email sent on  December 5, 2003, at  3:17PM, to  Lipp, Brewer, Edell, Fojut, Subject: *'Need immediate documents'* and states, *"Chris/Matt- As both a director and shareholders, I demand to see the following documents."* did not result in the company sending him the Myspace Asset Sale agreement that was purported to have been signed on December 17, 2003. This is further key evidence that supports such agreement not having really existed at such time and prior to November 2004 when defendants first publicly disclose the claim that the MySpace Asset Agreement selling 33% to DeWolfe's MSV LLC really occurred on December 17, 2003.

77.     Email evidence shows the chilling effect of defendants fabricating proxy to make it appear Sony had nominated Edell and originally also, Moreau as Series B Directors. Showing initial response from an informed investor can be seen thru email on December 4, 2003, at 3:30pm, current board member, former CEO and 20% stockholder of Issuer emails proxy information to his outside counsel, Subject: *'Darn'* and states,

*"Tougher Road to fight.  It looks like these guys got Sony to PURPOSELY elect directors so there are only 3 slots open and 4 forced seats. Only three directors are up for nomination."*

And

*"Sony owns the Series B which VantagePoint has a right to purchase and the Series B has rights to elect 2 Board Members, but Vantagepoint had specifically agreed to cancel such rights as part of their acquisition of Sony's Series B just for the reason of not doubling up on forced directors."* And *"Sneaky sneaky...They got Sony to nominate 2 of the existing directors to 'BulletProof' these guys...."*

78.     Edell emails Flahie and states on December 4, 2003,

*"Only comment, is please make sure from Nate that this info is clearly necessary of a press release...I am sure you checked already but let me know? Thanks jeff"*[viii]

79.     CFO Flahie a few minutes later replies via email and states,

> "Yes, all these lawyers agreed. They also want to Fore 8-k the press release."

80.     Lipp emails Harroch on December 8, 2003 at 4:01PM and states,

> "Richard, Last time we discussed this, I thought we agreed that it was neither party's intent to have the shares purchased under the option be anything other than the Series C shares"

81.     Ultimately, Lipp capitulates to the demand Orrick firm and agrees to issue C-1 shares which are worth $2.00 in extra preferred liquidation vs. $1.50. A loss of .50 cents per share for shareholders and additional corporate waste by defendants, using shareholder money to effect a change of control.

82.     December 8, 2003- 2:16PM, from Harroch of Vantage/Orrick to Chris Lipp and other Carlick and Sheehan and Rodi Guidero;, Subject:. Subject:

> "Chris, we still need to deal with the Sony option, Series B issue. _As I see it, the proxy statement should also seek approval for amending the Series B Certificate of Designation_ to encompass the matters set forth in Exhibit B of the Option Agreement (PIK/dividend for VPVP Shares elimination of company Election concepts, authorized # of shares, etc :) " and,
>
> _"If we had a chance to review the proxy statement before you filed it, I would have pointed this out to you. So let us figure out how we implement this now.   Thanks!"_

83.     December 9, 2003, at 11:29AM, Edell emails Chris Lipp, Sheehan, Carlick, Moreau, Brewer, and states,

> "Chris, The meeting took place this morning and the board is in the dark about its results." and
> "Please see to it that Nate reports on the Nasdaq meeting ASAP. I heard that there were some problematical issues, such as dilution that we should have known about with the VP deal, that I would love to sort out."

84.     Lipp sends a revised Note to VantagePoint and the January Proxy confirms that indeed, the 'Accelerator' was part of the January 2004 proxy material and shareholders were forced to vote or be victims the 'accelerated' Note scheme.

85.     On December 17, 2003 at 10:46PM, Brewer emails Edell. Lipp, Sheehan, Flahie, Carlick, Moreau, Ward, Mosher and states,

> "Gentlemen- We will be having our board call tomorrow as scheduled at 4 PM sharp."
> And
> "Also, after speaking with some of the board and management, we think it would be useful to have an in person board meeting next Tuesday in LA.
>     The meeting will be from 10-4pm and will include Mike Kennedy from WS as well as other lawyers if needed. We have several ratifications of chartes, reports on litigation, proxy contest issues, and other house keeping matters to take care of."

86.     Decempsan 18, 2003- Greeenspan emails Carlick, Edell, Mosher, Subject: 'Info-' and states,

> "Guys- I have lots of additional information on the performance of Brett Brewer, Chris Lipp, and Adam Goldenberg before, during, and after the restatement" and "It sheds a very negative light on all of these gentlemen's performance."

87.     After getting sent an email sent by former CEO to non-management board members critical of certain managers and offering to provide information to help Board best evaluate executives at company, Director Edell sends ~~principal executive~~ them to be disloyal with adware and other transgressions against former CEO of Issuer, In Brewer's email on this date to Lipp and Goldenberg he states,

> "this guy is one of the biggest assholes that ever lived...there is no other way to say it." [xi]

88.     On Thursday December 18, 2003, at 1:46AM, Brewer emails board and states, *Gentlemen- We will be having our board call tomorrow as scheduled at 4pm sharp.* [xii]

89.     There is no evidence that the Myspace asset sale agreement was disclosed or voted on by the board at the December 19, 2003 board meeting. While there is significant evidence there was a focus according to Brewer on, *"modifications of charters, reports on litigation, proxy contest issues"* [xiii]

90.     Annual Meeting date rescheduled on December 19, 2003 at 4:14pm, Flahie emails Lipp, Sheehan, Carlick, Moreau, Mosher, Ward, Brewer, Edell, Subject: 'Filings' and states,

> "The attached proxy amendment was filed today and the attached press release announcing the new meeting date was issued." [xiiii]

## THE 2003 DEFECTIVE 'AMENDED NOTE'

91.     On December 27, 2003, Lipp emails Harroch and Sheehan of VantagePoint with Subject 'Amended VPVP Note' and states, *As discussed, please find attached for your review an amended note."* and attaches a revised $2.5 million note that now has been amended under Section (1) 'Repayment' to change the original due date of March 2005 to now be due February 8, 2004 a few days after the planned Shareholder meeting unless *'stockholders of the Borrower, provide approvals necessary"*.

92.     The December 30, 2003 Proxy falsely states:

> "Pursuant to the Certificate of Designation of Series B Preferred Stock, 550 Digital Media Ventures, Inc. ("550 DMV"), an indirect subsidiary of Sony Corporation of America, the majority holder of our Series B preferred stock, has the exclusive right voting separately as a single class, to elect two directors in the event the Board consists of six to eight members, 550 DMV has notified the Company that it intends to elect Jeffrey Edell to the Board and leave one Series B Board seat vacant at this time"

93.     Sony had not notified the company it intended to elect Edell as of and thru the date of the Chancery Court trial in January 2004.

## The false and defective January 2004 Proxy AND PUFFERY OF EDELL (EXHIBIT #6 pg 44-46)

94.     In January 2004, Vantage sealed control over eUniverse thru one of three Proxy frauds perpetuated on common stockholders by Carlick, Sheehan, Brewer, Lipp, Rosenblatt and associates. 2003-2005 Flahie who is disloyal along with Brewer in not revealing Edell's fabricated resume then colludes with General

Counsel Lipp to knowingly falsify January 2004, July 2004, August 2005 Proxies, violating Item 102 Rule 8K.

more difficult, and on the December 30, 2003 DEF14A Proxy, on page 4, the company states,

> "Jeffrey Edell has served as a Director since October 14, 2003 and as Chairman of the Board since November 14, 2003. Mr. Edell is currently a member of eUniverse's Compensation and Audit Committees. Mr. Edell was employed as President and Chief Executive Officer and a director of Soundelux Entertainment Group, Inc., a provider of entertainment content and technologies, from 1995 until 2002"

96.     It was part of the Defendants' scheme to use the United States Postal Service to deliver fraudulent SEC Proxy to the eUniverse (Intermix) Inc. MySpace Parent Company Shareholders in December 2003, January 2004, July 2004, August 2005, and September 2005 and to conceal the errors contained in the Proxy Disclosure statements on each occasion regarding Edell and Petitioner in violation of 18 U.S.C. § 1341.

## FRAUD UPON THE CHANCERY COURT (Exhibit #9, pg. 52-64)

97.     After adverse ruling that caused general counsel Chris Lipp to admit he had taken several actions without ever getting the critical consents needed as required by law to be first approved by the company's board of directors and/or by Series B Preferred stockholder Sony Corp. These were also shown to be consents that the general counsel knew were in fact required prior to general counsel taking such actions. These actions were to claim consents and waivers were given and then to include these in Issuer's proxy and describe they had occurred when in fact such events had never taken place and such waivers or consents had not been given. This behavior and activity was in court and in Judge Strine's cross examination, shown to have occurred multiple times on multiple dates and thru insertion of such fabricate events into multiple versions of Proxies distributed to shareholders leading up to the 2004 Shareholder Annual meeting thru proxy.

98.     Judge Strine was adamant about going on record multiple times during the trial to notify all parties of his views that the testimony of general counsel Lipp was not believable as to Mr. Lipp's rationales for certain disclosures and statements in the company's Proxy.

## SONY'S SECURITIES FRAUD AND AIDING AND ABETTING BLASIUS VIOLATION AND AIDING AND ABETTING FRAUDULENT CONVEYANCE

99.     Sony Music Corp in 2004, transacted after a still uncured Federal Securities Violation and these

transactions damaged and fraudulently conveyed assets to the detriment of Issuer shareholders.

100. Insider securities violations makes the Proxy and subsequent 10Q and 10Ks and next Proxy statement defective, all caused by Sony Music Corp aiding and abetting this securities fraud thru multiple acts in 2003 and 2004. Most directly by opting after Judge Strine's January 14, adverse ruling to manipulations of defendants and Sony Corp's interactions relating to upcoming 2004 Proxy Disclosures.

101.    After adverse ruling that caused general counsel Chris Lipp to admit he had taken several actions without ever getting the critical consents needed as required by law to be first approved by the company's board of directors and/or by Series B Preferred stockholder Sony Corp. These were also shown to be consents that the general counsel knew were in fact required prior to general counsel taking such actions. These actions were to claim consents and waivers were given and then to include these in Issuer's proxy and describe they had occurred when in fact such events had never taken place and such waivers or consents had not been given. This behavior and activity was in court and in Judge Strine's cross examination, shown to have occurred multiple times on multiple dates and thru insertion of such fabricate events into multiple versions of Proxies distributed to shareholders leading up to the 2004 Shareholder Annual meeting thru proxy.

Shockingly with evidence of Defendant's improprieties laid bare in court and significant red flags raised, Sony then agrees to nominate Edell to serve as Series B Director. Sony's aid eliminates shareholders ability to keep Edell off Board & further conspiring with Defendants in late 2004 to complete a sweetheart deal to sell almost half of MySpace. Defendants also breach pledge made with Judge Strine & Petitioner, failing to make corrective disclosure in January 2004 Proxy.

102. Defendant's have also not legally effected a valid closing or vote on the Series C stock sale or transfer from Sony of their Series B shares, blocking public issuer's option received in three way agreement between Sony, VantagePoint, and public issuer in 2003. The crooked dealings expand when Orrick uses its insider knowledge to produce a commercial benefit for VantagePoint while having Issuer pay 100% of the cost by paying off Sony debt earlier then due.

103.    Defendants were aware and admitted the proxy statement was defective in January 2004. Defendants willfully ignore Judge Strine's ruling and continue to allow A defective proxy to be the final proxy for the annual shareholder

## ISS REPORT DEFAMATION

104. Part of the Defendants's scheme to conspire to interfere with Plaintiff's livelihood by disseminating

defamatory statements about Plaintiff to the public through media outlets in retaliation for providing truthful

information to SEC, FTC, DOJ and Chancery Court relating to the Defendants's scheme, in violation of § 1513(f).

105. Defendants press release titled ""*eUniverse Wins ISS Support for Its Director Nominees; ISS Rejects

Greenspan's Hand-Picked Director Nominees.*" is published January 23, 2004:

> "eUniverse, Inc. today announced that Institutional Shareholder Services, Inc. (ISS) has recommended that eUniverse stockholders vote FOR eUniverse's four director nominees -- Brett Brewer, Daniel Mosher, Lawrence Moreau and Bradley Ward -- and vote FOR the Board's other proposals at the Company's annual meeting on January 29, 2004.

> "ISS is widely recognized as the leading independent proxy advisory firm in the nation. Its recommendations are relied upon by hundreds of major institutional investment firms, mutual funds, and other fiduciaries throughout the country."

> "In recommending that eUniverse stockholders re-elect eUniverse's Board nominees, ISS stated in its January 22, 2004 report that:"

> "[T]he dissident slate does not offer a clear plan to operate the business that distinguishes themselves from the path of the current board of directors."

> "Further, we question the independence of the dissident slate as they were proposed by Mr. Greenspan and Mr. Greenspan's record as CEO eUniverse is blemished with financial difficulties. "

> "ISS also stated that:"

> "[T]he company's board has independent directors for six out of seven board seats, setup independent board committees as of Nov. 14, 2003, and two new directors added after the company announced its accounting problems."

> "Further, the board has taken steps to improve management of the company by removing Mr. Greenspan and initiating the process of hiring a new CEO."

> "In conclusion, ISS believes that "the [eUniverse] nominees should have an opportunity to implement plans to grow the business, shore up the company's finances, and find new management leadership."

> "Jeffrey Edell, Chairman of the eUniverse Board of Directors, said, "We are very pleased that ISS recognizes that the current Board is best suited to successfully guide eUniverse. We look forward to moving beyond Mr. Greenspan's costly and counterproductive proxy contest and to continuing the progress we have made to build a stronger future for eUniverse and all its stockholders."

106.    However, ISS is basing its report on the fabricated Edell bio and work experience that was created thru

emails again mailing the fraudulent Proxy prior to the ISS reports in violation of Statue 1341.

107.    ISS was not able to write an accurate report or reach an equitable conclusion because Defendants

destroyed the evidence of Edell's true background violating 18 U.S.C. §1512(c)(1) and 18 U.S.C. § 1519.

108.    January 23, 2004 press release is defamatory attack on Petitioner and misleads all shareholders, and is

distributed via wire service in violation of 18 U.S.C. §1343.

## Los Angeles Times Defamation

109    Defendants scheme to use fabricated and false Director Edell continued in a January 29, 2004

article titled, "Battle of EUniverse Is Up in the Air" that continues to harm Plaintiff and is located at

public web link: http://articles.latimes.com/2004/jan/29/business/fi-golden29 stating:

> "Battle of EUniverse Is Up in the Air
> Michael Hiltzik / GOLDEN STATE/January 29, 2004|
>
> There's an old joke about how university campus politics are so vicious because there's so little at stake.
> From that, we might conclude that the proxy fight over the Internet company EUniverse Inc. would
> have been more dignified had it concerned an operation that actually turned a profit over the last year
> and didn't spend several months in the doghouse of a Nasdaq trading suspension.
>
> Instead, the battle pitting EUniverse's founder and ex-chairman, Brad D. Greenspan, against a
> management team that he had largely appointed himself has reached new standards in backbiting and
> vituperation.
>
> Over the last few weeks, the existing board has been issuing letters to shareholders with lurid headlines
> such as: "BRAD GREENSPAN -- THE THREAT TO YOUR COMPANY'S SUCCESS," and
> "GREENSPAN'S SOUR GRAPES."
>
> Even the Democrats in New Hampshire backed away from this sort of campaigning.
>
> The board accuses the 30-year-old Greenspan of employing "empty rhetoric" and "petty personal
> attacks" in order to seize control of the Los Angeles-based company for personal financial gain and
> self-aggrandizement. It notes that the trading suspension and a huge restatement of financial results
> going back to 2002 occurred on his watch.
>
> The incumbents further charge that he tried to torpedo an $8-million private equity deal that they deem
> crucial to the survival of the company, which runs a collection of game and entertainment websites,
> earning revenue from advertising and memberships.
>
> Greenspan has fired back in kind. His shareholder letters accuse the officers and directors of conflicts of
> interest, self-dealing and mudslinging. ("THERE THEY GO AGAIN! DO NOT BE MISLED BY
> INCUMBENT MANAGEMENT'S CONTINUING MISSTATEMENTS, OMISSIONS AND

MANIPULATION OF THE FACTS IN THEIR EFFORTS TO DIVERT YOUR ATTENTION FROM THE REAL ISSUES."

EH-BCM    Document 32-2    Filed 09/

...fore charge [...] prison [...] claim to seize from a EUniverse from the holders of its common shares, of which he owns the largest block. As for its financial problems in the last year, he acknowledges that he was chairman and chief executive during much of that period. But he says he was left day-to-day operations in the hands of some of the same people now sniping at him from the other trench, including President Brett Brewer, 31, a board member and his former UCLA classmate.

Under the circumstances, one can only sympathize with the 4,000 shareholders being importuned to vote for one or another slate of four directors (out of seven) at the company's annual meeting, scheduled for today. Both sides say their first order of business will be to hire a professional CEO for EUniverse, obviously an admission that no one in place now is up to the job. Both also claim to possess the strategic key to restoring EUniverse's former luster as one of the rare, pure Internet plays that worked."

### The false and defective July 2004 Proxy (EXHIBIT #7, pg. 48-49)

110.   Edell's July 2004 Proxy disclosure totally omits any notion of bankruptcy. Edell and defendants later

after using the fabricated Edell to win the January 2004 Proxy contest, attempt thru a footnote,  in second Proxy

distributed in July 2004, to avail themselves  of the disclosure requirements they know exists by concealing

Edell's true background by disclosing:

*"Mr. Edell was the Chief Executive Officer of Showorks Entertainment Group, Inc., a Delaware corporation that later changed its name to Media Technology Source of Delaware, Inc. Within two years of the time that Mr. Edell resigned from that company, it filed a petition for relief under the United States Bankruptcy Code."*

111.   However, even with this disclosure of a bankruptcy Edell does not disclose the year that he works for

Showorks in his main bio area. Combined with fabricating the year Edell concluded his job at Soundelux to

2002, An informed investor  would not be able to  deduce that Edell worked for Showorks as CEO in 2001

before its bankruptcy in 2001. Edell misled investors, omitting fact that in 2001 & 2002 he was Showorks CEO.

112.   Defendants are guilty of the destruction or altering of the true Edell background information and work

experience and bankruptcy by omission violating 18 U.S.C. §1512(c)(1) and  18 U.S.C. § 1519.

113.   Defendants violate . § 1341 using email to send fabricated draft Proxy for review furthering scheme.

### 2009 FRAUD

114.   Edell & Defendants in mid-2009 launch another prong of fraudulent concealment.

115.   New evidence includes i) publication of a book by employee loyal to News Corp to fabricate the

background of Jeff Edell a former Director ii) Using fabricated Edell character to conceal truth that

MySpace asset sale documents were not executed until 2004. These schemes create a fraud upon the

Court on the Examiner and Class Representative in violation of the judicial process.

116. Defendant's leverage their relationship with acquiror to create defamatory and fabricated lies thru Angwin's published in late 2009 book, 'Stealing MySpace' which fraudulently conceals the true background of Edell and scheme to forward a fabricated false resume, misleading CEO to get Edell onto the Board.

117. The Defendants seek to use the benefits of the fabricated Edell resume and scheme to fraudulently conceal the fact that the purported MySpace Asset Purchase document disclosed by Issuer in a 10Q filing in November 2004 but that claims to have been signed as of December 17, 2003, is fabricated.

118. Defendants attempt to leverage the undiscovered fraudulent concealment of Edell's true Professional Experience, by using the resulting puffery and fake credibility temporarily captured by Edell to provide false historical statements to Julia Angwin concerning the rationale and reason why eUniverse would sold 33% of Myspace.com on December 17, 2003 to insiders for $50,000.

119. Defendants hope their final scheme and fraud on Shareholders thru using Edell's false statements packaged in a nationally published book strategically released in late 2009 by a clearly sympathetic employee of acquiror News Corp will serve as the final act to permanently fraudulently conceal their string of misdeeds.

120. Indeed, Edell is the critical source of evidence for Angwin on page 84 of her book who leverages the purported credibility of Edell as then Chairman of eUniverse to claim retrospectively that indeed the MySpace Asset sale agreement was signed on December 17, 2003 as defendants claim is authentic. Angwin states,

    i.    "By the end of 2003, the eUniverse board had to decide what to do about the earnout money it allegedly owed to its now-defunct ResponseBase division. Chris DeWolfe and Josh Berman argued that they were owed about $400,000. EUniverse disputed the figure, and according to Chairman of the Board Jeff Edell, "couldn't afford it" anyway." (pg.84 and pg. 298 footnotes)

    ii.    "On December 17, the two sides agreed to a compromise: ResponseBase would trade its earnout for a one-third stake in MySpace. The one-third stake would primarily be owned by DeWolfe and Anderson, with smaller stakes shared among MySpace's Berman, Whitcomb, Colin Digiario, and Kyle Brinkman. "We thought we made a great deal because we didn't think they had anything," Edell said." (pg.84)

    iii.    "Still, the board was divided about the prospect of funding MySpace's future losses. Board member Andrew Sheehan, a managing director at VantagePoint Ventures Partners, proposed a compromise. "Can't we do this with little or no capital?" he asked. EUniverse and MySpace agreed to jointly create a budget for MySpace, with initial funding of $50,000." (pg. 84)

121.    Angwin takes Edell's rendition of the events as truth after two interviews with Edell, on May 4, 2007

and...interviews with...Edell accord..."...when...Josh Berman and..." they

were owed about $400,000", "EUniverse disputed the figure", and most critically, "couldn't afford it anyway".

122.    According to Josh Berman based on his June 6, 2007 interview, "the board was divided" and Sheehan in

his interview remembers thinking "Can't we do this with little or no capital?"

123.    Investigation of eUniverse financial condition during period the Board allegedly enters into the December 17,

2003 MySpace asset sale shows financial condition to be exact opposite of what defendants claim in 2009.

124.    According to the publicly filed SEC documents, Issuer had over $7.0 million in cash by end of

December 2003, therefore the reason given by Edell for not paying the disputed monies makes no sense. Edell

confirms the modest amount of $400,000 claimed owed by ResponseBase is disputed by the CFO Flahie.

eUniverse is in the business of investing its capital into creating internet web assets. Therefore, defendants

admit that  because the $400,000 amount was in dispute, eUniverse ccould have been settled by paying even

less than $400,000 cash. Having raised over $10 million in financing at dilutive valuations in the 60 days prior

to the alleged signing of the December 17, 2003 MySpace asset sale agreement, logic would dictate that

eUniverse's board would have wanted to continue to own 100% of one of its best performing assets  rather then

sell a 1/3rd stake to insiders at a fire sale valuation. eUniverse raised capital to invest in its own assets so it did

not have to sell such assets off to raise capital.

125.    Therefore, the Board had a duty to try to keep 100% of the asset it just spent time, resources, and

capital creating for benefit of shareholders. Furthermore, MySpace was a good core asset for Issuer and Issuer's

business was to create, own, invest in, and operate  internet assets. (Exhibit: Angwin, pg. 298 footnotes)

126.    Investigation into Edell's background after he makes materially misleading factual statements about

Issuer's cash on hand leads to discovery that defendants and Edell fraudulently concealed Edell's true

Professional Experience because Edell was not qualified to join eUniverse board.

### DEFAMATORY 2009 NEWS CORP  BOOK CREATED USING FABRICATED EDELL

127.    "That night, Carlick and Brett Brewer had dinner" and according to Carlick in his January

9, 2007 interview , "such violent mood swings were part of Greenspan's character."

128. Carlick told Brewer, "VantagePoint would not wire money" until the CEO was removed. (Exhibit pg. 74)

129. In late 2008 defendants work with News Corp's Angwin to create a book called "Stealing MySpace". This book largely promotes a clearly false set of facts to cover up new claims and other liabilities of Defendants. This perverts and corrupts the Class's chance of getting a fair trial. RGRD obstructs equitable discovery process by ensuring no discovery comes from petitioner, while using only one source, Julia Angwin. Angwin worked for News Corp for over two years before publishing her book and continues to work for News Corp. Angwin uses Edell as a critical source, attempting to explain why Intermix would have sold a big piece of their crown jewel to insiders for scant consideration in December of 2003. A significant challenge as Issuer failed to disclose any such arrangement in any public filings for 11 months. News Corp, Defendants and RGRD fraudulently conceal Edell's background again in 2009 and 2010 as well as new MySpace search evidence when releasing the book & for the purpose of replacing Summary Judgement claims.

JOINT MOTION TO BAN IN 2010 IS INDEPENDENT ACT IN SCHEME

130. Petitioner and class members are both harmed by the motion to ban in late 2010 which is the 2nd to last independent act of defendants, defendant's counsel, and RGRD in the overall fraudulent concealment effort that seeks to obstruct the higher damages and liability based on the facts and claims and evidence that 701 lay witness seeks to enter into this case. RGRD knew petitioner was valuable Federal 701 lay witness for the Class in April 2009, October 2010, and May 2011 as RGRD filed pleadings which aided and abetted defendant's efforts to cover up & obstruct new evidence from entering this case. RGRD was notified by petitioner of new evidence on multiple occasions such as in July 2010 regarding: i) Heckman's admissions in Angwin book about the Search auction timing and economics of January 2006 Microsoft bid ii) value of missing MySpace Search.

131. An independent scheme by defendants is 2010 joint motion to brief the motion to ban Brad Greenspan. The stated goal is to preclude petitioner. Brown & RGRD lie thru omission of relationship and agreements with petitioner. I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed this 24th day of December at Los Angeles, California.

_____

Brad D. Greenspan

EXHIBIT #1

CH-BCM     Document 32-2     Filed 09/

**Brad Greenspan**

| | |
|---|---|
| From: | Brad Greenspan [bspan@earthink.net] |
| Sent: | Wednesday, August 27, 2003 1:30 AM |
| To: | 'Brett Brewer'; 'Tom Flahie' |
| Subject: | RE: resume/bio |


Great resume!

-----Original Message-----
From: Brett Brewer [mailto:BBrewer@euniverse.com]
Sent: Tuesday, August 26, 2003 5:39 PM
To: Brad Greenspan; Tom Flahie
Subject: FW: resume/bio

looks strong... again jeff will be here tomorrow to have lunch with tom and i. brad, i'll
set something up for you later this week or next depending on your schedule


-----Original Message-----
From: Jeff Edell [mailto:jeff@edellproductions.com]
Sent: Tuesday, August 26, 2003 4:08 PM
To: Brett Brewer
Subject: resume/bio

JEFFREY S. EDELL

244 Bridgetown Place, Westlake Village, CA 91362 • 805-379-4182 • jeff@edellproductions.com

EXECUTIVE MANAGEMENT • MERGERS AND ACQUISITIONS • BUSINESS DEVELOPMENT

## MARKETING AND CREATIVE LEADERSHIP

Dynamic and decisive, a results-oriented Senior Executive, with a track record of stellar accomplishments and a proven history of building top-performing creative and corporate teams; designing, managing and implementing business-development tactics and marketing strategies, that have driven dramatic revenue growth for each organization in his career. Possessing entrepreneurial savvy and a recognized commitment to excellence, integrity and bottom-line financial accountability, he has repeatedly gained consensus and maintained corporate and shareholder confidence, while directing beneficial changes in company structure, management and procedures, to consistently deliver significant improvements in performance and profitability - not to mention the multi-award winning results.

### CORE COMPETENCIES

- Visionary Leadership
- Strategic and Tactical Planning
- P& L Authority

- Project Conception, Management, Implementation
- International Management
- Persuasive Public Speaker

- CPA with Tax and Audit Experience
- Effective Negotiator
- Strategic Alliances

### PROFESSIONAL EXPERIENCE

SOUNDELUX ENTERTAINMENT GROUP, INC., Hollywood, CA                     1995-2002
**President/CEO/Director**
Directed company to become one of the largest/most successful independent providers of entertainment content, technologies, products and services worldwide, successfully reorganizing 13 separately run creative and technical service companies, with revenues of approximately $20 million, into one full-service integrated entertainment and technology conglomerate, encompassing 500 employees, with revenues in excess of $110 million—all within 4 ½ years.

*Key Mergers and Acquisitions Achievements:*
- Successfully initiated, negotiated and closed sale of the Hollywood postproduction division of SEG (Soundelux) to the Liberty Media Group, an AT&T company, resulting in newly created subsidiary: Liberty Livewire.
  - A record transaction in this market segment, where SEG sold approximately 1/3 of its assets and revenues for $90 million in cash, at an EBITDA multiple of approximately 28 times.
- Successfully initiated, negotiated and closed sale of the Hollywood postproduction division of SEG (Soundelux) to the Liberty Media Group, an AT&T company, resulting in newly created subsidiary: Liberty Livewire.
- Instrumental in securing a $35-million credit facility to refinance existing debt and acquire Media Technology Source (MTS), effectively doubling SEG's revenue. MTS was one of the world's largest independent theater designers, suppliers and integrators of cinema technologies, products and services, with a client list of over 9000 screens or 25% of the

From: Brett Brewer
Sent: Thursday, October 16, 2003 4:15 PM
To: Tom Flahie
FW: ...t-Completed D&O Questi......
Importance: High

:H-BCM    Document 32-2    Filed 09/




-----Original Message-----
From: Lawrence R. Moreau [mailto:lrmoreau@moreaugroup.com]
Sent: Friday, October 03, 2003 9:56 AM
To: Thomas Gewecke; Brett Brewer; Brad Greenspan; Danie L. Mosher
Cc: Chris Lipp; David L. Anderson
Subject: Jeff Edell -Completed D&O Questionnaire
Importance: High

Gentlemen,

Attached for your review is Jeff's completed D&O questionnaire.

You will note that he has been very through and candid in his responses. Based on my
review, there are no negatives for the Nominating Committee to report to the board.

Also, the Nominating Committee's previous legal and financial background checks did not
disclose any negatives.

Based on the results of the Nominating Committee's due diligence procedures including
meeting and various discussions with Jeff, I think he is an outstanding candidate and
hereby recommend that the Board approval his appointment.

I know we need to have Jeff on board as soon as possible, so I suggest we have a telephone
vote sometime today, so, if approved by the Board, Jeff can start immediately.

Larry
Director & Member of the Nominating Committee.
eUniverse, Inc.

## EUNIVERSE, INC.

### QUESTIONNAIRE FOR DIRECTORS AND OFFICERS

In connection with the preparation by eUniverse, Inc. (the "Company") of its Proxy Statement for the 2003 Annual Meeting of the Stockholders (the "Proxy Statement"), the Company must obtain from you the information called for by this questionnaire. This questionnaire is being furnished to each of the directors and officers of the Company. Your responses to this questionnaire will be used to assure the accuracy of certain information to be included in the Proxy Statement and are intended to enable the Company to make informed judgments in the preparation of this document. In addition, this information may be used by the Company's Board of Directors (including any committees or agents thereof) to assure the Company's compliance with its legal obligations and for any other purpose relevant to the Company's business. Accordingly, great care should be exercised in completing this questionnaire. You should be aware that if the Proxy Statement contains any false or misleading statements, the Company and those in control of the Company could be subject to liability under federal securities laws.

Please read the Notes at the back of this questionnaire for an explanation of the meaning of certain terms used in this questionnaire.

Please answer *every* question. If the requested information has been supplied, please verify that it is true, correct and complete. If the answer to any question is "none" or "not applicable," please so state. If the space supplied is insufficient to answer any question, please attach supplemental pages, each of which should also bear your signature and the appropriate question number to which the response is directed. In every instance where the word "Company" is used, the term refers to eUniverse and its subsidiaries. For example, if a question refers to a transaction between you and the Company, the answer should indicate a transaction between you and eUniverse and/or its subsidiaries.

Please complete, sign, date and return the questionnaire to Chris Lipp at 6060 Center Drive, Third Floor, Los Angeles, CA, as soon as possible, but in no event later than July 31, 2003. A copy of the completed questionnaire should be retained for your files since reference to the completed questionnaire may be necessary in connection with requests to update the information supplied.

If you have questions as to the terminology used in this questionnaire or as to the significance of any particular fact or situation, please contact Chris Lipp (310-215-1001 x119).

QUESTIONNAIRE FOR DIRECTORS AND OFFICERS

I.    **Employment, Occupation and Business Experience.**

1.    (a)    Please set forth your full name and date of birth.

**Jeffrey S. Edell, 11/10/57**

(b)    Please indicate all positions and offices, including directorships, with the Company which you hold or have held and the dates during which you held those positions and offices.

Position/Office                                    From/To

(c)    Please indicate all positions and offices which you hold or have held (other than positions (if any) with the Company) during the past five (5) years. Please furnish the proper name and principal business of any corporation or other organization in which such occupations and employment were carried on and whether such corporation or organization is or was a parent, subsidiary or affiliate of the Company, the dates during which you held such position and a brief account of your business experience. If you are an officer of the Company or any of its subsidiaries, please be advised that this information is required relating to the level of your professional competence which may include, depending upon the circumstances, such specific information as the size of the operation supervised.

Position/Office                                    From/To

President/CEO & Director Showorks Entertainment Group, Inc.
A successor to Soundelux Entertainment Group, Inc.          January 2001–April 2002
(resigned April 2002) disassembling remainder of company
and assets NOT purchased by John Malone
Location based entertainment company & theatre integration
And technology provider

President/CEO/Director, Soundelux Entertainment Grp, Inc.   November 1995–12/31/2000
Grown from $15M in 1995 to $120M in 2000 and materially
Sold to John Malone, Liberty Media in 2000.
Integrated Entertainment company involved in providing services and
Content. Large web based Sound and Music library. Sound and Music
Services garnered company 5 Academy Awards & 50+Emmys

President/CEO/Director, Enterprise Entertainment Group, LLC.  November 2002–May 2003
(resigned May 2003, after working on severe turnaround situation)
Integrated Entertainment Company, providing non-mainstream IMAX

If any of the following events has occurred since April 1, 1998, please provide a brief description of the event.

Note: For purposes of this section, the date of a reportable event is the date on which the final order, judgment or decree was entered, or the date on which any rights of appeal from preliminary orders, judgments or decrees have lapsed. With respect to bankruptcy petitions, the computation date is the date of filing for uncontested petitions or the date upon which approval of a contested petition became final.

(a)    A petition under the Federal bankruptcy laws or any state insolvency law was filed by or against you, or a receiver, fiscal agent or similar officer was appointed by a court for your business or property, or any partnership in which you were a general partner at or within two years before the time of such filing, or any corporation or business association of which you were an executive officer at or within two years before the time of such filing.

__X__ YES _____ NO

Description:

Showorks Entertainment Group, Inc. underwent a name change in 2002 to MTS, Inc. I resigned as President and CEO of this company in April of 2002. Subsequent to my leaving, sometime in September of 2002, I learned that they had filed bankruptcy until Chapter 7. I was not there at the time of the filing. I was never personally named or contacted as part of these subsequent proceedings.

(b)    You were convicted in a criminal proceeding or are the subject of a pending criminal proceeding (excluding traffic violations and other minor offenses).

_____ YES __x__ NO

**FOR IMMEDIATE RELEASE**

*...iverse Announ...*

### Brad Greenspan Steps Down as Chief Executive Officer

Jeffrey Edell, eLabor Founder and Former CEO/President of Soundelux Entertainment Group, and Bradley Ward, CEO of The Game Tr...
Join eUniverse Board

*Los Angeles, CA – October 31, 2003* – eUniverse, Inc. (EUNLPK) announced today that Brad D. Greenspan has stepped down as the Company's Chief Executive Officer and, although still a member of the Company's Board of Directors, will no longer serve as Chairman. ... Brewer, the Company's President, will serve as the Company's principal executive officer as the Company evaluates CEO candidates. eUniverse also announced the recent addition of two new members to its Board of Directors, Jeffrey Edell and Bradley G. Ward. Edell, a twenty-four year industry veteran, replaces Thomas Gewecke who, since October of 2001, served on the Company's Board as the designee ... Sony Music Entertainment ("SME"), the holder of the Company's Series B Preferred Stock.

Mr. Edell's achievements include having served as President/CEO & Director of Soundelux Entertainment Group, Inc., a leading provider o... entertainment content and technologies, where he oversaw growth in the company's revenues from $15 million to $110 million over a 4-yea... period. Soundelux was recognized with 5 Academy Awards and over 50 Emmys. While at Soundelux, Edell initiated, negotiated and closed ... sale of the company's post production group to John Malone's Liberty Media Group, resulting in the creation of Liberty Livewire, a Libert... Media Group subsidiary company. Additionally, Edell served as Founder, Director and CEO of eLabor, Inc., which was sold to ADP in February of 2003. Previously, Edell sat on the Board of publicly traded IVC Industries, Inc., helping to navigate the sale of that company to ... Inverness Medical.

In 2000, Edell was named, "Entertainment Entrepreneur of the Year," by NASDAQ and Ernst and Young and is presently a member of the Academy of Television Arts & Sciences, the Academy of Motion Picture Arts and Sciences and the Young Presidents' Organization. Edell obtained his CPA while at KPMG and is a graduate of the McIntire School of Commerce of the University of Virginia.

Bradley Ward has served as President and Chief Executive Officer of The Game Tree, an online publisher of games and game-related intellectual property, since 2002. From 2001 to 2003, Mr. Ward served as the Vice President of Licensing/Corporate Development of PopC... Games, Inc. Mr. Ward consulted from 1998 to 2001, providing technical and online gaming consulting to various companies. In addition, ... served a short tenure in 2000 as the Vice President of Internet Operations for ETM Entertainment Network, Inc., a provider of online, offli... and point of sale ticketing services for live events and movies.

"This is a very exciting period for eUniverse," said Brett Brewer, the Company's President. "Brad Greenspan led our team through some ... exciting times, and we are thrilled at all we've been able to accomplish during his tenure. Jeff Edell's experience in building top-performin... creative and corporate teams through a combination of superior executive leadership and strategic mergers and acquisitions, and Bradley Ward's strong ties to the gaming community, will be a boon to eUniverse and help the Company move forward and pursue the opportunit... that lie ahead."

*... ...minantly online businesses engaged in interactive*
*... ...eration Web s...*

down as the Company's Chief Executive Officer and, although still a member of the Company's Board of Directors, will no longer serve as Chairman. Brett Brewer, the Company's President, will serve as the Company's principal executive officer as the Company evaluates CEO candidates. eUniverse also announced the recent addition of two new members to its Board of Directors, Jeffrey Edell and Bradley G. Ward. Edell, a twenty-four year industry veteran, replaces Thomas Gewecke who, since October of 2001, served on the Company's Board as the designee of Sony Music Entertainment ("SME"), the holder of the Company's Series B Preferred Stock.

Mr. Edell's achievements include having served as President/CEO & Director of Soundelux Entertainment Group, Inc., a leading provider of entertainment content and technologies, where he oversaw growth in the company's revenues from $15 million to $110 million over a 4-year period. Soundelux was recognized with 5 Academy Awards and over 50 Emmys. While at Soundelux, Edell initiated, negotiated and closed the sale of the company's post production group to John Malone's Liberty Media Group, resulting in the creation of Liberty Livewire, a Liberty Media Group subsidiary company. Additionally, Edell served as Founder, Director and CEO of eLabor, Inc., which was sold to ADP in February of 2003. Previously, Edell sat on the Board of publicly traded IVC Industries, Inc., helping to navigate the sale of that company to Inverness Medical.

In 2000, Edell was named, "Entertainment Entrepreneur of the Year," by NASDAQ and Ernst and Young and is presently a member of the Academy of Television Arts & Sciences, the Academy of Motion Picture Arts and Sciences and the Young Presidents' Organization. Edell obtained his CPA while at KPMG and is a graduate of the McIntire School of Commerce of the University of Virginia.

"This is a very exciting period for eUniverse," said Brett Brewer, the Company's President. "Brad Greenspan led our team through some very exciting times, and we are thrilled at all we've been able to accomplish during his tenure. Jeff Edell's experience in building top-performing creative and corporate teams through a combination of superior executive leadership and strategic mergers and acquisitions, and Bradley Ward's strong ties to the gaming community, will be a boon to eUniverse and help the Company move forward and pursue the opportunities that lie ahead."

EXHIBIT #5

ZH-BCM     Document 32-2     Filed 09/

Defendants Omit Edell's Bankruptcy and ... Or else CE... Brad Greenspan would never have accepted Or supported Edell joining board

If any of the following events has occurred since April 1, 1998, please provide a brief description ...

... income and assets, or the date on which any rights of appeal from preliminary orders, judgments or decrees have lapsed. With respect to bankruptcy petitions, the completion of the distribution of the estate or the date upon which approval of a restated petition became final.

(a) A petition under the Federal bankruptcy laws or any state insolvency law was filed by or against you, or a receiver, fiscal agent or similar officer was appointed by a court for your business or property, or any partnership in which you were a general partner at or within two years before the time of such filing, or any corporation or business association of which you were an executive officer at or within two years before the time of such filing.

___ YES ___ NO

Description: _____

Showorks Entertainment Group, Inc. underwent a name change in 2002 to MTS, Inc. I resigned as President and CEO of this company in April of 2002. Subsequent to my leaving, sometime in September of 2002, I learned that they had filed bankruptcy until Chapter 7. I was not then at the time of the filing. I was never personally named or contacted as part of these subsequent proceedings.

(b) You were convicted in a criminal proceeding or are the subject of a pending criminal proceeding (excluding traffic violations and other minor offenses).

___ YES ___ NO

---

**From:** Brad Greenspan [bgsan@earthlink.net]
**Sent:** Wednesday, August 27, 2003 1:30 AM
**To:** 'Brad Brewer' 'Tom Flahie'
**Subject:** RE: resume/bio

Great counsel.

-----Original Message-----
From: Brett Brewer [mailto:BBrewer@extreme.com]
Sent: Tuesday, August 26, 2003 3:35 PM
To: Brad Greenspan; Tom Flahie
Subject: FW: resume/bio

Looks strong... again jeff will be here tomorrow to have lunch with tom and i. brad, i'll set something up for you later this week or next depending on your schedule

-----Original Message-----
From: Jeff Edell [mailto:jeffedell productions.com]
Sent: Tuesday, August 26, 2003 4:38 PM
To: Brett Brewer
Subject: resume/bio

---

# JEFFREY S. EDELL

1234 Bridgeton Place, Westlake Village, CA 91361 • 805-370-6182 • jeff@edellsolutions.com

## EXECUTIVE MANAGEMENT ▪ MERGERS AND ACQUISITIONS ▪ BUSINESS DEVELOPMENT
### MARKETING AND CREATIVE LEADERSHIP

Dynamic and decisive, a results-oriented Senior Executive, with a track record of solid accomplishments and a proven history of building top-performing creative and corporate teams; designing, managing, and implementing business development tactics and marketing strategies that have driven dramatic revenue growth for each organization in his career. Possessing entrepreneurial savvy and a recognized commitment to excellence, integrity and bottom-line financial accountability, he has repeatedly gained consensus and maintained corporate and shareholder confidence, while driving beneficial changes in company structure, management and procedures, to consistently deliver significant improvements in performance and profitability — not to mention the multi-award-winning climate.

**CORE COMPETENCIES**

- Visionary Leadership
- Strategic and Tactical Planning
- P & L Authority
- Project Conception, Management, Implementation
- International Management
- Permanent Public Speaker
- CPA with Tax and Audit Experience
- Effective Negotiator
- Strategic Alliances

## PROFESSIONAL EXPERIENCE

**SHOWORKS ENTERTAINMENT GROUP, INC.**, Hollywood, CA 1995-2002
**President/CEO/Director**

Directed company to become one of the largest/most successful independent providers of entertainment content, technologies, products and services worldwide, successfully reorganizing 13 separately run creative and technical service companies, with revenues of approximately $35 million, into one full-service integrated entertainment and technology employer, encompassing 500 employees, with revenues in excess of $110 million — all within 6 ½ years.

Key Mergers and Acquisitions Achievements:
- Successfully initiated, negotiated and closed sale of the Hollywood post-production division of SEG (Showorks) to the Liberty Media Group, an AT&T company, resulting in newly created subsidiary Liberty Livewire.
  - A moved transaction in this market segment, where SEG sold approximately 1/3 of its assets and revenues for $90 million in cash, in an EBITDA multiple of approximately 20 times.
- Successfully initiated, negotiated and closed sale of the Hollywood post-production division of SEG (Showorks) to The Liberty Media Group, an AT&T company, resulting in newly created subsidiary Liberty Livewire.
- Instrumental in securing a $35 million credit facility to refinance existing debt and acquire Media Technology Systems (MTS), effectively doubling SEG's revenues. MTS was one of the world's largest independent home designers, suppliers and integrators of cinema technologies, products and services, with a client list of over 5000 screens or 25% of the marketplace. This acquisition dramatically positioned SEG to pursue the emerging D-Cinema (Digital) arena.
  - The purchase of MTS and subsequent sale of SEG's Hollywood postproduction division to Liberty Media, resulted in being named "The Entertainment Entrepreneur of the Year 2000" by Ernst & Young and NASDAQ.
- Negotiated and directed acquisition of Interplay Group, leveraging and expanding company's core business (audio/video services) substantially, boosting both non-entertainment related venues: hospitals, schools, stadiums and governmental agencies.
- Orchestrated purchase of Ryder Sound Services, oldest sound-recording company in Hollywood.

Edell later fills out D&O Questionnaire
□ Fabricates work experience and omits
□ Options or False Proxy statements
□ By fabricating work experience and omitting
□ Prior bankruptcy violating Item 401 s'

**TRUE**

**PROFESSIONAL EXPERIENCE**

[partially legible text] Hollywood, CA.

[illegible paragraph of professional experience text]

technologies, products and services worldwide, successfully integrating 13 separate rate creation and technical service companies, with revenues of approximately $20 million, into one full-service integrated entertainment and technology conglomerate, encompassing 500 employees, with revenues in excess of $110 million—all within 4½ years.

*Key Mergers and Acquisitions Achievements:*

[illegible bullet points]

**FUNIVERSE, INC.**

**QUESTIONNAIRE FOR DIRECTORS AND OFFICERS**

I. **Employment, Occupation and Business Experience.**

1. (a) Please set forth your full name and date of birth.

Jeffrey S. Edell, 11/10/57

(b) Please indicate all positions and offices, including directorships, with the Company which you hold or have held and the dates during which you held those positions and offices.

| Position/Office | From/To |
|---|---|
| none | |

(c) Please indicate all positions and offices which you hold or have held (other than positions of any) with the Company during the past five (5) years. Please furnish the proper name and principal business of any corporation or other organization in which such occupations and employment were carried on and whether such corporation or organization was a part owner, a parent, subsidiary or affiliate of the Company, the dates during which you held such position and a brief account of your business experience. If you are an officer of the Company or any of its subsidiaries, please be advised that this information is required relating to the level of your professional competence which may include, depending upon the circumstances, such specific information as the size of the operation supervised.

| Position/Office | From/To |
|---|---|
| President/CEO & Director Showcite Entertainment Group, Inc. | |
| A successor to Soundelux Entertainment Group, Inc. | January 2001-April 2002 |
| (resigned April 2002) disassembling remainder of company | |
| 401 work NOT purchased by John Malone | |
| Location based entertainment company & theatres Integration | |
| And technology provider | |
| President/CEO/Director, Soundelux Entertainment Grp, Inc. | November 1995-12/31/2000 |
| Grown from $13M in 1995 to $120M in 2000 and financially | |
| Sold to John Malone, Liberty Media in 2000. | |
| Integrated Entertainment company involved in providing services and | |
| Content. Large web based Sound and Music library. Sound and Music | |
| Services garnered company 5 Academy Awards & 50+ Emmys | |
| President/CEO/Director, Enterprise Entertainment Grp, LLC. | November 2001-Mar 2003 |
| (resigned May 2003, after working on seven turnaround situations) | |
| Integrated Entertainment Company, providing non-mainstream IMAX | |
| Content on DVD and for TV and Webcast, also sound service & rental | |
| Video and audio post to production companies. | |

**FABRICATED**

Initial fabricated resume

**JEFFREY S. EDELL • Page 2**

[illegible paragraph about infrastructure while maintaining highly effective interaction with major law and accounting firms and international parent corporation, supporting deal structuring and tax and financial planning.]

TRANSAMERICA INSURANCE GROUP, Los Angeles, CA 1983-1987

Assistant to Chairman of the Board/Director of Finance/Vice President of Budgeting & Planning

[illegible paragraph]

*Key achievements:*
• Created and enacted the company's accounting, budgeting and cost-control system.
• Persuaded hundreds of employees to alter existing practices to embrace new systems and procedures – critical to successful integration and implementation.

INSURTECH, Los Angeles, CA 1983-1986

Vice President of Finance/Corporate Controller

[illegible paragraph]

*Key achievements:*
• Highly influential in sale/merger into the Transamerica Insurance Group.
• Successful in managing turnaround for both pricing and construction subsidiaries.

KPMG (formerly Peat, Marwick, Main & Co.), Los Angeles, CA 1979-1983

Senior Auditor and Senior Tax Accountant

[illegible paragraph]

*Key achievements:*
• Instrumental in assisting in the valuation of 20th Century-Fox's entertainment properties/film libraries, facilitating the acquisition by Marvin Davis.
• One of 10 individuals from KPMG's Southern California offices to train in their tax division, a department normally exclusive to licensed attorneys, and while enrolled in a rigorous night school Master's in Taxation program.
• Extensive audit work on MCA Record's music royalty accounts on behalf of Universal.
• Successfully obtained CPA certificate in 1981.

**EDUCATION**

Cum Coursework, Master of Business Administration in Taxation, 1984-1991
Golden Gate University, Los Angeles, CA

Bachelor of Science in Commerce, 1979
Malcolm School of Business, University of Virginia, Charlottesville, VA
McIntire School Advisory Board, 2001- present

**PROFESSIONAL HONORS AND ASSOCIATIONS**

Named "Entertainment Entrepreneur of the Year 2001" by Ernst & Young and NASDAQ
The Academy of Motion Picture Arts & Sciences, 1999-present
The Academy of Television Arts & Sciences, 2002-present
The Young Presidents Organization (YPO), non-profit, Santa Monica Bay Chapter, 1997-present
YPO Membership Chair, Santa Monica Bay Chapter, 1999
The Hollywood Arts Award, 1998
Hollywood Film Festival (HFF), non-profit, Events Chair, 1998-2001
HFF Founder, Best Young Filmmaker Award, 1998-1999
Director, non-profit, Ocean Park Community Center for the Homeless, 1999-present
Director, non-profit, Hollywood Chamber of Commerce, 1998-2000
Member, AICPA & California Society of CPAs, 1981-1996

EXHIBIT #6

For instance, Defendants fail to disclose the bankruptcy in December 11, 2013 8k, creating ongoing

Securities violation that defendants should all be held in contempt for until corrected.

"Item 6. Resignations of Registrant's Directors

On December 11, 2003, Brad Greenspan resigned from his position as a director of eUniverse, Inc. (the "Company"). A copy of his resignation letter addressed to Jeffrey Edell, Chairman of the Board of Directors (the "Board") and Brett Brewer, President of the Company, in which Mr. Greenspan described his disagreements with the Board, is attached hereto as Exhibit 99.1.

In his resignation letter, Mr. Greenspan makes a number of assertions as reasons for his resignation. He disagrees with the Board's decision to not nominate him for election at the Company's upcoming annual stockholder's meeting and his removal as Chairman of the Board. He also asserts that certain directors have taken actions to entrench their positions on the Board and violated their fiduciary duties to the Company and its stockholders. Mr. Greenspan also expressed his disagreement with the Board's approval of a financing transaction with affiliates of VantagePoint Venture Partners. In addition, Mr. Greenspan expressed his disagreement with certain actions taken by the Board in connection with the upcoming annual stockholder's meeting, including the adoption of a bylaw provision relating to advance notification of stockholder proposals, a reduction in the number of director nominees eligible for election, and the rescheduling of the stockholder's meeting to January 21, 2004 with a record date of December 1, 2003.

The Nominating and Corporate Governance Committee of the Board recently informed Mr. Greenspan that they did not consider him fit to serve on the Company's Board and the Board decided not to include Mr. Greenspan in the Board's proxy for the January 21, 2004 stockholder's meeting. The Company believes that Mr. Greenspan's assertions in his letter of resignation are not factual and result from the Board's request for his resignation as Chief Executive Officer and removal as Chairman of the Board.

Item 7. Financial Statements, Financial Information and Exhibits (c)
Exhibits Description
99.1 Letter, dated December 11, 2003, from Brad Greenspan to Jeffrey Edell, Chairman of the Board of Directors and Brett Brewer, President of eUniverse, Inc."

http://www.sec.gov/Archives/edgar/data/1088244/000119312504008883/d4efa14a.htm

The following press release was issued January 26, 2004.
FOR IMMEDIATE RELEASE

EUNIVERSE URGES STOCKHOLDERS TO VOTE WHITE PROXY CARD
Issues Open Letter
LOS ANGELES, January 26, 2004 – eUniverse, Inc. (OTC:EUNI.PK) today issued the following open letter strongly urging all stockholders to vote FOR the Board's director nominees – Brett Brewer, Daniel Mosher, Lawrence Moreau and Bradley Ward – and reject Brad Greenspan's hand-picked director nominees by signing, dating and returning the WHITE proxy card today.
January 26, 2004
Dear eUniverse Stockholder:
Perhaps in talking to eUniverse stockholders, Brad Greenspan has realized that his purported reasons for engaging in this proxy contest are falling on deaf ears. It now appears that in a last ditch attempt to gain support for his hand-picked director nominees, Mr. Greenspan has resorted to what we see as petty personal attacks on your Board and has continued to issue press releases littered with inaccurate information.
Don't be fooled by Mr. Greenspan's empty rhetoric. Protect your investment. eUniverse's annual meeting is only days away and the outcome could significantly impact the value of your investment and the future of your Company. We urge eUniverse stockholders to focus on the facts – not Mr. Greenspan's distortions – and vote the WHITE proxy card FOR your Board's four director nominees and discard all blue proxy cards that you may receive from Mr. Greenspan.
Time is short. If you have any questions about voting or need other assistance, please call Mackenzie Partners, Inc., the firm assisting us in the solicitation of proxies for our annual meeting of other stockholders, toll-free at 1 (800) 322-2885 or collect at 1 (212) 929-5500.
EUNIVERSE'S DIRECTOR NOMINEES ARE EXPERIENCED IN OUR BUSINESS
The eUniverse Board remains committed to doing the right thing for ALL eUniverse stockholders, and we have been working diligently to address the challenges arising under Mr. Greenspan's leadership. Importantly, we are making meaningful progress. In distinct contrast to your current Board, Mr. Greenspan's nominees have NO prior experience with the Company's business, NO direct understanding of the challenges that arose under Mr. Greenspan's leadership and NO direct understanding of the Company's efforts to address these challenges.
Further, we question whether Mr. Greenspan's hand-picked nominees have the objectivity required to act in the best interest of ALL eUniverse stockholders, especially considering the fact that one of Mr. Greenspan's nominees is being paid $5,000 per month by Mr. Greenspan for consulting services in connection with his proxy contest. But don't take our word for it. Institutional Shareholder Services, Inc. (ISS), the nation's leading independent proxy advisory firm, stated in its January 22, 2004 report that "we question the independence of the dissident slate as they were proposed by Mr. Greenspan and Mr. Greenspan's record as CEO of eUniverse is blemished with financial difficulties."*

GREENSPAN'S SOUR GRAPES
The eUniverse Board and management team are implementing a strategic plan focused on the future for the benefit of ALL stockholders. While Mr. Greenspan has attempted to mislead you about the Board's independence, ISS has no doubts. In recommending that stockholders vote FOR eUniverse's director nominees, ISS stated in its report that, "the company's board has independent directors for six out of seven board seats, setup independent board committees as of Nov. 14, 2003, and two new directors added after the company announced its accounting problems."
Unlike many other boards that have been criticized for not exercising independent judgment, your Board has made difficult decisions and has stood up to and removed a dominating Chief Executive Officer and founder who, in our view, treated eUniverse like his own private company. ISS supports the decisions we are making.
In its report, ISS stated that "the [eUniverse] board has taken steps to improve management of the company by removing Mr. Greenspan and initiating the process of hiring a new CEO."
And don't forget – as Mr. Greenspan appears to have forgotten – that Mr. Greenspan personally recruited all of the Board's

DECLARATION IN SUPPORT OF MOTION 70(b) 42(b) CONTEMPT          45

director nominees. It was only when these same directors challenged his dominance that Mr. Greenspan attempted to oust them.

**GREENSPAN DROPPED HIS CLAIMS AND ESSENTIALLY ABANDONED HIS LAWSUIT**

After ISS issued its report, Mr. Greenspan dropped his claims, describing them as moot. In spite of Mr. Greenspan's claim that he and eUniverse failed to reach a settlement, eUniverse continued its attempts to obtain materials to you, but Mr. Greenspan refused to drop his lawsuit.

Mr. Greenspan has caused your Company to spend considerable sums of money and management resources defending eUniverse and your Board against Mr. Greenspan's baseless and costly claims. Yet, Mr. Greenspan has threatened to again assert more claims. Ask yourself, how are Mr. Greenspan's threats in your best interest?

**SOME THINGS ARE CLEAR**

**THE VANTAGEPOINT TRANSACTION WAS THE RIGHT TRANSACTION**

ISS agrees that the VantagePoint transaction was the right transaction. In its report, ISS stated, "we agree with the Company's decision to go with an alternative that offered more than $2.5 million in capital based on the company's liquidity position."

It's clear to us that your Board did what any responsible Board would do – it negotiated the best deal it could on behalf of all stockholders.

**THE STAKES ARE HIGH**

**DON'T RISK THE FUTURE OF YOUR COMPANY**

**VOTE FOR YOUR BOARD'S DIRECTOR NOMINEES**

Under Mr. Greenspan's stewardship as Chairman and Chief Executive Officer, eUniverse restated its financial results; was subjected to an informal inquiry by the U.S. Securities and Exchange Commission; was delisted from NASDAQ; and was sued by stockholders in various class action and derivative lawsuits.

Now under the current Board's leadership, we have started to distance the Company from those issues and build the foundation for a stronger future. However, we are concerned that a vote for Mr.

the past.

Vote FOR a stronger future. Vote FOR your Board's director nominees on the WHITE proxy card.

**TIME IS SHORT**

Whether or not you plan to attend the annual meeting, please sign, date and return the WHITE proxy card TODAY and discard all blue proxy cards that you may receive from Mr. Greenspan.

IF YOU HAVE ANY QUESTIONS ABOUT VOTING OR NEED OTHER ASSISTANCE, PLEASE CALL MACKENZIE PARTNERS, INC., THE FIRM ASSISTING US IN THE SOLICITATION OF PROXIES FOR OUR ANNUAL MEETING OF STOCKHOLDERS, TOLL-FREE AT 1 (800) 322-2885 OR COLLECT AT 1 (212) 929-5500.

On behalf of your Board of Directors, I thank you for your continued confidence and support.

Sincerely,

/s/ Jeffrey Edell

Chairman of the Board of Directors

---

**About eUniverse**

eUniverse, Inc. and its subsidiaries own and operate a compelling collection of predominantly online businesses engaged in interactive entertainment, electronic commerce and publishing, and direct to consumer marketing. The Company's many popular destination websites attract millions of visitors who view, share and interact with eUniverse content, and who purchase an array of products and services from eUniverse and its advertisers. The Company's holdings include the following: Flowgo (www.flowgo.com), the Company's flagship entertainment web site; comedy site MadBlast (www.madblast.com ); dating site Cupid Junction (www.cupidjunction.com); GameUniverse, which includes online computer gaming sites Case's Ladder (www.CasesLadder.com) and SkillJam (www.SkillJam.com ); and one of the largest e-mail newsletter portfolios, delivering content daily to many millions of subscribers with such titles as Infobeat, IntelligentX and GossipFlash.

**Further Information**

The Company has filed a definitive proxy statement with the U.S. Securities and Exchange Commission (SEC) relating to its annual meeting of stockholders on January 29, 2004. Stockholders of the Company are advised to read the Company's proxy statement for the annual meeting because it contains important information. The Company's proxy statement for the annual meeting was mailed to stockholders of the Company. Stockholders and other interested parties may obtain free copies of the proxy statement and other documents filed by the Company with the SEC through the website maintained by the SEC at http://www.sec.gov. These documents may also be obtained free of charge by contacting MacKenzie Partners, the firm assisting the Company in the solicitation of proxies, toll free at +1-800-322-2885.

For more information, please contact:

Thomas Flahie of eUniverse, Inc., +1-310-215-1001, ext. 101, tflahie@euniverse.com

---

EXHIBIT #7

Intermix Media, Inc. (Form: DEF 14A, Received: 07/16/2004 13:13:41) 10/16/10 11:38 PM
http://ssh.brand.edgar-online.com/EFX_dll/EDGARpro.dll?FetchFile...2Fb%3E&SearchText=%3CNFAR%2F4%3Fj%22ADAM%23%2C%220OLDENBERG%22) Page 1 of 49

## SCHEDULE 14A INFORMATION
Proxy Statement Pursuant to Section 14(a) of the
Securities Exchange Act of 1934

Filed by the Registrant ! Filed by a Party other than the Registrant "

Check the appropriate box:

" Preliminary Proxy Statement

" Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))

!

Definitive Proxy Statement

" Definitive Additional Materials

" Soliciting Material Pursuant to §240.14a-12

Intermix Media, Inc.

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement if Other Than the Registrant)

Payment of Filing Fee (Check the appropriate box)

!

No fee required.

" Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

1. Title of each class of securities to which transaction applies:

2. Aggregate number of securities to which transaction applies:

3. Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

4. Proposed maximum aggregate value of transaction:

5. Total fee paid:

" Fee

The Board carefully considers all stockholder proposals. When adoption of a stockholder proposal is clearly in the best interest of our Company and our stockholders, and can be accomplished without stockholder approval, the proposal is implemented without inclusion in our proxy materials.

Communications with the Board

The Board has established a process for stockholders to communicate with members of the Board. If you have any concern, question or complaint regarding our compliance with any policy or law, or would otherwise like to contact the Board, you can reach the Chairman of the Board, Jeffrey Edell, via email at jedell.director@intermixmedia.com.

Proposal 1 - To Elect Six Directors to Serve Until the Next Annual Meeting of Stockholders.

Nominees for Election of Directors

The Board proposes the election of Richard Rosenblatt, Brett Brewer, Daniel Mosher, Lawrence Moreau, Jeffrey Edell and James Quandt as Company directors, each for a term of office that runs until the 2005 annual stockholder's meeting and until his successor has been elected and has qualified. Each of the nominees has served continuously on the Board since the date indicated in the table below. There are no family relationships among our directors and executive officers. The Board knows of no reason why any nominee may be unable to serve as a director. If any nominee is unable to serve, the shares represented by all valid proxies may be voted for the election of such other person as the Board may recommend.

Pursuant to the Certificate of Designation of Series C Preferred Stock, affiliates of VantagePoint Venture Partners ("VantagePoint"), the sole holders of our Series C preferred stock, have the exclusive right, voting separately as a single class, to elect two directors. VantagePoint has notified the Company that it intends to re-elect David Carlick and Andrew Sheehan to the Board. Company Directors are elected by a plurality of the votes cast at the annual meeting. Plurality means that the six nominees who

receive the largest number of votes cast "FOR" are elected as directors. You may not cast your votes for more than six nominees. Votes withheld and broker non-votes will be counted in determining the presence of a quorum but will not be counted in determining the outcome of the election.

**Recommendation of the Board:**

The Board recommends a vote "FOR" the nominees Richard Rosenblatt, Brett Brewer, Daniel Mosher, Lawrence Moreau, Jeffrey Edell and James Quandt.

The names and ages of the nominees, their principal occupations or employment during the past five years and other data regarding them, based on information received from the respective nominees, are set forth below:

Name
Age
Principal Occupation
Director Since

Directors nominated by the Board:
Richard Rosenblatt 35 Chief Executive Officer, Intermix Media, Inc. February 23, 2004
Brett Brewer 31 President, Intermix Media, Inc. August 29, 2000
Daniel Mosher 31 Director, Corporate Development, Verisign, Inc. December 8, 1999
Lawrence Moreau 61 Chairman, Stone Mountain Financial Systems, Inc. May 27, 2004
Jeffrey Edell
46
Past President and Chief Executive Officer.
Showorks Entertainment Group, Inc. October 14, 2003
James Quandt 54 Partner, Highland Partners June 1, 2004
Directors expected to be elected by the Series C stockholders:
David Carlick 54 Managing Director, VantagePoint Venture Partners October 31, 2003
Andrew Sheehan 46 Managing Director, VantagePoint Venture Partners October 31, 2003

Jeffrey Edell has served as a Director since October 14, 2003 and as Chairman of the Board since November 14, 2003. Mr. Edell is currently a member of the Compensation and Audit Committees. Mr. Edell was employed as President and Chief Executive Officer and a director of Soundelux Entertainment Group, Inc., a provider of entertainment content and technologies, from 1995 until 2002. From 2000 to 2002, he was a Director of IVC Industries, Inc. (IVC), a manufacturer of vitamins and supplements. Mr. Edell was also the founder, in 1984, of eLabor, a developer of time and attendance software, where he served as the Chairman and Chief Executive Officer until 1991 and a Director to 2003. From 1995 to 1999, Mr. Edell was the President and Executive Producer of Hastings/Edell Productions, Inc., an independent film company, from 1992 to 1995, he was a partner at DF & Co. (subsequently Century Business Services, Inc.), an accounting and tax services firm. Mr. Edell became a Certified Public Accountant while at KPMG and he holds a B.S. degree in Commerce from the McIntire School at the University of Virginia. Ernst & Young and NASDAQ named him Entertainment Entrepreneur of the Year 2000. He is a member of the Young Presidents Organization, the Academy of Motion Picture Arts & Sciences and the Academy of Television Arts & Sciences.

Mr. Rosenblatt was the Chief Executive Officer of drkoop.com, Inc., a Delaware corporation doing business as Dr. Koop LifeCare Corporation, within two years of the time that company filed a petition for relief under the United States Bankruptcy Code. Mr. Edell was the Chief Executive Officer of Showorks Entertainment Group, Inc., a Delaware corporation that later changed its name to Media Technology Source of Delaware, Inc. Within two years of the time that Mr. Edell resigned from that company, it filed a petition for relief under the United States Bankruptcy Code.

Information Relating to Directors, Nominees and Executive Officers
Board of Directors Meetings and Board Committees
The Board held 38 meetings during fiscal year 2004. Each member of the Board during fiscal year 2004 attended at least 75% of all Board meetings held during the period that he was a director. In addition, each member of the Board during fiscal year 2004 attended at least 75% of all Board committee meetings on which he served during the period that he served on the committee. Information about the Audit, Compensation and Nominating Committees is as follows:

Name of Committee and
Number of Meetings in Fiscal Year 2004
Audit Committee 18
Daniel Mosher (1)
Thomas Gewecke (2)
Lawrence Moreau* (3)
Jeffrey Lapin (4)
Jeffrey Edell (5)

During fiscal year 2004, the Board acted by written consent on 4 occasions and the Compensation Committee acted by written consent on 2 occasions.

EXHIBIT #8

## Executive Summary
Overview of Constituent Parties

> We have taken a
> look at the different
> parties to a
> potential
> transaction and
> analyzed their
> individual
> motivations and
> considerations

| | Remix Management | Social Club Management | Brad Greenspan | VantagePoint | Redpoint | Other Remix Shareholders |
|---|---|---|---|---|---|---|
| **Description** | • Management appears to be dominated by Richard who would support him Brad | • Obviously a key player in the process due to need to retain and introduce them | • A definite wild card in any process • Does not have significant credibility | • Wild Remix board seats • Social Club board seat | • Investments in both Remix and Social Club • 1 Social Club board seat | • Significant accumulation by various institutions over the last several months |
| **Ownership** | • Richard has 2 million shares • Holders own 38.1% of Remix Club • 54.7% of Social Club | • 24% ownership of Social Club • Effective ownership potentially limited by call | • Approximately 4.4 million shares of Remix common stock | • Approximately 29.4% of total diluted shares (7%) • Vote rights of preferred | • 5 million shares of Remix common and 16% warrants • 20.2% of Social Club | • Institutional hold approximately 30% of Remix • Approximately 21% in retail float |
| **Influence** | • 3 of 6 board seats • Control of several process dynamics and information flow | • Need to be retained • Ability to induce a home field bid to maximize call | • History as an active shareholder • Risk of disrupting a process | • Vote rights as a change or control • Board seats • Ear of Remix management | • Limited influence • Social Club board seat | • No specific influence other than obligation to maximize shareholder value |
| **Preferred Deal Structure** (pre 20B) | • Likely to be a merger of Remix in which the call is exercised | • Likely to be a sale of the company in which the call is exercised | • Likely to be a merger of Remix in which the call is exercised | • Likely to be a merger of Remix in which the call is exercised | • Likely to be a sale of the subsidiary in which the call is not exercised | • Likely to be a merger of Remix in which the call is exercised |
| **Indifference Points** | • Due to tax leakage and arbitrage, Remix will prefer a low or no-value deal to a sale of sub • Arbitrage at $190m and up | • With the call exercised, Social Club management will receive the same amount in all scenarios | • Indifference to Remix management | • Indifference point likely in alignment with Remix management | • Indifference point likely in alignment with Remix management | • Indifference point likely in alignment with Remix management • Redpoint will be paid the same amount in all scenarios |

W Thomas Weisel Partners                                                    Confidential  For Internal Use Only    5

VIA-00282

Exhibit 121

EXHIBIT #9

1/13/04-
Delaware-
Greenspan Vs. Brewer, Carlick, VantagePoint
Vice Chancellor Leo Strine.

THE COURT: Is the company -- is the Series B -- is part of your contention the way the Series B seats work now, that there isn't any contemplated role for the board to be nominating someone, anyway, for a B slot?
Mr. WALSH: Yeah. I mean, I think that's what it boils down to. Obviously, when this -- the deal was negotiated with Sony, they wanted representation on the Board. And they got representation. And what it comes down to is if they don't want to avail themselves of that board seat, they don't have to. But the board is or-- should not be in a position and can't appoint Sony seats.

Mr. WALSH: I think what is very clear from the testimony that we have acquired is that the board never -- neither the nominating committee nor the board ever formally sat down at a meeting and said, "Mr. Moreau and Mr. Edell are going to be Series B directors." That was a decision made by the general counsel without the input, knowledge or prior approval of the board.

MR WALSH: What happened at the board meeting on October 6th was the board appointed Mr. Edell. Sony didn't consent. And in fact, the consent they got is more than a month after that.
THE COURT: More than a month after that in what sense?
MR. WALSH: Well, Sony never gave prior approval to having Mr. --Mr. Edell is not a Sony-affiliated individual.

THE COURT: what is going to be most important to me know is -- from both sides, is to understand exactly how Mr. Edell got on the board, and whether validly appointed or not. You can always have a disconnect between what people consciously thought they were doing, for example, thinking they were sliding him into the Sony seat -- may be something that the board believed it could do, but it may be something that it could not do. So I understand -- I want to say that is obviously the thing that is weighing on my mind most. That is the only issue in the case sitting there."

Q And how is it that the company satisfied that provision in the appointment of Mr. Edell to fill MR. Gewecke's seat?
A. Through the affirmative vote of Mr. Gewecke, as well as through the consent.
THE COURT: When was this document signed?
A. My guess is it's on or about the date indicated in the fax notation. I don't know when it was signed. I just know it was received.
THE COURT: But at least a month-and-a-half after the October 6 meeting?

THE COURT: where are you all deriving the authority of the board to fill a vacancy in a Series B seat?
MR TEKLITS: Well, do you want me to respond to that, or do you want CHRIS LIPP--
THE COURT: He is the general counsel. Yeah. He is the one who orchestrated this. I would like to know where in the corporate documents there is anything like this?

THE COURT: So this is a proxy embedded in a written consent?
DECLARATION IN SUPPORT OF MOTION 70(b) 42(b) CONTEMPT      53

CHRIS LIPP: I wouldn't call it that. I would really think of it more as a consent, but--

THE COURT: well, it's -- it gives the board the voting power that belongs to Sony. Right?

CHRIS LIPP: No, I -- I re-- I reject it doesn't -- I'm sorry.

CHRIS LIPP: It doesn't -- it doesn't purport to limit--

CHRIS LIPP: It limits it to the extent of the manner in which the board would consider filling a vacancy generally.

THE COURT: Right. If there is a vacancy--you are not contending this was a vacancy which any of the corporte instruments would have given the board the right to fill.

CHRIS LIPP: That's correct

THE COURT: Was this essentially you all knew that you goofed on October 6th? You needed to fix it?

CHRIS LIPP: I don't think it was that we knew that we goofed, because my understanding in discussions with counsel was that, you know, whether or not this was required is a debatable issue, but under Delaware law-- certificate designation. My view is -- his replacement is considered in the manner provided for the election of Series B director generally, which is by a vote of the Series B directors. I mean Series B stockholders, as directors. The board has no role to play in this at all. Except perhaps facilitating notice to the Series B, if they somehow don't know their representative resigned. So that's what the certificate of designation said. And yet the board purports to fill the vacancy in the Series B slot created by MR. Gewecke's resignation. Where is the authority in the certificate designation to do that, on October 6th?

CHRIS LIPP: I guess there is none of three ways that I have thought about it, and that I think are relevant

THE COURT: what if MR. Gewecke voted no. The resolution would have still passed? Everybody else's votes stayed the same.

CHRIS LIPP: It would have passed and we would have required the consent of the holder of the Series B stock.

THE COURT: Mr. Gewecke wasn't acting as a stockholder, was he, or a proxy holder?

CHRIS LIPP: Correct.

THE COURT: For 550 DMV?

CHRIS LIPP: I think he was an authorized representative.

THE COURT: Wait. You are general counsel of this corporation. This is a board vote. Was he sitting there as a proxy holder for the stockholders, the Series B stockholders?

CHRIS LIPP: Your Honor, in reality -

THE COURT: Not in reality. In law. What did you understand as general counsel?

CHRIS LIPP: My understanding is that the board, including Mr. Gewecke, identified Mr. Edell as a suitable replacement for MR. Gewecke.

THE COURT: As directors, they did that. Correct?

CHRIS LIPP: Correct. And Mr. Gewecke, as a Series B director.

THE COURT: They voted as directors to fill that vacany.

CHRIS LIPP: Correct.

THE COURT: And that violated the certificate of designation. Did it not?

CHRIS LIPP: They weren't empowered as the board of directors to fill that vacancy. I agree with that.

THE COURT: As of that date, Mr. Gewecke couldn't have even pulled out of his pocket a proxy that gave him the voting power for the Series B. Could he?

CHRIS LIPP: Mr. Gewecke may have been authorized as the executive of --

THE COURT: Did he have a proxy, to your knowledge?

CHRIS LIPP: In writing? I have never seen one. I don't know what his authority is, Your Honor. That's --

THE COURT: Do you believe people have oral proxies?

CHRIS LIPP: No.

THE COURT: Let's take our break.

MR. SHANNON: but he also testified -- this is Mr. Eisenberg-- as the authorized representative plantiff Sony., he did not in fact approve the replacement of Mr. Gewecke by Mr. Edell.

MR. SHANNON: "Question: But it was Sony's intent that when Mr. Gewecke resigned, at least until the action you're referring to now, that would not have any designees on the eUniverse board correct? "At the time that I signed this document" -- that's the November 18th consent -- "we did not intend to replace Mr. Gewecke on the board. "Question: So there would be no Series B eUniverse members on the board correct? "Unless there were other Series B shareholders who had the right to nominate a director. I don't believe there any are. "Question: Well, this is an action and written consent by the sole Series B stockholder, so at the time you signed this, you

thought that 550 DMV was the sole" --it says "whole Series B stockholder; correct?

"Correct. "So Sony would be the sole stockholder who had the right to elect Series B Directors; correct?

"Correct

"And at the same time you signed this document, it was Sony's intention not to have any Series B directors on eUniverse's board; correct?

"Correct" -- or "Answer: Yes.

"And you advised the company at the time you signed this that it was Sony's intention to not have any directors on eUniverse's board; correct?

"Correct" -- or "Answer: At the time it was signed, yes."

And once again Your Honor, as the testimony has shown, this was signed on November 18th. I just wanted to clearify that.

Q.  And just so the record is clear, if you had thought as of October 6th that Mr. Gewecke was authorized to express 550 DMV's consent to elect the Series B seat, why is it that you went and got the consent that is identified as Defendants' Trial Exhibit 40?

A. For the -- for the purpose of not having the debate that we're having today, which was to make clear that the Series B holder was consenting to the action that occurred.

Q.  Did someone at Sony convey to you at some point that Sony no longer wanted one of their employees to fill a seat on the eUniverse board?

A. Sure, yeah.   That was --came up in several discussions.

### Minutes

Q. As secretary of the company, I understand that you draft the minutes of the board of directors' meetings?

A.  Yes.

Q.  Okay.  How many board meetings have there been since November 20th we're talking about?

A. I--I'd have to refer to notes, but ballpark, I would say maybe three.

Q.  And how many of those meetings have been reduced to minutes?

A.  I don't think any have.   Since November 20th we're talking about?

Q.  Yes.

Q.  Yes.  As a matter of fact, the November 20th minutes are still in draft form, aren't they?

A.  The typewritten is virtually in draft, that's right.

Q.  Okay.  So your notes say "nominating committee recommends Jeff Edell to board." Do you see that?

A.  Yes.

Q.  Okay.  I don't see anythng in your minutes about Mr. Edell being a Series B director. Was that omitted for some reason?

A.  Wasn't omitted for any particular reason.

Q.  Okay.  So you would agree with me it's possible that, at least based upon your minutes, and you were the recording secretary, there may not have even been a discussion about whether Mr. Edell was going to be a Series B director.

A. I -yeah, it -- not in those terms necessarily, although, as I said, I don't specifically recall the discussion. The -- the gist of it, from my recollection, is that he's being brought on to the board to --to replace Mr. Gewecke.

Q.  Your notes indicate there was a vote five for five, zero against. What does that refer to?

A.  That would be the vote of the board as to whether Mr. Edell should sit.

Q.  Uh-huh. Does the board of directors get to vote on Series B directors?

A.  Typically no.

Q.  In fact, if a Sony board member resigns, the only person that can appoint that -- a new Sony board member to fill the slot is Sony itself; isn't that true?

A. The holder of the -- the Series B, that's right.

Q. Okay. And, in fact, what happened at the October 6th meeting is that the board of directors voted to appoint Mr. Edell as a director.

A. They approved Mr. Edell, correct.

Q.  As far as you recall, there was no discussion about whether Mr. Edell was in fact being slotted as a Series B to replace Mr. Gewecke isn't that correct?

A.  Aside -- aside from the fact that he was being appointed to -- to replace Mr. Gewecke, right.

BY THE COURT:  But--wait a minute.  I just want to be clear. Your testimony is that the board of directors

DECLARATION IN SUPPORT OF MOTION 70(b) 42(b) CONTEMPT

appeared Mr. Edell?

A. They approved him and ... I don't mean to be cute, honestly.

you understand that to mean.

A. That this was somebody that the board of directors believed should be elected to the board.

Q. Okay. So he didn't join the board.

A. That's correct, he didn't

Q. He did not.

A. Correct.

Q. So he did not become a director on October 6th is your testimony.

A. No. He was seated actually on October 14th, if I'm not mistaken.

Q. How did he get seated?

A. That was when he agreed to come on board and his compensation had been worked out.

Q. Well, how did he get appointed?

A. That was basically left to me to figure out. And my understanding was that he was to replace Thomas in Thomas' seat.

Q. But there'a gap here. What --who or what appointed him?

A. The -- the Series B stockholder, I believe, appointed him.

Q. In October?

A. Yes.

Q. When in October?

A. This relates to back of what we're sort of struggling with.

Q. I'm talking about in October. You're saying to me now that the board approved Mr. Edell as someone it believed was qualified and should be on the board. That's what the 5-0 vote means correct?

A. Yes.

Q. But that was not an appointment of Mr. Edell to the board. Correct?

A. That's right.

Q. And how did he get appointed again? Mr. Edell--Mr. Gewecke did what?

A. There's no question that I was left to divine the intent of the board.

Q. Well, not the intent of the board. You've already told me what the  board did and what you believe it only did.  What did Mr. Gewecke -- and then you add that Mr. Gewecke did something.  What did he do and when did he do it?

A. Is vote in favor of Mr. Edell is the action I'm refering to on the part of Mr. Gewecke.

Q. That was the appointment?

A. Well, again, I'm trying to reconcile what happened with the intent of the board. And so it was--

Q. Not the intent of the board. You're making a distinction between approval and appointment, and I'm trying to understand. The board said, "This is a good guy, We think he should be on the board." That was a 5-nothing vote, Mr. Gewecke voting as a director. I asked you how did he get appointed.  You told me he actually didn't get appointed until October 14th because he was haggling over compensation.  But then I ask you who or what appointed him.

A. And I'm trying to answer in terms of-- of how it would be effective legally, which is why, again, I don't mean to be cute--

Q. No. It's very important. I'm trying to get an understanding, too.  What-- it should be simple.  There has to be an act of appointing.  Who did it and when did they do it?

A. And I believe Mr. Gewecke did it.  And to the extent that we were struggling with issues that called into question whether Mr. Gewecke had done it, we secured the consent of the Series B through Mark Eisenberg.

BY MR. WASLH:

Q. Mr. Lipp, when Mr. Gewecke voted along with the other directors for Mr. Edell's election to the board, was he voting in his capacity as a director of eUniverse?

A. It wasn't clear.

Q. Your notes don't-- certainly don't distinguish as to whether he was voting in his capacity as a director or as -- as an appointee of Sony, do they?

A. They don't

Q. And the fact of the matter is, at or about the time of the October 6th meeting, nobody had gone to Sony and said, "Hey, guys, we have a pretty decent candidate, Jeff Edell. Do you have any objection to us putting him in the Series B seat?" That didn't happen at any time on or before October 6th, did it?

A. I don't believe it did.

Q. It didn't happen in all of October, did it?

A. I actually don't recall.

Q. Well, don't you think it would make sense that if you were having—you had any idea that Mr. Edell was going to be the B director in one of the two Sony preferred seats—pick up the phone and say; wait a minute, guys, you can't do that. Would you oppose—such that—and that happen?

A. Well frankly, the way our board meetings were called and the way Brad conducted them as chairman didn't really make that possible.

Q. You're saying it's Mr. Greenspan's fault that our -- that Mr. Edell was not properly appointed as a Series B director?

A. I--No. I, I wouldn't say it's necessarily his fault.

Q. Okay. Can you turn to Exhibit 10 in the binder, please. And can you identify for us what Plantiff's Exhibit 10 is?

A. It appears to be an e-mail from Tom Flahie, the company's CFO, to---- to Brad, Brett, and myself.

Q. And what --what is--why was Mr. Flahie sending you what appears to be a draft proxy statement?

A. In an attempt to help us meet our-- our then-planned November 20 meeting date.

Q. Okay. So just -- just to put this in context, this is about a week after you understood that Mr. Edell supposedly -- supposedly had been appointed as a Sony director by the board; right?

A. Correct.

Q. Okay. Let's look at what the proxy statement says.

Q. Now, according to you, you had just slotted Mr. Edell as -- as a Sony director. What does it say concerning the nominees for election of directors? When does the board propose to be elect them by the stockholders generally?

A. It includes a slate of five directors, including Mr. Edell.

Q. Uh-huh. Even though you had just --just supposedly slotted him a week or so before as --as a B director?

A. Correct. And Tom Flahie drafted this, and he would have been aware of-- of the distinction

Q. He's the company's chief financial officer.

Q. Okay. It also goes on to say in the next paragraph that "550 DMV notified the company that no directors will be nominated by the Series B preferred stockholders at this time." Do you see that?

A. I don't see it, but I remember--

Q. Okay. And again, it says that "550 DMV" which is Sony, "notified the company that no directors will be nominated by the Series B preferred stockholders t this time." Do you see that?

A. Yes.

Q. Had that in fact occurred?

A. Had 500 DMV notified us?

Q. Right.

A. I don't believe so.

Q. Okay. Again. Why was it that Mr. Edell had just been appointed as a B, that thats not so indicated here? In other words, why -- why wouldn't you just carry him on as a B for purposes of the 2003 election.

A. Well, we would, That's ultimately what we did, but this is just Tom Flahie's first crack at -- at the proxy.

Q. And here we are Friday, November 7th. And Mr. Flahie is forwarding

Q. -- a draft of the proxy dated November 7th. And again, where's Mr. Edell fall as a director?

A. He's in the same spot as the -- the prior draft.

Q. Okay. So now we're about a month out from when Mr. Edell was supposedly slotted as a Series B, and your proxy statement is still telling --or at least in draft form is indicating that Sony hasn't nominated anybody. Would you agree with that?

A. In Tom's draft here, yes.

Q. And you didn't -- you didn't make any changes to the draft between the time you first got it from Mr. Flahie in mid-October and November 7th isn't that true?

A. I don't recall working on it during that period.

BY THE COURT: Q. Who would have given Mr. Flahie this information?

A. I ultimatoly did when we returned to--to sort of--when I got involved in helping draft it.

THECOURTQ. No. Who would have given....This seems like an odd part of the proxy statement for the information to have come directly from the brain of the CFO. Do you understand what I'm saying? I mean, this isn't the financial statements or anything like that.

A. Right.

THE COURT Q. So where did it come from? This is two drafts now, and you were copied on both of them.

A. I think Tom was working off of probably the prior year's draft, and he undertook--

THECOURT Q. Wait a minute. There's a very specific statement in each of these about 550 DMV and what its ___ ___ ___ ___. So he couldn't have ___ rotary specification ___ because Mr. Ge___ Kawas ___the ___ ___ ___ why would he have made an assumption, I believe.

THE COURT Q. Well, how would he have made that assumption?
A. Based on potential -- I mean, I-I'm sort of speculating, but I would assume based on his general awareness that Sony didn't want their people on-- on boards or on our board.

Q. Now, Mr. Lipp, would you agree with me that at least as of November 7th, nobody , as far-- certainly there's no --no records or documents that we've seen which in any way suggest that Sony had any intention of appointing a Series B director; would you agree with that?
A. I would agree with it insofar as it relates to having any of their own people onboard, yes.
Q. And in fact, in connection with the October 17th meeting--actually, within an hour or so of the October 17th meeting, you and Mr. Greenspan had somewhat of a falling-out, didn't you?
A. I suppose we did.

THE COURT Q: Q. Wait. Was the -- just so I ...Well, what was the basis that you had to believe that under Delaware law a shareholder could, six weeks after an event, file a consent, retroactively authorizing a group of people to make a decision that they had already previously made at a time when they actually made it, they had no authority to act on behalf of the stockholder who owned the underlying shares?
A    I was just trying to accomplish what I believed everybody wanted and intended.
THE COURT Q.  So--but you didn't do any research to indicate that you could retroactively--you understand, this is written prospectively; right?
A. When you say "perspective"--
THE COURT Q. Prospectively in the sense that it's-- it's-- it's action by written consent by the Series--sole Series B stockholder to elect the person that the board of directors shall select in a manner provided for the board the filling of four vacancies generally.
A. Right.
THE COURT Q.  So, I mean,  the way it's --you would think, if you didn't have the "as of," you would think that the board is going to act after the fact when this document which acts as sort of a dual proxy and written consent; right, but --but this swings back--the person granting it had no idea what was going on, was certainly--the entity didn't. Maybe Mr. -- Mr. Gewecke is obviously in the room but he didn't have anything like this at the time.  And so did--did you do any legal research about this?
A. I did not.

A. I believe it was in our 8-K, and I can't recall the exact date, but it was..I don't remember the exact date. It was--it was probably a week to 10 days after.
Q. Okay. You'll see the 8-k indicates it was filed November 26, 2003? Do you see that?
A. Yes, I see that, yes.
Q. That would have been 12 days after the bylaw amedment had been adopted by the board; is that right?
A. I think that's right.
Q. And in between the-- adoption of the bylaw and this 8-k amendment, the company put out a press release, didn't it?
A. Yes.
Q. Did that press release say anything about the adoption of a bylaw amendment requiring stockholders to give advance notice of actions to be taken at this meeting?
A. It did not, as I recall.
Q.    Why not?
A. I --as I think I mentioned in--in deposition, I certainly would have liked to have seen that in there but it was more or less an oversight or not considered at the time.
Q.   Did you have any involvement in drafting that press release?
A. It was principally Tom Flahie, and I don't --I don't recall whether I reviewed it or not. It was-- It was a pretty straightforward release. Really just announced the shift of the annual meeting.
Q And doesn't say anything about the bylaw amendment, does it?
A.  It does not.
Q. It also says "A new record date for the meeting of December 1, 2003, has also been set." Do you see that?
A. Yes.

Q. As of the November 17th, had the board set a record date of December 1?
A. The resolution of the board in regard to the record date was to have it set as soon as practicable after the date of the resolution.
Q. As the board did not set a record date on November 17th either did they, yes or no.
A. As of November 17th indeed, they reserved a record date as soon as practicable after the date of the resolution.
THE COURT: Mr. Lipp--
Q. On November 14th--
THE COURT: Mr. Lipp, answer the question directly. It deserves a yes or no.
CHRIS LIPP: Okay.
Q. You could ask it again, Mr. Walsh.
A. Yes.
Q. Would you agree with me that on November 14th the board did not set a record date of December 1?
A. Yes.
Q. Yet you proceeded to disclose to the public that a record date of December 1 had been set, didn't you?
A.  Yes.

Mr. WALSH: Just so the record is clear, I think the proxy statement is in the record.  And as far as we can tell, this is not what is being proposed to the stockholders.  And what I was trying to get at as to whether the board has ever approved it, I don't know the answer to that question.
THE COURT:  I understand.  I was going to ask another question about this document, which is what you have got it in front of you.
CHRIS LIPP: Yes.
THE COURT:   This is the exhibit-- this is what the board was considering that day as the proposed amendment to the certificate of designation.
CHRIS LIPP: This one here is the wrong version.
THE COURT: Is this what was before the board on that day?
CHRIS LIPP: I don't know.
THE COURT: There is a sentence in it that refers to Mr. Gewecke.
CHRIS LIPP: Yes.
THE COURT: Could you read that for the record?
CHRIS LIPP: The one beginning "The initial preferred stock director?"
THE COURT: Yes.
CHRIS LIPP:  "The initial preferred stock director shall be Thomas Gewecke and he is elected to serve until his..."--there are two words crossed out.  Then begins, "...successor is duly elected and thereafter, the preferred stock director shall be elected at the same time as other members of the board of directors."
THE COURT: This document was produced in discovery by your corporation. Was it not?
CHRIS LIPP: Yes.  I believe it was.
THE COURT:  This is what is attached as being the Exhibit A to the minutes of the November 14th meeting which you prepared?
CHRIS LIPP: Yes. It is.
THE COURT: So the directors, on November 14th, were considering an amendment that by its own terms indicated that the initial preferred director would be Thomas Gewecke, and that he would serve until his successor is duly elected, and is that what was before the board on November 14th?
CHRIS LIPP: Yes.  This wasn't changed from the original.
THE COURT: Well, how does that comport with your testimony that Mr. Edell was sitting in the preferred director's seat as of October 2003, when the amendment before the board for action on the certificate of designation indicates that Mr. Gewecke will be the initial preferred director.
CHRIS LIPP: My assumption would be that this would speak as of the date of the original certificate of designation.
THE COURT: well, this is an amendment.
CHRIS LIPP:  Yes.
BY Mr. WALSH:
Q. Mr. Lipp, I should have asked you at the outset, but you were the one that actually prepared this amendment were you not?
A.  Yes.
Q. Is there some reason you didn't indicate that Mr. Edell was now the Series B director, as you contend?
A  I was only thinking that we should change the portions of it that we intended to effect changes to. I wasn't thinking in terms of updating it, for instance, by having reference to somebody other than to Thomas Gewecke. I didn't want to change things I didnt think were necessary to change.

Q. And then you will see -- I'm sorry. Continue to read.

A. There was a motion -- I'm sorry. "Motion to approve slate recommended by NCGC. 7-1 approved slate."

Q. Okay. So there was also discussion -- a motion to approve the slate? Do you recall any --

Q. And so the only discussion, as you recall, at the November 20 in terms of who the sale of directors would be for the upcoming annual meeting was whether it was a slate with Brad Greenspan or a slate without. Isn't that fair?

A. That was most of the discussion, yes.

Q. So there was no discussion about who the nominating committee thought should be -- if anybody--in a B slot or otherwise, Isn't that true?

A. I think that's right, yes.

Q. Incidentally, what does the next say in your notes?

A. It says "Ratification of record date of the December 1, 2003 approved 8-0

Q.  Why was the board ratifying a record date of December 1?

A.  Because they had previously resolved to have the record date be as soon as practicable, and we had reported back that that date would be December 1, based on the broker's search.

Q.  They were really ratifying Tom Flahie's decision to pick December 1. Right?

A. Yes

THE COURT:  Had that been -- had the record date already been publicly announced at that time?

CHRIS LIPP:  I believe on November 18th, it was.

Q. And at the board meeting of November 20th, the board did not discuss in any way whether any of those directors should be directors, B directors did they?

A.  I don't recall any such discussion.

Q. After this meeting of November 20th, you took it upon yourself to slate Mr. Moreau and Mr. Edell as B directors. Did you not?

A. I assume you mean in connection with filing our preliminary proxy.

A. Correct.

Q. At that time, Sony hadn't indicated to you one way or the other that they wanted anybody to be--to fill the Sony slots.  Did they?

A.  I don't know when I had those discussions with Sony, whether it was before or after that. It may have been before

Q. You are not sure as you sit here today?

A. Im not sure.

THE COURT:  Was Mr. Moreau originally elected by Sony?

Mr. WALSH: No. Let me ask a couple questions.

Q. How was it that -- as you understand it, Mr. Moreau came to join the board of eUniverse?

A. He was appointed to a vacancy that was created on the resignation of Jeff Lapin, who resigned.  I think on May 8th of 2003.

Q. But he was not affiliated with Sony in had any way, was he?

A. No.

After you slotted MR. Moreau and Edell as B directors, you went about getting Sony's consent to do that. Didn't you?

A. Yes.

A. It's an e-mail that I sent, looks like on November 25th, 2003, to Melissa Cole, with a copy to Mark Eisenberg.

Q. What was the purpose of sending this e-mail to Melissa Cole?

A. I think it's the consent pursuant to which the Series B holder would elect Jeff Edell and Lawrence Moreau at the upcoming annual meeting.

Q. Who is Melissa Cole?

A. She is an attorney, in-house, with--I think she is with Sony Music.

Q. Turn to the next page.   This is the form of consent.   You drafted this did you not?

A. Yes.

Q. Okay. Could you read into the record the fourth whereas clause?

A. Sure.  "whereas, the nominating committee of he board has nominated, and the board has approved, Jeffrey Edell and Lawrence Moreau as directors of the Company to fill the seats reseved for the Series B Preferred Stock Directors."

Q. Now as of November 25th, was that a true statement?

DECLARATION IN SUPPORT OF MOTION 70(b) 42(b) CONTEMPT          60

A.   As of that time, I don't think the board took that action.
Q  Did you tell Sony that neither the nominating Committee nor the board of directors had in fact approved Mr. Edell or Mr. Moreau in either Sony seat?
A.  I don't recall discussing that with Sony.
Q.  When you asked with the board, did you have any concern that Sony would think that the nominating committee and board had approved Mr. Moreau and Mr. Edell that they were misled?
A.  I would agree that their consent would not be effective. The point here was to do the things we needed to get done to get the proxy filed.
A.  And there was certainly by no means any intent to slip one by anybody, and no objective to do something contrary to what the board would want.  The board would always have to sign off on this.
Q.  But the fact of the matter is that the board hadn't signed off to what you proposed to Sony was the case?
A.  That's right.  I got that out of where we were on the board level.


THE COURT: Something you just said confused me. You said the only vacancies were the B slots.  But the board purported to expand the board.  Why couldn't they have filled the newly created directors?
CHRIS LIPP: They could.  At the time we had five and went to seven was to have the addition of Bradley Ward, to a seat elected generally.
THE COURT: Then on Halloween, as Mr. Walsh was asking you, at the culmination of the four-day board meeting, the board decided to go to ten.
CHRIS LIPP: YES. The composition--
THE COURT: And why -- if Sony didn't want to appoint, nothing makes them appoint. Why couldn't Messrs. Edell and Moreau have been elected to the board to the newly created directorships?
CHRIS LIPP: Mr. Moreau was already on as --in what we will call a common seat.
THE COURT:  He was already there.
CHRIS LIPP: Yeah.  And if we --


Q.  Just so Im clear, you haven't received a consent form Sony which appoints Mr. Edell to the B seat. Have you?
A.  No.

THE COURT: Before I forget this, this says, "Director since October 14th, Mr. Edell."  He wasn't a director, in your mind, as of October 6th?
CHRIS LIPP:  That's right.  He was approved at that meeting, but he didn't accept his appointment until the 14th, when his compensation had been worked out.
THE COURT:  When did the board authorize the compensation?
CHRIS LIPP: On October 14th.

THE COURT: They acted again on Mr. Edell?
CHRIS LIPP: with respect to his compensation.
THE COURT: I have a question.  Would you look at Plaintiff's Exhibit 7, which is the minutes of October 6th?  These are minutes you drafted.
CHRIS LIPP:  Yes.
THE COURT:  Were they approved by the board?
CHRIS LIPP: Yes.
THE COURT:  Do you recall telling me that the directors didn't appoint Mr. Edell that day?
CHRIS LIPP: if I said that, I probably misspoke.
THE COURT:  How many times did you misspeak, because I asked you this, I think, about four times?  And you made a big deal out of telling me that the directors approved Mr. Edell; I think it was in words such as "This would be a good person, who should be put on the board."  And I said, :Did they appoint him?  I believe I asked you that several times.  And you would never answer me yes.  And I would like to you read in the record the sentence beginning, "The NCGC," which is the Nominating and Corporate Governance Committee, then recommended finishing with a resolution -- the first resolution after that.
CHRIS LIPP:  Sure.  "NCGC then recommended to the board the appointment of Jeffrey Edell to fill the vacancy created by the impending resignation of Thomas Gewecke, whereupin a motion was made, and duly seconded and approved by the vote of five for and zero against, constituting unanimity of the directors onthe Board, including the affirmative vote of Thomas Gewecke as the sole Series B. preferred stock director. It was "Resolved, that Jeffrey Edell be and hereby is appointed as a member of the company's board of directors, upon

Mr. Gewecke's resignation and Mr. Edell's acceptance of such appointment, to serve until the next annual meeting of shareholders of the company or as otherwise provided by the certificate of incorporation and bylaws

CHRIS LIPP: So I leave -- you are saying not accurately taking the action the board thought it was taking at that meeting, and you thought the board was taking?

THE COURT: No. I don't know what that means.

CHRIS LIPP: Can I explain?

THE COURT: Is this minute--does it accurately reflect what you understood the board to be doing on October 6th?

CHRIS LIPP: Yes.

THE COURT: You understood as of that date that the board of directors was appointing Mr. Edell--

CHRIS LIPP: It couldn't--

THE COURT: That's not what I asked you, Mr. Lipp. You may have made a mistake as a counselor, but did you understand as of that date the you -- as of October 6th, was it your understanding that the board of directors was electing Mr. Edell to be one of its members

CHRIS LIPP: I really apologize for this. I'm answering you as best I can. But yes, that was my understanding.

THE COURT: That they were appointing him to the board. Right?

CHRIS LIPP: Yes.

THE COURT: That was your understanding at the time?

CHRIS LIPP: My understanding that they were appointing him to replace Thomas Gewecke.

THE COURT: That was your understanding as of the time these minutes were approved by the board of directors.

CHRIS LIPP: I think that's right.

THE COURT: What meeting was that at?

CHRIS LIPP: I'm sorry. I don't hear the question. You said at the time that these minutes were approved by the board of directors? That meeting, I believe, occurred on November 14th.

THE COURT: You recommended approval of these minutes. Right? You put them before your client, the company's board, as being fully accurate?

CHRIS LIPP: Yes. That's right. I believe this is what the board did. But the difficulty we are having is reconciling the intent of the board with the action they took.

THE COURT: Well, what you are saying -- aren't you admitting that you believe--you now come to believe that this October 6th appointment could not have been a valid appointment to a Series B directorship?

CHRIS LIPP: I agree, yes, the board could not put him in a Series B seat. Only a Series B person could do that.

THE COURT: And what basis do you have for me to believe that as of October 6th, the board even believed that it was placing Mr. Edell in a Series B directorship?

CHRIS LIPP: Because I believe that person intended for him to replace MR. Gewecke and did not intend for the board to expand in size.

THE COURT: why isn't a perfect rational inference, given that your CFO and colleague drafted that, that indicated Mr. Edell was going to be elected by the common, and that Sony wasn't--didn't intend to fill a vacancy, that the board believed that Sony was waiving its right to appoint a director, and that the company was going to go ahead, because it had discussions that it wanted to expand the board, had asked Sony to waive its right, Sony wanted to get off--and so the board went ahead and elected a new member. So it was five members, none of whom were Series B directors, because Sony had forsaken its right.

CHRIS LIPP: My difficulty there is that they could have done that, but I don't think they intended to expand the size of the board. There was no discussion about that.

THE COURT: Well, it's not necessary to practically speaking, expand the board. In fact, if it's a binding waiver, you have temporal issues, but formalities didn't seem to be a big thing for anybody, you know. If Sony could--if Mr. Gewecke could -- did this testimony early on about Mr. Gewecke somehow acting as a stockholder, or something, without a proxy, we have gotten through that. We know that wasn't the case.

Why am I not to infer that the board simply believed that Sony was not going to appoint, and that there had been specific discussions about Sony, that the board in fact wanted to add an outside director, it wanted to be able to do so and have Sony not appoint anybody of its own?

Sony was rid of this. It's got bigger problems than being on the board, having somebody on the board of a small company that has other issues. And the board simply, with Mr. Gewecke sitting there for Sony saying; We have no problem with this. You want Edell. Fine. I'm gone. I'm out of here." and then you have your colleague, CFO, drafting documents that are perfectly consistent with that interpretation. Why shouldn't I make that interpretation?

DECLARATION IN SUPPORT OF MOTION 70(b) 42(b) CONTEMPT

62

CHRIS LIPP: The reason is that even if they waived the right to the seat, the seat still exists and can only be elected exclusively by the Series B stockholder.

THE COURT: Right. But the issue is not that anybody sits in that seat. It's that -- when was the board changed.

CHRIS LIPP: When the board expanded on... I believe it was that on October 16th, I believe.

THE COURT: Right. But the issue is not that anybody sits in that seat. It's that -- when was the board expanded.

THE COURT: You admit the way the board purported to fill it was invalid.

THE COURT: I guess what I'm saying is we have this really -- we have a fair number of undisputed facts here. I really don't know what the defendants' position is on this. In terms of -- clearly, Mr. Edell was not validly elected to a Series B slot on October 6th. He just wasn't he could not have been appointed by the Board to a Series B slot.

THE COURT: You know, if we are going to -- I take very seriously the claim that's been -- the singular claim I was told that I was trying this morning, which is: Is Mr. Edell actually on the board? And I think there is a very serious question about whether he is actually on the board.

THE COURT: It's even odder when it's supposed to be retroactive to October 6th, especially when as of October 6th, as I understand it, Mr. Edell hasn't even agreed to be on the board.
As of October 6th, I have got to say, I really -- I think Mr. Lipp basically said the board had no idea that was slotting him in a Series B. I think there is a great deal of record evidence-- it's not a big record, but what record evidence there is suggests that the board wasn't really thinking about putting him in as a Series B director but thought Sony was simply waiving its right.
I think those are all very serious questions. The idea that it's a Blasius violation-- if the certificate means what it says, for Sony to, you know, exercise its absolute right to appoint whoever it wants to that slot--maybe Blasisus leaves that open,

THE COURT: It's a very strange -- I mean, I have got to say--I will say this on the record. I'm very dubious about the validity of this election, and there is a certain formality that has to be done around electing people. And I mean, is this a proxy?
I don't know. But I'm really troubled by this, because again, it doesn't say, "We elect Stephan Edell as a Series B director. We recognize that the board has commended Stephen Edell to us, or the board purported to elect, " blah, blah, blah, Doesn't say any of that.
And even the later consent is as of January 21st, you know. What that means --

THE COURT: Has the board actually voted upon, Mr. Teklits, a final copy of the certificate of designation amendment?
MR. TEKLITS: There was some confusion. We had done it with Mr. Lipp, Your Honor. Sony would not consent to an amendment that didn't require Vantage to exercise over 50 percent. They didn't want Vantage to exercise one share and they would lose their right to the seats. I'm not sure what was attached to that.

THE COURT: It's not really, I guess, my job to be Director of Hygiene for eUniverse, but now that very competent Delaware counsel has been engaged to assist the company, I mean, it's pretty common knowledge that the board of directors has to approve the actual certificate of designation amendment that's being proposed. And you know-- and this isn't the first dot come kind of company that's tried to be a bit innovative.

THE COURT: "But you can get this stuff fixed out or you put me in a position where I have got some sort of -- this is low hanging fruit for Mr. Walsh. And if you haven't done it, I mean -- I mean, if you know they have done it, that's great
"I mean, if you want, I don't have to say these words and you don't have to go fix them or call your client. And then when Mr. Walsh asks me to confirm, upi -- grant the motion to conform the evidence, I probably am going to grant it." You might have won on everything else. Then I have a disclosure violation here,"
"You may need to do corrective disclosure to begin with, because of this.
MR. TEKLITS: We will make sure this is right, Your Honor. I think everybody wants this amendment approved.

THE COURT: "I can't help but observe the other thing, which is if this -- if the company --if the incumbent board is really fine with a fair fight and doesn't mind the common and the preferred voting togeterh to elect a majority every carry, why don't you say, "You know, let's have a fair fight" and let's have a showdown. We again --We have four in there, we're going to make sure that there's a -- at the showdown. We Con- We want Mr. Edell to be on the board. Well, there is an obvious way to do that. Right? And if you don't want to have a legal fight, then you know, you figure out who your four are. You know the Vantage two are If Edell is one of the fighting four, you know, make sure the certificate of designation has been approved. You clean that up. You know you probably have to amend your proxy statement, then. Then maybe you change your slate and you put Edell on it. And the four that is currently in there, make a decision as being on the board or not.. You have a fight about the majority. That is the judge trying to be practical in a situation where I have seen both sides,

"I'm saying if it's fair fight time and you are ultimately going to have a majority up, that is a real clean way to do it. I don't know how Blasius comes into tht at all.

"So to the extent that Sony -- for example, if Mr. Edell were to resign today, to say, "I am not longer on the board," one of his other colleagues would resign -- and you do it in however elegant fashion to make sure you get it done right. Mr. Edell is immediately reelected to teh vacancym a common vacancy, and the company amends its proxy statement and puts Mr. Edell as hime as one of the four. Sony just says, "We really -- this has even gotten worse."

"I can imagine what it's like at Sony today. They are like, "Gee, this is great. We even want to be bothered by this," Right?
Then you have four up at the election."


THE COURT: Right. There is a certain elegant order in things. You have to -- the board has to approve it. And they have to approve it in the form they are proposing. Then the stockholders have to do it.
THE COURT: I think we have all come to a rather nonastonishing discovery, which is to the extent that Sony does not wish to fill its directorships, then it doesn't have to. And we have also come to the nonastonishing discovery that to the extent Sony doesn't wish to fill them, and doesn't act by a valid written consent to fill them, no one else can act in its stead.

THE COURT: Right. What I'm saying is you do represent Mr. Edell. And it's just a suggestion in light of what -- of the dance that is going on, because as I understand it, it's not at all clear even to you that your client's board has approved the certificate of designation that's being proposed beofre it got the written consent from Sony. So there is a real problem that I may have to take some notice of. It looks like it's going to be raised to me. You hear what they are saying about Edell. because as I understand it, it's not at all clear even to you that your client's board has approved the certificate of designation that's being proposed before it got the written consent form Sony. So there is a real problem that I may have to take notice of.

THE COURT: "could I plead with the Delaware lawyers for the company that if we are going to get -- if you are going to get a consent from Sony, craft it. I mean, it's one thing Mr. Shannon and Mr. Walsh -- it's one thing if they want to do a Blasius thing. You know, you don't want to walk in here again with some sort of technical problem,"

BRAD D. GREENSPAN, )
                   )
        Plaintiff, )
                   )
             v.    )   C.A. No. 106-VCS
                   )
BREWER, et al.     )
                   )
        Defendants. )
                   )
                   )

JUDGMENT ENTRY SETTING HEARING

On the Motion of Plaintiff 70b in the above entitled action, and for good cause shown;

it is hereby ORDERED that Defendants appear before a Judge of the Delaware Chancery Court at      o'clock

.., on the day of ,     , to show cause why should not be punished for contempt as

required by previous Order and/or implied ruling of this Court.

_____

J