**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**LIVEVIDEO.AI CORP**
        **Plaintiff,**                  **CIVIL ACTION**
**vs.**

                                    Case No. 1:24-cv-06290
                                    Honorable Judge Dennis Ho
                                  **SECOND AMENDED**
                                  **COMPLAINT AND**
                                  **JURY DEMAND**

**SHARI REDSTONE,**
**NATIONAL AMUSEMENTS, INC.,**
**CHRISTINE VARNEY,**
**MONICA SELIGMAN,**

        **Defendants.**
_____/

      Plaintiff, LiveVideo.AI Corp., (hereinafter "Plaintiff" or "Live") hereby alleges, for its Second Amended Complaint against Defendants, SHARI REDSTONE, NATIONAL AMUSEMENTS, INC., CHRISTINE VARNEY, and MONICA SELIGMAN, and DOES 1-10 (hereinafter collectively the "Defendants"), as follows:

      1.      Plaintiff LiveVideo.AI Corp is an Artificial Intelligence technology company that sought to acquire Paramount Global, owner of CBS, Comedy Central, Nickelodeon and MTV.

      2.      The Plaintiff's July 5, 2004 buyout offer was not considered and instead Paramount on July 7, signed a merger agreement with Skydance, a Los Angeles film company.

      3.      Defendants unlawfully interfered with Plaintiff's effort to make a buyout offer.

      4.      Defendants controlled Paramount's sale at all times despite conflicts of interest with the Plaintiff's CEO.

      5.      Federal questions include whether the Plaintiff and its CEO were victims of harassment and discrimination after the defendants decided to retaliate for protected actions under §78u–6(h)(1). If Plaintiff was the victim of tortious interference harming its relations with Paramount including a May 2024 unauthorized accessing of a computer system in violation of 8 U.S.C. § 1030 – The Computer Fraud and Abuse Act.

**NATURE OF THE CLAIMS**

6.      This action seeks relief under §78u–6(h)(1), declaratory, and monetary damages for U.S.C. §1030 violations, while redressing tortious interference and unfair competition torts.

**JURISDICTION AND VENUE**

7.      This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (Federal question).  28 U.S.C. § 1367 provides supplemental jurisdiction over the state law tort claims that arose from the same common nucleus of facts. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful practices and actions alleged herein, occurred in or around the City of Manhattan, New York. Upon information and belief, defendants have ongoing and systematic contacts with this District, maintain offices in, reside in, and/or have committed wrongful acts which occurred within this District, and which impacted this District.

**PARTIES**

8.      Plaintiff, LiveVideo.AI Corp., Delaware incorporated, with offices in New York.

9.      Defendant, Shari Redstone (hereinafter "Redstone"), President of Defendant National Amusements, Inc., Chairperson Paramount Global Inc., and citizen of Massachusetts.

10.     Defendant, National Amusements, Inc. (hereinafter "NAI"), a Foreign Business Corporation authorized to do business in New York, registered in Maryland, a dbc organized and existing under the laws of New York, principal place of business situated in Massachusetts

11.     Defendant, Christine Varney (hereinafter "Varney"), Paramount Special Committee outside counsel at all times and a citizen of Washington D.C.

12.     Defendant Monica Seligman (hereinafter "Seligman"), a New York citizen and Paramount Special Committee member that joined the board of competitor OpenAI in March.

13.     Does 1-10 and Non-Party Christine D'Alimonte (hereinafter "D'Alimonte"), a New York citizen was General Counsel of Non-party Paramount Global d/b/a Paramount, f/k/a Viacom CBS, Inc., registered in Delaware with its principal place of business in New York.

**FACTUAL ALLEGATIONS AND RELEVANT BACKGROUND**

Viacom Acquires MTV and Nickelodeon Crown Jewels

14.    Gus Hauser, a Harvard Law School professor, Great Uncle & mentor of Plaintiff's CEO, as Chairman/CEO Warner Amex, creates MTV, Nickelodeon, and other channels.

15.    After Gus left, "Warner sold the Warner Amex cable programming business, including MTV, Nickelodeon and The Movie Channel to movie theater chain Viacom" run by Harvard lawyer, Sumner Redstone  which expands to become Paramount Global ("Paramount").

16.     Plaintiff's CEO starts eUniverse, Inc., in 1999 by transforming e-commerce site CDUniverse.com, with one million users, into an entertainment network, growing to surpass Google with nearly 50 million monthly average unique users (MAU) by August 2001.

17.    100% owned Myspace.com launched August 2003, quickly becomes the eUniverse crown jewel. Soon after, things take a turn for the worse when a venture capital fund gains control of eUniverse aided by unscrupulous Board members resulting in the CEO's resignation at the end of October 2003.

18.    In July 2005, as a Delaware lawsuit moves forward against the Directors for their unlawful acts, they sign a deal to sell the company to News Corp for $12.00 per share cash but gaining broad indemnification.

19.    Owning 12% of eUniverse, believing the price undervalues its #1 social network Myspace.com, and upon learning Paramount was prevented from making a bid, the Plaintiff's CEO contacts Paramount Global future CEO Robert Bakish, then the International division head by email August 2, 2005 Subject: "Myspace – shareholder":

"Bob-I am currently a 10% holder of Intermix, the company that owns Myspace.com I was the founder and CEO of Intermix until October 2003, and actually initiated the creation of Myspace (I bought the company of the execs that run Myspace

today-Chris Dewolfe) I think management & the VCs that control a big block of stock are selling too cheaply to News Corp. "    "My idea …

MYSPACE- THE PUBLIC COMPANY BACKED BY VIACOM/MTV-

"Viacom comes in as a strategic investor offering to buy 33% of Intermix shares at $12.10 a share (roughly a $200mln investment). "

"shareholders can sell some of their stock and keep a portion to go 'long' on the MYSPACE story- ""BOTTOM LINE- The marketplace gets a pure play Myspace that is publicly traded.""Viacom has a great new strategic Relationship with the Myspace"

20.    Confirming interest in joining the $13.50 counter offer, discussions expand to

include Paramount's top lawyer Michael Fricklas as seen by way of an August 25, 2005 email:

"Good speaking with you today! I will try tI will try to arrange a call with my lead lawyer (from Quinn Emanuel) who is riding herd with Crayton Condon ASAP. In addition, I could also arrange a casual conf call Tomorrow or Monday-with the principal at firms Trafeletter & Gardener Lewis.to give you a good sense of institutional support. e 2 and myself, we are at about 10mln shares or 23% roughly."

Paramount top executives learn of even more compelling reasons to join the $13.50 counter offer

from Plaintiff CEO's in an August 28, 2005  email to Bakish and Fricklas:

Subject: Myspace Metrics/Value

"Gentlemen-I am sure you saw the NY-TIMES MYSPACE article today. A little metrics and back of the envelope valuation piece I put together for some private equity funds I just started talking to one fund focused in the online space that would Be willing to form a partnership to bring a voting block together to do the 35-45% buyout of Intermix and creation of a Myspace Public company. Perhaps they could be the 'front-guy' on such an attempt to keep Viacom out of the limelight. They could drop in $50 - 100 million By themselves. MYSPACE- TRAFFIC GROWTH & VALUATION The Deal with News Corp was announced on July 18th. Since then, in roughly 30 days, Myspace has increased its weekly unique visitors by 17% and # of ad impressions by over 30%. (according to online traffic measurement company Nielsen Netratings for period covering July 3-August 14, 2005).THIS IS STAGGERING "

21.    The Paramount executives agree to finance the $13.50 counteroffer while assuring

the Plaintiff's CEO, a valuable counter-bid partner and likely future strategic collaborator, that

they will be treated fairly if Paramount were ever to go up for sale, getting to make an offer or bid alongside other interested parties.

22.    LiveVideo.AI's CEO could reasonably assume since it cost Paramount no cash expenditure, the promise of fair future M&A participation would be honored in 2024, with Plaintiff's CEO receiving access to the same confidential information shared with other potential buyers upon expressing interest in making an offer to purchase Paramount.

23.    Therefore Plaintiff's CEO agrees to Paramount's 2005 condition: Paramount's role providing the financing will not be disclosed publicly until after shareholders reject the $12.00 buyout or the eUniverse Board terminates the News Corp transaction.

24.    The September 30 shareholder vote on $12.00 buyout looms as the $13.50 counter-offer is announced September 23, 2005 and filed with SEC September 27.  (Exhibit #3)

25.    The $13.50 counter-offer already time constrained to gather enough shareholders to vote against the $12.00 deal was further undermined by undisclosed cash bribes paid to Myspace's management team, approved by News Corp's outside counsel, to conceal its financials ahead of the shareholder meeting.

26.     Despite the $13.50 counter-offer failing to stop the News Corp $12.00 buy out, the Plaintiff's CEO continued to maintain a friendly relationship with Bakish, seeking to expand the business relationship with successor Paramount thru the present.

The Genesis of Paramount's 2024 Merger with Skydance

27.    Defendant NAI controlled CBS Corporation ("CBS") and Viacom Inc. ("Viacom") after they became separate companies in December 2005.  As NAI founder Sumner Redstone's

health began to decline in 2014, Defendant Shari Redstone seized control of NAI and used it to reshape the CBS and Viacom boards, all done with a goal to find the best exit strategy for NAI.

28.  In January 2018 Evercore advised Redstone that buyer interest in Viacom could be lacking if sold separately from CBS, suggesting combining them followed by a sale of NAI would be best for Redstone but not necessarily good for public shareholders.

**Redstone Controls Conflicted Boards After Packing Them With Friendly Directors**

29.  Shari Redstone using NAI's voting power, packs both boards with Directors willing to due her bidding and succeeds in forcing a CBS-Viacom merger at the end of 2019. After the merger closes Redstone packs successor Paramount Global's ("Paramount") Board with insiders over whom she exercises control, and appoints Bob Bakish as CEO Paramount

The AI Technology Partnership And IP Deals

30.     In early 2023 Plaintiff believing its AI technology products and services would be of interest to Paramount, contacts its publishing arm, Simon & Schuster on July 17, 2023 thru Senior VP Bergstrom with a "proposal for a strategic digital media AI partnership" (Exhibit #2)

31.     On August 8, 2023, LiveVideo.AI emailed Paramount's CEO  as part of a new stratagem using IP the Plaintiff had acquired from its CEO, developing it into valuable film and television assets.

32.     The Plaintiff had high expectations after determining Paramount to be a perfect business partner for exploiting the aforementioned IP and presented the idea directly to Paramount's CEO in 2023 detailing plans to create and market films, books, and television series based on (i) the true story of Myspace.com, titled "Myspace: End of eUniverse," (ii) a true story

about first USPTO trademark for Metaverse issued July 4, 2000, and (iii) the true story of the y2k credit card hacking incident involving the Russian hacker Maxus.

33.    Plaintiff's strategy included enticing Paramount with a movie deal leveraging its successful production arm while featuring the CEO in a positive light. An August 8th email hilights how Paramount is significantly involved in shared historical events that are part of the true story of Myspace.com:

"Subject: Congrats! Your edgy inspiring 2005 media fighter role made cut!

"The kid stays in the movie.""..."Whats better then "The Social Network2"? "Myspace: End of EUniverse".(working title) " "premieres Xmas 2025.

"Scene Title (you will be forced to select actor to play your role)"

"September 2005, BG announces $13.50 per share counter-bid (which Viacom is secretly financing)…to keep Myspace Public"

"Despite failing to "create the Utopia deal Viacom the White Knight owning 20-33% of Public Independent Myspace"

34.    The Plaintiff's strategy was successful, as evidenced by Paramount's CEO not objecting to the outlined plan.   An IP Partnership with Paramount was on a clear path, with the next step being to submit a completed book for production. The Plaintiff had already completed most of the important work for this story about the creation of Myspace.com .

35.    Plaintiff also invested time and resources into finding outside parties, such as an author and screenwriter, to enhance the value of the partnership for both parties. In comparison, Sony Pictures' biopic "The Social Network" made over $224 million at the box office and an estimated $34 million in domestic video sales (not including streaming or broadcast rights).

36.    In September 2023, the CEO of LiveVideo.AI Corp honoring the 2005 Paramount $13.50 Counter-bid agreement, sent a proposal to Paramount's CEO giving them a "first look"

opportunity to take a strategic stake in LiveVideo.AI Corp. A few days later, after reviewing the proposal, Paramount's CEO responded via email declining, later its revealed that Paramount was focusing on cash preservation and sale of assets to pay off debt.

Financial difficulties Pushes Redstone Frantic Fire Sale of Paramount

37.    After the CBS-Viacom merger, Paramount had been consistently paying out a quarterly dividend of $0.24 per share. However, in 2023 this amount was drastically reduced to only $0.05 per share.  This dividend was crucial for NAI and Redstone to cover their operational costs without having to resort to selling or using shares as collateral.

38.    To make up for the shortfall, Defendants Redstone and NAI secured a $125 million loan from BDT Capital , who became their financial advisor. According to NY Post story titled "Shari Redstone banker tied to Warren Buffett amid Paramount sale talks",

"BDT" stands for Byron David Trott — a former Goldman Sachs executive who has long been most famous for being Warren Buffett's banker. "

"One major elephant in the room: Warren Buffett — a longtime client of Trott, although it's not clear he's currently a client — also happens to be Paramount's biggest shareholder. Buffett's 15% stake is down about 60% since he began amassing it in early 2022. According to a well-placed source, Buffett began amassing his stake shortly after Redstone hired Trott as her banker."

39.    According to the New York Post, a looming deadline to repay a separate $175 million loan was the driving force behind Redstone's rushed decision to sell off assets. Failure to meet the deadline could result in her losing control of Paramount.

40.     Shari Redstone held meetings with Skydance CEO David Ellison in the summer of 2023 to explore the possibility of acquiring NAI, rather than Paramount.

41.    Despite obvious conflicts of interest, Paramount delays until January 2, 2024 forming a Special Committee of independent directors to "evaluate strategic alternatives, including third party proposals." (Paramount Form 8-K).

On January 10, 2024, the New York Post reported Redstone put NAI up for auction. January 24, 2024, various reports suggest Skydance made a bid to acquire NAI, contingent on a

second step: Skydance acquiring Paramount.

42.    April 3, 2024, Skydance and Paramount entered into a 30-day exclusive period blessed by Paramount advisor Centerview Partners, conflicted from financial advisor role for CBS special committee in previous Viacom merger.[1]

**Redstone Recklessly Removes Plaintiff's CEO Contact**

43.    April 26, 2024, Paramount announced resignation of CEO Bob Bakish and the formation of an "Office of the CEO" committee. It is believed that Bakish was forced out by Redstone due to opposing Skydance.  The unexpected loss of a CEO when selling a company certainly diminishes its value, including forcing potential buyers to bring emergency plans for the transition.

44.    Redstone proceeded as if this event would not be seen as a surprise by bidders and shareholders while also not lowering in the short term the value of Paramount on the auction block requiring a repair or replacement CEO before continuing the sales process.

45.    On April 29th, it was reported Skydance had provided a "best and final" offer but was refusing to require shareholder approval which the deal had earlier been conditioned on.  In May, the special committee accepted Skydance's new offer, with no shareholder vote provision.

**Plaintiff's Unanswered June 2024 Phone Calls/Voicemails To Redstone**

46.    Its Paramount CEO contact gone, learning of the special committee approval of a revised Skydance offer on June 3rd, the Plaintiff decides to contact Shari Redstone after numerous news articles cite her position as chief negotiator with potential bidders.

47.    Plaintiff's CEO engaged in extensive efforts to contact the defendants and press forward with completing a transaction. Contacting National Amusement HQ in Norwood Massachusetts during working business hours on five separate days between June 3rd thru 11th, leaving five very detailed voice messages at Shari Redstone's office while also providing

---

[1] The Delaware Court noted the conflict and speculated Centerview was hired by Paramount but controlled by Redstone's instructions – to focus on the Skydance offer and ensure its success.

Redstone's executive assistant Michelle with a myriad of options NAI could use to communicate with and contact back LiveVideo.

48.    June 4th, Redstone false statements designed to mislead the public include:

"The new Skydance offer"... is to "the dismay of Redstone, Reuters reported."

"Redstone is unhappy with the updated merger deal from Skydance and is considering rival bids and options."

"Sources said Redstone is obliged to consider all offers for National Amusements."

These misleading claims are relied on by the Plaintiff and induce Plaintiff's continued efforts, including work to prepare offer, soliciting financing sources to support a buy out offer for Paramount and NAI and consulting with various tax and finance advisors.

49.    Redstone allowed Paramount to engage with other potential acquirors including Byron Allen's Media Group in January 2024.

50.    On June 6th, the plaintiff had no choice but to leave a voicemail for Redstone at 4:20PM EST for 1 minute 10 seconds, reiterating points from a previous message left on June 4th. Since Redstone expressed unhappiness with the Skydance terms and was open to other offers, the Plaintiff confidently stated Plaintiff's offer would be better for Redstone and Paramount shareholders.

51.    Since Plaintiff's contact is removed as Paramount CEO on June 6th the Plaintiff tries to connect with Paramount's General Counsel,  D'Alimonte through a phone number listed with New York Bar Association. Despite multiple call attempts, Plaintiff was unable to reach her and left a 2 minute 15 second voicemail at 4:50pm EST. voicemail left the previous day,

52.    Plaintiff attempted to reach NAI and Redstone by telephone during working hours on June 7th only to get the same voicemail sole option. Plaintiff with limited options makes a communication by leaving a fourth voicemail did so at 3:16PM EST for 1 minute 28 seconds which re-iterated the points stated in June 3rd, 4th, 6th voicemails.

53.    Redstone continued to manipulate the public spin and messaging broadcast out to the public such as a June 7th headline: "Redstone was unhappy with the reduced offer, paving a

way for rival bidders" creating the illusion she was working for shareholders and keeping Paramount's sales process unbiased. However, shareholders increasingly vocal about dislike for Skydance proposal and wanted other suitors.

54.    Caving to Shari Redstone's demands, key Paramount officers were spontaneously given improved management severance packages in 2024 to disregard their fiduciary duties to shareholders, as Shari usurped third parties' interest in acquiring Paramount and other corporate opportunities, pushing buying NAI as path to acquire control of Paramount

**Defendants Conceal July 5, 2024 Fax and email Offer**

55.    Despite defendant's multiple delay tactics, Paramount Chairperson Redstone received Plaintiff July 5th offer by corporate fax, and emailed to NAI top lawyer on July 5. 2024. Defendants ignore Plaintiff July 5th fax and email offer to Mr. Jankowski. (Exhibit #1)

56.    Meanwhile evasive defendants rushed to sign a merger on July 7th giving Skydance a new $400 million dollar termination fee to scuttle other bidders. (Exhibit #2)

57.    Another element of the bid ridding scheme was to avoid a Livevideo rival bid to emerge in the media and press like the 2007 Dow Jones Counter bid which became featured by CNBC in interview by host Maria Bartiromo. The particular need to conceal the Plaintiff's bid was to keep Plaintiff from getting the Paramount largest independent shareholder Gabelli's support.  The defendants concealed the Plaintiff's bid knowing Gabelli's fund would support LiveVideo.AI over Skydance, as evidenced by his previous successful investments in eUniverse and Viacom. The Defendants were aware of Skydance management's sexual harassment history including a top executive terminated by NBC for violations corroborated as well as a top executive terminated from Pixar, as Chicago Tribune and sources like NY Post report , while LiveVideo.AI had a clean track record, making for more favorable option for investors.

58.    Between July 5-7, defendants interfered with Plaintiff potential business relations by erasing records, refusing to make contact about the July 5 offer faxed and emailed or the

voicemail left later that day for NAI President and Paramount Chairperson Shari Redstone again expressing desire to acquire Paramount and NAI.

59.    Defendants used false statements broadcast on television, radio, and print, while also waiving away adviser initiated inquiries requesting contact approval with Plaintiff and refusing to follow up through outside advisors and law firms, making defamatory statements, they influenced others to turn a blind eye to their reckless actions.

## COUNT I -Unfair Competition (Brought Directly Against All Defendants)

60.    Plaintiff repeats and re-alleges every allegation set forth in previous paragraphs as if fully set forth herein.

61.    Redstone and NAI with BDT transferred control of Paramount's sale process from one run in the best interests of shareholders to one tilted in favor of Defendants Redstone, NAI, and creditor advisor BDT whose former employee was partners with the winning bidder Skydance, and in the process the Plaintiff was harmed including the concealment and blocking of its July 5, 2024 offer sent to the defendants.

62.    One method was unfairly using conflicted BDT's role as financial advisor to assign or recommend Redstone insert as Special Committee outside counsel a conflicted person that was previously adverse to Paramount in another transaction and responsible for harming Paramount shareholders while that lawyer was engaged by rival News Corp.

63.    Shari orchestrates a strategy to force Paramount to rubber-stamp transactions NAI, Redstone, and Lender BDT wanted done quickly without the usual checks and balances restraining Boards of public companies.

64.    BDT's plan was to lend cash to Shari Redstone and NAI collateralizing Paramount stock. First Shari agrees NAI hires BDT as its advisor on all Paramount financial

transactions including change of control, instantly creating conflicts of interest in arrangement which would never have been approved by a public board of directors.  BDT places Christine Varney from its long time law firm Cravath Law, in key  Paramount with the help of NAI and Shari Redstone. As outside counsel for the Special Committee, Varney controlled information, making influential recommendations, having ability to communicate with BDT, NAI, and Redstone about committee decisions and reactions.

**Paramount and Plaintiff CEO Both Victims Of Varney 2005 Bid Rigging**

65.    Varney's strategy to help her client News Corp snatch up Myspace's public parent company damaged and humiliated Viacom when the company failed to deliver a bid. Years later Federal Judge George King will conclude the target company's management," evaded Viacom's advances, even though it's representatives were communicating a competing bid was imminent." (Exhibit #4)

66.    NY Times' Gretchen Morgenson described Judge King 2010 ruling:

"a shareholder's worst nightmare. A company is in play, with two potential acquirers circling it, but the boards of directors and others running the enterprise who are supposed to snare top dollar for shareholders favor bidders who are dangling the biggest rewards for  directors and senior executives.

67.     Defendant Varney managed the "dangling" that NY Times cites the Judge concluded harmed Paramount shareholders and the Plaintiff's CEO.

68.    The lawyers blueprint in 2005 for News Corp allowing them to acquire publicly held Myspace at a below fair market price, outfoxing an equally determined key rival, Paramount's predecessor Viacom, Inc. was under the table undisclosed cash bribes. It would not be until five years later evidence of the cash bribes would be found after a determined investigation by class action lawyers pursuing the securities fraud case initiated by the Plaintiff's CEO in 2005.

69.     Another problem with Varney was an unusual legal liability created in 2005 while serving as top lawyer for News Corp in its completed acquisition of eUniverse (later renamed Intermix) and its Myspace asset (collectively the "Myspace buyout").

In 2024, She manipulates Paramount into quickly approving a future transaction that NAI, Redstone, and lender BDT have been eagerly awaiting.

70.     Varney's "strategy" for acquiring the company was a plan to pay off key individuals with under-the-table cash bribes. Evidence in the class-action case revealed that Varney had orchestrated secret cash payments without disclosing them publicly before the crucial shareholder meeting (page 172, 174, 176, 178, dkt 18-1 Federal FRCO Rule 23 Case No. 5:1606268 see Exhibit #5).

> "Summary of key deal terms [TBD]"
>
> "Approximately $709 million"
>
> "Expect to enter into arrangements with a pre-tax cost of $70mm post transaction signing to ensure continuity of key personnel" . "Deal Update" report from "Fox Entertainment Group"
>
> "Total deal cost: $750M vs. previous $680M", iii.
>
> "Myspace Retention Plan"…"$90M gross ($50M net) critical to maintain positive relationship with management and reduce their tax exposure as much as possible."…"Additionally, trigger option pool for rank-and-file employees as goodwill move ($5m). "

71.     Varney used this strategy to induce the target's management not to consider the $13.50 counter offer back in 2005. (Exhibit #3). It was Case 5:16-cv-06286 her client settled in 2013 for $45 million dollars after Judge King ruled a jury would likely find bid rigging had occurred.  Varney's lucrative 2005 compensation received from News Corp., expanded into an

even more lucrative series of assignments including from Myspace.com , generating millions of dollars for Varney and her law firm thru at least 2013.

**Misleading Press Leaks And Statements**

72.     On June 11th, Defendant Redstone publicly announced negotiations with SkyDance had ended. This statement was misleading and false because Redstone was aware of LiveVideo.AI's interest in making a competing buyout offer, yet wanted to give the appearance that other bidders were welcome while secretly blocking out Plaintiff, instructing Paramount advisors not to engage and preventing the Special Committee considering LiveVideo.AI.

73.     Redstone's public statements about ending negotiations with SkyDance were misleading and false, leading Paramount's General Counsel certainly by then to make D'Alimonte question the integrity of her leadership. On one hand, Redstone claimed to be open to other bidders while secretly freezing out LiveVideo.AI and preventing the Special Committee from engaging with them. D'Alimonte surely knew that by remaining silent, she would be further breaching her duty of candor.

**Termination of Paramount GC Without Cause Golden Parachute**

74.     Another masterful corporate manipulation plays out June 21, 2024 with the 8k disclosure Paramount will terminate its General Counsel D'Alimonte without cause on June 28th.

75.     More disturbing its evident the GC was given a lucrative golden parachute worth well over $5 million cash, to silence any knowledge of Plaintiff's offer and conceal it from shareholders as part of an unfathomable deception designed and directed by Varney.

76.     The true motive behind D Alimonte's sudden acceptance of the separation that can be inferred from the 8k is that as Paramount's General Counsel, she realized the legal requirement to publicly disclose to shareholders the existence of a new potential buyout offer from LiveVideo.AI.

**Defective Systems and Internal Controls**

77.    Defendants NAI, over ten years later, Defendant Shari Redstone who lacked operating experience and still continues to lack public company operating experience and has never signed a Sarbanes Oxley SOX Officer Certificate, willfully damaged LiveVideo.AI's business opportunities with Paramount. They destroyed all records of communication, refused to reach out or allow others to do so on their behalf, and disregarded attempts at contact from LiveVideo.AI and the Special Committee. This caused significant harm to Plaintiff's integrity and resulting in economic damages that will be proven in court.

78.    A June 6 voicemail left by LiveVideo.AI informed D'Alimonte of communications with Defendants NAI and Shari Redstone and an intention to make a competing offer on better terms than Skydance's proposal. Despite this, Defendants Shari Redstone, NAI, Varey, and Seligman instructed D Alimonte to keep quiet about the LiveVideo.AI contacts and not respond to their proposition, while publicly feigning negotiations with Skydance. D Alimonte discovers that Defendant Shari Redstone's statement on June 11 claiming an end to negotiations with Skydance is deceitful.

79.    Despite LiveVideo.AI  expressing interest in a buyout offer, Redstone announces Paramount is open to other offers while secretly working to complete the deal over the July 4th weekend. On July 2, news sources report that NAI and Skydance have reached a revised agreement, falsely making it seem like a recent development. Redstone and affiliated media partners continue to spread false narratives about the situation. These actions misled Plaintiff which was actively seeking financing for a potential merger with Paramount. D Alimonte discovers that Shari Redstone falsely claimed she wasn't pursuing the transaction, thru sources like the NYPost and WSJ to propagate the false narrative.  This is misleading by the omissions of Defendants Varney, Seligman, NAI, and now Paramount's General Counsel thru an 8k.

80.    On June 11, 2024, its reported that Redstone rejected the Skydance offer terms.

"National Amusements confirmed the deal was dead, saying the company has "not been able to reach mutually acceptable terms, regarding the potential transaction with Skydance Media."

NAI said the company "supports the recently announced strategic plan being executed by Paramount's Office of the CEO." and "Redstone will now likely pursue a sale of just National Amusements, without merging Paramount with another company, according to The Wall Street Journal,", and "NAI has received interest from two other suitors, an investor consortium led by Hollywood producer Steven Paul, and media exec Edgar Bronfman"

81.    Plaintiff attempted to reach NAI and Redstone by telephone during working hours on June 11th, after seeing the news reports that Redstone and NAI had "confirmed the deal was dead" only to get the same voicemail sole option, and the Plaintiff finally with no other choice and limited to making a communication by leaving a fifth voicemail did so at 6:03PM EST for 1 minute 21 seconds which largely re-iterated the points stated in voice mails left on June 3, 4, 6 for reasons completely unconnected with the unfairness of the deal to shareholders and possible threat of litigation, the delay was in part caused by Plaintiff's June 6th contacting of and voicemail left with Paramount's General Counsel.

82.    Despite Redstone refusing to respond to LiveVideo.AI she had no problem engaging other new interested parties.   Reportedly, Diller's company, IAC, had signed a nondisclosure agreement with NAI and was looking at its data room to determine the specifics of the bid;

83.    On Sunday, July 7, 2024, Paramount and Skydance issued 8-K announcing the merger agreement "approved by Paramount Board based on the unanimous recommendation of the Special Committee and Redstone's NAI, (Exhibit #3)  Barclays on July 8th estimates the price of Redstone's class A shares from the deal at $66.16 per share, Skydance will purchase NAI for $2.4 billion, gaining voting control of Paramount and providing indemnifications to Redstone. Paramount will merge with Skydance, resulting in 317 million new Class B shares for Skydance, valuing the company at $4.75 billion.

84.    Criticism of the Merger among analysts and within the investing community was quick and widespread. July 8, 2024, analysts covering Paramount downgraded their stock

17

ratings. The $400 million Termination Fee is exceptionally high, representing 4.8% of the total value of the Merger.

**An Adverse Special Committee Member Seligman**

85.    Sony invested $5 million dollars in eUniverse for a 15% stake plus a Board seat in 2001 but writes off investment in 2003, its Sony employee resigning from Board. Defendant Seligman, is GC Sony America (SCA) from 2001 until she's terminated in 2016. After Plaintiff's CEO resigns as eUniverse CEO,  Seligman breaches 2001 agreements and obligations owed to Plaintiff's CEO by wrongfully adding a non Sony employee into eUniverse's Series B right for a Sony employee only. Seligman further failed to review the background of their nominee, failing to disclose Edell's bankruptcy as required under Federal Law and SEC regulations nor to make corrective disclosure under Rule S-K 404.

86.    Seligman, adverse to Plaintiff, suffered a blow on January 9, 2024, when DC District Court granted Plaintiff CEO request for judicial notice of ten facts. The first fact is list of ten legal cases detailing unlawful actions overseen by Seligman for her employer but leaving Seligman with liability as Sony USA's CEO or CLO during periods they were actively operating in violation of antitrust laws. (Exhibit #6)

> "iv. August 20, 2015 "FRCP Rule 23 5:14-cv-04062 "  Denial of Defendants Twenty-First Century Fox, Inc., Sony Corporation of America, Orrick Herrington Law LLC, claims for violation of Sherman Act 1, Clayton Act, Rule 17200 5:14-cv-04062"

87.    This Court can determine if Seligman's actions at Sony failing to take SEC corrective action is of a material nature by way of substituting or consideration of Seligman as another member of the 1502 Enterprise alongside "Sony Corporation, Sony Music Entertainment, Sony Corporation America, 550 DMV, Sony Broadband Entertainment" and fully incorporating by reference the #9567 Delaware complaint. its attached 70b motion and declaration including the evidence attached as fact based evidence as to why Seligman would have been incented and desirous to use her Special Committee Membership to act capricious,

arbitrary and discriminate, make defamatory false claims casting Plaintiff's CEO in a negative

light to the other Special Committee Members, advisors, and Directors Officers of Paramount.

(Exhibit #7, Page 4)

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and actual

damages in an amount to be determined at trial plus punitive damages, interest, counsel fees,

costs and the expenses of this action, and for such other and further relief as the court seems

equitable. As a direct, legal and proximate result of Defendants' aforementioned actions, Plaintiff

has sustained economic damages to be proven at trial. Plaintiff seeks judgment for actual

damages, interest and costs.

## COUNT II  Tortious Interference With Business Relations (Brought Directly Against All Defendants)

88.    Plaintiff repeats and re-alleges every allegation set forth in previous paragraphs as

if fully set forth herein. The Plaintiff had a pre-existing business relationship with Paramount

prior to the January 2, 2024 formation by the Board of Directors of a Special Committee.

89.    The Special Committee and Board of Directors of Paramount chose to ignore the

superior offer presented by LiveVideo.AI on July 5th, dismissing it without proper consideration.

Despite offering a higher share price of $17.50 compared to Skydance's $15.00 for Class A and B

shareholders, LiveVideo.AI's proposal would have resulted in 50% less dilution for Paramount

stockholders. This significant cost savings was made clear in multiple voice messages to

Chairperson Shari Redstone, yet she chose to overlook it and continue with the Skydance deal

that required a whopping $4.8 billion worth of stock issuance.

90.    Plaintiff had every reason to believe that their competitive offer would be given

due diligence by Paramount. Not only was it a superior offer in terms of financial benefits for

shareholders, but also promised a more experienced management team and $2.4 billion less in

stock issuance. Yet, despite these clear advantages, Paramount chose to disregard the Plaintiff's offer and instead went ahead with the costly and dilutive Skydance deal.

91.     The Special Committee and Board of Directors of Paramount chose to ignore the superior offer presented by LiveVideo.AI on July 5th, dismissing it without proper consideration. Despite offering a higher share price of $17.50 compared to Skydance's $15.00, and a result of 50% less dilution for Paramount stockholders. This significant cost savings was made clear in multiple voice messages to Redstone, yet she chose to overlook it and continue with the Skydance deal that required a whopping $4.8 billion worth of stock issuance. Later damaging these LiveVideo.AI technology and IP deals as a result of the Plaintiff seeking to attempt to make a superior buy-out offer that would have benefitted stockholders and employees of Paramount.

92.     With malicious intent, Defendants NAI and Shari Redstone took deliberate actions to sabotage LiveVideo.AI's chances of securing a partnership with Paramount on June 7th. Despite receiving multiple phone calls and a clear request to participate in Paramount's sales process, they destroyed all physical and electronic evidence of the communication and refused to personally reach out or direct their outside advisors and legal counsel to do so.

93.     They even went as far as refusing to involve the Special Committee and Board of Directors in any follow-up with LiveVideo.AI, revealing a calculated plot to harm the plaintiff's business prospects. These ruthless actions demonstrate a blatant disregard for fair competition and unethical behavior at the highest levels of leadership within NAI and Redstone's inner circle.

94.     On the crucial day of June 11th, Defendants NAI and Shari Redstone knowingly and deliberately sabotaged LiveVideo.AI's potential business opportunities with Paramount. As soon as they received LiveVideo.AI's desperate phone calls and voicemail at 6:03pm EST,

begging to be included in the ongoing sales process, they immediately set out to destroy all physical and electronic evidence of these communications.

95.    They refused to personally reach out or direct any outside advisors or law firms working with Paramount to contact LiveVideo.AI. Despite being fully aware of LiveVideo.AI's interest in acquiring Paramount and NAI, they callously disregarded any attempts at communication from LiveVideo.AI, the Special Committee, and even the Board of Directors.

96.    With calculated malice, Defendants NAI and Redstone effectively cut off all avenues for LiveVideo.AI to pursue a potential partnership with Paramount, causing immeasurable damage to the plaintiff's business prospects.

97.    Plaintiff had every reason to believe that their competitive offer would be given due diligence by Paramount. Not only was it a superior offer in terms of financial benefits for shareholders, but also promised a more experienced management team and $2.4 billion less in stock issuance. As a result, the Plaintiff is seeking damages of no less than 50% of the value in stock $2.42 billion for the unjustified rejection of their proposal and those legal and professional fees found to have been paid in cash.

98.    Another reason that NAI, Varney, and Redstone seek to fraudulently conceal the July 5th offer is because it would force them to explain the malicious, tortious interference scheme they have used to block, frustrate, and harass the LiveVideo.AI because they Varney and Seligman are conflicted with Plaintiff because of its CEO from ongoing and recent adverse legal matters causing significant conflicts of interest and it is because of the defendants subsequent actions the Plaintiff has now suffered the inability to advance strategic partnerships directly with Paramount begun in good faith during 2023.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and actual damages in an amount to be determined at trial plus punitive damages, interest, counsel fees, costs and the expenses of this action, and for such other and further relief as the court seems equitable. As a direct, legal and proximate result of Defendants' aforementioned actions, Plaintiff has sustained economic damages to be proven at trial. Plaintiff seeks judgment for actual damages, interest and costs.

## COUNT III Aiding And Abetting Breach Of Fiduciary Duty, Candor, or Breach of Duty Loyalty (Brought Directly Against All Defendants)

99.    Plaintiff repeats and re-alleges every allegation set forth in previous paragraphs as if fully set forth herein.

100.    The corporate opportunity doctrine is a fiduciary duty of corporate directors and officers. They cannot take an opportunity for their own benefit if: (1) the corporation can take advantage of it; (2) it falls within the corporation's line of business; (3) the corporation has an interest in it; and (4) taking it would conflict with their duties to the corporation.

101.    Controlling stockholders are also prohibited from using their power to benefit themselves at the expense of the corporation. Directors, special committee outside counsel, M&A transaction special committee members, and Chairpersons have a responsibility to prioritize the interests of the shareholders above their own personal interests or those of other parties involved.

102.    In this case, the Defendants breached their fiduciary duty by prioritizing the interests of the Controlling Stockholder to approve an unfair Merger, which benefited Skydance and Redstone personally through a buyout at a premium price.

103.    D'Alimonte had a fiduciary obligation to disclose the existence of LiveVideo.AI, but was instructed by Redstone, Varney, and Seligman to keep quiet about it and not respond to their offer. However, on June 11, when Shari Redstone announced the end of negotiations with SkyDance, she was aware of LiveVideo.AI's interest in a competing offer but did not allow the

22

Special Committee to consider it.

104.    This put D'Alimonte in a difficult position of having to betray her duty of candor further. The sudden termination of Paramount's General Counsel June 21 was a result of Redstone's misleading public statements about negotiations with Skydance while withholding information about LiveVideo.AI's interest. These actions forced D'Alimonte to make false statements in Paramount's June 8k which ultimately hurt Paramount shareholders and the Plaintiff by blocking any chance for an alternative offer to be considered.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and actual damages in an amount to be determined at trial plus punitive damages, interest, counsel fees, costs and the expenses of this action, and for such other and further relief as the court deems equitable. As a direct, legal and proximate result of Defendants' aforementioned actions, Plaintiff has sustained economic damages to be proven at trial. Plaintiff seeks judgment for actual damages, interest and costs.

## Count IV- Unjust Enichment (All Defendants)

105.    Plaintiff repeats and re-alleges every allegation set forth in previous paragraphs as if fully set forth herein.

106.    Defendant NAI shared LiveVideo.AI communications with Skydance including details contained in Plaintiff's indications of interest voice mail communications. The defendants maliciously handed over Plaintiff's confidential strategies and plans to SkyDance as part of a misdirection and false broadcasting scheme Redstone launched on June 11th when the defendants leaked to media cohorts that Redstone "killed" or ended the negotiations with SkyDance, for reasons completely unconnected with the unfairness of the deal to shareholders.

107.    Further putting in place newly crafted legal protections amidst threats of litigation and the $400 million dollar termination, and to mislead the Plaintiff into delaying coming forth with an actual offer like the July 5, 2024 one Plaintiff transmitted.

108.    Plaintiff attempted to reach NAI and Redstone by telephone during working hours

on June 11th after seeing the news reports that Redstone and NAI had "confirmed the deal was dead" only to get the same voicemail sole option, and the Plaintiff finally with no other choice and limited to making a communication by leaving a fifth voicemail did so at 6:03PM EST for 1 minute 21 seconds which largely re-iterated the same points stated in the first voice mails left on June 3rd, 4th, and 6th.

109.    Despite Redstone and NAI refusing to respond to Plaintiff they had no problem engaging other new interested parties such as Barry Diller's IAC, which signed a nondisclosure agreement with NAI and was looking at its data room to determine the specifics of the bid; WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and actual damages in an amount to be determined at trial plus punitive damages, interest, counsel fees, costs and the expenses of this action, and for such other and further relief as the court seems equitable. As a direct, legal and proximate result of Defendants' aforementioned actions, Plaintiff has sustained economic damages to be proven at trial. Plaintiff seeks judgment for actual damages, interest and costs, as well as judgment temporarily and permanently enjoining Defendants from continuing described actions.

## COUNT V – VIOLATION § 78u-6(h)(1)(B)(i) DODD-FRANK WHISTLEBLOWER STATUTE – (Against Varney and Seligman)

110.    Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

111.    Plaintiff is entitled to a cause of action pursuant to § 78u-6(h)(1)(B)(i). for damages suffered pursuant to the Dodd Frank Whistleblower Statue.

112.    Defendants have discriminated against the Plaintiff for lawful acts done including investigating the conflicts of interest behind the Skydance offer and Redstone's financial advisor BDT who is also her lender.

113.    Plaintiff has been discriminated against by not getting treated similar to the manner other 3rd parties have been welcomed and invited to sign a mutual non disclosure agreement with Paramount as part of receiving the opportunity to participate in making a

Paramount buy out offer.

114.    Despite contacting Redstone, NAI, and Paramount, and sending an executed non-disclosure agreement via fax and email, the defendants discriminated against the Plaintiff by not responding or having an advisor reach out after repeated phone calls and voicemails left with Paramount's Chairperson and General Counsel on June 6th.

115.    On July 5th, it only gets worse as the Defendants continue to discriminate and harass the Plaintiff, denying the treatment afforded other interested buyers pursuing a Paramount buyout. Articles referencing Paramount's sale process flood news outlets, serving as a reminder of how the Plaintiff has been wronged and mistreated.

116.    Yet despite these claims being made by Defendants, Varney and Seligman are using control of the special committee to manipulate the information the rest of Directors are aware of in regards to alternative offers or bidders.

117.    Varney, Seligman, and Redstone have instructed Paramount employees and other executives that work on Paramount's behalf not to return the Plaintiff's phone calls, not to reply by email, and not to send any letter communications, giving Plaintiff no chance to review the information about Paramount defendants cause to be shared with other interested buyers.

118.    The defendants have further discriminated against the Plaintiff and have harassed the Plaintiff by refusing to fix defective SEC Filings, ignoring their fiduciary duties and duties of disclosure after the Plaintiff delivered a bona fide 7-page offer agreement fully detailing why the economics would be superior and even offering to travel to Massachussets to meet with NAI, Redstone, and her lawyers in person.

119.    It was discrimination July 5, 2024 at approximately 2pm, when Plaintiff CEO was refused without explanation after Plaintiff requested to speak with someone at NAI or Paramount or their advisors in order to be able to participate in the opportunity with basically the same chances as the other interested parties.

120.     Seligman with malicious intent to harm Plaintiff in retaliation for its CEO informing regulators of News Corp and Sony misdeeds, and ongoing litigation with her husband's company because CEO was member of Class Action being pursued in Federal Court Los Angeles that News Corp was the indemnifying party.

121.     As a Result of the applicable defendant's involvement in the above- described conspiracy and conspiratorial scheme, the Plaintiff has suffered severe emotional, financial, mental, and physical harm and other deleterious effects; have been unfairly disadvantaged in multiple civil lawsuits initiated against him by several of the Defendants and other parties; had his freedom of speech severely impinged; forced to spend millions of dollars in legal fees, and had his professional reputation severely damaged.

122.     Defendants are continuing to engage in the above-described conspiracy and conspiratorial scheme even though they are well aware of the devastating toll that their prior conspiratorial actions have already taken on Petitioner and his business assets.

123.     A Jury must determine if Seligman lied to Court regarding Jeffrey Edell.

124.     Defendant's failure to "make this right" promise by Seligman's Delaware counsel requires corrective disclosure and declaratory relief is needed.  (page #41 of Exhibit #9) WHEREFORE, Plaintiff seeks declaratory relief and is entitled to a jury trial and judgment against Defendants for Special, Compensatory, and actual damages to be determined at trial plus punitive damages, interest, counsel fees, costs and the expenses of this action, and for such other and further relief as the court deems equitable. As a direct, legal and proximate result of Defendants' aforementioned actions, Plaintiff and its CEO have sustained economic damages to be proven at trial. Plaintiff seeks judgment for actual damages, interest and costs.

## COUNT VI- VIOLATION OF 18 U.S.C. § 1030 – CFAA

## The Computer Fraud and Abuse Act (All Defendants)

125.     Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

126.     Defendants became aware of LiveVideo.AI's potential interest in making an offer

for Paramount no later then May 6, 2024 after the Plaintiff sent an email to former Paramount CEO Bakish, to learn whether he retained corporate email access.

127.    The Plaintiff assumed it was possible a Paramount employee might now be reviewing the former CEO's email inbox to share potential leads or help the new Paramount CEO more rapidly transition key corporate contacts Bakish email account messages.

128.    However the Plaintiff was not prepared for what happened next.

129.    The Plaintiff's May email was sent with marketing software for confirming email receipt, and if the email is shared with other unintended recipients using different computers.

130.    A couple of weeks after the Plaintiff sent the test email in May, the log summary information provided by the marketing software was reviewed. The Plaintiff was stunned by the unlawful behavior long suspected after so many news articles and legal settlements pounded home the same simple story: That Shari Redstone did not believe in corporate governance and never took seriously the conflict of interest legal requirements requiring her to keep separate both her personal and NAI interests from those of Paramount. Further, that Redstone just because she owns 9.9% of the stock of Paramount and is Chairperson, does not mean Redstone can operate inside Paramount as if she was the CEO and direct Paramount resources in self-serving manners while only focusing on purposing Paramount to benefit Redstone and NAI.

131.    Defendant Redstone violated 1030 by directly or indirectly accessing the Paramount CEO's email communications residing or stored in Paramount's mail server. Redstone as Chairperson was not an executive working for Paramount and therefore Redstone's unauthorized taking or transfer or removal of Paramount owned emails including Plaintiff's May 6, 2024 email residing in the former CEO's Paramount email server or inbox, contravened 1030 The Computer Crime Prevention Act.

132.    Indeed, Redstone and other unauthorized non-executives appear to have without authorization, transferred to upwards of three unauthorized computers a copy of Plaintiff's confidential May 6 email Plaintiff expected would be confidentially received and read by the Paramount CEO or his successor.

133.    On May 6th, and then again on May 11th, and later on July 22, 2024 Defendants Varney, Redstone, Korfman, Seligman "intentionally accessed a computer " owned by Paramount and maintained solely for the use of its employees.

134.    The defendants without authorization accessed the Bakish email inbox and without first receiving authorization or accessed the inbox of the former CEO which was Paramount owned property and exceeded authorized access. This is because non-executives have no reason or need to be able to access computer servers which are strictly maintained for Paramount employees not for Paramount Directors, outside counsel, or members of the special committee.

135.    Further, the defendants violated 1030 because they did also obtain "information from any protected computer". The defendants conspired to usurp opportunities they knew they would likely find by invading the Paramount CEO's confidential inbox that it strictly owned by Paramount and to be used only for the benefit of solely Paramount.

136.    Further, Defendant Varney and her lieutenant Deputy GC Groce, that took over access to Paramount computer records after GC D'Alimonte resigned, proceeds to forward without authorization to access or gave an unauthorized access pass to Defendant Redstone's son Mr. Korff who passed or shared access with SkyDance in Los Angeles and later San Jose, CA exposing it to other unauthorized to access private corporate emails sent from the public company's personal business contacts its CEO maintained.

137.    Defendants pass them to at least six other unauthorized persons in at least four states, DC, California, New York, Massachusetts, and to show in meetings to countless other adverse conflicted parties. This activity could not have been a benefit to Paramount Global the corporation or its shareholders as violations of the CCFA being generated and other privacy violations are not what Paramount will earn more revenue or profits from. (See Exhibit #11)

138.    The Plaintiff has suffered damage and loss by reason of Defendant CFAA violations and the unauthorized access resulted in the taking of information defendants used to undermine Plaintiff's buyout offer and interfere with Plaintiff's business relations with Paramount.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and actual damages in an amount to be determined at trial plus punitive damages, interest, counsel fees, costs and the expenses of this action, and for such other and further relief as the court deems equitable. As a direct, legal and proximate result of Defendants' aforementioned actions, Plaintiff has sustained economic damages to be proven at trial. Plaintiff seeks judgment for actual damages, interest and costs, as well as judgment temporarily and permanently enjoining Defendants from continuing described actions.

Dated: September 17, 2024


Respectfully submitted


By  /s/ Alfred C. Constants III

Alfred C. Constants III, Esq.

 Constants Law Offices, LLC.

DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable in accordance with Federal Rule of Civil Procedure 38(b).


By  /s/ Alfred C. Constants III

Alfred C. Constants III, Esq.


Attorneys for Plaintiff

Constants Law Offices, LLC.