THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

LIVEVIDEO.AI CORP
　　　　　*Plaintiff,*

vs.

SHARI REDSTONE,
NATIONAL AMUSEMENTS,
INC., CHRISTINE VARNEY,
MONICA SELIGMAN,

　　　　　*Defendant's.*

_____/

CIVIL ACTION
C.A. NO. 1:24-CV-06290

### DECLARATION IN SUPPORT OF
### AMENDED MOTION FOR LEAVE TO
### SUPPLEMENT PURSUANT TO RULE 15(d)

　　　　Attached as Exhibit #1 to this declaration is a true and correct copy of the

Supplemental Pleading this motion seeks added as section "134." containing causes

of action seven, eight, nine, ten, eleven, twelve. A newly discovered anti-

competitive agreement has been added which harmed the Plaintiff. In this case, the

$4,000,000 newly disclosed monthly cash payments to Skydance were disclosed

very recently in two February 2025 SEC and S-4 filings related to Paramount

Global.

　　　　Dated March 17, 2025

　　　　　　　　　　　　　　　　　By _/s/ Alfred C. Constants III___

　　　　　　　　　　　　　　　　　Alfred C. Constants III, Esq.
　　　　　　　　　　　　　　　　　Constants Law Offices, LLC.
　　　　　　　　　　　　　　　　　115 Forest Ave., Unit 331
　　　　　　　　　　　　　　　　　Locust Valley, NY 11560
　　　　　　　　　　　　　　　　　Email: Constantslaw49@gmail.com
　　　　　　　　　　　　　　　　　*Attorney For Plaintiff*

EXHIBIT #1

134.    Defendant NAI, as the controller of Paramount, entered into agreements with Skydance and other third parties that unreasonably restrained trade by preventing legitimate acquisition offers for Paramount Global.

135.    NAI and Skydance engaged in a coordinated conspiracy with an agreement that violated Section 1 of the Sherman Act (15 U.S.C. § 1), constituting a per se violation of antitrust laws. LiveVideo.AI Corp was prevented from acquiring Paramount Global due to such conspiracy involving NAI and Skydance.

136.    One such agreement was formed in May 2024 when Paramount secretly agreed to pay Skydance $4 million cash per month. This arrangement contradicted the public statements made by NAI and Paramount about the Skydance negotiations. Specifically:  i. Paramount and NAI had previously claimed the exclusivity period under the Exclusivity Agreement had terminated in May 2024. ii. They did not disclose that Paramount had agreed to begin these monthly payments to Skydance as part of ending the exclusivity period. iii. The payments were to continue as long as Paramount had not entered into a merger agreement with anyone else. iv. This secret arrangement was at odds with the transparency expected in such negotiations.

137.   The deal itself was simple in its phrasing but laden with implications: Paramount would funnel $4 million in cash per month to Skydance under the radar. The arrangement wasn't scribbled hastily on paper; it was meticulously crafted, each clause scrutinized in silence before being finalized with curt nods and firm handshakes. This wasn't merely a business

transaction—it was a hushed alliance, one that sidestepped public scrutiny and defied the carefully curated image both companies had presented to the world.

138.    Publicly, Paramount and parent company NAI (National Amusements Inc.) had maintained a unified front. In statements to the press just weeks prior, they had confidently declared that the exclusivity period outlined in their longstanding Exclusivity Agreement with Skydance had officially ended.

139.    An additional agreement was that Paramount facilitated and allowed Skydance to learn information about other interested buyers and their offers so that Skydance could interfere with them or poach by approaching these interested buyers and inviting them to participate under Skydance's offer.

140.    Paramount and NAI also encouraged and facilitated Skydance's creation of a syndicate which included potential competing buyers like private equity firm KKR by sharing confidential and timely indications of interest by new outside parties that had approached NAI or Paramount. This type of information was not provided to other interested buyers like LiveVideo.AI Corp.

141.    Alternatively or in addition, the court will find Defendant NAI, as the controller of Paramount, entered into an agreement with Skydance and other 3rd parties that unreasonably restrained trade by preventing legitimate acquisition offers for publicly traded Paramount by making the conditions harder for non-Skydance interested buyers:

    i. Delaying the execution of non-disclosure agreements with Party C and Party H.[1]

---

[1] -"representatives of Cravath sent to representatives of Party C's legal counsel a draft non-disclosure agreement for each of Party C and Party H."

ii. Offering different deal structures to non-Skydance interested buyers, including:

a. Conditioning on Paramount shareholder approval, making a bid less attractive and harder to execute.

b. Providing Skydance with more favorable no shareholder approval requirement.

iii. Allowing special committee to continuously assert or promote Skydance's advantages.

iv. Limiting access to due diligence information for non-Skydance buyers.

v. Imposing stricter timeline and other constraints on non-Skydance buyers submissions.

142.    These actions collectively created an uneven playing field, giving Skydance a significant advantage in the acquisition process and potentially deterring other interested parties from pursuing or improving their offers for Paramount Global.

143.    Other prospective buyers like buyer C and H were forced to sign restrictive agreements that limited their ability to compete in a free market auction process, putting them at an even greater disadvantage.

144.    According to the S4 amendments, the non-disclosure agreements executed between Paramount and interested buyers were part of an anticompetitive scheme involving binding standstill provisions, confidentiality constraints, and a Fallaway Provision.

145.    Paramount's special committee insisted on these restrictive agreements before sharing crucial information potential buyers needed to review before finalizing their offers.

---

-" Over the course of the following two weeks, representatives of Cravath and Party C's legal counsel negotiated the non-disclosure agreements, which, "due to delays not caused by the Special Committee or its advisors, "

-"Paramount did not execute with each of Party C and Party H until May 16, 2024.

This unfair strategy curtailed communications and dictated the types of offers a buyer could initiate.

146. However, Skydance was not subjected to these limitations, instead they were permitted to review the same information other interested parties were barred from accessing unless they signed one of the Cravath "standstill" non-disclosure agreements created by defendant Varney.

147. The conspiracy took a more insidious turn with Skydance at the helm, fueled by clandestine $4,000,000 monthly payments from Paramount for continued "engagement". This plot sought to convert competing firms into joining a syndicate as part of Skydance's offer to own parts of Paramount Global assets instead of competing as rival bidders. The shareholders were thus deprived of the chance to get the best economic purchase price.

148. A direct victim of this conspiracy was LiveVideo.AI Corp., which sustained significant injury when its timely July 5th acquisition offer for Paramount was stonewalled.

149. Thus, while Skydance enjoyed preferential treatment on one hand, on the other hand, it was leading a conspiracy that caused harm to companies like LiveVideo.AI   Corp., further skewing the playing field against honest competition.

150. Proof of scienter existing is found by the fact that Paramount's special committee head overseeing Paramount's sales process and approval of the Skydance deal resigned October 18, 2024 just a few months after the signing of the merger agreement and before the transaction closed, a glaring red flag.[2]

_____

[2] "Charles Phillips Resigns From Paramount Global Board",
https://variety.com/2024/bit/news/charles-phillips-resigns-paramount-board-1236182204/

**COUNT VII- VIOLATION OF SECTION § 10(b) AND RULE 10b-5 UNDER THE**

**EXCHANGE ACT**

151. Plaintiff repeats, realleges the foregoing paragraphs as set forth herein.

152. Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa] because certain of the transactions, acts, practices, and courses of business alleged in this Complaint occurred, within this District. Exchange Act Section 27 [15 U.S.C. § 78aa] is the basis for jurisdiction of Section 10(b) and Rule 10b-5 under the Exchange Act making it "unlawful for any person, in connection with the purchase or sale of any security, to use any means of instrumentality in interstate commerce, directly or indirectly, i. to employ any device, scheme, or artifice to defraud ii. make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or iii. engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

**Successful Service on NAI:**

153. On November 6, 2024, legal service of process was successfully completed on NAI through its registered Maryland agent, Corporation Trust Incorporated ensuring that NAI had actual notice of the pending litigation.

**NAI NY Attorney General Consent Decree:**

154. On November 15, 2024, NAI agreed to pay a $250,000 penalty to the NY Attorney
General as part of entering into a consent decree after "Failing to Protect Employees" from a
data breach. (Ex. #3) This consent decree:

1. Highlights the depths of the misconduct at play

2. Admits NAI violated Executive Law § 63(12) and GBL §§ 899-aa, 899-bb

3. Reveals NAI delayed notification to tens of thousands of victims for over a year

4. Demonstrates a pattern of negligence in data protection and breach response

5. Underscores the company's failure to implement adequate cybersecurity measures

The October 2024 NY AG consent decree (Ex. #4)  emphasizes the severity of NAI's
actions and inactions regarding data security and employee protection, further stating:

"The investigation determined the attacker accessed the network on December 13,
The threat actor used an employee's VPN credentials, most likely obtained
from the dark web, to enter the network. National had multifactor authentication
in place for remote access prior to the incident.

However, National's single virtual private network ("VPN"), which was not
intended for general use, did not have multifactor authentication. The VPN tunnel
was closed immediately after the incident. Once in the network, the threat actor
utilized Cobalt Strike to extract additional credentials in order to gain
additional network      privileges. Information exposed by this breach included
name, date of birth, social      security number, passport number, financial account
number, driver's license number and health insurance number."... of former and
current employees and contractors. "

155. Further point of concern noted by the NY AG, "A small portion of the network
contained a subset of social security numbers that were not encrypted. In fact, National's IT
team was unaware that certain unencrypted data was stored on the network. The review
completed around November 2, 2023 and notification to the individuals didn't take place
until December 18, 2023, over one year after the incident occurred. "

156. The OAG's investigation also identified the following areas where National failed to implement reasonable data security practices:

    a. Encryption: National failed to encrypt social security numbers and other private information on a portion of its network.

    b. Multi-Factor Authentication: National failed to employ multi-factor authentication across one access point at the time of the incident.

    c. Data Security Assessments: National's data security assessments did not identify the vulnerability described above. d. Password Rotation: National did not enforce its password complexity and rotation requirements as to a portal that was the subject of the incident."

157. The investigation by the NY AG revealed the cyber intrusion that sparked all of this chaos was due to NAI's negligence and failure to implement proper security measures.

158. The attacker gained access to their network using an employee's stolen VPN credentials from the dark web and proceeded to extract sensitive information such as names, social security numbers, passports, financial and health insurance account numbers. And it wasn't just current employees who were impacted, even former ones had their personal information compromised.

159. What's worse is that NAI's IT team was unaware that certain data was not encrypted, leaving it vulnerable to cyber attacks. And despite having some security measures in place, such as multi-factor authentication, it was not consistently used across all access points-making it easy for the attacker to gain further privileges.

160. In short, National Amusements' lack of proper data security practices and negligence towards protecting their employees' private information ultimately led to the catastrophic sale to Skydance.

161. NAI and Redstone entered into a consent decree with the NY AG on November 13, 2024 regarding a data breach and property loss, which greatly impacted Paramount's security measures and its capacity to protect confidential information.

162. The omission of this data breach and consent decree from Paramount's S4 filings makes them materially misleading.

163. This omitted information is important because:

a) It had direct consequences for Paramount Global's security.

b) It raised questions about the company's ability to protect sensitive data.

c) It exposed vulnerabilities in how Paramount handled its information.

d) It underscored potential weaknesses in its systems, which could lead to financial losses, reputational damage, or regulatory penalties.

164. Defendant Redstone's role in the matter makes the omission even more serious:

a) As someone with decision-making authority over Paramount, her involvement in entering into the consent decree raises concerns about her fitness to oversee the company's security strategies.  b) If properly disclosed, it would have sparked concerns about the implications of Redstone continuing to hold a position of influence like Chairperson.

165. Shareholders would have wanted to know about:

a) The breach itself and its long-term ramifications.

b) Whether enough was being done to prevent future breaches.

c) Potential further liabilities arising from ongoing issues tied to this breach.

166. Failing to disclose this consent decree:

a) Created a misleading picture of Paramount's stability and leadership.

b) Hid risks tied to potential future breaches and regulatory scrutiny.

c) Allowed NAI and Redstone to downplay their accountability for the incident.

d) Undermined shareholders' ability to make informed decisions about their investments.

167. By concealing these critical details, the defendants reinforced their pattern of manipulating disclosures to prioritize their own interests at the expense of transparency.

168. The NY AG consent decree requires National Amusements to put in place compliance systems fixing the problems that led to the data breach and train its CEO and other senior executives with minimum education and obligations they have to prevent future data breaches.

169. Since the consent decree was signed just this past November, NAI has not yet met the requirements, representations, and warranties stipulated in the agreement, nor has it complied with the consent decree.

170. It is likely that the data breach issues identified by the NY AG contributed to NAI's inability to track the notices and documents sent by its registered agents across the country, as NAI operates in multiple states.

171. This situation almost certainly led to several mistakes in NAI's ability to ascertain where, when, and to whom its registered agents forwarded communications, including scanned copies of documents those agents received in person in paper form for NAI.

172. For instance, one error was noted in NAI's December 18, 2024 ECF letter, where NAI incorrectly cited "CT Corp" as the registered agent served with legal process. However,

both the Plaintiff's documents and the affidavit from the intermediary legal service provider

clearly indicate that the registered agent served was Corporation Trust Incorporated.

173. Another indicia of Scienter and negative inference can be formed from a recent

court case decided on January 29, 2025, when the Delaware Court of Chancery overturned a

previous ruling made by a magistrate judge in favor of the defendant, Paramount Global, in a

shareholder complaint filed by the State of Rhode Island Office of the General Treasurer.

174. In the case STATE OF RHODE ISLAND OFFICE OF THE GENERAL

TREASURER v. PARAMOUNT GLOBAL C.A. No.  2024-0457, Vice Chancellor Laster

granted the Plaintiff shareholder access to the company's books and records.

175. Access was sought by shareholders "to explore possible corporate wrongdoing"

related to the sales process ahead of the July 2024 merger signed with Skydance (Exhibit #1).

176. The Delaware decision concludes that it is more likely than not that the defendants

were involved in wrongdoing.

177.  In summary, it states, "The record as a whole demonstrates by a preponderance of

the evidence that the stockholder has a credible basis to suspect wrongdoing." (Ex 1 at 38).

178.  The decision further outlines the evidence reviewed by the court, the defendants'

position, and the Delaware legal standards that the Plaintiff shareholder successfully met.

"The Company also argues that the court cannot infer potential wrongdoing from the fact
that NAI faced liquidity issues. Taking the evidence as a whole, the court can credit that
liquidity issues could have affected Redstone's decisions and led her to seek a near-term
sale of NAI rather than a Company-level  transaction.
        The Company also argues that the stockholder has failed to establish any
motivation Redstone had to engage in wrongdoing. The stockholder does not have to
prove motive. The stockholder has offered a credible account. Moreover, the record
supports an inference that Redstone could extract more value from a sale of NAI than
from a Company-level sale. It also supports an inference that Redstone steered the sale
process to achieve that result.
        The Company also argues that the court cannot infer wrongdoing from the
directors' departures and the CEO's termination because they don't directly implicate

Redstone. And the Company argues that the record does not support an inference that five directors left because the Skydance Deal only benefited Redstone. The court must consider the record as a whole. Considered against the backdrop of deal discussions, the market reactions to events in the deal process, and Redstone's position, these events are probative and support the inferences the stockholder seeks." (Ex. 1 at 38)

"Taking the record as a whole, there is a credible basis to suspect that Redstone torpedoed the Company-level Skydance Deal because it would not provide her with the benefits she wanted. Whether Redstone steered bidders for the Company away from a Company-level transaction and toward an NAI-level transaction is a legitimate topic for a Section 220 demand. The stockholder established a proper purpose by proving a credible basis to suspect corporate wrongdoing." (Ex. 1 at 39)

**Misleading Shareholders With Defective SEC Disclosures**

179.  Before and after the Plaintiff became a stockholder starting in July 2024, as detailed herein, Defendants made materially false and misleading statements and omissions, while engaged in a scheme to deceive the market.

180.  This artificially inflated the price of Paramount's common stock and operated as a fraud or deceit on the Plaintiff and those similarly situated (as defined below).

**Defective S-4 Filings Containing Material Misrepresentations and Omissions:**

181.  On November 4, 2024, Paramount, filed an SEC Form S-4 disclosing existence of this ongoing legal matter.

"Additionally, on August 20, 2024, LiveVideo. AI filed a lawsuit in the Southern District of New York against Shari Redstone, NAI, Christine Varney and Monica Seligman, alleging that defendants did not fairly consider its offer to purchase Paramount. The complaint asserts claims for unfair competition, tortious      interference, unjust enrichment and aiding and abetting breach of fiduciary    duty, among others, and seeks unspecified monetary damages, costs, as well as other relief. *As of the date of this   information statement/prospectus, the defendants have not been served.*"

182.  The Nov. 4 S-4 filing omitted critical facts, including:

  a.  Defendant Varney's dual role as both a Defendant in the litigation and the preparer of the S-4 filing.

b. Significant conflicts of interest among Paramount Board and Officers.

183. An Amended Complaint was served on NAI on Nov. 6, 2024.[3]

**Entry of default against NAI:**

184. A default was entered against NAI Dec. 9, 2024 at Plaintiff's request (Dkt. No. 63), reflecting NAI disregard for its legal obligations.

185. On December 11, 2024, NAI by ecf letter falsely claims it was not served and requesting magistrate vacate the entry of default.

**Misleading Shareholders With False Misleading Public Filing Disclosure:**

186. Defendants knowingly concealed material information to downplay the litigation's significance, undervalue future risk to Paramount shareholders, and protect their reputations.

187. For example, Varney, as a defendant and attorney whose law firm has responsibility for drafting the Paramount S4 and other SEC filings, intentionally aided and abetted the fraudulent omissions to shield Paramount and NAI from disclosing the entry of default because it would have put them in breach of one or more contracts including the Skydance Merger Agreement.

188. Under New York Law, a default constitutes admission of well- pleaded factual allegations in the complaint, except those relating to damages. It is an ancient common law axiom that a defendant who defaults thereby admits all well- pleaded factual allegations contained in the complaint.

---

[3] Proof of service confirmed an "amended" complaint was served on Defendant in Maryland along with a September 18, 2024 summons.

189. After the Dec. 16, 2024 first amendment to the S-4 revealed to the market that Plaintiff's complaint in the Southern District of New York had not been quickly dismissed with prejudice the price of Paramount's stock fell precipitously, as the prior artificial inflation came out of the price over time.

190. As a result of their purchases of Paramount stock during the Shareholder Period, Plaintiff and other members of the presumptive Class or those similarly situated to the Plaintiff suffered economic loss, i.e., damages, under the federal securities laws.

191. Questions of law and fact common to members of the presumptive Class include:

(a) Whether Defendants violated the Exchange Act;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether the Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e) Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f) Whether Defendants conduct impacted the price of Paramount common stock;

(g) The extent of damage sustained by Plaintiff and those similarity situated or the Class members and the appropriate measure of damages.

192. Plaintiff's securities claims are typical of those of the presumptive Class because Plaintiff and other shareholders similarly situated or members of the presumptive Class sustained damages from Defendants' wrongful conduct.[4]

---

[4] Becoming a Paramount Global common stock owner in July of 2024

193. At all relevant times, the market for Paramount's common stock was an efficient market for the following reasons, among others: (a) Paramount common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market; (b) As a regulated issuer, Paramount filed periodic public reports with the SEC and NYSE; (c) Paramount regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide

ranging public disclosures, such as communications with the financial press and other similar reporting services; and (d) Paramount was followed by securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

194. As a result of the foregoing, the market for Paramount common stock promptly digested current information regarding Paramount from all publicly available sources and reflected such information in the price of Paramount common stock.

195. Under these circumstances, the Plaintiff like all purchasers of Paramount common stock during the Class Period suffered similar injury through their purchase of Paramount common stock at artificially inflated prices and the presumption of reliance applies.

196. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972).*

197.  The Plaintiff, those similarly situated, and the presumptive Class claims are grounded on defendants' material omissions of information that was necessary to render defendants' statements not misleading.

198.  Defendants' repeated references to the Company's merger and acquisition activities created an obligation on defendants to disclose true and accurate information to public shareholders, as well as to in timely fashion correct any errors and omissions in such public disclosures.

199.  After the removal of the Paramount CEO in April 2024, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Paramount common stock at artificially inflated prices. Defendants: (i) employed devices, schemes, and artifices to defraud;

(ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Paramount common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

200.  Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

201. During the Presumptive Class Period ("Shareholder Period"), defendants made the false statements specified above.

202. They knew or recklessly disregarded the fact that these statements were false and misleading due to their content.

203. These statements contained misrepresentations and failed to disclose material facts necessary for the context under which they were made.

204. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.

205. Defendants engaged in this misconduct to conceal Paramount's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

206. Plaintiff, those similarly situated, and the presumptive Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Paramount common stock.

207. Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Paramount common stock had been artificially inflated by Defendants' fraudulent course of conduct.

208. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the presumptive Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

209. Defendants NAI, Shari Redstone, Christine Varney, and Seligman are collectively referred to hereinafter as the "Individual Defendants."

210.  The Individual Defendants, because of their positions with Paramount, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.

211. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

212. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

**Paramount's Amended SEC S-4 Filing and Material Misrepresentations:**

213. On Dec 16., defendant NAI directs Paramount file S4 "AMENDMENT NO. 1".

214. Instead of taking the opportunity to update and provide the correct status change in its legal proceedings previously identified and disclosed in its S-4 SEC filing, the defendant doubles down on the scheme to conceal the true status of the SDNY Federal case and directs Paramount to make the following false or misleading disclosures on pages 172, 56, 45:

> "Additionally, on August 20, 2024, LiveVideo. AI filed a lawsuit in the Southern District of New York against Shari Redstone, NAI, Christine Varney and Monica Seligman, alleging that defendants did not fairly consider its offer to purchase Paramount. The complaint asserts claims for unfair competition, tortious interference, unjust enrichment and aiding and abetting breach of fiduciary duty, among others, and seeks unspecified monetary damages, costs, as

well as other relief. *As of the date of this information statement/prospectus, the defendants have not been served."*

215. This was the exact statement about the existence and status of the Plaintiff's SDNY complaint as had been disclosed in the November 4, 2024 S-4.

**PARA Stock Price Significantly Higher Before Corrective Disclosure**

216. The stock price of PARA closed at $11.22 per share on December 13, 2024, one day before defendants used their control to direct PARA to file an amended S-4 registration statement on December 16, 2024.

217. Defendants Redstone and NAI are the makers of the statements in the S-4 filings dated November 14, 2024, December 16, 2024, and January 5, 2025, respectively, regarding Paramount, because they both have ultimate authority over the statement at issue, the S-4 including its content and whether and how to communicate it.

218. On January 10, 2024 a recent trading day, PARA share price closed at $10.48 per share, a .74 cent loss per share of Paramount.

219. The defendants made the at issue statements with the intent to deceive or manipulate the public shareholders or with reckless disregard for their truthfulness.

220. On December 16, 2024, NAI authorized Paramount Chairperson Shari Redstone to approve the First Amended S-4 registration statement containing materially false representations that "Defendants have not been served,".

221. The false representation was made despite defendants knowing that:

   i. An entry of default had been granted on December 9, 2024 against NAI in SDNY Federal Court.

   ii. NAI legal counsel appeared in court on December 11, 2024 to file a motion to vacate the default.

iii.  NAI's default status was an ongoing material fact that Paramount was legally

obligated to disclose. iv. The December 11th filing made by defendants seeking to

vacate the default had not been granted by the court as of December 16th when

they filed the First Amended S-4.

222.  Plaintiff as a shareholder also brings a cause of action under 10(b) on a derivative

basis against Defendants because the Defendants control or are in positions to direct the SEC

disclosures of publicly traded Paramount Global (PARA).

223.  The defendants made the disclosure statement with intent to deceive, manipulate or

defraud the public shareholders.

224.  Alternatively it will be found the defendants made the at issue statements with

reckless disregard for, or no belief in, its truths.

225.  Defendant NAI Authorized Paramount Chairperson Shari Redstone to approve

PARA's December 16, 2024 S-4 Amended registration statement documents.

226.  Defendants utilized their control over Paramount to manipulate SEC filings

concerning this litigation by concealing material information about NAI's default status and

misrepresenting non-service of process of other defendants from shareholders.

227.  This scheme allowed them to devalue legal and financial risks associated with the

case while concealing defendant Redstone's negligent management.

228.  This course of conduct benefitted the defendants financially through cash bonuses

and continued engagement fees despite the December Amended S-4 including materially

false representations such as stating that "Defendants have not been served."

229.  This false statement was made despite the following known facts:

iv.        NAI had been properly served on November 6, 2024.

v.      An entry of default had been granted on December 9, 2024.

**vi.**    NAI legal counsel had appeared in this Court on December 11, 2024, to

file a motion to vacate the default.

**vii.**   NAI default status was an ongoing material fact that Paramount was

legally obligated to disclose.

230.   The default status was a material fact concerning NAI's financial and legal

standing, which Paramount shareholders had a right to know.

**Defendant's Unlawful Scheme to Mislead the SEC and Shareholders:**

231.   Defendants utilized NAI's control over Paramount to manipulate the SEC filing

process, creating the false impression that this litigation was not active or immaterial as a risk

or concern for the company.

232.   This scheme served the following purposes:

**i. Undervaluing Risk:** By omitting the default, Defendants sought to minimize

perceived financial and legal risks associated with the case.

**ii. Concealing Negligence:** The omissions obscured Shari Redstone's negligent

management of NAI, including her failure to ensure timely legal compliance.

**iii. Misleading Shareholders:** Defendants knowingly provided false or incomplete

disclosures to Paramount shareholders regarding the status of this litigation,

violating securities laws and constituted a breach of fiduciary duty by Defendants.

233.   It can be concluded that the defendants were aware of the default but chose not to

reveal this fact in the ongoing Federal case.

234.   Instead, they attempted to deceive the public and their shareholders by intentionally

continuing to falsely assert that none of the defendants had received the complaint. This was

despite NAI being aware that it had been served in Maryland to its registered agent and subsequently being defaulted for failing to appear.

235. These facts were concealed and instead the defendants conspired to claim the opposite including falsely stating no defendants had been served. This allowed the defendants to lie to creditors and get substantial benefits for themselves including cash bonuses and continued paid engagement as the legal advisor in the case of defendant Varney.

### The Concealed Information Comes To Light

236. The defendants defective disclosure resulted in creating a Fraud On The Market.

237. This is further proven by reviewing the impact of partial corrective disclosure by the defendants which is greater then an 8% per share loss for shareholders like Plaintiff that purchase PARA in July 2024.

### Material Misrepresentations in the Amended S-4:

238. The December First Amended S-4 included explicit misrepresentations under the section titled "Litigation Relating to Paramount."

239. These misstatements were deliberate and intended to obscure the true nature and progress of this litigation.

240. The filing omitted critical information, including the entry of default against NAI and the pending motion to vacate.

241. Defendants' actions demonstrate a calculated effort to mislead both the Court and the public, including shareholders, regulators, and stakeholders.

242. Plaintiff seeks judicial intervention to correct these injustices, uphold the integrity of the legal process, and ensure accountability for Defendants' misconduct.

243. On Jan. 14, defendant NAI again decides "AMENDMENT NO. 2" to the S-4 filed with

the SEC and again decides to mislead its shareholders and doubles down on the scheme to

conceal the true status of the SDNY Federal case and directs Paramount to make the

following false disclosures on pages 175, 58, 46:

> Additionally, on August 20, 2024, LiveVideo. AI filed a lawsuit in the Southern District of New York against Shari Redstone, NAI, Christine Varney and Monica Seligman, alleging that defendants did not fairly consider its offer to purchase Paramount. The complaint asserts claims for unfair competition, tortious interference, unjust enrichment and aiding and abetting breach of fiduciary duty, among others, and seeks unspecified monetary damages, costs, as well as other relief. *As of the date of this information statement/prospectus, the defendants have not been served.*

244. On Feb. 6, 2025 defendant NAI directs "AMENDMENT NO. 4" to the

S-4, again deciding to mislead its shareholders.

245. Defendants do this by continuing to conceal the true status of the SDNY Federal

case, directing Paramount to make the following misleading disclosure on pages 177, 59, 46:

> "Additionally, on August 20, 2024, LiveVideo.AI Corp. filed a lawsuit in the Southern District of New York against Shari Redstone, NAI, Christine Varney and Monica Seligman, alleging that defendants did not fairly consider its offer to purchase Paramount. The complaint asserts claims for unfair competition, tortious interference, unjust enrichment and aiding and abetting breach of fiduciary duty, among others, and seeks unspecified monetary damages, costs, as well as other relief. *As of the date of this information statement/prospectus, the defendants have not been served.*"

246. Pages 45-46 of first amended S-4 includes another misleading statement:

> *"If New Paramount is unable to effectively implement or maintain a system of internal control over financial reporting, it may not be able to accurately or timely report its financial results and its stock price could be adversely affected.* "Pursuant to Section 404 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), New Paramount will be required to furnish a report by its management on its internal control over financial reporting, including an attestation report on internal control over financial reporting issued by its independent registered public accounting firm. While Paramount has historically furnished this report, as a private company, Skydance has not been subject to the information and reporting requirements of the Sarbanes-Oxley Act.

Therefore, to bring New Paramount into compliance with Section 404 of the Sarbanes-Oxley Act, New Paramount will be engaged in a process to document and evaluate internal controls for Skydance which is both costly and challenging. New Paramount will need to dedicate internal resources, potentially engage outside consultants, adopt a detailed work plan to establish and document internal controls for Skydance, validate through testing that controls are functioning as documented and integrate Skydance into the continuous reporting and improvement process for internal control over financial reporting already established at Paramount. The completion of the Transactions described in this information statement/prospectus and the subsequent integration of Skydance into Paramount's accounting and operations may make it more difficult for New Paramount to comply with Section 404 of the Sarbanes-Oxley Act. Despite New Paramount's efforts, there is a risk that neither it nor its independent registered public accounting firm will be able to conclude that its internal control over financial reporting is effective as required by Section 404 of the Sarbanes- Oxley Act. This could result in an adverse reaction in the financial markets due to a loss of confidence in the reliability of New Paramount's financial statements. New Paramount could also become subject to investigations by the SEC or other regulatory authorities, which could require additional financial and management resources. Additionally, any deficiencies in New Paramount's internal control over financial reporting may affect its ability to report its financial results accurately or to prevent or detect fraud. Such deficiencies also could result in restatements of, or other adjustments to, New Paramount's previously reported or announced operating results, which could diminish investor confidence and reduce the market price for New Paramount's common stock. "

247. The statement is misleading because it omits the November 2024 announced New York AG consent decree that NAI and Redstone entered into for data breach and property loss. The significant capital investment needed to hire personnel to comply with the consent decree affirmative obligations including ongoing reports made each year or quarterly to the NY AG. Training for all officers and directors and employees arguably would include where Redstone Chair to Paramount and the merged Skydance Paramount entity. These are significant risk factors that have been omitted in the public S4 filed amendments cited herin.

248. The data breach had a direct and indirect impact on Paramount's security and ability to safeguard its data.

249. Public shareholders would have wanted to understand the ramifications of Redstone continuing to be in a position of authority and decision maker for Paramount's data protection and security processes, sequences, and strategies.

250. The omission of the NY AG consent decree and the damages it had caused and was expected to cause in the future for both companies make the disclosure false and misleading and incomplete.

251. A fifth amended S-4 was submitted to the SEC on February 14, 2025.

252. It once again deceives shareholders by concealing the real status of the SDNY Federal case as a result of defendants instructing Paramount to repeat the false disclosures.

253. These omissions fail to mention that the defendants had filed a sanctions motion on December 30, 2024, clearly stating they had reviewed all versions of the complaint the Plaintiff submitted to the Court.

254. Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

255. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

256. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other shareholders including presumptive members of the Class suffered damages in connection with their purchases of the Company's stock during this period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from the Company's stock.

257. The exact amount of damages to be determined at trial.

### COUNT VIII- VIOLATION OF SECURITIES ACT SECTION § 17(a)

258. Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

259. Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently have obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

260. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C.§ 77q(a)].

261. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other shareholders including presumptive members of the Class suffered damages in connection with their purchases of the Company's stock during this period, as evidenced by,

among others, the stock price declines discussed above, when the artificial inflation was released from the Company's stock. The exact amount of damages to be determined at trial.

## COUNT IX - VIOLATION OF SECTION 14(a) OF THE EXCHANGE ACT AND RULE 14a-9

262. Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

263. On Behalf of Plaintiff and the Class Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9

264. The defendants registration statement S-4 was filed containing inaccurate and missing information about legal liabilities, the status of the SDNY default in a case disclosed to the public that was ongoing, and the risks that existed at the times the amendments to the registration statements were filed.

265. Defendants at all times were negligent or turned a blind eye to their fiduciary duties to oversee the release and reporting requirements as Directors of Paramount Global or as Officers.

266. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and other members of the presumptive Class suffered damages in connection with their purchases of the Company's stock during the Class or Shareholder Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from the Company's stock. The exact damages suffered shall be determined at trial.

## COUNT X - VIOLATION OF EXCHANGE ACT SECTION 20(a)

267. Plaintiff repeats and realleges the foregoing paragraphs as set forth herein Against the Individual Defendants ('Defendants')

268. During the Shareholder or Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.

269. Because of their senior positions, they knew the adverse non-public information about the Company's false financial and registration statements.

270. As officers or Directors or controllers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's' financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

271. Because of their positions of control and authority the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Period at issue concerning the Company's results of operations.

272. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.

273. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.

274. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

275. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of Exchange Act for the violations committed by the Company.

276. As alleged above, Redstone violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5] thereunder.

277. Defendants knowingly or recklessly provided substantial assistance to Shari Redstone and NAI with respect to its violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

278. By reason of the foregoing, Defendants Redstone, NAI, Varney, and Seligman are liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Shari Redstone's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder and, unless enjoined, Defendants will again aid and abet these violations.

279. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class or Shareholder Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from the Company's stock. The exact damages suffered shall be determined at trial.

## COUNT XI - DERIVATIVE AND DIRECT BREACH OF FIDUCIARUY DUTY OWED TO PLAINTIFF AS PARAMOUNT GLOBAL PARA SHAREHOLDER

(All Defendants)

280. Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

281. Plaintiff brings derivative and direct shareholder breach of fiduciary duty claims against defendants for disloyal engineering of the Merger in a conflicted transaction that violates Delaware law and from which they extracted non-ratable benefits.

282. Plaintiff also asserts a derivative claim for breach of fiduciary duty against the Special Committee for disloyally approving the unfair Merger at Ms. Redstone's behest.

283. Plaintiff also asserts a direct claim against Redstone and the NAI parties for breaching their fiduciary duty of loyalty by forcing stockholders to enter into a Merger that converts their shares for stock of a new and less valuable company, Pluto Global, resulting in both diluted ownership stakes and diluted value.

284. Plaintiff also asserts an individual and class claim against Redstone, and other Defendants for breaching their fiduciary duties by allowing Redstone to negotiate the Merger she already signaled she was willing to force Paramount Global to pursue, failing to advocate for the interests of Paramount's public stockholders, and also by allowing Redstone improperly to influence the Skydance negotiations and cause Paramount Global to enter into the patently unfair Merger to the detriment of public stockholders.

285. Further that Redstone refused to even consider competing superior offers like the July 5, 2024 LiveVideo.AI Corp superior offer.

**The Negative Inference Cases**

286. The following cases may be incorporated by reference as evidence of defendant Redstone's well established history of malfeasances, violations of fiduciary duty, and wrong doing as a result of their position as President of NAI, Paramount Chair, or a Director of successor corporations:

    i. "In re CBS Corp. Stockholder Class Action & Derivative Litig., CONSOLIDATED C.A. No. 2020-0111-JRS, 114-16 (Del. Ch. Jan. 27, 2021)

    ii. *Feuer v. Dauman*, Civil Action No. 12579-CB, 8-9 (Del. Ch. Oct. 25, 2017)

    iii. *Freedman v. Redstone, Civ. No. 12-1052-SLR, 20-21 (D. Del. Jul. 16, 2013)*

    iv.*In re Midway Games, Inc.*, 428 B.R. 303, 310 (Bankr. D. Del. 2010)
    v. *Redstone v. Superior Court* , No. B288954, 2-3 (Cal. Ct. App. Aug. 1, 2018)

**COUNT XII - VIOLATION OF SHERMAN ACT 15 U.S.C. § 1**

(ALL DEFENDANTS)

287. Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

288. 15 U.S.C. § 15(a), provides that federal district courts shall have jurisdiction to prevent and restrain violations of the Sherman Act.

389. Defendants engaged in an unlawful conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. 'Every contract, combination... or conspiracy, in restraint of trade or commerce... is declared to be illegal'.

299. 15 U.S.C. § 15(a), provides that federal district courts shall have jurisdiction to prevent and restrain violations of the Sherman Act.

300. Defendants engaged in an unlawful conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. 'Every contract, combination... or conspiracy, in restraint of trade or commerce... is declared to be illegal'.

290. Defendant NAI, as the controller of Paramount, Paramount, and Skydance entered into agreements that unreasonably restrained trade by:

a) Preventing legitimate acquisition offers for publicly traded Paramount

b) Artificially suppressing the value of Paramount Global shares.
   b) Limiting competition in the film, television, and online video and streaming marketplaces.

c) Excluding potential buyers from participating in the Paramount sales process in 2024.

291. This agreement has caused antitrust injury to LiveVideo.AI Corp and harm to competition in the marketplace. This conspiracy has caused direct antitrust injury to LiveVideo.AI Corp by preventing it from acquiring Paramount Global operations despite submitting a timely July 5, 2024 offer.

292. Alternatively, the court will find the conspiracy has also harmed competition more broadly by allowing a syndicate led by Skydance that includes competing media companies to participate in owning portions of Paramount Global assets, rather than competing as rival bidders to acquire Paramount Global with the highest or best economic purchase price that shareholders can benefit from.

293. Alternatively or in addition, the court will find Defendant NAI, as the controller of Paramount, entered into an agreement with Skydance and engaged in an unlawful conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Their coordinated actions constitute a per se violation of antitrust laws through:

a) Price fixing

b) Market allocation

c) Bid rigging

d) Group boycotts of potential buyers

294. Alternatively or in addition the court will find Defendant NAI, as the controller of Paramount, entered into an agreement with Skydance and other 3rd parties that unreasonably restrains trade by Preventing legitimate acquisition offers for publicly traded Paramount Global. One way this was done was making the conditions harder for non Skydance interested buyers.

295. Moreover, non-Skydance interested buyers who were permitted to sign NDAs were presented with alternative deal structures. Buyers C and H, as outlined in the

defendants' S4 filing, were informed that their deals hinged on shareholder approval, while

Skydance, backed by the special committee, faced no such requirement.[5]

296.  Buyers C and H were also compelled to sign agreements that stifled their ability

to participate in a fair and competitive auction process. For example, the finalized NDAs

between Paramount and each of Party C and Party H included a standstill provision binding

both parties which suppressed competition.[6]

297.  These acts were part of an antitrust conspiracy which further limited competition in

the media and entertainment industry, artificially suppressing the value of Paramount Global

shares, excluding potential buyers from participating in a fair bidding or sales process of a

publicly traded media company.

Market Allocation and Division.

298. Alternatively or in addition part of the antitrust conspiracy included that, Defendant

NAI as the controller of Paramount entered into an agreement with Skydance and other

media companies and agreed to take control over Paramount's operations through a sham

buyout by Skydance a front for the media companies providing the capital to complete the

---

[5] On May 5, 2024, representatives of Cravath held a call with representatives of Party C's legal counsel to discuss the potential transaction with Party C and Party H, including the proposed transaction structure, regulatory considerations, "the Special Committee's request that any transaction would be conditioned on a majority-of-the-minority vote, and potential non-disclosure agreements with each of Party C and Party H."

[6] "The executed non-disclosure agreement between Paramount and each of Party C and Party H contained a standstill provision binding each of Party C and Party H, "with a customary exclusion " permitting each of Party C and Party H to make proposals to Paramount privately and confidentially "and a Fallaway Provision. "

merger squeeze out structure, effectively allocating the U.S. social media market between

them while excluding other potential acquirers;

**Group Boycott:.**

299.  Alternatively or in addition part of the antitrust conspiracy included that ,

Defendant NAI as the controller of Paramount entered into an agreement with Skydance and

conspired to boycott LiveVideo.AI Corp and other parties seeking to make acquisition offers.

**Bid Rigging:**

300.  Bid rigging occurs when competitors agree in advance who will submit the winning

bid on an M&A transaction.  Alternatively or in addition part of the antitrust conspiracy

included that Defendant NAI as the controller of Paramount entered into an agreement with

Skydance and coordinated with Redbird LLC to manipulate the Special Committee of

Paramount Global and ensure Skydance's selection as the merger partner while suppressing

LiveVideo.AI Corp's superior offer made on July 5, 2024.

301.  Defendants engaged in bid suppression to effect the bid rigging by refusing to

acknowledge or respond to LiveVideo.AI Corp's July 5, 2024 offer letter sent by email and

fax, nor return the company's many phone calls in the days leading up to July 5th offer.

**Concerted Refusal to Deal:**

302.  Alternatively or in addition part of the antitrust conspiracy included that Defendant

NAI as the controller of Paramount entered into an agreement with Skydance and refused to

respond to or negotiate with Livevideo.AI Corp regarding its legitimate offer of $33.3 billion

and, instead pursued the inferior Skydance merger in furtherance of their conspiracy.

303.  In addition, based on information and belief from new disclosures in the S4, the

defendants used their special committee member Seligman to serve as a legal counsel to one

or more potential buyers but this resulted in further suppressing competition because

Seligman was focused on creating a false narrative for the news media to report more

interested parties were active in the pursuit of Paramount then the actual number involved.[7]

304.  This anticompetitive conduct has caused direct harm to competition in the film,

television, and streaming market by: Preventing legitimate acquisition offers for publicly

traded Paramount Global, reducing competition in the film, online video, television, and

streaming media markets, artificially maintaining higher barriers to entry, and depriving

consumers of the benefits of legitimate competition.


305. As a direct result of Defendants' anticompetitive conduct, Plaintiff has suffered

antitrust injury through lost profits, equity shares, licensing revenue, and other business

opportunities from its thwarted acquisition attempt, damage to its competitive position in the

online video and streaming media markets, and increased costs and lost efficiencies that

would have resulted from a legitimate acquisition. *'Agreements between competitors to*

*allocate markets, refuse to deal, or rig bids are per se violations of Section 1 of the Sherman*

*Act.' Palmer v. BRG of Georgia, Inc., 498 U.S. 46, 49-50 (1990)*

**Agreement Gives $4,000,000 Cash Per Month To Skydance**

306.  Defendant NAI forced Paramount to begin paying Skydance $4,000,000 in cash

per month beginning in May 2024 to continue to stay engaged with Paramount.

307.  This was not known to the public until disclosed in a 2025

---

[7] "Party C's legal counsel noted that they did not represent Party H and did not know which
law firm would be acting as legal counsel to Party H, but that they would endeavor to
facilitate the entry into non-disclosure agreements on behalf of both Party C and Party H. "

amended S4 months after the merger agreement was signed between the defendants.[8]

308. The $4 million dollar monthly cash payments for due diligence expenses was

unjustified, unconscionable, and blindingly unfair to all other interested potential buyers who

Paramount Global would not pay any monthly cash while such competing interested buyer

worked on due diligence.

309. The defendants now admit in their S4 that Paramount and NAI were responsible for

"leaks in the press" of clearly often false narratives, limited hangouts, and blindingly clear

falsely planted information regarding the Paramount sales process. [9]

310. Therefore the "leaks in the press" were yet another strategy and tactic that

suppressed competition and were acts by the defendants to make sure only Skydance could

---

[8] "On May 6, 2024, representatives of Latham sent to representatives of Cravath an initial draft of an agreement (the "Expense Reimbursement Agreement") providing for the reimbursement of certain transaction expenses incurred by Skydance and certain of its investors and their respective affiliates and financing sources on or after May 4, 2024 until the earlier of the termination of discussions or Paramount's entry into a definitive transaction agreement. " (S4, page 128)

"Over the course of the following days, representatives of Cravath and Latham negotiated the Expense Reimbursement Agreement, which Paramount and Skydance executed on May 10, 2024. The executed version provided for reimbursement of such transaction expenses incurred on or after May 4, 2024 through May 28, 2024 (or the date of the termination of discussions, or Paramount's entry into a definitive written agreement, if earlier) up to a maximum of $4 million in the aggregate." (id)

[9] The representatives of Skydance and RedBird also expressed increased frustration at how long the negotiating process had taken and the number of leaks in the press and stated that they were not prepared to continue in this manner absent exclusivity. " (id)

compete because only Skydance was informed which leaks were false and which were

factual by the defendants.

311. Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15 and as a direct and

proximate result of these Defendants' wrongful conduct, Plaintiff is entitled to recover treble

damages, costs of suit, and reasonable attorneys' fees for the violations of the Sherman Act

alleged herein.

312. In addition as an indirect and proximate result of these Defendants' wrongful

conduct, in connection with their purchases of the Company's stock during the Class or

Shareholder Period, as evidenced by, among others, the stock price declines discussed above,

when the artificial inflation was released from the Company's stock. The exact damages

suffered shall be determined at trial.

Dated March 17, 2025

By /s/ Alfred C. Constants III
Alfred C. Constants III, Esq.
Constants Law Offices, LLC.
115 Forest Ave., Unit 331
Locust Valley, NY 11560
Email: Constantslaw49@gmail.com
*Attorney For Plaintiff*