EXHIBIT #1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

### LIVEVIDEO.AI CORP

Plaintiff(s),

- against -

SHARI REDSTONE, NATIONAL AMUSEMENTS INC.,
CHRISTINE VARNEY, MONICA SELIGMAN

Defendant(s),

----------------------------------------------------------------X

1:24-cv-06290

_____ Civ. _____(___)

**CLERK'S CERTIFICATE
OF DEFAULT**

I, TAMMI M. HELLWIG, Acting Clerk of the United States District Court for

the Southern District of New York, do hereby certify that this action was

commenced on August 20, 2024 (dkt. 1) with the filing of a complaint. An Amended

Complaint was served prior to the service of the original complaint. Summons

for the Amended complaint was issued on September 18, 2024.

A copy of the summons and Amended complaint was served on defendant

National Amusements Inc November 6, 2024 by personally serving National

Amusements thru registered agent The Corporation Trust Incorporated. Proof of

service was filed on Dec 9, 2024, Doc # 49, and 56 a revised version filed confirming an

"amended" complaint was served along with the summons. I further certify that the

docket entries indicate that the defendant(s) has not filed an answer or otherwise

moved with respect to the complaint herein. The default of the defendant(s) is/are

hereby noted.

Dated: _____

New York, New York

**TAMMI M. HELLWIG**

~~Acting~~ Clerk of Court

By: _Negam Dulal_

Deputy Clerk

EXHIBIT #2

Revised 05/01 WDNY

AFFIRMATION OF SERVICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

LIVEVIDEO.AI CORP
_____,

        Plaintiff(s),             AFFIRMATION OF SERVICE

                                1:24-cv-06290
       v.
SHARI REDSTONE, NATIONAL AMUSEMENTS, INC.,
CHRISTINE VARNEY, MONICA SELIGMAN,
_____,

        Defendant(s).

_____

I, *(print your name)* __Robert Roberts_____, served a copy of the attached papers
*(state the name of your papers)* ___Federal summons and amended complaint_____

_____

_____

_____ upon all other parties in this case
by mailing |_____| by hand-delivering |___✗___| *(check the method you used)*

these documents to the following persons *(list the names and addresses of the people you served)*_____

_____National Amusments Inc         _____

The Corporation Trust Incorporated, 2405 York Road, Suite 201, Lutherville Timonium, MD 21093

_____

_____

_____

on *(date service was made)* __November 6, 2024_____

I declare under penalty of perjury that the foregoing is true and correct, to the best of my
knowledge, information and belief.

Executed on __11/6/2024_____        _____
      *(date)*                          *(your signature)*

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

LIVEVIDEO.AI CORP
            *Plaintiff,*                         CIVIL ACTION
vs.                                              C.A. NO. 1:24-CV-06290

                                                **DECLARATION
                                                IN SUPPORT**

SHARI REDSTONE,
NATIONAL AMUSEMENTS, INC.,
CHRISTINE VARNEY,
MONICA SELIGMAN,

        *Defendant's.*
_____/

**DECLARATION IN SUPPORT**

I, Bob Roberts declare under penalty of perjury, that the following is true and correct:

1.      I have first-hand, personal knowledge of the facts set forth below and, if called as a witness, I could and would testify competently thereto.

2.      I work as a process server in the State of Maryland and am knowledgable about serving legal process for State and Federal litigation matters.

3.      On November 5, 2024 I attempted to serve legal process on The Corporation Trust Incorporated at 2405 York Road, Suite 201, Lutherville Timonium MD 21093-2254 but they had closed early for the election according to a note in the window. Attached as Exhibit #1 to this declaration is a photo I sent later that day to the client, to prove the registered agent was closed.

4.      On November 6th, I served two packets of court docuents to 2405 York Rd Suite 201 at about 1:30pm in Lutherville Maryland.  There were two different UPS

Express bubble packs each with approximately 250 pages in each. One was labeled with the name National Amusements, Inc.

5.      I personally handed the UPS Express bubble pack labeled National Amusements Inc. to one of the two receptionists I saw when I went inside Suite 201, both of which were caucasian females who appeared to be in their mid 20's.

6.      When I handed the UPS Express bubble pack with the summons and amended complaint for National Amusements to the receptionists, I asked if I was at the correct location at which point the receptionists looked at the labels and responded, "Yes, they are for us" meaning that the registered agent, Corporation Trust Incorporated, could accept service of process on behalf of National Amusements.

7.      I also took a date stamped photo of the entrance to the registered agent on November 6, 2024, the day I served legal process of the amended complaint. (Exhibit #2)

8.      I am able to identify the amended complaint I printed out and served on Corporation Trust Incorporated by re-opening the pdfs the client provided.

9.      After further review of these pdf files, I can confirm the amended complaint, I placed in the UPS Express bubble pack, consists of 51 pages not including the exhibits.

10.      At the top of every page of the amended complaint is a docketing imprint showing *"1:24-cv-06290-DEH-BCM Document 32 Filed 09/13/24"*.

Dated: December 13, 2024

Respectfully submitted,

By /s/    Bob Roberts

Bob Roberts

EXHIBIT #1



EXHIBIT #2



EXHIBIT #3

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

LIVEVIDEO.AI CORP
    *Plaintiff.*

        CIVIL ACTION

vs.

        **COMPLAINT AND**
        **JURY DEMAND**

SHARI REDSTONE,
NATIONAL AMUSEMENTS, INC.,
SPV-NAIEH LLC ("SPV")
NAI Entertainment Holdings LLC
Sumner M. Redstone National Amusements Part B General Trust,
CHRISTINE VARNEY,
MONICA SELIGMAN,

    *Defendant's.*

Plaintiff, LiveVideo.AI Corp., (hereinafter "Plaintiff" or "Live") hereby

alleges, for its Complaint against Defendants, SHARI REDSTONE, NATIONAL

AMUSEMENTS, INC., CHRISTINE VARNEY, and MONICA SELIGMAN, and

DOES 1-10 (hereinafter collectively the "Defendants"), as follows:

### PRELIMINARY STATEMENT

1. The Plaintiff, LiveVideo.AI Corp, is a Delaware incorporated New York

based Internet technology company focused in creating and operating Artificial

Intelligence powered online short form video and livevideo streaming technology

platforms. This matter relates to Defendant Shari Redstone's determination to

complete in a grossly negligent self-interested manner, a fire sale of co-Defendant National Amusements, Inc. (NAI), a private movie theater operating company inherited from her father, and the harms and damages caused to Plaintiff, thousands of stockholders, and hundreds of publicly traded Paramount's NY employees.

## NATURE OF THE CLAIMS

2.   This action seeks declaratory and monetary damages to redress violations of tortious interference with business relations, unfair competition, and aiding and abetting breaches of fiduciary duty.

## JURISDICTION AND VENUE

3.    This Court has federal question subject matter jurisdiction over Plaintiff's Complaint. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to this action, including the unlawful practices and actions alleged herein, occurred in or around the City of Manhattan, New York. This Court has personal jurisdiction over Defendants because, upon information and belief, Defendants respectively have ongoing and systematic contacts with this District, maintain offices in, reside in, and/or have committed wrongful acts which both occurred within this District, and which had an impact or effect in this District.

## PARTIES

4.    Plaintiff, LiveVideo.AI Corp., incorporated in the State of Delaware, with an address of 244 5th Avenue, New York, New York.

5.    Defendant, Shari Redstone (hereinafter "Redstone"), is the President of National Amusements, Inc., and Chairperson of non-party Paramount Global Inc., and a citizen of New York because she resides in Queens, NY part time.

1

6. Defendant, National Amusements, Inc. (hereinafter "NAI"), at all times herein mentioned, was and still is a Foreign Business Corporation authorized to do business in the State of New York, being registered in the State of Maryland, was and still is a domestic business corporation organized and existing under the laws of the State of New York using the same name, with its principal place of business situated in the County of New York and State of New York. Conducted and carried on business in the County of Queens, City, and State of New York. Derived substantial revenue from interstate or international commerce and transacted business within the State of New York and expected or should reasonably have expected its acts to have consequences in the State of New York.

7. Defendant, Christine Varney (hereinafter "Varney"), is a resident of the State of New York and was hired by Paramount as Special Committee Outside Counsel at all relevant times thru out 2024.

8. Defendant, Monica Seligman (hereinafter "Seligman"), is a resident of the State of New York. Seligman is a Paramount Special Committee Member and joined board of OpenAI, a competitor of Plaintiff LiveVideo.AI in March 2024.

9. Does 1-10 and Non-Party Christine D'Alimonte (hereinafter "D'Alimonte"), former General Counsel of Paramount, is a resident of New York.

10.    Non-party Paramount d/b/a Paramount, f/k/a Viacom CBS, Inc., at all times herein mentioned, was and still is a Foreign Business Corporation authorized to do business in the State of New York, being registered in the State of Delaware.

11. Plaintiff's CEO has agreed to transfer rights and privileges due to the CEO individual related to indemnification and under other Federal statutes cited herein to the Plaintiff for the Plaintiff's sole benefit to dispose of and prosecute any and all rights possessed by the Plaintiff's CEO individually.

### FACTUAL ALLEGATIONS AND RELEVANT BACKGROUND

### Viacom Acquires MTV and Nickelodeon Crown Jewels

12.    In the late 1970s the Great Uncle and mentor of the Plaintiff's CEO the late Gus Hauser, a former Harvard Law School professor, while Chairman and CEO of Warner Communications created cable channels MTV and Nickelodeon. Gus left and "Warner sold the Warner Amex cable programming business, including MTV, Nickelodeon and The Movie Channel to Viacom "Another Harvard Law School alumni, Sumner Redstone, Defendant's deceased father started Viacom as a movie theater operator before acquiring MTV and Nickelodeon, growing into Paramount, a diversified entertainment company.

13.    Plaintiff's CEO Brad D. Greenspan incorporated Entertainment Universe, Inc. ("EUNI"), then completed a reverse merger on April 14, 1999 becoming publicly traded and acquiring struggling e-commerce website

4

CDUniverse.com, barely reaching one million monthly online users. Renamed eUniverse, it was reaching 50 million users surpassing even Google in 2001 when Sony invests $5 million dollar in eUniverse for 15% ownership with a Director nomination thru Series B Preferred stock that would come to be controlled by Defendant Seligman newly hired 2001 General Counsel of Sony Corp America (SCA), exiting in 2016.

### Paramount and Plaintiff CEO Both Victims Of Varney 2005 Bid Rigging

14.    It was Varney's strategy that was the cause of the damage Viacom suffered in 2005 when it was unable to deliver a bid to acquire Myspace.com and its parent company as a Federal Judge determined.[1]

15.    According to New York Times reporter Gretchen Morgenson who covered the 2010 Federal Judge King Summary Judgment Ruling

> "IT'S a shareholder's worst nightmare. A company is in play, with two potential acquirers circling it, but the boards of directors and others running the enterprise who are supposed to snare top dollar for shareholders favor bidders who directors and senior executives. but the board of directors and others supposed to snare top dollar favor bidders who are dangling the biggest rewards for directors and senior executives. It is hard to know how often events like these have played out at public companies over the years, given that details surrounding corporate board deliberations are typically kept under wraps. But facts turned up in a lawsuit brought by shareholders of Intermix, the parent of the social networking pioneer MySpace, suggest that something like this may have occurred when the News Corporation bought Intermix five years ago.

---

[1] "Plaintiff proffers evidence tending to show that during the crucial week leading up to the July 18, 2005 merger, Rosenblatt evaded Viacom's advances, even though Viacom's representatives were communicating that a competing bid was imminent." (Exhibit #4)

5

The case, which is being heard by Judge George H. King in United States District Court for the Central District of California, centers on a few days in mid-July 2005 when executives and directors at Intermix were juggling two different suitors: the News Corporation and Viacom. Over the course of a frenzied weekend of deal-making, Intermix sold itself to the News Corporation for $580 million, or $12 a share.

Testimony and documents in the case indicate that Viacom was excluded from the bidding process and did not have the opportunity to top the News Corporation offer before Intermix accepted it.

In announcing the Intermix deal on July 18, 2005, the News Corporation called MySpace "the leading lifestyle portal for networking online."

The News Corporation boasted that during the previous month, more than 8 percent of all Internet advertisements had appeared on the site. The deal closed in September 2005, but Intermix investors sued the company's eight directors in federal court the next year. The suit contended that the board, which included Richard Rosenblatt, Intermix's chief executive, had breached its fiduciary duties to shareholders by selling to the News Corporation when a higher bid from Viacom was imminent. The shareholders also argued that Intermix made five significant omissions in proxy materials that investors relied upon before voting on the deal. Among the omissions, the shareholders contended, was a set of internal financial projections for Intermix extending through 2009. More recently, the directors asked Judge King to throw out the suit; in a June 17 ruling, he declined, allowing much of the case to go forward. IN his opinion on the matter, the judge cited evidence and testimony that has emerged in the case. Some of it points to Mr. Rosenblatt favoring the News Corporation bid because he anticipated receiving a big job there if the deal went through.
Judge King wrote that evidence in the lawsuit "raises the inference that Rosenblatt had a strong interest in seeing a merger transaction with News Corp. completed and had made up his mind that Intermix would be sold to News Corp. as of July 13."

*

Meanwhile, Mr. Rosenblatt was dodging Viacom's advances, the judge's ruling shows. On July 15, 2005, a female executive from MTV, a Viacom unit, alerted Mr. Rosenblatt that Viacom would produce a bid early the following week. The judge said, "Rosenblatt replied evasively, failing to correct her mistaken impression that the auction would still be ongoing after Monday."

Rosenblatt wrote. Viewed as a whole, Judge King wrote, the evidence indicates that "there are at least triable issues of fact" about whether Mr. Rosenblatt acted in good faith or tilted the auction in favor of the NewsCorporation "for a purpose other than maximizing shareholder value."

16. Varney had designed and helped carry out a blueprint in 2005 for News Corp to undertake which would allow the public company to acquire publicly held Myspace at a below fair market price, facing an equally determined and economically equal key rival that had been attempting to acquire the same publicly held Myspace beginning earlier then News Corp, and do so without initiating a bidding war with that key rival. That key rival happened to be Paramount's predecessor Viacom, Inc.

17. The second part of the scheme was paying cash bribes without disclosure to the public as seen on Page 174 of evidence in Exhibit #5 titled " Summary of key deal terms [TBD]" which states the total transaction cost is planned to be "Approximately $709 million" and that as a premeditated scheme which Varney advised to not be disclosed at all to the public target's shareholders before they voted on approving the transaction "Expect to enter into arrangements with a pre-tax cost of $70mm post transaction signing to ensure continuity of key

personnel". This was another way of saying, her client should plan to offer and pay $70 million dollars in cash bribes to management of the acquisition target as a way to insure management helps News Corp get the merger agreement signed before Viacom has a chance to send in its planned rival bid. Page 176 that was part of the docketed filing 18-1 n Case 5:16-cv-06286 where Judge George King was presiding is another document reflecting Varney's 2005 strategy fraudulently conceal the fact revealed on the face of this "Deal Update" report from "Fox Entertainment Group" used in the 2005 acquisition of Myspace.com and its parent company: i. "Total deal cost: $750M vs. previous $680M", ii. "Using market comps from JPM, valuation" "$1.0- $1.4B (forward year), iii. "Myspace Retention Plan"…"$90M gross ($50M net) critical to maintain positive relationship with management and reduce their tax exposure as much as possible."…"Additionally, trigger option pool for rank-and-file employees as goodwill move ($5m). Page 178 of that filing is a document titled "Revised Investment" showing how Christine Varney approved and directed her client "Fox Entertainment Group" after signing and announcing publicly her client had entered into a merger agreement that was for a $582 million dollar deal, approving her client first secretly agree to pay management of the target $69 million dollars as a "MySpace Retention Plan" as part of the scheme a Federal Judge concluded was designed and succeeded in preventing Viacom from getting a chance to bid on the acquisition target. Then Varney approved her client after the merger

8

agreement had been signed agreeing to increase the cash payments to management by another $70 million dollars while advising both companies not to disclose the payments in their SEC filings ahead of the shareholder vote to approve the sale of the public parent of Myspace.com. Varney used this strategy to induce the target's management not to consider the CEO of LiveVideo.AI's $13.50 counter offer which Viacom had agreed to provide the financing for back in 2005. (Exhibit #3). This was Case 5:16-cv-06286 which her client settled in 2013 for $45 million dollars after the Federal Judge ruled a Jury would likely find bid rigging had occurred in the deal Varney oversaw.

18. Varney was able to accomplish this difficult task thru employing her vast network of industry contacts in the media sector, her groomed contacts in the media reporting space, and close relationships with New York State regulators.

19. The outcome of how she did it also relied on an oft frowned upon technique that was done so skillfully that evidence of it was only forthcoming five years later and only after a determined push by well resourced and experienced class action lawyers had pursued discovery deep in the process of the securities fraud class action case initiated in 2005 after the News Corp $12.00 Myspace Buyout had been announced.

9

20. Plaintiff's CEO who at that time owned about 10% of the Myspace public parent, eUniverse (renamed Intermix), had only detected several other problems about the transaction thru reading the SEC filings Varney directed News Corp and the acquisition target to disclose in required S-4 or 8k filings in the months leading up to the required September 2005 shareholder vote meeting needed to close the Myspace buyout.

21. **Liquidity Issues Force Shari Redstone to Shop NAI.** After the CBS-Viacom merger, Paramount maintained a quarterly dividend of $0.24 per share for several years. However, in 2023 this was cut to just $0.05 per share. This dividend is important to Shari Redstone and NAI as it provides income for operating expenses without having to sell or pledge shares. To make up for the cut, NAI had to get a $125 million investment from BDT Capital, who is also their financial advisor. The urgency to sell NAI was driven by a March deadline to pay off a $175 million loan, according to the New York Post.[1],[2] or force her to sell shares losing control of Paramount[4],[5]

---

[1] Paramount Global, Inc., Dividend Information, https://ir.paramount.com/dividend-history/#menu. Paramount has been forced to maintain the $0.05 dividend since May 2023.

[3] Jessica Toonkel, *Paramount Global Controlling Shareholder Gets $125 Million Investment*, THE WALL STREET JOURNAL (May 25, 2023), https://www.wsj.com/articles/paramount-global-controlling-shareholder-gets-125-million-cash-infusion-9c15554d.

[4] *Id*

[5] *Id*; Cynthia Littleton, *Shari Redstone's National Amusements Receives $125 Million Investment From BDT & MSD Partners*, VARIETY (May 25, 2023),

22. Defendant Redstone who despite having a fiduciary duty, duty of loyalty, and duty of candor to Paramount shareholders, also has a history of disregarding these duties and pushing for her desired transaction, while disregarding commonly accepted corporate governance standards.

**The Genesis of the Sale of NAI and Paramount's Merger with Skydance**

23. Caving to Shari Redstone's demands, the Paramount Board and executive officers focused on management severance packages disregarding their fiduciary duties to shareholders allowing Redstone to use third parties' interest in acquiring some or all of Paramount to usurp Paramount's corporate opportunities, pushing for an a sale of NAI to potential buyers as an alternative means to acquire control of Paramount. According to other reports, Shari Redstone held meetings with Skydance CEO David Ellison in the summer of 2023 to explore the possibility of acquiring NAI, rather than Paramount.[*] In late December 2023, the CEO of Warner Bros. Discovery, David Zaslav, met with the Paramount CEO, Robert Bakish ("Bakish"), about a possible merger.

24. Despite the obvious conflicts of interest, the Paramount Board did not

---

https://variety.com/2023/biz/news/shari-redstone-paramount-bdt-capital-investment-1235625758/.

[*] Josh Kosman, *Shari Redstone banker's ties to Warren Buffett raise scrutiny amid Paramount sale talks*, NEW YORK POST (Jan. 18, 2024), https://nypost.com/2024/01/18/media/shari-redstone-banker-tied-to-warren-buffett-amid-paramount-sale-talks/.

form a committee excluding Shari Redstone until the end of January 2024.[1] It had already persistently failed to Redstone from diverting corporate opportunities or interfering with Paramount's ability to seek the best deal for Paramount and its other stockholders. In April and July 2024, shareholders of Paramount filed complaints against Redstone for allegedly usurping corporate opportunities and breaching fiduciary duty. (Delaware Case 2024-0457) highlighted Paramount stockholders who felt like passive onlookers in a company controlled by a 9.9% equity owner with no prior executive experience.

### Shari Blends Financial Advice By Binding To Lender BDT Before
### Agreeing To Send In Lender's Lawyer To Become Defendants Legal Fixer

25. Shari Redstone sometime in late 2023 driven by her insatiable thirst for power and control, orchestrates a devious plan as part of the strategy to force Paramount to rubber stamp all future transactions NAI, Redstone, and Lender BDT wanted done quickly and without the usual checks and balances restraining Boards of public companies. Its decided to have NAI hire BDT as its advisor on all Paramount financial transactions including change of control deals.

26. The act of assigning NAI's lender to become its adviser on a future Paramount sale when Paramount was the core asset that BDT's loan was secured against instantly created conflict of interest problems and was the sort of transaction that would never have been approved by a public company board of directors. BDT used its power to place Christine Varney, a top legal adviser from Cravath Law, in a key position at Paramount with the help of NAI and Shari Redstone. As outside counsel for the Special Committee, Varney could control information and make influential recommendations. She also had the ability to

---

[1] Sarnark Hughes, Paramount Takes Initial Steps Toward Possible Sale: NYT, Bloomberg (Jan. 31, 2024), https://www.bloomberglaw.com/product/blaw/bloomberglawnews/news/bloomberg-terminal-news/585A0W7TUV4RW.

communicate with BDT, NAI, and Redstone about committee decisions and reactions.

27. Another masterful chess move in a high-stakes game of corporate manipulation and greed played out resulting in the June 21st & termination of Paramount General Counsel, less than two weeks from receipt of the June 6th voice mail communication from the Plaintiff LiveVideo.AI. Another problem with Varney however beyond the first conflict of interest issue cited previously. Varney was saddled with an unusual legal liability created during a crusade she had undertaken in 2005 while serving as top lawyer for News Corp in its completed acquisition of eUniverse (later renamed Intermix) and its Myspace asset (collectively the "Myspace buyout"). She manipulates Paramount into quickly approving a future transaction that NAI, Redstone, and lender BDT have been eagerly awaiting.

28. In order to facilitate the swift approval, NAI hires BDT as its advisor for all financial dealings involving Paramount, including potential change of control deals. But this seemingly innocent move creates a dangerous conflict of interest. BDT's loan is secured against Paramount, making them both the lender and advisor for the same company. This unethical arrangement would never pass muster with a publicly traded company's board of directors.

29 . On January 2, 2024, the Board of Directors of Paramount formed a Special Committee of independent directors to "evaluate strategic alternatives ,including third party proposals." Paramount Form 8-K, dated July 7, 2024. On January 10, 2024, the *New York Post* reported that Shari Redstone had put NAI up for auction.[5] Beginning around this time, Paramount received several significant

---

[5] J. Kosman, L. Moynihan & A. Steigrad, *Shari Redstone launches auction of Paramount Global's holding company: sources*, NEW YORK POST (Jan. 10,

cash offers. The *Wall Street Journal* reported that Skydance was preparing an all-cash bid for NAI.[9] According to the report, the second step would be a merger of Paramount with Skydance.[10] On January 24, 2024, various reports suggested that Skydance made a bid to acquire NAI, which was contingent on a second stepdeal with Skydance acquiring Paramount.[11]

30. April 3, 2024, Skydance and Paramount entered into a 30-day exclusivity agreement for the negotiations with the blessing of Paramount's Special Committee advisor Centerview Partners. Centerview is also conflicted as they were the financial advisor for CBS' special committee on a previous merger with Viacom. The Delaware Court noted this conflict in their dismissal ruling and it can be inferred that Centerview was hired by Paramount with a similar instruction from Redstone - to focus on the Skydance offer and ensure its success. This goes against their role to independently advise the Special Committee on strategic alternatives

---

2024, https://nypost.com/2024/01/10/business/shari-redstone-launches-auction-of-paramount-global-holder-source/.

[9] J. Toonkel & M. Gottfried, *Skydance Backers Explore All-Cash Deal to Gain Control of Paramount*, THE WALL STREET JOURNAL (Jan. 10, 2024). https://www.wsj.com/business/media/skydance-backers-explore-all-cash-deal-to-gain-control-of-paramount-3530a409.

[10] Id.

[11] Alex Sherman, *David Ellison's Skydance Media explores acquiring all of Paramount Global, sources say*, CNBC (Jan 25, 2024), https://www.cnbc.com/2024/01/24/david-ellisons-skydance-media-explores-buying-paramount-global.html.

for Paramount's shareholders. The exclusivity agreement was not received well by Paramount's investors.

31. LiveVideo.AI Longtime Paramount CEO Liaison Unexpectedly Remove April 26, 2024, Paramount announced the immediate resignation of CEO Bob Bakish and the formation of an "Office of the CEO" committee. It is believed that Bakish was forced out by Redstone due to opposing Skydance. Unexpected loss of a CEO when selling diminishes its value, forcing potential buyers to bring emergency plan for transitioning it. Despite this, Redstone proceeded as if this event would not be seen as a surprise or lower the value of Paramount on the auction block. It is unlikely Redstone let the three Co-CEOs review the Skydance offer before it was agreed to by NAI and the Special Committee processed thru the signatures needed to effect the July 7, transaction of the public issuer.

32. On April 29, 2024, it was reported that Skydance had provided a "best and final" revised offer to Paramount including $2 billion to acquire National Amusements, would buy out less than 50% of class B shares at $15 each, or $4.5 billion, and forcing shareholders to hold diluted equity in the new company after Skydance merged with public Paramount. This revised offer still did not contain a majority of the minority provision that the Special Committee had earlier conditioned the deal upon. In late May 2024, the committee agreed to recommend

a revised offer from Skydance to the Board, even though there was no shareholder
vote provision. Shareholders expressed their dissent through letters and online. The
advisors for NAI, Paramount, and Skydance were aware of potential lawsuits and
discussed how to handle them, but negotiations continued. Redstone and NAI
insisted on legal protection from Skydance in case of lawsuits as a crucial term in
the deal.

### 33. Plaintiff Five June Direct Communications To Defendant Redstone

LiveVideo.AI after having lost its contact at Paramount decided to contact the only
person the news articles consistently pointed to as the individual reviewing the
terms of offers from potential interested buyers of NAI and Paramount., Shari
Redstone. Further on June 3rd it was reported Paramount's Special Committee
had accepted Skydance's proposed buy out terms.[12] Therefore
LiveVideo.AI's CEO proactively contacted National Amusement in Norwood
Massachusetts five separate days over the subsequent week, in good faith
attempting direct contact by phone thru HQ of National Amusements, Inc.

---

[12] "Paramount Global has agreed on terms of an $8 billion merger with Skydance
— ""under the proposed deal with a Paramount special committee to pay $2 billion
for Paramount's parent company, National Amusements," "An announcement
could come as soon as Tuesday at Paramount's annual shareholder meeting,
according to reports.""We received the financial terms of the proposed
Paramount/Skydance transaction over the weekend and we are reviewing them," a
National Amusements spokesperson said. https://nypost.com/2024/06/03/business/paramount-
skydance-agree-to-terms-on-8b-merger-deal-report/

Between June 3 thru 11th, left five voice messages for Shari Redstone with her believed executive assistant Michelle. On June 3rd at 3:50pm Est. A company directory was the only option because there was no live operator that picked up after the Plaintiff dialed: 781-461-1600. The CEO of LiveVideo.AI contacted the headquarters of National Amusement in Massachusetts five times over the course of a week, leaving messages for Shari Redstone through her executive assistant Michelle. They invited Redstone to view a CNBC interview and informed her that their company was interested in making a better offer for Paramount's shares than what had been reported in the media, highlighted how their company could strategically benefit Paramount with advanced AI technology and their CEO's experience running a publicly traded compan, and assured Redstone that their purchase would not involve breaking up and selling off the company, left contact info, signed nda.

Calls to National Amusement's Shari Redstone and Paramount Genral Counsel Director S:

1.  June 3, 3:50PM 1 minute 9 second voicemail left with Shari's assistant Michelle* (781-461-1600)

2.  June 4, 5:00p no, 1 minute 22 second voice mail left with Shari's assistant(781-461-1600)

3.  June 6, 4:20PM 1 minute 30 second voice mail left with Shari's assistant

4.  June 6, 4:35pm no 2 minute 13 second voice mail left with PMO (32-1012-684-9935)

5.  June 7, 3:50PM no 1 minute 28 second voice mail left with Shari's assistant(781-461-1600)

6.  June 11, 4:30PM no 1 minute 27 second voice mail left with Shari's assistant(781-461-1600)

7.  July 5,5:12PM no 1 minute 36 second voice mailleft with Shari's assistant(781-461-1600)

*the National Amusement switchboard requests caller key in persons of persons they are trying to reach. Keying in Redstone is recognized and forwards to someone of executive assistant Michelle.

34. June 4th, Redstone Tells Public That She Is "Unhappy" with Skydance Deal and "Considering Rival Bids and Options" and Plaintiff's continued attempts to make progress in making an offer to buy Paramount was heavily influenced by news that came from June 4th Paramount stockholder meeting leaks: [11]

> The new Skydance offer included "reducing Skydance's valuation of the merger to $4.75 billion from $5 billion, to the dismay of Redstone, Reuters reported."
> "Redstone is unhappy with the updated merger deal from Skydance and is considering rival bids and options."
> "Redstone is now reportedly considering an offer from Hollywood."
> "Sources said Redstone is obliged to consider all offers for National Amusements."

35. Redstone had even allowed Paramount a full fair chance to prominent other potential acquirors including on or about January 31, 2024, Byron Allen's Allen Media Group to submit a bid for Paramount Global. Redstone continued to manipulate the public spin and messaging she sought to be broadcast out to interested parties like LiveVideo.AI to manipulate them as a June 7th headline: "Redstone was unhappy with the reduced offer, paving a way for rival bidders to make their case."[14] Redstone used manufactured media stories to give the illusion that she was working for shareholders and keeping Paramount's sales process unbiased. However, shareholders were becoming vocal about their dislike for the Skydance proposal and wanted other suitors to be considered. On June 6th, the

---

plaintiff had no choice but to leave a voicemail for Redstone at 4:20PM EST for 1 minute 10 seconds, reiterating points from a previous message left on June 4th. Since Redstone expressed unhappiness with the Skydance terms and was open to other offers, the plaintiff could confidently state that Livevideo.AI's offer would be better for both Redstone and Paramount shareholders after reviewing the Skydance offer made to NAI and Paramount.

36. LiveVideo.AI Contacts Paramount General Counsel June 6th by phone to D'Alimonte through a phone number listed with the New York Bar Association. Despite multiple call attempts, Plaintiff was unable to reach her and left a 2 minute 15 second voicemail at 4:50pm EST informing her of their superior offer for a Skydance merger that included purchasing Redstone's shares in Paramount and NAI. The Plaintiff also mentioned that their offer was willing to be subjected to approval by a majority vote and would pay higher prices per share for both Class A and Class B stockholders compared to Skydance's proposal. Further Plaintiff made clear that messages by Plaintiff regarding interest were also being left with Chairperson Shari Redstone. Also to speak with D'Alimonte about a conflict of interest with "one member of the special committee".

37. With Paramount's GC refusing to respond to the Plaintiff's voicemail left the previous day, Plaintiff attempted to reach NAI and Redstone by telephone during working hours on June 7th only to get the same voicemail sole option, and

19

the Plaintiff finally with no other choice and limited to making a communication

by leaving a fourth voicemail did so at 3:16PM est for 1 minute 28 seconds which

largely re-iterated the same points stated in the first voice mails left on June 3rd, 4th,

and 6th. A Paramount 8k is signed by D'Alimont June 21,

> "On June 28, 2024, Christa A. D Alimonte, Executive Vice President,
> General Counsel and Secretary, will be leaving Paramount Global (the
> Company). Her separation from the Company will be considered a
> termination without cause and she will be entitled to receive the post-
> employment payments and benefits associated with an involuntary
> termination without cause under her employment agreement dated as
> of March 15, 2022.[13]

### LiveVideo.AI Sends July 5th Superior Offer Defendants Conceal

38. Despite these delay tactics used against tPlaintiff, on July 5, 2024, a few

minutes after 2pm eastern time, Plaintiff sent Offer letter to Paramount

Chairperson Redstone transmitted over NAI corporate fax, concurrently emailing

to Mr. Jankowski, NAI's Director and top lawyer.

> "purchase...interests..NAI holds ..on superior terms to..Skydance"
>
> "higher of $17.50 per share or.. 111% of ..price offered by SkyDance"
>
> "CEO with significant public operating experience "
>
> "under the structure you prefer..or..subject to....shareholder approval."

---

[13] making a prediction of a future event that the Board and Counsel of three CEOs
would first have needed to meet about, discuss, provide approval vote of Directors
before D'Alimonte could be granted a termination without cause benefits package
on the terms that a resignation would also have been available method for
Alimonte to choose to leave the job as General Counsel of Paramount immediately.

"binding" agreement "within 3 business days from…return…NDA "

" travel to MA in coming days to meet…with Mr. Jankowski and/or yourself"

"PARA GC"…blocked…progress to move our offer process forward."

"contacted…D'Almonta…left a voice mail …indicating our intent to make an offer…2 weeks ago "

"some conflict of interest concerns…relating to certain members of the special committee…adverse to ourselves…which might impact their ability to consider our offer on the basis of what was best for their fiduciaries in their role on the special committee."
**(Exhibit #1)**

39. Part of Gameplan was to avoid a Livevideo rival bid to emerge

to keep Plaintiff LiveVideo.AI from getting Gabelli's support. Mario

Gabelli, Paramount's largest non-Redstone voting-stock shareholder told Reuters

that "If Shari sells voting stock and my clients don't get it, I have no choice but to

sue," referring to any premium paid for the voting shares. Another reason that the

defendants concealed the Plaintiff's July 3rd bid is because they know that Gabelli's

fund would support LiveVideo.AI over Skydance. This is because Gabelli was the

largest shareholder in eUniverse when it got acquired in 2005 thru the buyout by

News Corp and made a profit. Also Gabelli was one of the largest shareholders in

Viacom in 2005, so Gabelli was hurt by Varney's scheme that stopped a Viacom

bid. The Defendants know that Gabelli picking the Plaintiff's deal would be a

shoe-in because SkyDance management also had no experience operating a public

company, whereas the Plaintiff's experience was significant and would be accounted for very positively by Gabelli. In addition, two senior managers of Skydance had been terminated by public companies for corroborated sexual harassment they had been found guilty of after internal investigations. While the Plaintiff had no such senior managers with sexual harassment findings against them, Skydance would not win any head to head managements with its sordid and defective management team when LiveVideo.AI had an iconic successful clean management team.

40. Between July 5th and July 7th. The defendants interfered with the plaintiff's potential business relations in July by erasing records and not contacting Plaintiff about a July 5 email or faxed offer letter, or July 5th, 2024 voicemail communication left for NAI President and Paramount Chairperson Shari Redstone voicemail expressing interest in acquiring Paramount and NAI. The defendants used false statements to lead others to turn a blind eye to their actions. They also refused to follow up through outside advisers and law firms. Using defamatory statements, they influenced others to turn a blind eye to reckless actions.

**COUNT I -Unfair Competition (Brought Directly Against All Defendants )**

41.   Plaintiff repeats and re-alleges every allegation set forth in previous paragraphs as if fully set forth herein. **Varney And Seligman Creates Malicious Scheme** On June 11th, Defendant Shari Redstone publicly announced that negotiations with SkyDance had ended. This statement was misleading and false because Redstone was aware of LiveVideo.AI's interest in making a competing buyout offer, further wanted to give the appearance that other bidders were welcome while secretly blocking out Plaintiff by instructing Paramount advisors not to engage with them and preventing the Special Committee considering LiveVideo.AI.

Redstone's public statements about ending negotiations with SkyDance were misleading and false, leading Paramount's General Counsel certainly by then to make D'Alimonte question the integrity of her leadership. On one hand, Redstone claimed to be open to other bidders while secretly freezing out LiveVideo.AI and preventing the Special Committee from engaging with them. D'Alimonte surely knew that by remaining silent, she would be breaching her duty of candor even further than her last 8k disclosure already had.

42. The true motive behind D'Alimonte's sudden acceptance of the separation revealed in the 8k is that she, as Paramount's General Counsel, must have made the difficult decision of the need to publicly disclose to shareholders the existence of a new potential offer from LiveVideo.AI for a change of control.

A voicemail left by LiveVideo.AI on June 6, 2024 has informed D'Alimonte

that they have also contacted Defendants NAI and Shari Redstone with their intention to make a competing offer on better terms than Skydance's proposal. Despite this, Defendants Shari Redstone, NAI, Varey, and Seligman instructed D Alimonte to keep quiet about the LiveVideo.AI contacts and not respond to their propositions, while publicly feigning negotiations with Skydance. D Alimonte has discovered that Defendant Shari Redstone's statement on June 11 claiming an end to negotiations with Skydance is deceitful.

43. Despite LiveVideo.AI expressing interest in a buyout offer, Redstone announces that Paramount is open to other offers while secretly working to complete the deal over the July 4th weekend. On July 2, news sources report that NAI and Skydance have reached a revised agreement, falsely making it seem like a recent development. Redstone and affiliated media partners continue to spread false narratives about the situation. These actions misled Plaintiff LiveVideo.AI, which was actively seeking financing for a potential merger with Paramount. D Alimonte has discovered that Shari Redstone falsely claimed she wasn't pursuing the transaction, using media partners like NYPost and WSJ to propagate the false narrative. This is misleading by omission of Defendants Varney, Seligman, NAI, and now Paramount's General Counsel thru an 8k.

44. On Sunday, July 7, 2024, Paramount and Skydance issued a press release (which was attached to a Paramount 8-K) announcing that they had signed.

a merger agreement "approved by (i) the Paramount Board of Directors based on the unanimous recommendation of the Special Committee and (ii) by Redstone's NAI, (Exhibit #3)

45. Barclays on July 8, 2024 estimated the price of Redstone's class A shares from the deal at $66.16 per share, completed in three steps: Skydance will purchase Redstone's NAI for $2.4 billion, gaining voting control of Paramount and providing indemnifications to Redstone. Paramount will merge with Skydance, resulting in 317 million new Class B shares for Skydance, valuing the company at $4.75 billion. Skydance will buy 100 million Paramount Class B shares for $15/share, totaling $1.5 billion. An additional $4.5 billion will be used to purchase non-NAI Class A and B shares. Only approximately 46% of Class B shareholders will receive cash, with the rest paid in non-voting New Paramount stock.

46. Criticism of the Merger among analysts and within the investing community has been quick and widespread. July 8, 2024, analysts covering Paramount downgraded their stock ratings Barclays estimated that Redstone was getting over $66 per share for her Class A stock. The $400 million Termination Fee is exceptionally high, representing 4.8% of the total value of the Merger.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory and actual damages in an amount to be determined at trial plus punitive damages, interest, counsel fees, costs and the expenses of this action, and for such other and

further relief as the court seems equitable. As a direct, legal and proximate result of Defendants' aforementioned actions, Plaintiff has sustained economic damages to be proven at trial. Plaintiff seeks judgment for actual damages, interest and costs.

**COUNT II. Tortious Interference With Business Relations (Brought Directly Against All Defendants )**

47. Plaintiff repeats and re-alleges every allegation set forth in previous paragraphs as if fully set forth herein. The Plaintiff had a pre-existing business relationship with Paramount prior to the January 2, 2024 formation by the Board of Directors of a Special Committee. The Plaintiff's business relationship with Paramount existed over a long period of time including on its corporate inception date and prior to such inception with Predecessor Viacom, Inc. Began in 2005 when Plaintiff's CEO contacted Paramount/Viacom executive Mr. Bob Bakish. Initially by email communications progressing to telephonic meetings, in late August 2005 those discussions escalated into including new outside lawyers, advisors, experts from FreeMyspace and multiple senior executives of Viacom joining the meetings before all parties had agreed on the terms of the $13.50 counter-bid joint venture agreement. Filed with SEC on September 27, 2005, days before the September 30, 2005 News Corporation Intermix eUniverse shareholder meeting to approve $12.00 cash offer. (Exhibit #5) The Plaintiff's CEO, Viacom, and its senior executive then head of Viacom International which included

Viacom's foreign operated media assets agreed to form a joint venture which documentation would be subject to one or more future events occurring before, during, or shortly after the September 30, 2005 shareholder meeting. After the goal or deal sought as a result of or after the formation of the initial business relationship, Plaintiff's CEO continued to advance and expand the business relationship with the predecessor Viacom, Inc.

48. Defendants NAI, over ten years later, Defendant Shari Redstone who lacked operating experience and still continues to lack public company operating experience and has never signed a Sarbanes Oxley SOX Officer Certificate, willfully damaged LiveVideo.AI's business opportunities with Paramount. They destroyed all records of communication, refused to reach out or allow others to do so on their behalf, and disregarded attempts at contact from LiveVideo.AI and the Special Committee. This caused significant harm to Plaintiff's integrity and resulting in economic damages that will be proven in court. The Plaintiff had high expectations for the IP partnership because LiveVideo.AI had determined Paramount to be the perfect business partners for exploiting the aforementioned IP it owned for several reasons. First, LiveVideo.AI has a content production partnership already with Paramount's CEO television and production subsidiaries thru the 60 Minutes Maxus Hacker Y2K paused production, which the Plaintiff's CEO paused on or about March 15, 2000 for national security and employee safety

concerns as the Plaintiff's CEO determined the importance of focusing on urgent work the CEO was conducting jointly with the Connecticut branch office of the FBI to secure a data breach of the then CEO's publicly traded company's e-commerce website which the FBI had offered to assist with after the Russian Hacker Maxus sent blackmail extortion threats to eUniverse's CDUniverse.com subsidiary in the beginning of January 2000 which threatened to harm hundreds of thousands of CDUniverse credit card owning customers thru an intentional leaking of these customer's private information and credit card numbers online to the public. (Declaration In Support, p)

49. In late 2023, the Plaintiff used a strategy to entice the Paramount CEO with a movie deal that would showcase their successful production arm and feature the CEO in a positive light. Second   as the August 8th 5:30PM email points out, Paramount and its CEO Bob Bakish separate from the earlier former 60 Minutes Y2K content production deal from 2000, is significantly involved in shared historical events and had been involved from Paramount predecessor "Viacom" and its involvement beginning in 2005 in the true story of Myspace.com in 2005 during a critical juncture in the historical story.

Subject: Congrats! Your edgy inspiring 2005 media fighter role made cut!

"The kid stays in the movie."..."Whats better then "The Social Network2"? "Myspace: End of EUniverse".(working title) " "premieres Xmas 2025. Scene Title (you will be forced to select actor to play your role)

"September 2005, BG announces $13.50 per share counter-bid (which Viacom is secretly financing)...to keep Myspace Public"
Despite failing to "create the Utopia deal Viacom the White Knight owning 20-33% of Public Independent Myspace"

The plan succeeded as CEO reviewed script without objections or reject the deal.

## AI Strategic Partnership Deal

50.   The Plaintiff has developed and acquired technology including its AI products and services that could be used across Paramount so LiveVideo.AI contacted Paramount publishing arm, Simon & Schuster July 17, 2023 thru their Senior Vice President Jennifer Bergstrom and made a "proposal for a strategic digital media AI partnership", stating "I am writing you to schedule meeting to present a proposal for a strategic digital media AI partnership benefiting S&S." Noting how the Plaintiff was recently CEO was "featured as top AI expert by Fox Business in their future of AI forecasting report March 28, 2003:"(Exhibit #2)

## 2023 Triple IP Joint Venture Including Meizler Movie Deal

51.   On August 8, 2023, LiveVideo.AI emailed Paramount's CEO with a new idea as part of a planned stratagem to begin development of joint IP LiveVideo.AI had acquired from its CEO into valuable film and television assets The deal included exploiting proprietary IP controlled by LiveVideo.AI to create and market films and television leveraging multiple IP Assets including (i) the true story behind Myspace.com and eUniverse its public parent, tentatively titled

"Myspace: End of eUniverse" (ii) the true story behind the first USPTO trademark describing the Metaverse issued July 4, 2000, (iii) the true story of the first y2k e-commerce mass credit card hacking and blackmail extortion effort undertaken by infamous Russian hacker Maxus.

**Later For Buyout Again Unfair**

52. The Special Committee and Board of Directors of Paramount chose to ignore the superior offer presented by LiveVideo.AI on July 5th, dismissing it without proper consideration. Despite offering a higher share price of $17.50 compared to Skydance's $15.00 for Class A and B shareholders, LiveVideo.AI's proposal would have resulted in 50% less dilution for Paramount stockholders. This significant cost savings was made clear in multiple voice messages to Chairperson Shari Redstone, yet she chose to overlook it and continue with the Skydance deal that required a whopping $4.8 billion worth of stock issuance.

53. Plaintiff had every reason to believe that their competitive offer would be given due diligence by Paramount. Not only was it a superior offer in terms of financial benefits for shareholders, but also promised a more experienced management team and $2.4 billion less in stock issuance. Yet, despite these clear advantages, Paramount chose to disregard the Plaintiff's offer and instead went ahead with the costly and dilutive Skydance deal. The Special Committee and Board of Directors of Paramount chose to ignore the superior offer presented by LiveVideo.AI

on July 5th, dismissing it without proper consideration. Despite offering a higher share price of $17.50 compared to Skydance's $15.00, and a result of 50% less dilution for Paramount stockholders. This significant cost savings was made clear in multiple voice messages to Redstone, yet she chose to overlook it and continue with the Skydance deal that required a whopping $4.8 billion worth of stock issuance.

54. Plaintiff had every reason to believe that their competitive offer would be given due diligence by Paramount. Not only was it a superior offer in terms of financial benefits for shareholders, but also promised a more experienced management team and $2.4 billion less in stock issuance. As a result, the Plaintiff is seeking damages of no less than 50% of the value in stock $2.42 billion for the unjustified rejection of their proposal and those legal and professional fees found to have been paid in cash. Another reason that NAL, Varney, and Redstone seek to fraudulently conceal the July 5th offer is because it would force them to explain the malicious tortious interference scheme they have used to block, frustrate, and harass the LiveVideo.AI because they Varney and Seligman are adverse to the company and its CEO because of legal conflicts causing significant conflicts of interest and after efforts but inability to advance strategic partnerships directly with Paramount Global and certain of its subsidiaries in late 2023.

**COUNT III Aiding And Abetting Breach Of Fiduciary Duty, Candor, or Breach of Duty Loyalty (Brought Directly Against All Defendants )**

55. Plaintiff repeats and re-alleges every allegation set forth in previous

31

paragraphs as if fully set forth herein.  The corporate opportunity doctrine is one of the fiduciary duties of a corporate director or officer. They are not allowed to take an opportunity for their own benefit if (1) the corporation can take advantage of it; (2) it falls within the corporation's line of business; (3) the corporation has an interest in it; and (4) taking it would conflict with their duties to the corporation. Controlling stockholders are also prohibited from using their power to benefit themselves at the expense of the corporation. If there is any doubt about the corporation's ability or willingness to take an opportunity, the officer or director should present it to the board for consideration and remove themselves from the decision-making process.

56. As directors, special committee outside counsel, Board of Director M&A transaction special committee member, and Chairperson, the Defendants were very richly paid for part time work  and , obligated to place the interests of the Paramount stockholders above their own personal interests and those of NAI and BDT. Director Defendants breached their fiduciary duty obligations by prioritizing the interests of the Controlling Stockholder to approve an unfair Merger, which  an unfair process enabled defendants  to effectuate a transaction that favored Skydance and Redstone personally by purchasing her interest in NAI at a substantial premium. Skydance knew Redstone had a fiduciary duty to all Paramount shareholders, but that as an owner of NAI, she would pursue her

personal interest in getting the most money for herself from a buyout. Defendant must be viewed with her background on prior obligation breaches

57. NAI controlled CBS Corporation ("CBS") and Viacom Inc. ("Viacom") after they were split into separate companies in December 2005.[16] As NAI founder Sumner Redstone's health began to decline in 2014, Defendant Shari Redstone seized control of NAI, reshaped both CBS and Viacom board, all done while strictly seeking to find the best exit strategy for NAI.[17] In January 2018 Evercore[18] advised Redstone of the risk of no buyers for Viacom if sold separately from CBS, suggesting CBS and Viacom be combined followed by a sale of NAI would be best for Redstone but not necessarily fair or good for shareholders of CBS, Viacom, or successor Paramount.

58. Defendant Redstone's 2024 tactics are similar to her actions during the CBS-Viacom merger. She used NAI's status and power as controlling shareholder, ousted and packed boards with Directors to get what she wanted, just as she did before. Her extreme level of control over Paramount can be understood by looking at her past actions.

---

[16] *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268770, at *6, *15 (Del. Ch. Jan. 27, 2021).

[17] *See id.* at *6, *9.

[18]

**Redstone's Control Over the Conflicted Paramount Board**

59. After the CBS-Viacom merger closed Redstone packed Paramount Global ("Paramount") Board with insiders over whom she exercises control including with McHale, Schuman, Griego and Byrne. In April 2024 after the Bakish removal, three more Directors resigned, leaving six Directors: Schuman, McHale, Phillip, Griego, Byrne, and Redstone. None of six directors are disinterested in considering a merger proposal that Redstone wanted. This elaborate web of deceit, manipulation, and obstruction must be exposed and brought to justice for the sake of the plaintiff, thousands of long time stockholders and tens of thousands of employees working for Paramount globally, victimized by the defendants unscrupulous actions.

60. That reason D'Alimonte suggested as Paramount General Counsel agreed to accept the June 18th 8k described "separation" arrangement based on her realization of fiduciary obligation to disclose the existence of the LiveVideo.AI Corp potential change of control offer after June 6, 2024 voicemail to D'Alimonte and that LiveVideo.AI had also contacted Defendants NAI and Shari Redstone, notifying them of intent to make a competing change of control offer on superior terms to the Skydance proposal.

61. Additionally, D'Alimonte was instructed by Defendants Redstone, Varney, and Seligman to keep quiet about LiveVideo.AI's and not respond, despite

knowing that it could potentially outbid SkyDance's proposal. This put D'Alimonte in a difficult position of having to betray her duty of truthfulness even further than what was already disclosed in her last 8k statement.

62. On June 11th, Defendant Shari Redstone announced the end of negotiations with SkyDance while being aware of LiveVideo.AI's interest in a competing offer. She gave the appearance of being open to other bidders while secretly instructing Paramount advisors not to engage with LiveVideo.AI and preventing the Special Committee from considering their offer. D'Alimonte knew remaining silent would be a breach of her duty of candor, especially given Redstone's deceitful public statements. The unexpected June 21, 2024 8k Paramount General Counsel surprise self-termination without cause, just days before Merger agreement is executed was a direct result from the GC's discovery Redstone claiming publicly on June 11th that negotiations with Skydance had ended, D'Alimonte became aware that this statement was misleading and false. This is because Redstone was simultaneously withholding information about LiveVideo.AI's interest and falsely claiming that Paramount was open to other bidders. These actions forced D'Alimonte to breach her duty of candor and make false statements in the last 8k, these in turn hurt the Plaintiff and eliminated the opportunity for the Plaintiff's offer to be considered.

**Count IV- Unjust Enrichment (Defendant NAI)**

63. Plaintiff repeats and re-alleges every allegation set forth in previous paragraphs as if fully set forth herein. Defendant NAI used the LiveVideo.AI Indications of interest to give that information to SkyDance as part of a successful gambit by Redstone on June 11, 2024 when its leaked to media cohorts that Redstone "killed" or ended the negotiations with SkyDance because their offer was rejected. However, Ellison, determined to get the Skydance deal back on track, agreed to "another $50 million earmarked for the Redstones' NAI" as reported in the Los Angeles Times.[33]

**Aware of LiveVideo.AI Interest In Paramount No Later Then May 6, 2024.**

64. On May 6, 2024, Plaintiff sent an email May 6th at 11:35 am EST with the subject line "Perfect move opportunity!" trying to cheer up the embattled Paramount executive by inviting discussions about potential new future projects for Bakish. Plaintiff contends with evidence likely pointing to different access points showing the email was usurped from Paramount corporation email account and siphoned out to NAI and most likely Redstone, and Varney, who should not have had access, it was read by at least three individuals during the month of May and re-opened in late July after the July 5th offer had been concealed as Varney or her staff were looking to cover their tracks.

---

[33] Meg James, So the Paramount and Skydance Deal is Back on Track. What Happened and What's Next?, (July 5, 2024), https://www.latimes.com/entertainment-arts/business/story/2024-07-05/paramount-and-skydance-deal-is-back-on-track-what-happened-and-whats-next

**WHEREFORE,** Plaintiff demands judgment against Defendants for compensatory and actual damages in an amount to be determined at trial plus punitive damages, interest, counsel fees, costs and the expenses of this action, and for such other and further relief as the court seems equitable. As a direct, legal and proximate result of Defendants' aforementioned actions, Plaintiff has sustained economic damages to be proven at trial. Plaintiff seeks judgment for actual damages, interest and costs, as well as judgment temporarily and permanently enjoining Defendants from continuing described actions.

Dated: August 19, 2024

Respectfully submitted Constants Law Offices, LLC.

By _/s/ Alfred C. Constants III_
Alfred C. Constants III, Esq.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable in accordance with Federal Rule of Civil Procedure 38(b).

By _/s/ Alfred C. Constants III_
Alfred C. Constants III, Esq.

Attorneys for Plaintiff
Constants Law Offices, LLC.

EXHIBIT #4

# UNITED STATES DISTRICT COURT

for the

Southern District of New York ▢

LiveVideo.AI Corp

)
)
)
)

*Plaintiff(s)*

)
)

Civil Action No. 1:24-cv-06290

v.

SHARI REDSTONE,
NATIONAL AMUSEMENTS, INC.,
CHRISTINE VARNEY,
MONICA SELIGMAN,

)
)
)
)

# 1:24-cv-0629(

*Defendant(s)*

)

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* National Amusements. Inc.

2405 YORK ROAD
SUITE 201
LUTHERVILLE TIMONIUM MD 21093-2264

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Alfred C. Constants III

Constants Law Offices, LLC
115 Forest Avenue, Unit 331
Locust Valley, NY 11560
Tel. 516-200-9690
Constantslaw46@gmail.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: 09/18/2024

/S/ V. BRAHIMI

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 1:24-cv-06290

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $    0    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

Print    Save As    Reset

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

LIVEVIDEO.AI CORP
    *Plaintiff,*

vs.

                    CIVIL ACTION

**SECOND AMENDED
COMPLAINT AND
JURY DEMAND**

SHARI REDSTONE,
NATIONAL AMUSEMENTS, INC.,
CHRISTINE VARNEY,
MONICA SELIGMAN,

    *Defendant's.*

_____/

    Plaintiff, LiveVideo.AI Corp., (hereinafter "Plaintiff" or "Live") hereby alleges, for its
First Amended Complaint against Defendants, SHARI REDSTONE, NATIONAL
AMUSEMENTS, INC., CHRISTINE VARNEY, and MONICA SELIGMAN, and DOES 1-10
(hereinafter collectively the "Defendants"), as follows:

    1. Plaintiff, LiveVideo.AI Corp, is a New York based Artificial Intelligence technology
company that sought to participate in what it had believed was a bidding process to acquire
Paramount Global, Inc. ("Paramount") owner of CBS, Comedy Central, Nickelodeon and MTV.
However the opportunity to buy Paramount ended on July 7, 2024 when it entered into a binding
merger agreement with Skydance, a private Los Angeles based film company.

    2. The Plaintiff did not get a chance to have its July 5th 2004 buyout offer considered
because of a series of unlawful actions taken by the defendants who were in control of the
Paramount sales process and had significant conflicts of interest with the Plaintiff's CEO.

    3. Federal questions include whether the Plaintiff and its CEO were victims of
harassment and discrimination after the defendants decided to retaliate for protected actions under
§78u–6(h)(1). In addition, the Plaintiff was the victim of several types of tortious interference

1

instigated by the defendants to harm its relations with Paramount including the unauthorized accessing of Paramount's computer system which violated 8 U.S.C. § 1030 – The Computer Fraud and Abuse Act.

## NATURE OF THE CLAIMS

4. This action seeks relief under §78u–6(h)(1), declaratory and monetary damages for U.S.C. §1030 violations, while also redressing tortious interference and unfair competition torts.

## JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (Federal question). 28 U.S.C. § 1367 provides supplemental jurisdiction over the state law tort claims that arose from the same common nuclei of facts. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful practices and actions alleged herein, occurred in or around the City of Manhattan, New York. Upon information and belief, Defendants respectively have ongoing and systematic contacts with this District, maintain offices in, reside in, and/or have committed wrongful acts which occurred within this District, and which impacted this District.

## PARTIES

6. Plaintiff, LiveVideo.AI Corp., incorporated in the State of Delaware, with its main offices in New York.

7. Defendant, Shari Redstone (hereinafter "Redstone"), President of Defendant National Amusements, Inc., Chairperson non-party Paramount Global Inc., and a citizen of Massachusetts.

2

8.    Defendant Monica Seligman (hereinafter "Seligman"), a New York resident, serves as a Paramount Special Committee Member and joined Plaintiff's competitor OpenAI as a Director in March 2024.

9.    Does 1-10 and Non-Party Christine D'Alimonte (hereinafter "D'Alimonte"), a New York resident was General Counsel of Non-party Paramount Global d/b/a Paramount, f/k/a Viacom CBS, Inc., registered in Delaware and operating its principal place of business in New York.

## FACTUAL ALLEGATIONS AND RELEVANT BACKGROUND

### Viacom Acquires MTV and Nickelodeon Crown Jewels

10.    In 1970s Great Uncle and mentor of Plaintiff's CEO the late Gus Hauser, a former Harvard Law School professor, Chairman and CEO of Warner Communications created cable channels MTV and Nickelodeon.[1]

11. Gus left and "Warner sold the Warner Amex cable programming business, including MTV, Nickelodeon and The Movie Channel to Viacom" started by Harvard Law educated, Sumner Redstone as movie theater chain and diversified entertainment company, Paramount Global ("Paramount").

12.    Plaintiff's CEO starts eUniverse, Inc., 1999 by reverse merging e

commerce site CDUniverse.com, with one million users, into a public shell, expanding into a network of entertainment quickly surpassing even Google with nearly 50 million monthly average unique users (MAU) by August 2001.

13. After launching 100% owned Myspace.com in August 2003 which would quickly become eUniverse's crown jewel asset, things took a turn for the worse when a venture capital fund gained control of eUniverse aided by unscrupulous members of the Board of Directors. The CEO resigned at end of October 2003. exposing part of wrongdoing in 8k disclosure. In July 2005, due to the progress made by the Plaintiff CEO's complaint against the outside venture capital firm and Directors for their wrongdoing, they signed a deal with News Corp for broad indemnification as part of a sale offering shareholders $12.00 per share cash. The Plaintiff's CEO still owning 12% of eUniverse believed the price to be unfair based on the continued growth of Myspace.com the #1 social network.

14. The Plaintiff's CEO learns Viacom was misled and had no chance to make a bid, contacts International division head, Robert Bakish, Paramount Global's future CEO, on august 2, 2005 Subject: "Myspace – shareholder"

> "Bob-I am currently a 10% holder of Intermix, the company that owns Myspace.com I was the founder and CEO of Intermix until October 2003, and actually initiated the creation of Myspace (I bought the company of the execs that run Myspace today-Chris Dewolfe) I think management & the VCs that control a big block of stock are selling too cheaply to News Corp. " "My idea ...
> MYSPACE- THE PUBLIC COMPANY BACKED BY VIACOM/MTV-
> "Viacom comes in as a strategic investor offering to buy 33% of Intermix shares at $12.10 a share (roughly a $200mln investment). "

"shareholders can sell some of their stock and keep a portion to go 'long' on the MYSPACE story- "

"BOTTOM LINE- The marketplace gets a pure play Myspace that is publicly traded.""Viacom has a great new strategic Relationship with the Myspace"

15. Confirming interest in joining the $13.50 counter offer ahead of eUniverse's September 30, 2005 Shareholder vote, the Plaintiff's CEO begins strategizing with Viacom's top lawyer Michael Fricklas in August 25, 2005 email:

Subject: FW: Complaint

"Good speaking with you today! I will try to arrange a call with my lead lawyer (from Quinn Emanuel) who is riding herd with Crayton Condon ASAP. In addition, I could also arrange a casual conf call Tomorrow or Monday-with the principal at firms Trafeletter & Gardener Lewis.to give you a good sense of institutional support. Between these 2 and myself, we are at about 10min shares or 23% roughly."

16. Paramount top executives receive more compelling reasons to join the $13.50 counter offer from Plaintiff CEO's August 28, 2005 6:02:28 PM email.

To: "Bakish,Robert"<bb@viacom.com>,michael.fricklas@viacom.com

Subject: Myspace Metrics/Value

"Gentlemen-I am sure you saw the NY-TIMES MYSPACE article today. A little metrics and back of the envelope valuation piece I put together for some private equity funds I just started talking to. I believe I have one fund focused in the online space that would Be willing to form a partnership to bring a voting block together to do the 35-45% buyout of Intermix and creation of a Myspace Public company. Perhaps they could be the 'front-guy' on such an attempt to keep Viacom out of the limelight. They could drop in $50 - 100 million By themselves. MYSPACE- TRAFFIC GROWTH & VALUATION The Deal with News Corp was announced on July 18th.Since then, in roughly 30 days, Myspace has increased its weekly unique visitors by 17% and # of ad impressions by over 30%. (according to online traffic measurement company Nielsen Netratings for period covering July 3–August 14, 2005).THIS IS STAGGERING "

5

17. The Plaintiff's CEO, and the senior executives agreed to form a joint venture that included a Paramount promise to finance the $13.50 counter offer.

18. As part of their agreement, Paramount also assures the Plaintiff's CEO, a valuable counter-bid partner worth $13.50 and a potential future strategic collaborator, that they will be treated "fairly" if Paramount were ever to go up for sale in accordance with Delaware law. Including allowing LiveVideo.AI's CEO to participate in making an offer or submitting a bid alongside other interested parties.[2]

19. LiveVideo.AI's CEO could have reasonably assumed based on the prior affirmations of top leadership executives met with in 2005 that in the future because it cost Paramount no cash expenditure, the understanding would be honored and the Plaintiff's CEO no later then July 5th, 2024 would also get equal access to any confidential information shared with other potential buyers upon expressing interest to make an offer to purchase Viacom (including its predecessor) should it go up for sale.

---

[2] This promise was made based on the mistreatment that Paramount suffered under the control of Myspace's parent company in 2005. The management colluded with News Corp and quickly signed a merger agreement, resulting in Viacom's bid being disregarded and ultimately harming both eUniverse and Paramount shareholders.

20. The Plaintiff's CEO in turn agrees to Paramount's condition: Paramount's role providing the financing will not be disclosed publicly until after shareholders reject or eUniverse' Board terminates the News Corp deal.

21. The $13.50 counter offer is announced September 23, 2005 then filed with SEC September 27, 2005, done only days before the September 30, 2005 News Corporation Intermix/eUniverse shareholder meeting to approve the below fair market $12.00 buyout. (Exhibit #3)

22. The $13.50 counter-offer is already challenged by the severe time constraints allowing for the marshaling of sufficient shareholders to vote against News Corp's offer before the shareholder meeting.

23. However harming the $13.50 counter-offer even more was a diabolical scheme approved by News Corp's outside counsel to pay undisclosed cash bribes to eUniverse and Myspace's management teams to induce them to omit disclosure of Myspace's financial results ahead of the September 2005 shareholder meeting.

24. Despite the $13.50 counter-offer failing to stop the News Corp $12.00 buy out, the Plaintiff's CEO continued to maintain a friendly relationship with Bakish, while continuing to advance and expand the business relationship with Paramount and its predecessor thru the present.

**The Genesis of Paramount's 2024 Merger with Skydance**

7

25. Defendant NAI controlled CBS Corporation ("CBS") and Viacom Inc.

("Viacom") after they were split into separate companies in December 2005.[3] As

NAI founder Sumner Redstone's health began to decline in 2014, Defendant Shari

Redstone seized control of NAI, reshaped both CBS and Viacom board, all done

while strictly seeking to find the best exit strategy for NAI.[4]

26. In January 2018 Evercore[5] advised Redstone of the risk of no buyers for

Viacom if sold separately from CBS, suggesting CBS and Viacom be combined

followed by a sale of NAI would be best for Redstone but not necessarily fair or

good for shareholders of CBS, Viacom, or successor Paramount.

27. Defendant Redstone's uses NAI status and power with outsize voting

power, ousted and packed both boards with Directors willing to give her what she

wants and succeeds in forcing a CBS-Viacom merger at the end of 2019.

**Redstone Controls Conflicted Paramount Board**

28. After the CBS-Viacom merger closed Redstone packed Paramount Global

("Paramount") Board with insiders over whom she exercises control and Bob Bakish

became CEO of the combined entities renamed Paramount Global.

---

[3] *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at \*6, \*15 (Del. Ch. Jan. 27, 2021).

[4] *See id.* at \*6, \*9.

[5]

8

## The AI Technology Partnership

29.     In early 2023 Plaintiff had developed and acquired multiple AI technology products and services for use across Paramount. Plaintiff contacted Paramount publishing arm, Simon & Schuster July 17, 2023 thru their Senior Vice President Jennifer Bergstrom and made a "proposal for a strategic digital media AI partnership", stating "I am writing you to schedule meeting to present a proposal for a strategic digital media AI partnership benefitting S&S. " Noting how the Plaintiff was recently CEO was "featured as top AI expert by Fox Business in their future of AI forecasting report March 28, 2003:" (Exhibit #2)

## 2023 IP Deals

30.     On August 8, 2023, LiveVideo.AI emailed Paramount's CEO with a new idea as part of a planned stratagem to begin development of joint IP LiveVideo.AI had acquired from its CEO into valuable film and television assets.

31. The Plaintiff had high expectations for the IP partnership because LiveVideo.AI had determined Paramount to be the perfect business partners for exploiting the aforementioned IP it owned and LiveVideo.AI presented directly to Paramount CEO in 2023 proprietary IP plan to create and market films, TV, books based on (i) the true story of Myspace.com, titled "Myspace: End of eUniverse," (ii) a true story about first USPTO trademark for Metaverse issued July 4, 2000, and (iii) the true story of the y2k credit card hacking incident involving Russian hacker Maxus.  Plaintiff used a strategy to entice the Paramount CEO with a

movie deal that would showcase their successful production arm and feature the

CEO in a positive light as August 8th 5:30PM email points out, Paramount is

significantly involved in shared historical events involved in the true story of

Myspace.com in 2005 during a critical juncture in the historical story.

> "Subject: Congrats! Your edgy inspiring 2005 media fighter role made cut!

>> "The kid stays in the movie."…"Whats better then "The Social
>> Network2"? "Myspace: End of EUniverse".(working title) "
>> "premieres Xmas 2025.

> "Scene Title (you will be forced to select actor to play your role)"

>> "September 2005, BG announces $13.50 per share counter-bid (which
>> Viacom is secretly financing)…to keep Myspace Public"
>> "Despite failing to "create the Utopia deal Viacom the White Knight
>> owning 20-33% of Public Independent Myspace"

32. The strategy proved successful, as evidenced by Paramount's CEO not

rejecting or criticizing the offer and plan outlined by email.[*] The Plaintiff had a

clear path to complete an IP Partnership with Paramount - all they needed to do

---

[*] Back in the year 2000, the Plaintiff was in a race against time. The ruthless
Russian hacker, Maxus, had already infiltrated their systems and was holding the
entire company hostage with his demands. In a desperate attempt to protect the
privacy of hundreds of thousands of customers, the CEO made the difficult
decision to pause production on their partnership with Paramount's 60 Minutes.
But there was no time to waste as the CEO worked alongside the FBI to secure
their e-commerce website and fend off Maxus' relentless attacks. Every second
counted as they raced to prevent the hacker from releasing sensitive information
and credit card numbers belonging to innocent customers. It was a high-stakes
battle for national security and employee safety, and Plaintiff's CEO was
determined to come out victorious. (see https://www.zdnet.com/article/biggest-
hacking-fraud-ever/ )

was provide a completed book so that Paramount could begin production, including adapting it into a screenplay. The Plaintiff had already completed most of the important work involved in this story about the Founder of Myspace.com during its launch in 2003. They also invested significant time and resources into finding outside parties, including an author and screenwriter, who would enhance the value of the IP Partnership for both Paramount and themselves.

33. For comparison, the biopic in 2010 by Sony Pictures "The Social Network" according to Nash generated $224,922,135 in global box office revenue and an est $34,697,366 Domestic Video Sales.[7] not include streaming receipts or cable/broadcast rights.

34. In September 2023, the CEO of LiveVideo.AI Corp exercised their "first look" provision from the 2005 Paramount $13.50 Counter-bid agreement and sent a proposal to Paramount's CEO. The proposal offered the opportunity for Paramount to discuss taking a strategic stake in LiveVideo.AI Corp. A few days later, after reviewing the proposal, Paramount's CEO responded directly via email to thank the Plaintiff's CEO for the offer but declining to invest cash in purchasing a minority equity stake in a private company at that time. It was later revealed that Paramount was focusing on cash preservation and sale of assets to pay off debt.

**Financial difficulties Pushes Redstone Frantic Fire Sale of Paramount**

---

[7] https://www.the-numbers.com/movie/Social-Network-The-(2010)#tab=more Page 4 of 4

35. After the CBS-Viacom merger, Paramount had been consistently paying

out a quarterly dividend of $0.24 per share. However, in 2023 this amount was

drastically reduced to only $0.05 per share.[8] This dividend was crucial for NAI and

Redstone to cover their operational costs without having to resort to selling or

using shares as collateral.

36. To make up for the shortfall, Defendants Redstone and NAI secured a

$125 million loan from BDT Capital[9], who became their financial advisor.

According to NY Post story titled "Shari Redstone banker tied to Warren Buffett

amid Paramount sale talks",

> "BDT" stands for Byron David Trott — a former Goldman Sachs
> executive who has long been most famous for being Warren Buffett's
> banker. "
> " One major elephant in the room: Warren Buffett — a longtime client
> of Trott, although it's not clear he's currently a client — also happens
> to be Paramount's biggest shareholder. Buffett's 15% stake is down
> about 60% since he began amassing it in early 2022. According to a
> well-placed source, Buffett began amassing his stake shortly after
> Redstone hired Trott as her banker."[10]

---

[8] Paramount Global, Inc., Dividend Information, https://ir.paramount.com/dividend-history#menu. Paramount has been forced to maintain the $0.05 dividend since May 2023.

[9] Jessica Toonkel, *Paramount Global Controlling Shareholder Gets $125 Million Investment*, THE WALL STREET JOURNAL (May 25, 2023),
https://www.wsj.com/articles/paramount-global-controlling-shareholder-gets-125-million-cash-infusion-9e155340.

[10] A key backer of Skydance is Gerry Cardinale, the dealmaker behind RedBird Capital — who also happens to be a former Goldman banker who worked with Trott and spent a short time at BDT.

37. According to the New York Post, a looming deadline to repay a separate $175 million loan was the driving force behind Redstone's rushed decision to sell off assets. Failure to meet the deadline could result in her losing control of Paramount by being forced to sell shares according to the New York Post losing control of Paramount[11].[12]

38. According to other reports, Shari Redstone held meetings with Skydance CEO David Ellison in the summer of 2023 to explore the possibility of acquiring NAI, rather than Paramount.[13] Despite obvious conflicts of interest, Paramount Board delays until January 2, 2024 forming a Special Committee of independent directors to "evaluate strategic alternatives, including third party proposals." Paramount Form 8-K, January 10, 2024, the *New York Post* reported Shari Redstone put NAI up for auction.[14] January 24, 2024, various reports suggested

---

[11] *Id.*

[12] *Id.*; Cynthia Littleton, *Shari Redstone's National Amusements Receives $125 Million Investment From BDT & MSD Partners*, VARIETY (May 25, 2023), https://variety.com/2023/biz/news/shari-redstone-paramount-bdt-capital-investment-1235625758/.

[13] Josh Kosman, *Shari Redstone banker's ties to Warren Buffett raise scrutiny amid Paramount sale talks*, NEW YORK POST (Jan. 18, 2024), https://nypost.com/2024/01/18/media/shari-redstone-banker-tied-to-warren-buffett-amid-paramount-sale-talks/.

[14] J. Kosman, L. Moynihan & A. Steigrad, *Shari Redstone launches auction of Paramount Global's holding company: sources*, NEW YORK POST (Jan. 10, 2024),https://nypost.com/2024/01/10/business/shari-redstone-launches-auction-of-paramount-global-holder-source/.

that Skydance made a bid to acquire NAI, which was contingent on a second stepdeal with Skydance acquiring Paramount.[17]

39. April 3, 2024, Skydance and Paramount entered into a 30-day exclusive period blessed by Paramount Special Committee advisor Centerview Partners, conflicted from financial advisor role for CBS special committee in previous Viacom merger. The Delaware Court noted the conflict and speculated Centerview was hired by Paramount but controlled by Redstone's instructions – to focus on the Skydance offer and ensure its success.[18]

### Redstone Recklessly Removes Plaintiff's CEO Contact

40. April 26, 2024, Paramount announced resignation of CEO Bob Bakish and the formation of an "Office of the CEO" committee. It is believed that Bakish was forced out by Redstone due to opposing Skydance. Unexpected loss of a CEO when selling diminishes its value, forcing potential buyers to bring emergency plan for transitioning it.

41. Redstone proceeded as if this event would not be seen as a surprise by bidders and shareholders while also not lowering in the short term the value of Paramount on the auction block requiring a repair or replacement CEO before continuing the sales process . On April 29th, it was reported Skydance had

---

[17] Alex Sherman, *David Ellison's Skydance Media explores acquiring all of Paramount Global, sources say*, CNBC (Jan 25, 2024), https://www.cnbc.com/2024/01/24/david-ellisons-skydance-media-explores-buying-paramount-global.html.

[18] This goes against their role to independently advise the Special Committee on strategic alternatives for Paramount's shareholders. The exclusivity agreement was not received well by Paramount's investors.

provided a "best and final" offer but was refusing to require shareholder approval which the deal had earlier been conditioned on. In late May, the special committee accepted Skydance revised offer, with no shareholder vote provision. [17]

**Plaintiff Five June 2024 Phone Calls/Voicemails To Defendant Redstone**

42. LiveVideo.AI after having lost its CEO contact decided to contact the sole party news articles consistently pointed to as the individual responding to offers from potential bidders, Defendant Shari Redstone after reading June 3rd news that Paramount Special Committee accepted Skydance's buy out terms. [18]

43. LiveVideo.AI's CEO engaged in extensive efforts to contact the defendants and press forward with completing a transaction. Contacting National Amusement HQ in Norwood Massachusetts during working business hours on five separate days between June 3rd thru 11th, leaving five very detailed voice messages at Shari Redstone's office while also providing Redstone's executive assistant Michelle with a myriad of options NAI could use to communicate with

---

[17] Shareholders expressed dissent. The advisors for NAI, Paramount, and Skydance were aware of potential lawsuits and discussed how to handle them, but negotiations continued. Redstone and NAI insisted on legal protection from Skydance in case of lawsuits as a crucial term in the deal.

[18] "Paramount Global has agreed on terms of an $8 billion merger with Skydance", "under the proposed deal with a Paramount special committee to pay $2 billion for Paramount's parent company, National Amusements," "An announcement could come as soon as Tuesday at Paramount's annual shareholder meeting, according to reports.", "We received the financial terms of the proposed Paramount/Skydance transaction over the weekend and we are reviewing them," a National Amusements spokesperson said. https://nypost.com/2024/06/03/business/paramount-skydance-agree-to-terms-on-8b-merger-deal-report/

and contact back LiveVideo.[19]

Calls to National Amusement's Shari Redstone and Paramount General Counsel Christine D.

1.  June 3- 3:50PM 1 minute 9 second voicemail left with Shal's assistant Michelle* (781-461-1600)

2.  June 4-5:47pm est, 1 minute 22 second voice mail left with Shari's assistant(781-461-1600)

3.  June 6- 4:25PM 1 minute 10 second voice mail left with Shar's assistant

4.  June 6- 4:50pm est 2 minute 15 second voice mail left with PARA GC (212-846-5933)

5.  June 7- 3:16PM est 1 minute 28 second voice mail left with Shari's assistant(781-461-1600)

6.  June 11- 8:03PM est 1 minute 21 second voice mail left with Shari assistant(781-461-1600)

7.  July 5-5:02PM est 1 minute 10 second voice mail left with Shari assistant(781-461-1600)

*the National Amusements switchboard requests caller key in last name of person they are trying to reach. Keying in Redstone is recognized and forwards to voicemail of executive assistant Michelle

44.  June 4th, Redstone tells public she is "Unhappy" with Skydance deal and "Considering Rival Bids and Options", these false statements mislead the Plaintiff and its CEO inducing them to continue efforts, including work to prepare offer, soliciting financing sources to pay for making buy out of Paramount and

---

[19] On June 3rd at 3:50pm Est. A company directory was the only option because there was no live operator that picked up after the Plaintiff dialed: 781-461-1600. The CEO of LiveVideo.AI contacted the headquarters of National Amusement in Massachusetts five times over the course of a week, leaving messages for Shari Redstone through her executive assistant Michelle. They invited Redstone to view a CNBC interview and informed her that their company was interested in making a better offer for Paramount's shares than what had been reported in the media, highlighted how their company could strategically benefit Paramount with advanced AI technology and their CEO's experience running a publicly traded compan, and assured Redstone that their purchase would not involve breaking up and selling off the company, left contact info, signed nda.

NAI offer and consulting with various tax and finance advisors.[20]

> "The new Skydance offer included "reducing Skydance's valuation of
> the merger to $4.75 billion from $5 billion, to the dismay of Redstone,
> Reuters reported."
> "Redstone is unhappy with the updated merger deal from Skydance
> and is considering rival bids and options."
> "Redstone is now reportedly considering an offer from Hollywood."
> "Sources said Redstone is obliged to consider all offers for National
> Amusements."

45. Redstone had even allowed Paramount a full fair chance to prominent

other potential acquirers including on or about January 31, 2024, Byron Allen's

Allen Media Group to submit a bid for Paramount Global.

46. On June 6th, the plaintiff had no choice but to leave a voicemail for

Redstone at 4:20PM EST for 1 minute 10 seconds, reiterating points from a

previous message left on June 4th. Since Redstone expressed unhappiness with the

Skydance terms and was open to other offers, the plaintiff could confidently state

that Plaintiff's offer would be better for Redstone and Paramount shareholders.

47. As result that Plaintiff's contact is removed as Paramount CEO in April

on June 6th the Plaintiff pivots to try to connect with Paramount's General Counsel,

D'Alimonte through a phone number listed with the New York Bar Association.

Despite multiple call attempts, Plaintiff was unable to reach her and left a 2

---

[18] "Paramount Global shares drop after annual meeting as hopes of merger with Skydance fade"
https://nypost.com/2024/06/04/media/paramount-global-shares-drop-after-annual-meeting-as-hopes-of-merger-with-skydance-fade/

minute 15 second voicemail at 4:50pm EST.[21]voicemail left the previous day,

48.Plaintiff attempted to reach NAI and Redstone by telephone during working hours on June 7th only to get the same voicemail sole option, and the Plaintiff finally with no other choice and limited to making a communication by leaving a fourth voicemail did so at 3:16PM est for 1 minute 28 seconds which largely re-iterated the same points stated in first voicemails left June 3rd, 4th, 6th.

49.Redstone continued to manipulate the public spin and messaging she sought to be broadcast out to interested parties like LiveVideo.AI to manipulate them as a June 7th headline: "Redstone was unhappy with the reduced offer, paving a way for rival bidders to make their case."[22] Redstone used manufactured media stories to give the illusion that she was working for shareholders and keeping Paramount's sales process unbiased. However, shareholders increasingly vocal about dislike for Skydance proposal and wanted other suitors.

50. Caving to Shari Redstone's demands, key Paramount officers were spontaneously given improved management severance packages in 2024 to disregard their fiduciary duties to shareholders, mitigating resistance by Paramount

---

[21] informing her of their superior offer for a Skydance merger that included purchasing Redstone's shares in Paramount and NAI. The Plaintiff also mentioned that their offer was willing to be subjected to approval by a majority vote and would pay higher prices per share for both Class A and Class B stockholders compared to Skydance's proposal. Further Plaintiff made clear that messages by Plaintiff regarding interest were also being left with Chairperson Shari Redstone. Also to speak with D'Alimonte about a conflict of interest with "one member of the special committee". With Paramount's GC refusing to respond to the Plaintiff's
[22] https://nypost.com/2024/06/07/media/shari-redstone-receives-fewest-votes-in-paramount-board-election/

Officers or Directors as Shari usurped third parties' interest in acquiring Paramount
to usurp its corporate opportunities, pushing buying NAI as an alternative means to
acquire control of Paramount

### Defendants Conceal July 5, 2024 Fax and email Offer

51. Despite defendant's multiple delay tactics, Paramount Chairperson
Redstone received Plaintiff July 5th offer by corporate fax, and emailed to NAI
top lawyer on July 5, 2024.[23] Defendants ignore both Plaintiff's July 5, 2024 offers
sent by fax and to Mr. Jankowski by email. (Exhibit #1)

52. Meanwhile evasive Defendants rushed to complete and sign a merger
with Skydance on July 7th adding a new material $400 million dollar termination
fee to help scuttle any other interested bidders. (Exhibit #2)

53. Another element of the bid ridding scheme was to avoid a Livevideo
rival bid to emerge in the media and press like the 2007 Dow Jones Counter bid
which became featured by CNBC in interview by host Maria Bartiromo. The
particular need to conceal the Plaintiff's bid was to keep Plaintiff from getting

---

[23] "purchase...interests...NAI holds..on superior terms to..Skydance"
"higher of $17.50 per share or.. 111% of ..price offered by SkyDance"
"CEO with significant public operating experience "
"under the structure you prefer..or..subject to...shareholder approval."
"binding" agreement "within 3 business days from...return.. NDA "
left a voice mail ..indicating our intent to make an offer...2 weeks ago ""PARA
GC".blocked..progress to move offer process forward."
"some conflict of interest concerns.. certain members special committee... impact
ability consider.. what was best for..fiduciaries"

19

the Paramount largest independent shareholder Gabelli's support.[24]

The defendants concealed the Plaintiff's bid because they knew Gabelli's fund would support LiveVideo.AI over Skydance, as evidenced by his previous successful investments in eUniverse and Viacom. The Defendants were aware that Skydance's management team had a history of sexual harassment including a top executive terminated by NBC for violations corroborated as well as a top executive terminated from Pixar, as reported by Chicago Tribune[25] and other news sources like NY Post[26], while LiveVideo.AI had a clean track record, making them the more favorable option for investors.

54. Between July 5th and July 7th defendants interfered with the plaintiff's potential business relations by erasing records, refusing to contact Plaintiff about the July 5 offer letter faxed and emailed or the voicemail left later in the date for NAI President and Paramount Chairperson Shari Redstone voicemail expressing interest in acquiring Paramount and NAI.

55. Defendants used false statements broadcast on television, radio, and

[24] Mario Gabelli, Paramount's largest non-Redstone voting-stock shareholder, threatened legal action if Shari sells voting stock.

[25] https://www.chicagotribune.com/2024/07/08/column-paramounts-new-president-was-fired-last-year-as-ceo-of-nbcuniversal-after-allegations-of-sexual-harassment/

[26] https://www.msn.com/en-us/money/companies/feminist-group-blasts-skydance-for-naming-jeff-shell-president-after-hadley-gamble-sexual-harassment-scandal/ar-BB1pLdY2

print, while also waiving away adviser initiated inquiries requesting contact

approval with Plaintiff and refusing to follow up through outside advisors and law

firms, making defamatory statements, they influenced others to turn a blind eye to

their reckless actions.

## COUNT I - Unfair Competition (Brought Directly Against All Defendants )

56.     Plaintiff repeats and re-alleges every allegation set forth in previous

paragraphs as if fully set forth herein.

57.     Redstone and NAI with BDT transferred control of Paramount's sale

process from one run in the best interests of shareholders to one tilted in favor of

Defendants Redstone, NAI, and creditor advisor BDT whose former employee was

partners with the winning Skydance July 7 merger agreement Paramount entered

into and in the process the Plaintiff was harmed including the concealment and

blocking of its July 5, 2024 offer sent to the defendants.

58.     One method was unfairly using a conflicted BDT role as financial

advisor to assign or recommend Redstone insert as Special Committee outside

counsel a conflicted person that was previously adverse to Paramount in another

transaction and responsible for harming Paramount shareholders  while that lawyer

was engaged by rival News Corp.

59. Shari orchestrates strategy to force Paramount to rubber stamp transactions NAI, Redstone, and Lender BDT wanted done quickly without the usual checks and balances restraining Boards of public companies.

60. The BDT Plan Lend Cash To Shari Redstone Collateralized By Paramount Stock. First Shari agrees NAI hires BDT as its advisor on all Paramount financial transactions including change of control. Assigning the NAI lender to be advisor on future sale of core asset securing lender's loan instantly created conflicts of interest the sort of transaction that would never have been approved by a public board of directors. BDT places Christine Varney from its long time law firm Cravath Law, in key Paramount with the help of NAI and Shari Redstone. As outside counsel for the Special Committee, Varney controlled information, making influential recommendations, having ability to communicate with BDT, NAI, and Redstone about committee decisions and reactions.

**Paramount and Plaintiff CEO Both Victims Of Varney 2005 Bid Rigging**

61. Varney's strategy to help her client News Corp snatch up Myspace's public parent company damaged and humiliated Viacom when the company failed to deliver a bid. Years later Federal Judge George King will conclude the target company's management," evaded Viacom's advances, even though it's representatives were communicating a competing bid was imminent." (Exhibit #4)

62. NY Times' Gretchen Morgenson described Judge King 2010 ruling:

> "a shareholder's worst nightmare. A company is in play, with two potential acquirers circling it, but the boards of directors and others running the enterprise who are supposed to snare top dollar for shareholders favor bidders who are dangling the biggest rewards for directors and senior executives.

63. Defendant Varney managed the "dangling" that NY Times cites the Judge concluded occurred harming Paramount shareholders and the Plaintiff's CEO.[27]

64. The lawyers blueprint in 2005 for News Corp allowing them to acquire publicly held Myspace at a below fair market price, outfoxing an equally determined key rival, Paramount's predecessor Viacom, Inc.

65. Another problem with Varney however beyond the first conflict of interest issue cited previously. Varney was saddled with an unusual legal liability created during a crusade she had undertaken in 2005 while serving as top lawyer for News Corp in its completed acquisition of eUniverse (later renamed Intermix) and its Myspace asset (collectively the "Myspace buyout"). She manipulates Paramount into quickly approving a future transaction that NAI, Redstone, and lender BDT have been eagerly awaiting.

---

[27] "Testimony and documents in the case indicate that Viacom was excluded from the bidding process and did not have the opportunity to top the News Corporation offer before Intermix accepted it."

"evidence and testimony...points to Mr. Rosenblatt favoring the News Corporation bid because he anticipated receiving a big job there if the deal went through. "
"Judge King wrote that evidence "raises the inference
that Rosenblatt"..was dodging Viacom's advances,".."On July 15, 2005, a female executive from MTV, a Viacom unit, alerted Mr. Rosenblatt that Viacom would produce a bid early the following week. The judge said, "Rosenblatt replied evasively, failing to correct her mistaken impression that the auction would still be ongoing after Monday."

"there are at least triable issues of fact" about whether Mr. Rosenblatt acted in good faith or tilted the auction in favor of the NewsCorporation "for a purpose other than maximizing shareholder value."

66.   Varney's "strategy" for acquiring the company was a plan to pay off

key individuals with under-the-table cash bribes. Evidence in the class action case

revealed that Varney had orchestrated secret cash payments without disclosing

them publicly before the crucial shareholder meeting (page 172, 174, 176, 178,  dkt

18-1 Federal FRCO Rule 23 Case No. 5:1606268 see Exhibit #5).[28]

"Summary of key deal terms [TBD]"

"Approximately $709 million"

"Expect to enter into arrangements with a pre-tax cost of $70mm post transaction signing to ensure continuity of key personnel"[29]. "Deal Update" report from "Fox Entertainment Group"

"Total deal cost: $750M vs. previous $680M", iii.

"Myspace Retention Plan"..."$90M gross ($50M net) critical to maintain positive relationship with management and reduce their tax exposure as much

---

[28] The sheer amount of money involved - a whopping $70 million dollars - was enough to raise suspicions but News Corp's attorneys ensured client got what wanted and these proof of manipulating and deceiving omissions even after the merger agreement was signed and publicly announced, Varney gave her approval for another $70 million dollars to be paid off to management, advising both companies not to disclose them. It was clear that the attorneys for Paramount rival main concern was securing the deal at any cost, even if it meant disregarding ethical and legal boundaries. Federal Class Action by public acquisition target shareholders of which largest qualifying FRCP Rule 23 certified class member is GAMCO Gabello Case 5:16-cv-06286, which finally concluded in 2013 with Varney's client settling for a hefty sum of $45 million dollars. The Federal Judge presiding over the case had already deemed it highly likely that bid rigging had occurred.

[29] and that as a premeditated scheme which Varney advised to not be disclosed at all to the public target's shareholders before they voted on approving the transaction

as possible."..."Additionally, trigger option pool for rank-and-file employees as goodwill move ($5m). [30]

67. Varney used this strategy to induce the target's management not to consider the CEO of LiveVideo.AI's $13.50 counter offer which Viacom had agreed to provide the financing for back in 2005. (Exhibit #3). This was Case 5:16-cv-06286 which her client settled in 2013 for $45 million dollars after Federal Judge ruled a Jury would likely find bid rigging had occurred in the deal Varney oversaw.[31]

---

[30] page 178 (Exhibit #5 page 179 dkt 18-1 Federal FRCO Rule 23 Case No. 5:1606268 ). "Revised Investment" that reveals Christine Varney's involvement in directing her client, Fox Entertainment Group. Despite publicly announcing their merger agreement worth $582 million dollars, Varney directed Fox to secretly agree to pay the target company's management a whopping $69 million as part of their "MySpace Retention Plan" - a scheme deemed successful by a Federal Judge in preventing Viacom from bidding on the acquisition And that's not all; after the merger agreement was signed, Varney approved another $70 million in cash payments to management and advised both companies to keep it off their SEC filings before the shareholder vote to approve the sale of Myspace.com's parent company.

[31] 18. Varney was able to accomplish this difficult task thru inducing the behavior of the target acquired corporations thru rigging support by key management like the "Richard Rosenblatt" ceo position cited by the Federal Judge in the King 2010 judgment about Varney's lucrative 2005 completed M&A advisory payday Varney received from News Corp., Intermix, later Myspace.com further paid Varney and her law firm millions of dollars in legal fees thru at least 2013.

five years later and only after a determined push by well resourced and experienced class action lawyers had pursued discovery deep in the process of the securities fraud class action case initiated in 2005 after the News Corp $12.00 Myspace Buyout had been announced.

20. Plaintiff's CEO who at that time owned about 10% of the Myspace public parent, eUniverse (renamed Intermix), had only detected several other problems about the transaction thru reading the SEC filings Varney directed News Corp and

## A. Misleading Press Leaks And Statements

68. On June 11th, Defendant Redstone publicly announced negotiations with SkyDance had ended. This statement was misleading and false because Redstone was aware of LiveVideo.AI's interest in making a competing buyout offer, further wanted to give the appearance that other bidders were welcome while secretly blocking out Plaintiff by instructing Paramount advisors not to engage with them and preventing the Special Committee considering LiveVideo.AI.

69. Redstone's public statements about ending negotiations with SkyDance were misleading and false, leading Paramount's General Counsel certainly by then to make D'Alimonte question the integrity of her leadership. On one hand, Redstone claimed to be open to other bidders while secretly freezing out LiveVideo.AI and preventing the Special Committee from engaging with them. D'Alimonte surely knew that by remaining silent, she would be breaching her duty of candor even .further.

## B. Termination of Paramount GC Without Cause Golden Parachute

70. Another masterful chess move in a high-stakes game of corporate manipulation and greed played out resulting in the June 21·2024 8k disclosure Paramount will terminate her without cause on June 28th.

---

the acquisition target to disclose in required S-4 or 8k filings in the months leading up to the required September 2005 shareholder vote meeting needed to close the Myspace buyout.

71. Even more shocking then the GC D'Alimonte disappearing days after she learns about LiveVideo.AI offer as if that wasn't suspicious enough, it quickly becomes clear that the GC was given a lucrative golden parachute worth well over $5 million cash, to silence any knowledge of Plaintiff's offer and not disclose its receipt to shareholders an unfathomable deception designed by defendants and directed by Varney.

72. The true motive behind D Alimonte's sudden acceptance of the separation revealed in the 8k is that she, as Paramount's General Counsel, must have made the difficult decision of the need to publicly disclose to shareholders the existence of a new potential offer from LiveVideo.AI for a change of control.

C. Ensuring Defective Systems and Internal Controls

73. Defendants NAI, over ten years later, Defendant Shari Redstone who lacked operating experience and still continues to lack public company operating experience and has never signed a Sarbanes Oxley SOX Officer Certificate , willfully damaged LiveVideo.AI's business opportunities with Paramount. They destroyed all records of communication, refused to reach out or allow others to do so on their behalf, and disregarded attempts at contact from LiveVideo.AI and the Special Committee. This caused significant harm to Plaintiff's integrity and resulting in economic damages that will be proven in court.

74. A voicemail left by LiveVideo.AI on June 6, 2024 has informed

D'Alimonte that they have also contacted Defendants NAI and Shari Redstone with their intention to make a competing offer on better terms than Skydance's proposal. Despite this, Defendants Shari Redstone, NAI, Varey, and Seligman instructed D Alimonte to keep quiet about the LiveVideo.AI contacts and not respond to their proposition, while publicly feigning negotiations with Skydance. D Alimonte has discovered that Defendant Shari Redstone's statement on June 11 claiming an end to negotiations with Skydance is deceitful.

75. Despite LiveVideo.AI expressing interest in a buyout offer, Redstone announces that Paramount is open to other offers while secretly working to complete the deal over the July 4th weekend. On July 2, news sources report that NAI and Skydance have reached a revised agreement, falsely making it seem like a recent development. Redstone and affiliated media partners continue to spread false narratives about the situation. These actions misled Plaintiff LiveVideo.AI, which was actively seeking financing for a potential merger with Paramount. D Alimonte has discovered that Shari Redstone falsely claimed she wasn't pursuing the transaction, using media partners like NYPost and WSJ to propagate the false narrative. This is misleading by omission of Defendants Varney, Seligman, NAI, and now Paramount's General Counsel thru an 8k.

## C. $400 Million Dollar Paramount Termination Fee

76. On June 11, 2024, it was publicly reported that Paramount, NAI and

Redstone had rejected the Skydance offer terms.[32]

> "National Amusements confirmed the deal was dead, saying the company has "not been able to reach mutually acceptable terms, regarding the potential transaction with Skydance Media."

> NAI said the company "supports the recently announced strategic plan being executed by Paramount's Office of the CEO."

> "Redstone will now likely pursue a sale of just National Amusements, without merging Paramount with another company, according to The Wall Street Journal, ."

> "NAI has received interest from two other suitors, an investor consortium led by Hollywood producer Steven Paul, and media exec Edgar Bronfman"

> "a committee of Paramount directors, who had recently approved the economic terms of the merger but continued to negotiate with Skydance about other deal points, The Journal said."

> "some of those points included pushing for a deal to be subject to a vote of all other shareholders."..."National Amusement was supportive of a vote. Skydance said such a vote is "a nonstarter," according to The Journal."

> "The committee was scheduled to vote on the Paramount merger with Skydance on Tuesday afternoon, but it is not clear if the vote happened.

> "A spokesperson for Paramount Global declined to comment. Skydance did not immediately respond to a Reuters request for comment."

77.    Plaintiff attempted to reach NAI and Redstone by telephone during

working hours on June 11th after seeing the news reports that Redstone and

---

[32] **"Shari Redstone kills Skydance bid to buy her controlling stake in Paramount Global"**

https://nypost.com/2024/06/11/media/shari-redstone-kills-skydance-bid-for-paramount-global/

NAI had "confirmed the deal was dead" only to get the same voicemail sole option, and the Plaintiff finally with no other choice and limited to making a communication by leaving a fifth voicemail did so at 6:03PM est for 1 minute 21 seconds which largely re-iterated the same points stated in the first voice mails left on June 3rd, 4th, and 6' for reasons completely unconnected with the unfairness of the deal to shareholders and possible threat of litigation, the delay was in part caused by Plaintiff June 6th voicemail left with Paramount's General Counsel.

78.   Despite Redstone refusing to respond to LiveVideo.AI she had no problem engaging other new interested parties.   Reportedly, Diller's company, IAC, had signed a nondisclosure agreement with NAI and was looking at its data room to determine the specifics of the bid;

79. On Sunday, July 7, 2024, Paramount and Skydance issued a press 8-K) announcing   a merger agreement "approved by (i) the Paramount Board of Directors based on the unanimous recommendation of the Special Committee and (ii) by Redstone's NAI, (Exhibit #3)  Barclays on July 8, 2024 estimated the price of Redstone's class A shares from the deal at $66.16 per share.  Skydance will purchase Redstone's NAI for $2.4 billion, gaining voting control of Paramount and providing indemnifications to Redstone. Paramount will merge with Skydance, resulting in 317 million new Class B shares for Skydance, valuing the company at $4.75 billion.

80. Criticism of the Merger among analysts and within the investing community has been quick and widespread. July 8, 2024, analysts covering Paramount downgraded their stock ratings. The $400 million Termination Fee is exceptionally high, representing 4.8% of the total value of the Merger.

### An Adverse Special Committee Member Seligman

81. Sony invested $5 million dollars in eUniverse for a 15% stake plus a Board seat in 2001 but writes off investment in 2003, its Sony employee resigning from Board. Defendant Seligman, is  GC Sony America (SCA) from 2001 until she's terminated in 2016. After Plaintiff's CEO resigns as eUniverse CEO,   Seligman breaches 2001 agreements and obligations owed to Plaintiff's CEO by  wrongfully adding a non Sony employee into eUniverse's Series B right for a Sony employee only. Seligman's further failed to review the background of their nominee, failing to disclose  Edell's bankruptcy as required under Federal Law and SEC regulations nor to make corrective disclosure under Rule S-K 404.

82. Seligman was adverse to Plaintiff and suffered a legal blow when January 9, 2024, DC District Court granted Plaintiff CEO's request for judicial notice of ten facts. The first fact judicial notice was granted included ten cases with a negative judgement Seligman's employer was the party defendant but carried Seligman's liability as CEO or CLO or both during those period for U.S. company Antitrust liability. (Exhibit #6)

"iv. August 20, 2015 "FRCP Rule 23 5:14-cv-04062 " Denial of Defendants Twenty-First Century Fox, Inc., Sony Corporation of America, Orrick Herrington Law LLC, claims for violation of Sherman Act 1, Clayton Act, Rule 17200 5:14-cv-04062"

83. This Court can determine if Seligman's actions as head Sony attorney and later CEO failure to not take SEC corrective action is of a material nature. By way of substituting Seligman's name in as another member of the 1502 Enterprise in place of largest number of companies "Sony Corporation, Sony Music Entertainment, Sony Corporation America, 550 DMV, Sony Broadband Entertainment" and fully incorporating by reference the #9567 Delaware complaint starting on page 4, its attached 70b motion and declaration including the evidence attached as fact based evidence as to why Seligman would have been incented and desirous to use her Special Committee Membership to act capricious, arbitrary and discriminate, make defamatory false claims casting Plaintiff's CEO in a negative light to the other Special Committee Members, advisors, and Directors Officers of Paramount. (Exhibit #7, Page 4)

**WHEREFORE,** Plaintiff demands judgment against Defendants for compensatory and actual damages in an amount to be determined at trial plus punitive damages, interest, counsel fees, costs and the expenses of this action, and for such other and further relief as the court seems equitable. As a direct, legal and proximate result of Defendants' aforementioned actions, Plaintiff has sustained economic damages to be proven at trial. Plaintiff seeks judgment for actual damages, interest and costs.

## COUNT II Tortious Interference With Business Relations (Brought Directly Against All Defendants )

84.  Plaintiff repeats and re-alleges every allegation set forth in previous paragraphs as if fully set forth herein. The Plaintiff had a pre-existing business relationship with Paramount prior to the January 2, 2024 formation by the Board of Directors of a Special Committee.

85.  The Special Committee and Board of Directors of Paramount chose to ignore the superior offer presented by LiveVideo.AI on July 5th, dismissing it without proper consideration. Despite offering a higher share price of $17.50 compared to Skydance's $15.00 for Class A and B shareholders, LiveVideo.AI's proposal would have resulted in 50% less dilution for Paramount stockholders. This significant cost savings was made clear in multiple voice messages to Chairperson Shari Redstone, yet she chose to overlook it and continue with the Skydance deal that required a whopping $4.8 billion worth of stock issuance.

86. Plaintiff had every reason to believe that their competitive offer would be given due diligence by Paramount. Not only was it a superior offer in terms of financial benefits for shareholders, but also promised a more experienced management team and $2.4 billion less in stock issuance. Yet, despite these clear advantages, Paramount chose to disregard the Plaintiff's offer and instead went

ahead with the costly and dilutive Skydance deal.The Special Committee and

Board of Directors of Paramount chose to ignore the superior offer presented by

LiveVideo.AI on July 5th, dismissing it without proper consideration. Despite

offering a higher share price of $17.50 compared to Skydance's $15.00, and a result

of 50% less dilution for Paramount stockholders. This significant cost savings was

made clear in multiple voice messages to Redstone, yet she chose to overlook it and

continue with the Skydance deal that required a whopping $4.8 billion worth of stock

issuance. Later damaging these LiveVideo.AI technology and IP deals as a result of

the Plaintiff seeking to attempt to make a superior buy-out offer that would have

benefitted stockholders and employees of Paramount.

87. With malicious intent, Defendants NAI and Shari Redstone took

deliberate actions to sabotage LiveVideo.AI's chances of securing a partnership with

Paramount on June 7th. Despite receiving multiple phone calls and a clear request

to participate in Paramount's sales process, they destroyed all physical and

electronic evidence of the communication and refused to personally reach out or

direct their outside advisors and legal counsel to do so.

88. They even went as far as refusing to involve the Special Committee and

Board of Directors in any follow-up with LiveVideo.AI, revealing a calculated plot

to harm the plaintiff's business prospects. These ruthless actions demonstrate a

blatant disregard for fair competition and unethical behavior at the highest levels of leadership within NAI and Redstone's inner circle.

89. On the crucial day of June 11th, Defendants NAI and Shari Redstone knowingly and deliberately sabotaged LiveVideo.AI's potential business opportunities with Paramount. As soon as they received LiveVideo.AI's desperate phone calls and voicemail at 6:03pm est, begging to be included in the ongoing sales process, they immediately set out to destroy all physical and electronic evidence of these communications.

90. They refused to personally reach out or direct any outside advisors or law firms working with Paramount to contact LiveVideo.AI. Despite being fully aware of LiveVideo.AI's interest in acquiring Paramount and NAI, they callously disregarded any attempts at communication from LiveVideo.AI, the Special Committee, and even the Board of Directors.

91. With calculated malice, Defendants NAI and Redstone effectively cut off all avenues for LiveVideo.AI to pursue a potential partnership with Paramount, causing immeasurable damage to the plaintiff's business prospects.

92. Plaintiff had every reason to believe that their competitive offer would be given due diligence by Paramount. Not only was it a superior offer in terms of financial benefits for shareholders, but also promised a more experienced

management team and $2.4 billion less in stock issuance. As a result, the Plaintiff is seeking damages of no less than 50% of the value in stock $2.42 billion for the unjustified rejection of their proposal and those legal and professional fees found to have been paid in cash.

93. Another reason that NAI, Varney, and Redstone seek to fraudulently conceal the July 5th offer is because it would force them to explain the malicious tortious interference scheme they have used to block, frustrate, and harass the LiveVideo.AI because they Varney and Seligman are conflicted with Plaintiff because of its CEO from ongoing and recent adverse legal matters causing significant conflicts of interest and it is because of the defendants subsequent actions the Plaintiff has now suffered the inability to advance strategic partnerships directly with Paramount begun in good faith during 2023.

**WHEREFORE,** Plaintiff demands judgment against Defendants for compensatory and actual damages in an amount to be determined at trial plus punitive damages, interest, counsel fees, costs and the expenses of this action, and for such other and further relief as the court seems equitable. As a direct, legal and proximate result of Defendants' aforementioned actions, Plaintiff has sustained economic damages to be proven at trial. Plaintiff seeks judgment for actual damages, interest and costs.

## COUNT III Aiding And Abetting Breach Of Fiduciary Duty, Candor, or Breach of Duty Loyalty (Brought Directly Against All Defendants )

94.    Plaintiff repeats and re-alleges every allegation set forth in previous paragraphs as if fully set forth herein.

95. The corporate opportunity doctrine is a fiduciary duty of corporate directors and officers. They cannot take an opportunity for their own benefit if: (1) the corporation can take advantage of it; (2) it falls within the corporation's line of business; (3) the corporation has an interest in it; and (4) taking it would conflict with their duties to the corporation.

96.    Controlling stockholders are also prohibited from using their power to benefit themselves at the expense of the corporation. Directors, special committee outside counsel, M&A transaction special committee members, and Chairpersons have a responsibility to prioritize the interests of the shareholders above their own personal interests or those of other parties involved.

97. In this case, the Defendants breached their fiduciary duty by prioritizing the interests of the Controlling Stockholder to approve an unfair Merger, which benefited Skydance and Redstone personally through a buyout at a premium price.

98. D'Alimonte had a fiduciary obligation to disclose the existence of LiveVideo.AI, but was instructed by Redstone, Varney, and Seligman to keep quiet about it and not respond to their offer. However, on June 11, when Shari Redstone announced the end of negotiations with SkyDance, she was aware of

LiveVideo.AI's interest in a competing offer but did not allow the Special Committee to consider it.

99. This put D'Alimonte in a difficult position of having to betray her duty of candor even further. The sudden termination of Paramount's General Counsel on June 21 was a result of Redstone's misleading public statements about negotiations with Skydance while withholding information about LiveVideo.AI's interest. These actions forced D'Alimonte to make false statements in Paramount's June 8k which ultimately hurt Paramount shareholders and the Plaintiff by blocking any chance for an alternative offer to be considered.

**WHEREFORE,** Plaintiff demands judgment against Defendants for compensatory and actual damages in an amount to be determined at trial plus punitive damages, interest, counsel fees, costs and the expenses of this action, and for such other and further relief as the court seems equitable. As a direct, legal and proximate result of Defendants' aforementioned actions, Plaintiff has sustained economic damages to be proven at trial. Plaintiff seeks judgment for actual damages, interest and costs.

## Count IV- Unjust Enichment (All Defendants)

100. Plaintiff repeats and re-alleges every allegation set forth in previous paragraphs as if fully set forth herein.

101. Defendant NAI shared LiveVideo.AI communications with Skydance including all details contained in Plaintiff's indications of interest voice mail

communications. The defendants maliciously handed over Plaintiff's confidential

strategies and plans to SkyDance as part of a misdirection and false broadcasting

scheme Redstone launched on June 11th when the defendants leaked to media

cohorts that Redstone "killed" or ended the negotiations with SkyDance.[33] for

reasons completely unconnected with the unfairness of the deal to shareholders and

moreso to put in place newly crafted legal protections amidst threats of litigation

and the $400 million dollar termination, and to mislead the Plaintiff into delaying

coming forth with an actual offer like the July 5, 2024 one Plaintiff transmitted.

### Redstone had rejected the Skydance offer terms.[34]

"National Amusements confirmed the deal was dead, saying the company
has "not been able to reach mutually acceptable terms, regarding the
potential transaction with Skydance Media."

NAI said the company "supports the recently announced strategic plan being
executed by Paramount's Office of the CEO."

"Redstone will now likely pursue a sale of just National Amusements, without
merging Paramount with another company, according to The Wall Street Journal,
"

---

[33] Meg James, So the Paramount and Skydance Deal is Back on Track. What
Happened and What's Next?, (July 3, 2024),
https://www.latimes.com/entertainment-arts/business/story/2024-07-03/paramount-
and-skydance-deal-is-back-on-track-what-happened-and-whats-next.

### [34] "Shari Redstone kills Skydance bid to buy her controlling stake in Paramount Global"

https://nypost.com/2024/06/11/media/shari-redstone-kills-skydance-bid-for-
paramount-global/

"NAI has received interest from two other suitors, an investor consortium led by Hollywood producer Steven Paul, and media exec Edgar Bronfman Jr., " "The second part of the deal would have entailed Skydance merging with Paramount, .. in a stock deal."

"a committee of Paramount directors, who had recently approved the economic terms of the merger but continued to negotiate with Skydance about other deal points, The Journal said."

"some of those points included pushing for a deal to be subject to a vote of all other shareholders."..."National Amusement was supportive of a vote. Skydance said such a vote is "a nonstarter," according to The Journal."

"The committee was scheduled to vote on the Paramount merger with Skydance on Tuesday afternoon, but it is not clear if the vote happened."

"A spokesperson for Paramount Global declined to comment. Skydance did not immediately respond to a Reuters request for comment."

102. Plaintiff attempted to reach NAI and Redstone by telephone during working hours on June 11th after seeing the news reports that Redstone and NAI had "confirmed the deal was dead" only to get the same voicemail sole option, and the Plaintiff finally with no other choice and limited to making a communication by leaving a fifth voicemail did so at 6:03PM est for 1 minute 21 seconds which largely re-iterated the same points stated in the first voice mails left on June 3rd, 4th, and 6th.

103. Despite Redstone and NAI refusing to respond to Plaintiff they had no problem engaging other new interested parties. Reportedly, Diller's company, IAC, had signed a nondisclosure agreement with NAI and was looking at its data room to determine the specifics of the bid;

**WHEREFORE,** Plaintiff demands judgment against Defendants for compensatory and actual damages in an amount to be determined at trial plus punitive damages, interest, counsel fees, costs and the expenses of this action, and for such other and further relief as the court seems equitable. As a direct, legal and proximate result of Defendants' aforementioned actions, Plaintiff has sustained economic damages to be proven at trial. Plaintiff seeks judgment for actual damages, interest and costs, as well as judgment temporarily and permanently enjoining Defendants from continuing described actions.

## COUNT V – VIOLATION OF DODD-FRANK WHISTLEBLOWER STATUTE – SECTION 922 & 18 U.S.C. §1513(e))(Against Varney and Seligman)

104. Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

105. Petitioner is entitled to a private cause of action for damages suffered Pursuant to the Dodd Frank Whistleblower Statute. Plaintiff[55] entitled to a private cause of action for whistleblowers alleging retaliatory discharge or other discrimination. Id. § 78u-6(h)(1)(B)(i). and Proxy Battle against Petitioner.

106. Defendant Seligman controlled a critical Board Seat Nomination legal right (Series B Preferred) nominating Jeff Edell in 2004 even after evidence

---

[55] Plaintiff's CEO has agreed to transfer rights and privileges due or held by the CEO personally to the Plaintiff.

in Delaware Court showed Edell and Defendants had mislead shareholders by
filing multiple defective and false proxy statements to Issuer's shareholders in
2003 and 2004.Relief includes Right to Jury Trial, reinstatement, double the back
pay owed, and costs and fees. Id. § 78u-6(h)(1)(C).

107. Defendants have discriminated against the Plaintif because of the
Plaintiff 's lawful acts done including investigating the conflicts of intrest behind
the Skydance offer and Redstone's financial advisor BDT who is also her lender.

108. Plaintiff has been discriminated against by not getting treated similar
to the manner other 3rd parties have been welcomed and invited to sign a mutual
non disclosure agreement with Paramount as part of receiving the opportunity to
participate in making a Paramount buy out offer.

109. Despite the Plaintiff contacting Redstone, NAI and Paramount,
and drafting., signing, then sending by fax and email an executed non disclosure
agreement the Plaintiff had executed. The defendants discriminated against the
Plaintiff and its CEO by refusing to respond, call back, answer, or have an advisor
reach out to the Plaintiff after the June 6 phone calls and voice mails left with
Paramount's Chairperson and General Counsel.

110. Defendants further discriminated and harassed the Plaintiff and its CEO
on July 5th when refusing to treat the Plaintiff like other interested buyers that
have contacted Paramount or Redstone. For instance, there are many articles about
the Paramount sales process and each article includes references to the fact that

Paramount and Redstone are open to other bidders and offers.

111. Yet despite these claims being made by Defendants, Varney and Seligman are using their control of the special committee and outside counsel to manipulate the information the other Special Committee members possess and are aware of in regards to alternative offers or bidders.

112. Varney, Seligman, and Redstone have instructed Paramount employees and other executives that work on Paramount's behalf not to return the Plaintiff's phone calls, not to reply by email, and not to send any letter communications. To give the Plaintiff no chance to review the information about Paramount being shared with other interested buyers.

113. The defendants have further discriminated against the Plaintiff and have harassed the Plaintiff by refusing to fix defective SEC Filings, ignoring their fiduciary duties and duties of disclosure after the Plaintiff delivered a bona fide 7 page offer agreement fully detailing why the economics would be superior and even offering to travel to Massachussets to meet with NAI, Redstone, and her lawyers in person.

114. It was discrimination after July 5, 2024 at approximately 2pm, when Plaintiff CEO was refused without explanation after Plaintiff requested to speak with someone at NAI or Paramount or their advisors in order to be able to participate in the opportunity with basically the same chances as the other interested parties.

115. Seligman with malicious intent to harm Plaintiff CEO for informing regulators of misdeeds News Corp and Sony, and aidongoing litigation husband's company has with Plaintiff CEO in his position as a shareholder member of Class Action that RGRD Law was pursuing in Judge King's Federal Court in Los Angeles that News Corp was the insured for, Sony Corp executives, Defendants in this Complaint, abused theirfiduciary duty to Issuer by misleading the Public and shareholders as part of assisting Defendant's scheme to take control of eUniverse, Inc. in 2003 and get approval and entrench Defendants as a result of the January 2004 Annual Meeting.

116. As a Result of the applicable Defendant's involvement in the above-described conspiracy and conspiratorial scheme, the Plaintiff has suffered severe emotional, financial, mental, and physical harm and other deleterious effects; been unfairly disadvantaged in multiple civil lawsuits initiated against him by several of the Defendants and other parties; had his freedom of speech severely impinged; been forced to spend hundreds of thousands of dollars on legal fees; been forced to; And had his personal and professional reputation severely and permanently damaged.

117. Based upon information and belief, some of the Defendants are continuing to engage in the above-described conspiracy and conspiratorial scheme even though they are well aware of the devastating toll that their prior conspiratorial actions have already taken on Petitioner and Petitioner's business

assets.

118. A Jury will determine if Seligman lied to Court regarding Defendant's

Proxy disclosure related to Edell. Defendant's failure to "make this right" as

claimed by Seligman's Delaware counsel is worthy of corrective disclosure by

Sony or Seligman including Declaratory Relief. That is if Seligman's actions and

non actions were actually a:

> "thumbing their nose at the Chancery Court ruling in January 2004 (and
> fraudulently concealing from the "Chancery Court in July 2004 at which
> time the Court entertained an award of legal fees but only granted in part
> because defendants were fraudulently concealing the aforementioned matters
> which are detailed fully in the underlying Motions). "

(page #41 of Exhibit #9)

**WHEREFORE,** Plaintiff on behalf of its CEO demands jury trial and judgment

against Defendants for Special, Compensatory and actual damages in an amount to

be determined at trial plus punitive damages, interest, counsel fees, costs and the

expenses of this action, and for such other and further relief as the court seems

equitable. As a direct, legal and proximate result of Defendants' aforementioned

actions, Plaintiff's CEO has sustained economic damages to be proven at trial.

Plaintiff seeks judgment for actual damages, interest and costs.

## COUNT VI- VIOLATION OF 18 U.S.C. § 1030 –

### The Computer Fraud and Abuse Act

119. Plaintiff repeats and realleges the foregoing paragraphs as set forth

herein.

120. Defendants became aware of LiveVideo.AI's potential interest in making an offer for Paramount no later then May 6, 2024 after the Plaintiff sent out a test email to find out if the former Paramount CEO might still have access to his corporate email even as he had transitioned to a consulting arrangement with Paramount.[36]

121. The Plaintiff send out an email May 6th at 11:35 am EST with the subject line "Perfect move opportunity!". The email was used as a test to determine if the Plaintiff's previous top level contact, CEO Bakish,

122. The Plaintiff assumed it was possible a Paramount employee might now be reviewing the former CEO's email inbox to share potential leads or help the new Paramount CEO more rapidly transition key corporate contacts Bakish email account messages.

123. However the Plaintiff was not prepared for what happened next.[37]

---

[36] had been merely sidelined from leading exploration of the sale of Paramount or totally frozen out without access to be in the Paramount office and no longer able to send or review any email communications sent to the CEO's longtime email address BB@ParamountGlobal (Paramount.com, Viacom.com).

[37] At time of May "test" email sent, the Plaintiff was still evaluating the desirability and practicality in regards to if it would be prudent of the Plaintiff to make an offer to acquire Paramount.

124. The Plaintiff's May email was sent with an online marketing software pixel that provides basic information about if and to what degree the email communication was received and read by the intended recipient as well as further detail consisting of providing information if the email is passed on from the email account of the intended recipient to other users using different computers.

125. A couple of weeks after the Plaintiff sent the test email in May, the log summary information provided by the email marketing software was reviewed. The Plaintiff was stunned by the unlawful behavior long suspected after so many news articles and legal settlements pounded home the same simple story: That Shari Redstone did not believe in corporate governance and never took seriously the conflict of interest legal requirements requiring her to keep separate both her personal and NAI interests from those of Paramount. Further, that Redstone just because she owns 9.9% of the stock of Paramount and is Chairperson, does not mean Redstone can operate inside Paramount as if she was the CEO and direct Paramount resources in self-serving manners while only focusing on purposing Paramount to benefit Redstone and NAI.

126. Defendant Redstone violated 1030 by directly or indirectly accessing the Paramount CEO's email communications residing or stored in Paramount's mail server. Redstone as Chairperson was not an executive working for Paramount and therefore Redstone's unauthorized taking or transfer or removal of Paramount

owned emails including Plaintiff's May 6, 2024 email residing in the former

CEO's Paramount email server or inbox, contravened 1030 The Computer Crime

Prevention Act.

127. Indeed, Redstone and other unauthorized non-executives appear to

have without authorization, transferred to upwards of three unauthorized

computers a copy of Plaintiff's confidential May 6 email Plaintiff expected would

be confidentially received and read by the Paramount CEO or his successor.[38]

128. On May 6th, and then again on May 11th, and later on July 22, 2024

Defendants Varney, Redstone, Korfman, Seligman "intentionally accessed a

computer " owned by Paramount and maintained solely for the use of its

employees.

---

[38] Sent for purposes also to try to cheer up the embattled Paramount but
evidence points to abuse by different access points showing the email was usurped
from Paramount corporation email account and siphoned out to NAI and most
likely Redstone, and Varney, who should not have had access, it was read by at
least three individuals during the month of May and re-opened in late July after the
July 5th offer had been concealed as Varney or her staff were looking to cover
their tracks.

129. The defendants without authorization accessed the Bakish email inbox and without first receiving authorization or accessed the inbox of the former CEO which was Paramount owned property and exceeded authorized access. This is because non-executives have no reason or need to be able to access computer servers which are strictly maintained for Paramount employees not for Paramount Directors, outside counsel, or members of the special committee.

130. "Further, the defendants violated 1030 because they did also obtain "information from any protected computer"

The defendants conspired to usurp opportunities they knew they would likely find by invading the Paramount CEO's confidential inbox that it strictly owned by Paramount and to be used only for the benefit of solely Paramount.

131. Further, Defendants Varney, her lieutenant that took over access to computer records deputy general counsel Ms. Groce after D'Alimonte resigned, forwarded without authorization to access or gave an unauthorized access pass to Defendant Redstone's lawyer son Mr. Korff who passed or shared access with SkyDance in Los Angeles and later San Jose, CA exposing it to other unauthorized to access private corporate emails sent from the public company's personal business contacts its CEO maintained and pass them to at least six other unauthorized persons in at least four states, DC, California, New York, Massachusetts, and to show in meetings to countless other adverse conflicted

parties. This activity could not have been a benefit to Paramount Global the corporation or its shareholders as violations of the CCFA being generated and other privacy violations are not what Paramount will earn more revenue or profits from. (See Exhibit #11)

132. The Plaintiff has suffered damage and loss by reason of Defendants violations of CCFA.

**WHEREFORE,** Plaintiff demands judgment against Defendants for compensatory and actual damages in an amount to be determined at trial plus punitive damages, interest, counsel fees, costs and the expenses of this action, and for such other and further relief as the court seems equitable. As a direct, legal and proximate result of Defendants' aforementioned actions, Plaintiff has sustained economic damages to be proven at trial. Plaintiff seeks judgment for actual damages, interest and costs, as well as judgment temporarily and permanently enjoining Defendants from continuing described actions.

Dated: September 3, 2024

Respectfully submitted Constants Law Offices, LLC.

By _/s/ Alfred C. Constants III_

Alfred C. Constants III, Esq.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable in accordance with

Federal Rule of Civil Procedure 38(b).

By _/s/ Alfred C. Constants III_

Alfred C. Constants III, Esq.

Attorneys for Plaintiff
Constants Law Offices, LLC.

EXHIBITS

EXHIBIT #1

**New Purchase Offer $17.50 Per Share L**

Good morning, Mr. [illegible].

Please find a fuller offer to be delivered to Ms. Stock Redstone
which is consistently being delivered to her with a near fuller Deal status.

"Please find New Purchase Offer $17.50 Per Share + 12% Auto Super Squeeze!"

Please call us through at your earliest convenience. Thank you and we look forward to
engaging further[ly] with you upon approval from Ms. Redstone and return of the output.
We've been provided for everything we've brought at an astounding to sign a version
over legal counsel partners and is more comfortable with.

Best Regards,

Paul Vermeyer

Managing Director, McQuade Capital, Inc.
[illegible]
34 [illegible] Avenue
Suite 4[illegible]
New York, NY

EBCBCM DoDomente1t40521 FFilddo069

This fax was successfully sent to 17012340894 y Nketo Fax.

Fax Details

Date: 2024-07-08 14:35:3 (GMT)
Number of Pages: 5
Length of Transmission: 250 second
Receiving Machine Fax ID: 17018012137

If you have any questions, please visit our online help center.

Thank you for choosing WestFax.

Sincerely,
The WestFax Team

FAX COVER SHEET

| TO | Ryan Redgers |
| Company | |
| FAX NUMBER | 1-Tr-DXXXX |
| FROM | Brad Greer |
| DATE | 30X-DFXX 10:XX11:XXF |
| RE | ATTN: Re: Brad Redmond (C.M. Fax exchange) |

COVER MESSAGE

Ryan: Are New Purchases Offer, RT-CN: Per Above = 47% Auto Trigger
Suspects

EB CBACM Document 1140521   Filed 069

The page content is too faded and low-resolution to read reliably.

EXHIBIT A

EXHIBIT #2



## PARAMOUNT GLOBAL'S SPECIAL COMMITTEE UNANIMOUSLY APPROVED MERGER WITH SKYDANCE MEDIA

NEW YORK, July 7, 2024 — The Special Committee of the Board of Directors (the "Special Committee") of Paramount Global (NASDAQ: PARA, PARAA) ("Paramount" or "the Company") today confirmed that it has unanimously approved a merger agreement between Paramount and Skydance Media, LLC ("Skydance").

The Special Committee was formed on January 2, 2024, at the request of Paramount's controlling stockholder, National Amusements, Inc. ("NAI"), to evaluate potential transactions involving both NAI and Paramount as NAI considered its options relating to its investment in Paramount. The Special Committee retained independent financial and legal advisors, Centerview Partners LLC and Cravath, Swaine & Moore LLP respectively. Over a period of more than six months, the Special Committee considered multiple approaches and constructs from various counterparties and solicited interest from potential counterparties for an acquisition of Paramount.

The merger agreement includes a 45-day "go-shop" period, which permits the Special Committee and its representatives to actively solicit and consider alternative acquisition proposals. There can be no assurance that this go-shop process will result in a superior proposal, and the Company does not intend to disclose developments with respect to the go-shop process unless and until it determines such disclosure is appropriate or is otherwise required.

On behalf of the Special Committee, Charles E. Phillips, Jr. said: "We are pleased to have reached an agreement that we believe delivers to Paramount stockholders both immediate value and future upside opportunity. The Special Committee, with the assistance of independent financial and legal advisors, conducted a thorough review of actionable potential transactions to drive value for our stockholders. In addition to economic value, the Special Committee took into account the certainty of closing and regulatory approvals. Following extensive negotiations with Skydance, we believe this proposed transaction will position Paramount for success in a rapidly evolving industry landscape. Upon closing, it will deliver immediate cash consideration at a premium to both the minority Class A and Class B stockholders, who will also benefit from what we believe to be considerable upside through continued equity participation in New Paramount."

Mr. Phillips continued: "The Special Committee would like to thank our Co-CEOs George Cheeks, Chris McCarthy and Brian Robbins for making significant progress in optimizing company operations in a short period of time, positioning Paramount for a sustainable transformation and a path to profitable-growth going forward."

Further information regarding terms and conditions contained in the merger agreement will be available on the investor relations section of Paramount's website at https://ir.paramount.com and in a joint press release issued earlier today by Paramount and Skydance.

**Important Information About the Transactions and Where To Find It**

In connection with the proposed transactions involving Paramount, Skydance and NAI (the "Transactions"), Paramount will file with the Securities and Exchange Commission (the "SEC") a registration statement on Form S-4 that will include an information statement on Schedule 14C and that

Exhibit 83

## Press

Published: 9/29/06

### Outside investor offers $13.50 a share for Intermix

By Carl Rowan

EXHIBIT 14

CIVIL MINUTES - GENERAL

| Case No. | CV 16-171 GHK (Dbl) | Date | Jan. 11, 2016 |
|---|---|---|---|
| Title | In re Social Media, et al. | | |

Presiding: The Honorable **GEORGE H. KING, U. S. DISTRICT JUDGE**

| Beatrice Herrera | N/A | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

Proceedings: (In Chambers) Order re Cross-Motions for Summary Judgment [211, 118, 334, 351, and 341]

This shareholder class action arises out of Terra Corporation's ("Terra Corp.") 2009 acquisition of Interior Media, Inc. ("Interior"), formerly Queen et al Servers, Inc. ("Server Del.") a company which owned, among other internet businesses the social networking website MySpace. Plaintiff Liu Brown ("Plaintiff"), both broadly and on behalf of all members of the certified class of former Interior shareholders, claims the Defendants Peter Brown ("Brown"), David Whitlow ("Whitlow"), Lawrence Morgan ("Morgan"), David Carlick ("Carlick"), Andrew Sheehan ("Sheehan"), Richard Rosenblatt ("Rosenblatt"), James Quandt ("Quandt"), and William Woodward ("Woodward") (collectively, "Defendants"), the eight Interior directors at the time of the company's sale, breached their fiduciary duties under state law and violated Sections 14(a) of the Securities and Exchange Act of 1934 and SEC Rule 14a-9 (Counts IV and II, respectively).¹ Consolidated Second Amended Complaint ("CSAC").²

¹ In our June 22, 2009 Order, we certified the following class: "All holders of Interior Media, Inc. ("Interior" or the Company") common stock, from July 31, 2009 through the consummation of the sale of Interior to Terra Corporation (Terra Corp.) at the price of $12.05 per share on September 9, 2009 (the "Acquisition"), who were harmed by Defendants' conduct, excluding Defendants and the Acquisition Group and the Class and defendants and any person, firm, trust, corporation or other entity related or affiliated with any Defendant." (Dkt. No. 195.)

² In our July 14, 2008 Order on the Motion to Dismiss, we dismissed with prejudice Defendants Montgomery & Co. L.L.C. ("Montgomery"), and Thomas Weisel Partners Group, Inc. and Thomas Weisel Partners L.L.C. ("TWP"), the two named entities which advised the Interior board during the 2009 transaction and completed fairness analyses on the $12.05 per share price offered by Terra Corp. as the consideration over per Interior's sale. (Dkt. No. 118, at 8-9.) In that same Order, we also dismissed with prejudice Counts I for violation of Section 10(a) of the 1934 Act and SEC Rule 14a-9, which was stated against the 2009 individual Defendants, which included Sheehan, Khanna, Morgan, Jeffrey Scott Adell, Bradley Ward, Carlick, Sheehan and Liau, and Viceroy/Icarus. (Id. at 8-11.) Accordingly, Count IV for...



CIVIL MINUTES – GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 08-1721-GHK (SHx) | Date | June 17, 2009 |
| Title | *In re Brocade Inc et al.* | | |

MEJL-1784P. Brocard Oact I ¶ 3. The only other remaining matter is Count II for "control person" liability under Section 20(a) of the 1934 Act against Defendants involved in the 2005 acquisition of Intensity. (CRAC ¶¶ 1339-79.) This matter is before us on the Parties' Cross Motions for Summary Judgment. We have considered the papers filed and all of the admissible evidence, and deem the issues appropriate for resolution without oral argument. L.R. 7-15. As the Parties are familiar with the facts in this case, we will repeat them only as necessary. Accordingly, we rule as follows:

## I.    Motion for Summary Judgment Standard

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On a motion for summary judgment, our "function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

The moving party bears the initial responsibility to point to the absence of evidence to support the nonmoving party's case. See *Celotex Corp.*, 477 U.S. at 325. "While the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006) (citation and quotation marks omitted). By contrast, when the nonmoving party "bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case.'" *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting *Celotex*, 477 U.S. at 322) (alteration in original). "[T]he moving party can meet its burden by pointing out the absence of evidence from the non-moving party," and no "need not disprove the other party's case." *Soremekun*, 509 F.3d at 984 (citation omitted). Accordingly, "[t]he moving party may produce evidence necessary to negate an essential element of a nonmoving party's claim or . . . show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

"control person" liability was discussed as to Kahl and Ward, as it was premised on the only other claim against them for aforementioned in *Broccon Ct. I (Ct. at 4-6)*. The Parties stipulated to dismiss certain Defendants (i.e. that 100, 1bis. On June 10, 2009, pursuant to the Parties' stipulation, we dismissed without prejudice Defendants VantagePoint Venture Partners, VP Alpha Holdings IV, L.L.C., VantagePoint Venture Partners IV (Q), L.P., VantagePoint Venture Partners (IV), L.P., and VantagePoint Venture Partners IV Principals Fund L.P. (Dkt. No. 156). On August 26, 2009, pursuant to the Parties' stipulation, we dismissed without prejudice Defendant Christopher Cupp, Interstiv's General Counsel. (Dkt. No. 202).



| | | | |
|---|---|---|---|
| Case No. | CV 16-1721 GHK (MRx) | Date | Jun 17, 2018 |
| Title | Jim Brown L. Bose Brown, et al. | | |

unlikely. However, "[i]f the opposing party does act to respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e)(3); *see also Celotex Corp.*, 477 U.S. at 322-23 ("The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.") . The "opposing party may not rely merely on allegations or denials in its own pleading." *Fed. R. Civ. P. 56(e)(2)*. "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *see also In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) ("the court must view the evidence in the light most favorable to the nonmoving party.") (citation omitted).

"Only admissible evidence may be considered in deciding a motion for summary judgment." *Miller*, 454 F.3d at 984. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. ". . . supporting or opposing affidavits must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." *See also Block v. City of Los Angeles*, 253 F.3d at 410, 418-19 (9th Cir. 2001). Conclusory and speculative affidavits that fail to set forth specific facts are insufficient to raise a genuine issue of material fact. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Absent a proper exemption, hearsay statements are inadmissible. *See Anand Telecom, Inc. v. Anand Telecom, Inc., Inc.*, 250 F.3d 660, 671 n.1 (9th Cir. 2002). Furthermore, neither an incomplete complaint nor amicus arguments made in the parties' briefs can be considered as evidence at this stage. *See Moran v. Selig*, 447 F.3d 748, 759 n.16 (9th Cir. 2006) (noting that unverified complaint cannot be considered as evidence on motion for summary judgment; *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978) (legal memoranda . . . are not evidence.)).

## II. Count IV: Breach of Fiduciary Duty Claim

### a. Delaware Law on Corporate Fiduciary Duties Generally

Delaware law governs Plaintiff's state law claim for breach of fiduciary duty. Under Delaware law, all directors and officers of a corporation owe their shareholders fiduciary duties of loyalty and care. *Cinerama v. Technicolor*, 663 A.2d 1156, 1163 (Del. 1995).[6]

---

[6] Under Delaware law, the business judgment rule creates "a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). "A plaintiff challenging a board decision from the burden to rebut the rule's presumption by providing evidence that the directors breached their fiduciary duties." *Cinerama v. Technicolor, Inc.*, 663 A.2d 1156, 1164 n.5 (Del. 1995); *modified by* 636 A.2d 956 (Del. 1994) ("*Cede II*"); *Cinerama v. Technicolor, Inc.*, 634 A.2d 345 (Del. 1993). "In order to overcome that presumption a plaintiff must prove an act of bad faith by a preponderance of the evidence."



Case No.   CV 06-1721-GHK (SHx)                                    Date   Jan. 17, 2010

Title       Jim Brown v. Brett Brewer, et al.

### 1.   Duty of Loyalty

CIVIL MINUTES--GENERAL

| Case No. | CV 06-7772 GPS (FMO) | Date | June 17, 2010 |
|---|---|---|---|
| Title | *Jim Brown v. Brett Brewer, et al.* | | |

**B.    Scope of Plaintiff's Claim of Breach of the Duty of Loyalty**

**1.    Bad Faith in Excess Junior Context**



CIVIL MINUTES - GENERAL

Case No.  CV-02270 (JPR)   Date  June 1, 2011

Title  *The Baron v Well Sisters, et al.*



Case 2:06-cv-05797-AHM-SH Document 339 Filed 05/17/11 Page 13 of 66



**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 06-5797-GHK (SHx) | Date | Jun 17, 2010 |
| Title | Jim Brown v. Brett Ratner, et al. | | |

These issues fall into three categories: (1) whether Intermix CEO Rosenblatt impermissibly tilted the playing field in favor of News Corp.; (2) whether the remaining financial institutions consistently downplayed their duties; and (3) whether the purported risk of a direct bid by MySpace, which would have frozen the MySpace Option, precludes a finding that Defendants consistently downplayed their duties.

### a. Rosenblatt

Plaintiff proffers evidence tending to show that during the crucial weeks leading up to the July 18, 2005 merger, Rosenblatt courted Viacom's advances, even though Viacom's representatives were contemplating less of a proposal/higher-cost Intermix. Plaintiff raises at least two interrelated sub-issues: (1) whether Rosenblatt was self-interested in the merger transaction; and (2) whether he impermissibly steered the auction in favor of News Corp.'s favor.

As to Rosenblatt's supposed self-interest, here is no intent of Rosenblatt's motivation for the alleged hidden incentives, namely his anticipation of Viacom employment with News Corp. To not particularly revealing small note on July 15, Rosenblatt excitedly endorses News Corp.'s Ross Levinsohn's vision: "So, we come for our Intermix group, for our own interview, since, quite tell under it, plus all new acquisitions, and you are CEO For Internet and I am Too. America great News!!!" (U.A., Ex. 484). Rosenblatt continues: "I would like to discuss my specific role and position whenever we can reach. It is so rich unless Peter and Roper were; but to sign an employment agreement by Sunday (July 17, 2005)...." (Id.). In so far he what he that note rises, Rosenblatt wrote: "If I am betting, none real equity with every major media company, by getting this deal done ..., so [so] love to this the point I will strike on Monday. I feel both have agreed pb for sure cause Levi's b/c I gotta work in this test again...." (Id.). On July 15, Rosenblatt wrote: "tell Tom Mundach and I run the best in 30 min [xx] and I get 50% of what we wanted. Due closing by Monday." (Id., Ex. 343). The evidence, if not taken the advance that Rosenblatt had a strong interest in seeing a merger transaction with News Corp. completed and his stake up his excit that Intermix would be sold to News Corp. as of July 18.

Moreover, Plaintiff points to several key pieces of documentary evidence and whose testimony which tend to suggest his contention that (1) Rosenblatt, in representing the Intermix board through the Transaction Committee ("TC"); (2) Ratner, who sat on the TC; and (3) here again, deliberately dodged, Fore Intermix, in arguably Intermix led Only Viacom.

---

[4] Although analytically, we are reviewing the evidence on the bad faith prong of the duty of loyalty component of the breach of fiduciary duty claim, in this particular, we consider Rosenblatt's alleged self-interest in the matter that it bears on whether Plaintiff has raised a triable issue of material fact as to whether Rosenblatt acted in conscious disregard of his duties by impermissibly tilting the field in favor of News Corp.

Case 2:08-cv-03721-GHK-SS... Document 470 Filed 08/17/10 Page 54 of 90

CIVIL MINUTES - CENTRAL

Case No.    CV 08-3721 GHK (SSx)          Date:   June 17, 2010

Title    *In Re Mattel, Inc.* ...

First, on July 6, Montgomery responded to an e-mail announcing "Viacom is trying to lead" by telling Rosenblatt "I've said it before with [Viacom] . . . slow them down. I know you can do it." (Id., Ex. 117.)

Second, 1799, one Brad's Robert Kitts ("Kitts"), was aware that Epstein was trying to reach them to talk about a potential Viacom bid. (Kitts Tr. at 224-5; 226-6/6.) Epstein noted on July 10 that Kitts never called him back in protest. (Id., Ex. 19) ["We exchanged subsequent emails and he indicated he would call me, but he never did"].

Third, on July 14, Montgomery wrote Rosenblatt following one of Rosenblatt's replies to the full board, saying "Viacom sounds like a pipe-dream." (Id., Ex. 182.)

Fourth, on July 13, Judy McGrath of MTV wrote Rosenblatt to inform him that Viacom was "moving with a bid very soon" (Id., Ex. 185). She added: "We really want to be with you on this, and hope to get to the ring for it . . ." (Id.). Rosenblatt replied evasively, failing to correct her mistaken impression that the parties would still be engaging in the process and said that he was too much for the stand . . . I tell call you back soon . . ." (Id.). Rosenblatt would just recall precisely whether he had received her call "I was here in bed. I think actually I don't think I even said I couldn't get a hold of her." (Rosenblatt Tr. at 108 51-3).

Fifth, Viacom's CEO Thomas Freston ("Freston"), who informed Viacom's interest in pursuing Instamer to Rosenblatt, has testified that he was very sure that the process with the competing bidder was "moving quickly." (Freston Tr. at 173-22-20; 159-11; 224-16.) "He testified that he could not "recall if Rosenblatt said this they were going to do a deal by Sunday." (Id. at 72-73-24). When asked whether Rosenblatt had communicated that a deal would be completed by Sunday, he stated that he did not believe so. (Freston Tr. at 198-21.)

---

[footnote]   Viacom must MTV Networks.

[footnote]   The Parties initially sought in the Freston's Apposition evidently under seal because it contained information subject to the governing protective order. On November 13, 2009, the Parties filed a joint stipulation to allow the publication to be under seal and hereinafter both of the Link Reel, the Joint Statement of Uncontroverted Facts, and Exhibits 2-1 and 3-9 of the Mac Exhibition Apposition, as well as certain full deposition transcripts including Freston's testimony. (Dkt. No. 294). In that document, the Parties stated that "WHEREAS the Parties have conferred all non-parties that produced documents and/or gave depositions believe which was the subject of the application to file under seal, and obtained their permission for the documents to be publicly filed, and therefore withdraw the application to File Order Item." (Id. at 3.) Our November 13, 2009 Order regarding the joint stipulation was not clear as to whether the production materials were thus being filed to trigger seals record. (Dkt. No. 782). To area clarify that all of the proposition transcripts labeled "Confidential Pursuant to Protective Order" and submitted to the Court along with the Cross-Motions for Summary Judgment SHALL you be filed to the public record pursuant to the Parties' joint stipulation.

CV-08-3721         CIVIL MINUTES - GENERAL         Page 54 of 90

Case 2:16-cv-02213-SVW-BK   Document 275   Filed 06/17/16   Page 13 of 18

CIVIL MINUTES - GENERAL

Case No.    CV16-2213 (JRK 2016)                                Date   June 17, 2016
Title       Jane Doe v. Roe et al.

CIVIL MINUTES - GENERAL

CIVIL MINUTES - GENERAL

6. The MySpace Option

CIVIL MINUTES - GENERAL

[illegible]

Self-Interested Transaction

[illegible]

The page is too faded and low-resolution to extract reliable text content.



morphed [sic], they were not inclined to make an offer for the company on the time that the ex was looking at" [sic at Ex 66-11]. Having the secretary as a witness to the light may be credible to Plaintiff, including the secretary evidence that Viacom was indeed very seriously interested in bidding on Interim: "there are at least viable issues of fact as to whether Interim was manipulated by a well conceived faceay Brownism.

Moreover, based on Mesha's description of the content of Rosenblatt's presentation to the board, the issue of manipulation is likely with respect to all of the other board members. Accordingly, as a reasonable jury could potentially conclude that a majority of the directors was interested or manipulated by someone who was, we hereby DENY Defendants' Motion for Summary Judgment on the second basis for Plaintiff's claim of breach of the duty of loyalty.

## III.   Count B: Violation of Section 14(a) of the Securities and Exchange Act of 1934 and SEC Rule 14a.[*]

On August 23, 2000, Interim issued a proxy statement ("Proxy") concerning the Next Corp merger. (Hernandez Decl. ¶ 93.) On November 20, 2000, a majority of Interim's shareholders voted to adopt the Merger Agreement. (Id. ¶ 55.) Plaintiff alleges that there were five material omissions in the Proxy. (J.L., Ex. A). To recover on its claim under § 14(a) and Rule 14a-9, a plaintiff must establish that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular deed in the solicitation analysis, was an essential link in the accomplishment of the transaction." New Gulf City Employees Ret. Sec. v. Arm, 593 F.3d 1018, 1025 (9th Cir. 2007) (citation and internal quotation marks omitted), 15 U.S.C. § 78(n), 17 C.F.R. § 240.14a-9(a) "No solicitation subject to the regulations shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading. s.

[*] The Seller of ITN emailed Rosenblatt on July 17 to note that his emails were "In the office working around the clock at 2Viacom would give forth a meeting so Him that [wrong]." (J.-L., Ex. 202). On the same day, Ameri Blackthorn of Viacom informed Chris Del Rollo that he has "had a topic of 24+ arrange... working for 12 hours straight in a significant buy." (Id., Ex. 208).

Case 3:06-cv-02713-SI Document 1276   Filed 06/17/10   Page 54 of 88

UTIL ROUTES - GENERAL

Case No.   CV 06-2713 GEB [JFK]   Date   June 17, 2010

TO   _Joe Evans v. Brett Bouwer et al._

### 4.   Alleged Material Omissions

#### 1.   Mylpmm's Then Current Revenue and Profits

#### 2.   Intrinsic Management's 2004-2009 Financial Projections

Case 2:04-cv-09373-GHK-EX   Document 376   Filed 06/17/10   Page 00 of 00

| Case No. | CV 04-9373 GHK (Ex) | | Date | June 17, 2010 |
|---|---|---|---|---|
| Title | | | | |

Accordingly, Defendants' Motion For Summary Judgment is **DENIED** as to this alleged material omission.

## II.   Outstanding Derivative Lawsuits

Case 8:08-cv-05572-WHA Document 378 Filed 09/07/11 Page 27 of 110



Case 2:16-cv-13721-SVW-JN   Document 1528/275   Filed 06/17/16   Page 28 of 58



**CIVIL MINUTES - GENERAL**

| | | |
|---|---|---|
| Case No. | CV 16-1771 ABC OFSx | Date June 17, 2016 |
| Title | | |

**CIVIL MINUTES - GENERAL**

| Case No. | CV 00-5731 DMG (Rx) | Date | June 17, 2016 |
|---|---|---|---|
| Title | *Joe Doe v. Matt Bichco, et al.* | | |

below, a jury determined [...] the fraction disclaimers. Since we have denied summary judgment with respect to State of the profferred neutral reference in his Proxy, and Defendant has admitted to participating in "the process of preparing, reviewing, and disseminating" that Proxy, we must also **JOIN** summary judgment with respect to the element of negligence. If Plaintiff can persuade a jury as to both materiality and Defendant's participation in the preparation and/or review of the Proxy at trial, then a finding of negligence will flow from those findings.

### C. Damages

#### 1. Benefit-of-the-Bargain Damages

The theory of damages is wholly inappropriate in this case. A request for "benefit-of-the-bargain damages" under the "value that was represented as coming to" the shareholder under a particular transaction, such as a merger ... *see Real Estate Assocs. Ltd. P'ship Litig.*, 617 F. Supp. 2d 518, 533 (C.D. Cal. 2002). "[B]enefit-of-the-bargain damages are available in the limited instance when a misrepresentation is made in the proxy solicitation as to the consideration to be forthcoming upon an intended merger ... of, solution contract). In the Ninth Circuit has stated, "[t]he benefit-of-the-bargain measure of damages allows a plaintiff to recover 'the difference' between what the plaintiff expected to would receive ... and the security the plaintiff actually received ..." *In re Program, Inc. v. Leighton*, 805 F.2d 1442, 1449 (9th Cir. 1986) (quoting *Garden v. Hartz/Fondy, Inc.*, 863 F.2d 148 8, 428 (9th Cir. 1986) (emphasis in original). Here, the Proxy made no misrepresentation as to the per share price offered to and ultimately received by the shareholders. The Proxy stated the class members would receive $12 cash for each common share, and it is undisputed that they received $12 cash for each common share. (LA, Ex. 4 at 119 John Summart of Uncontested Facts ¶ 330.) Accordingly, this damages theory is not viable. We GRANT summary judgment with respect to the damages theory.

#### 2. Out-of-Pocket Losses

##### a. Legal Framework

"'Out-of-pocket' losses are the standard measure of damages for Rule 10b-5 and Section 14(a) claims." *In re Daimler/Chrysler A/S Sec. Litig.*, 294 F. Supp. 2d 616, 624 (D. Del. 2003) (citing *Five Francisco Fed. Sav. Ass'n v. Dayt*, 1 F. Supp. 2d 231, 235 (D. Del. 2008) ("The 3"). That standard loss constitutes "the difference between the fair value of all that the seller received and the fair value of what he would have received had there been no fraudulent conduct." *Zar d.* 321 F. Supp. 2d at 322 (quoting affirmed cite). *Colson v. Goldman*, C.D., 364 U.S. 128, 155 (1972) (quotation marks omitted). The Ninth Circuit accord, "The out-of-pocket rule fixes recoverable damages as 'the difference between the purchase price and the value of the stock at the date of purchase." *Ward v. Franklin Computer Inc.*, 863 F.2d 3433, 3437 (9th Cir. 1987), [unclear] ... in part in other grounds by *DeMaria v. Elan Clinical Corp.*, 918 F.2d 1264, 1271 (9th Cir. 1990) (en banc) (citation omitted). "The guiding philosophy of this out-of-pocket theory of damages ... is to award not what the plaintiff might have ...

Case 8:06-cv-01573-AHM-SH Document 278 Filed 06/12/08 Page 31 of 38



**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-5711 (RK) (RK) | Date | Jun 12, 2008 |
|---|---|---|---|

| Title | *In re [...] v. [...] et al.* | | |

gained, but what he has lost by being deprived [of] the earnings." *Id.* § 1537.12 [...]

A. *Defendants' Motion to Exclude, Plaintiff's Motions to Strike*

[body paragraphs — largely illegible due to faded scan]

It would... technical... or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In conduct, the Supreme Court construed Rule 702 to require district courts to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597. The Court noted that "[p]ertinent evidence based on scientifically valid principles will satisfy those demands...

CIVIL MINUTES - GENERAL

| Case No. | CV 91-7113-(GHK) (EHx) | Date | June 17, 2010 |
|---|---|---|---|
| Title | *The People v. Real (Person, et al.* | | |

EHBCM M  DDooccuummeennt t1425-21    FFileedd 055/1

LIFE SOUTH, GENERAL

| Line No. | CV 06-275 (SHB, JM) | Dot Jan 17, 2010 |
|---|---|---|
| Title | Joe Broner, Beck Broner, et al. | |

Interest, Taxes, Depreciation and Amortization ("EBITDA") figures for 2008 and 2009 for McSpun-ski et al. Thusly, "[u]sing a discount rate of 15% and a terminal EBITDA multiple of 10x, TTs Kennedy calculated "a value of $962.4 million after subtracting the $65 million option exercise price from the present value of McSpun's Cash Flows." (Id.). The "present discount rate was chosen based on the discount rates used in the Montgomery and TWP Interest opinions, which ranged from 17 percent up to 25 percent. (Id. at 11).

Defendants make several arguments against the reliability of this procedure. They argue first that Dr. Kennedy has insufficiently justified his use of a uniform discount rate from 2003 to 2009 and the 10x terminal multiple. (Mot. 9–5). Defendant claims that Dr. Kennedy has offered no coherent reason for his rejection of management's projections for 2007-2008 and 2008-2009. (Id. at 11). They note that he has merely declared that Montgomery and TWP's projections "were appropriately low and not consistent with the very aspirations of growth currently observed at the time of the [Interim] is attached to the social welding provided by firm." (Id. at 11 (quoting Moreira Decl., Ex. 7, Kennedy Supplemental Decl. ¶ 4 (complete omitted)). For this reason the rate implied in which Dr. Kennedy explained his use of higher growth rates for 2007-2008 and 2008-2009 by saying that "[th]ese revenues consistently singularized business management's core projections in each of the [last four months of 2007]." (Baron Decl., Ex. 5 Kennedy Report, at 30). This is at least one reasoned basis for his adjustments in which he viewed as demonstrably "conservative" forecasts. (Id.). After all, the entire reference is fascinating, but hard science. Projections themselves cannot be tested to accuracy. Any "statement hopes rather than the results of scientific analysis." Zenith Electric Corp. v. WSI-TV Broad. Cops., 395 F.3d 518, 532 (7th Cir. 2005); see also New Orchards Village Inc. 323, No. 98-20958-AQ2, 2010 WL 143394, at *13 (Bankr. D. Or. Jan. 8, 2010) ("[D]enoting future financial needs from the operations of a business is not as exact science.").

Additionally, Defendants argue first "Kennedy provides no theoretical or empirical justification for applying this incredibly aggressive ... His terminal multiple, except this overstates that it is based on forward EBITDA multiples observed in comparably publicly traded guideline companies" referenced in its comparable public company analysis below. (Mot. 11–12 (quoting Moriarty Decl., Ex. 1, Kennedy Report, at 11 (quotation marks omitted)). They assert that Dr. Kennedy only relied on "the more profitable of the 11 comparable companies relied upon by" Montgomery and TWP, including Group1 and Yahoo!, and could not remove a single company that had proven of the rate projected with his correct growth rates and terminal value. (Id. at 13 (citing Moriarty Decl., Ex. 1, Kennedy Report, at 13; id., Ex. 6, Kennedy To, at 133–4.13).

While these two challenges may be objections to Kennedy's conclusions on his DCF analysis, they do not render his methodology unreliable. Rather the deviation from management's projections, the use of its arguably aggressive terminal multiple, and the alleged selection of the most profitable guideline companies are proper subjects for cross-examination. Defendants do not take issue with the

## CIVIL MINUTES - GENERAL

Title    *Abe Rivera v. Brad Bivona, et al.*


Case 2:10-cv-03633-GW-SS   Document 378   Filed 09/17/13   Page 57 of 58

**CIVIL MINUTES – GENERAL**

| Case No. | CV 10-3633-GW (SSx) | | Date | Sept 17, 2013 |
|---|---|---|---|---|

| Title | Jim Brown v. Rock Flower, et al. | | | |

prohibits publicity trade companies." (Id. at 28.) He justified his deviation from these comparable books, beginning with TWR as follows.

> In implementing the public publicity company method, TWR selected publicity Companies based on all of the businesses of Interests, was combined basis. . . . Montgomery selected publicity companies based on such business units. Interests because the three businesses have different concepts and peer groups." As a result, Montgomery selected only "Ocean Advertising" and "Online Content and Networking" to apply to MySpace. We agree with Montgomery's approach that uses favorable business segments and specifically MySpace has different growth and profit potential and therefore, different methods would be appropriate to apply to MySpace and the other Internet business segments. Within TWR's comparables, only the "Ocean" group is applicable.

(Id. at 29-31.) Accordingly, Dr. Kennedy selected the following six comparable companies: Harbinca, CNET, iVillage, Google, Yahoo, and Remote. (Id. at 32.) Then, based on "separate MySpace Financial performance information," Dr. Kennedy narrowed the field down to Google and Yahoo!, contending those were the only two companies whose concepts in prices and EBITDA growth matrices. (Id. at 33-35.) Dr. Kennedy calculated that MySpace "fell[] into the higher probability tier" of the six publicity companies and therefore he could discount its 2006 Spaces for MySpace and utilize an "average of the multiples suffered by Google and Yahoo." (Id. at 34-35.)

> There is nothing in the record to support the proposition that selecting comparable companies based on (1) serving products, (2) revenue metrics, and (3) EBITDA matrix multiples a comparable public company analysis methodologically unreliable. We will not exclude Dr. Kennedy simply because Defendant dislike Dr. Kennedy's conclusions that the only publicity companies isn't standing in the final analysis were Google and Yahoo!. "Even Defendants' cited evidence urges the selection of "as broad a base of comparable companies as is reasonably possible." (Saks / BSC Ex. 1, FNFX, et al., supra, at 23 (emphasis added).). Dr. Kennedy concludes that the remaining comparable companies are as broad a base of comparable companies as is reasonably possible. Defendants' disagreement exhibits conclusions in properly explored on cross-examination.

Accordingly, we *broke* **DENY** Defendants' Motion to Exclude Dr. Kennedy's testimony, or Dr. Kennedy's testimony is sufficient year basis (one if able, noises on damages from out of pocket losses; we also **DENY** Defendants' Motion for Summary Judgment on this issue.

## 3.  *"Lost Opportunity"* Damages

As a final alternative, Plaintiff seeks "lost opportunity" damages based on the allegedly impending Viacom bid. "When actual losses cannot be demonstrated," some recent courts have recognized "an alternate theory of establishing damages," the "lost opportunity" theory. Dataleaf Society, 334 F. Supp. 2d at 877 (internal quotation marks omitted). Lost opportunity damages represent "loss of a possible profit or benefit, defined only as anddition to the value of one's investment,

CIVIL MINUTES - GENERAL

Case No. CV 06-5712 (OP), 2004.)      Date   Jun 17, 2011

Title      Abdelaziz, Bob, Brown, et al.

Accordingly, we **GRANT** Defendants' Motion for Summary Judgment as to this theory of damages.[37] On this Section 10(a) claim, Plaintiff may **ONLY** proceed a claim on the theory of out-of-pocket losses based on a prevailing valuation of losses at the loss of the merger.

## IV. Count III: Violation of Section 20(a) of the Securities and Exchange Act of 1934

Section 20(a) of the 1934 Act provides that: "Every person who directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). Our Parties agree that there is no primary liability under Section 10(a), there can be no control person liability. (*See* fn. 47.) However, since we have denied summary judgment with respect to three of the bases for Count II, we likewise **DENY** the Motion for Summary Judgment with respect to Count III.

## V. Conclusion

Plaintiff's Motion for Summary Judgment is **DENIED**. Defendants' Motion for Summary Judgment is hereby **GRANTED in part and DENIED in part** as set forth in this Order. **Within thirty (30) days hereof**, counsel **SHALL** file a joint status report setting forth their views regarding further resolution in light of these rulings.

**IT IS SO ORDERED.**

Initials of Deputy Clerk ____        ____

---

[37] We had no occasion to consider and therefore express no opinion on whether the "lost opportunity" theory of damages premised on a potential Viacom bid would be viable with respect to the breach of fiduciary duty claim which is based on evidence beyond the alleged remedial utterances from the Proxy. The Parties have not addressed this issue in their Cross-Motions.

# Summary of key deal terms [TBD]



HIGHLY CONFIDENTIAL DOCUMENT ...

# Deal Update

**Economics**

- ☐ Enterprise value cost of $650M vs. previous estimate of $648M
- ☐ Total real cost: $790M vs. previous estimate – that present cost of $700M
- ☐ Has adjusted DCF Valuation $659M–$840M
- ☐ Using (market) earnings from 29%, valuation of $585M–$725M (current yr.) and $1.4–$1.6B (forward year)
  - ▸ Hydrate stone is being valued in $650M–Y5M using Management projected near forward year EBITDA of $20M

**Exchange Ratio/Valuation Plan**

- ☐ Solid goose ($60M real) critical to explore neither relationship with management and reduce their tax exposure as much as possible
  - ▸ Additional, bigger value pool for rent and its amounts as goodwill move down

**Legal**

- ☐ NM mocking between voting rights against vs. stock purchase agreement
  - ▸ Break-up fee of $25M
  - ▸ Financing of $55M stock as a secured debt

CONFIDENTIAL

Exhibit 709

E-B-CKZM  Document 1425-1  Filed 05/



# Potential Acquisition Comparison

REDACTED

FOX Entertainment Group

CONFIDENTIAL

EXHIBIT 46

=-BCM   Document 405-21   Filed 05/...

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, STATE OF
ARKANSAS, STATE OF CALIFORNIA,
STATE OF FLORIDA, STATE OF GEORGIA,
STATE OF INDIANA, COMMONWEALTH
OF KENTUCKY, STATE OF LOUISIANA,
STATE OF MICHIGAN, STATE OF
MISSISSIPPI, STATE OF MISSOURI, STATE
OF MONTANA, STATE OF SOUTH
CAROLINA, STATE OF TEXAS, and
STATE OF WISCONSIN,

        Plaintiffs,

v.

GOOGLE LLC,

        Defendant.

STATE OF COLORADO, STATE OF
NEBRASKA, STATE OF ARIZONA, STATE
OF IOWA, STATE OF NEW YORK, STATE
OF NORTH CAROLINA, STATE OF
TENNESSEE, STATE OF UTAH, STATE OF
ALASKA, STATE OF CONNECTICUT,
STATE FOR DELAWARE, DISTRICT OF
COLUMBIA, TERRITORY OF GUAM,
STATE OF HAWAII, STATE OF ILLINOIS,
STATE OF KANSAS, STATE OF MAINE,
STATE OF MARYLAND,
COMMONWEALTH OF MASSACHUSETTS,
STATE COMMONWEALTH, STATE OF
NEVADA, STATE OF NEW HAMPSHIRE,
STATE OF NEW JERSEY, STATE OF NEW
MEXICO, STATE OF NORTH DAKOTA,
STATE OF OHIO, STATE OF OKLAHOMA,
STATE OF OREGON, COMMONWEALTH
OF PENNSYLVANIA, COMMONWEALTH
OF PUERTO RICO, STATE OF RHODE
ISLAND, STATE OF SOUTH DAKOTA,
STATE OF VERMONT, COMMONWEALTH
OF VIRGINIA, STATE OF WASHINGTON,



Case No. 1:20-cv-03010-APM

HON. AMIT P. MEHTA

Case No. 1:20-cv-03715-APM

HON. AMIT P. MEHTA

**REQUEST FOR JUDICIAL NOTICE**

1

FEDERAL JUDICIAL NOTICE

Court take judicial notice of the following items in connection with Plaintiff Motion (#####):

Exhibit #1

1. Record Supplemental September 17, 2013 in Delaware Supreme Court, 1 Page

Exhibit #2

2. April 11, 2013 IN THE SUPREME COURT OF THE STATE OF DELAWARE

No. 182, 2013
A WRIT OF MANDAMUS
Before STEELE, Chief Justice, HOLLAND, and JACOBS, Justices.
ORDER - 3 pages

3. September 17, 2013 Delaware Supreme Court Order on No. 547, 2013

PETITION OF BRAD D. SHEPPARD FOR A WRIT OF CERTIORARI - 4 pages

4. April 2, 2013 Delaware Court Chancery grants Plaintiff's Motion Instead of Judge - 4 pages

5. WRIT Order See How District Court Order 1 page

Exhibit #3 documents

6. Plaintiff filed Notice of Appeal in San Jose Federal District case vs. Google 142 in May

2014 and the Circuit Court's Order dated JAN 17, 2017 U.S. COURT OF APPEALS - 14 (?#####)

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

BRAD GREENSPAN, Plaintiff-Appellant, v. FACENTRACTON.COM, a business

No. 16-17000 D.C. No. 5:16-cv-00337-RMW MEMORANDUM*

Appeal from the United States District Court for the Northern District of California

Ronald M. White, District Judge, Presiding Submitted August 9, 2017**

Before: SCHROEDER, TASHIMA, and M. SMITH, Circuit Judges.

FILED AUG 17 2017

MOLLY C DWYER, CLERK

E-BCKM  Document 1405-1   Filed 09/

"Thereupon' notice of appeal challenging its final five (or) lacking Commission' ("FCC") May 1, 2014 Order Governing Modifications vacated Claim, which was filed in the district court, should have been filed in this court. See 47 U.S.C. § 79(4)(b) (providing for certain determinations of modifications awards "may be appealed to the appropriate court of appeals of the United States not more than 60 days after the determination is issued by the Commission"). We construe Chevequen' notice of appeal as a petition for review. See Fed. R. App. P. 15(a)(1). In the interests of justice, we transfer Chevequen' petition for review to this court. See 28 U.S.C. § 1631; Kolek v. Engen, 869 F.2d 498, 1504 (9th Cir. 1989) (setting forth conditions for transfer order 1912(1) § 1631); see also Pana v. Sununu, 271 F.3d 1011, 1344 (9th Cir. 2001) ("[B]ecause for purpose of the transfer statute it is all litigants who were confused about the proper forum for review a petition that would be time-barred without a transfer satisfies the interest of justice test.") (citation and internal quotation marks omitted). The Clerk shall file Chevequen' notice of appeal (Docket # 1168, Docket Entry No. 1414) as a petition for review of the BFCI May 1, 2014 order and open a new case in this order."

-1 page

7. DEFENDANT GOOGLE INC.'S EXH.'S IN SUPPORT OF MOTION FOR AN ORDER DECLARING PLAINTIFF A VEXATIOUS LITIGANT AND FOR ATTORNEYS' FEES PURSUANT TO 35 U.S.C. § 997 (RageXXXX)

Docket in 14-cv-00437-RMW involving Defendant Thereupon 155+6 pages.

8. Filed by defendant Facel/Fac entitled to bring to default claims against by way of motion

1

**"DEFENDANT GOOGLE INC."**

**FED R. CIV. P. 7.1 AND LOCAL RULES-II**

**CERTIFICATE OF INTERESTED ENTITIES"**

**DATE FILED: OCTOBER 8, 2015**

1. "Alphabet Inc... Parent Company of Defendant 2. Google Inc., Defendant"

Dated: October 8, 2015"

WHEREAS Plaintiff represents that Google Inc. filed a Certificate of Conversion with the Delaware Secretary of State, in which Google Inc. converted from a corporation to a limited liability company and changed its name to Google LLC on September 30, 2017;

WHEREAS Plaintiff represents that Google LLC filed a Certificate of Formation with the Delaware Secretary of State, effective September 30, 2017;

WHEREAS the Parties agree that this Stipulation merely reflects the above-noted change of corporate name, and does not affect any substantive issue in this case;

NOW, THEREFORE, IT IS HEREBY STIPULATED by and between the Parties, through their respective counsel and subject to the Court's approval, that Google Inc. shall now be known as Google LLC in this action and the caption of the case shall be:

To listen at Google LLC in this action and the caption of the case shall so:

GOOGLE, LLC,

    Plaintiff,

v.

CREATIVE LABS, INC. and
CREATIVE TECHNOLOGY LTD.,

    Defendants.

Dated:   October 31, 2017

Respectfully submitted,

By:   /s/ Alan S. Yang
      Alan S. Yang

Attorneys for Plaintiff
Google LLC

By:   /s/ Jonathan D. Baker
      Jonathan D. Baker

Attorneys for Defendants
Creative Labs, Inc. and
Creative Technology Ltd.

10. Id. § 3.27 (see No. 3:18-cv-02585-JD)

JOINT STIPULATION AND [PROPOSED] ORDER TO REFLECT NAME CHANGE
FROM GOOGLE INC. TO GOOGLE LLC

11. Certificate FRCP 7.1 Filed in this case by Defendant Google LLC states" Alphabet, Inc.,
    Google, Inc. XXXX Technologies Inc., XXX Holding, Inc., Holding Company of Google
    LLC Hands LLC."

IV.   CONCLUSION

1

Evidence, and therefore, the Court may take judicial notice of these pursuant to Rule 201(b)(2)

of the Federal Rules of Evidence.

Respectfully Submitted,

/s/ Brad Greenspan                                    Dated: January 2, 2024

Brad Greenspan, pro se

244 5th Ave, #G200

New York, NY 10001

Email: bgreenspan1@tech-capt.com

6

EXHIBIT 21



Paul D. Grossgar

Plaintiff-Petitioner,
Appellant

THE ANNUCKLoOFENDANT
WRIT OV CERTIORARI
IC.T.A. No. 1947

v.

Twenty-First Century Fox, Inc. et al

Defendant-Below,
Appellee

RE URG (SUPPLEMENTAL)

1. September 11, 2014 FRCP Rule 45 Class No. 1:14-cv-01 1 cv-Defendant (s) Opposition "Declaration of Kurt A. Kappes in Support of Defendant (s) Normative Corp's Bill of Costs and Costs"

2. September 14, 2014 FRCP Rule 25 Federal District Judge finding Case No. 3:13-cv-04157 in favor of Plaintiff and against Defendants Twenty-First Century Fox, Inc., LLC Surrender, et al

3. August 14, 2013 FRCP Rule 25 No. 3:14-cv-04157 in Millennium (sought via) motion to complaint & "DEFENDANT MICROSTRATEGY CORP'S NOTICE IF JOINDER TO GOOGLE, INC.'S ADMINISTRATIVE MOTION TO CONSOLIDATE SHARED DATES"

4. August 21, 2013 FRCP Rule 21 1:14-cv-0482 "OF A Motion " ORDER DENYING DEFENDANT JOINT MOTION TO DISMISS" Denial of Defendants Twenty-First Century Fox, Inc., Teva Consolidated America, Hatch Biosimplex Law LLC, claim for relation of Business Act ) Clayton Act, Title 17US 1:14-cv-0482

5. February 18, 2013 9th Amended Class Action Case No. 7:14-cv-0467 in Defendants Twenty-First Century Fox, Inc. LLC Symantec, et al., one Google, Inc.

6. July 7, 2014 FRCP Rule 23 Case No. 3:13-cv-03490 Motion To Consolidate Plaintiff's claims under FRCP (C) against Defendants Twenty-First Century Fox, Inc. LLC Surrender, Oracle Heuristics Law LLC and Google, Inc.

7. March 22, 2013 FRCP Rule 37 Case No. 3:11-cv-02269 "ALL ACTION" ORDER DENYING DEFENDANTS' INDIVIDUAL MOTIONS FOR SUMMARY JUDGMENT by on Defendants Google, Inc., Twenty-Century Fox, Inc., LSC Industries, Inc, Apple Corporation, Intel Corporation, Adobe Corporation, violation of Sherman Act ), Clayton Act, Rule 17(B)

DATED: September 27, 2015

Respectfully submitted,

s/ Paul D. Grossgar
Paul D. Grossgar
3939 Woodside Rd
Suite 400 Woodside, CA 94062
Ph: 408-837-5614 ext. 490

EHBCKM Document 425-1 Filed 09/

Evidence, and therefore, the Court must take judicial notice of these pursuant Rule 201(c)(2).

of the Federal Rules of Evidence.

Respectfully Submitted,

_/s/ Brad Greenspan_          Dated: January 2, 2024

Brad Greenspan, pro se

244 5th ave, #1295

New York, NY 10001
Email: Equitypacel1.Litigro.Justiceorg

<div align="center">9</div>

EXHIBIT 22

IN THE SUPREME COURT OF THE STATE OF DELAWARE

IN THE MATTER OF THE )
PETITION OF BRAD D. )  No. 387, 2015
GREENSPAN FOR A WRIT OF )
MANDAMUS )

Submitted: March 23, 2015
Decided: April 13, 2015

Before STRINE, Chief Justice, HOLLAND, and VALIHURA, Justices.

ORDER

This 13th day of April 2015, upon consideration of the petition of Brad Greenspan for a writ of mandamus, it appears to the Court that:

(1) The petitioner, Brad Greenspan, seeks to invoke the original jurisdiction of this Court under Supreme Court Rule 43. He requests that the Court issue a writ of mandamus directing a Master of the Court of Chancery to: (i) grant his "Motion to Expedite Summary Judgment;" (ii) declare that he is immediately entitled to advancement of his legal fees; (iii) grant his "Motion Rule 3d(b) or Rule 23(b);" (iv) grant his "Motion for Partial Summary Judgment;" (v) order a hearing on his "Motion 30b;" (vi) order an independent accounting of legal fees paid by defendants to the Master's former employer; (vii) transfer his case to Vice Chancellor Laster; (viii) disqualify the law firm of Richards Layton & Finger from appearing

his row; (b) join certain people as contributors; and (c) set a new hearing date on his "Motion to Expedite Summary Judgment."

(2)   Defendant-below, News Corporation and Intermix Media LLC, as well as defendants, Sony Entertainment, Inc., Sony Music Holdings, Inc., and 350 Digital Media Ventures, Inc., have filed motions seeking to dismiss Greenspan's writ of mandamus. After careful consideration of the parties' respective positions, we find that Greenspan's petition manifestly fails to invoke this Court's original jurisdiction to issue an extraordinary writ. Accordingly, his petition must be dismissed.

(3)   A writ of mandamus is designed to compel a lower court to perform a duty if it is shown that:  the complainant has a clear right to the performance of the duty; that no other adequate remedy is available; and that the trial court has arbitrarily failed or refused to perform its duty.[1]  A writ of mandamus will not be issued "to compel a trial court to perform a particular judicial function, to decide a matter in a particular way, or to dictate the control of its docket."[2]  A writ of mandamus is not warranted under the present circumstances because the pending motions before are within the discretion of the Master in Chancery.[3]  This Court will not compel the Court

---

[1] In re Bordley, 969 A.2d 619, 619 (Del. 1991).

[2] Id.

[3] Id.

of Chancery to rule in Grandpa's favor in the arbitrative mini-trial.

These are matters Grandpa may raise in any appeal from a final order issued by the Court of Chancery in the proceedings below.

NOW, THEREFORE, IT IS ORDERED that the petition for the issuance of an extraordinary writ of mandamus is DISMISSED.

BY THE COURT:

/s/ Leo E. Strine, Jr.
Chief Justice

3

[illegible]

The page is too faded and low-resolution to reliably extract its content.

## I. PRELIMINARY STATEMENT & SYNOPSIS

1. Plaintiff Brad D. Greenspan ("Plaintiff"), a former Director an Officer of eUniverse, Inc. a Delaware Corporation, hereby files this complaint. Plaintiff is entitled to a private cause of action for damages suffered as a result of Defendant acts, omissions, damages, violations, and other losses, caused by the very wrong 1400(j)(i) conspiracy among Defendants. Petitioner also has contractual rights for Indemnification and Advancement.

## II. PARTIES

PLAINTIFF

2. Brad Greenspan, former Director, Officer, Shareholder of eUniverse, Inc

DEFENDANTS

3. News Corporation, a Delaware Corporation

4. 21st Century Fox Corporation, a Delaware Corporation

5. News Aviation Corporation, Delaware corporation

6. Sony Corporation, incorporated in Japan (herein Sony Corporation and its subsidiaries listed below will be referred to as "Sony"):

    7.   Sony Corporation America, a Delaware corporation

    8.   Sony Music Entertainment Inc., a Delaware Corporation

    9.   550 Digital Media Ventures, Inc. ("550 DMV"), a Delaware Corporation

    10.   Sony Broadband Entertainment, Inc., a Delaware corporation

Corporation (News Corp acquired in 2005)

12.    Myspace, Inc., a Delaware Corporation (News Corp acquired in 2005)

13.    WSKD Law LLC, a California LLC

14.    VantagePoint Venture Partners, a California LLC

15.    Orrick Herrington Law LLC, a California LLC

16.    EMI Music, a Delaware Corporation

17.    Warner Music Group, a Delaware Corporation

18.    Ask.com Inc., a Delaware corporation (IAC Corp acquired in 2005)

19.    IAC Corporation, a Delaware corporation

20.    JP Morgan Chase, a Delaware corporation

21.    RedPoint Partners, a California LLC

22.    Washington Post Corporation, a Delaware Corporation

23.    Arent Fox Law, a Delaware LLC

## III.    JURISDICTION AND VENUE

24.    The jurisdiction of this Court is conferred and invoked pursuant to statutory, tbd., and in bylaw, News Corporation being Delaware Incorporated

## IV.    FACT HISTORY

### The 1960 & 1985 Claims

25.    1985 & 1960 according to Delaware states §1781 have a preponde

3

"is guard against and prevent the utilization and illegal acquisition of legitimate ...

"to apply to conduct beyond what is traditionally regarded as "organized crime" or "racketeering."

26. **Enterprise under § 1961 is defined:**

"(1) "Enterprise" shall include any individual, sole proprietorship, partnership, corporation, trade or other legal entity, and any union, association or group of persons associated in fact, although not a legal entity. The word "enterprise" shall include illicit as well as licit enterprises, and governmental as well as other entities."

27. Members of the "Scramble/Face/Racking" ("SOU") Enterprise are an association in fact Enterprise that are known as of the date of filing this complaint to include: LVC, Jak Jervis, News Corporation, Divide Herrington, Vanangellene Palmes, RedPoint Partners, JPMorgan, Washington Post Corporation, SORD Law LLC, Sony Corporation, Sony Music Entertainment, Arent Fox, EMI, Warner Brothers Music, MySpace Inc., Intermix Inc., Sony Corporation America, 350 OMV, Sony Broadband Entertainment Inc., as well as certain of their Officers, Directors, and employees ("Enterprise").

28. This Enterprise possessed and continues to possess a common purpose and goal, a membership, organizational structure, and ongoing relationships with each other to engage in joint and unitle pursuit of the Enterprise's purpose and long-term objective through a continuous course of conduct that affected and continues to affect interstate and foreign commerce. Most or all of the members of this Enterprise are also Principals, defined under Delaware status.

29.    The MHI Enterprise, members, and/or Principals engaged, attempted to

engage in, or conspired to engage in or to solicit, coerce or intimidate other person

to engage in Racketeering violations which under Delaware state law is defined as:

"18. "Racketeering" shall mean to engage in, to attempt to engage in, to conspire to
engage in or to solicit, coerce or intimidate another person to engage in:

a.   Any activity defined as "racketeering activity" under 18 U.S.C. § 1961(1)(A),
(1)(B), (1)(C) or (1)(D); or

b.   Any activity constituting any felony which is chargeable under the Delaware
Code or any activity constituting a misdemeanor under the following provisions of
the Delaware Code:

Chapter 73 of Title 6 relating to the sale of securities, Chapter 5 of Title 11 & Title
# relating to bogus and counterfeiting; Chapter 5 of Title 11 relating to perjury,
Chapter 5 of Title 11 and Title 23 relating to bribery and misuse of public office
and improper influence; Chapter 5 of Title 11 relating to tampering with jurors,
evidence and witnesses."

30.    MHI Enterprise, members, and Principal's that make up the MHI

Enterprise initiated a Pattern of racketeering activity between 2001thru 2013,

defined as:

"(7) "Pattern of racketeering activity" shall mean 3 or more incidents of conduct:

   a.   That

   1.   Constitute racketeering activity;

   2.   Are related to the affairs of the enterprise;

   3.   Are not so closely related to each other and connected in point of time and
place that they constitute a single event; and

   b.   Where:

      1.   At least 1 of the incidents of conduct occurred after July 9,   1985.

184

2. The last incident of conduct occurred within 10 years after a prior ...

... in no relevant change, had act as to ... of proceedings, at over 1 in the incidents of conduct constituted a felony under the Delaware Criminal Code, or if committed subject to the jurisdiction of the United States or any state of the United States, would constitute a felony under the Delaware Criminal Code if committed in the State."

31. "SBE Enterprise "racketeering activity" includes: 18 U.S.C. § 1341 (relating to mail fraud), 18 U.S.C. § 1512 (relating to tampering with a witness, victim, or an informant) 18 U.S.C. § 1513 (relating to retaliating against a witness, victim, or an informant) and 18 U.S.C. § 1519 (relating to destruction, alteration, or falsification of records in Federal investigation and bankruptcy).

32. The pattern of racketeering activity is based on the following facts:

33. Principals and members of the SBE enterprise desired and wanted to fraudulently take control of a publicly traded company that was the #1 fastest growing Top 10 Property in the world as of October 2005.

34. Defendants launch series of schemes and fraud to take control of publicly traded MySpace and its parent corporation of Intermix (later renamed Intermix) and went through CEO Brad Greenspan.

35. Defendants also initiate schemes to defraud and harass Petitioner, and additionally obstruct justice.

36. Not satisfied with their existing economic gains, defendants, unhurried on an over-growing series of schemes and schemes to loot the public company.

37. Petitioner on January 31, 2004 published press release titled,

"Substantial Conflicts of Interest with Respect to VeriSign Nasdaq:VRSN And Ask Jeeves NASDAQ: ASK."

a

Holding:

ii. "certain of referenced incumbent Directors have substantial conflicts of interest that could threaten the Company's success in the past search industry."

iii. "Daniel Mattes has conflicts of interest arising from his stable management role at Verisign, Inc. (NASDAQ: VRSN) which introduced the "stalwire" indirect service in direct competition with referenced's PerfectRec application."

iv. "David Carlick has a conflict of interest arising from his membership on the Board of Widescreen (Nasdaq: WSM) which is a pure play in the paid search space."

v."Carlick has the ability to influence management decisions which may adversely affect statements Paid Search shows."

## DEPENDANTS ENTRENCHMENT SCHEME SHIFTS CONTROL

38.   Petitioner incorporates by reference Exhibit #5 which includes:

i.   January 2, 2014 letter to Chancellor Strine

ii.   NOTICE: MOTION IN CONTEMPT

iii.   MOTION FOR CONTEMPT TtQ() 42(i) AND/OR 16(f)(1)

II.   DECLARATION IN SUPPORT OF MOTION TRk() 0,2() CONTEMPT

iv.   JUDGMENT ENTRY SETTING HEARING

(Note: All above assigned documents were signed and submitted by counsel January 2, 2014 on Brenda at intake with copy of December 2013 proof of service to Defendant.)

## DEFENDANTS PASS ON FRAUDULENTLY CONCEALED IDELL DISCLOSURE VIOLATION TO ACQUIRE NEWS CORPORATION

44.   July 17, 2003 News Corporation Corporate counsel Lang emailed at 9:13AM to Defendant of its same Director Skadden and team, by Interstate wire or interstate carrier an email forthwith the fraudulent concealment scheme to Eldridge and

fraudulently removed unlawful acts including contempt of Court in *inactive* News ... strictly fraud class action. "Subject: Purchase Agreement", stating:

> "Do the issues, left close on the remaining ones. It's a fair and reasonable way—so we can hold our relationship." And

> "5. We feel like we have given indemnification on the shares and the purchase agreement itself to do so as any issue we have had in involvement in whatever it is (i.e. Greenspan)—that stems for no coach. Andy, I know we are very eager to get this done. Let do it in both sides case had good and move forward on our longer-term relationship."

Lang's communication is in violation of 18 U.S.C. § 1341, 18 U.S.C. § 043, and 18 U.S.C. § 1519 (relating to destruction, alteration, or falsification of records in Federal investigation and bankruptcy).

## 183 HITECH FEDERAL CLASS ACTION EVIDENCE

44. Evidence disclosed for the first time May 2013 in the Hitech Class Action Case 2:1102509, specifically the center 59v3, page 37 and 38, proves Google had confiscated illegal agreements in place with Adchemy, AOL, Intel, Intuit, IAC Corp. and Apple as of March 6, 2009 certified violating Federal antitrust statute. The companies fraudulently concealed the agreements and failed to disclose them in their annual 10K SEC or Proxy filings, violating security law and Director fiduciary duties.

45. The evidence confirms Petitioner and shareholders were victims in 2005 of an 16k tipping conspiracy led by Google and caused in coordination with Adchemy's Director who used their positions on the Boards of both MySpace, Inc. and Parents Universe to mislead the other Directors and shareholders while

8

42. This conspiracy revealed 1) blocking prior sale of MySpace stock with fraudulent agreement in November 2004 2) agreement allowing AdvInvest Director Jeff Yang to purchase 50% of MySpace, Inc. in February 2005. A below-the-market value using his RedPoint fund where he is managing Director.

a. September 17, 2004 Vantagepoint internal report proves SBM Enterprise, Carlick, and AdvInvest manipulated Intrusity Directors to forgo using less dilutive debt financing available, instead facilitating investment equity sale to Yang and RedPoint Partners.

> "Myspace will require approximately $1.5 -2 million in the next 3 months for storage arrays, database servers, salaries and leases."

And

> "The company is in discussions with Silicon Valley Bank regarding a 5bn line of credit, which is likely to be approved."

b. October 1, 2004, 3:43PM Rosenblatt contacts Sheehan asking interstate wire or interstate carrier to send and deliver the email:

> "Just had a tough talk with Chris Dewolf. His lawyer is definitely giving him someone about our offer. Heart acts about us letting the boft, rates if we sell, etc. He really thinks he is worth more independently. ..I am told him that is not going to happen."

are disclosed order of events described in the November 2004 10Q is fabricated and this email is in violation of both 18 U.S.C. § 1341 & 18 U.S.C. § 1343, and is a Key component to produce an lie fraudulently concealing the false facts in the November of swamp 2004 10Q filing witness to voting backdated MySpace stock purchase approval by defendants.

c. October 7, 2004 3:43PM Sheehan contacts Rosenblatt & Carlick by interstate wire or interstate carrier using an email in violation of 18 U.S.C. § 1341 & let § 1343

E-BCM Document 1421 Filed 05/...

...fabricated and backdated with Subject "My thoughts of the day".

My current thoughts on the MS situation:

* We need to get in place the revised agreement before any meaningful negotiation with any other third party.

* I believe I understand Chris' concerns about being locked into an illiquid subsidiary, but that is their choice — they could have MS stock if they want Equality.

* They are minority shareholders and need to accept this fact.

* We, InterMa, need the right to be able to sell all of MS, including founders shares.

* We, InterMa, need the right to buy out the founders at a price or a formula.

On Redpoint:
* Why not continue talking to them, it is too hard to figure out if they could present the most attractive deal or not at this time"

6.   November 1, 2004 11:43PM Carlick emails Bledsoe, by internet wire or interstate carrier or email  in violation 18 U.S.C. § 1341 &/or § 1343 furthering the fraudulent concealment scheme to fabricate and fraudulently conceal the MySpace Stock purchase documents published in the November 2004 10Q were fabricated and backdated Subject "My talk with Tony" stating:

"Redsun, Spoke with Geoff, who holds you in the highest regard, I am not in the loop on that offer, which he describes as 21% Redpoint, 25% Founders and pool and 12% interests.

His case for the offer was interesting and compelling, as Intermix could still "fold in" the earnings, traffic, etc. I want to discuss with you my thoughts on the subject tomorrow, God knows when, as we

have no friends I can count on. In any case, I suggested that Geoff

c. November 7, 2004 11:35AM Sheehan contacts Carlick and states, by
interstate wire or interstate carrier an email in violation 18 U.S.C. § 1343 & / or § 1348
furthering the fraudulent concealment scheme to fabricate and fraudulently unsand the
MySpace Stock purchase documents published in the November 2004 10Q were
fabricated and backdated.

> "what it comes down to is do we sell no now or keep it. Doing a
> deal where we keeps 52% doesn't make any sense for anyone
> except Tony. At the banks and investors think we would be foolish
> to sell some or all of no now. We will get much less benefit to me
> if we own 52% and have give all sorts of rights to an investor.
> Richard wants to keep it in site."

f. November 18, 2004, 3:34PM Orick's Richard Horvath contacted Sheehan,
Roldanick & AnJoovne' Director Yong and RedPoint's Dawly, by interstate wire or
interstate carrier an email in violation 18 U.S.C. § 1341 &/or § 1343 furthering the
fraudulent concealment scheme to fabricate and fraudulently conceal the MySpace Stock
purchase documents published in the November 2004 10Q were fabricated and
backdated.

> Subject: 'MySpace Term Sheet' and states,
>
> "Gentlemen: As a follow up to our conversation today, attached is a
> clean and redlined markup of the last version of the term sheet that was
> give to us in connection with the Myspace transaction. Let us discuss the
> issues at your convenience. Richard Horvath <<MySpace Sale of Series
> A Preferred Stock.doc>>"

g. November by interstate wire or interstate carrier sent email in violation 18
U.S.C. § 1341 &/or § 1343 to further the fraudulent concealment scheme forwards an
incoming Horvath email to Chris Lipp and from Hanie at 4:20PM to fabricate and
fraudulently conceal the MySpace Stock purchase documents published in the November
2004 10Q; to hide the fact the documents were fabricated and backdated.

The email states: "I have not seen yet"

11

Rosenblatt positions to not know the terms that the company has already agreed to sell a [...illegible...] on Ask [...], Tong and his fund company he is optimized in, Reitjord.

b. November 18, 2004 CFO Fisher emails Rosenblatt, Subject: "RE: MySpace Term Sheet" and states:

> "This situation really goes beyond anything I want to be a part of. I communicated my feelings in writing twice now about the lawyer for a large preferred stockholder and one director negotiating a major business transaction on behalf of the company without authorization of our board and all I received was an admonishment from Harriott about my email and told to shut up in a conference call."

> "Since you have not seen this yet and I have certainly not, this makes a broader statement about our 'Senior Management.' "As an officer I would be derelict in my duties to our company to allow this to continue outside of the view of the Board without doing something about it."

Plable uses interstate wire to interstate carrier in violation 18 U.S.C. § 1341 &/or § 1343 to deliver email to further the fraudulent concealment scheme to fabricate and fraudulently conceal the MySpace Stock purchase documents published in the November 2004 10Q, to hide the fact the documents were fabricated and backdated.

c. November 18, 7:38PM Rosenblatt emails Fisher Subject "Re:Myspace Term Sheet", stating:

> "Sam, I know how this could look but it is NOT at-al how it may appear."

and

> "Andy NEVER looked at it as a vintage shareholder, but as a Board member looking out for interests as a whole."

and

> "I believed (and was right) that he was better positioned than I was to extract terms that would be acceptable to the Board at large. Over the past week he was, to my surprise, able to get the

larne as all think are BETTER for the company and make the

"In Hedsight, I should have asked Tim to give those same terms to
Chris and no sharil. Aaro and the same chart to Redpoint. I plan
on clarifying with Redpoint tomorrow that Andy was simply helping us
get a deal done and the Company will take it from here."

Resmblot was insaness who or blooming earrier to violation 18 U.S.C. § 1341 does § 1343 to define email to further the fraudulent concealment scheme to fabricate and fraudulently conceal the MySpace Stock purchase documents published in the November 2004 10Q, to hide the fact the recoveries were fabricated and backdated.

j. November 18, 2004 at 7:31 PM, Sheehan forwards the email thread and CFO's effective "whistleblower notification" to Oriti's Hartsch who is directly involved in the fraudulent concealment scheme to fabricate and fraudulently conceal the MySpace Stock purchase documents published in the November 2004 10Q, to hide the fact the disclosure were fabricated and backdated, to conceal scheme to sell 25% of Myspace.com in conflicted interholding, Sheehan violating Chyron Act fibers Andrews Director, Geoff Yang in violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and violation of 1851 U.C. § 1519 (relating to destruction, alteration, or falsification of records in Federal investigation and bankruptcy).

(d) agreement of having Google, Time Warner AOL, News Corporation, Askjeeves, INC. and other defendants to collude to gain economic benefits, by delaying closing of a competitive PTNY MySpace search engine auction for a new commercial search engine agreement in the months leading up to News Corporation acquiring 100% of uktronic in September 2005. This arrangement entered Google's $4.4 Billion dollar August 2005 accretion by tying up the fast growing

-ii-

online audience of MySpace, significantly growing its share of online ...

As arrangement allowing News Corporation to purchase MySpace.com at below fair market value, growing in market valuation and generating billions in incremental profits and a massive online audience to seed new online assets for years to come, while preventing a nonprofit or auction with more rival Viacom.

k.      MySpace and Universe's failure in class 5th MySpace Universe was key part of scheme to rig bidding in Search Auction and sale of Universe. Failure to disclose Intermix's majority owned MySpace, Inc. was in breach of this covenant in the August 2005 Proxy was a 14A violation. Defendants breach and non disclosure of such breach are used to effect the Antitrust bid rigging scheme. Defendants violated 18 U.S.C. §§ 1341 thru publishing, distributing, and mailing the August 2005 Proxy omitting the disclosure of such breach.

l.      continues's failure to cure breach of Merger Agreement. Business 6.3 & 6.3.K 6.3. was a key part of scheme to rig bidding in Search Auction and sale of Universe. Failure to disclose the breach in the August 2005 Proxy was a 14A violation. Defendants breach and non disclosure of such breach are used to effect the Antitrust bid rigging scheme. Defendants violated 18 U.S.C. §§ 1341 thru publishing, distributing and mailing the August 2005 Proxy omitting the disclosure of such breach.

m.      of Universe and CEO Rosenblatt by oral of Exec has earmarked $25-30 million to remove the restrictions are not owed or entitled to which helps float his own ...

"This chef would need to be a network for everybody. I liked we could motivate and energize the Myspace team. I've took $21-40mm and put in escrow for 12-24 months. They would receive that money if they continued to build Myspace and remained at the Company. Right now, they own 20% and would receive about $330M when the preferred, Fox Budgeted. I've exercised our option. If they could sell the $270mm they would receive $85mm. While that level Myspace is worth far more than $330mm, the escrow would clearly be enough incentive to keep them very motivated and want to stay on board."

of interests and Rosenblatt first use of each email, violate 18 U.S.C. § 1341 & /or § 1343, and 18 U.S.C. § 1519 (relating to destruction, alteration, or falsification of records in a Federal investigation and bankruptcy). Scheme is designed to bribe corupt members of management to support the below fair market sale of MySpace to News Corporation while not disclosing such additional payments to the Proxy as required by Federal law.

ix.    On July 16, 2005 at 8:55PM, el Investee's Rosenblatt uses interstate wire to email News Corporation executive Levinsohn in violation 18 U.S.C. § 1341 &/or § 1343 to further the Raadikus scheme to sell el investees and Myspace below fair market value. The email indicates Rosenblatt is aware the $12.00 per share price he negotiated with News Corporation days earlier is below fair market value and is aware of the correct valuation level for intemet stocks including the future value Google will use to value AOL in the months ahead.

"Subject of the press piece, You will  be famous... now 268"

BROWN v. BREWER FEDERAL SECURITY FRAUD CLASS ACTION

22.    Petitioner was originally part of a Federal Class Action filed in

Federal Court in a securities class action, titled *Brewer v. Horton*. However, a series of sweepings and struck a deal with Class Counsel to remove key evidence and claims in hiding, running a scheme to Barnaby obstruct justice by eliminating petitioner before he could submit evidence into the Federal court in 2009 which would have led to adding claims.

43. June 17, 2010 Federal Judge King Summary Judgment stated:

"Though Brewer's failure to recall what everyone had specifically asked back in 2005 would be understandable, a reasonable jury might draw a negative inference from his representation that he could not recall any discussion as to the investment banks' analyses.

Construing all of the above testimony in the light most favorable to Plaintiffs, as we must on Defendants' motion for summary judgment, we conclude that it is at least triable as to whether the remaining six board members consciously disregarded their duties and acted in bad faith. There is evidence in the record suggesting that no one on the board asked any questions about the requested per share price, the treatment of the competing bidders, the fairness situations, or the relative likelihood of a Viacom bid.

A reasonable jury could infer that this evidence demonstrates the other six directors consciously abdicated their roles as corporate fiduciaries required by law to do their utmost to maximize shareholder wealth.

"Nevertheless, we think a reasonable jury could find that the other six directors exceeded the bounds of negligence conduct, willfully proceeded to their decisions knowing they lacked material information, Disen?, 906 A.2d at 1163, and thereby intentionally disregarded their fiduciary duties. Disney, 906 A.2d at 68"

"2. Self-Interested Transaction

In the alternative, Defendants move for summary judgment on the second theory supporting the breach of fiduciary duty claim, arguing that five of the eight Defendants (a majority) were had self interested or controlled by someone who was. "

18

"Plaintiff argues that Rosenblatt deliberately misled the other board members... that Viacom would buy News Corp.'s offer. (Joint Br. 26-27).

"That evidence is sufficient to raise an inference that Rosenblatt's presentation to the board may have been misleading as to Viacom's estimates.

According to Shusker's description of the board meetings, "from the management team estimation standpoint [sic], they were not inclined to make an offer for the company on the timeline that we were looking at." (Id. at 250-251).

[*] There are at least triable issues of fact as to whether Shusker was manipulated by a self-interested director, Rosenblatt. Moreover, based on Shusker's description of the content of Rosenblatt's presentations to the board, the issue of manipulation is triable with respect to all of the other board members.

Accordingly, as a reasonable jury could potentially conclude that a majority of the directors was interested or manipulated by someone who was, we hereby DENY Defendants' Motion for Summary Judgment on this second basis for Plaintiff's claim of breach of the duty of loyalty.

A. Alleged Material Omissions

"current revenue and profits" omissions, which was so clearly identified in the PSAC (if not so clearly in the investigation responses). Accordingly, as this argument was not waived, and Defendants have not made any threshold showing entitling them to summary judgment on this basis, we DENY the Motion for Summary Judgment as to this alleged material omission under Count I.

Here, we conclude that there is at least a triable issue as to the materiality of the omission of Viacom's internal financial projections. Accordingly, Defendants' Motion for Summary Judgment is DENIED as to this alleged material omission.

Outstanding Derivative Lawsuits

Plaintiff also argues that Defendants failed to disclose two pending

derivative lawsuit, LeBrun v. Greenspan, et al., No. CV 03-3603-... ... and the fact however that the ... ... two derivative lawsuits pending at the time the Proxy was issued.

Defendants concede that they did not disclose the existence of the pending LeBrun action. (Joint Br. §6 cc7)

With respect to the disclosed Greenspan v. Schwartz action, Defendants argue they had no obligation to further announce the extinguishment of derivative standing.

Here too, the disclosure above is arguably misleading as well, as it did not affirmatively disclose that the Greenspan v. Schwartz plaintiffs' derivative standing would be extinguished under Delaware law, LL.s., §c. 4, at 332). Instead, it only stated that Fox Interactive Media would seek the dismissal of the action and would do so only if it was not required to pay the plaintiffs or their counsel. (Id.) Accordingly, it is at least triable whether the above language was misleading as to the extinguishment of derivative standing, which was material information.

Accordingly, we also hereby DENY Defendants' Motion for Summary Judgment as to this alleged material omission.

43. Edel & Defendants' ... 2009 launch another prong of fraudulent concealment, includes (i) publication of a book by employee told to News Corp to titlesize the background of Jeff Edel, a former Director (11) citing false and Edel charges to conceal fact that MySpace must take document more not executed until 2004. These schemes create a fraud upon the court ... petitions and Chan ... from getting himself of his judicial process.

43. Defendant's leverage their relationship with reporter to create defamatory and fabricated lies then acquire News Corporation employee Angwin's published in her 2009 book, "Stealing MySpace," which fraudulently conceals the ... background of former Director and Chairman Jeff Todd and his scheme with

98

46.   This creates further crippling defamatory damages to Plaintiff and Shareholders because Class Counsel accepts and uses false Ideal facts in lieu instead of Plaintiff's facts offered in Class Counsel & 2012 Federal Class Action in Los Angeles United District. Ideal's false facts allow the fraudulent conveyance Of approximately 50% of Myspace.com, the crown jewel of eUniverse, Inc. in 2004. Further, Ideal's false facts which become Accurate Never Corporation false facts, obstruct Plaintiff's true facts thus steering the record for the benefit of the Federal Court knowing the true damages and claims rightfully owed to shareholders. Plaintiff and shareholders will continue to suffer until the definitive disclosure is cured by Defendants. CBII Declaration, pg. 24-27, paragraphs (14-111).

47.   Additional act of fraudulent concealment is part of scheme by defendants and in 2009 Angwin published book that uses fabricated documents to support artificial concoctions, altering, destroying, profiting, or concealing a document with the intent to obstruct justice in violation of 18 U.S.C. § 1512(c)(1).

48.   Petitioner a fact witness with testimony that was adverse to Defendants  was excluded and obstructed from entering evidence how the Brown Brewer case, immediately before Defendants plugged in Angwin's false facts and testimony while using "Stealing MySpace" as an instrumental source of facts to corrupt the Chao's case And damages/court reports.

49.   News Corporation destroyed  Petitioner testimony from "opposing" tilted damages Petitioner and violates Section 1512(f) which criminalizes the actions of

19

"...forever intentionally focuses another person and thereby hinders, delays, prevents.

30. Angesto fraudulently conceals evidence of Edell's true work experience and took ground and his violation of SEC rules in 2003 and 2004. Defendants concert their knowledge of this scheme thru the March 19, 2012 Approval of the Federal Bower Bower settlement the Petitioner and 4 other Class members attempted to object in to a terveen to remove RGRD and his Attorney from representing the Federal Class and agreeing to An Inadequate consideration for the settlement and failure to seek most valuable claims and citations into the Court prior to approving settlement.

31. Angesto, Minors, Sorro Corporation, Hagen Lovell, RGRD, and of Interest Defendants violate 15 U.S.C. § 15(76)(1) and 18 U.S.C. § 1519 by hiding evidence of Edell's two resignations on his list that were really his last two jobs instead of submitting an accurate bio, defendants stretched the job of Edell that was actually 2 jobs prior, and bierraned this 3rd job by another 2 years in the year 2002 (from 2008). Edell both omits to accomplish his end goal of making detection and disclosure of his true bank record and financial history as difficult as possible.

   i. Angesto, News Corporation, Hutton, Murdoch, RGRD, if Interest and David Cannoni the time re-read RIO of Edell filed in July 2008 SEC filings.

      "Mr. Edell was the Chief Executive Officer of Alervutus Entertainment Group, Inc., a Delaware corporation that have changed its name to Media Technology Source of Delaware, Inc. Within two years of the time that Mr. Edell resigned from that company, it filed a petition for relief under the United States Bankruptcy Code."

32. Defendant's scheme entailed Creating a Bollront Glowing work experience

28

called "Stealing MySpace" was sent in US Mail to bookstores, across the United States beginning in March 2009, and overseen with the fabricated false facts related to Edell's tort work Experience and his SEC violations in 2003, 2004, 2005 in violation of Rule 401, Past violated section 18 U.S.C. § 1341.

93. After the Class was summary judgment in June 2010, petitioner in 2011 tried to bring new evidence to the attention of Class Counsel indicating the true damages were related to the value of MySpace's search value, the clients and facts which had never been put before the Federal Court. Petitioner's Rule 701 damage report providing for damages of over $96 billion dollars was ignored by Class Counsel who learned joined with defendants in a brazen scheme to (1) mislead and achieve a fraud upon the Court by changing the definition of the certified class to eliminate upwards of 68% of the eligible shares and shareholders and (2) enter into a sham settlement for pennies on the dollar which was accepted by the Federal Court in March 2012.

94. In September 2010, by RSSI, Barrett, Hogan Lovell, Stone, News Corporation, Delish and other Defendants files Joint Motion to bar tort witness and Petitioner from the Federal Class to delay and harass Petitioner from appearing before Federal Judge. Defendants knew my motion to bar the petitioner could not be true unless district could continue to suppress new evidence and discovery from assuring the Federal Brown V. Brown ongoing tort.

200

with MySpace Parent Company executive Chris Dewolfe, Orrick and DeWolfe acted together in 2004 and 2005 to document a fabricated sale of a copy of MySpace at each bottom prices for DeWolfe.

56.   In 2010, News and News Corporation and Hogan & Lovell, and News, and BGRD and Orrick violated 18 U.S.C. § 1341 (relating to mail fraud) by sending notice of the Joint Motion to Brief the "Motion to Non Brad Greenspan" for purported "res judicata" they intended to file in Federal Court via email to Petitioner's then lawyer Mr. Lawrence.

i.   Above Defendants violated further 18 U.S.C. § 1512 (relating to tampering with a witness, victim, or an informant) 18 U.S.C. § 1513 (relating to retaliating against a witness, victim, or an informant) and 18 U.S.C. § 1519 (relating to destruction, alteration, or falsification of records in Federal investigations and bankruptcy) by omitting and destroying the evidence they possessed at the time the above actions were taken that would have provided new facts and information and claims not raised or in State proceeding and that would have the effect of voiding the defendant's motion.

ii.   News, News, Wachtov&tor violated their fiduciary duty to Petitioner as well as aiding and abetting above violations of other Defendants.

iii.   News & BGRD hid and fabricated briefings, pleadings, and affidavits in 2011 and 2012 to fraudulently conceal the prior criminal action in Federal Court.

57.   In December 2010, BGRD was again delayed by changing the Class

i.    6/8/09 - Judge King approved "Certified Class" with definition.

Most clear to portion of RGRD Law at the time:

> "Plaintiff responds herein to both questions raised by the Court in its Order on Plaintiff's Motion for Class Certification: (1) **should the class definition be modified to include only holders of Interstate Media, Inc. common stock who held continuously from July 18, 2009** (the date the merger with News Corporation was announced) through the consummation of the merger on September 30, 2011; and (2) **should the plaintiffs in the state court actions be carved out of the class definition?** As set forth below, the answer is both questions is yes."

ii.   11/23/10 - Certified Class is veiw of definitional changes by RGRD Law, removing stockholder, word "continuously". This cuts approximately 40% of used shares that were eligible under "Certified Class" definition.

iii.  December 2011 - RGRD challenged by Shareholders objecting to Settlement denied the Class Certifcate had been switched.

10.   Sony Music Corp and Seligman using its central position on the Board of the RIAA and its relationship with EMI and Warner Music Group, induced Anti-Trust Safely tax officials and the fact contained which were used to conceal the fact that EMI and Petitioner's startup LiveUniverse, Inc. had entered into a music tool split license prior to Warner Music, EMI, RIAA, Sony Music, and PeerMusic King's federal

---

**Footnote**

A major shareholder of original Certified Class defined in 2005 Treblik & Co., a multi-billion dollar N.Y. hedge fund which makes a plea, referred by Neal Greenspan, another injured shareholder was fact subject. Deal was one of named plaintiffs in State Class action which was dismissed in 2006. Similar to Cox/tax claims RGRD switched its position mid-trial, showing Defendants to file amended Motion in Bar state ever plaintiffs as defended, default judgment carved out Deal's 2,000,000 shares. Deal was the largest single shareholder, owning their 15% common stock & 10% preferred.

as agreed to in 2009.

93. It was part of the Defendants' scheme to conspire to interfere with Plaintiff's livelihood by filing a lawsuit against Plaintiff in 2009 in retaliation for providing truthful information to the SEC, DOJ, and FTC relating to the Defendants' scheme, in violation of 18 U.S.C. § 1513(e) and (f).

94. It was part of the Defendants' scheme to interfere with Plaintiff's livelihood by disseminating defamatory statements about Plaintiff to the public through various media outlets in retaliation for providing truthful information to the SEC, DOJ, FTC, and Federal and State court relating to the RICO Defendants' scheme, in violation of 18 U.S.C. § 1513(e) and 1513(f).

NEWS CORPORATION: CRIMINAL HACKING & BRIBERY

91. In 2012, News Corporation, who indemnified director information in Bennet v. Bennet and was operating the case's U.S. legal strategy, was exposed as a criminal enterprise that had hacked the phones of over 1000 UK citizens and employed a massive campaign of bribing police and public officials.

92. News Corporation's general counsel resigned in 2011 and its CEO appearing under oath at the Leveson Inquiry admitted he was the victim of a "coverup" and all of related acts required had gone on without his knowledge.

93. News Corporation conceded its internal controls were defective as a result of the exposure of years of bribes its UK subsidiaries had paid out and bribes by testifying to financials.

94. At the recent time, the FBI's most wanted fraudsters and top

employees are an critical trial for obstruction of justice, bribery of government...

67. Four employees of News Corporation have already pled guilty.

66. News Corporation, has already conceded it has no defense for the illegal acts charged and admits its internal controls were defective and that CEO didn't know what was going on and that same "covers" News Corp admits to by a victim of not operating and responsible for the acts petitioner claims herein.

## V. CONCLUSION:

67. Chancery Court's failure to force Defendants to honor their promise to fix the defective Disclosure in 2005 is directly responsible for allowing Defendants to steal upwards of $32 Billion in damages (Rule 701 Damage Report) from thousands of shareholders in 2005 including Petitioner.

68. Defendants have failed to respond to a Motion 70(b) filed with Judge Brine January 2, 2014 seeking relief from the contempt of that Vice Chancellor Strine's order and ruling January 16, 2004 and the included agreed relief for any "technical violation".

## VI. CLAIM COUNTS

### COUNT #1 - § 1503 (A) VIOLATION

69. Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

70. All Defendants have violated Count #1

### COUNT #2 - § 1503, (B) VIOLATION

71. Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

72. All Defendants have violated Count #2

### COUNT #3 - § 1503 (C) VIOLATION

25

75. All Defendants have violated § 1503 (a)

## COUNT # 4 - § 1503(a) VIOLATIONS.

76. Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

76. All Defendants have violated Count 34

## COUNT # 5 - § 1504 TRIGGERED PETITIONER RIGHT TO CIVIL REMEDY UNDER § 1505(F)

77. Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

78. News Corporation 2013 US CRIMINAL GUILTY PLEAS "UNLAWFUL

UNDER" 1504 and 1505(f)

## COUNT # 6 - (BREACH OF AGREEMENT)

79. Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

80. Sony has breached the July 2003 Option agreement which stated,

> ix. "Pursuant to the debt financing agreements, all Seizers and VPVF agreed that in the event that VPVF does not exercise the Option within 90 days of its grant, that VPVF may, within its class after the expiration of such 90-the period, transfer the Option to Seizers, in exchange for a warrant (the "Warrant") to purchase 200,000 shares of the Company's Series C Convertible Preferred Stock."

81. Sony and VantagePoint Venture Partners have further breached

"OPTION AGREEMENT, dated as of July 15, 2003, among 555 Digital Media Ventures, Inc. ("Seller"), an affiliate of Sony Broadband Entertainment, Inc. (Crictive, Inc., a Delaware corporation (the "Company"), and VP Alpha Holdings IV, L.L.C. ("Buyer")

Sections 6 & 7 & 18.8-14 which state:

> "6 Representations and Warranties of Seller. Seller represents, warrants and covenants to Buyer, as of the date hereof and as of the Closing Date, that:

205

(c) No Price Stabilization or Manipulation. Seller has not taken and will not...

7. Representations and Warranties of Buyer. Buyer represents, warrants and covenants to Seller, as of the date hereof and as of the Closing Date, that:

(c) No Price Stabilization or Manipulation. Buyer has not taken and will not take, directly or indirectly, any action designed to cause or result in stabilization or manipulation of the price of any of the Shares."

"14. Buyer May Exercise Option For Less Than All Shares. Notwithstanding any other provision herein to the contrary, Buyer may exercise the Option with respect to less than all of the Shares, but in no event less than 50% of the Shares."

10. Certain Transactions. Seller shall vote as a stockholder in favor of an investment and loan transaction between the Company and Buyer resulting in an additional investment in the Company by Buyer of no less than $5 million at a price of at least $1 per share (if an equity transaction), as approved by the Board of Directors of the Company (the "Transaction")."

"16. Miscellaneous.
This Agreement may not be modified or amended, except by an instrument in writing signed by duly authorized officers of both of the parties hereto."

82. Proxy states on page 17, that on "October 31, 2003, the option term was extended to April 16, 2004 and VantagePoint partially exercised the option and purchased 454,545 shares of our Series B preferred stock from 550 Digital Media Ventures." The term as worded had an original term of 120 days or November 16, 2003 for VantagePoint to purchase the Sony Corp shares under the option.

83. In footnote 3/31/04 - 126, section Certain Relationships:

"On October 31, 2003, the option term was extended to April 16, 2004 and VantagePoint partially exercised the option and purchased 454,545 shares of our Series B preferred stock from 550 Digital Media Ventures. On April 16, 2004, VantagePoint exercised the remainder of the option."

84. However, The October 31, 2003 "extended option" agreement between

37

Sony and VantagePoint was improper and when non-it was disclosed to shareholders [...] of the deal which called for Issuer to have the right to purchase 100% of the Sony 'Option Shares' after January 16, 2004 as part of an agreement that would transfer 200,000 Series B Warrants of Issuer to VantagePoint and ii) The October 11, 2003 'extended option' actually acted as a ray that Orlick and defendants sought to avail themselves of the 19.9% funding and other exchange limits that required Issuer to have a shareholder vote prior to approving any issuance of stock of Issuer including an issuance of stock as part of an integrated deal that shifted more than 19.9% of Issuer's stock to new party.

## COUNT # 7 - ["INSEPARABLE FRAUD"] VIOLATION

81. Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

84. All Defendants have violated Count #7

## COUNT #8 –PARKSEL TYPE FRAUD VIOLATION THRU FAILURE TO DISCLOSE "COMPLIANCE FAILURES"

87. Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

88. All Defendants have violated Count #8

## COUNT #9 – RULING BASED ON DELAWARE STATUE AND CODE 1304 THAT 2004 MYSPACE TRANSFER AND 2005 TRANSACTIONS "FRAUDULENT"

89. Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.
90. § 1304, fraud in fraud abet acts present and future creditor.

## COUNT #10 – VIOLATION OF DODD-FRANK WHISTLEBLOWER STATUTE – SECTION 922] AS [U.S.C. 5361(1)]

91. Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

28

the Dodd-Frank Whistleblower Statute, Mr. Grosnspar is entitled to a private cause of action for whistleblowers alleging retaliatory discharge or other discrimination. Id. ¶ The relief sought. Relief includes Right to Jury Trial, reinstatement, double the back pay owed, and costs and fees. Id. ¶ 7 Pa. 40(d)(2)(C).

      i.   Damages including loss of employment and Chairman/Director position from Nyopco Point company in 2003 under 15 U.S.C. § 78u-6 ("Section 922") and loss of Director employment under the same statute. Petitioner reported information concerning Defendant's breach of fiduciary duty, disloyalty, and violation of Section 10(b) of the Exchange Act when he resigned as CEO on October 30, 2003. Petitioner reported information concerning Defendant's breach of fiduciary duty, disloyalty, and violation of Section 10(b) of the Exchange Act when he resigned as Director in December 2003.

    hh. Grosnspar was terminated for two reasons: (1) in retaliation for reporting misconduct of Browns, Edell, Lipp and other Defendants, and (2) to stop the CEO from terminating, divesting or discussing the compensation of Browns, Edell, Lipp, Morzan, (ii) The CEO's refusal to sign a Board control settlement agreement during the week of October 26, 2003 which would have prevented Grosnspar from contacting other shareholders or regulators and disclosing the breach of fiduciary duty or other security violations the Board and certain executives had committed in the process of concatenating the Vantog/Point Series C

Financing in October 2003. The acts had been committed by Defendants

PETITIONER ALSO HAS CLAIMS AGAINST SONY.

b. Sony Corp executives, Defendant in this Complaint, abused their fiduciary duty to Issuer by terminating the fields and shareholders as part of undoing Defendant's scheme to take control of eUniverse, Inc. in 2005 and get approval and unwench Defendants as a result of the January 2004 Annual Meeting and Proxy Battle against Petitioner.

c. Sony Corp Defendant's possessed a critical Board Seat Nomination legal right the Series B Stock possessed. Sony Corp maintained Edel as the Series B Stockholder in 2004 even after evidence in Delaware Court showed Edel and Defendants had violated shareholder by Filing multiple defective and false proxy statements to Issuer's shareholders in 2003 and 2004.

iii. As a Result of the applicable Defendant's involvement in the above-described conspiracy and conspiratorial scheme, the Plaintiff has suffered severe emotional, financial, mental, and physical harm and other deleterious effects; been unfairly disadvantaged in multiple civil lawsuits initiated against him by several of the Defendants and other parties; had his freedom of speech severely impinged; been forced to spend hundreds of thousands of dollars on legal fees; been forced to And had his personal and professional reputation severely and permanently damaged. Based upon information and belief, some of the Defendants are continuing to engage in the above-described conspiracy and conspiratorial scheme

## COUNT # 11 - BLASIUS VIOLATION

93. Plaintiff incorporates by reference and realleges each allegation set forth above.

94. All Defendants are charged with Count #11.

## COUNT #12 - CONTEMPT VIOLATION

95. Plaintiff incorporates by reference and realleges each allegation set forth above.

96. Defendants lied to Court regarding Defendant's Proxy disclosure related to E&O. Defendant's Failure to "make this right" as claimed by Defendant Dickman, counsel is worthy of Contempt violation.

## COUNT #13 - RULING CERTAIN TRANSACTIONS AFTER OCTOBER 17, 2003 ARE VOID.

97. Plaintiff incorporates by reference and realleges each allegation set forth above.

98. Plaintiff affirms 3-) -1 appraisal of property, instilled Director state on October 17, 2003. Defendants fraudulently concealed their property national state.

Defendant's loans also not legally effected a valid existing or vote on the Series C stock sale or transfer from Sony of their Series B shares. Nothing public issuer's option involved in there way agreement between Sony, VantagePoint, and public issuer in 2003. The resulted dealings expired what Orrick trust by Insider knowledge to produce a commercial benefit for VantagePoint while having Issuer pay 100% of the cost by paying off Sony debt earlier than due.

CH-BBCM    Document 125-2    Filed 09/0

## COUNT # 14 – VOID DEFENDANTS RIGHT TO PASS UNDER 10/17

99.   Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

100.   Defendants Directors right to Exculpation because of Judge King acting "bad faith" and dishonesty must be void.

## COUNT #15. –   RULING CERTAIN TRANSACTIONS AFTER OCTOBER 17, 2003 ARE VOID.

101.   Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

102.   Plaintiff reflects 3-1-1 approval of property control Director class at October 23, Defendants fraudulently concealed each property control class. Therefore, Defendant's have also not legally effected a valid placing or vote on the Series C asset sale or transfer from Sony of their Series D shares, blocking public issuer's option right to reduce the cluster for benefit of common stock shareholders received

in there way agreement between Sony, VantagePoint and public Issuer is 2003.

103.   voids Illunius Directors compensation post Illunius event

104.   void VantagePoint financing transfer 1 on October 31, 2003

105.   voids VantagePoint financing transfer 2 on January 24, 2003 which was subject to shareholder vote of issue to Illunius Proxy created by Illunius Directors

106.   Plaintiff reserves damages to stock owned equal to the dilution caused by Illunius Directors and Illunius Proxy.

107.   Plaintiff awarded Expectancy damages as Proxy Share broker damaged by Illunius Directors and Illunius Proxy.

108.   Award in computing Proxy class compensation as if Slate Directors had not been

COUNT #4: INDEMNIFICATION AND ADVANCEMENT CLAIMS

108.   Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

109.   PLAINTIFF RIGHT TO INDEMNIFICATION AND ALSO RIGHT TO INDEMNIFICATION FOR ADVANCEMENT LEGAL FEES INCLUDING ALL MATTERS OR EVENTS OR FACTS CITED:

110.   Plaintiff was Director and Officer at Issuer that even Plaintiff benefited of "contract rights" defined in Section 7 of Issuer Bylaws for Indemnification and Advancement:

"The rights conferred upon indemnities in this ARTICLE VII shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer or trustee and shall inure to the benefit of the Indemnitee's heirs, executors and administrators." (Exhibit , Article VII Section 7 Nature of Rights )

111.   Plaintiff 's "Right to Indemnification" is entitled to 1) "indemnification" to

"fullest extent  authorized  by the Delaware General Corporation Law" or "broader

indemnification rights"[1]

112.   Plaintiff is also beneficiary broader protection compared to Del 145 statute limits[2]

113.   Indemnitee in addition to being an Officer, was Director and also benefit of Issuer's

Eighth Below broadening scope of Indemnification and Advancement rights:

"EIGHTH: Directors of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except, for liability (1) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (2) for acts or omissions not in good faith or which involve

---

[1] "shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the Delaware General Corporation Law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such amendment)" (Issuer VII Section 1 Exhibit )

[2] "any action suit or proceeding, whether civil, criminal, administrative or investigative that Indefinite 'proceeding')" (Exhibit , Article VII Section 1, "Right to Indemnification")

**INDEMNIFIED FOR "ALL EXPENSE, LIABILITY, AND LOSS" SUFFERED**

113. Indemnitee "contract" right is Mandatory advancement. Plaintiff is not

limited by construed Defenses. (1) Permissive advancement limitations such as allowing

"terms and conditions" to be set that a "corporation deems appropriate".

114. Petitioner seeks to be indemnified for following:

    (a) Damages and impact to Indemnitee from leftward dividend or fraudulent conveyance of 33% of Myspace.com to vendors Intermix in November 2004.

    (b) Damages and impact on Indemnitee from cold October 31, 2003 Certificate of Designation of Series C Preferred Stock, void Series C Preferred Stock sale, void Series C Overstate, void January 2004 Annual Shareholder meeting, void sale of Sell.Last.com.

    (c) Damages and impact to Indemnitee from void February 2005 acquisition in RedPoint Capital of 53% of Myspace, Inc. stock.

    (d) Damages and impact to Indemnitee from void name change by eUniverse, Inc. to Intermix, Inc., and sale of eUniverse, Inc. aka Intermix, Inc. to Defendant in September 2005.

    (e) Damages and impact to Indemnitee from void issuance of stock and options in certain Officers and Directors after October 30, 2003.

    (f) Damages and impact to Indemnitee from fraudulent commitment by Defendants of void October 17, 2003 Annual Slate of Directors being validly nominated, for Annual Shareholder meeting with a shareholder record date of October 21, 2003.

    (g) Damages and impact to Indemnitee from void News Corporation 2005 purchase of eUniverse, Inc. since Indemnitee owned 30% of eUniverse, Inc.

    (h) Damages and impact on Indemnitee from void 2000 vidEum Google Search Commercial agreement.

    (i) Damages and impact on Indemnitee's January 2004 conflicted "search

interest" conflict, and warning notice filed with SEC.

interests, Inc., and Interests's June 2005 reply and action.

(hh)  Damages and impact to Indemnitor described: Cutlark June 2005 fraudulent concealment while Cutlark controlled Miami Law, firm misled & manipulated NYAG to investigate Indemnitor.

(hi)  Damages and impact to Indemnitor and Expectancy Damages from Indemnitor's $11.30 Cruise Offer to Purchase Interests, Inc. and Myspace Inc.

(ii)  Damage and impact to Indemnitor and Expectancy Damages from Indemnitor's failed online music hot/exit community website venture after and as part of Sony Int'l Brand November 30, 2012 Warner Music Group "FeedMusic" lawsuit against Indemnitor.

(hh)  Damages and impact to Indemnitor and Expectancy Damages from Indemnitor's failed buyout of publicly traded Delaware Incorporated Answers.com in 2011.

(hi)  Damages and impact to Indemnitor and Expectancy Damages from Indemnitor's failed buyout of subsidiary of publicly traded Delaware Corporation, Washington Post Corporation in DE.L

(ii)  Damages and impact to Indemnitor and Expectancy Damages from preventing Indemnitor from entering Rich 701 Damage Report into Federal Court in Los Angeles in 2011 and 2012.

(ii)  Plaintiff did not receive $2.75 per share despite having qualifying trade Debt of over 2,908,000 shares.

Plaintiff as shareholder was damaged by reason that Plaintiff was Director and Officer of a/k/a/to, Inc. Plaintiff was obstructed from participating 701 Damage Report into Federal Court before the December 11, 2012 Final Disposition.

## COMPLAINT FOR DAMAGES

Regarding if agreement and/or breaching a contract for trust upon Defendants' 21-gotten gains, forcing Defendants' assets, and/or requiring Defendants to pay restitution to Plaintiff and to all members of the class of all funds acquired by reason of any act or

VIII – RELIEF REQUESTED

A.    WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, to its favor and in favor of the Class and against the Defendants as follows:

B.    Awarding Plaintiff appropriate damages including compensatory damages, together with pre- and post-judgment interest;

C.    Awarding Plaintiff the costs, expenses and disbursements of this action, including any attorneys' and experts' fees and, if applicable, pre-judgment and post-judgment interest; and

D.    Awarding Plaintiff such other relief as this Court deems just, equitable and proper.

Dated: April 14, 2011

_____

Brad D. Desnoyers (SEAL)

_____

_____

BRAD D. GREENSPAN,

Plaintiff,

v.                                                    C V No. 106-VES

MDSPFOX, et al,

Defendants.

MODULE MOTION 3rd CONTEMPT

Now comes the Plaintiff's Motion for contempt under 700 and moves the Court for an Order requiring

Defendants to appear before Chancery Court and answer as to why Defendant(s) have failed to comply with

the prior Orders of this Court and to show cause why sanction not be provided for Contempt.

TO: Jane Spezie, Jeffrey Adell, Bradley Petter Lute, Morton Chas Nuttos, David Carbols, Andrew Sharkes,
Vantage Point Partners, LL, et seryd, Inc., associated  News Connectored & 21st Century Fox, Inc.
Registed de Agent:
The Corporation Trust Company
Corporation Trust Center
1209 Orange St
Wilmington, Delaware, 1980.

PLEASE TAKE NOTICE that the attached Motion will be presented to this Court by **Brad Greenspan**, Plaintiff at

the convenience of the Clerk.

_____

Brad Greenspan
512 South 1st Street
#123
Beverly Hills, CA 90211
Ph: 310.249.1580

Date: 11/10/2017

MODULE SET 3rd CONTEMPT THIS

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

BRAD D. GREENSPAN,

Plaintiff,

v.

BRETT BREWER, et al.,

Defendants.

C.A. No. ___-___-___

MOTION FOR CONTEMPT 'MR. KID-ANGIE ANZ(A)

II.  SUMMARY OF ALLEGATIONS........................................................................................pg. 4

III.  ARGUMENT.............................................................................................................pg. 5

A.  DEFENDANTS WILLFULLY IGNORED
WARNINGS AND MULTIPLE NOTICES...................................................................pg. 5

B.  COURT PROVIDES RECOMMENDATIONS
THAT DEFENDANTS OPTED TO IGNORE.................................................................pg. 6

C.  BOTH DELAWARE COUNSEL AND
DEFENDANT BROLE PROMOTED TO COURT.........................................................pg. 7

D.  DEFENDANTS IGNORED FIDUCIARY DUTY
TO HONOR OCTOBER 17, 2003 DULY ELECTED PROXY SLATE................................pg. 8

E.  DEFENDANTS FAILED TO TRANSPARENTLY CONCEALED
SHELL GAME DELISTING VIOLATION TO ACQUIRE NEWCO CORPORATION...............pg. 8

F.  JOINT IN CONNECTED AND HAD INDUCTED
MULTIPLE PREDICATE ACTS...............................................................................pg. 9

G.  FRAUDULENT CONCEALMENT USED TO DISRUPT PLAINTIFF W 2003
MATERIALLY PUBLISHED NOVEL AND TO SUPPRESS UNLAWFUL SCHEME...............pg. 9

H.  DEFENDANT'S "BAD FAITH" & "DISLOYAL" FINDINGS AND ACTS DAMAGING
SHAREHOLDERS IN FEDERAL 2003 SUMMARY JUDGMENT RULING WERE CAUSED
BY FAILURE OF CHANCERY COURT TO FORCE DEFENDANTS TO MAKE 2009
EFFECTIVE DISCLOSURES...................................................................................pg. 10

IV.  CONCLUSION..........................................................................................................pg. 18

1.  SUPPLEMENTAL SUPPORE RULES & ITEMS OF VIOLATIONS.................................pg. 18

COMES NOW the Plaintiff acting in his ... respectfully ... to this Honorable Court to enter Judgment on the Findings of Plaintiff's Facts and relief in support the following:

## I. INTRODUCTION

1. The Plaintiff moves the Court to find Defendants in contempt under 75(b).

A.2.0(a)(a)(4)  ... Admittedly, Plaintiff requests Court to sanction Defendants $20,000 per day since Chancery Court January 2009 ruling that "corrective disclosure" refused by their Vice Chancellor Strine was not undertaken by Defendants and until yet they failed to undergo until Defendants provide proof to the Chancery Court that "corrective disclosure" has been made to the public.[1]

2. Having January 2004 trial, then Vice Chancellor Bush Defendants guilty of Proxy Disclosure Violation:

i. "already, Mr. [illegible] was not rapidly situated to a factor. If also on October 6th, ... [illegible] ... he could not have been approved by the Board to a factor if also." [TSB Restitution, Exhibit P-X, pg.87]

ii. "It's even odder what it's supposed to be persuasive to October 6th, especially since as of October 6th, as I mentioned it. Mr. [illegible] hasn't even agreed to be in the board." [TSB Restitution, Exhibit P, pg.91]

iii. "As of October 6th. There got to use, I make — I think Mr. [illegible] basically said the board had no idea that I was linking him in or below it. I think there is a great deal of record evidence — it's not a big record, but what raised evidence there is suggests that the board wasn't truly thinking about putting him to or a factor. It does to me thought there was simply nothing to right." [TSB Declaration, Exhibit P-X pg.97]

iv. "It a very strange — I mean, I have got to use, I think Mr. [illegible] to this on the board. I'm very dubious about the validity of this election, and there, is a certain trouble that has to be done around thinking people. And I mean, a this a proxy?" [TSB Restitution, Exhibit P, pg.xxx]

v. "It's not really, I guess, my job to be Director of litigation but as advisor, but now that very competent Defense counsel has been engaged to assist the company's chants, it's pretty common knowledge that the board of directors has to approve the actual sell/lease of..."

---

[1] Delaware ... Long, the Delaware Supreme Court found, "as I'd judge has been describe it before nowhere for Mister [illegible] to order," to drag an old account to not you just underside."

ii.   "There is a certain elegant order to things. You have to — the board has to approve it. And they have to approve it in the form they are covering. Then the buddies have to do it." (JM Testimony, Exhibit 9, at 41)

iii.   "The Court: 'I have a disclosure violation here.'" (JM Testimony, Exhibit 9, at 5)

## B.   SUMMARY OF ALLEGATIONS

1.    Defendants, VantagePoint, and Ditech are guilty of Fraud upon the Chancery Court deceiving trying to mislead that Vice Chancellor Strine that Strine disclosure is biased. Vara sought to prohibit this before the court, defendant agreed to its injuries disclosure and fail to do so.

ii.    Vice Chancellor Strine further discovered the certificate of designation amendment was never approved by Board.

"THE COURT: Has the board actually voted upon Mr. Tolton, whose copy of the certificate of designation amendment?

MR. TOLLON: There was some confusion. We had done it with Mr. Agee, Vout Homer Betty would not consent to an amendment that didn't require Vantage to contribute over 90 percent. Then didn't want Vantage to exercise over short and they would lose their right to the same. Person not what was attached to either.

THE COURT: It's not really. I guess, not just to be chosen of Happoner its of interest, not now that very corporate. Prino not annoyed has been engaged to make the company, I mean. It's pretty common knowledge that the board of directors has to approve the actual certificate of designation amendment that's being proposed. And you know — and this isn't the first that was kind of company that's led to be a bit innovative." (JM Declaration, Exhibit 9, at 60)

1.    Deneation of Edell's bankruptcy to Strny statement is violation of: Rule 8-4, Rule 001 and Rule 3.4, Part 401-02. (JM Testimony, at 2011, amount 2010-031)

ii.    Defendants every the January 2004 Strny was definitive, forbidsteld concealing Edell's work experience. Agree that Vice Chancellor Schar ruling, don't even the defense and make now

-6-

### III - ARGUMENT

6

11.  January, July 2000, & August 2001 Persist with key facts underlying harm detection and rash.

A.  **DEFENDANTS WILLFULLY IGNORED WARNINGS AND MULTIPLE NOTICES**

14.  Warnings by then Vice Chancellor Drew included:

i.  "..."

ii.  "..."

iii.  "..."

iv.  "..."

v.  "..."

vi.  "..."

vii.  "..."

viii.  "..."

ix.  "..."

B.  **COURT PROVIDES RECOMMENDATION THAT DEFENDANTS OPTED TO IGNORE**

15.  Then Vice Chancellor Steen says to avoid Blaine and Clarkson violence ignored:

i.  "..."

D.   DEFENDANTS IGNORED FIDUCIARY DUTY TO HONOR OCTOBER 17, 2013 DULY
ELECTED PROXY SLATE

19.   After January 2004 Chancery Court hearing, it was ordered for Defendants to fraudulently
consent and to not honor Plaintiff's October 17, 2013 approved Director slate instrumental in safely called
Board Meeting. (NB Incurrence at 12 pursuant #14)

20.   Vendat Edell Bionews, resdu Edell com stating Plaintiff met of investor's October 14, 2001
Vote to Nominate Director slate proposed by Plaintiff before Plaintiff resigned as Chairman and CEO.
This reflects 3-1-1 win by Plaintiff as previous "94-part" Defendants passport related from 2-1-2 vote
before Chancery Court ruled Edell was never strictly elected as Director in October 2012.

E.   DEFENDANTS PASS ON FRAUDULENTLY CONCEALED EDELL DISCLOSURE
VIOLATION TO ACQUIRER NEWS CORPORATION

21.   Defendants pass on fraudulently concealed material non-disclosing strategy of Court to
acquirer News Commission is clearly exhibited in email disclosed to Class Counsel in 2013 United
security StandaLux action. Such email on July 17, 2001 from Corporate counsel Lang emailed at 9:23AM
to Holophant Director Bioclass, "Subject: Bioclass Agreement", stating,

"I'it for issues, let's close on the remaining ones in a fair and reasonable way - so we can build our
relationship." End

9

**F.** **SONY IS CONFLICTED AND HAS INFLICTED MULTIPLE PREDICATE ACTS**

12. Sony was an insider shareholder of Invotra (Austin), and Wyjuanchn (ownership) level price at face of ListingzPrint VC data in July 2014 (Series B), 2015 April 2014–2015 disclosures and has a Director and Series D Member Entit in January 2014 Proxy.

13. Sony (Sony's general counsel Bolgnass) counseled to find Kheir who began working for Sierra Corp in 2009. Sony has fraudulently concealed the defensive E&H background of both violations of Rule 8E item 401 in Austin and July 2014 Proxy and Annual meetings respectively. Sony and its Sid grant are aiding and abetting Sierra Corp for the benefit of Isel Kheir who (i) as investor and Western earning $ fee per year their own Loop.

**G.** **FRAUDULENT CONCEALMENT USED TO DISORIENT PLAINTIFF IN 2009 NATIONALLY PUBLISHED NOVEL AND TO FURTHER UNLAWFUL SCHEME**

14. Defended a leverage their relationship with acquirer to create defamatory and fabricated bias then acquired Sierra Corporation employees Asprin's published in late 2009 book, "Sunday McInnes" which fraudulently conceals the true background of former Director and Chairman Jeff Sitell and his scheme with Bezos to forward a fabricated false reason, wholeseling CEO to get Edell onto the Board. This creates false ongoing defamatory attempts to Plaintiff and Shareholders because Class Counsel accepts such new false Edell facts, schools instead of Plaintiff's facts offered to Class Counsel in 2012 United Class Action in Los Angeles Central District. Edell's false facts allows the fraudulent conspirators (i) approximately 50% of Hlypano area, discovery proof of of Adverise Inc. in 2016. Further, Edell's false facts, which became Acquirer News Corporation false facts, obstruct Plaintiff's true facts, thus causing the courts for the benefit of the Fraudor Corp, inserting his true damages and values fighting, went to shareholders. Plaintiff and shareholders will continue to suffer until the defective disclosure is made by

Defendant. 338 Delaware at 24,27, paragraph 14-112.

11. Defendants are requiring Third Districts dismissed scheme for defense Plaintiff and leverage.

Opposition (Clerk Talwib claiming, "Useful denial asserts every part of Damrnana's claimant". 1990 Document 12, 26 paragraph 247.

## II. DEFENDANT'S "BAD FAITH" & "OBSOLUTE" FINDINGS AND ACTS (SHAMAGIC SHAREHOLDERS) IN FEDERAL 2010 SUMMARY JUDGMENT RULING WERE CAUSED BY FAILURE OF CHANCERY COURT TO FORCE DEFENDANTS TO FIX 1004 DEFECTIVE DISCLOSURE

16. Chancery Court's failure to force Defendants to honor their promise to fix the defective

Disclosure in 2004 is directly responsible for allowing Defendants to seek a minimum of $670 million in

damages (Federal Judge King 2010 approved damage report) and grounds of $31 Million in damages (from

701 Damage Expert not used by Class Counsel because of ongoing Udolf fraud) from thousands of

shareholders in 2010.

(Exhibit 61, page 12, June 2010 Federal Central District Judge King, Summary Judgment Ruling).

## IV.   CONCLUSION

### 1.   DEFENDANTS FAIL TO CURE RULE 8.4 STEU-801 (F) VIOLATION

277.  Rule 3.8, June 401 (1) states the requirement for information disclosed in attorney's

January, 2008 & July 2004 Proxy filings for "Director's" involvement in private legal proceedings", stating:

"Provide any of the following events that occurred during the past ten years and has not material in evaluation of the ability or integrity of any Director, person nominated to become a director or executive officer of the registrant.

"(1) within under the Federal bankruptcy laws or any state fresh court law, was filed in or against or a receiver, fiscal agent or similar officer was appointed for a court for the business or property of such person, or any membership in which he was a general partner or an affiliate two years before the time of such filing, or any corporation or business association of which he was an executive officer at or within two years before the time of such filing;"

278.  To make Proxy not defection under 12a or Delaware security laws, Isuers would have to

disclose that

---

48

EXHIBIT 41

June 2010 Federal Central District, Judge King, Summary Judgment Ruling

|  | ) |  |
|---|---|---|
| Plaintiff, | ) |  |
|  | ) | C.A. No. 106-VCS |
| v. | ) |  |
|  | ) |  |
| SHETTERLY et al. | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

DECLARATION IN SUPPORT OF MOTION FOR CIVIL CONTEMPT

## DEFENDANTS SCHEME TO ENTRENCH THEMSELVES AND SHIFT CONTROL

BOING CEO RAISES POLICY AND FAULTY LITIGATION AID IN PUBLIC DISCLOSURES

## FLAME THE NEW CTO

## EHLL THE NEW DIRECTOR CANDIDATE

and Jerome Brazil in 2021 and bonuses approved by fellow Board Member founder, and largest shareholder, CEO Brad Greenspan.

27.   Defendants fraudulently enticed the true buying power of former Director and Chairman Jeff Edell out beyond a fabricated false vacancy, misleading CEO to put Edell onto the Board.

i.   Edell benefitted, Irvin fund of Webcasting his work experience by gaining access to the public Issuer's board.

28.   Edell had no intent of a successful fundraise rollout in his fabricated boasts stated his early bad debts to the tune of a vacuum including one of two failures resulting in a Chapter 7 Bankruptcy filing.

29.   Brazil moved schemes forward with aid of new CEO Palice whose disloyalty to our rounding in the CEO to public that Edell connoisseur was fabricated demonstrates fictitious intent to defraud & mislead shareholders.

30.   Jeff Edell's ambition to elect CEO of Issuer via omission of his immediate two-year employment jobs. A Director's last two jobs and each director candidate's performance to the company's performance being thrown critical bit of information for Issuer or CEO to prove or review to do his day.

31.   Edell tenure results in extrinsic shareholders being diluted via over-exposed to VantagePoint financing.

32.   On August 28, 2023 at 5:39PM Brazil forwards via email a fabricated three page (EXHIBIT 41, Pg. 29) resume for "Jeffrey S. Edell" in the CEO info CEO Palice of cited states.

> "looks strong... again jeff will be here tomorrow to have lunch with tom and a break. I'll put something up for you later this week or next depending on your schedule."

i.   Brazil lies, misleading the CEO Palice asserting Edell's resume "looks strong", even to Brazil and Palice are aware that Edell's prior two actual jobs are being intentionally omitted from the aforementioned to Greenspan. Edell, Brazil, and Palice have discussed the actual one week experience information prior to sending the fabricated Edell resume, this is a violation of 10 U.S.C. § 37.2(c)(1), which prohibits the dissemination of records.

ii.   Defendants omitted a portion of the loan documents and information in the Release sent to Palisares... only the lesser in claimed causes in violation of 18 U.S.C. § 37.2(e)(1) and who closes the three

The page is too faded and low-resolution to extract reliable text.

**The John and deleution October 3, 2002 Nominating Committee Recommendations**

36    Lucy Messem, Director and Nominating Committee member talked with review of Edell, Seals email noting *Jeff Edell – Completed D&O Questionnaire* to Director Meyers, Director Glerrasure, Director Mesley, General Counsel Opp, and Seip's attention if Director Gerrantu and name.

i.    Messem and Definitions list in his email about what is connected to the D&O questionnaire, failing to disclose Edell's all related recent bankruptcy and deviating:

> "Based on my review, there are no negatives for the Nominating Committee to report to the Board."

ii.    This John statement is distributed then read for Petitioner and other Directors misleading then and causing them to be unaware that Edell's Proxy disclosure is false. This is a violation of 18 U.S.C. § 1348 retoiling to read. Truth. Messem feeding the nominating committee, concealed his knowledge that D&O does have "negatives" that would be brought to the Board's attention like fact that Edell has a monetary disclosures SEC even under Rule S.C. Item 401 (f), requiring specific disclosure on Edell's recent federal bankruptcy.

iii.    Furthermore the dissemination or altering of the true information by omission which Edell, Messem and Messem are guilty of in violation of 18 U.S.C. § 1512(c)(2) and violation of 18 U.S.C. § 1519.

iv.    Messem and Definitions further reiterate the Board by noting:

> "the Nominating Committee's previous legal and financial background checks did not disclose any negatives.
>
> "Based on the results of the Nominating Committee's due diligence procedures including meeting and various discussions with Jeff, I think he is an outstanding candidate and hereby recommend that the Board approve of his appointment."

37    In attached D&O questionnaire is disclosed in October 1, 2002 email with false claims used to conceal underlying facts in violation of 18 U.S.C. § 1350 (whiting to read Sand).

38    In Jan 2012, Petitioner disseminates D&O questionnaire/Edell submitted in to attention's Nominating Committee headed by Director Lucy Messem. Edell's lass work requirements consists of

thoroughly, you can check to consider in completing the questionnaire. You should be aware that if the Proxy Statement contains any false or misleading statements, the Company and those in control of the Company could be subject to liability under federal securities laws."

E. The Initial D&O Questionnaire of Field from Exhibit IX reveals.

a. On the second page of the document cited,

"LENVERSE, INC. QUESTIONNAIRE FOR DIRECTORS AND OFFICERS"

the first section is labeled, "I. Employment, Occupation, and Business Experience."

And it lists information submitted by "Jeffrey A. Edell (1/1/07)"

b. Under section G, document states,

"Please Indicate all positions and offices which you hold or have held during the past five years."

c. Edell's "Questionnaire For Directors And Officers" Sub I information under Previous Offices:

"President/CEO & Director Showtek Entertainment Group, Inc."

from "January 2006 - April 2007" and voted by "resigned April 2007".

"President/CEO/Director, Soundelux Entertainment Grp., Inc."

from "November 1995 - 2/11/2007".

"President/CEO/Director, Enterprise Entertainment Corp, LLC".

from "November 2002-May2007"

and the next line is parentheses immediately below states,

"resigned May 2007, after working on street contracts and direction."

d. On page 11 of Edell's "Questionnaire For Directors And Officers", Edell checks "YES" list

section (2) of bar which if "any of the following events has occurred since April 1, 199X, please

provide a brief description of the event".

c. Section in states

"A petition under the Federal bankruptcy laws or any state insolvency law was filed by or against you, or any corporation or business association of which you were an executive officer at or within two years before the time of each filing."

14

"President/CEO/Director, Enterprise Entertainment Grp, LLC"

40. October 11, 2003 at 2:43PM, Edell emails Oremspan requesting politics to be added to the draft press release:

"Brad, Commission Release. It says nothing of the record sale to Liberty Media and John Malone [illegible] $3.6bn, the sale of the cellular company at par, sale that I owned as CFO and founder for 10 years, and sold to AOL, the taking on the Public bond of DC Industries and sale of [illegible] Medical. Also the release of Entertainment Competitors of the [illegible] by [illegible] and [illegible] and Young in 2000, and member of both TV and Film Academies, member of Young Presidents Organization. I've been hung out on it. That should all be somewhere in it, please have them also mention this?"

41. October 11, 2003 at 4:43PM Edell email Oremspan and Brewer

Subject: "RE: Press Release. AOL/'s Edell and mine.

"Your PR dept can do a better job correcting what I have can say I've edited in the subjects that are pertinent to [illegible], but please do not sum this until we finalize our deal..."

42. October 11, 2003, at 6:47PM Oremspan emails Lipp and Brewer forwarding above Edell

Email and mines, "still on to discuss for we can finalize?"

43. The October 11, 2003 draft PR announces Defendants Edell and Brewer are hiding and have destroyed the evidence of Edell's True worth experience in the press release draft being distributed as well as the final release in violation of [illegible], [illegible] and violation of [illegible], [illegible].

44. Also Defendants violate Section 1350 by using email to send false facts draft press release to PR firm.

45. Brewer orders Highland Partners and De Quinth to provide background checks for the directors nominating committee by Director candidates Edell and Word. As evidence of this scheme, Brewer emails Blanka on October 16, at 2:04PM and mines.

"dez- have you received the background check from diplined partners for Bradley word?"

46. BOARD MEETING. October 17, 2003 there is Board meeting where Brad Oremspan attempts to elect the annual board slate and his slate leaves of Lawrence Morton and Dan Walker General named Chris Lipp [illegible] investigates state did not give even though 3 Directors approved for new slate. I disappeared, and [illegible] Director Allocator Lipp Board minutes Indicate, "The motion failed with a vote of 5 for, 1 quetioned, 3 abstentions, constituting less than the requisite majority of decisive process."

47. On October 20, 2003 at 4:57PM, Fielden emails Lipp, Subject: "fdis: Re First: Brewron For proxy, Draft"

and provides a bit for E&H which state

*(previously known as Stanley Inc Entertainment Group, Inc.) a provider of entertainment content and technologies, from 1992 until 2002."*

76. On Friday, October 31, 2003 Defendants cause the company to put out a press release with false information

*"Universal announces Galactic Announce CEO Departures and Board of Director Changes Read Statement Story Alwtel at Glad Encounter Gallant Jeffrey Isbell section Gannett and Amster USON Feature of Sonskilas Entertainment Group and aDudley Waits CEO of the Game Free, Joel of Octaver Bames"*

77. Significant positive caused by E&H and put less press release but made statement otherwise was with comments such as his recent fraudulently concealed FITS Bankruptcy and other employment information provided in the original D&O Questionnaire E&H provided to investor. Defendants also violate Section 15A] as the defendants cause this false information to be distributed via over wire to the public. (EXHIBIT 19) pg. 34 [9]

72. Ross to first open freely made it impossible it would not allow TurmagiPoint to take over or usurofu the rights to vool Series B until "TumogaPUise" bought all the stock held in Stone Troy of petfilo estate.

73. November 7, 2003 at 5:09PM. Intrusive HTS Tom Flatte wrote a draft Proxy to Chris Lipp, Subject: 'Proxy' wthbb dides.

74. On November 17, 2003 - Their Upp sends Corporation Stole Poss to toys

## LIPP KNOW SONS DID NOT SIGN THE CONSENT ON NOVEMBER 1 [10]

75. Ross's Mail. Homberg only sign the consent to change the Certificate of Designation of the Series B provided by Lipp

76. Ross's Gausling reassure the consent on November 18, 2003 according to his testimony seal in court."

57. On November 18, 2003 at 12:58PM, Lipp create Vantageport v1 of ick and Shurlea a new draft Series C consent that appear to have some backdated element of optimizing the prior Notes to the detriment of the shareholders.

58. Out of a transcript notice to the planning of the Proxy and E&H founder erock Lipp writing.

*"I don't understand the background of this, and it will take some time to review. Chris are you working on the proxy statement language to implement the delays required by the Option Agreement."*

59. On November 18, 2003 at 4:09PM, Lipp asks PR assumey vai by Jonthan Bell to put out "Annual Meeting Release" The release falsely states lesser's

*"annual meeting of stockholders has been concluded for January 21, 2004 at that certain aspects of the Company's recently announced financing transaction with VantageFront Parties*

## NOVEMBER 2003: SONY SERIES B PREFERRED CONSENT SCHEME

47.    November 26, 2003 at 8:15 AM, Howard emails Fiahn, Carlish, Mosher, Sullivan "RE: Nominating Committee - Dropped nominations" and states, "Did you ever re-set up Kevin Carlish (Andy Morden, Jeff Pahl) and Chris the Room?" Also, when is the proxy deadline?" [...]

48.    Fiahn responds at 8:27AM on November 25th, fairly stating:

> "Only three directors are up from election at the January 24 stockholders' meeting. The Series B stockholders (Sony) have elected Larry Mosher and Jeff Pahl. The Series C stockholders have selected Andy Mosher and David Carlish. The only directors that are up for election are Dan Mosher, Brett Brewer and Bradley Ward." And;

> "The proxy deadline is driven by the timing of Chris Gragg's vacation. Chris has part of a European vacation several weeks due to the issues we are working through. He will be out all next week. I will prepare the proxy in his absence."

49.    On November 25, 2003, at 1:03 PM, Lisp emails Fiahn, Subject "Proxy Counsel" with attached files including one titled "By-Laws" and states:

> "Attached is the language I would suggest for Proposal 2 and the Other Business section, if is attached to the newly added Section 10 in the section 3 of the business."

50.    On November 21, 2003, Chole Lisp emails Sony's Melissa Colo and Mark Steinberg, Subject "This Mary Series B Consent" and attaches a draft of Section B consent from to directors of directors, and states. "Melissa, Please find attached what should be the final Series B consent we will need in connection with getting the director written consent of"

71.    Director Ward is unrelated to the Fiahn claim but a new threat that has been placed which included Udell and Marcus as Series B Directors. Ward who had just voted with the rest of the Directors to elect the slate on November 20, 2003, states in a November 26, 2003 8:28AM.

> "Stated question ... "The role of the Nominating and Corporate Governance Committee ("NCGA,") shall be to determine the slate as director nominees for election to the Company's Board of Directors (the "Board") to be included in the Company's annual proxy statements..." And

> "Will the committee only be determining the nominees to the slate you're longer require to fill Board seats, Or we just had just want" to the directors of any specification or a full Board seat had. I have voted that."

72.    November 26, 2003 at 11:54AM, Patrick Christian emails Nate Connell, emails Chris Lisp, Subject "Series B Written Consent to Election of Directors 11:26:03 DOC" and states.

ACTION BY WRITTEN CONSENT OF MAJORITY SERIES B STOCKHOLDER AND OF FOUNDERS, ETC.

## NOVEMBER 26, 2003: CFO FLABBY INSTRUCTS STAFF TO FILE PROXY

73.    November 26, 2003, 3:41PM, Tobin emails Indenet McClure, Sidley: "Proxy" and notes:

"Please send the proxy now to Brunello for Edict [forwarding]."

74.    As of November 26, Sero had not given his consent to nominate Moran or Edell as Series B members.

## DECEMBER 1, 2003: PROXY IS FILED

75.    The December 1, 2003 Proxy lists Edell & Moran as Series B "Preferred Nominated Directors stating:

"the majority holder of our Series B preferred stock, has the exclusive right, voting separately as a single class, to elect two directors" and "EB-JMS has notified the Company that it intends to elect Lawrence Moran and Jeffrey Edell to the Board."

## PROXY CONTEST DECEMBER 2003–JANUARY 2004

76.    According to Steven Morrow exchanges, his emails across: December 3, 2003, at 3:37PM, to Lipp (Bryan), Edell, Fryar, Subyar: "Until immediate documents and mater, 'I [Fritchhan is both a director and shareholder, I demand to see the following documents: did and stock in the company owing him the Myzona Asset Sale agreement that was purported to have been signed on December 17, 2003. This is before key evidence that supports each agreement are having really relined at such here and piece to November 2004 when defendants this partake disclose the share that his Myspace Asset Agreement selling TPI to InWAD's MWU LLC only, consented on December 17, 2003.

77.    Email evidence shows the cluking of direct defendants fabricating proxy to make it appear they had instructed [SdE ad] originally also, Moran acted as S Directors. Showing initial response from uninformed Investor can be seen thru email on December 4, 2003, a 3:10pm, current keep member, former CEO and 20% stockholder of lesser interit piece information to his entide consent. Subject: "Sero and notes:

"Tougher found is light.  A looks like these guys got Amy to PURPOSELY put down [not] on There are only 5 class open and I could room. Only these directors are up for nomination."

and

"Now once the Series B which [integity]what has a right to purchase and the Series B law refers to elect 2 Board Members, but Transported had specifically agreed to name/each refers as part of their acquisition of Amy's Series B just for the express of not doubling up on forced directors." And 'Thanks reads. They get Sero to nominate [? of his writing document is Bolled/Wad? these guys—"

78.    Edell emails Ulmer and skart on December 4, 2003.

"Holy moment: a please make sure from Nate has the best is clearly unaware of a proxy release. Can sure you clarified already but let us know? Thanks (g)"

H-BBCM   Document 125-2   Filed 09/0

47.

48.   On Thursday, December 18, 2003, at 1 did M. Bennet reach board and states, "Gentlemen, it's will be having our board call tomorrow is scheduled at 4PM there."

49.   There is to evidence that the Myspint user sale agreement was disclosed or voted on by the board at the December 19, 2003 board meeting. While there is significant evidence there was a firma according to Bowen on, "modification of Bowen's reports on litigation proxy contest issues."

50.   Annual Meeting was conducted on December 19, 2003 at 4:15PM, Flight studies Lije, Director.

Corlely Ahrenss, Median, Ward, Bowen, Edell, Sclafee "Filings" and others.

> The ntructlcal proxy cancelment was filed today, and the ...attached proxy volmm communicting the new meeting date was issued.

## THE 2003 DEFECTIVE "AMENDED" NOTE:

51.   On December 23, 2003, Lipp emails Harrach and Sharimo of NantagePoint with Subject 'Amended OPVF Note' and states, "As discussed please find attached for your review as amended" note, "and attaches a second TLJ million note that was note has been amended under Section 51 'Equipment' to change the original Jan date of March 2003 to note be dut February 3, 2004 a few days after the planned Shareholder meeting where 'stockholders of the Baltemia provide approvals necessary."

52.   The December 30, 2003 Note Elearly states.

> "Persuant to the certificate of Designation of Series B Preferred Stock, 330 Digital Media Ventures, Inc. ("330 DMV"), an indirect subsidiary of Sony Corporation of America, the majority holder of our Series B preferred stock, has the preferred right voting separate as a single class, to elect four directors to the nine member Board consists of six to eight members. 330 DMV has notified the Company that it intends to elect Jeffrey Edell to the Board and Leave one Sot to E Board's our nominate this one."

53.   Sony had not notified the company it intended to elect Edell at al until close to the date of the Chancery Court trial in January 2004.

## The Alterated Advertise January 2004 Proxy AND EVIDENCE OF UREILL EXHIBIT 44 pg 34-66

94.   In January 2004, Nantage makeld issued board of interest loss, one of them Proxy funds perpetuated on common stockholders by Corley, Sheehan, Bowen, Lipp, Rosenblatt and associates 2003-2004 Fluhje rules is dialectal along with Bowen in not revealing Edell's Alterated income that colludes with Central on Car...(won is..) at...(question becomes response)

most difficult, even in the December 31, 2003 10-Ki as Proxy, on page 4, the company states,

> Jeffrey Edell has servedas a Director since October 31, 2003 and as Chairman of the Board since November 14, 2003. Mr. Edell is currently a member of of director's Compensation and Audit Committees. Mr. Edell was employed as President and Chief Executive Officer and a director of Soundelux Entertainment Group, Inc., a provider of entertainment content and technologies, from 1999 until 2003.

96.  It was part of the DeGeeters' scheme to use the United States Postal Service to deliver fraudulent SEC Proxy on the Genesis electronics Inc. MySpace Parent Company Shareholders in December 2003, January 2004, July 2004, august 2005, and September 2005 and to conceal the errors contained in the Proxy Disclosure statements in each instance regarding Edell and Pfeiffer in violation of 18 U.S.C. § 1341.

**FRAUD UPON THE CHANCERY COURT (Exhibit 49, pp. 42-44)**

97.  After advise telling his retained general counsel Chris Lipp to admit he had taken several actions without ever getting the critical company motion as required by law to be first approved by the company's Board of directors and/or by Judge II Preferred stockholder Suzy Gray. These were also shown to be required thereby general counsel have sent to his required prior to general counsel taking such action. These actions were to claim acounts and waivers were given and then to include them in Issuer's proxy and then thy had asserted where in fact such event had never taken place and such waivers of consents had nil been given. This behavior and activity was in court and in Judge Street's court examination, shows to have occurred multiple time. on multiple dates and first instance of such fabrians event has multiple instance of Proxies distributed in shareholders leading up to the 2004 Shareholder Annual meeting that proxy.

98.  Judge Street was alarmed about going on several multiple times during the trial to notify all parties of this event that the testimony of general counsel Lipp was not believable as to Mr. Lipp's intention for certain disclosures and statements in the company's Proxy.

**SONY'S SELF-DEALING AND AIDING AND ABETTING BREACH VIOLATION AND AIDING AND ABETTING FRAUDULENT CONVEYANCE**

99.  Suzy Music Corp in 2006, measured after a sub amount Andant December Prelude in and from

CASE NO. CV04-15-B-DWM-CR SECOND AMENDED COMPLAINT                 255

H-BBCM    DDocumeent1425-2    Filed 09/0

Los Angeles Times Defamation

"Battle of TiUniverse Is Up in the Air"
Michael Hiltik / DOABILY UPDATED January 20, 2004

From the Democrats in New Hampshire looked away from the end of campaigning.

MANIPULATION OF THE FACTS IN DELIBERATE ATTEMPT TO DIVERT YOUR ATTENTION FROM
THE REAL ISSUES

___

### The False and Deletive July 2004 Proxy (EXHIBIT 17, at 40-45)

110.

111.

112.

113.

114.

115.

128. Curfield and Brown, "Carnegie/Post would not win money" said the CEO was incensed. (Exhibit \_\_, pg. 74)

This prevents and corrupts the Court's choice of getting a fair trial. WORD obstructs equitable discovery process by assuring no discovery comes from platforms, while using only one source, John Inquiris. Inquiris worked for News Corp for over two years before publishing his book and continues to work for News Corp. Inquiris must label as a critical source, attempting to exploit why Warzone would have told a big piece of their events, proof to insiders the seven considerations to December of 2023. A significant challenge at issue failed to disclose any such arrangement in any public filings for 11 months. News Corp, Defendants and WORD fraudulently concealed Edell's background again in 1999 and 2018 as well as new MySpace search evidence when releasing his book & for the purpose of reducing Summary Judgment claims.

DEPT. NINETEEN TO MAY 19, 2013 IS INDISPENSIBLE. ACT IN SCRUPLE.

129. Perlmutter and class members are itself harmed by the motion to bar in late 2010 which is the 2nd in his incineration act of defendants, defendant's counsel, and WORD in this overall fraudulent concealment effort that seeks to thwart his higher damages and liability based on the facts and claims and evidence that 154 lay witnesses unite to enter into this case. WORD knew petitioner was valuable Federal '80 lay witness for the Class in April 2009, October 2010, and May 2011 as WORD filed pleadings which aided and abetted defendant's efforts to sever us & silence new evidence from entering this case. WORD was entitled to additional citizen evidence on multiple occasions such as in July 2010 regarding 1) Heckman's submission in Argville book about the South America timing and economics of January 2001 Microsoft bid & 1) value of missing MySpace Search.

130. As independent witness by declaration in 2010 petitioner is tied this motion to bias that bring argues. The stated goal is to preclude settlement. Brown & WORD to date removes all relationship and agreements with petitioners.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed this 24th day of December at Los Angeles, California.

---

Paul E. Grommet

DECLARATION IN SUPPORT OF MOTION FOR NEW TRIAL




**ENVISTA, INC.**

**QUESTIONNAIRE FOR DIRECTORS AND OFFICERS**

1.  Employment, Occupation and Business Experience.

1.     (a)    Please set forth your full name and date of birth.

Jeffrey S. Jakal, 12/1/57

(b)    Please indicate all positions and offices, including directorships, with the Company which you hold or have held and the dates during which you held those positions and offices.

Position/Office                                            Dates

and

(c)    Please indicate all positions and offices which you hold or have held (other than positions (if any) with the Company) during the past five (5) years. Please furnish the proper name and principal business of any corporation or other organization in which such occupation and employment were carried on and whether such corporation or organization is or was a parent, subsidiary or affiliate of the Company, the dates during which you held such position and a brief summary of your business experience. If you are an officer of the Company or any of its subsidiaries, please be advised that this information is required, relating to the level of your professional competence which may include, depending upon the circumstances, such specific information as the size of the concerns supervised.

Position/Office                                            Dates

President/CEO & Director Starworks Entertainment Group Inc.     January 2000-April 2002
A successor to Sunshine Entertainment Group, Inc.
(resigned April 2002 - financial/big remainder of company
and assets NOT purchased by John Meixas
Canadian based entertainment company & theatre integration
and technology provider

President/CEO/Director Sunshine Entertainment Corp, Inc.     November 1999-12/31/2000
Grew from $25M in 1995 to $50M in 2000 and eventually
sold to John Meixas, Liberty Media in 2000.
Integrated Entertainment company involved in providing service and
Content, Large web based Sound and Music library, Sound and Music
Services partnered company 5 Academy Awards & 90 Emmys

President/CEO/Director, Enterprise Entertainment Corp, LLC.     November 2002-May 2007
(resigned May 2007, after working on seven turnaround situations)
Integrated Entertainment Company, providing non-mainstream film &



# SCHEDULE 14A INFORMATION

Proxy Statement Pursuant to Section 14(a) of the
Securities Exchange Act of 1934

EXHIBIT 38

BRAD D. GREENSPAN,

    Plaintiff,

       v.

... al.,

    Defendants.

C.A. No. 166-TCK

JUDGMENT ENTRY SETTING HEARING

In one reason of Plaintiff. THUS the above entitled action and for good cause shown,

It is hereby ORDERED that Defendants appear before a Judge of the Delaware Chancery Court at ____ o'clock ____ on the day of ____, ____ to show cause why they should not be punished for contempt as required by pre-trial Order and/or lawful ruling of this Court.

_____