USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  8/12/25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LIVEVIDEO.AI CORP, | 24-CV-6290 (DEH) (BCM) |
| Plaintiff, | |
| -against- | **REPORT AND RECOMMENDATION TO THE HON. DALE E. HO** |
| SHARI REDSTONE, et al., | |
| Defendants. | |

**BARBARA MOSES, United States Magistrate Judge.**

On January 2, 2024, the Board of Directors of the publicly-traded media conglomerate Paramount Global, Inc. (Paramount) formed a Special Committee to "evaluate strategic alternatives, including third-party proposals." First Amended Complaint (FAC) (Dkt. 35) ¶ 38. On July 7, 2024, the Special Committee approved a proposed merger between Paramount and Skydance Media, LLC (Skydance), valued at approximately $8 billion. *Id*. ¶¶ 42 n.18, 52, 79. On August 7, 2025, after the required regulatory approvals were obtained, the merger closed.[1]

In this action, referred to me for general pretrial supervision and report and recommendation on dispositive motions, plaintiff LiveVideo.AI Corp (LiveVideo) seeks billions of dollars in damages from National Amusements Inc. (NAI), which was the parent company of Paramount; Shari Redstone, who was the President of NAI and the Chair of the Paramount Board of Directors; Christine Varney, who served as an outside attorney for the Paramount Special Committee; and "Monica" Seligman, who was allegedly a member of the Paramount Special Committee. FAC ¶¶ 1, 5-8.[2] According to plaintiff, these defendants violated the whistleblower

---

[1] *See* Paramount 7/7/25 Form 8-K, *available at* https://ir.paramount.com/static-files/87a71eaf-4f9a-43e7-ac3a-8f881de63a20 (all websites last visited August 12, 2025).

[2] No individual named Monica Seligman ever sat on the Paramount Special Committee. *Nicole* Seligman was an outside director of Paramount and a member of the Special Committee until April 2024, when she (and three other directors) stepped down. *See* Paramount 4/11/24 Preliminary

provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) and committed various state law torts by failing to return voicemail messages left for Ms. Redstone in June 2024 by LiveVideo's principal, Brad Greenspan, and by ignoring his July 5, 2024 letter offering to purchase Paramount on better terms than those offered by Skydance. *Id*. ¶¶ 42-118. Separately, plaintiff alleges that defendants violated the Computer Fraud and Abuse Act (CFAA) by opening a May 6, 2024 "test email" that Mr. Greenspan sent to a former Paramount executive at his former Paramount email address. *Id*. ¶¶ 119-32

As discussed in more detail below, plaintiff's federal claims, upon which this Court's jurisdiction hangs, are frivolous. Moreover, since filing this action one year ago, LiveVideo has flooded the docket with meritless, repetitive, and frequently incoherent filings. On September 17, 2024 (after more than a dozen unsuccessful attempts), plaintiff succeeded in filing an initial complaint, followed immediately by the FAC, which became – and remains – its operative pleading. However, plaintiff failed to serve the FAC on any defendant within the 90-day period prescribed by Fed. R. Civ. P. 4(m). It also failed, despite judicial prompting, to make a timely motion to enlarge that period. Instead, plaintiff moved aggressively to default all four defendants, without having properly served any of them. When that failed, plaintiff churned out a series of motions to modify, alter, reconsider and/or vacate this Court's prior rulings regarding service and default, together with a motion to "supplement" the FAC with new and equally frivolous claims under the federal securities laws. When the reconsideration motions were denied, plaintiff filed a string of objections pursuant to 28 U.S.C. § 636(b)(1)(A), followed by a motion to revoke my

---

Schedule 14-A, *available at* https://ir.paramount.com/sec-filings/sec-filing/pre-14a/0001193125-24-093320 (disclosing that Seligman would not stand for re-election).

reference. Additionally, plaintiff has repeatedly disobeyed my February 12, 2025 order staying briefing on its motion to supplement the FAC pending decision on NAI's (now fully-briefed) motion for sanctions pursuant to Fed. R. Civ. P. 11. Most recently, on August 6, 2025, plaintiff filed an *ex parte* motion for a temporary restraining order (TRO) to prevent the closing of the Paramount/Skydance merger the next day, supported by a declaration attesting, falsely, that NAI was "properly served" and that good service was "undisputed." The TRO motion was denied by the Hon. Gregory Woods, United States District Judge, sitting in Part I.

All of LiveVideo's submissions (with one exception, discussed below) have been electronically filed using the ECF credentials of its counsel of record, Alfred C. Constants III, and signed in Mr. Constants' name. However, counsel has admitted that he did not prepare, review, or file at least one of plaintiff's motions (which sought reconsideration of an order denying reconsideration of a prior order). Moreover, there is substantial evidence in the record suggesting that the true author of that motion – and likely others – was Mr. Greenspan himself, who filed them using Mr. Constants' name and ECF account.

This Report and Recommendation (Report) addresses two interrelated issues: (1) whether this action should be dismissed pursuant to Rule 4(m) due to plaintiff's failure to timely serve any of the named defendants with the operative complaint and its inability to show good cause for that failure; and (2) whether plaintiff and its counsel should be sanctioned pursuant to Rule 11 or the Court's inherent powers to deter them from filing further frivolous pleadings and motions and prevent them from continuing their pattern of vexatious litigation.

For the reasons that follow, I recommend that the case be dismissed, without prejudice, pursuant to Rule 4(m) (mooting plaintiff's remaining pending motions); that monetary sanctions

in the amount of $10,000, payable to the Clerk of Court, be imposed jointly and severally against plaintiff and its counsel pursuant to Rule 11; that plaintiff's counsel be referred to this Court's Grievance Committee; and that a limited filing injunction be issued to prevent plaintiff from continuing to advance the frivolous claims it has raised in this action.

## I.    BACKGROUND

I assume familiarity with the Court's previous orders in this action. *See, e.g.*, *Livevideo.Ai Corp. v. Redstone*, 2024 U.S. Dist. LEXIS 174703 (S.D.N.Y. Sept. 26, 2024) (9/26/24 Order) (Dkt. 46); *Livevideo.Ai Corp. v. Redstone*, 2024 U.S. Dist. LEXIS 228982 (S.D.N.Y. Dec. 18, 2024) (12/18/24 Order) (Dkt. 69); *LiveVideo.AI Corp. v. Redstone*, 2025 WL 641465, 2025 U.S. Dist. LEXIS 35813 (S.D.N.Y. Feb. 27, 2025) (2/27/25 Order) (Dkt. 123); *LiveVideo.AI Corp. v. Redstone*, 2025 WL 1435104, 2025 U.S. Dist. LEXIS 95252 (S.D.N.Y. May 19, 2025) (5/19/25 Order) (Dkt. 142). In this Report, I set out the facts and procedural history only to the extent necessary to resolve the questions now before me.

### A.    Factual Background

#### 1.    LiveVideo and its CEO

LiveVideo is a Delaware corporation, formed in 2023,[3] that describes itself as a "NY-based Artificial Intelligence technology company." FAC ¶¶ 1, 4. As this Court has previously noted (*see* 5/19/25 Order at 1),[4] LiveVideo has no apparent assets (beyond "joint IP" acquired from its founder and CEO, Mr. Greenspan, *see* FAC ¶ 30), no apparent customers, no apparent revenue, and no

---

[3] *See* Entity Search, Department of State, Division of Corporations, State of Delaware, *available at* https://icis.corp.delaware.gov/ecorp/entitysearch/NameSearch.aspx.

[4] Pin citations to prior orders of this Court are to the page numbers in the orders as filed on the docket of this action.

apparent employees (aside from Mr. Greenspan). Its eponymous website, at https://livevideo.ai, consists of a single page with no functional links or contact information.

Mr. Greenspan was once the CEO of eUniverse (later known as Intermix), the parent company of the early social network Myspace.com. According to the FAC, he resigned from that position in October 2003 to expose "wrongdoing" by an outside venture capital firm that gained control of the company with the assistance of "unscrupulous members of the Board of Directors." FAC ¶ 13. In 2005, those directors oversaw the sale of Myspace to News Corp. on terms that Mr. Greenspan believed to be insufficient. *Id*. Mr. Greenspan made a competing bid, backed by Viacom (which later became part of Paramount). *Id*. ¶¶ 14-16. The Greenspan/Viacom bid was unsuccessful. *Id*. ¶¶ 21-24.[5] However, Mr. Greenspan developed a "friendly relationship" with Robert M. Bakish, who was then a senior Viacom executive. *Id*. ¶¶ 14, 24.

## 2. Greenspan's Litigation History

Mr. Greenspan has devoted much of his energy in recent decades to filing and pursuing lawsuits, many of them rehashing his claims arising out of the sale of Myspace in 2005. In those suits he has frequently used tactics similar to those seen here. As a result, at least three federal district courts have sanctioned him, refused to accept further filings from him, or both. *See Peermusic, III, Ltd. v. LiveUniverse, Inc.*, 2011 WL 2358549, at *12 (C.D. Cal. May 24, 2011) (recommending terminating sanctions due to "[w]illfulness, fault and/or bad faith on the part of Mr. Greenspan," which he "repeatedly demonstrated throughout this litigation" and which lesser

---

[5] For a detailed description of the competing bids and the first round of follow-on litigation, *see Greenspan v. Intermix Media, Inc*, 2008 WL 4837565, at *6 (Cal. Ct. App. Nov. 10, 2008) (unpublished) (affirming the dismissal, with prejudice, of all of Greenspan's claims arising out of the News Corp./Intermix transaction).

sanctions did not curb), *adopted*, 2011 WL 2415786 (C.D. Cal. June 16, 2011); *Greenspan v. IAC/ InterActiveCorp*, 2016 WL 5724972, at *2-3 (N.D. Cal. Sept. 30, 2016) (noting that Greenspan "has litigated or attempted to litigate claims arising out of the Myspace sale in several other cases," declaring him a "vexatious litigant," imposing a filing injunction, and ordering him to pay attorney's fees to defendants); Minute Order (text-only), *United States of America, et al. v. Google, LLC*, No. 20-CV-03010 (D.D.C. Jan. 25, 2024) (denying Greenspan's request to intervene in the government's antitrust case against Google – and his motions to recuse the presiding judge and another district judge – and directing the Clerk "to accept no further filings from Mr. Greenspan in this matter, absent leave of court," due to "his history of frivolous, repetitive filings").[6]

In addition, Mr. Greenspan has at least twice been found to have submitted litigation papers himself even though he (or one of his companies) was represented by counsel. In *Peermusic III*, the court struck the improperly-filed documents after determining that Greenspan's counsel improperly "enabled" this practice by permitting his client to file "pro se" pleadings using counsel's ECF credentials. 2011 WL 2358549, at *10-12 & n.10. In *IAC*, Mr. Greenspan's attorney was granted leave to withdraw from the representation due in part to "plaintiff's pro se filing of the motion to intervene without the knowledge or involvement of counsel." *Greenspan v.*

---

[6] *See also* Order (ECF No. 2075382), *In re Brad Greenspan*, No. 24-5007 (D.C. Cir. Sept. 18, 2024) (denying Greenspan's motion for reconsideration of the court's prior order denying him a fourteenth extension of time to file a petition for rehearing, and directing the Clerk to accept "no further filings from petitioner[.]"); Transcript (ECF No. 107) at 8:24-9:1, *LiveUniverse, Inc. v. Muijrers*, No. 22-CV-4918 (D.N.J. Dec. 24, 2024) (warning Mr. Greenspan directly, after three lawyers in a row withdrew from representing the Greenspan-controlled corporate plaintiff and a fourth lawyer appeared only after the deadline for doing so expired: "I think you're . . . jerking the defendants around, and you're jerking the Court around at this point.").

*IAC/Interactivecorp*, 2016 WL 9185281, at *2 (N.D. Cal. May 5, 2016) (internal quotation marks omitted), *aff'd*, 696 F. App'x 279 (9th Cir. 2017).

### 3.    Plaintiff's Claims

Plaintiff's claims in this action arise primarily from Mr. Greenspan's efforts to acquire control of Paramount in June and July 2024.[7] In January 2024, Ms. Redstone "put NAI up for auction," and Paramount formed its Special Committee to evaluate bids. FAC ¶ 38. On April 26, 2024, Paramount announced the resignation of Mr. Bakish as CEO. *Id*. ¶ 40. On May 6, 2024, while considering whether it would be "prudent" to "make an offer to acquire Paramount," Mr. Greenspan sent a "a test email" to Mr. Bakish's Paramount email address, with the subject line "Perfect move opportunity!" *Id*. ¶¶ 120 & n.37.[8]

On June 3, 2024, Mr. Greenspan learned from news reports that the Paramount Special Committee had accepted Skydance's proposal for an $8 billion merger. FAC ¶¶ 42 & n.18. This apparently prompted him into action. Over the next eight days (between June 3 and June 11, 2024),

---

[7] The previous year, Mr. Greenspan made several unsuccessful attempts to develop a business relationship with Paramount. In July 2023, he contacted an executive at Paramount's publishing arm, Simon & Schuster, and requested a meeting "to present a proposal for a strategic digital media AI partnership benefitting S&S." FAC ¶ 29. Insofar as can be gleaned from the FAC, no meeting took place. In August 2023, Mr. Greenspan emailed Mr. Bakish – who was by then the CEO of Paramount – "with a new idea as part of a planned stratagem to begin development of joint IP LiveVideo.AI had acquired from its CEO into valuable film and television assets." *Id*. ¶ 30. The "planned stratagem" was "to create and market films, TV, [and] books based on . . . the true story of Myspace.com." *Id*. ¶ 31. Insofar as can be gleaned from the FAC, Bakish did not respond. In September 2023, Greenspan sent another email proposal to Bakish, inviting Paramount "to discuss taking a strategic stake in LiveVideo.AI Corp." *Id*. ¶ 34. This time, Bakish responded by "declining to invest cash in purchasing a minority equity stake in a private company at that time." *Id*.

[8] Plaintiff explains that Greenspan wanted to "find out" whether Bakish "might still have access to his corporate email," but also "assumed it was possible a Paramount employee might now be reviewing the former CEO's email inbox." FAC ¶¶ 120-22. The FAC does not reveal whether Mr. Greenspan's May 6 email had any content beyond its subject line.

he left "five very detailed voice messages" for Ms. Redstone's executive assistant, explaining that his company "was interested in making a better offer for Paramount's shares." *Id.* ¶¶ 43, 46, 48 & nn.19, 21. He left a similar message for Paramount's General Counsel. *Id.* ¶ 48.

No-one returned Mr. Greenspan's calls. FAC ¶ 54. Undeterred, on July 5, 2024, he faxed a letter to Ms. Redstone, proposing that NAI sign a nondisclosure agreement as a first step towards negotiating a purchase of NAI by LiveVideo "on superior terms to what has been reported in the recent press articles regarding a Skydance transaction." *Id.* ¶ 51 & Ex. 1. Once again, NAI failed to respond. *Id.* ¶¶ 51, 54. Two days later, the Paramount/Skydance merger agreement was announced. *Id.* ¶¶ 52, 79 & Ex. 2.

According to LiveVideo, defendants "deliberately sabotaged [its] potential business opportunities with Paramount" by failing to respond to Greenspan's voicemails or letter, "refusing to involve the Special Committee and Board of Directors in any follow-up with LiveVideo.AI," and "conceal[ing]" its bid from Paramount's public shareholders. FAC ¶¶ 51-54, 87-90. This constituted "a calculated plot to harm the plaintiff's business prospects," *id.* ¶ 88, resulting in "immeasurable damage." *Id.* ¶ 91.

Additionally, plaintiff alleges that the individual defendants engaged in various acts of misconduct wholly unrelated to LiveVideo. For example, plaintiff accuses defendant Varney of harming Mr. Greenspan in 2005, "while serving as top lawyer for News Corp in its completed acquisition of eUniverse," by orchestrating "a plan to pay off key individuals with under-the-table cash bribes" so that they would favor News Corp.'s bid. FAC ¶¶ 65-67. Similarly, plaintiff accuses defendant Seligman of injuring Mr. Greenspan more than twenty years ago – when she was General Counsel of Sony Corporation of America – by "wrongfully adding a non Sony employee

into eUniverse's Series B right for a Sony employee only." *Id*. ¶¶ 81-83, 106, 115, 118. As for Ms. Redstone, plaintiff alleges that in 2014, after she "seized control of NAI," she packed its board with "Directors willing to give her what she wants," including the 2019 merger between NAI subsidiaries Viacom and CBS (forming what became Paramount), which made NAI more saleable, but was "not necessarily fair or good for shareholders of CBS, Viacom, or successor Paramount." *Id*. ¶¶ 25-27. LiveVideo was not a shareholder of CBS, Viacom, or Paramount at that time.

Invoking this Court's federal question jurisdiction pursuant to 28 U.S.C. § 1331, *see* FAC ¶ 3, plaintiff asserts two federal claims, pleaded under the Dodd-Frank Act, 15 U.S.C. § 78u-6(h)(1)(B), and CFAA, 18 U.S.C. § 1030(g), and four state-law causes of action, for unfair competition, tortious interference with business relations, aiding and abetting breach of fiduciary duty, and unjust enrichment. The state-law claims all arise out of NAI's failure to respond to Mr. Greenspan's voicemails and letter. *See* FAC ¶¶ 57, 71-75, 77-79, 85-92, 98, 102-03. The Dodd-Frank claim alleges that defendants "discriminated against" Mr. Greenspan (by failing to call him back or respond to his letter) because he was "investigating" certain alleged "conflicts of int[e]rest behind the Skydance offer." *Id*. ¶¶ 107-12. The CFAA claim alleges that defendants improperly accessed the May 6, 2024 "test email" that Mr. Greenspan sent to Mr. Bakish's former Paramount email address. *Id*. ¶¶ 120-131.[9]

---

[9] Greenspan sent the email using "an online marketing software pixel" to track whether and when his message was received, read, or forwarded. FAC ¶ 124. He later learned, thanks to the pixel, that the email was forwarded to other computers and "read by at least three individuals," including, "most likely Redstone, and Varney, who should not have had access" to "Paramount owned property" (Bakish's inbox), because they were not Paramount employees. *Id*. ¶¶ 127-29 & n.38.

**B.**    **Procedural History**

**1.**    **Pleadings**

Plaintiff initiated this action on August 20, 2024. However, its first 13 pleading attempts were rejected by the Clerk of Court for non-compliance with the Electronic Case Filing (ECF) rules. *See* Dkts. 1, 2, 6, 12, 13, 24, 25, 26, 27, 29, 30, 31, 32.[10] Finally, on September 17, 2024, plaintiff managed to file a document entitled "Complaint and Jury Demand" (Dkt. 34),[11] followed by the FAC, thereby exercising its right to amend once, "as a matter of course," pursuant to Fed. R. Civ. P. 15(a)(1). Summonses were issued that same day as to all four defendants named in the FAC. (Dkts. 40-43.) Under Fed. R. Civ. P. 4(m), plaintiff's deadline for service of process was December 16, 2024.

On September 19, 2024, plaintiff attempted to file another pleading, entitled "Second Amended Complaint and Jury Demand" (Dkt. 44), which the Clerk rejected for failure to obtain defendants' consent or leave of Court, as required by Fed. R. Civ. P. 15(a)(2). Although I gave plaintiff until October 3, 2024, to submit a properly supported motion for leave to further amend, *see* 9/26/24 Order at 2, it did not do so. Accordingly, on October 11, 2024, I denied leave to file

---

[10] These documents varied quite a bit. For example, Dkt. 1, entitled "Complaint and Jury Demand," listed seven defendants and set out four claims, all under state law, in 37 pages (exclusive of exhibits). Dkt. 6, also entitled "Complaint and Jury Demand," listed four defendants and set out four claims, under state law, in what should have been 37 pages. However, all of the even-numbered pages were missing. Dkt. 24, submitted on September 3, 2024 and entitled "First Amended Complaint and Jury Demand," listed four defendants and set out four state law claims and two federal claims, in 51 pages. Dkt. 32, submitted on September 13, 2024 and entitled "Second Amended Complaint and Jury Demand," listed the same defendants and set out essentially the same claims as Dkt. 24. However, it also included passages that did not appear in earlier iterations of the pleading. *Compare*, *e.g.*, Dkt. 24 ¶¶ 1-7 *with* Dkt. 32 ¶¶ 1-3.

[11] Although accepted for filing by the Clerk, the Complaint and Jury Demand at Dkt. 34 is also missing all of its even-numbered pages.

the proposed pleading at Dkt. 44 and confirmed that "[t]he FAC (Dkt. 35) remains the operative complaint." (Dkt. 47.)

### 2.    Initial Service Attempts and Entry of Default

On November 8, 2024, the Clerk of Court received a UPS envelope from "NYU Mail Services" in New York City, enclosing an affirmation of service as to Ms. Redstone, in which a process server named Robert Roberts attested that he personally served her at the Maryland office of the Corporation Trust Incorporated (Corporation Trust), NAI's agent for service of process. Given the unusual manner of delivery – and because "it seem[ed] unlikely that Ms. Redstone was personally served" at Corporation Trust – the Court "decline[d] to accept the purported Affirmation of Service for filing," and directed attorney Constants that if he wished to file the document, "he must do so electronically under his own ECF credentials." (Dkt. 48.) Plaintiff never e-filed that initial affirmation of service.

Instead, on December 3 and December 9, 2024, plaintiff e-filed two affirmations of service as to NAI (not Redstone), in which Mr. Roberts attested that he served NAI with a "federal summons and complaint" by delivering those documents to Corporation Trust on November 6, 2024. (Dkts. 49, 56.) Plaintiff then requested a Certificate of Default against NAI (Dkts. 50-55, 57-62), which the Clerk issued on December 9, 2024. (Dkt. 63.)

### 3.    Vacatur of Default

Two days later, on December 11, 2024, NAI appeared through counsel and moved to set aside the entry of default against it pursuant to Fed. R. Civ. P. 55(c), arguing that plaintiff delivered the wrong pleading to Corporation Trust, but assuring the Court that in the event it was properly served it would "vigorously defend against Plaintiff's frivolous case." (Dkt. 65 at 1-2.) That same

11

day, I issued a scheduling order directing plaintiff to respond by December 16, 2024, and to submit admissible evidence "identifying exactly what was served on NAI and in what manner." 12/11/24 Order (Dkt. 66) at 1. In response, plaintiff filed a new declaration from Mr. Roberts, in which he confirmed that the "amended complaint" he delivered to Corporation Trust on November 6, 2024, was the "Second Amended Complaint" that plaintiff attempted to file at Dkt. 32, but which the Clerk rejected. *See* 12/13/24 Roberts Decl. (Dkt. 67 at ECF pp. 3-6) ¶ 10.

On December 18, 2024, I granted NAI's Rule 55(a) application and vacated the default, because "plaintiff has conceded that the pleading it served upon NAI was never its operative complaint,"[12] and because – faulty service aside – the Court "reach[ed] the same result after considering the three traditional 'good cause' factors under Rule 55(c)[.]" 12/18/24 Order at 2. Although the 90-day service deadline pursuant to Rule 4(m) had by then expired, I denied NAI's request to dismiss the case entirely. *Id.* at 3. Instead, noting that Rule 4(m) contemplates an extension of the 90-day period on a showing of "good cause," I directed plaintiff to make any extension motion no later than January 3, 2025. *Id.*

### 4.    First Reconsideration Motion and Order to Show Cause

January 3 came and went, but plaintiff did not move for an extension of its time to serve defendants with a summons and the operative complaint. Nor did it file any new affidavits of service. Instead, on January 13, 2025, plaintiff filed a motion asking this Court to "modify or alter" the 12/18/24 Order pursuant to Fed. R. Civ. P. 59(e) and reinstate the entry of default against NAI.

---

[12] The differences between Dkt. 32 (the document delivered to Corporation Trust) and Dkt. 35 (the operative FAC) went well beyond their titles. Although both versions of the pleading are dated September 3, 2024 (which is not the date on which either of them was submitted), several paragraphs were substantially rewritten. *Compare*, *e.g.*, Dkt. 32 ¶¶ 1-7 *with* Dkt. 35 ¶¶ 1-7.

(Dkt. 70.)[13] Treating the motion as one for reconsideration under Local Civil Rule 6.3, I denied it. *See* 1/28/25 Order (Dkt. 74) at 3-7. Additionally – having seen no indication that *any* defendant was timely served with a summons and the FAC – I directed LiveVideo to show cause why the case should not be dismissed under Rule 4(m). *Id*. at 7.

### 5.    Second Reconsideration Motion and Show-Cause Hearing

After one adjournment, caused by attorney Constants' failure to calendar the date of the show-cause hearing, the hearing was scheduled for the morning of February 12, 2025. *See* 2/5/25 Order (Dkt. 77) at 1-2. Beginning at 5:19 p.m. on February 11, 2025, plaintiff filed three new affirmations of service (as to defendants Redstone, Varney, and Seligman), together with two new motions (for leave to file a supplemental pleading and for reconsideration of the 1/28/25 Order). The affirmation of service as to Ms. Redstone, signed by Mr. Roberts, stated that a summons and "amended complaint" were delivered to Corporation Trust in Maryland on November 6, 2024. (Dkt. 79 at ECF p. 1.) The affirmations of service as to Ms. Varney and Ms. Seligman, signed by a New York-based process server, stated that a summons and "amended complaint" were delivered

---

[13] Although plaintiff's Rule 59(e) motion, supporting affidavit, and supporting brief bore the (typed) signature of attorney Constants, the documents were notable for their odd formatting, poor grasp of legal citation basics, jumbled and incomplete sentences, incomprehensible paragraphs, random quotations from inapposite cases, and multiple non sequiturs. *See*, *e.g*., Dkt. 70 (titled "Plaintiff's Notice Motion 59e"); Dkt. 70-2 at 6 ("The defendant here cannot progress using waived 12(b)(4) dispositive 4(m) dismissal ecf underpinned by CT Corp, which is erroneously registered as the agent in Maryland."); *id*. at 7 ("Alter Docket #35 complaint with OSC Reply Amendment Evidence (Dkt. 33)."); *id*. at 9 ("Omission for 10 days on $2.05 billion dollar default judgment pending Order should have been part of the mix from December 16, 2024"); *id*. at 14 ("because the Magistrate assumption LiveVideo.AI Corp claims to be a 'whistleblower' pursuant to § 240.21F-2 is false."). Additionally, the brief included passages that bore telltale signs of having been supplied by ChatGPT or a similar AI tool. *See* Dkt. 70-2 at 10 ("Here's a revised and more coherent version of the text, with duplicate ideas removed and missing ideas added to lists[.]").

to the mailroom of Ms. Varney's law firm, and to the mailroom at Paramount, on December 30, 2024 – two weeks *after* the 90-day service period expired. (Dkts. 80, 81.)

The motion to supplement, made pursuant to Fed. Civ. P. 15(d), sought leave to add a claim under § 10(b) of the Securities Exchange Act of 1934 (Exchange Act) and SEC Rule 10b-5, as well as three related federal securities claims, alleging that defendants defrauded LiveVideo by failing to disclose in Paramount's SEC filings that NAI was "properly served" in this action on November 6, 2024, and that a default was entered against it on December 9, 2024. *See* Prop. Supp. Pleading (Dkt. 84 at ECF pp. 2-72) ¶¶ 154-163, 190-92, 200-01, 212.[14]

The motion for reconsideration, made pursuant to Local Civ. R. 6.3, was aimed at the 1/28/25 Order – which denied plaintiff's previous motion for reconsideration of the 12/18/24 Order. Although the second reconsideration motion (Dkt. 85) and accompanying brief (Dkt. 86) bore the typed signature of attorney Constants, they too were notable for their odd formatting, poor grasp of legal citation basics, jumbled and incomplete sentences, incomprehensible paragraphs, random quotations from inapposite cases, and multiple non sequiturs.[15]

---

[14] For purposes of its proposed securities fraud claims, LiveVideo alleges that it "became a [Paramount] stockholder starting in July 2024[.]" Prop. Supp. Pleading ¶ 153. But it never explains how it could have been defrauded by Paramount's failure to disclose information about its own lawsuit – much less how those omissions could have induced it to purchase Paramount stock in July 2024 (before they were made), as required to state a Rule 10b-5 claim. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) ("To recover damages for violations of section 10(b) and Rule 10b-5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.") (cleaned up).

[15] *See*, *e.g.*, Dkt. 85 (titled "Notice of L.R. Motion 6.3"); Dkt. 86 at 4 ("Defendant use of an informational ecf letter a compliant magistrate waivers into a legitimate letter-motion is the very act the Federal SDNY L.R., ECF, and presiding Judge Ho created rules specifically designed to neutralize.").

Notably absent from this flurry of filings was any effort to show good cause for plaintiff's failure to serve NAI or Redstone with the operative complaint (or its failure to serve Varney or Seligman with *any* complaint) by December 16, 2024. Nor did plaintiff address its failure to seek an extension of that period by the January 3, 2025 deadline set by this Court – or at all.

At the February 12, 2025 hearing, Mr. Constants confirmed that he did not submit the initial affirmation of service as to Ms. Redstone that was mysteriously sent to the Court from NYU Mail Services. *See* 2/12/25 Tr. (Dkt. 90) at 7:24-25 ("I don't know who sent it."). He then acknowledged that delivery to Corporation Trust was "not good service" on an individual defendant such as Ms. Redstone. *Id.* at 7:13-20. Additionally, he confirmed the Court's suspicion that he did not write, review, authorize, or file plaintiff's second reconsideration motion, filed earlier that morning. Nor could he explain its purpose. As to plaintiff's previous briefs, Mr. Constants stated that he "filed" all of them, but acknowledged that he did not "write" all of them:

[THE COURT:] Mr. Constants, did you write this brief [Dkt. 86]?

MR. CONSTANTS: No, I did not, Judge.

THE COURT: Who wrote it?

MR. CONSTANTS: A paralegal.

THE COURT: A paralegal wrote it.

MR. CONSTANTS: That's correct.

THE COURT: Did you review it before you filed it? Wait. Did you file it or did someone else file it?

(Pause)

THE COURT: It was filed under your ECF registration.

MR. CONSTANTS: It was last night. I did not do that.

15

THE COURT: Did you review it before it was filed?

MR. CONSTANTS: No. No, your Honor.

THE COURT: And would your answer be the same with respect to some of the earlier briefs filed in this action?

MR. CONSTANTS: No. All of the other briefs I did file.

THE COURT: Did you write them?

MR. CONSTANTS: Some of them I did, some of them I did not.

*** 

THE COURT: So what's the purpose of Docket 86?

MR. CONSTANTS: I do not know, Judge.

THE COURT: So your ECF number was used to file motion papers that you didn't write, didn't review, didn't file, and don't know the purpose of. Is that correct?

MR. CONSTANTS: I filed the summonses and complaints last night. I believe that the others were filed by the paralegal.

THE COURT: Without you having written them, reviewed them, or ascertained their purpose. Correct?

MR. CONSTANTS: 86 I did not do, no. That's correct, Judge.

2/12/25 Tr. at 22:20-23:14, 23:25-24:11.[16]

With respect to the service issue, Mr. Constants moved orally – for the first time – for a *nunc pro tunc* extension of time to serve the summons (and the correct complaint) on all defendants. 2/12/25 Tr. at 12:9-16. However, he was unable to articulate "good cause," as required

---

[16] Attorney Constants never identified the "paralegal" who wrote and filed the second reconsideration motion without his input or knowledge. Nor did he identify the author of the other briefs that he himself did not write. I note, in this regard, that during the same show-cause hearing, attorney Constants explained his failure to calendar the original date of the show-cause hearing by stating, "It's just me, Judge, I did not calendar it. . . . There's nobody else." 2/12/25 Tr. at 5:21-25.

by Rule 4(m), for plaintiff's failure *either* to serve the correct pleading within the 90-day period specified by Rule 4(m) *or* to request an extension of that period by the deadline set forth in the 12/18/24 Order. *See id.* at 9:15-12:8, 13:17-14:12. Consequently, I denied the untimely oral extension motion, *id.* at 14:13-14, 25:5-7; *see also* 2/12/25 Order (Dkt. 87) ¶ 1, but – in light of the newly-filed affirmations of service – reserved on the question whether the case should be dismissed entirely for failure to effect timely service. 2/12/25 Tr. at 25:7-10.

I then gave NAI a briefing schedule for its planned motion for Rule 11 sanctions, *see* 2/12/25 Tr. at 24:12-24,[17] and stayed briefing on both of plaintiff's newly-filed motions. *Id.* at 24:25-25:4; 2/12/25 Order ¶¶ 4-5. Finally, I reminded plaintiff's counsel that it is sanctionable for an attorney to file (or allow others to file in his name) motions or other papers that the attorney has not personally written or reviewed, 2/12/25 Tr. at 25:22-26:1; 2/12/25 Order at 2-3, and gave plaintiff an opportunity to withdraw its second reconsideration motion and/or its motion to supplement. 2/12/25 Order ¶ 5.

Later that day, plaintiff withdrew its second reconsideration motion. (Dkt. 88.) It did not, however, withdraw its motion to supplement the FAC, which remains stayed.

### 6.    Additional Default Efforts

Beginning on February 18, 2025 – six days after the show-cause hearing – plaintiff filed (or attempted to file) 18 different requests (some of them fragmentary) for Certificates of Default against defendants Redstone, Varney, and Seligman. (Dkts. 92-108.)[18] In response, on February

---

[17] NAI advised, during the hearing, that it had served its "safe harbor letter" more than 21 days earlier, in accordance with Fed. R. Civ. P. 11(c)(2). *See* 2/12/25 Tr. at 16:9-19.

[18] All of these requests appear to be signed by Mr. Constants, albeit on several different dates and in a confusing variety of typed and handwritten styles, some of them providing inconsistent contact

19, 2025, NAI and Redstone filed a letter-motion asking the Court to direct the Clerk "not to enter a default against any of the defendants," at least until the Court "has ruled on dismissal under Rule 4(m)." (Dkt. 109 at 3.) Plaintiff filed an opposition letter-brief on February 20, 2025. (Dkt. 114.) On February 27, 2025, after careful review of the underlying affirmations of service, the Court concluded that plaintiff "failed to show 'that the requirements of Fed. R. Civ. P. 4 for service or waiver of service [had] been satisfied,' as mandated by [Local Civil] Rule 55.1(a)(2)," as to any of the individual defendants, *see* 2/27/25 Order at 13, and directed the Clerk that "[n]o Certificate of Default shall be issued as to these defendants absent further order of the Court." *Id*. at 18.[19]

### 7.    NAI's Motion for Sanctions

On February 26, 2025, NAI timely filed its motion for sanctions against plaintiff and its counsel pursuant to Rule 11(b)(1), Rule 11(b)(2), and the Court's inherent powers (Dkt. 120), supported by a memorandum of law (Def. Sanctions Mem.) (Dkt. 121) and the Declaration of Ani-Rae Lovell (Dkt. 122), attaching, among other things, NAI's pre-motion letter (Def. Sanctions Ltr.)

---

information. *Compare*, *e.g.*, Dkt. 92 at ECF p. 2 (bearing a typed signature, dated February 11, 2025, above an email address ending in "@protonmail.com") *with* 92-1 at ECF p. 3 (bearing a handwritten signature, dated February 18, 2025, above a blank email address) *with* Dkt. 94 at ECF p. 2 (bearing a typed signature, dated February 13, 2025, above an email address ending in "@gmail.com").

[19] As to Ms. Redstone, service was ineffective for two primary reasons: plaintiff served the wrong complaint, and served it only on Corporation Trust, which was not authorized to accept service on her behalf. 2/27/25 Order at 13-16. As to Ms. Varney, service was ineffective because – even assuming, *arguendo*, that plaintiff delivered the FAC to her law firm – it did so on December 30, 2024, 104 days after the FAC was filed, and it failed to follow up with the mailing required by N.Y.C.P.L.R. § 308(2). *Id.* at 16-17. Likewise, as to Ms. Seligman, plaintiff made no effort to serve her until December 30, 2024, and failed to follow up with the required mailing. *Id*. at 17. Moreover, although *Nicole* Seligman was once a Paramount director, she was never an employee, and she left the board in April 2024. "Any argument that the real Ms. Seligman could be served by delivery to the Paramount mailroom evaporated when she left the Paramount board." *Id*.

(Dkt. 122-14), which was served upon plaintiff, along with a copy of the motion itself, on December 30, 2024. On March 13, 2025, plaintiff filed its opposition memorandum (Pl. Sanctions Opp.) (Dkt. 127),[20] and on March 19, 2025, NAI filed its reply brief (Def. Sanctions Reply) (Dkt. 131).

### 8.    Plaintiff's Continuing Stay Violations

Notwithstanding this Court's order staying briefing on plaintiff's motion to supplement its pleading, plaintiff has continued to file papers in support of its effort to further expand its claims. On March 17, 2025, plaintiff filed an "amended" motion to supplement its pleadings pursuant to Rule 15(d) (Dkts. 128-30, 134),[21] this time seeking leave to add the same federal securities claims described in its stayed motion, plus (i) direct and derivative "shareholder breach of fiduciary duty claims" for "disloyal engineering of the [Paramount/Skydance] Merger," *see* Second Prop. Supp. Pleading (Dkt. 130 at ECF pp. 2-55) ¶ 281, and (ii) an antitrust claim, pursuant to the Sherman Act, 15 U.S.C. § 1, on the theory that defendants "unreasonably restrained trade" by preventing LiveVideo from advancing its "legitimate acquisition offer[]" for Paramount. *See id.* ¶ 290.

On April 1, 2025, the Court admonished plaintiff for violating the 2/12/25 Order, which stayed the motion to supplement; reminded plaintiff and its counsel that they were "at risk of additional sanctions"; and warned that "[s]hould plaintiff continue to file 'unauthorized, repetitive, and frivolous motions,' a filing injunction may be imposed." 4/1/25 Order (Dkt. 137) (quoting *Cunningham v. United States Marshals Serv.*, 2016 WL 11703994, at *2 (S.D.N.Y. Aug. 2, 2016)).

---

[20] In that brief, plaintiff admits, for the first time, that it served all defendants (including Varney and Seligman) "with Dkt. No. 32" rather than its operative complaint. Pl. Sanctions Opp. at 7.

[21] The Clerk rejected the notice of motion at Dkt. 128 as deficient under the ECF rules. Plaintiff refiled the same document at Dkt. 134.

However, the Court noted, it could mitigate its risk of sanctions by voluntarily withdrawing the improperly-filed amended motion to supplement, "without prejudice to refiling if and when the stay is dissolved." *Id*.

Plaintiff did not withdraw its amended motion to supplement. To the contrary: on July 17, 2025, it filed a "Request for Judicial Notice," "urgently" requesting the Court to take notice of "critical items" in connection with (among other things) its motion to supplement (Dkt. 156 at 1) and on July 28, 2025, it added "two new facts" to its request for judicial notice. (Dkt. 158 at 1.)[22]

### 9.    Motion to Vacate

On May 6, 2025, LiveVideo filed a motion pursuant to Fed. R. Civ. P. 60(b)(3) (Dkt. 138), ostensibly to vacate this Court's 12/11/24 Order (which, as noted above, set a briefing schedule for NAI's Rule 55(a) motion to set aside the default entered against it). In its supporting memorandum, plaintiff requested in the alternative that the Court vacate the 12/18/24 Order (which granted NAI's Rule 55(a) motion and which plaintiff had already *twice* moved, unsuccessfully, to reconsider). *See* Dkt. 140 at 1 n.1. Plaintiff argued, among other things, that "the overwhelming evidence shows that NAI was indeed properly served on November 6, 2024," *id*. at 2, and attached more than 300 pages of exhibits, including a proposed form of default judgment against NAI in the amount of $2.42 billion. *See* Dkt. 140-1 at ECF p.1.

---

[22] Specifically, plaintiff asks this Court to judicially notice three motions that LiveVideo itself filed before the Federal Communications Commission in opposition to the Paramount/Skydance merger. *See* Dkt. 156 at ECF pp. 5-12. These documents, plaintiff asserts, are "critical items" going to "the defendants' character and their recent actions[.]" *Id*. at ECF p. 1.

On May 19, 2025, this Court denied the motion as "beyond frivolous," pointing out that – label aside – it constituted the plaintiff's third attempt to reinstate its default against NAI, on grounds that were not improving with age and repetition. 5/19/25 Order at 6-10.

### 10.    Objections, Motion to Revoke, and *Ex Parte* TRO Motion

Plaintiff has filed objections, pursuant to 28 U.S.C. § 636(b)(1)(A) and Fed. R. Civ. P. 72(a), to the 2/12/25 Order, the 2/27/25 Order, and the 5/19/25 Order. *See* Dkts. 118, 126, 143.[23] All have been fully-briefed, and all remain pending before the Hon. Dale E. Ho, United States District Judge. Additionally, on June 21, 2025, plaintiff moved to revoke my reference (Dkt. 147), on the grounds, among others, that I violated the federal antitrust laws, *see* Dkt. 148 at 1-2; that I am biased, *see id.* at 7-8; and that I have refused to consider "new evidence" concerning defendants' "character." *Id.* at 8-9.[24] The motion to revoke has also been fully briefed, and remains pending before the district judge.

On July 7, 2025, Judge Ho expanded my reference (previously limited to pretrial management) to include report and recommendation on dispositive motions. (*See* Dkts. 5, 152.)

Most recently, on August 6, 2025 – the day before the Paramount/Skydance merger was scheduled to close – plaintiff filed an *ex parte* motion for a temporary restraining order to prevent

---

[23] Plaintiff did not, however, file any objections to the 12/18/24 Order. Consequently, plaintiff has waived appellate review of this Court's decision to vacate the entry of default against NAI. *See* Fed. R. Civ. P. 72(a) ("A party may not assign as error a defect in the order not timely objected to."); *Kilcullen v. New York State Dep't of Transp.*, 55 F. App'x 583, 585 (2d Cir. 2003) (summary order) (dismissing appeal from magistrate judge's nondispositive ruling because appellant, having failed to object under Rule 72(a), "may not challenge that ruling in this Court").

[24] On June 21, 2025, plaintiff filed a "Request for Judicial Notice" in connection with its motion to revoke, requesting that the Court consider 11 exhibits (Dkt. 150), and on June 25 it filed the exhibits themselves, having failed to do so initially. (Dkt. 151.) None of the exhibits appear to bear on any issue in this action.

that transaction from closing. (Dkt. 161.) In a supporting affidavit, bearing the typed signature of attorney Constants, plaintiff's counsel declared, under penalty of perjury, that NAI was "properly served with process" on November 6, 2024, and that LiveVideo had "a substantial likelihood of success on the merits given the undisputed proper service of process and NAI's pattern of fraud upon the court." Constants TRO Decl. (Dkt. 161-3) ¶¶ 4-5, 10. Judge Woods unsealed and denied the TRO application that same day. (Dkt. 162.)

## II.    DISCUSSION

### A.    Rule 4(m)

Rule 4(m) provides: "If a defendant is not served within 90 days after the complaint is filed, the court – on motion or on its own after notice to the plaintiff – must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period." Fed. R. Civ. P. 4(m).

"The plaintiff bears the burden of proof in showing that it had good cause in not timely serving the defendant." *Deptula v. Rosen*, 558 F. Supp. 3d 73, 85 (S.D.N.Y. 2021) (quoting *George v. Prof. Disposables Int'l, Inc.*, 221 F. Supp. 3d 428, 432 (S.D.N.Y. 2016)). To establish good cause, a plaintiff must present "admissible evidence," *Prof. Disposables*, 221 F. Supp. 3d at 445-46, demonstrating that "despite diligent attempts, service could not be made due to exceptional circumstances beyond [its] control." *Spinale v. United States*, 2005 WL 659150, at *3 (S.D.N.Y. Mar. 16, 2005), *aff'd*, 352 F. App'x 599 (2d Cir. 2009); *accord Deptula*, 558 F. Supp. 3d at 85; *Kogan v. Facebook, Inc.*, 334 F.R.D. 393, 401 (S.D.N.Y. Feb. 3, 2020). Conversely, "good cause does not exist where the plaintiff, upon learning that a defendant was not properly served, fails

either to serve that defendant again within the time remaining under Rule 4(m) or to seek additional time within which to do so." *Deptula*, 558 F. Supp. 3d at 85; *accord Reed Holdings Inc. v. O.P.C. Corp.*, 122 F.R.D. 441, 444-45 (S.D.N.Y. 1988); *Cassano v. Altshuler*, 186 F. Supp. 3d 318, 322 (S.D.N.Y. 2016) (plaintiffs' failure to ask for more time "weighs against" a finding of good cause).

Courts in our Circuit do not hesitate to dismiss untimely served complaints if the plaintiff has not met its burden of showing good cause. *See*, *e.g.*, *O'Brien v. Rushmore Loan Mgmt. Servs., LLC*, 2025 WL 964813, at *10 (D. Conn. Mar. 31, 2025) (dismissing where plaintiff failed to serve defendants during the required 90-day period and first sought an extension two days after that period expired); *Deptula*, 558 F. Supp. 3d at 87-88 (dismissing where plaintiff first attempted to serve defendant at the wrong address, and then by mail, but offered "no explanation for [her] failure to effect proper service" thereafter) (quoting *Cassano*, 186 F. Supp. 3d at 322); *Grimes-Jenkins v. Consol. Edison Co. of N.Y., Inc.*, 2019 WL 1507938, at *5 (S.D.N.Y. Apr. 5, 2019) (dismissing where plaintiff served defendants 114 days after filing the complaint and did not show good cause for the failure to serve earlier); *Prof. Disposables,* 221 F. Supp. 3d at 433 (dismissing where plaintiff served the individual defendants 119 days after filing the operative complaint, did not show good cause for the delay, and did not seek an extension until faced with a motion to dismiss); *Kucher v. Alt. Treatment Ctr. of Paterson, LLC*, 2009 WL 1044626, at *3 (E.D.N.Y. Mar. 27, 2009) (recommending denial of default motion, and *sua sponte* dismissal pursuant to Rule 4(m), where plaintiff served original complaint but sought a default judgment on its amended complaint, which it never served on defendants), *adopted,* 2009 WL 1045989 (E.D.N.Y. Apr. 20, 2009).

Plaintiff LiveVideo filed its operative complaint – the FAC – on September 17, 2024, but failed to serve it on any defendant within the 90 days allotted by Rule 4(m).

23

As to NAI, which could be easily served through Corporation Trust, plaintiff made a single, ineffective service attempt on November 6, 2024, when it delivered the wrong pleading.[25] Thereafter, although the Court invited plaintiff to move for an enlargement of time so that it could properly serve the correct pleading (12/18/24 Order at 3), plaintiff stubbornly refused to do so. Instead, it has continued to insist, over and over again, that it "properly effectuated legal service of process on November 6, 2024[.]" Dkt. 70-2 at 16; *see also* Dkt. 86 at 7 ("The Plaintiff's process server properly served Corporation Trust Incorporation, as corroborated by Plaintiff's affidavit filed in support of entry default granted."); Dkt. 140 at 2 ("NAI was indeed properly served on November 6, 2024[.]"); Constants TRO Decl. ¶ 4 (NAI was "properly served" with process on November 6, 2024").

---

[25] It is well-settled that service of a superseded complaint does not satisfy Rule 4(m), even if the two pleadings are similar. *See*, *e.g.*, *Lau v. Fauci*, 2023 WL 3181887, at *2 (N.D.N.Y. May 1, 2023) ("Spirit is correct in arguing that Plaintiffs' service of the original complaint after the first amended complaint had been filed was not proper[.]"); *McCarthy v. Brennan*, 2020 WL 5549072, at *5 (N.D.N.Y. Sept. 16, 2020 (dismissing where plaintiff made a variety of service attempts but "has not actually effected service of the *operative* pleading—the Second Amended Complaint[.]"), *aff'd sub nom. McCarthy v. DeJoy*, 2022 WL 519180 (2d Cir. Feb. 22, 2022); *Kucher*, 2009 WL 1044626, at *3 ("Proper service of the Original Complaint does not excuse failure to serve the Amended Complaint."); *TCS Cap. Mgmt., LLC v. Apax Partners, L.P.*, 2008 WL 650385, at *10 (S.D.N.Y. Mar. 7, 2008) ("Argyros was served with a superseded complaint, so service on him was invalid."); *Phillips v. Murchison*, 194 F. Supp. 620, 622 (S.D.N.Y. 1961) (service was insufficient where plaintiff "did not serve the then complaint upon the defendant . . . but served a superseded complaint which then was no more than a mere scrap of paper insofar as the case is concerned.") (internal quotation and citation omitted). Here, plaintiff did not merely serve a "superseded" complaint; it served the "Second Amended Complaint and Jury Demand" at Dkt. 32, which was never accepted for filing by the Clerk and hence was *never* its operative pleading. Consequently, service of that document did not permit this Court to exercise personal jurisdiction over any defendant. *See Dynegy Midstream Servs. v. Trammochem*, 451 F.3d 89, 94 (2d Cir. 2006) ("Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied.").

Similarly, as to Ms. Redstone, plaintiff made a single, ineffective service attempt on November 6, 2024, delivering the wrong pleading to an entity authorized to accept service for NAI but not for Ms. Redstone personally. *See* 2/27/25 Order at 13-16. On February 12, 2025, plaintiff's counsel acknowledged in open court that service on Corporation Trust was ineffective as to Ms. Redstone. 2/12/25 Tr. at 7:13-20. Less than a week later, however, plaintiff requested a Certificate of Default against Ms. Redstone, based on the same ineffective service attempt.

As to Ms. Varney and Ms. Seligman, plaintiff "made no effort to effect service within the service period, neglected to ask for an extension within a reasonable period of time, and has advanced no cognizable excuse for the delay." *Zapata v. City of New York*, 502 F.3d 192, 199 (2d Cir. 2007). Plaintiff made its first (and only) effort to serve Varney and Seligman on December 30, 2024, 104 days after the FAC was filed. By then, of course, plaintiff knew that it had run out of time – and that "[a]ny motion to extend the time for service must be filed by January 3, 2025[.]" 12/18/24 Order at 3. Yet it did not seek an extension for another six weeks, finally making an oral motion at the Rule 4(m) show-cause hearing on February 12, 2025. *See* 2/12/25 Tr. at 12:9-10. The Court denied that motion. *See id.* at 14:13-14; 2/12/25 Order ¶ 1. Nonetheless, six days later, plaintiff requested Certificates of Default against Varney and Seligman based on the same December 30 service attempts.

This Court gave plaintiff ample notice that its case was at risk of dismissal under Rule 4(m), and plenty of opportunity to show good cause for the delay and thereby obtain an extension of its time to effect good service. *See* 12/18/24 Order at 3; 1/28/25 Order at 7; 2/5/25 Order at 1-2. But plaintiff has never shown – or even suggested – that it made "diligent attempts" to serve defendants by December 16, 2024, much less that its failure to timely serve was "due to exceptional

25

circumstances beyond [its] control." *Spinale*, 2005 WL 659150, at *3. Nor has plaintiff ever explained why it failed to seek an extension of its Rule 4(m) deadline until February 12, 2025. Consequently, plaintiff has not carried its burden of showing good cause for its failure to effect timely service, and is not entitled to any further opportunities to do so.

"Even in the absence of good cause, 'a court has the discretion to grant an extension of time to serve the defendant.'" *Deptula*, 558 F. Supp. 3d at 85 (quoting *Hahn v. Off. & Prof. Emps. Int'l Union, AFL-CIO*, 107 F. Supp. 3d 379, 382 (S.D.N.Y. 2015)); *accord Brunson-Bedi v. New York*, 2018 WL 2084171, at *6 (S.D.N.Y. May 1, 2018). However, to obtain a discretionary extension absent a showing of good cause, the plaintiff must, at a minimum, "advance some colorable excuse for neglect." *Cassano*, 186 F. Supp. 3d at 323 (quoting *Zapata*, 502 F.3d at 198). Courts then "balance justifiable excuses offered by the plaintiff, the length of the delay, and any prejudice to either party." *Spinale*, 2005 WL 659150, at *4.

Here, plaintiff has failed to advance any "colorable excuse" for its neglect. Moreover, its conduct, including its campaign to default defendants without first properly serving them, has already inflicted unnecessary burden and expense on its adversaries. Plaintiff, on the other hand, does not appear to be facing the imminent expiration of any relevant statute of limitations, and thus will not be prejudiced by a Rule 4(m) dismissal. *Cf. Zapata*, 502 F.3d at 198 ("an extension might be justified where statute of limitations would bar the refiling of an action."). Consequently, this action should now be dismissed in its entirety, without prejudice, pursuant to Rule 4(m).

### B.    Rule 11

NAI moves for sanctions against plaintiff and its counsel on two principal grounds: (i) that plaintiff's claims – in particular, the two federal claims in the FAC – are "patently frivolous," in

violation of Rule 11(b)(2), *see* Def. Sanctions Mem. at 12-16; and (ii) that this action was brought and has been pursued for the improper purpose of harassing defendants and imposing litigation costs upon them, in violation of Rule 11(b)(1). *See id*. at 19-20. Additionally, NAI proposes that plaintiff and its counsel be sanctioned pursuant to the Court's inherent powers, on the ground that "their conduct throughout these proceedings can only be understood as attempts to cause unnecessary delay and impose costs on defendants." *Id*. at 20-25. Recognizing that the burden of "dealing with both Constants and LiveVideo's behavior in this case" has largely "fallen on the Court," NAI does not seek an award of its attorney's fees or other cost-shifting sanctions. *Id*. at 20 n.15. Instead, it suggests "a substantial monetary sanction, to be paid into the Court," in order to deter further repetition of the sanctionable conduct. *Id*. at 25.

### 1.    Legal Standards

Rule 11 "authorizes a court, after notice and a reasonable opportunity to respond, to impose appropriate sanctions upon a party, its attorney, or both, for violating [their] obligations to the court as set forth by the Rule." *Sherman v. Graves*, 2025 WL 1558476, at *2 (S.D.N.Y. June 2, 2025) (quotations and citation omitted; alteration in original). Rule 11(b) provides, in relevant part, that "[b]y presenting to the court a pleading, written motion, or other paper," the attorney who signed that paper "certifies that to the best of [his] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; [and] (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law[.]" Fed. R. Civ. P. 11(b)(1)-(2).

27

A Rule 11 motion must be made "separately from any other motion," Fed. R. Civ. P. 11(c)(2), and only after the expiration of a 21-day "'safe harbor' period, during which the alleged violator has the chance to withdraw or correct the challenged filing." *Kyros L. P.C. v. World Wrestling Ent., Inc.*, 78 F.4th 532, 543 (2d Cir. 2023), *cert. denied,* 144 S. Ct. 822 (2024). "[T]he standard for triggering [sanctions] under Rule 11 is objective unreasonableness." *Margo v. Weiss*, 213 F.3d 55, 65 (2d Cir. 2000); *accord Sherman*, 2025 WL 1558476, at *2. No finding of subjective bad faith is required, except "[w]hen a court initiates Rule 11 sanctions *sua sponte* and the opportunity to correct or withdraw the challenged submission is unavailable." *Kyros L.*, 78 F.4th at 543. Thus, "[i]t is not a defense that the offending party acted with a pure heart but an empty head." *Gong v. Sarnoff*, 2023 WL 5372473, at *10 (S.D.N.Y. Aug. 22, 2023); *accord In re Australia & N.Z. Banking Grp. Ltd. Secs. Litig.*, 712 F. Supp. 2d 255, 266 (S.D.N.Y. 2010).

"A violation of Rule 11 is complete when the paper is filed." *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, 2017 WL 3671036, at *28 (S.D.N.Y. July 18, 2017) (quotations and citation omitted), *adopted*, 2017 WL 4712639 (S.D.N.Y. Sept. 28, 2017). However, "a litigant's obligations with respect to the contents of [its] papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit." Fed. R. Civ. P. 11 Adv. Comm. Note to 1993 Amend. In other words, sanctions may be imposed if, upon learning that a claim is "groundless," a party continues to press that claim. *Sherman*, 2025 WL 1558476, at *2; *accord Cameau v. Nat'l Recovery Agency, Inc*., 2018 WL 4853050, at *2 (E.D.N.Y. Sept. 28, 2018).

With respect to legal contentions challenged under subdivision (b)(2), "the operative question is whether the argument is frivolous, i.e., the legal position has no chance of success, and there is no reasonable argument to extend, modify or reverse the law as it stands." *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory*, Ltd., 682 F.3d 170, 177 (2d Cir. 2012) (cleaned up). In other words, "the standard is not whether the claim is a loser, but rather whether the claim is so clearly a loser that it is in the interest of justice to deter future plaintiffs and attorneys from prosecuting similar ones." *Toussaint v. NY Dialysis Servs., Inc.*, 230 F. Supp. 3d 198, 223 (S.D.N.Y.), *aff'd,* 706 F. App'x 44 (2d Cir. 2017).

"[A]n improper purpose," in violation of subsection (b)(1), may be inferred where "a complaint is so baseless as to suggest that there is an ulterior motive behind the lawsuit." *An v. Despins*, 2023 WL 4931832, at *6 (S.D.N.Y. Aug. 2, 2023) Sanctions under subsection (b)(1) are also appropriate where a party persists in relitigating claims that the court has clearly rejected. *See*, *e.g.*, *Ginther v. Provident Life & Cas. Ins. Co.*, 350 F. App'x 494, 496 (2d Cir. 2009) (summary order) (affirming sanctions where plaintiff, "having been correctly informed in the present case that his claims in this action were barred by *res judicata* or should have been raised as compulsory counterclaims," nevertheless "renewed the same substantive claims in a dilatory motion"); *Lipin v. Hunt*, 573 F. Supp. 2d 836, 844 (S.D.N.Y. 2008) (imposing sanctions under subsections (b)(1), (b)(2), and (b)(3) where plaintiff "persist[ed] in pursuing claims similar or identical to those that have been previously rejected without addressing the grounds for rejection").

Rule 11 sanctions "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). Sanctions may include "nonmonetary directives," *id.*, such as an order "striking the offending paper," Fed. R. Civ. P. 11

29

Adv. Comm. Note to 1993 Amend.; "an order to pay a penalty into court," Fed. R. Civ. P. 11(c)(4); or a fee-shifting order. *Id*. Courts consider a number of non-exhaustive factors in determining whether a particular sanction is appropriate, including "(1) whether the improper conduct was willful, or negligent; (2) whether it was part of a pattern o[f] activity, or an isolated event; (3) whether it infected the entire pleading, or only one particular count or defense; (4) whether the person [to be sanctioned] has engaged in similar conduct in other litigation; (5) what effect it had on the litigation process in time or expense; (6) whether the responsible person is trained in the law; (7) what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case." *Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, 2019 WL 422613, at *3 (S.D.N.Y. Feb. 4, 2019) (citations omitted).

## 2.    Plaintiff's Federal Claims Are Frivolous

As noted above, plaintiff invokes this Court's federal question jurisdiction pursuant to 28 U.S.C. § 1331, *see* FAC ¶ 3, premised on its two federal claims, pleaded under the whistleblower provisions of the Dodd-Frank Act, codified at 15 U.S.C. § 78u-6, and under CFAA, 18 U.S.C. § 1030. *Id*. ¶¶ 104-32. If these two claims fail, this Court lacks subject-matter jurisdiction to entertain any part of this action.[26]

---

[26] In an effort to forestall this result, plaintiff now claims that it "made good faith arguments for both federal question jurisdiction and diversity jurisdiction." Pl. Sanctions Opp. at 15. Not so. In both its original complaint and the FAC, plaintiff affirmatively alleges that it is a citizen of New York for diversity purposes, as are at least two of the defendants. Dkt. 34 ¶¶ 1, 7, 9; FAC ¶¶ 4, 6, 8. Thus, plaintiff cannot and does not rely on this Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332. Nor can plaintiff hope to maintain a federal forum absent a valid federal claim by complaining that NAI "failed to comply with its obligations under Fed. R. Civ. P. 7.1(a)(2), which requires parties in diversity cases to disclose the citizenship of every individual or entity whose citizenship is attributed to that party." Pl. Sanctions Opp. at 15. Plaintiff's argument is completely circular. As it acknowledges, Rule 7.1(a)(2) applies only in "diversity cases." As pleaded by

a.    *Dodd-Frank*

"Dodd-Frank protects whistleblowers against retaliation by their employers." *Rimini v. J.P.*

*Morgan Chase & Co.*, 2024 WL 4354875, at *7 (S.D.N.Y. Sept. 30, 2024), *appeal dismissed,* 2025

WL 1013373 (2d Cir. Jan. 28, 2025). Under the statute, a "whistleblower" is "any individual who

provides . . . information relating to a violation of the securities laws to the [Securities and

Exchange] Commission, in a manner established, by rule or regulation, by the Commission." 15

U.S.C. § 78u-6(a)(6). Subsection (h)(1)(A) provides:

> No employer may discharge, demote, suspend, threaten, harass, directly or
> indirectly, or in any other manner discriminate against, a whistleblower in the terms
> and conditions of employment because of any lawful act done by the
> whistleblower –
>
> (i) in providing information to the Commission in accordance with this section;
>
> (ii) in initiating, testifying in, or assisting in any investigation or judicial or
> administrative action of the Commission based upon or related to such information;
> or
>
> (iii) in making disclosures that are required or protected under the Sarbanes-Oxley
> Act of 2002 . . . and any other law, rule, or regulation subject to the jurisdiction of
> the Commission.

15 U.S.C.§ 78u-6(h)(1)(A). Subsection (h)(1)(B) grants a private right of action to any "individual

who alleges discharge or other discrimination in violation of subparagraph (A)." 15 U.S.C.

§ 78u-6(h)(1)(B)(i). Thus, in order to state a Dodd-Frank whistleblower claim, a plaintiff must

allege that she is an "individual" who has been subject to "adverse employment action" by her

"employer" in retaliation for providing information to the Commission relating to a violation of

---

plaintiff, this is not a diversity case. Therefore, Rule 7.1(a)(2) does not apply. Moreover, since NAI
is a corporation, *see* FAC ¶ 6, there are no other individuals or entities whose citizenship is
attributed to it.

the securities laws, assisting a Commission investigation, or engaging in other "protected activity" under the statute. *Ott v. Fred Alger Mgmt., Inc.*, 2012 WL 4767200, at \*4-5 (S.D.N.Y. Sept. 27, 2012); *accord Rimini*, 2024 WL 4354875, at \*7; *Cellucci v. O'Leary*, 2020 WL 977986, at \*10 (S.D.N.Y. Feb. 28, 2020).

As NAI correctly observes, plaintiff and its counsel "could not have reviewed this statute and reached a good-faith conclusion that it supported a cause of action on the basis of the allegations in the [FAC]." Def. Sanctions Mem. at 15. First, LiveVideo is not an "individual." Second, it is not an "employee" of any defendant named in this action. Third, it has not been discharged, demoted, or otherwise suffered an "adverse employment action," *Ott*, 2012 WL 4767200, at \*4, much less an adverse employment action that was "causally related" to any "protected activity" under the statute. *Id*. In fact, plaintiff does not plead any "protected activity." Instead, it speculates that its bid to acquire Paramount was ignored because it engaged in unspecified conduct to "investigat[e] the conflicts of int[e]rest behind the Skydance offer and Redstone's financial advisor BDT who is also her lender." FAC ¶ 107. Even if plaintiff were an employee of NAI who suffered an adverse employment action, this would be insufficient. *See Rimini*, 2024 WL 4354875, at \*7 (dismissing Dodd-Frank claim and imposing a filing injunction where plaintiff Rimini's pleadings "contain no facts indicating that he engaged in protected activity under the statute. He does not, for example, allege that he provided information to the SEC. Nor does he allege that he initiated or participated in any covered investigations or proceedings.").

In short, plaintiff's Dodd-Frank claim is "obviously inapplicable" to the facts pleaded in plaintiff's operative complaint, *Lipin*, 573 F. Supp. 2d at 844, has "no chance of success," *Star Mark*, 682 F.3d at 177, and is not susceptible of any "reasonable argument to extend, modify or

reverse the law as it stands." *Id*. Moreover, plaintiff was warned three times by this Court that its Dodd-Frank claim was deficient, beginning long before NAI filed its Rule 11 motion. *See* 9/26/24 Order at 1 n.1 ("The whistleblower provisions of the Dodd-Frank Act permit a claim by an 'individual' whose 'employer' retaliated against him or her 'providing information to the [Securities and Exchange] Commission' or making protected disclosures. 15 U.S.C. § 78u-6(h)(1). Plaintiff LiveVideo is neither an individual nor an employee of any of the named defendants.").[27] Plaintiff was then offered an opportunity to seek leave to further amend its complaint (which it ignored), and was pointedly reminded "that significant sanctions may be imposed if, *inter alia*, the 'claims . . . and other legal contentions' made in a pleading are not 'warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law.'" 9/26/24 Order at 2 (quoting Fed. R. Civ. P. 11(b)(2)). NAI warned plaintiff again, in its safe harbor letter, that the Dodd-Frank claim was "defective and unsupported," *see* Def. Sanctions Ltr. at 3, but plaintiff has neither withdrawn it nor made any effort to augment it.[28]

In its brief in opposition to the Rule 11 motion, plaintiff contends that it has a "colorable argument" that it has standing to pursue a Dodd-Frank claim "based on the assignment of rights from its CEO, Mr. Greenspan, to LiveVideo." Pl. Sanctions Opp. at 9; *see also* FAC ¶ 105 n.35 (alleging that "Plaintiff's CEO has agreed to transfer rights and privileges due or held by the CEO personally to the Plaintiff."). Thus, plaintiff argues, its claim represents a "good faith attempt to

---

[27] *See also* 12/18/24 Order at 3; 2/27/25 Order at 4 n.3.

[28] Although plaintiff has made two attempts to *supplement* the FAC with additional claims, those motions, if granted, would leave the Dodd-Frank claim intact, *see* Prop. Supp. Pleading; Second Prop. Supp. Pleading, thus "compound[ing] the claimed injury." *Gong*, 2023 WL 5372473, at *9 (sanctioning plaintiff who, instead of withdrawing the challenged claims, filed an amended complaint which repeated them and added new claims).

extend existing law." Pl. Sanctions Opp. at 10. But even if an employee could "assign" a Dodd-Frank whistleblower claim to his corporation (a dubious proposition, since the express language of the statute limits the private right of action to an "individual," 15 U.S.C. § 78u-6(h)(1)(B)(i)), this would not save plaintiff's Dodd-Frank claim, because Mr. Greenspan himself was never an employee of any defendant, did not engage in any "protected activity" under the statute, and did not suffer any "adverse employment action" in retaliation for that protected activity. *Ott*, 2012 WL 4767200, at *4. I therefore conclude that plaintiff's Dodd-Frank claim is "not a reasoned argument for the extension of the law but merely a woefully inadequate and fatally flawed pleading." *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 660 (S.D.N.Y. 1996) (sanctioning plaintiffs for asserting a RICO claim that "manifestly failed to meet even the most rudimentary requirements of any of the four distinct subsections" of the statute), *aff'd sub nom. Katzman v. Victoria's Secret Catalogue, Div. of The Ltd., Inc.*, 113 F.3d 1229 (2d Cir. 1997).

### b.    CFAA

To state a private civil claim under CFAA, a plaintiff must plead that the defendant "(1) accessed a protected computer; (2) without any authorization or exceeding its authorized access; and (3) caused loss in excess of $5,000." *Collins v. MCA Receivables, LLC*, 2024 WL 246111, at *8 (S.D.N.Y. Jan. 23, 2024) (internal quotations and citation omitted). The only losses compensable under CFAA are those related to "the victim's computer system." *Id.* (quoting *LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 514 (S.D.N.Y. 2015)); *see also* 18 U.S.C. § 1030(e)(11) (restricting "loss" to any "reasonable cost to the victim . . . incurred *because of interruption of service*") (emphasis added). As the Supreme Court held in *Van Buren v. United States*, 593 U.S. 374 (2021), there can be no recovery under CFAA unless the plaintiff's own

34

computer system suffered "technological harms – such as the corruption of files," as a result of the defendant's unauthorized access. *Id*. at 391. Thus, for example, the cost of repairing the victim's computer or "restoring the [victim's] data, program, system, or information to its condition prior to the offense" is recoverable, but "costs associated with lost competitive advantages, profits or revenue are not compensable under the CFAA[.]" *Redcell Corp. v. A.J. Trucco, Inc.*, 2022 WL 683007, at \*6 (S.D.N.Y. Mar. 8, 2022).

Plaintiff LiveVideo does not allege any "technological harms" to anyone's computer system, and certainly not to its own. Rather, it alleges that Ms. Redstone (and other "unauthorized non-executives" of Paramount) read the "test email" that Mr. Greenspan sent on May 6, 2024 to Paramount's former CEO, Mr. Bakish, as part of a conspiracy to "usurp opportunities they knew they would likely find by invading the Paramount CEO's confidential inbox[.]" FAC ¶¶ 126-28, 130. No competent attorney who has read the statute and *Van Buren* could conclude, in good faith, that these factual allegations support a cognizable CFAA claim. Perhaps that is why plaintiff makes no effort to defend the claim as alleged. Instead, in its brief in opposition to the Rule 11 motion, plaintiff mischaracterizes its own pleading, asserting that "the FAC alleges that defendants gained unauthorized access to Livevideo's proprietary email tracking system, which contained valuable business information." Pl. Sanctions Opp. at 10. In reality, however, the FAC "alleges no such thing." Def. Sanctions Reply at 4 n.2.

Once again, plaintiff was repeatedly warned that its CFAA claim was deficient – for precisely this reason, *see* 9/26/24 Order at 1 n.2; 2/27/25 Order at 4 n.4; Def. Sanctions Ltr. at 3-4 – but has refused to withdraw it and has made no effort to amend it. I therefore conclude that plaintiff's CFAA claim, like its Dodd-Frank claim, is not merely meritless, but frivolous. *See*

*Ammann v. Sharestates, Inc.*, 2024 WL 1956237, at *9 (E.D.N.Y. Mar. 21, 2024) (given the "substantial body of authority holding that there is no private right of action under § 15(a)(1)" of the Exchange Act, "and the lack of any nonfrivolous argument for recognizing one, the Court finds that Defendants' counterclaim which attempts to bring a claim thereunder was frivolous, in that it was not merely incorrect, but had no chance of success.").[29]

### 3.   Plaintiff Brought This Action for Improper Purposes

I further conclude that both of plaintiff's federal claims were pleaded for the improper purpose of "manufacturing subject matter jurisdiction," Def. Sanctions Reply at 3, when in fact there is none, which in turn allowed Mr. Greenspan to use this action as a vehicle for harassing two of the individual defendants in retaliation for unrelated wrongs that he believes were done to him decades ago.

As noted above, the "court may infer an improper purpose if . . . a complaint is so baseless as to suggest that there is an ulterior motive behind the lawsuit." *An*, 2023 WL 4931832, at *6. The inference is particularly well warranted where the plaintiff persists in pursuing the baseless claims after being warned of potential sanctions by the court. *Ginther*, 350 F. App'x at 496; *Lipin*, 573 F. Supp. 2d at 844; *see also Galonsky v. Williams*, 1997 WL 759445, at *6 (S.D.N.Y. Dec. 10, 1997) (issuing sanctions under Rule 11(b)(1) and (b)(2) where plaintiff "filed baseless charges despite ample notice that the claims were totally without merit and filed a frivolous motion to amend the

---

[29] NAI argues, with some force, that plaintiff's state-law claims are also frivolous. *See* Def. Sanctions Mem. at 16-17; Def. Sanctions Reply at 5-6. However, this Court need not reach that question, because even a well-pleaded state law claim would not justify the continuation of this action in a federal district court. *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *Bell v. Hood*, 327 U.S. 678, 682-83 (1946) (federal question jurisdiction does not exist where plaintiff has pleaded federal claims but they are "wholly insubstantial and frivolous").

complaint having been told by the Court that the amendment would not be permitted."); *McLoughlin v. Altman*, 1995 WL 640770, at *3 (S.D.N.Y. Oct. 31, 1995) ("This improper purpose may also be inferred from plaintiff's multiple attempts to re-litigate matters already decided by the court, and to pursue frivolous claims in the face of explicit warnings that to do so risked violation of Rule 11.").

Further support for the inference of an improper purpose may be found where the plaintiff "attempt[s] to misstate what occurred" in order to avoid Rule 11 sanctions, *see Galonsky*, 1997 WL 759445, at *6 ("Counsel's lack of good faith in filing the proposed amended complaint is demonstrated by the fact that, in opposing the motion for sanctions, he attempted to misstate what occurred during the pre-motion conference[.]"), or where the plaintiff has a history of harassing perceived enemies by relitigating failed claims, and has followed the same playbook in the case at bar. *See*, *e.g.*, *S. Pac. Shipping Co. v. Redi-Fresh Produce Inc.*, 2014 WL 6968039, at *10 (S.D.N.Y. Dec. 9, 2014) ("the deficiency of [plaintiff's] claim, coupled with its [litigation] behavior" in that and other courts "gives rise to an inference of improper purpose.")

All of these factors are present in the case at bar. Plaintiff pursued its two frivolous federal claims despite multiple warnings – including from the Court – that they could not succeed. *See* 9/26/24 Order at 1-2 nn.1-2; 12/18/24 Order at 3; 2/27/25 Order at 4 nn.3-4. In response to NAI's Rule 11 motion, it has misstated its own factual allegations, *see* Pl. Sanctions Opp. at 10, and claimed, falsely, that it "made good faith arguments" for diversity jurisdiction, *id.* at 15, when in fact it has affirmatively and repeatedly alleged that the parties are *not* diverse. Further, it is clear from plaintiff's pleadings that LiveVideo chose to sue Ms. Varney and Ms. Seligman, rather than any of Paramount's other lawyers or former directors, not because of anything they did in 2024 or

2025 (indeed, the FAC says almost nothing about their conduct during the Paramount/Skydance negotiations) but because they were "adverse" to Mr. Greenspan in prior unrelated matters. *See, e.g.*, FAC ¶¶ 61-67 (accusing Varney of engaging in "bid-rigging," manipulation, and bribery, when serving as News Corp.'s "top lawyer" in 2005, in order to help News Corp. acquire Myspace); *id.* ¶¶ 81-83 (accusing Seligman of breaching "2001 agreements and obligations" owed to Greenspan when he was CEO of eUniverse, and then, more than 20 years later, being "adverse" to Greenspan when he tried to intervene in the *Google* anti-trust litigation).

I note as well that this is not the first case in which plaintiff has sought to relitigate the events of 2001-05 and harass those who, in his view, are responsible for his inability to acquire Myspace. *See* Part I(A)(2), *supra*; Def. Sanctions Reply at 6 n.3 (listing 14 cases that Greenspan or an affiliated entity filed, or sought to intervene in, "in order to relitigate issues concerning or harass those who were involved with Intermix and its sale."). This too supports the interference that plaintiff brought the instant action for improper purposes. *See IAC/InterActiveCorp*, 2016 WL 5724972, at *2-3 (declaring Mr. Greenspan a "vexatious litigant" *nine years ago* because he had already attempted to relitigate his claims arising out of the Myspace acquisition too many times, in too many courts). I therefore conclude not only that plaintiff's two federal claims are frivolous but also that they were filed for the improper purposes of manufacturing federal question jurisdiction where there is none and punishing two of the individual defendants for conduct wholly unrelated to LiveVideo's claims as pleaded.

### 4.    NAI's Safe-Harbor Letter Is Adequate

Plaintiff complains that NAI's safe-harbor letter did not give it "fair notice" of its allegedly sanctionable conduct, because the letter "focused primarily on alleged jurisdictional defects and

38

the purported frivolousness of Plaintiff's claims, while the current motion emphasizes alleged litigation misconduct and vexatious behavior." Pl. Sanctions Opp. at 5. It is true, of course, that NAI's December 30, 2024 letter does not discuss any of the litigation misconduct that plaintiff engaged in after that date. By the same token, however, NAI does not seek Rule 11 sanctions for plaintiff's more recent machinations. Rather, NAI asks this Court to sanction LiveVideo and its counsel for their "vexatious behavior and dishonesty" pursuant to its inherent powers. *See* Def. Sanctions Mem. at 20-24. That request is discussed in Part II(C) of this Report, *infra*.

Nor can plaintiff escape Rule 11 sanctions on the peculiar ground that it could not "withdraw" the FAC because it never served that pleading. *See* Pl. Sanctions Opp. at 7.[30] There is no such rule. To the contrary: a Rule 11 motion "should be served promptly after the inappropriate paper is filed, and, if delayed too long, may be viewed as untimely." *In re Pennie & Edmonds LLP*, 323 F.3d 86, 89 n.1 (2d Cir. 2003) (quoting Fed. R. Civ. P. 11 Adv. Comm. Note to 1993 Amend.).

### 5.    Choice of Rule 11 Sanctions

Having found that LiveVideo and its counsel violated Rules 11(b)(1) and (b)(2), I next examine the seven factors outlined in *Bobcar Media*, 2019 WL 422613, at *3, to determine an appropriate sanction. Here, each factor weighs in favor of imposing a monetary sanction payable to the Clerk of Court.

---

[30] This portion of plaintiff's Rule 11 opposition brief was almost certainly not written by Mr. Constants – or any other licensed attorney. It reads as follows: "[T]he December 30, 2024 Rule 11 Letter is defective on its face because Dkt 35 [the FAC] cant be withdrawn because as a result of Plaintiff erroneously in attempting to re-file Dkt 32's amended complaint instead filing for the first time at Dkt 35, a new different version of the amended complaint, then Dkt 35 is a second amended complaint that the Magistrate was required to deny for the same reasons the Magistrate denied the proposed second amended complaint filed as Dkt. 44, or alternatively the Magistrate should have amended Dkt 35 to conform to the Dkt 33 Reply to OSC amendments cross referenced to Dkt 32." Pl. Sanctions Opp. at 7 (grammar and spelling as in the original).

First, plaintiff and its counsel filed and pursued their frivolous federal claims willfully, despite multiple judicial warnings, and for improper purposes. Second, the sanctionable conduct was not an "isolated event" but rather part of a pattern of misconduct in this action, including frivolous motion practice, disregard of court orders, and a last-minute TRO application supported by a demonstrably false attorney declaration. Third, the misconduct of plaintiff and its counsel infects the entire case, in that the frivolous federal claims are the basis for plaintiff's invocation of this Court's federal question jurisdiction. Fourth, Mr. Greenspan has engaged in similar conduct in other litigation, leading to sanctions in other jurisdictions.[31] Fifth, the sanctionable conduct has imposed significant costs and burdens on defendants – particularly NAI – and on this Court. Sixth, LiveVideo is led by an experienced litigant – Mr. Greenspan – and represented by a member of the Bar of this Court. Both Mr. Greenspan and Mr. Constants should have known better than to file – and press ahead with – plaintiff's baseless claims under the Dodd-Frank Act and CFAA.

As to the seventh factor – the "financial resources of the responsible person," *Bobcar Media*, 2019 WL 422613, at *3 – there is virtually no information in the record. If LiveVideo actually had the financial resources to make a credible bid for Paramount, a very substantial sanction would be required "to deter [it] from repetition." *Id.* But there is no *evidence* that

---

[31] In its opposition brief, plaintiff argues that NAI's "allegations" about Mr. Greenspan's litigation history are "unsupported by admissible evidence," and characterizes the prior judicial decisions imposing sanctions upon him as "hearsay statements." Pl. Sanctions Opp. at 18. Plaintiff is mistaken. "A court may take judicial notice of a document filed in another court . . . to establish the fact of such litigation and related filings." *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.,* 146 F.3d 66, 70 (2d Cir. 1998). Thus, in considering whether a party's misconduct is part of a pattern of abusive activity, the courts routinely review that party's litigation history, including any prior orders imposing sanctions or making findings as to vexatiousness. *See*, *e.g.*, *IAC/InterActiveCorp*, 2016 WL 5724972, at *2 (reviewing Mr. Greenspan's prior litigation history).

LiveVideo is well-resourced, and many indications that it is not. As for Mr. Constants, he claims

to be a sole practitioner with "nobody else" in his office. 2/12/25 Tr. at 5:24. I therefore recommend

a modest monetary sanction of $10,000, to be imposed jointly on plaintiff and its counsel, and to

be paid to the Clerk of Court within 30 days of the decision on the Rule 11 motion. *See Est. of*

*Calloway v. Marvel Ent. Grp., a Div. of Cadence Indus. Corp.*, 9 F.3d 237, 239 (2d Cir. 1993)

(where "[t]he Rule 11 violation was [] a coordinated effort, [] joint and several liability is entirely

appropriate."); *United States v. Potamkin Cadillac Corp.*, 689 F.2d 379, 382 (2d Cir. 1982)

("attorney and client are in the best position between them to determine who caused [the

sanctionable conduct]").[32]

## C.    Inherent Powers

NAI urges the Court to draw on its inherent powers to sanction plaintiff and its counsel for

their vexatious "course of conduct" throughout this litigation, including their conduct in:

- Seeking a default against NAI based on service of what they knew to be an unfiled, inoperative pleading;

- Concealing the defective service by repeatedly having plaintiff's process servers attest to the delivery of "an amended complaint";

- Ignoring the Court's invitation to seek an extension of the Rule 4(m) service deadline (so that plaintiff could properly effect service), while choosing instead to

---

[32] Monetary sanctions may not be imposed "against a represented party for violating Rule 11(b)(2)." Fed. R. Civ. P. 11(c)(5)(A). However, the court "may sanction a represented party under subdivision (b)(1), if the party had actual knowledge that filing the paper constituted wrongful conduct, e.g., the paper made false statements or was filed for an improper purpose." *Lipin v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 202 F. Supp. 2d 126, 140 (S.D.N.Y. Mar. 28, 2002) (internal quotations and citation omitted). Here, the party – through its principal Mr. Greenspan – undoubtedly had actual knowledge that its federal claims (which Mr. Greenspan may well have drafted himself) were baseless. *See* 9/26/24 Order at 1-2 (explaining the deficiencies in plaintiff's Dodd-Frank and CFAA claims and requiring Mr. Constants to "discuss this Order with his client").

file a "late and frivolous motion for reconsideration" of the order setting aside the NAI default;

- Multiplying proceedings by filing "a flurry of late and invalid motions, including a motion to reconsider the denial of its motion to reconsider"; and

- Requesting a default against Ms. Redstone after agreeing, in open court, that plaintiff's single service attempt upon her was ineffective.

Def. Sanctions Mem. at 20, 22-23. Additionally, in NAI's view, attorney Constants should be sanctioned because he "has allowed a non-lawyer, almost certainly Greenspan, to make filings in this Court under his name." *Id.* at 24; *see also* Def. Sanctions Reply at 10 (arguing that the Court need not accept the "self-serving and unlikely story" that a "paralegal" drafted the since-withdrawn second reconsideration motion, especially after Constants himself stated that "no one else worked at his law firm.").

The Court agrees that plaintiff's litigation conduct has been abusive, and that attorney Constants – who at times has served as nothing more than a conduit for frivolous filings likely prepared by his client's principal – has violated his "personal, nondelegable responsibility" under Rule 11 to "validate the truth and legal reasonableness of the papers filed" under his name. *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 547 (1991); *see also Amorosa v. Gen. Electric Co.*, 2022 WL 3577838, at *1 (S.D.N.Y. Aug. 19, 2022) (attorneys have a "personal non-delegable responsibility under Rule 11 to validate the truth and legal reasonableness of the papers filed.") (citation omitted). Moreover, since NAI filed its sanctions motion, plaintiff and its counsel have engaged in additional vexatious conduct, including, among other things:

- Violating my 2/12/25 Order (staying briefing on plaintiff's motion to supplement the FAC) by filing an "amended" motion to supplement the FAC pleading on March 17, 2025;

- Compounding that violation by filing two requests for judicial notice in support of the improperly-filed amended motion to supplement the FAC, on July 17 and 24, 2025;

- Filing, on May 6, 2025, yet another motion – this one "beyond frivolous" (5/19/24 Order at 6) – requesting that the Court reinstate plaintiff's short-lived default against NAI and enter a $2.42 million default judgment on the ground that "the overwhelming evidence shows that NAI was indeed properly served on November 6, 2024" (Dkt. 140 at 2); and

- Filing an *ex parte* TRO motion on August 6, 2025, in which attorney Constants made the astonishing claim – to a district judge unfamiliar with the docket – that proper service of process on NAI had occurred and was "undisputed." Constants TRO Decl. ¶¶ 4, 10.

Each of these filings was improper. Moreover, while it is possible that plaintiff and/or its counsel initially believed that NAI "had been properly served," Pl. Sanctions Opp. at 17 (even though the wrong pleading was delivered to Corporation Trust), it was *not* possible for counsel to maintain that belief as of August 6, 2025, after this Court vacated the default based on that service and explained – four times – that NAI was *not* properly served.[33] Consequently, attorney Constants (if it was indeed he who prepared and filed plaintiff's TRO papers on August 6, 2025) cannot have been acting in good faith when he attested that proper service on NAI was "undisputed."

Notwithstanding counsel's dishonesty, I do not recommend that additional monetary sanctions be imposed pursuant to this Court's inherent powers. "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). Moreover, "[t]he imposition of sanctions pursuant to a court's inherent authority is truly discretionary." *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 235 (2d Cir. 2020). Even where bad-faith conduct has occurred, "the court is not required to sanction a party or

---

[33] 12/18/24 Order at 2; 1/28/25 Order at 1, 5; 2/12/25 Tr. at 9:17-23; 5/19/25 Order at 7.

attorney." *Id.* (quoting *Murray v. City of Columbus*, 534 Fed. Appx. 479, 485 (6th Cir. 2013)). Thus, courts in our Circuit frequently decline to rely on their inherent powers to sanction false testimony, absent a showing that the perjury worked a "fraud on the court." *See*, *e.g.*, *Crown Awards, Inc. v. Trophy Depot, Inc.*, 2017 WL 564885, at *10 (S.D.N.Y. Feb. 13, 2017) (collecting cases); *Rybner v. Cannon Design, Inc.*, 1996 WL 470668, at *3 (S.D.N.Y. Aug. 20, 1996) (Sotomayor, J.) (collecting cases); *Skywark v. Isaacson*, 1999 WL 1489038, at *14 (S.D.N.Y. Oct. 14, 1999) ("Perjury alone does not constitute fraud upon the court."), *aff'd*, 2000 WL 145465 (S.D.N.Y. Feb. 9, 2000).

Moreover, additional monetary sanctions are not necessary to address the misconduct of plaintiff and its counsel. As to LiveVideo, a tailored filing injunction, as discussed below, can protect defendants (and this Court) against future litigation abuse. As to attorney Constants, I recommend that his conduct be referred to the Grievance Committee for the Southern District of New York for evaluation. In particular, I recommend that the Grievance Committee consider whether he should be disciplined for (i) permitting his ECF credentials to be used by others to file papers that he did not write, review, or authorize; and (ii) representing to this Court on August 6, 2025, under penalty of perjury, not only that NAI was "was properly served," but also that proper service was "undisputed." Constants TRO Decl. ¶¶ 4, 10.

D.    **Filing Injunction**

On April 1, 2025, I admonished plaintiff that its amended motion to supplement its pleading was in violation of my 2/12/25 order staying briefing on its original motion to supplement its pleading; warned that both LiveVideo and its counsel were "at risk of additional sanctions"; and gave plaintiff an opportunity to withdraw its improperly-filed amended motion to supplement.

4/1/25 Order at 1. In the same order, I advised plaintiff that should it "continue to file 'unauthorized, repetitive, and frivolous motions,' a filing injunction may also be imposed." *Id.* (quoting *Cunningham*, 2016 WL 11703994, at *2).

In response, plaintiff refused to withdraw its improperly-filed amended motion to supplement. Instead, it continued filing "unauthorized, repetitive and frivolous motions," *Cunningham*, 2016 WL 11703994, at *2, including its May 6, 2025 motion (constituting its third attempt to reinstate its default against NAI), which this Court denied as "beyond frivolous," 5/19/25 Order at 6, and its August 6, 2025 *ex parte* TRO motion, in which attorney Constants (or whoever prepared his declaration) attempted to mislead the Court as to the status of plaintiff's failed service attempts. Constants TRO Decl. ¶¶ 4, 6, 10. Consequently, I now recommend that a tailored filing injunction be issued to protect defendants – and this Court – against further abusive litigation by LiveVideo or its principal arising out of the Paramount/Skydance merger.

Federal district courts possess the authority under 28 U.S.C. § 1651 to enjoin a litigant from "further vexatious litigation." *Safir v. U.S. Lines, Inc.*, 792 F.2d 19, 23 (2d Cir. 1986). "The issuance of a filing injunction is appropriate when a plaintiff abuse[s] the process of the Courts to harass and annoy others with meritless, frivolous, vexatious or repetitive . . . proceedings." *Lau v. Meddaugh*, 229 F.3d 121, 123 (2d Cir. 2000) (internal quotations and citation omitted) (alteration and ellipses in original); *see also George v. N.Y. State Div. of Parole*, 685 F. App'x 30, 30 (2d Cir. 2017) (summary order) (courts may issue filing injunctions when confronted with "a demonstrated history of frivolous and vexatious litigation") (quoting *Milltex Indus. Corp. v. Jacquard Lace Co.*,

*Ltd.*, 55 F.3d 34, 39 (2d Cir. 1995)).[34] In determining whether to issue such an injunction, district courts "should consider the following factors: (1) the litigant's history of litigation and in particular whether it entailed vexatious, harassing or duplicative lawsuits; (2) the litigant's motive in pursuing the litigation, e.g., does the litigant have an objective good faith expectation of prevailing?; (3) whether the litigant is represented by counsel; (4) whether the litigant has caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel; and (5) whether other sanctions would be adequate to protect the courts and other parties. Ultimately, the question the court must answer is whether a litigant who has a history of vexatious litigation is likely to continue to abuse the judicial process and harass other parties." *Safir*, 792 F.2d at 24; *accord Eliahu v. Jewish Agency for Israel*, 919 F.3d 709, 714 (2d Cir. 2019).

Here, all five *Safir* factors are satisfied. First, Mr. Greenspan (plaintiff's only known decision-maker) has a long history of filing vexatious, harassing and duplicative lawsuits, both in his own name and through various corporate vehicles. Second, as discussed in Part II(B)(2), *supra*, plaintiff asserted and pursued its two federal claims in this action with no objective good-faith expectation of prevailing. Third, while plaintiff is represented by counsel, attorney Constants has allowed himself to be used as a conduit for frivolous litigation papers written and filed by a "paralegal" who is, in all likelihood, Mr. Greenspan himself. Moreover, Greenspan has a history

---

[34] In *George*, after the petitioner filed "five essentially duplicative motions for reconsideration of the 1996 judgment denying his habeas challenge to two New York State convictions," 685 F. App'x at 31, the district court enjoined him "from filing future motions in this habeas action or any other actions challenging his 1988 and 1991 state convictions without first obtaining leave from the district court." *Id.* at 30. On appeal, the Second Circuit affirmed, explaining that petitioner's conduct (including the fact that he filed his fourth and fifth motions after being warned that doing so could result in sanctions including a filing injunction) supported "the conclusion that, absent a filing injunction, George was 'likely to continue to abuse the judicial process.'" *Id.* at 31 (quoting *Safir*, 792 F.2d at 24).

of filing improper pro se submissions in cases where he, or a corporation he controls, is represented by counsel. *Peermusic III*, 2011 WL 2358549, at *10-12 & n.10; *IAC/Interactivecorp.*, 2016 WL 9185281, at *2. Fourth, plaintiff has caused "needless expense" to NAI, which has been required to respond to many of its meritless motions, and posed an "unnecessary burden" on this Court, which has been required to address all of them. *Safir*, 792 F.2d at 24. Fifth and finally, it is clear from Mr. Greenspan's litigation history – and plaintiff's cavalier disregard for many of this Court's orders and warnings in the case at bar – that monetary sanctions alone are unlikely to dissuade plaintiff from its vexatious campaign.

The only remaining question is the appropriate scope of the filing injunction. "The federal courts have wide discretion to issue injunctions of varying breadth when it becomes clear that a litigant is repeatedly asserting meritless claims." *Almazon v. JPMorgan Chase Bank*, 2025 WL 736565, at *15 (S.D.N.Y. Jan. 31, 2025), *adopted*, 2025 WL 720545 (S.D.N.Y. Mar. 6, 2025). The more "restrictive measures" regularly imposed against vexatious litigants include "completely foreclosing the filing of designated categories of cases," *In re Martin-Trigona*, 9 F.3d 226, 228 (2d Cir. 1993) (collecting cases), on a nationwide basis if necessary. *See, e.g., Woodhouse v. Meta Platforms Inc.*, 704 F. Supp. 3d 502, 518-19 (S.D.N.Y. 2023) (collecting nationwide-ban cases). Alternatively, where "the specific vice encountered by defendants" is a plaintiff's frivolous motion practice in a particular case, the court may impose a "less drastic remedy," *In re Martin-Trigona*, 9 F.3d at 229, by limiting the plaintiff's ability to file motions in that case only, or by requiring that plaintiff's filings be pre-screened for merit. *See*, *e.g*., *IAC/InterActiveCorp*, 2016 WL 5724972, at *3 (requiring Mr. Greenspan to "obtain leave of court before filing any further motions in this case"); *Almazon*, 2025 WL 720545, at *4 (enjoining plaintiff from "filing any further lawsuits in

the Southern or Eastern Districts of New York . . . arising from or related to the Property at 27 Grape Lane in Hicksville, New York [and related disputes], without first obtaining leave of the court in which she proposes to proceed").

In this case, a filing injunction is warranted both to curb plaintiff's ongoing campaign of frivolous motion practice in the case at bar and to prevent him from recycling the same frivolous claims in other courts. Plaintiff should therefore be required to obtain leave from this Court before filing any further motions for affirmative relief in this action. Specifically, plaintiff should be directed to seek such leave by filing a one-page letter – similar to the pre-motion letter that many judges of this Court already require before a party initiates motion practice – in which its counsel of record summarizes the proposed motion and explains succinctly why it would be neither duplicative nor baseless.[35] Additionally, given my recommendation that this action be dismissed pursuant to Rule 4(m) – without prejudice – the filing injunction should be designed to prevent plaintiff from simply refiling the same baseless claims in another federal court. Plaintiff should therefore be required to obtain advance leave from any federal district court in which it proposes to file or refile any claims arising out of the Paramount/Skydance merger. Specifically, plaintiff should be directed to seek such leave by filing a motion that (i) lists all of plaintiff's prior cases arising out of the Paramount/Skydance merger (including this one) and their disposition; (ii) certifies that it has paid any sanction assessed in the listed case(s); (iii) attaches the proposed new complaint; (iv) explains, succinctly, the basis of the court's subject-matter jurisdiction; and (iv) if

---

[35] The recommended injunction would not require plaintiff to obtain leave of Court before filing objections to this Report, nor interfere with its ability to respond to a motion filed by a defendant.

plaintiff invokes the court's federal question jurisdiction, explains, succinctly, why its proposed federal claims are not frivolous.[36]

## III.    CONCLUSION

For the reasons set forth above, I recommend, respectfully, that this action be DISMISSED in its entirety, without prejudice, pursuant to Rule 4(m), thereby mooting all of the parties' remaining motions (including plaintiff's motions to supplement its pleading and for judicial notice).

I further recommend that NAI's sanctions motion be GRANTED; that a monetary sanction in the amount of $10,000, payable to the Clerk of Court, be imposed upon plaintiff and its counsel, jointly and severally, pursuant to Rule 11(c); that attorney Constants be referred to this Court's Grievance Committee for consideration of the two issues described in Part II(C) of this Report; and that a tailored leave-to-file injunction be entered against plaintiff, as described in Part II(D) of this Report.

Dated:        New York, New York
              August 12, 2025

_____
BARBARA MOSES
United States Magistrate Judge

---

[36] *See Almazon*, 2025 WL 720545, at *4 (requiring plaintiff to file a pre-complaint motion that "(a) lists every prior case (including its docket number) that she has filed against Chase its affiliates, or its personnel, and its disposition, (b) attaches her proposed new complaint, and (c) explains why her new claims are not barred by *res judicata*, collateral estoppel, or the *Rooker-Feldman* doctrine").

## <u>NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS</u>
## <u>TO THIS REPORT AND RECOMMENDATION</u>

The parties have 14 days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). *See* Fed. R. Civ. P. 6(a), 6(d). Any objections must be filed with the Clerk of the Court, addressed to the Hon. Dale E. Ho, and delivered to Judge Ho in accordance with his individual practices. Any request for an extension of the deadline to file objections must also be directed to Judge Ho. **Failure to file timely objections will result in a waiver of such objections and will preclude appellate review.** *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018) (summary order); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).