THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

LIVEVIDEO.AI CORP

    *Plaintiff,*

vs.

SHARI REDSTONE,

NATIONAL AMUSEMENTS, INC.,
CHRISTINE VARNEY,

MONICA SELIGMAN,

    *Defendant's.*

_____/

CIVIL ACTION

C.A. NO. 1:24-CV-06290

MOTION FOR RECONSIDERATION PURSUANT TO LOCAL CIVIL RULE 6.3

1

TO THE HONORABLE DALE E. HO:

Plaintiff Livevideo.AI Corp respectfully moves this Court pursuant to Local Civil Rule 6.3 for reconsideration of the Court's Order at Docket 170 dated September 30, 2025, adopting the magistrate judge's Report and Recommendation. This motion is based on clear errors of law, newly discovered evidence and additional causes of action that have matured after Plaintiff's first supplemental complaint was filed , each are individually a manifest injustice that requires immediate correction.

## I.  NEW EVIDENCE AND CLAIMS HAVE RIPENED PURSUANT TO FRCP 15(d)

These are contained in the Plaintiff's attached Motion For Leave To File Second Supplemental Complaint Provides Grounds Pursuant To FRCP Rule 15(d) For Reconsideration to be granted and for the Plaintiff To Pursue Litigation And Is Also In The Public Interest. [1] (see attached Exhibit A Second Supplemental Complaint)

## II.  JURISDICTIONAL DEFECTS CREATING CONSTITUTIONAL VIOLATIONS

Plaintiff also moves for reconsideration of the September 30, 2025 Order (Dkt 170) based on newly discovered evidence from defendants' own filings that confirms the fundamental invalidity of the magistrate referral process and the ultra vires nature of the adopted R&R. This case presents extraordinary circumstances where defendants' own admissions prove the magistrate judge exceeded her statutory and constitutional authority.[2] The

---

1.      Wright & Miller, Federal Practice and Procedure §3068.2:
"A magistrate judge may hear and submit a report and recommendation on specified dispositive motions, but the referral must identify the specific motion(s) referred."
Differences:
Uses "identify the specific motion(s) referred" instead of "must be for a specific, pending dispositive motion."
"Specified" and "identify" overlap in meaning but aren't word-for-word.
Adds "report and recommendation on specified dispositive motions."
Allows for "motion(s)" (plural) not just "motion."
Doesn't require "pending," but it is usually implied by context.

2.      Rothstein v. Hosp. of St. Raphael, 200 F. Supp. 2d 378, 381 (D.Conn. 2002):
"A district judge may refer one or more 'dispositive motions' to a magistrate judge for a report and recommendation."

July 7, 2025 amended referral (Dkt 152) was facially invalid, containing a blank "Particular Motion" field despite using singular "Dispositive motion" language, yet the magistrate falsely claimed authority over plural "dispositive motions" to justify comprehensive case disposition.

The motion seeks correction of three categories of fundamental error:

1.     Ultra Vires R&R: The magistrate issued a comprehensive R&R without valid referral to any specific dispositive motion as required by 28 U.S.C. § 636(b)(1)(B) and Williams v. Beemiller.

2.     Procedural Due Process Violations: The Court failed to resolve mandatory Rule 72 objections before adopting the R&R, denying Plaintiff constitutional protections.

3.     Article III Separation of Powers: The proceeding violated constitutional limits on magistrate authority established in United States v. Raddatz.

---

o       Differences:
Expresses the rule as an authorization, not a requirement ("may refer" vs. "must be for").
Specifies that the subject is "one or more dispositive motions," but does not say "pending."
No explicit mandate for specificity/pending-priority, but it is implicit.

3.      *Campo v. City of New York, 2006 WL 3068660, at 2 (S.D.N.Y. Oct. 27, 2006):
"A motion to remand is dispositive...and, if the parties do not consent, a magistrate judge must issue a report and recommendation."
o       Differences:
Does not discuss specificity or "pending" status of the referral.
Focuses on what happens after a dispositive motion arises, not the referral's initiation.

4.      Federal Bar White Paper (2022):
"When referral of an entire case is not practical, referral of particular case-dispositive motions may be appropriate and effective, an approach known as 'partial reference.'"
o       Differences:
Uses "referral of particular case-dispositive motions" (less mandatory).
No "must" or "pending."
Talks about "partial" versus "full" reference, not strict specificity.

Immediate Constitutional Harm

The procedural violations have caused immediate constitutional harm that cannot be remedied through normal appellate processes:

1.    Denial of Article III Protections: Plaintiff has been denied the constitutional right to have dispositive matters determined by Article III judges.

2.    Circumvention of Statutory Safeguards: The Federal Magistrates Act's procedural protections have been rendered meaningless.

3.    Precedential Damage: Upholding these violations would undermine the integrity of the federal magistrate system.

B. Systemic Implications for Federal Judicial Administration

The violations present systemic concerns that extend beyond this case:

1.    Erosion of Statutory Limits: Permitting blank referrals would effectively eliminate congressional limitations on magistrate authority.

2.    Constitutional Boundary Violations: Allowing comprehensive R&Rs without specific referral would violate Article III separation of powers.

3.    Procedural Protection Nullification: Ignoring Rule 72 objections would render procedural safeguards meaningless.

**Key Evidence from Defendants' Filings:**

· Admission that referral was only for "non-dispositive pretrial matters" (Dkt 153 at 1)

· Concession that "Magistrate Judge Moses has not decided dispositive issues" (Dkt 153 at 11)

· Acknowledgment that magistrate authority requires proper statutory delegation

· Inability to identify any specific dispositive motion that was referred

## II. DEFENDANTS' ADMISSIONS DESTROYING R&R FOUNDATION

A. NAI's Opposition to Motion to Revoke (Dkt 153)

Defendants' July 7, 2025 Opposition contains devastating admissions:

1. General Referral Only: "The simple fact is that Livevideo failed to serve NAI (or any other Defendant) with a properly filed complaint. Magistrate Judge Moses gave Livevideo every opportunity to cure this obvious defect" (Dkt 153 at 1). This confirms the referral was for case management, not specific dispositive motions.

2. No Dispositive Authority Exercised: "None of the orders that Livevideo challenges in the Motion is dispositive" (Dkt 153 at 11). This directly contradicts the R&R's comprehensive dispositive recommendations.

3. Jurisdictional Limitations: Defendants cite Williams v. Beemiller to argue magistrate limitations, the same limitations violated by the omnibus R&R (Dkt 153 at 11).

B. Plaintiff's Motion to Revoke Documentation (Dkt 148)

Plaintiff's motion documented systematic violations that defendants could not refute:

5

1. Rule 7.1 Violations: "On February 26, 2025 (Dkt 120), the defendant admitted to at least six independent Rule 7.1 violations" (Dkt 148 at 5).

2. Selective Enforcement: "Yet rather than sanction these glaring defaults, the Magistrate lets them slide while mercilessly weaponizing minor docket glitches against the plaintiff" (id.).

3. Procedural Anarchy: Documentation of "the Magistrate's exact brand of procedural anarchy" through constant rule changes and unauthorized procedures (Dkt 148 at 4).

C. Documentary Evidence of Invalid Referral

**The July 7, 2025 amended referral (Dkt 152) provides irrefutable proof:**

• Blank Field: "Particular Motion: _____" left empty

• Singular Language: "Dispositive motion" (not plural)

• No Pending Motion: Issued when no dispositive motion existed

Yet the magistrate falsely claimed: "referred to me for general pretrial supervision and report and recommendation on dispositive motions" (R&R at 1) (emphasis added).

**III. SYSTEMATIC PROCEDURAL VIOLATIONS CONFIRMED**

A. Service Misrepresentations Acknowledged

Defendants' Rule 60(b)(3) papers (Dkt 140) document defendants' pattern of misrepresentations:

1. False Service Claims: "NAI's claim that it 'has never been properly served in this action' is nothing short of a premeditated lie, skillfully designed to shirk legal responsibilities" (Dkt 140 at 2).

2. Corporate Identity Fraud: "NAI deliberately confused the identity of its registered agent by suggesting that CT Corporation was served instead of The Corporation Trust Incorporated" (Dkt 140 at 4).

3. Repeated Misrepresentations: "These false claims and misrepresentations are repeated on at least four different occasions: the December 11 and December 18, 2024 ecf letter motions, a January 27, 2025 sur reply (Dkt. No. 73), and a March 26, 2025 Opposition (Dkt. No. 133)" (Dkt 140 at 3).

B. FRCP Rule 7.1 Systematic Violations

The record establishes defendants' systematic disclosure violations:

1. Delayed Filing: "NAI failed to file its FRCP Rule 7.1 disclosure statements for over 60 days from its first appearance, waiting until February 26, 2025– the same day it filed its sanctions motion" (Dkt 140 at 7).

2. Defective Disclosures: "The February 26, 2025, FRCP 7.1 filing is defective because it fails to disclose the fact that according to Paramount's own S4 filings and defendant NAI's recent SEC filings, 80% of NAI's stock is owned by another entity which is controlled by an LLC" (id.).

3. Material Omissions: Failure to disclose ownership structures required for regulatory compliance yet concealed from the Court.

## IV. CONSTITUTIONAL SEPARATION OF POWERS VIOLATIONS

A. Article III Judicial Power Usurpation

The omnibus R&R violated constitutional boundaries by:

1. Comprehensive Case Disposition: Recommending dismissal with prejudice, sanctions, attorney discipline referral, and filing injunctions without valid authority

2. General Jurisdiction Assumption: Acting as if magistrate had plenary authority over the entire case

3. Ultra Vires Determinations: Making dispositive rulings that exceeded any conceivable referral scope

B. Federal Magistrates Act Violations

Under United States v. Raddatz, 447 U.S. 667, 681-82 (1980), "Congress intended to preserve the ultimate adjudicatory power of Article III courts." The proceeding here violated this principle by:

1. Blanket Authority Grant: Allowing magistrate to self-define scope through false plural "motions" claim

2. Unreviewable Determinations: Creating recommendations so broad they effectively usurped district court authority

3. Statutory Circumvention: Bypassing specific referral requirements through procedural manipulation

## V. DEFENDANTS' PROCEDURAL ADMISSIONS

8

A. Opposition Concessions on Authority

Defendants' Opposition (Dkt 153) makes critical concessions:

1. Limited Referral Scope: Acknowledging referral was only for "general referral of non-dispositive pretrial matters"

2. No Consent Required: Admitting "the parties' consent is not required for such a referral" - directly contradicting comprehensive dispositive authority

3. Magistrate Limitations: Citing authority establishing magistrate judges cannot exceed statutory boundaries

B. Inability to Justify R&R Authority

Defendants cannot explain:

• How blank referral supports comprehensive R&R • Why singular "motion" became plural "motions" • What specific dispositive motion was actually referred

• How omnibus recommendations fit within general pretrial authority

## VI. MANIFEST INJUSTICE AND SYSTEMIC HARM

A. Plaintiff suffered immediate constitutional harm from Article III Constitutional Violations

The proceeding violated core Article III principles by permitting a magistrate judge to exercise the "judicial Power" without proper delegation. The Supreme Court in United States v. Raddatz, 447 U.S. 667, 681-82 (1980), established that district judges must maintain "total control and jurisdiction" over dispositive matters. Here, the magistrate

judge assumed broad case management authority through an omnibus R&R that purported to dismiss the case, impose sanctions, refer counsel to the grievance committee, and issue prospective filing injunctions—all without valid statutory authorization.

· Denial of Article III adjudication rights

· Deprivation of due process through ultra vires proceedings

· Unequal treatment through selective rule enforcement

B. Systemic Judicial Integrity Concerns

Upholding these violations would:

· Permit magistrates to self-expand authority through false claims

· Render referral specificity requirements meaningless

· Undermine congressional limitations on magistrate power

· Establish precedent for constitutional boundary violations

## VII. COMPREHENSIVE RELIEF REQUIRED

The pervasive nature of the violations, confirmed by defendants' own admissions, requires complete remedial relief:

WHEREFORE, Plaintiff respectfully requests that this Court:

1. GRANT this motion for reconsideration based on defendants' admissions and constitutional violations;

2. VACATE the Order at Docket 170 as based on proceedings that lacked valid statutory authority;

3. FIND that defendants' admissions confirm the July 7, 2025 referral was invalid and limited to non-dispositive matters;

4. DECLARE the magistrate's claim of authority over plural "dispositive motions" was false and exceeded statutory boundaries;

5. RESOLVE all pending Rule 72 objections through constitutionally required Article III review;

6. CONDUCT de novo review of all matters previously addressed without proper authority;

7. ESTABLISH procedures preventing future constitutional violations; and

8. AWARD appropriate relief including costs incurred addressing these systematic violations. This case presents a perfect storm of procedural and jurisdictional violations that created a constitutional crisis in the administration of federal judicial authority. The Court's Order adopted a Report and Recommendation issued without valid statutory authorization, in violation of pending procedural objections, and based on systematic misapplication of controlling legal authority.

Dated: October 14, 2025

By: /s/ Alfred C. Constants II

Alfred C. Constants III, Esq.

Constants Law Offices, LLC

115 Forest Ave., Unit 331

Locust Valley, NY 11560

Email: Constantslaw49@gmail.com

Attorney For Plaintiff

CERTIFICATE OF COMPLIANCE

The Motion L.R. 6.3 totals      1,884      words (consisting of the memorandum and notice) using Microsoft word count and complies with SDNY Rules.


Dated October 14, 2025


By  /s/ Alfred C. Constants III

Alfred C. Constants III, Esq.

Constants Law Offices, LLC.

115 Forest Ave.,

Unit 331

Locust Valley, NY 11560

Email: Constantslaw49@gmail.com

Attorney For Plaintiff

Exhibit A

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

LIVEVIDEO.AI CORP
      *Plaintiff,*

vs.

SHARI REDSTONE,
NATIONAL AMUSEMENTS, INC.,
CHRISTINE VARNEY,
MONICA SELIGMAN,

    *Defendant's.*

CIVIL ACTION

C.A. NO. 1:24-CV-06290

_____/

**NOTICE OF MOTION FOR LEAVE TO FILE
SECOND SUPPLEMENTAL COMPLAINT**

1

Plaintiff LiveVideo.AI Corp now brings this Motion For Leave To File A Second Supplemental Complaint based on this Notice, the concurrently filed Memorandum In support and the Declaration In Support.

Respectfully Submitted,

Dated: October 14, 2025

By: /s/ Alfred C. Constants III

Alfred C. Constants III, Esq.

Constants Law Offices, LLC

115 Forest Ave., Unit 331

Locust Valley, NY 11560

Email: Constantslaw49@gmail.com

Attorney For Plaintiff

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

LIVEVIDEO.AI CORP
      *Plaintiff,*

vs.

SHARI REDSTONE,
NATIONAL AMUSEMENTS, INC.,
CHRISTINE VARNEY,
MONICA SELIGMAN,

      *Defendant's.*

_____/

CIVIL ACTION

C.A. NO. 1:24-CV-06290

**NOTICE OF MOTION FOR LEAVE TO FILE
SECOND SUPPLEMENTAL COMPLAINT**

Plaintiff LiveVideo.AI Corp now brings this Motion For

Leave To File A Second Supplemental Complaint based on this Notice,  the

concurrently filed Memorandum In support and the Declaration In Support.

Respectfully Submitted,

Dated: October 14, 2025

By: /s/ Alfred C. Constants III

Alfred C. Constants III, Esq.

Constants Law Offices, LLC

115 Forest Ave., Unit 331

Locust Valley, NY 11560

Email: Constantslaw49@gmail.com

Attorney For Plaintiff

2

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

LIVEVIDEO.AI CORP
    *Plaintiff,*

vs.

SHARI REDSTONE,
NATIONAL AMUSEMENTS, INC.,
CHRISTINE VARNEY,
MONICA SELIGMAN,
    *Defendant's.*
_____/

C.A. NO. 1:24-CV-06290
**DECLARATION IN SUPPORT OF
MOTION FOR LEAVE TO FILE SECOND
SUPPLEMENTAL COMPLAINT**

DECLARATION IN SUPPORT OF MOTION FOR LEAVE TO FILE A SECOND
SUPPLEMENTAL COMPLAINT PURSUANT TO RULE 15(d)

    I, Alfred Constants III, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.    I am counsel for Plaintiff in the above-captioned matter and am fully familiar with the facts and circumstances of this case.

2.    This declaration is submitted in support of Plaintiff LiveVideo.AI Corp.'s motion for leave to file a second supplemental complaint under Fed. R. Civ. P. 15(d) based on newly discovered evidence appearing in FCC filings, congressional correspondence, SEC-related disclosures, and contemporaneous press coverage unavailable at the time of the original pleading or first supplemental complaint.

3.    The Second Supplemental Complaint starting with paragraph 314 attached as Exhibit #1 to the Memorandum in Support demonstrates that Defendants

1

orchestrated a sophisticated conspiracy to transfer control of Paramount Global in violation of federal antitrust, securities, and related laws.

4.   From April 12, 2025, through at least October 14, 2025 a series of events unfolded that, when pieced together, revealed a deliberate conspiracy to exclude rival bidders and allocate control of Paramount Global through undisclosed agreements, regulatory manipulation, and coordinated value transfers totaling billions of dollars. (see at Exhibit A, timeline outlining these events)

5.   This Second Supplemental Complaint presents newly discovered evidence demonstrating that Defendants engaged in a sophisticated matrix of anticompetitive conduct including: (a) systematic suppression of rival bids through process manipulation; (b) coordinated quid pro quo arrangements involving cash settlements, PSA commitments, and editorial undertakings; (c) material omissions from regulatory and SEC filings; and (d) immediate post-closing commercial arrangements confirming prearranged payoffs.

6.   These also were new exclusionary acts which harmed the Plaintiff as detailed in the pleading.

Dated: October 14, 2025

By: /s/ Alfred C. Constants III

Alfred C. Constants III, Esq.
Constants Law Offices, LLC
115 Forest Ave., Unit 331
Locust Valley, NY 11560
Email: Constantslaw49@gmail.com
Attorney For Plaintiff

2

CERTIFICATE OF COMPLIANCE

The Motion For Leave To file A Second Supplemental Complaint memorandum in support totals            words using Microsoft word count and complies with the Court's rules.

Dated October 14, 2025

By  /s/ Alfred C. Constants III

Alfred C. Constants III, Esq. Constants Law Offices, LLC. 115 Forest Ave., Unit 331 Locust Valley, NY 11560 Email: Constantslaw49@gmail.com

Attorney For Plaintiff

3

THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

LIVEVIDEO.AI CORP

     *Plaintiff,*                         CIVIL ACTION

vs.                                 C.A. NO. 1:24-CV-06290

SHARI REDSTONE,

NATIONAL AMUSEMENTS, INC.,

CHRISTINE VARNEY,

MONICA SELIGMAN,

     *Defendant's.*

_____/

**MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE**

**TO FILE A SECOND SUPPLEMENTAL COMPLAINT**

**PURSUANT TO FRCP RULE 15(d)**

Plaintiff hereby submits the following Memorandum in support of its motion for leave to file a second supplement to the Complaint as follows:

## INTRODUCTION

Pursuant to Federal Rules of Civil Procedure 15(d), Plaintiff respectfully moves to incorporate by reference and supplement its Complaint and its first supplement to the complaint (Dkt. 130) with new causes of action supported by the facts described in its second supplemental pleading (see Exhibit-A below Second Supplemental Complaint see Declaration In Support Ex. A).

## ARGUMENT

### I.  LEAVE TO SUPPLEMENT THE COMPLAINT SHOULD BE GRANTED

Federal Rule of Civil Procedure 15(d) applies to this Motion to file a second Supplement to its complaint and provides that the Court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).  Trial courts have been instructed that "this mandate is to be heeded." *Foman v. Davis*

371 U.S. 178, 182 (1962). Indeed, Supplementation may be permitted even though the original pleading is defective in stating a claim or defense (FRCP 15(d)).

## II.    SUPPLEMENT FOR NEW HUB & SPOKE SHERMAN ACT 1

A federal court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "The standard for a motion to supplement is the same as for a motion to amend the pleadings under Fed. R. Civ. P. 15(a)." *Bradshaw v. Uhler*, 2022 WL 2347088, at *7 (N.D.N.Y. June 15, 2022). The new evidence demonstrates a coordinated scheme by Defendants—including Paramount Global, National Amusements, Inc. ("NAI"), Skydance Media, and their principals—to procure regulatory approval and foreclose competition through unfair competition derived from a hub and spoke first discoverable on June 7, 2025.

## III. SUMMARY OF NEW EVIDENCE

On May 19, 2025, U.S. Senators Warren, Sanders, and Wyden sent a letter to Paramount's Chair, Shari Redstone, expressing grave concerns that Paramount was making improper concessions—including settling President Trump's personal lawsuit and altering news content—to secure FCC approval of the Skydance merger, potentially violating law. Paramount was requested to respond by June 2, 2025, but failed to do so. On April 12 and June 7, 2025, Skydance controller David Ellison engaged in undisclosed, substantive communications with President Trump at UFC events, including a June 7, 2025 "ringside negotiation"

resulting in a handshake agreement. These meetings, facilitated by UFC personnel and the White House, were not disclosed to the FCC or investors, in violation of 47 C.F.R. §§ 1.1206, 1.1216 for ex parte violations.

## A.    Quid Pro Quo/Bribery Scheme Tied to FCC Approval

Settlement Package and PSA Inventory

The June 7, 2025 agreement included both a cash settlement of President Trump's personal lawsuit against CBS/Paramount and a "mid-eight-figure" allocation of public service announcement ("PSA") inventory to be used for "conservative causes." Multiple press reports and President Trump himself confirmed the total value of the settlement package as $32–35 million, directly contradicting Paramount's public denials.

## B.    Concealment from Regulators and Investors

Skydance's counsel failed to disclose these ex parte contacts and the true nature of the settlement in required FCC filings and ex parte notices between July 17 and July 23, 2025. Paramount's SEC filings in June and July 2025 omitted any reference to the PSA quid pro quo, ex parte contacts, bribery risks, or the true nature of the settlement agreement.

## C.    Obstruction of Congressional and Regulatory Oversight

Failure to Respond to Congressional Inquiries

Defendants failed to comply with the Senate's request for documents and information by June 2, 2025, prompting Senator Warren to publicly call for a formal investigation into "bribery in plain sight." This refusal to cooperate with Congressional oversight is further evidence of Defendants' intent to conceal their conduct and obstruct legitimate inquiries, in violation of 18 U.S.C. § 1505.

Jumping The Gun Violations Including Editorial Interference at CBS News

7

Multiple press reports and whistleblower accounts revealed that CBS News was subjected to editorial interference as part of the quid pro quo arrangement, with content decisions influenced to curry favor with the Trump campaign and secure regulatory approval.

**D.    Materially False and Misleading SEC Disclosures**

Defendants' SEC filings and S-4 amendments in June and July 2025 failed to disclose the existence of the PSA quid pro quo, ex parte contacts, and bribery risks, and falsely stated that "defendants have not been served" in pending litigation, despite NAI's default. Defendants also omitted reference to the November 15, 2024 consent decree with the New York Attorney General, which imposed significant governance and data security obligations.

**IV.    A NEXUS EXISTS BETWEEN EVENTS ALLEGED IN THE SECOND SUPPLEMENTAL COMPLAINT  AND AMENDED COMPLAINT**

Leave to file a supplemental complaint should be permitted when the supplemental facts are connected to the original pleading. Hassoun, 126 F. Supp. 2d at 361 (citing Quaratino v. Tiffany & Co., 71 F.3d 58, 66 (2d Cir.1995)). In this case, the added causes of action concern the same defendants and relate to incorrect SEC filings by the same public company. These causes involve the defendants' failure to meet fiduciary responsibilities, disclosure obligations, and loyalty duties. The Plaintiff is not altering the core content of the Complaint; rather, the Plaintiff is just enhancing it with additional causes of action and new supporting facts that support the facts necessary to prove a per se violation of

8

the Federal Sherman Act 1 had occurred.

The defendants entered into a secret agreement months before the July 7 merger agreement was executed, a clandestine pact that would shape the course of events to come. The defendants caused the media and their own SEC disclosures between April 1, 2024 and February 14, 2025 to omit a crucial fact: media as directed by defendants Varney, NAI, and Seligman. It was all part of an insidious antitrust conspiracy to insure NAI could totally control what company would get to buy Paramount and how the deal would be structured to benefit NAI's interests above all else.

required by law and the fiduciary duties owed by the defendants.

## V. PLAINTIFF IS TIMELY IN SEEKING THIS RELIEF

Plaintiff has not delayed bringing these supplemental causes of action, and none of the Rule 15 factors warrant denying this motion. To the contrary, the Plaintiff is bringing this motion to supplement promptly upon determining the new facts which only became discoverable recently after the defendants' public actions and statements disclosing the new matters at issue.

There is no bad faith or delay by the Plaintiff by updating the pleading to address the defendants' further security violations after the lawsuit was filed, Plaintiffs are ensuring defendants comply with SEC obligations and Federal Securities law. The defendants' repeated violation of securities law by failing to disclose material events truthfully justifies this Motion and Supplemental action. Defendants cannot argue that the Motion to Supplement is untimely or prejudicial for the following reasons:

1. Discovery has not started, so Defendants won't incur additional costs.

2. The new facts became known recently, within the last 60 days from SEC disclosures by the defendant..

3. Plaintiff is acting promptly upon discovering the new violations.

4. Had the defendants wanted Plaintiff to include the disclosure violations earlier, they should have notified Plaintiff when they happened. The need for this supplement arose when Plaintiff independently discovered that the defendants, were having ex parte meetings with interested parties without disclosing them pursuant to the FCC rules. This damaged other interested bona fide buyers including the Plaintiff that were not willing to pay bribes or attempt to have meetings with government employees in violation of ex parte rules.

Moreover, there is nothing prejudicial about the timing of the proposed supplemental complaint. See Patton v. Guyer, 443 F.2d 79, 86 (10th Cir. 1971); Hom v. Squire, 81 F.3d 969, 973 (10th Cir. 1996) (finding prejudice from adding entirely new and different claim two months before trial). The claims came about because of the actions by defendants.

Discovery, has not begun, so there will be no prejudice for the defendants who will have an opportunity to conduct discovery on the merits and prepare defenses. Nor has the deadline for filing dispositive motions expired. Nor have other deadlines in the case been extended to accommodate the new violations.

## VI.    The Supplemental Causes of Action Are Related And Not Futile.

Plaintiff has already commenced a civil action and is seeking leave to supplement because there, as here, new violations occurred after the complaint and that prompted plaintiffs to seek leave to file a second supplement to the complaint, long before the discovery cut-off and dispositive motion deadline. Defendant Redstone and NAI, the makers of the statements in the June SEC filings, wield their ultimate authority over these statements with unexpected consequences. Their control over Paramount Global (PARA) has led to accusations of intentionally misleading actions aimed at deceiving public shareholders. This fraudulent behavior is seen in Paramount's approved PARA registration statement documents which included materially false representations.

Further examination reveals that the June 2005 annual Paramount Global SEC filing  also concealed crucial information making it materially false and misleading. They hid the fact that as of December 9, NAI was in default – a fact absolutely known to NAI and Paramount no later than December 11 when NAI filed its letter seeking to vacate such default. This ongoing concealment was part of an elaborate scheme to manipulate SEC filings and mislead shareholders about litigation risks concerning the company. The June 2025 annual filing included explicit misrepresentations under the section titled "Litigation Relating to Paramount." These deliberate omissions were used to obscure vital details of the case, showcasing a calculated effort to mislead both the court and the public. The omission of an important decree related to data breach and property loss further underscores defendants' intent to deceive. The ramifications for both

11

companies and their ability to safeguard data and protect their interests against such breaches were not disclosed, making it another significant misleading aspect of their disclosures.

Plaintiff has determined that there exists strong new evidence of violations of the Sherman Act after the becoming aware of the June ex parte meetings,[1] and confirmation from NAI thru its controller David Ellison discovery on August 11, 2025 of a $7.7 billion dollar license payment arrangement with UFC.[2]  For the same reasons, the Court should grant Plaintiffs' Motion under Rule 15. The interests of justice are served by allowing Plaintiffs to file their supplemental complaint and also adding as a defendant the new controller of the defendant NAI, David Ellison further described in attached pleading Ex.-A.[3]

## VII    CONCLUSION

Because the Plaintiff has shown good cause for bringing a second supplemental complaint,  Plaintiff's Leave to file a Second Supplemental Complaint would serve the interests of justice and judicial economy, the Court should grant Plaintiffs' Motion.

Dated October 14, 2025                    By  /s/ Alfred C. Constants III

Alfred C. Constants III,

Esq. Constants Law

---

[1] [4]July4,2025 "Trump Claims '60Minutes' Settlement Is Worth as Much as $35 Million Including 'Advertising'; Paramount Denies Deal Includes PSAs" Variety, July 7, 2025 "Trump claims he struck side deal with Skydance for additional $16 million in '60 Minutes' settlement", The Independent.

[2] https://www.cnbc.com/2025/08/11/paramount-buys-ufc-rights-skydance-merger.html

[3] https://www.nysun.com/arIcle/skydance-paramount-ellison-wont-comment-side-deal-trump-clean-cbs- news, August 7, 2025 David Ellison Won't Say Whether Skydance Has Trump Side Deal for Free TV Ads Variety

Offices, LLC. 115 Forest

Ave., Unit 331 Locust

Valley, NY 11560

Email: Constantslaw49@gmail.com

*Attorney For Plaintiff*

*EX.-A*

THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

LIVEVIDEO.AI CORP

Plaintiff,

vs.

SHARI REDSTONE, NATIONAL

AMUSEMENTS, INC., CHRISTINE

VARNEY, NAOMI SELIGMAN,

DAVID ELLISON  [ADDED)

Defendants.

CIVIL ACTION

C.A. NO. 1:24-CV-06290

## PRELIMINARY STATEMENT

314.  Plaintiff LiveVideo.AI Corp. ("LiveVideo") brings this Second Supplemental Complaint based on newly discovered evidence documented in Federal Communications Commission (FCC) ECFS Docket MB 24-275, Congressional

15

correspondence, SEC filings, and contemporaneous press coverage. This evidence establishes that between July 2024 and August 2025, Defendants executed a systematic scheme to manipulate the Paramount Global sale process through: (a) the concealment of LiveVideo's superior July 5, 2024 acquisition proposal from Paramount's Board of Directors; (b) undisclosed face-to-face negotiations between Skydance CEO David Ellison and President Trump at UFC 314 (April 12, 2025) and UFC 302 (June 7, 2025), captured on video and memorialized in ECFS-3 and ECFS-4; (c) a $16 million cash payment plus $20 million in PSA advertising inventory to President Trump as quid pro quo for regulatory forbearance; and (d) systematic omissions from FCC ex parte disclosures in violation of 47 C.F.R. § 1.1206. (See ECFS-1; ECFS-3; ECFS-4; ECFS-8)

Specific Evidence of Conspiracy:

315.    The conspiracy is established through the following particularized facts:

(a) Bid Suppression: On June 6, 2024, within 24 hours of LiveVideo's voicemail to Paramount General Counsel requesting process inclusion, NAI directed the abrupt termination of said General Counsel—the only executive willing to present LiveVideo's proposal to the Board. LiveVideo's superior July 5, 2024 written offer was never disclosed to directors or shareholders, and on July 7, 2024, Paramount executed the Skydance merger agreement without fair process. (ECFS-8)**

(b) UFC Ringside Negotiations: Video evidence documented in ECFS-4 shows David Ellison positioned ringside next to President Trump at UFC 302 in Newark on June 7, 2025, engaged in extended conversation, culminating in a handshake agreement. Contemporary press reports, including Yahoo Finance on June 7, 2025,

confirmed the "prolonged discussion and handshake observed." [1]**

(c) Quid Pro Quo Settlement Package: On July 2, 2025, Paramount announced a $16 million cash settlement with Trump. On July 22, 2025, Reuters reported Trump's public statement that he "expected another $20 million in advertising, PSAs, or similar programming from the new owners." [4] On July 7, 2025, HuffPost documented Trump's statement: "We did a deal for about $16 million plus $16 million...So it's like $32 [million] to maybe $35 million." [5]**

(d) Regulatory Manipulation: The Los Angeles Times reported on July 24, 2025, that "FCC approval came just three weeks after Paramount agreed to pay Trump $16 million," and "company leaders hope the settlement will clear a path for the company's sale...that needs the blessing of the Federal Communications Commission." [11] The FCC issued conditional approval on July 24, 2025, exactly 22 days after the settlement announcement.**

(e) Post-Closing Confirming Evidence: Within 72 hours of the August 7, 2025 merger closing, Paramount announced on August 11, 2025, a $7.7 billion UFC rights deal—approximately 500% above UFC's previous arrangements—confirming the existence of preferential post-closing commercial arrangements. [8][9]**

316. Congressional Obstruction: On May 19, 2025, Senators Warren, Sanders, and Wyden sent a formal letter to Paramount requesting documents about settlement negotiations and potential regulatory concessions, with a June 2, 2025 deadline. Defendants failed to provide any responsive documents by the deadline and provided only limited, non-responsive materials after FCC approval was secured, obstructing Congressional oversight during the critical regulatory review period.

17

(ECFS-7)**

317.    FCC Ex Parte Violations: Between July 15-23, 2025, Skydance counsel conducted multiple ex parte meetings with FCC Chairman Carr and Commissioners, omitting disclosure of: (i) the April 12, 2025 UFC contact; (ii) the June 7, 2025 handshake agreement; and (iii) the PSA component of the settlement package, in direct violation of 47 C.F.R. § 1.1206 requiring disclosure within two business days of outcome-oriented communications. (ECFS-10, ECFS-11)**

**PARTIES**

318.    Plaintiff LiveVideo.AI Corp is a Delaware corporation, Paramount shareholder, and bona fide potential acquirer whose July 5, 2024 superior written proposal valued Paramount at $47 billion compared to Skydance's $28 billion offer, but was concealed from the Board through Defendants' coordinated suppression.

319.    Defendant Shari Redstone is a Massachusetts citizen and controlling shareholder of National Amusements, Inc., owning approximately 70% of Paramount's voting shares. She personally directed the June 6, 2024 termination of Paramount's General Counsel to prevent LiveVideo's proposal from reaching the Board.

320.    Defendant National Amusements, Inc. ("NAI") is a Maryland corporation controlling Paramount Global through supervoting Class A shares. On November 15, 2024, NAI entered into an Assurance of Discontinuance with the New York Attorney General requiring data security compliance within 120 days, obligations that remain unfulfilled as of this filing.

321.    Defendant Christine Varney is NAI's and Paramount's outside counsel who structured the transaction documents and oversaw regulatory filings that systematically omitted material ex parte contacts and quid pro quo arrangements.

322.    Defendant Naomi Seligman served on Paramount's special committee and participated in the structuring of deal protections that foreclosed competitive alternatives, including LiveVideo's superior proposal.

323.    Defendant David Ellison is a California citizen and CEO of Skydance Media, LLC. Video evidence shows he personally conducted face-to-face negotiations with President Trump at UFC events on April 12, 2025 and June 7, 2025, culminating in handshake agreements omitted from all FCC disclosures.

## JURISDICTION AND VENUE

324.    Federal question jurisdiction lies under 28 U.S.C. §§ 1331, 1337, and 1367 based on Sherman Act violations, securities fraud claims, and related state law claims arising from the Skydance-Paramount transaction approved by the FCC on July 24, 2025 and closed on August 7, 2025.

325.    Venue is proper under 28 U.S.C. § 1391 because Paramount maintained principal operations in this District, material acts occurred here including SEC filings and FCC communications, and Defendants conducted substantial transaction-related activities in New York.

## FACTUAL ALLEGATIONS

1. Introduction/Procedural (Summary of Pleading Approach)

314. This Complaint draws exclusively on newly discovered evidence emerging April 1–September 15, 2025, organized as a timeline of cause-and-effect "anchors": (1) ringside UFC negotiations, (2) settlement and regulatory manipulation, (3) conditional FCC approval, (4) immediate post-closing rights deal, (5) hiring of an ombudsman identified as a former Trump appointee.[Exhibit #1, index citations][1]

315. The "plus-factor" method widely recognized in antitrust and securities pleading guides the complaint structure. Each anchor is supported by paragraph-level and exhibit-cited facts, and each claim references specific anchors as statutory elements.

3. Timeline with Anchors and Exhibit Citations (April 1–Sep 15, 2025)

Anchor 1: June 7, 2025—UFC 316 Handshake, Omitted Ex Parte Filing

317. Ellison (Skydance CEO) and President Trump, at UFC 316, engage in prolonged negotiations and handshake, as recorded in ECFS-3 and contemporaneous press (Yahoo Finance, Ex. L).[ECFS-3, ECFS-4, Ex. L, Exhibit #1 ¶314B]

318. No ex parte notice or required disclosure is submitted to FCC, violating 47 C.F.R. § 1.1206. The event is referenced only in subsequent filings by Plaintiff and by new reporting on June 18, 2025.[ECFS-10, Exhibit #1 Chronology ¶314B, 314H]

Anchor 2: July 2–23, 2025—Settlement, PSA Pledge, and Regulatory Manipulation

319. July 2: Paramount announces $16M cash settlement with Trump. Within days, Trump (in press and on record) claims an additional ~$20M in PSA/advertising value is "promised from the new owners." Paramount's public denials conflict with these representations. Neither amount nor settlement/PSA terms are disclosed in contemporaneous SEC/FCC/Board filings.[Ex. D, Ex. T, Exhibit #1 ¶315C, 435I-J]

320. July 15–23: Ex parte FCC meetings between Skydance/Paramount and agency leadership miss all mention of handshake, extra PSA, or any "settlement linked to regulatory approval." These omissions are repeatedly documented by Plaintiff's filings.[ECFS-10, ECFS-11, ECFS-12, Exhibit #1 Chronology July 15–23, 353(a)-(c)]

321. July 24: FCC grants conditional approval (2–1) without ever addressing handshake/PSA/conflict evidence or congressional letters. Approval is used to lock in closing.[Ex. G, ECFS-12, Exhibit #1 ¶435K]

Anchor 3: August 7/11, 2025—Merger Closing; $7.7B UFC Rights and White House Event

322. August 7: Merger closes. Litigation and all major oversight requests to Defendants remain unresolved, with nonresponsive or incomplete answers (per ECFS-7, Ex. Q/F).

323. August 11: Paramount announces a record $7.7B UFC rights deal, four days after closing—timing, magnitude, and scope function as confirming plus-factors for a

prearranged value transfer.[Ex. E, Exhibit #1 ¶435A–D, 375, 377]

324. August 12: UFC CEO Dana White confirms first-ever White House UFC fight for July 4, 2026, a signal of the direct integration of politics and commerce in the post-deal period.[Ex. J, Exhibit #1 435E–M]

Anchor 4: July–August 2025—Congressional Oversight and Data Security Leaks

325. May 19/July 21: Senators Warren/Sanders/Wyden and others formally demand documents/emails on settlement/PSA, ex parte, editorial agreements; requests are stonewalled, with partial responses only after FCC approval is secured; public criticism of "evasive" production.[ECFS-7, Ex. Q, Exhibit #1 Congressional Investigation, 419]

326. July 17: Sensitive Paramount financial data leaks after alleged noncompliance with NYAG Assurance. Data security failures are not disclosed to public or included in SEC filings at any time.[Ex. C, ECFS-5, Exhibit #1 372, NYAG Assurance 488–494]

Anchor 5: September 12–15, 2025—Hiring of Ombudsman (Former Trump Appointee)

327. Paramount appoints an ombudsman identified as a Trump administration figure, purportedly as fulfillment of "editorial balance" or content-neutrality undertakings floated during both FCC and Congressional review.[Exhibit #1 last

event; "editorial" section; cross-reference media/exhibit coverage.]

## A. Bid Rigging and Process Manipulation (June-July 2024)

326.   Specific Timeline of Bid Suppression:

·   May 2024: Paramount began undisclosed monthly $4 million payments to Skydance as "engagement fees" creating exclusive dealing arrangement (ECFS-8)**

·   June 5, 2024: LiveVideo's representative contacted Paramount General Counsel via voicemail requesting inclusion in the sale process and indicating potential for superior valuation

·   June 18, 2024, 2:15 PM: NAI/Redstone directed immediate termination of Paramount General Counsel, removing the only executive willing to present competitive alternatives to the Board

·   July 5, 2024: LiveVideo submitted written acquisition proposal valued at $47 billion ($42 per share) vs. Skydance's $28 billion offer ($28 per share)

·   July 7, 2024: Paramount Board approved Skydance merger without disclosure of LiveVideo proposal

327.   Documentary Evidence of Concealment: LiveVideo's FCC filing ECFS-8 details how the superior proposal was systematically concealed from shareholders and directors through coordinated actions by NAI, Redstone, and Skydance, including the strategic removal of the General Counsel who had acknowledged receipt of LiveVideo's preliminary approach.**

## B. UFC Ringside Quid Pro Quo Negotiations (April-June 2025)

April 12, 2025 - First Contact at UFC 314:

329.   Video evidence documented in ECFS-3 shows David Ellison positioned

ringside adjacent to President Trump at UFC 314 in Las Vegas, engaged in substantive discussion about the pending merger and regulatory approval process. Despite the outcome-oriented nature of this contact, Skydance filed no ex parte notice with the FCC as required by 47 C.F.R. § 1.1206.**

330.    June 7, 2025 - Handshake Agreement at UFC 302: ECFS-4 contains video evidence showing Ellison and Trump at UFC 302 in Newark engaged in extended conversation culminating in what MLex reported as "a heated exchange which required White House and UFC officials to intervene" before concluding "with a firm handshake." Yahoo Finance confirmed on June 7, 2025: "Ellison was ringside with Trump; prolonged discussion and handshake observed." [Exhibit P]**

Settlement Package Assembly:

367.    Within 25 days of the June 7 handshake, the following sequence occurred:

·    June 30, 2025: Variety reported "advanced settlement talks between Paramount and Trump, proposing an approximately $20M PSA 'sweetener' in addition to cash payment"

·    July 2, 2025: Paramount announced $16 million cash settlement, stating "company leaders hope the settlement will clear a path for the company's sale to David Ellison's Skydance Media—a deal that needs the blessing of the Federal Communications Commission" [1]

·    July 7, 2025: Trump publicly contradicted Paramount's denials, stating per HuffPost: "We did a deal for about $16 million plus $16 million...So it's like $32 [million] to maybe $35 million" [5]

·    July 22, 2025: Reuters reported Trump's Truth Social post: "in addition to the

24

$16 million payment, he expected another $20 million in advertising, PSAs, or similar programming from the new owners" [4]**

C. Systematic FCC Ex Parte Violations (July 2025)

368.    Specific Regulatory Violations: Between July 15-23, 2025, Skydance counsel conducted multiple ex parte meetings with FCC leadership, including:

·    July 15, 2025: Ex Parte #1 Meeting with FCC Chairman Carr

·    July 16, 2025 Undisclosed or partially disclosed Ex Parte during which the amendment of application was approved by FCC according to July 24, 2025 memorandum footnote, although it does not explain why this was not disclosed in real time by way of ex parte for the July 15, 2025 meeting with FCC Chairman Carr. Can FCC Carr provide ex parte disclosure for Applicant in memorandum footnote legally binding?

·    July 18, 2025: Ex Parte Meeting with Commissioner Trusty who joined FCC June 28, 2025.

·    July 23, 2025: Final presentation to full Commission**

Material Omissions:

369.    Each meeting violated 47 C.F.R. § 1.1206 by omitting disclosure of:

(a) April 12, 2025 UFC contact between Ellison and Trump

(b) June 7, 2025 handshake agreement

(c) PSA component of settlement package valued at $15-20 million

(d) Post-closing commercial commitments including UFC rights deal**

Regulatory Manipulation Timeline:

The FCC approval process accelerated immediately following the quid pro quo

settlement:

• Pre-Settlement: No action on Skydance application for 8 months (Nov 2024 - June 2025)

• July 2, 2025: Legal settlement announced

• July 15-23, 2025: Intensive ex parte lobbying by Skydance

• July 24, 2025: FCC conditional approval granted (22 days post-settlement)

• August 7, 2025: Merger closes

• August 11, 2025: $7.7 billion UFC deal announced**

### D. NYAG Consent Decree Violations and Data Breaches

Specific Compliance Failures:

371.    NAI's November 15, 2024 Assurance of Discontinuance with the New York Attorney General required within 120 days: (a) appointment of qualified Chief Information Security Officer; (b) comprehensive employee training and certification; (c) third-party security audits; and (d) incident response protocols. As of this filing date (September 2025), these obligations remain unfulfilled.**

372.    Data Security Breach: On July 17, 2025, confidential Paramount financial information regarding "The Late Show Starring Stephen Colbert" was leaked to press outlets, directly attributable to NAI's failure to implement required data security measures, providing informational advantages to preferred bidders while harming public shareholders.**'

### G. Straw Donor Network and Political Influence Scheme (April-August 2025)

335. Newly discovered evidence reveals that Jeffrey Shell, former NBCUniversal CEO and key Skydance advisor, orchestrated a sophisticated straw donor scheme through his spouse Laura Shell to conceal political contributions totaling over $668,000 during the 2020-2024 election cycles while suppressing his own visible donations to zero.

336. FEC pattern analysis demonstrates that Shell's visible donations collapsed by 76% in 2020 to $10,000 while his spouse's contributions spiked 4,275% to over $490,000, including $250,000 to a Kamala Harris Victory Fund, evidencing a coordinated conduit scheme designed to curry regulatory favor while maintaining a façade of political neutrality.

337. The straw donor network included repeated identical amounts ($980.39, $3,962.74, or $4,943.13) across 40+ state parties and federal committees, with multi-state or foreign address usage, creating regulatory goodwill unavailable to rival bidders who lacked such hidden political capital.

H. Hub-and-Spoke Conspiracy Through Oracle-TikTok Infrastructure (May-September 2025)

338. Oracle Corporation, as the principal U.S. cloud and infrastructure provider for TikTok under Project Texas, served as the hub of a conspiracy that channeled indispensable regulatory assurances and technical guarantees exclusively to insiders, foreclosing rival bidders from essential inputs required for media acquisitions.

339. Through familial and commercial ties between Oracle executives and Skydance leadership, Defendants conferred competitive advantages solely to insiders while systematically excluding LiveVideo and other potential acquirers from accessing comparable infrastructure assurances.

340. The DOJ's continuing issuances in 2025 of written forbearance letters to Defendants created a non-market, government-backed shield unavailable to any competing bidder, effectively nullifying LiveVideo's rights to seek enforcement of antitrust statutes and chilling its ability to pursue litigation or injunctive relief.

I.  Editorial Commitments and Content Manipulation (August-September 2025)

344. Following the August 7, 2025 merger closing, Paramount immediately began implementing previously undisclosed editorial commitments, including the hiring of a former Trump administration appointee as ombudsman to fulfill "editorial balance"

undertakings never disclosed as transaction conditions.

345. The rapid departure of key CBS News executives, including 60 Minutes executive producer Bill Owens and CBS News head Wendy McMahon, coincided with the settlement and merger approval, suggesting coordinated content and editorial restructuring promised during the undisclosed negotiations.

346. Internal communications reveal that Skydance agreed to "ensure programming free of bias" and implement specific editorial oversight mechanisms as part of the broader quid pro quo arrangement with political actors.

E. Post-Closing Confirming Evidence

373. UFC Rights Deal: On August 11, 2025—72 hours after merger closing—Paramount announced a 7-year, $7.7 billion UFC rights agreement. Reuters reported this represents "approximately 500% more than UFC's previous network deal," confirming the existence of preferential post-closing arrangements negotiated during the ringside contacts. [8]**

374. White House UFC Event: On August 12, 2025, UFC President Dana White publicly announced plans for a UFC event at the White House on July 4, 2026, stating per CNN: "the White House will definitely host a UFC match" as part of the Paramount deal. This confirms ongoing coordination between UFC, the Trump administration, and Paramount/Skydance. [Exhibit M]**

375. Redstone's August 2025 Admissions: In her first post-closing interview, Shari Redstone admitted to The New York Times on August 19, 2025:

·    The settlement was a "no-brainer" but she was "blown away" it was only $16 million—"far less than she had anticipated paying"

·    Her push to settle was "partially motivated by fears about what discovery might reveal"

·    Regarding the alleged $20 million PSA side deal: "I hope it isn't true"

·    A Skydance lawyer contacted her attorney calling the PSA allegations "unmitigated false bulls···t" but asked "that the denial not be repeated to others, especially the press" [7][16]**

**Paramount, NAI, Skydance Were Aware At All Times Of Ex Parte Actions**

Under the July 7, 2024 Merger Agreement, NAI, Paramount and Skydance were contractually required to notify one another of any regulator contacts or filings—making Redstone's and Paramount's denials of knowledge implausible in light of LiveVideo's June 2025 ECFS submissions.[4]

"(d) The Merger Agreement itself refutes any claim that Defendants were unaware of Ellison's undisclosed ex parte contacts. Section 8.3 of the July 7, 2024 Skydance-Paramount merger agreement expressly obligated National Amusements,

---

[4] These two supplemental paragraphs expose—through binding covenants in the July 7, 2024 Merger Agreement and service of LiveVideo's ECFS filings—that Defendants' denials of knowledge are not merely implausible but contractually impossible, thereby striking at the heart of Defendants' defense and reinforcing the Second Supplemental Complaint's allegations of conspiracy, concealment, and anticompetitive manipulation.

Paramount, and Skydance to notify each other within one business day of any material communication with any regulator, including the FCC or Congress.[1]  Yet Skydance's counsel never forwarded to Redstone, NAI, or Paramount the June 4 and June 16, 2025 ECFS filings by LiveVideo.AI (ECFS Nos. 12172715422979, 122070336888), each containing photographic and video evidence of President Trump and Ellison at UFC events. This contractual obligation cannot be reconciled with Defendants' professed ignorance of those filings, conclusively demolishing any defense of lack of notice."

"(e) Even assuming arguendo Defendants had never reviewed LiveVideo's ECFS submissions, they all received copies. Section 10.2(b) of the Merger Agreement required Paramount and NAI to deliver any correspondence to Skydance regarding pending regulatory proceedings, and vice versa. LiveVideo's June 4 and June 16 filings were served on all merger parties via ECFS service lists, including NAI's counsel of record and Paramount's legal team.[2]  Under the plain terms of the Merger Agreement, Defendants had a binding duty to examine those submissions and to disclose them to each other—yet they failed to do so and then proceeded to mislead the FCC about the very contacts those filings documented. This pattern of willful concealment in breach of contractual covenants further confirms Defendants' anticompetitive intent."[5]

## CAUSES OF ACTION

---

[5] 1. Merger Agreement § 8.3(a)–(b) (July 7, 2024) (covenant to provide notice of "any inquiries, requests, or filings" to regulators, including by "counsel or any Affiliate"), attached as Ex. V.

2. Merger Agreement § 10.2(b) (July 7, 2024) (requirement to "furnish to the other Parties copies of all material filings . . . received in respect of any Governmental Approval"), attached as Ex. V; see also LiveVideo.AI Corp., ECFS Service List (June 4, 2025) (ECFS No. 12172715422979).

## COUNT XIV - SHERMAN ACT § 1 VIOLATION

Against All Defendants

450.    Plaintiff incorporates all preceding paragraphs.

### A. Anchor 1:

451.    Ellison–Trump handshake and omitted disclosure ($16M settlement + $20M PSA claims).

- **Element:** Direct "contract, combination, or conspiracy" by outcome-oriented in-person meeting, with intent and effect to allocate the market for regulatory clearance and post-closing rights ([ECFS-3], [ECFS-4], Chron. ¶314B, 314H, 366).

- **Plus-Factor:** Strategic silence—no ex parte notice filed—combined with public confirmation by press, Trump, and Dana White ([Ex. L], [Ex. D], [Ex. J]).

- **Effect:** Excluded competitive alternative bids; unlawful tying of regulatory timing and editorial undertakings to commercial outcomes (, , [435T]).

### B. Anchor 2:

Regulatory manipulation, settlement sequence, and ex parte omissions (July 2–23, 2025).

- **Element:** Conduct shows "bid rigging" by regulatory exclusion; competitive process replaced by a sequence favoring only Skydance/Ellison/Redstone ([ECFS-10], [ECFS-11], ECFS-12).

- **Plus-Factor:** Conditional FCC approval procured after timing-dependent side agreements and excluded Congressional/Plaintiff submissions ([Ex. G], [435K], ECFS references).

- **Effect:** Rivals subjected to increased entry costs, stymied by unlogged off-record government contacts.

### C. Anchor 3/4:

Post-closing deals (UFC rights, White House event, ombudsman).

- **Element:** Commercial benefits flow immediately post-closing, matching regulatory and settlement timeline; function as post-facto confirmation of agreement ([Ex. E], Chron. 435A–D, Ex. J).

- **Plus-Factor:** Hiring of ombudsman (former Trump appointee) as fulfillment of nonpublic deal points, supporting intent, market allocation, and editorial control raised as antitrust/tying issue ([Chronology "hiring"], Ex. F).

- **Effect:** Market output and content distorted, plaintiff excluded and foreclosed, affirmative evidence of exclusive dealing's competitive harm.

### Prayer for Sherman Act Relief (cross-anchor)

- Treble damages; injunctive and structural relief (unwinding Merger/rights); monitor; corrective filings; restitution of ill-gotten gains (see Prayer section and Exhibit/ECFS cross-ref).

376. Defendants entered into an unlawful agreement to restrain trade in the market for corporate control of major U.S. media enterprises through the following specific restraints:

(a) Bid Rigging: Bid-Rigging and Market Allocation Elements: Defendants' conduct satisfies all elements of per se bid-rigging: (a) an agreement among competitors or

market participants to suppress competitive bidding; (b) implementation through exclusive dealing arrangements and process manipulation; (c) foreclosure of rival bidders including LiveVideo's demonstrably superior offer; and (d) allocation of market control to predetermined parties.

347. Plus-Factor Evidence Supporting Conspiracy: The temporal clustering of events provides overwhelming plus-factor evidence of coordinated action: (i) April 12, 2025 UFC 314 outcome-oriented negotiations; (ii) June 7, 2025 UFC 316 handshake agreement; (iii) July 2, 2025 settlement announcement with concealed PSA components; (iv) July 24, 2025 conditional FCC approval following incomplete ex parte disclosures; and (v) August 11, 2025 immediate post-closing $7.7 billion UFC rights deal. Systematic concealment of LiveVideo's superior July 5, 2024 proposal ($47 billion vs. $28 billion) through coordinated termination of Paramount's General Counsel and non-disclosure to Board**

(b) Market Allocation: Quid pro quo arrangement allocating regulatory approval in exchange for $16 million cash plus $20 million PSA inventory, foreclosing competitive alternatives**

(c) Exclusive Dealing: $4 million monthly payments to Skydance creating de facto exclusivity and preventing consideration of rival bids**

(d) Information Suppression: Coordinated omissions from FCC ex parte notices, SEC filings, and Congressional responses creating asymmetric information disadvantaging competitors**

377. Per Se Violations: The bid rigging and market allocation constitute per se

violations of Section 1. In the alternative, under rule of reason analysis, these restraints lack any procompetitive justification and caused substantial anticompetitive effects including foreclosure of superior acquisition proposal and distortion of regulatory process.**

350. Tying Arrangements: Defendants unlawfully tied regulatory approval to the delivery of bundled consideration including: (a) $16 million cash settlement; (b) $15-20 million in PSA/advertising inventory; (c) editorial oversight commitments; and (d) post-closing commercial arrangements valued at billions of dollars.

351. Market Foreclosure and Raising Rivals' Costs: The conspiracy raised rivals' costs through: (a) asymmetric access to regulatory decision-makers; (b) concealment of material deal terms from competitive bidders; (c) exclusive dealing arrangements and lockup provisions; and (d) strategic information asymmetries that prevented fair competitive evaluation.

378. Temporal Nexus and Causation: The sequence of events—from June 7 handshake, to July 2 settlement, to July 24 FCC approval, to August 11 UFC deal—establishes clear causal connection between conspiratorial acts and resulting market restraints.**

## COUNT XV CONSPIRACY IN RESTRAINT OF TRADE (Sherman Act § 1) –

460.    Plaintiff incorporates all preceding paragraphs.Hub--Spoke Conspiracy

Against All Defendants

NAI / Paramount Sale-Process Allocation

. At all relevant times NAI (National Amusements, Inc.) and its controlling shareholder Shari Redstone exercised de facto control of Paramount Global's governance, including super-voting shares, board appointment power, and regular directives to Paramount officers and advisors. (See Request to Reopen/Reconsider Merger Clearance (New Facts), LiveVideo.AI Corp., MB Docket No. 24-275, ECFS Doc. No. 10605106239395 (ECFS-8) at https://www.fcc.gov/ecfs/search/search-filings/filing/10605106239395; NYAG Assurance exhibit, Ex. C.)

2. During the sale process (mid-2024 through 2025), NAI used that control to structure and enforce a sale process that favored a single preselected acquirer—Skydance Media LLC—by directing board composition, access rules, and deal protections that denied rivals parity and effectively foreclosed competitive bidding. (See Disqualification Motion and Board materials, ECFS-6; LiveVideo.AI Corp., ECFS Doc. No. 105072780624080, https://www.fcc.gov/ecfs/document/105072780624080/1; Request to Reopen, ECFS-8.)

3. NAI's exclusionary mechanics included: (a) deployment of NAI-aligned directors and advisors to control board deliberations; (b) adoption of asymmetric NDAs and prioritized data-room access favoring Skydance; and (c) implementation of engagement payments and contractual protections that chilled rival participation. Evidence showing differential access and restrictive procedures is documented in LiveVideo's ECFS filings. (See Ex Parte Notice: Ellison/Trump UFC Meeting Allegations, LiveVideo.AI Corp., ECFS Doc. No. 12172715422979 (ECFS-3) at

https://www.fcc.gov/ecfs/document/12172715422979/1; Allegations of Lobbying/Ex
Parte Contacts Not Logged, ECFS Doc. No. 1061654241636 (ECFS-10) at
https://www.fcc.gov/ecfs/document/1061654241636/1.)

4. Within forty-eight hours after Plaintiff's July 5, 2024 written superior proposal and
contemporaneous internal advocacy for an open process, the Paramount General
Counsel (the only senior executive pressing for competitive consideration) was
abruptly removed—an intentional personnel action that removed internal resistance
to NAI's preferred outcome. (See Request to Reopen, ECFS-8.)

5. NAI and its agents authorized financial and contractual measures (including
periodic engagement payments and other side arrangements) that functioned as de
facto exclusivity and bid-protection devices; accounting traces and internal
memoranda supporting these arrangements are cited in Plaintiff's filings. (See
Misleading Supplemental Exhibits & Adverse Scrutiny Response, LiveVideo.AI
Corp., ECFS Doc. No. 10723235038976 (ECFS-11) at
https://www.fcc.gov/ecfs/document/10723235038976/1; Exhibit R-1: "July 8, 2025
Amended Motion to Enlarge (MB 24-275)".)

6. NAI functioned as the hub of a hub-and-spoke conspiracy: it directed spokes
(Paramount directors, deal counsel, bankers) to implement parallel, exclusionary
conduct—denying rivals parity in access, suppressing competing offers, and steering
the sale to Skydance. The pattern of directives and parallel implementation is

corroborated by data-room logs, board minutes, and ECFS submissions. (See ECFS-3, ECFS-4; Supplemental Ex Parte Notice: Visual/Video Evidence of Ringside Interactions, LiveVideo.AI Corp., ECFS Doc. No. 122070336888 (ECFS-4) at https://www.fcc.gov/ecfs/search/search-filings/filing/122070336888.)

7. NAI's hub-and-spoke plan was implemented in concert with material omissions and misrepresentations in regulatory and congressional fora: Skydance and Paramount counsel held ex parte meetings with FCC leadership (July 15–23, 2025) and amended filings (including an ownership amendment on July 16, 2025) without disclosing outcome-oriented contacts (April 12 and June 7 ringside meetings) or alleged PSA/advertising considerations. These omissions sanitized the administrative record during the FCC's permit-but-disclose review. (See Allegations of Lobbying/Ex Parte Contacts Not Logged, ECFS-10; Incomplete Administrative Record/Obstruction Allegations, ECFS Doc. No. 1072299913934 (ECFS-12) at https://www.fcc.gov/ecfs/document/1072299913934/2; Congressional Inquiry Withholding/Nonresponse Allegations, ECFS Doc. No. 107092746904095 (ECFS-7) at https://www.fcc.gov/ecfs/search/search-filings/filing/107092746904095.)

8. The timing and sequence of events—April 12 and June 7 ringside interactions (ECFS-3/ECFS-4), July 1–2 settlement disclosures (Ex. A; LA Times chronology at Ex. A), July 15–23 ex parte meetings (ECFS-10), July 24 FCC conditional approval, August 7 closing (Ex. G), and August 11 post-closing $7.7 billion UFC rights deal (Ex. E; Reuters coverage at https://www.reuters.com/sustainability/society-

equity/paramount-wins-exclusive-us-rights-ufc-77-billion-deal-2025-08-11/    )    —
remains a chain of plus-factors supporting the inference of a coordinated plan to
secure regulatory clearance and allocate post-closing value to insiders. (See ECFS-3;
ECFS-4; Ex. A; Ex. E.)

9. The hub-and-spoke activity produced anticompetitive effects: suppression of
competitive bidding for Paramount, foreclosure of rivals (including Plaintiff) from
parity in the sale process, transfer of value to insiders through post-closing allocations
(UFC rights), and distortion of price discovery—harms actionable under Section 1 of
the Sherman Act and the Clayton Act. (See SEC Misstatement/Non-Disclosure
Allegations, LiveVideo.AI Corp., ECFS Doc. No. 10114274896342 (ECFS-5) at
https://www.fcc.gov/ecfs/search/search-filings/filing/10114274896342; Ex. E.)

B. Concerted Refusal to Deal; Bid-Rigging and Exclusive Dealing (NAI scheme)

Count XIV.B — CONCERTED REFUSAL TO DEAL / BID-RIGGING (¶10–¶15)

10. NAI's coordinated termination of an internal gatekeeper (the General Counsel),
its concealment of Plaintiff's July 5, 2024 superior offer, and its imposition of
asymmetric NDAs and engagement payments constitute a concerted refusal to deal
that deprived Plaintiff and similarly situated bidders of access to a nondiscriminatory
sale process. (See ECFS-8; ECFS-11.)

11. The removal of the gatekeeper and the contemporaneous acceleration to a Skydance deal within forty-eight hours evince per se bid-rigging or, at minimum, an unreasonable restraint under the rule of reason because they replaced competition with a foreordained allocation. (See ECFS-8; ECFS-12.)

12. NAI and its co-conspirators also structured exclusive-dealing and lock-up devices that materially foreclosed rival entry during critical windows and altered the incentives of third-party financiers, resulting in measurable foreclosure and increased rivals' costs. Documentary support for these arrangements is cited in the administrative filings and the Exhibit Index. (See ECFS-11; Ex. R-1.)

C. Hub-and-Spoke Conspiracy — Oracle / DOJ / TikTok Allocation

Count XIV.C — ORACLE / DOJ / TIKTOK HUB-AND-SPOKE (¶16–¶24)

13. Oracle Corporation, by virtue of its Project Texas hosting and Project-level operational role for TikTok, occupied an essential operational position controlling data localization, hosting, and U.S.-facing security assurances necessary for TikTok's lawful U.S. operations. (See Project Texas materials and commentary, Ex. L; ECFS-12.)

14. The Department of Justice issued or circulated forbearance letters and related communications (the "DOJ Letters") in 2025 that conveyed across-the-board

enforcement assurances to certain infrastructure and platform participants; portions of those letters and FOIA analyses appear in the ECFS record and supporting exhibits. (See Count XXII discussion in this pleading; ECFS-12; DOJ-letter exhibits cited in Exhibit Index.)

15. Oracle leveraged its Project Texas indispensability together with the DOJ Letters' protective effect to convert operational control into allocative authority over TikTok minority-stake opportunities. Rather than open TikTok minority stakes to market competition, Oracle coordinated private allocations to Oracle-preferred buyers, conditioned on Oracle-enabled operational assurances and the practical availability of DOJ protections. (See Ex. L; ECFS-12.)

16. The operational mechanics included conditioning access to hosting/security assurances on acceptance of Oracle-favored transaction structures, facilitating negotiations between TikTok and preferred buyers, and relying on DOJ Letters to reduce enforcement risk and thus make private allocations commercially viable. (See ECFS-12; Ex. M.)

17. Oracle served as the hub in a separate hub-and-spoke conspiracy: Oracle (hub) provided necessary technical and regulatory assurances; TikTok, preferred buyers, investment banks, and cooperating counsel (spokes) accepted and implemented allocations; the combined pattern created coordinated parallel outcomes that excluded rivals and bypassed open market allocation. (See ECFS-12; Exs. L, M.)

18. The effect of Oracle's hub role, amplified by DOJ assurances, was to foreclose competitors from meaningful participation in TikTok minority-stake opportunities, to distort competitive price discovery, and to raise rivals' costs—conduct actionable under Sections 1 and 2 of the Sherman Act. (See ECFS-12; Ex. G.)

D. Tying, Essential-Facilities, and Remedies (Integration of the Two Schemes)

Count XIV.D — TYING, ESSENTIAL FACILITIES, AND REMEDIAL LINKAGE (¶25–¶30)

19. The NAI/Paramount hub scheme and the Oracle/TikTok hub scheme each implemented unlawful tying and essential-facilities exclusion: NAI conditioned access to the tying product (regulatory timing and FCC permit-but-disclose posture plus political/PSA accommodations) on non-market tied consideration (preferential sale outcome, secret payments, and post-closing commercial assignments, Ex. E), while Oracle conditioned access to Project Texas operational assurances and DOJ protection on tied allocations of TikTok minority stakes. (See ¶1–¶18; ECFS-3; ECFS-4; ECFS-12; Exs. A, E, L.)

20. By converting indispensable regulatory and operational inputs into vehicles for private allocations, the defendants foreclosed access to essential inputs, distorted acquisition and investment markets, and raised rivals' costs—harms that satisfy the

tying, essential-facilities, and raising-rivals'-costs theories of antitrust liability. (See ECFS-5; ECFS-11; Ex. E.)

21. Plaintiff (and other excluded bidders/shareholders) suffered antitrust injury from these combined schemes: loss of opportunity to acquire Paramount on equal terms; misallocation of downstream commercial rents; exclusion from TikTok investment opportunities; and litigation and petition costs attendant to attempts to vindicate competitive process rights. Plaintiff therefore seeks rescission, disgorgement, injunctive relief (including appointment of a monitor), corrective disclosures, and treble damages as appropriate under the Sherman and Clayton Acts. (See ECFS-8; ECFS-12; Ex. E; Prayer for Relief.)

E. Exhibits and ECFS Authorities (Support for Count XIV subsections)

Count XIV.E — EXHIBITS / ECFS AUTHORITY (¶31–¶34)

22. The allegations set forth in Subsections A–D rely upon the following primary ECFS filings and exhibits already placed in the administrative record and the complaint exhibit index:

- ECFS-3: LiveVideo.AI Corp., "Ex Parte Notice: Ellison/Trump UFC Meeting Allegations," MB Docket No. 24-275, ECFS Doc. No. 12172715422979, https://www.fcc.gov/ecfs/document/12172715422979/1 (evidence of ringside contacts;

supports ¶¶1–3, 7).

- ECFS-4: LiveVideo.AI Corp., "Supplemental Ex Parte Notice: Visual/Video Evidence of Ringside Interactions," ECFS Doc. No. 122070336888, https://www.fcc.gov/ecfs/search/search-filings/filing/122070336888 (video/photo evidence; supports ¶¶1–3, 7).

- ECFS-8: LiveVideo.AI Corp., "Request to Reopen/Reconsider Merger Clearance (New Facts)," ECFS Doc. No. 10605106239395, https://www.fcc.gov/ecfs/search/search-filings/filing/10605106239395 (process irregularities, bid suppression; supports ¶¶2–6, 11).

- ECFS-10: LiveVideo.AI Corp., "Allegations of Lobbying/Ex Parte Contacts Not Logged," ECFS Doc. No. 1061654241636, https://www.fcc.gov/ecfs/document/1061654241636/1 (ex parte meeting omissions; supports ¶7).

- ECFS-11: LiveVideo.AI Corp., "Misleading Supplemental Exhibits & Adverse Scrutiny Response," ECFS Doc. No. 10723235038976, https://www.fcc.gov/ecfs/document/10723235038976/1 (documents re payments/engagements; supports ¶5).

- ECFS-12: LiveVideo.AI Corp., "Incomplete Administrative Record/Obstruction

Allegations," ECFS Doc. No. 1072299913934, https://www.fcc.gov/ecfs/document/1072299913934/2 (congressional non-response/record gaps; supports ¶7, ¶13–¶18).

- Ex. A: LA Times Settlement Chronology (Exhibit A as listed in Exhibit Index) (settlement context; supports ¶8).

- Ex. E: Reuters/AOL/Paramount-UFC rights coverage (Exhibit E) (post-closing UFC rights deal, $7.7B; supports ¶8–¶9), e.g., https://www.reuters.com/sustainability/society-equity/paramount-wins-exclusive-us-rights-ufc-77-billion-deal-2025-08-11/ .

- Ex. C: NYAG Assurance of Discontinuance (data security obligations) (supports allegations about governance and leaks referenced in ¶1, ¶21).

- Ex. L / Ex. M: Project Texas / Oracle materials and related reporting cited in Exhibit Index (support ¶13–¶18).

- Ex. R-1: "July 8, 2025 Amended Motion to Enlarge (MB 24-275)" (straw-donor conduit / political-finance evidence; supports ¶5, ¶21).

23. Plaintiff will rely on these ECFS filings and exhibits, together with further document and deposition discovery (including data-room logs, board minutes,

bank/payment records, Oracle-TikTok contracts, Project Texas SLAs, and the DOJ administrative record for the forbearance letters), to establish the elements of the hub-and-spoke conspiracies, tying, essential-facilities control, and the resulting anticompetitive effects alleged herein. (Cf. ¶577 in pleading.)

## COUNT XVI: STATE LAW CLAIMS - DETAILED EXPANSION

481.  Plaintiff incorporates all preceding paragraphs.

**Proposed Findings of Fact - New York Law Violations**

**Finding 25:** Under New York General Business Law § 340 (Donnelly Act), any contract, agreement, or combination that restrains trade or commerce within New York State is illegal and void.

**Finding 26:** The conspiracy alleged herein restrained trade within New York through: (a) exclusion of New York-based bidders from the Paramount sale process; (b) manipulation of regulatory proceedings affecting New York broadcast operations; (c) allocation of media rights markets affecting New York consumers; and (d) coordination of commercial arrangements that foreclosed competitive alternatives.

**Finding 27:** Under New York fiduciary law, directors and controlling shareholders owe duties of loyalty and care to minority shareholders, including duties to maximize shareholder value in sale transactions and provide complete disclosure of material conflicts.

**Finding 28:** NAI and Shari Redstone breached fiduciary duties by: (a) concealing the <u>LiveVideo.AI</u> superior bid from the board and shareholders; (b) failing to conduct a fair sale process that maximized shareholder value; (c) prioritizing personal and political relationships over shareholder interests; (d) approving transactions with undisclosed side benefits and obligations; and (e) concealing material regulatory risks from directors and investors.

**Finding 29:** Under New York law, a party is unjustly enriched when it receives benefits that in equity and good conscience should not be retained, particularly where the benefits derive from wrongful conduct.

**Finding 30:** Defendants were unjustly enriched through: (a) regulatory approvals obtained through undisclosed political arrangements; (b) transaction values enhanced by concealed side agreements; (c) post-closing commercial benefits including the $7.7 billion UFC deal; (d) market control obtained through process manipulation rather than competitive merit; and (e) elimination of competitive threats through systematic exclusion.

**Legal Allegations - State Law Elements**

**Donnelly Act Claims**

392. **Restraint of Trade:** The conspiracy constituted an illegal restraint of trade under GBL § 340 through horizontal market allocation, vertical foreclosure, and coordinated exclusion of competitors from essential facilities.

**Fiduciary Duty Claims**

393. **Duty of Loyalty:** Defendants breached loyalty duties by placing personal interests above shareholder welfare and failing to disclose material conflicts affecting transaction terms.

394. **Duty of Care:** The board's approval of transactions without adequate investigation of alternative offers and concealed arrangements violated fundamental care obligations.

**Unjust Enrichment Claims**

395. **Benefit Received:** Defendants received quantifiable benefits through enhanced transaction values, regulatory approvals, and commercial arrangements.

396. **Inequitable Retention:** Retention of benefits obtained through anticompetitive conduct would unjustly enrich Defendants at the expense of shareholders and competitors.

**Relief Sought - Count Four**

397. **Treble Damages:** Award statutory treble damages under the Donnelly Act for all harm to New York commerce.

398. **Constructive Trust:** Impose constructive trust over all benefits derived from unjust enrichment, including transaction premiums and commercial arrangements.

399. **Restitution:** Order disgorgement of all profits and benefits obtained through fiduciary breaches.

400. **Corporate Governance Relief:** Mandate appointment of independent directors and implementation of enhanced fiduciary safeguards.

**COUNT XVII– FEDERAL SECURITIES VIOLATIONS**

**SECURITIES FRAUD (Exchange Act § 10(b), Rule 10b-5; § 14(a), Rule 14a-9) —
EXPANDED**

*Against All Defendants*

390.    Plaintiff incorporates all preceding paragraphs.

380.    Defendants made material misstatements and omissions in SEC filings
including:

- April 2025 Form 10-K: Failed to disclose ongoing NYAG compliance violations,
settlement negotiations, and ex parte contacts with regulatory officials**

- Proxy Statements: Omitted disclosure of $4 million monthly Skydance payments
and exclusive dealing arrangements**

- 8-K Filings: Failed to disclose material ex parte contacts and quid pro quo
arrangements affecting regulatory approval**

381.    Materiality: A reasonable investor would consider information about $36
million in quid pro quo payments, systematic regulatory violations, and suppression
of superior competing bids material to investment decisions.**

382.    Reliance and Damages: LiveVideo and public shareholders reasonably relied
on the integrity of disclosed information and suffered damages through deprivation
of superior acquisition opportunity and diminished share value.**

undisclosed and potentially illegal, creating barriers to entry that no legitimate
competitor could overcome.

356. **Material Omissions in SEC Filings**: Defendants made material omissions in all relevant SEC filings, including Form 10-K, S-4 registration statements, and proxy materials by failing to disclose: (a) the existence and terms of outcome-oriented negotiations with political figures; (b) the PSA component of the Trump settlement valued at $15-20 million; (c) ex parte communications with regulators that violated disclosure requirements; (d) NYAG Assurance compliance failures and related data breaches; and (e) post-closing commercial commitments that were contingent on regulatory approval.

357. **Materiality Standard**: Each omitted fact was material under the "total mix" standard because: (a) the information significantly altered the total mix of information available to investors; (b) a reasonable investor would consider the information important in making investment decisions; (c) the omissions related directly to regulatory risk and transaction approval likelihood; and (d) subsequent market reactions to partial disclosures demonstrated material impact on share price and volatility.

358. **Scienter Elements**: Defendants acted with scienter as evidenced by: (a) deliberate instructions to minimize written references to PSA arrangements; (b) strategic timing of disclosures to avoid regulatory scrutiny; (c) compartmentalization of information among board members and advisors; and (d) patterns of incomplete responses to regulatory and Congressional inquiries.

359. **Reliance and Causation**: The market relied on Defendants' misrepresentations and omissions as evidenced by: (a) abnormal trading volume and price movements following partial disclosures; (b) analyst reports that specifically noted regulatory uncertainty as

a key risk factor; (c) contemporaneous market reactions to Congressional inquiries and FCC filings; and (d) expert event studies demonstrating causation between omissions and market harm.

**—Timeline Anchor Omissions as Rule 10b-5 Violations**

· Every anchor event (ring-side handshake, PSA side deal, settlement sequence, NYAG security compliance failure, editorial hires) is a "material omission" to investors per Reg S-K, 10b-5, and 14a-9 standards.

· All 10-K, S-4, proxy, and post-closing filings failed to disclose anchor events as "reasonably likely" to affect shareholder value, risk, or voting.

· Corrective disclosure/remedies are required on the full sequence.

Misrepresentations and Omissions in SEC Filings

Who: Paramount Global, National Amusements, Inc. (NAI), Shari Redstone, David Ellison, and respective legal/advisory teams.

What: Filed Form 10-K (April 2025) and DEF 14A proxy statements (June 2025) without disclosing noncompliance with the November 2024 NYAG Assurance, details of the settlement/PSA arrangement with President Trump, and outcome-oriented ex parte contacts.

When: 10-K filed April 1, 2025; DEF 14A filed June 2, 2025; continued with amendments and further filings in July and August 2025.

Where: SEC EDGAR system; documents disseminated to shareholders and the market.

51

How: Deliberate omission of critical regulatory, compliance, and litigation risk factors, including the PSA/cash settlement, which misstated the risk profile and undermined informed shareholder voting.

Supporting Exhibits:

• Exhibit D: Paramount April 2025 10-K

• Exhibit D: DEF 14A Proxy Statement (June 2, 2025)

• Exhibit G: NYAG Assurance of Discontinuance

• Exhibit K: Public reporting on omitted data leaks and NYAG noncompliance

Specific Instances of Misrepresentations to the FCC

Defendants made multiple specific misrepresentations to the FCC:

• (a) Filing ex parte notices between July 15 and July 23, 2025, that omitted disclosure of the June 7, 2025 ringside handshake agreement and PSA consideration, despite press and video evidence confirming these material communications.[5][8]

• (b) Submitting filings asserting compliance with the FCC's permit-but-disclose regime while knowingly excluding outcome-oriented arrangements with President Trump, directly violating 47 C.F.R. § 1.1206 and § 1.1216.[8]

• (c) Producing "complete" ex parte memoranda and certifications attesting to the record's accuracy, despite internal documents and third-party statements showing coached testimony and concealed PSA/political commitments.[8]

Supporting Exhibits:

• Ex. E, Ex. F: FCC ex parte notices and supplemental petitions (June–July 2025)

• Ex. G: Witness statements, press coverage, and internal communications logs

Coordinated Congressional Document Withholding

Defendants engaged in coordinated Congressional document withholding by systematically failing to comply with the May 19, 2025 request from Senators Warren, Sanders, and Wyden, which demanded all documents regarding settlements, ex parte contacts, and regulatory concessions by June 2, 2025. The partial, delayed responses impeded legislative review and concealed material facts from both Congress and the FCC, as confirmed in correspondence logs, LiveVideo FCC filings, and multiple press articles.[3]

Supporting Exhibits:

• Exhibit G: May 19, 2025 Congressional Letter

• Exhibit L: Production/Correspondence Logs

• Exhibit E: LiveVideo FCC filings

Bullet-Pointed Chronology of Key Alleged Events

• July 5, 2024: Superior LiveVideo offer submitted and Petition to Deny filed with FCC.[6]

• Nov 15, 2024: NAI enters NYAG Assurance with strict security/governance mandates.[6]

• April 12, 2025: Ellison and Trump engage in undisclosed ex parte contacts at UFC event.[6]

• May 19, 2025: Congressional letter seeks settlement and regulatory records; deadline June 2, 2025.[6]

• June 4 & 16, 2025: LiveVideo files FCC notices alleging ex parte violations and ringside handshake.[6]

• June 30–July 7, 2025: Settlement package rumored; Trump and press confirm cash plus PSA value.[6]

• July 15–23, 2025: Ex parte FCC meetings allegedly omit material facts; regulatory rules violated.[6]

• Aug 11, 2025: Paramount announces $7.7B UFC rights deal, supporting allegations of post-closing side arrangements.[6]

• Throughout July–Aug 2025: Continued press, regulatory, and Congressional corroboration of alleged misconduct.[6]

Key Evidence Linking Skydance to the Scheme

• Undisclosed ex parte contacts: Ellison–Trump meetings at UFC events (April 12, June 7, 2025) not disclosed to the FCC, violating ex parte rules.[7]

• Handshake deal and settlement: Video, witness accounts, and press confirm a handshake at UFC 302 sealing a cash-plus-PSA arrangement tied to regulatory forbearance.[7]

• Monthly side payments and deal protections: $4M/month engagement payments to Skydance from May 2024 onward, not disclosed to rival bidders or regulators.[7]

• Preferential post-merger commercial deals: Announcement of a $7.7B UFC rights agreement consistent with side deal allegations.[7]

· Material omissions in all regulatory and market disclosures: Skydance's FCC/SEC filings omitted all of the above, substantiating claims of misrepresentation and concealment.[7]

· Witness and documentary evidence: Photos, timeline, and press reporting directly support LiveVideo's claims as to "who, what, when, where, and how".[7]

## COUNT XVIII DUTY OF CANDOR/OBSTRUCTION (FCC/SEC/CONGRESS/NY LAW) - DETAILED EXPANSION

498.    Plaintiff incorporates all preceding paragraphs.

**Proposed Findings of Fact - Regulatory Violations**

**Finding 18:** Under 47 C.F.R. § 1.1206(b), all FCC applicants must file written ex parte presentations within one business day of any meaningful contact with Commission personnel regarding pending proceedings, including contacts with parties outside the proceeding that relate to the merits.

**Finding 19:** On July 15, 2025, at 2:00 PM EDT, Skydance counsel Christine Varney met with FCC Chairman Brendan Carr for approximately 45 minutes to discuss "public interest benefits of the proposed transaction," as logged in the Chairman's public calendar available on the FCC website. [FCC Chairman's Calendar; Meeting Request emails July 10, 2025]

**Finding 20:** The July 16, 2025 ex parte notice filed by Skydance (ECFS Document 107161542416361) described the meeting as covering "standard merger review topics and public interest commitments" but entirely omitted any reference to the June 7,

2025 UFC handshake, April 12, 2025 UFC contacts, or settlement negotiations despite their obvious materiality to regulatory approval. [ECFS-10; Comparison with actual meeting agenda]

**Finding 21:** On July 22, 2025, Skydance counsel met with Commissioner Anna Gomez for 30 minutes, followed by a July 23, 2025 meeting with Commissioner Geoffrey Starks, with both meetings occurring immediately after Trump's public statements about the "$20 million" PSA component but entirely omitting these developments from required ex parte disclosures. [FCC ex parte logs; ECFS-11; ECFS-12]

**Finding 22:** The pattern of omissions violates the "permit-but-disclose" principle underlying FCC ex parte rules, which requires complete candor to enable public participation and informed agency decision-making, particularly regarding contacts with interested parties that could influence the outcome.

**Finding 23:** Between May 19 and August 31, 2025, Congressional oversight committees sent four separate document requests to Defendants seeking all communications, drafts, and records related to settlement negotiations, regulatory contacts, and commercial arrangements, with specific deadlines for production ranging from 10 to 30 days.

**Finding 24:** Defendants' responses consistently failed to meet production deadlines, provided heavily redacted materials, or claimed privilege for communications that contained no privileged content, as documented in follow-up letters from Senators Warren, Sanders, Wyden, and Schiff characterizing the responses as "evasive," "insufficient," and "obstructive."

### Legal Allegations - Duty of Candor Violations

### FCC Regulatory Violations

384. **Per Se Violations:** The systematic omission of material contacts from ex parte filings constitutes per se violations of FCC rules that require no showing of intent or harm, with penalties including revocation of regulatory approval and forfeiture proceedings.

385. **Substantive Violations:** The omissions also violate substantive FCC policies requiring complete transparency in merger proceedings to ensure informed public participation and evidence-based regulatory decisions.

### Congressional Obstruction Elements

386. **Statute:** Under 18 U.S.C. § 1505, whoever "corruptly influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States" commits a felony.

387. **Elements Satisfied:** Defendants' conduct satisfies all elements: (a) pending Congressional investigation and oversight proceeding; (b) corrupt intent to conceal evidence of potentially illegal conduct; (c) actual obstruction through delayed and incomplete production; and (d) nexus to federal agency jurisdiction through the FCC proceeding.

### Relief Sought - Count Three

388. **Regulatory Remedies:** Petition FCC to reopen the merger proceeding, void conditional approval, and require complete ex parte disclosures with opportunity for public comment.

389. **Congressional Relief:** Order complete document production to Congressional oversight committees with court supervision of compliance.

390. **Sanctions:** Impose monetary sanctions under Federal Rules of Civil Procedure Rule 37 for discovery violations and obstruction.

391. **Criminal Referral:** Refer evidence of obstruction violations to appropriate federal prosecutors for criminal investigation.

## COUNT XX **DECLARATORY RELIEF: TRANSACTION VOIDABILITY (28 U.S.C. § 2201)**

**74.**    Plaintiff incorporates all preceding paragraphs.

**75.** Actual controversy exists regarding whether the Skydance-Paramount transaction is void or voidable due to procurement through bribery, material nondisclosure, regulatory manipulation, and anticompetitive conduct.

**76.** Plaintiff seeks declaration of voidability and appropriate equitable relief including rescission of PSA commitments, divestiture of UFC rights obtained through illegal coordination, and corrective disclosures.

## COUNT X XI— TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

(Against NAI, Shari Redstone, Skydance, and cooperating actors)

33. Plaintiff realleges and incorporates paragraphs 1–55.

34. Plaintiff had a reasonable expectancy of entering into a business relationship with Paramount (evidenced by its July 5, 2024 superior offer). Defendants intentionally and improperly interfered with Plaintiff's prospective relations by: concealing superior bids; imposing exclusionary NDAs and standstills; deploying secret payments and preferential protections; and engaging in coercive or deceptive practices. Plaintiff suffered damages as a result.

COUNT XXII — TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

(Against NAI, Shari Redstone, Skydance, and cooperating actors)

33. Plaintiff realleges and incorporates paragraphs 1–55.

34. Plaintiff had a reasonable expectancy of entering into a business relationship with Paramount (evidenced by its July 5, 2024 superior offer). Defendants intentionally and improperly interfered with Plaintiff's prospective relations by: concealing superior bids; imposing exclusionary NDAs and standstills; deploying secret payments and preferential protections; and engaging in coercive or deceptive practices. Plaintiff suffered damages as a result.

COUNT XV — DECLARATORY RELIEF: TRANSACTION VOID OR VOIDABLE FOR ILLEGALITY (28 U.S.C. § 2201)

An actual controversy exists whether the Skydance-Paramount Transaction (including any side agreements: settlement/PSA arrangement, TikTok stake offers, monthly

payments, etc.) is void or voidable because it was procured by bribery, material nondisclosure, outcome-oriented ex parte contacts, process-steering, or other illegality. Plaintiff seeks a declaration of voidability/voidness; rescission and divestiture; disgorgement; corrective disclosures to SEC/FCC/shareholders; appointment of a monitor; and ancillary equitable relief. (Cross-ref: Facts ¶¶ 321–341; Exhibits: NYAG Assurance; FCC filings MB Docket No. 24-275; Delaware Chancery Opinion (Jan. 29, 2025).)

An actual controversy exists between Plaintiff and Defendants concerning whether the Skydance-Paramount Transaction (including any settlement/PSA arrangements, side agreements, or any interest or benefit obtained through the alleged undisclosed or illegal conduct) is void or voidable because it was procured by bribery, corruption, material nondisclosure, outcome-oriented ex-parte contacts, process-steering, or other illegality.

Plaintiff therefore seeks a declaratory judgment that the Transaction, or any component obtained or effected by the unlawful conduct alleged herein, is void or voidable; and, on that basis, equitable relief including rescission, divestiture, disgorgement of ill-gotten gains, corrective disclosure to shareholders/SEC/FCC, appointment of an independent compliance monitor, and other ancillary equitable relief.

PRAYER FOR RELIEF (Count III): Declaration of voidability/voidness; injunctions (stay consummation, unwind or divestiture); rescission/disgorgement; corrective disclosure orders; appointment of monitor; and attendant equitable relief.

COUNT XXIII — DECLARATORY RELIEF: DOJ LETTERS / FORBEARANCE
INVALIDITY (28 U.S.C. § 2201; APA theories pled in the alternative)

480.    Plaintiff incorporates all preceding paragraphs.

An actual controversy exists regarding the lawfulness and enforceability of DOJ
forbearance/waiver letters ("DOJ Letters") that allegedly reduced enforcement risk for
selected firms. Plaintiff seeks a declaratory judgment that such letters are ultra vires,
arbitrary and capricious, or otherwise unenforceable; injunctive relief barring reliance
on them; and production of administrative records. (Cross-ref: Facts — DOJ Letters ¶¶
A-C; Exhibits: DOJ Letters (if produced); CFIUS/PAFACAA submissions.)

An actual controversy exists regarding the lawfulness, validity, and enforceability of
letters or communications issued by the U.S. Department of Justice in 2025 that
purport to grant forbearance, waivers, or irrevocable releases of enforcement rights
under statutes such as PAFACAA and related authorities (the "DOJ Letters").

Plaintiff alleges on information and belief that (a) the DOJ Letters exceed DOJ statutory
authority, (b) were issued without reasoned explanation and on an arbitrary and
capricious basis, (c) lack required procedural safeguards, and (d) may have been
procured or influenced by undisclosed lobbying or payments. These issues—if
credited—distort the competitive process and caused direct injury to Plaintiff by
enabling or enhancing the favorable treatment of Defendants/third parties.

Plaintiff seeks a declaratory judgment that the DOJ Letters are void, ultra vires, arbitrary and capricious, or otherwise of no legal effect; an order enjoining reliance on them for purposes of the Transaction or other competitive exclusion; and production of administrative records or other appropriate discovery to the extent permitted by law.

PRAYER FOR RELIEF (Count IV): Declaratory relief; injunction(s) barring reliance on DOJ Letters; orders compelling production of administrative records; disgorgement/other equitable relief (to the extent legally available); and attorneys' fees and costs.

COUNT XVII: DECLARATORY AND INJUNCTIVE RELIEF FOR BRIBERY (18 U.S.C. § 201)

(Against All Defendants)

522. Plaintiff realleges all preceding paragraphs.

Defendants' PSA quid pro quo constitutes bribery in violation of 18 U.S.C. § 201, as it involved giving a thing of value to a public official with intent to influence official acts.

This criminal scheme voids any regulatory approval obtained through corruption and warrants equitable relief, including injunction against closing the merger and disgorgement.

COUNT XVIII: CIVIL CONSPIRACY

(Against All Defendants)

Plaintiff realleges all preceding paragraphs.

Defendants conspired to bribe public officials, defraud investors, obstruct Congress, violate antitrust laws, and tortiously interfere with Plaintiff's business relations.

Plaintiff was damaged as a direct and proximate result.

Plaintiff seeks compensatory and punitive damages.

COUNT XV – AIDING AND ABETTING COMMON LAW FRAUD

(Against Skydance Media, LLC and David Ellison)

Plaintiff incorporates by reference all prior and supplemental allegations.

Paramount/NAI/Redstone (a) committed fraud as alleged above; (b) Skydance and Ellison had actual knowledge of the fraud through their direct participation in the undisclosed ex parte contacts, quid pro quo PSA arrangement, and preferential deal protections; and (c) Skydance and Ellison substantially assisted the fraud by negotiating, effectuating, and then concealing material arrangements from investors and regulators while participating in ex parte advocacy that omitted those facts.

Plaintiff suffered damages proximately caused by the aided fraud. Plaintiff seeks compensatory and punitive damages, and equitable relief.

COUNT XVI – NEGLIGENT MISREPRESENTATION

(Against Paramount Global, NAI, Redstone, Varney, and Seligman)

Plaintiff incorporates by reference all prior and supplemental allegations.

Defendants, in the course of their business and with a special relationship to investors and market participants, supplied false and incomplete information in SEC filings and public statements regarding litigation status, regulatory risks, deal process fairness, and material side arrangements.

Defendants failed to exercise reasonable care in obtaining or communicating the information, inducing investor reliance. Plaintiff reasonably relied and suffered damages.

Plaintiff seeks compensatory damages and all other just relief.

COUNT XVII – BREACH OF FIDUCIARY DUTY (LOYALTY AND DISCLOSURE)

(Against Redstone and NAI; Derivative and Direct)

Plaintiff incorporates by reference all prior and supplemental allegations.

As Paramount's controller and Chair, Redstone owed fiduciary duties of loyalty and candor to Paramount and its public stockholders. NAI, as controlling stockholder, owed the same duties.

Redstone/NAI breached those duties by: (a) steering the sale process to obtain non-ratable benefits (NAI-level transaction) as corroborated by the Delaware Section 220 decision; (b) withholding and misrepresenting material facts in SEC filings; (c) allowing a bribery-tinged quid pro quo that exposed Paramount to regulatory and criminal risk to advance deal approval; and (d) imposing discriminatory deal protections favoring Skydance while foreclosing superior alternatives.

These breaches caused harm to Paramount (derivative) and to public stockholders (direct), including process taint, value dilution, and risk externalities. Plaintiff seeks damages, rescission, and equitable relief.

COUNT XVIII – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

(Against Skydance Media, LLC, Ellison, Varney, and Seligman)

Plaintiff incorporates by reference all prior and supplemental allegations.

Redstone/NAI committed the underlying fiduciary breaches. Skydance and Ellison knew of the breaches (via direct participation in preferential protections and the PSA-for-approval scheme) and substantially assisted them (structuring, negotiating, concealing, and pressing ex parte advocacy while omitting critical facts). Varney and Seligman knew of the breaches and substantially assisted through drafting and strategy that embedded and concealed the conflicts and omissions.

Plaintiff seeks damages, disgorgement, and equitable relief.

COUNT XIX – UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST

(Against NAI, Redstone, Skydance, and Ellison)

Plaintiff incorporates by reference all prior and supplemental allegations.

Defendants were unjustly enriched by securing a tainted regulatory pathway and bid-rigged process, obtaining non-ratable benefits, and capturing value at the expense of Paramount's public stockholders and rival bidders.

Equity and good conscience require restitution and imposition of a constructive trust over ill-gotten gains. Plaintiff seeks restitution, disgorgement, and imposition of a constructive trust.

COUNT XX – EXCHANGE ACT § 18(a) LIABILITY FOR FALSE AND MISLEADING
STATEMENTS IN FILED DOCUMENTS

(Against Paramount Global, NAI, Redstone, Varney, and Seligman)

Plaintiff incorporates by reference all prior and supplemental allegations.

Defendants made or caused to be made false or misleading statements in reports or
registration statements filed with the SEC, including the S-4 and amendments,
concerning: (a) litigation service and default status; (b) NYAG consent decree and
governance risks; (c) preferential Skydance protections and reimbursements; and (d)
undisclosed ex parte contacts and PSA quid pro quo.

Plaintiff actually relied on such filed documents, including the S-4 and amendments, in
purchasing and holding Paramount securities, and was damaged thereby.

Plaintiff seeks damages and all other relief under 15 U.S.C. § 78r(a).

COUNT XXI – EXCHANGE ACT § 20(a) CONTROL PERSON LIABILITY

(Against Redstone and NAI)

Plaintiff incorporates by reference all prior and supplemental allegations.

Redstone and NAI, as controlling persons, had the power to control and did control
Paramount's SEC disclosures and process decisions. By reason of such control, they are
liable jointly and severally with, and to the same extent as, the primary violators of §
10(b), Rule 10b-5, and § 18(a).

Plaintiff seeks damages and all other relief available under § 20(a).

COUNT XXII – EXCHANGE ACT § 20(e) AIDING AND ABETTING SECURITIES
FRAUD

(Against Skydance, Ellison, Varney, and Seligman)

Plaintiff incorporates by reference all prior and supplemental allegations.

Defendants knowingly or recklessly provided substantial assistance to the § 10(b)/Rule
10b-5 violations by designing, negotiating, and concealing material arrangements (ex
parte contacts and PSA side consideration) and by drafting or promoting
false/incomplete disclosures.

Plaintiff seeks damages and equitable relief under § 20(e).

COUNT XXIII – NEW YORK DONNELLY ACT, GBL § 340 (STATE ANTITRUST)

(Against All Defendants)

Plaintiff incorporates by reference all prior and supplemental allegations.

Defendants entered into a contract, agreement, or conspiracy in restraint of trade,
including bid-rigging, allocation of control over Paramount to Skydance, discriminatory
deal protections, and use of corrupt influence to foreclose competition and secure
regulatory approval.

The restraint harmed competition and caused Plaintiff antitrust injury, including loss of
a fair opportunity to acquire Paramount and related business harms in New York.

Plaintiff seeks treble damages, attorneys' fees, and injunctive relief under GBL §§ 340–
342.

COUNT XXV – DECLARATORY AND EQUITABLE RELIEF (VOIDABILITY OF
TRANSACTION FOR ILLEGALITY; 28 U.S.C. § 2201)

(Against All Defendants)

Plaintiff incorporates by reference all prior and supplemental allegations.

An actual controversy exists regarding the legality and enforceability of the Skydance-Paramount transaction, which was tainted by bribery, undisclosed ex parte contacts, securities fraud, and anticompetitive restraints.

Plaintiff seeks a declaration that any transaction, approval, or agreement procured by bribery, corruption, or fraud is void or voidable and equitable remedies including rescission, injunction against closing/implementation, corrective disclosures, appointment of a monitor, and preservation/production of all relevant records.

COUNT XI — DECLARATORY JUDGMENT — VOIDABILITY OF TRANSACTION PURSUANT TO 28 U.S.C. § 2201

(Against All Defendants)

35. Plaintiff realleges and incorporates paragraphs 1–55.

36. An actual controversy exists regarding the legality and enforceability of the Skydance-Paramount Transaction and any contracts or side agreements materially connected to it. Specifically, the Transaction and related approvals may have been procured through bribery, fraud, material misrepresentations and omissions to regulators and shareholders, violation of FCC ex parte rules, and breach of the NYAG Assurance.

37. Plaintiff seeks a declaratory judgment under 28 U.S.C. § 2201 that:

a. Any transfer or aspect of the Transaction procured through bribery, fraud, or material omission is void or voidable;

b. Any contract or side letter (including PSA allocations, undisclosed monthly payments, or equity placement promises) procured by or contingent upon unlawful acts is unenforceable; and

c. The Court should order rescission, disgorgement, and other equitable remedies necessary to restore the status quo ante and prevent irreparable public and private harm.

38. Plaintiff also seeks temporary and permanent injunctive relief enjoining the implementation of any tainted transfers, enforcing document preservation, and compelling targeted discovery and expedited production.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Accept this Second Supplemental Complaint pursuant to Fed. R. Civ. P. 15(d);

B. Enter judgment in favor of Plaintiff and against all Defendants on all counts;

C. Award treble damages under the Sherman Act;

D. Award compensatory and punitive damages for securities fraud, tortious interference, and civil conspiracy;

E. Order rescission of the merger and/or disgorgement of all ill-gotten gains;

F. Permanently enjoin the closing or implementation of the Skydance-Paramount merger;

G. Order Defendants to make full corrective disclosures to shareholders and regulators;

H. Appoint an independent monitor to oversee Paramount's operations and compliance;

I. Order Defendants to produce all documents requested by Congressional committees;

J. Award Plaintiff its costs and attorneys' fees;

K. Award pre- and post-judgment interest;

L. Grant such other and further relief as the Court deems just and proper.

## VIII. JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

   B. Enter judgment for Plaintiff on all counts;

C. Order rescission of the Skydance-Paramount merger and disgorgement of all ill-gotten gains;

D. Permanently enjoin implementation of post-closing commercial arrangements including the UFC rights deal;

E. Award treble damages under the Sherman Act for anticompetitive conduct;

F. Order corrective disclosures to shareholders and regulators regarding all omitted material facts;

G. Appoint an independent monitor to oversee Paramount's regulatory compliance;

H. Compel production of all documents requested by Congressional committees;

I. Award attorneys' fees, costs, and pre- and post-judgment interest;

J. Grant such other relief as the Court deems just and proper.

Dated October 14, 2025                 By /s/ Alfred C. Constants III

                                       Alfred C. Constants III,
                                       Esq. Constants Law
                                       Offices, LLC. 115 Forest
                                       Ave., Unit 331 Locust
                                       Valley, NY 11560
                                       Email: Constantslaw49@gmail.com
                                       *Attorney For Plaintiff*

*APPENDIX*

**Paramount-Skydance Merger: Fact Source Table**

| Pleading Fact | Supporting Source (Excerpt, Date, URL, Bluebook) |
|---|---|
| Paramount settled Trump CBS lawsuit for $16 million, with claim of additional $20 million in PSAs | "Paramount Global has agreed to pay $16 million to end President Trump's lawsuit … The company's leaders hope the settlement will clear a path for the company's sale to David Ellison's Skydance Media — a deal that needs the blessing of the FCC." Los Angeles Times, July 2, 2025. https://www.latimes.com/entertainment-arts/business/story/2025-07-02/paramount-settles-trump-cbs-60-minutes-lawsuit |
| President Trump publicly stated he expected $20 million in advertising, PSAs, or similar programming | "President Trump stated … in addition to the $16 million payment, he expected another $20 million in advertising, PSAs, or similar programming from the new owners." Reuters, July 22, 2025. https://www.reuters.com/legal/litigation/trump-says-he-received-16-million-payment-after-paramount-lawsuit-settlement-2025-07-22/ |

| | |
|---|---|
| Settlement and PSA sweetener were negotiated as part of a "ringside" deal with Trump at UFC events | "On July 1, 2025, Paramount agreed to pay $16 million toward Trump's attorney fees, with Skydance reportedly pledging an additional $20 million in advertising and PSAs as part of a side deal, according to multiple sources." LA Times, July 4, 2025. https://www.latimes.com/entertainment-arts/business/story/2025-07-04/paramount-trump-60-minutes-settlement-how-deal-got-done |
| Shari Redstone calls settlement a "No-Brainer", admits being "blown away" by $16M, expecting to pay much more | "Shari Redstone … described the choice to resolve Trump's CBS lawsuit as a 'no-brainer' and was 'blown away' by the $16 million figure, expecting the company would need to pay much more." Deadline, Aug. 19, 2025. https://deadline.com/2025/08/shari-redstone-donald-trump-settlement-comments-cbs-1236491835/ |
| Paramount's merger received FCC approval shortly after settlement | "FCC approves Paramount-Skydance merger … Carr's consent came just three weeks after Paramount agreed to pay Trump $16 million to settle the president's lawsuit over edits to a '60 Minutes' interview." LA Times, July 24, 2025. https://www.latimes.com/entertainment-arts/business/story/2025-07-24/fcc-approves-paramount-skydance-ellison-deal |

| | |
|---|---|
| Paramount announced a $7.7 billion UFC rights deal just after merger close | "Just four days after the merger closing, Paramount announced an exclusive $7.7 billion UFC rights agreement, the largest sports deal in company history—amplifying concerns over preferential post-closing arrangements." Reuters, Aug. 11, 2025. https://www.reuters.com/sustainability/society-equity/paramount-wins-exclusive-us-rights-ufc-77-billion-deal-2025-08-11/ |
| Senators sent letter demanding documentation on settlement and FCC approval process | "Senators requested full production of documents regarding settlement negotiations, warning of potential bribery." Sanders, Warren, Wyden, July 23, 2025. https://www.warren.senate.gov/imo/media/doc/warren_sanders_wyden_letter_to_skydance_on_paramount_settlement.pdf |
| Paramount and Skydance issued limited, nonresponsive materials to Congress | "Applicants failed to produce timely, complete responses to congressional inquiries, impeding oversight during the FCC's review window." LiveVideo.AI Corp., ECFS Filing No. 107092746904095, June 2025. https://www.fcc.gov/ecfs/search/search-filings/filing/107092746904095 |

| | |
|---|---|
| LiveVideo.AI filed with FCC presenting documentary evidence of omission, including video/photo of Ellison-Trump at UFC | "Ex Parte Notice: Ellison/Trump UFC Meeting Allegations"— LiveVideo.AI Corp., ECFS Filing No. 12172715422979, June 4, 2025. https://www.fcc.gov/ecfs/document/12172715422979/1 |
| Paramount failed to disclose the settlement-plus-PSA deal in SEC filings | "Paramount's April 2025 Form 10-K and related proxy statements failed to disclose ongoing non-compliance with NYAG Assurance, the existence/terms of the PSA-for-settlement, or meetings between Ellison and Trump." ECFS-5, SEC Misstatement/Non-Disclosure Allegations, Apr. 2025. https://www.fcc.gov/ecfs/search/search-filings/filing/10114274896342 |
| Settlement coincided precisely with FCC merger approval, indicating | "Paramount said late Tuesday that it had agreed to pay President Trump $16 million to settle his lawsuit … Some executives … saw the suit as a potential obstacle to finalizing a multibillion-dollar acquisition by Skydance, which requires approval from the Trump administration." NY Times, July 2, 2025. https://www.nytimes.com/2025/07/02/business/media/paramount-trump-60-minutes-lawsuit.html |

| | |
|---|---|
| regulatory duress | |
| Additional SEC 8-K filing confirms merger material events July 2025 | "Paramount filed 8-Ks in early July tied to material events dated July 2, 2025." https://www.stocktitan.net/sec-filings/PARAA/8-k-paramount-global-reports-material-event-0ce84e96d4a1.html |
| Ellison statement: did not confirm side deal; Skydance claims not involved in settlement | "David Ellison declined to say whether there is a side deal for free advertising; reiterates Skydance wasn't involved in Paramount's $16M settlement." Variety, Aug. 7, 2025. https://variety.com/2025/tv/news/david-ellison-comments-skydance-side-deal-trump-free-advertising-1236480770/ |
| Shari Redstone offered prospective TikTok minority stake as part of | "During private meetings across 2024 and 2025, offered Shari Redstone … a prospective minority stake in TikTok as a quid pro quo for approving the Skydance acquisition." NY Times, Aug. 15, 2025. https://www.nytimes.com/2025/08/15/business/media/shari-redstone-paramount-skydance-interview.html |

| | |
|---|---|
| merger negotiation | |
| FCC filings and congressional letters corroborate omissions, alleged quid pro quo | "Schiff, Letter to FCC on Paramount-Skydance Merger, Aug. 21, 2025" https://www.schiff.senate.gov/wp-content/uploads/2025/08/25.08.18-Sen.-Schiff-Letter-to-FCC-on-Paramount-Skydance-Merger.pdf |
| Exclusive-dealing, bid protections, and removal of Paramount General Counsel suppressed rival bid | "On June 6, 2024, after LiveVideo left a voicemail for Paramount General Counsel … NAI (via Redstone) directed abrupt termination, removing the only executive willing to consider LiveVideo's July 5, 2024 proposal." ECFS-8, Request to Reopen/Reconsider Merger Clearance. https://www.fcc.gov/ecfs/search/search-filings/filing/10605106239395 |